# UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

## Docket No. 15-1429

---

Robert Draper, Ariel Weisberg, Donna Major, Eric Notkin, Robert Boudrie and Brent Carlton (collectively the "CONSUMERS"); Concord Armory, LLC and Precision Point Armory, LLC (collectively the "DEALERS"), and Second Amendment Foundation, Inc.

*Plaintiffs – Appellants*

v.

MAURA HEALEY, in her capacity as
The Attorney General of the Commonwealth of Massachusetts

*Defendant – Appellee*

---

ON APPEAL FROM A JUDGMENT OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS
Civil Action No. 1:14-CV-12471-NMG

---

## BRIEF OF PLAINTIFFS-APPELLANTS

---

**Alexander Aron Flig**
Law Office of Alexander A. Flig
1st Circuit No. 1169830
BBO No. 669132
490 Chapman Street, Suite 201
Canton, Massachusetts 02021
(781) 352-7260

# TABLE OF CONTENTS

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD ......................................... 1

JURISDICTIONAL STATEMENT ...................................................................... 2

ISSUES PRESENTED .................................................................................... 3

STATEMENT OF THE CASE ............................................................................ 4

    I.   RELEVANT FACTS.............................................................................. 4

        A.  The Massachusetts Two-Layered Statutory and Regulatory Scheme for Retail Sales and Transfers of Handguns ................................. 4

            1.  The STATUTE ...................................................................... 4

            2.  The REGULATION ................................................................. 5

        B.  Glock Handguns .......................................................................... 6

            1.  Glock Handguns are Firearms in Common Use ........................... 6

            2.  Gen3/4 Glock Handguns Use "Load Indicators" That are *Virtually Identical* to Those of Other Handguns the AG has Tacitly Approved for Sale in Massachusetts ................................ 7

        C.  The CONSUMERS Could Not Acquire Gen3/4 Glock Pistols from the DEALERS Because the DEALERS Were Uncertain About Their Compliance with the REGULATION and Feared an Enforcement Action by the AG ......................................................................... 7

        D.  The DEALERS' and CONSUMERS' Requests for Clarification to the AG Regarding Gen3/4 Glock Pistols' Compliance With the REGULATION and the AG's Responses Thereto ................................. 9

            1.  The AG Responded That There is Ample Information About Why She Proclaimed Gen3/4 Glock Pistols REGULATION Noncompliant ..................................................................... 9

      2. The Sources of Information to Which the AG Directed Inquiries Regarding Why *She* Proclaimed Gen3/4 Glock Handgun "Load Indicators" REGULATION Noncompliant Provide No Such Information........................................................ 10

II. PROCEDURAL HISTORY ................................................................ 12

III. RULINGS BY THE DISTRICT COURT ....................................... 13

SUMMARY OF ARGUMENT ................................................................ 15

ARGUMENT ................................................................................................ 23

I. STANDARD OF REVIEW ................................................................ 23

   A. De Novo Standard of Review for a Rule 12(b)(6) Motion to Dismiss ........................................................................................ 23

   B. Abuse of Discretion Standard of Review .................................. 24

II. ORGANIZATIONAL STANDING ..................................................... 25

   A. The District Court Relied on Inapplicable Authorities to Deny SAF Organizational Standing Through the Standing of its Members ............................ 25

   B. Facts Alleged in the Complaint and in SAF's Affidavit Establish SAF's Organizational Standing........................................ 26

III. FACIAL VOID-FOR-VAGUENESS CHALLENGE ...................... 29

   A. The District Court Analyzed the DEALERS' Facial Vagueness Challenge Through a Flawed Analytical Framework........................ 29

   B. The District Court Misapplied the Salerno "No Set of Circumstances" Analytical Framework for Facial Challenges ............ 32

   C. The District Court Converted the Defendant AG's Rule 12(b)(6) Motion to Dismiss into a Rule 56 Motion for Summary Judgment, But Without Affording Plaintiffs A Reasonable Opportunity to Present All Pertinent Material ........................ 33

   D. The District Court Misapplied the Doctrine of Stare Decisis to the Improperly Admitted and Irrelevant Fact Evidence........................ 35

E.   The Standard for Facial Vagueness Challenges and the REGULATION's Complete Failure to Meet that Standard................................... 37

IV. AS-APPLIED VOID-FOR-VAGUENESS CHALLENGE ............................................... 42

A.   The District Court's Conclusion that the DEALERS Had Notice and Knowledge That Gen3/4 Glock Pistols are REGULATION Noncompliant is Based on a False Factual Assumption and on an Inapplicable Legal Authority...................................................................... 43

B.   The District Court Concluded That the Words Defining "Load Indicator" are Constitutionally Valid Without Referring to Any Facts or Legal Authorities.................................................................................. 45

C.   The District Court's Flawed Analysis ............................................................ 48

D.   The District Court Did Not Rule Whether the REGULATION is Unconstitutionally Vague As Applied to Gen3/4 Glock Pistols................. 50

V.  VIOLATION OF THE SECOND AMENDMENT ........................................................ 53

A.   The District Court Issued Rulings on a Moot Cause of Action ................... 54

B.   The District Court Violated the Article III Canon of Prohibiting Advisory Opinions ........................................................................................... 55

1.   The District Court's First Advisory Ruling ................................................... 56

2.   The District Court's Second Advisory Ruling............................................... 57

a.   Wrong and Nonexistent Facts............................................................... 57

b.   Flawed Analysis....................................................................................... 59

3.   The District Court's Third Advisory Ruling .................................................. 64

C.   The District Court Violated the Canon of Constitutional Avoidance........................ 64

CONCLUSION ........................................................................................................... 66

---

# TABLE OF AUTHORITIES

## Cases

ACLUM v. Conf. of Catholic Bishops
705 F. 3d 44, 52 (1st Cir. 2013)..............................................................................54, 64

Animal Welfare Inst. v. Martin
623 F.3d 19, 25 (1st Cir. 2010)............................................................................ 25

Auer v. Robbins
519 U.S. 452, 462 (1997)........................................................................................ 51

Bartlett v. IRS
749 F.3d 1 (1st Cir. 2014) ....................................................................................... 34

Bell Atl. Corp. v. Twombly
550 U.S. 544, 570 (2007).................................................................................16, 23

Bennett v. Spear
520 U.S. 154, 168 (1997)........................................................................................ 23

Boateng v. InterAmerican Univ., Inc.
210 F. 3d 56, 60 (1st Cir. 2000)............................................................................ 34

Cablevision of Boston, Inc. v. Pub. Improvement Comm'n
184 F.3d 88, 96 (1st Cir. 1999)............................................................................. 24

Camreta v. Greene
564 U.S. ___, 131 S. Ct. 2020, 2045 (2011) .................................................... 65

Chafin v. Chafin
568 U.S. ___, 133 S. Ct. 1017, 2023 (2013) ................................................ 20, 54, 55

Charlesbank Equity Fund II v. Blinds to Go
    370 F. 3d 151, 158 (1st Cir. 2004) .............................................................................. 24

Chicago v. Morales
    527 U.S. 41 (1999) ..........................................................................................17, 37

Christopher v. SmithKline Beecham Corp.
    132 S. Ct. 2156, 2166 (2012)............................................................................... 51

City of Los Angeles v. Patel
    Supreme Court 2015 (No. 13-1175) ....................................................................17, 32

Coates v. Cincinnati
    402 U.S. 611, 614 (1971)................................................................................... 41

Crooker v. Magaw
    41 F. Supp. 2d 87, 92 (D. Mass. 1999) ................................................................30, 31

Culhane v. Aurora Loan Servs. of Neb.
    708 F.3d 282, 289 (1st Cir. 2013) ......................................................................... 25

Debnam v. FedEx Home Delivery
    766 F.3d 93, 96 (1st Cir. 2014)...........................................................................23, 29

Decotiis v. Whittemore
    635 F. 3d 22, 33 (1st Cir. 2011) ........................................................................... 53

District of Columbia v. Heller
    554 U.S. 570 (2008)....................................................................................passim

FCC v. Fox Television Stations, Inc.
    567 U.S. ___ 132 S. Ct. 2307, 2317 (2012) ..........................................................63, 66

Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.
    528 U.S. 167, 181 (2000)................................................................................... 25

FW/PBS, Inc. v. Dallas
  493 U.S. 215 (1990)...................................................................................................... 26

García-Catalán v. United States
  734 F.3d 100, 103 (1st Cir. 2013) ............................................................................... 23

Gately v. Massachusetts
  2 F.3d 1221, 1227 (1st Cir.1993)................................................................................. 35

Grayned v. City of Rockford
  408 U.S. 104, 108-109 (1972)....................................................................................... 66

Hoffman Estates v. Flipside, Hoffman Estates, Inc.
  455 U.S. 489, 497 (1982)............................................................................................... 37

Houlton Citizens' Coal. v. Town of Houlton
  175 F.3d 178, 184 (1st Cir.1999).................................................................................. 23

Johansen v. U.S.
  506 F.3d 65 (1st Cir. 2007) ....................................................................................55, 57

Kampfer v. Cuomo
  993 F. Supp. 2d 188, 196 (N.D.N.Y. 2014) ................................................................ 60

Kerin v. Titeflex Corp.
  770 F. 3d 978, 981 (1st Cir. 2014) ............................................................................... 27

Love v. Butler
  952 F.2d 10, 13 (1st Cir. 1991)..................................................................................... 32

Lujan v. Defenders of Wildlife
  504 U.S. 555, 560-61 (1992) ......................................................................................... 23

Mangual v. Rotger-Sabat
  317 F.3d 45, 60 (1st Cir.2003)...................................................................................... 54

McInnis-Misenor v. Me. Med. Ctr.
    319 F.3d 63, 67 (1st Cir. 2003) ........................................................... 25


North Carolina v. Rice
    404 U.S. 244, 246 (1971) (per curiam) ............................................. 55


Ocasio-Hernández v. Fortuño-Burset
    640 F. 3d 1, 17 (1st Cir. 2011) ........................................................... 27


Overseas Military Sales Corp. v. Giralt-Armada
    503 F.3d 12, 17 (1st Cir. 2007) ........................................................... 55


Pitonyak v. State
    253 S.W.3d 834, 845 (Tex. App. 2008) ..................................... 34, 36, 37


Powell v. Tompkins
    Docket No. 13-1310 (1st Cir. 2015) ................................................ 61, 63


Reno v. American Civil Liberties Union
    521 U.S. 844, 884 – 885 (1997) ........................................................... 31


Rosario-Urdaz v. Rivera-Hernandez
    350 F.3d 219, 221 (1st Cir. 2003) ....................................................... 24


Rosaura Bldg. Corp. v. Municipality of Mayaguez
    778 F.3d 55 (1st Cir. 2015) ................................................................. 23


Smilow v. Southwestern Bell Mobile Sys., Inc.
    323 F.3d 32, 37 (1st Cir.2003) ...................................................... 24, 28


Smith ex rel. Smith v. Bryco Arms
    33 P.3d 638, 641 (N.M. App. 2001) ......................................... 33, 36, 37


Summers v. Earth Island Inst.
    555 U.S. 488, 498-99 (2009) ......................................................... 25, 26

United States v. Cardales-Luna
   632 F. 3d 731, 734 (1st Cir. 2011) ..........................................................................17, 35

United States v. Williams
   553 U.S. 285 (2008)............................................................. 39, 40, 46, 47, 51

United States v. Diaz-Bastardo
   929 F.2d 798, 799 (1st Cir.1991)........................................................................... 35

United States v. Salerno
   481 U.S. 739, 745 (1987)...............................................................17, 18, 32, 40

United States v. Zhen Zhou Wu
   711 F.3d 1, 15 (1st Cir. 2013) cert. denied sub nom.
   Yufeng Wei v. United States, 134 S. Ct. 365 (2013)................................................43, 44, 45

Waste Mgmt. Holdings, Inc. v. Mowbray
   208 F.3d 288, 295 (1st Cir. 2000) ..................................................................... 26

Wilson v. HSBC Mortg. Services, Inc.
   744 F. 3d 1, 7 (2015)..............................................................................................23, 27

Wis. Right to Life, Inc. v. FEC
   546 U.S. 410, 411-12 (2006) (per curiam)............................................................ 42

Woods v. Wells Fargo Bank, N.A.
   733 F.3d 349, 353 (1st Cir. 2013) ..................................................................... 23

## Statutes

28 U.S.C. § 1291......................................................................................................................2

28 U.S.C. § 1331......................................................................................................................2

28 U.S.C. § 1343(a)(3) ........................................................................................... 2

42 U.S.C. § 1983 .................................................................................................... 2

M.G.L. c.93A §9(3A) ............................................................................................. 5

M.G.L. c.140 §123 ................................................................................................. 4

## Rules

F.R.C.P. Rule 12(b)(6) ................................................................................. passim

F.R.C.P. Rule 12(c) ................................................................................................ 34

F.R.C.P. Rule 12(d) ......................................................................................... 17, 34

F.R.C.P. Rule 56 .......................................................................................... 26, 34, 35

## Regulations

§16.01 ....................................................................................................................... 5

§16.05(3) .................................................................................................................. 5

940 CMR 16.00 .................................................................................................. 4, 5

# Constitutional Provisions

U.S. Constitution, Article III, § 2, clause 1 ................................................................................20, 55

# REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

Pursuant to Local Rule 34.0, plaintiffs-appellants respectfully request oral argument on the issues and facts contained in this brief and its accompanying addendum. In light of the importance of the Constitutional issues in the case, the complex weave of the Massachusetts Attorney General's theories and factual nuances, oral argument will assist the Court's review.

# JURISDICTIONAL STATEMENT

The Federal District Court for the District of Massachusetts had subject matter jurisdiction over this matter pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331 and 1343(a)(3) because this matter involved constitutional issues under the Second and Fourteenth Amendments to the U.S. Constitution.

This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1291 because the District Court's 5 March 2015 grant of the Defendant's Motion to Dismiss (Addendum #1) disposed of all of the Plaintiffs' claims, constituting a final judgment (Addendum #2). Plaintiffs timely filed their Notice of Appeal on 3 April 2015 (entered on 14 April 2015). Addendum #3.

# ISSUES PRESENTED

1.      Must an organizational plaintiff asserting standing through the standing of its members actually identify those members at the pleadings stage (e.g. complaint or in response to an F.R.C.P. Rule 12(b)(6) motion to dismiss), even if it provides substantially detailed information regarding its members affected by a challenged regulation and proffers to provide identifying information about such members during discovery?

2.      Is a regulatory design requirement facially void-for-vagueness if it is comprised of words so subjective that it provides an enforcement agency opportunity to negate *any* attempt at compliance, or contra-correspondingly, renders non-compliance impossible because *anything* will meet the standardless design requirement?

3.      Does an agency's summary proclamation of compliance or noncompliance of one among several identical implementations of a standardless regulatory design requirement provide constitutionally adequate notice to those subject to it of what is permitted and what is prohibited?

4.      Does a federal district court's ruling on an issue that is not before the court, or about which there is no dispute between the parties, constitute an impermissible advisory opinion?

*///*

# STATEMENT OF THE CASE

## I.  RELEVANT FACTS

### A.  The Massachusetts Two-Layered Statutory and Regulatory Scheme for Retail Sales and Transfers of Handguns

Massachusetts firearms dealers may sell or transfer to eligible Massachusetts residents only those handguns that comply with *two independent standards*:  (1) M.G.L. c.140 §123 (the "STATUTE"), and (2) the Massachusetts Attorney General's ("AG") <u>Handgun Sales Regulation</u> codified at 940 CMR 16.00, *et seq.* (the "REGULATION").  Addendum #12.  They may not sell or transfer any handgun that does not comply with the STATUTE *and* the REGULATION.  Complaint ¶¶20 – 21.

### 1.  The STATUTE

The STATUTE prohibits sales of handguns in Massachusetts which do not comply with enumerated design or performance criteria.  The STATUTE requires the Executive Office of Public Safety and Security ("EOPSS"), an executive branch agency, to publish a list of handguns complying with the STATUTE's requirements (but not those of the REGULATION) in a quarterly document known as the <u>Approved Firearms Roster</u>.  Complaint ¶¶22 – 23 (Addendum #4a, 62–77).

The EOPSS <u>Approved Firearms Roster</u> admonishes Massachusetts firearms dealers that inclusion of a handgun on the <u>Approved Firearms Roster</u> does *not* mean that it complies with the Attorney General's ("AG") REGULATION (Complaint ¶¶25):

"Massachusetts licensed firearms dealers should note that the transfers of handguns are also subject to the Attorney General's Handgun Sales Regulations, 940 CMR 16.00, *et seq.* Firearms on this Approved Firearms Roster do not necessarily comply with the requirements of the Attorney General's Handgun Sales Regulations. Information about those regulations, as well as the Enforcement Notice may be obtained from the Office of the Attorney General and may be accessed on the website of the Attorney General (www.ago.state.ma.us)."

## 2. The REGULATION

The REGULATION includes several design requirements that are not in the STATUTE, among which is that pistols (handguns that employ magazines to feed cartridges) contain a "load indicator". Addendum, 338. The REGULATION at §16.01 defines a "load indicator" as "a device which plainly indicates that a cartridge is in the firing chamber within the handgun." Id., ¶27 (Addendum, 335).

The enabling statute for the Handgun Sales Regulation is Chapter 93A of the Massachusetts General Laws, commonly known as the "Consumer Protection Act". Addendum, 339. The REGULATION at §16.05(3) provides (with very limited exception) that it is *per se* a violation of Chapter 93A for a firearms dealer to "transfer or offer to transfer to any customer located within the Commonwealth any handgun which does not contain a load indicator or magazine safety disconnect." Violation of Chapter 93A exposes the violator to double or treble damages and reimbursement of attorney fees. M.G.L. c.93A §9(3A). Complaint ¶32.

///

**B. Glock Handguns**

**1. Glock Handguns are Firearms in Common Use**

Pistols manufactured by Glock, Inc. of Smyrna, Georgia are some of the most common—if not *the* most common—handguns in use throughout the United States. Glock pistols are enormously popular due to their widely reputed quality, reliability and ability to function under adverse conditions. Complaint ¶34. Indeed, Glock pistols enjoy an amazing 65% market share of handguns used by U.S. law enforcement agencies, from local police departments (including many in Massachusetts) to the BATFE itself. Id., ¶34.2. Glock pistols are prized for their reliability and accuracy by competitive shooters, almost invariably dominating the list of production handguns used in most popular national and international sport shooting competitions. Id., ¶34.1. Glock pistols are extremely popular self-defense firearms because of their simplicity and reliability, contributing to the fulfillment of the core purpose of the Second Amendment right. Id., ¶34.2, District of Columbia v. Heller, 554 U.S. 570, 630 (2008).

Like many other popular handgun manufacturers, Glock offers a variety of handguns models. Unlike other manufacturers, however, Glock handguns are distinguished primarily by their size and caliber of ammunition they use; otherwise (with few exceptions) *all* Glock pistol models are nearly identical in design—they are scaled up or scaled down versions of the same pistol. Id., ¶35.

Third Generation ("Gen3") and Fourth Generation ("Gen4") Glock handguns were introduced in 1998 and 2010, respectively.  Id., ¶36.  *Virtually **ALL** production Gen3/4 Glock handguns* (that are not designed and sold strictly to law enforcement, military and/or government agencies) *comply with the requirements of the STATUTE and are therefore included on the EOPSS <u>Approved Firearms Roster</u>.*  Id., ¶38.

### 2. Gen3/4 Glock Handguns Use "Load Indicators" That are *Virtually Identical* to Those of Other Handguns the AG has Tacitly Approved for Sale in Massachusetts

The defendant AG has tacitly approved an array of "load indicator" implementations on handguns lawfully sold in Massachusetts.  Complaint, ¶69.2 and exhibits thereto (Addendum #4a, 152–181).  In particular, she has not objected to the extractor-based "load indicator" implementations of several handgun makes and models that are *virtually identical* to Gen3/4 Glock pistols, including Kahr Arms pistols (all models) (Addendum, 172–174), Heckler & Koch USP and P-series of pistols (Addendum, 176–177) and Beretta 92-series of pistols (Addendum, 179–181).  Complaint ¶¶69.3.A – C, and exhibits thereto.

### C. The CONSUMERS Could Not Acquire Gen3/4 Glock Pistols from the DEALERS Because the DEALERS Were Uncertain About Their Compliance with the REGULATION and Feared an Enforcement Action by the AG

Appellants Robert Draper, Ariel Weisberg, Donna Major, Eric Notkin, Robert Boudrie and Brent Carlton (collectively the "CONSUMERS") all are Massachusetts residents duly licensed to acquire and possess firearms in Massachusetts.

Complaint, ¶¶6.1 – 6.6.  Though the CONSUMERS are a diverse group of individuals they all have extensive knowledge of and experience with firearms.  Complaint, ¶¶39.2, 40.2, 41.2, 42.2., 43.2 and 44.2.

Business entity appellants, Precision Point Firearms, LLC and Concord Armory, LLC (collectively the "DEALERS"), both hold federal and state firearms dealer licenses.[1]  Complaint, ¶¶5.1 – 5.2.  Both DEALERS hold federal Type 07 licenses ("Title 1 manufacturer of firearms and ammunition, who may also act as dealer") and both are licensed Massachusetts gunsmiths.[2]  Addendum, 115 & 117.

Each of the CONSUMERS sought to acquire a Gen3/4 Glock pistol from one or both of the DEALERS.[3]  Complaint, ¶¶39.1, 40.1, 41.1, 42.1., 43.1 and 44.1, and exhibits thereto.  The DEALERS, however, rejected every one of the CONSUMERS' solicitations.  Complaint, ¶¶45 – 50 and exhibits thereto.  *In each instance the DEALERS cited their confusion over Gen3/4 Glock pistols' compliance with the REGULATION and feared an enforcement action by the AG should she disagree with*

---

[1]     The federal Bureau of Alcohol, Tobacco, Firearms and Explosives ("BATFE") issues several types of federal firearms licenses.  FFLs doing business in Massachusetts must also be licensed as firearms dealers by EOPSS.

[2]     The DEALERS' federal Type 07 licenses and Massachusetts gunsmith licenses permit the DEALERS to manufacture, alter and/or modify firearms.

[3]     The CONSUMERS did not seek to purchase pistols directly from Glock, Inc. because Glock, Inc. does not have a federal firearms license in Massachusetts (nor a Massachusetts firearms dealer license).  Thus, pursuant to both federal and Massachusetts law Glock, Inc. cannot transfer firearms to Massachusetts residents.

*the DEALERS' reasoned opinion that Gen3/4 Glock pistols comply with the REGULATION.*  Complaint, ¶¶51 – 52 and exhibits thereto.

### D. The DEALERS' and CONSUMERS' Requests for Clarification to the AG Regarding Gen3/4 Glock Pistols' Compliance With the REGULATION and the AG's Responses Thereto

The DEALERS and CONSUMERS sought clarification directly from the AG regarding Gen3/4 Glock handguns' compliance with the REGULATION.  Each wrote a letter to the AG asking whether Gen3/4 Glock pistols comply with the REGULATION and if not, *why* not.  Complaint, ¶¶53 – 60 and exhibits thereto.  The AG sent responses to all of the CONSUMERS and DEALERS (Complaint, ¶63 and exhibits thereto) in which she wrote:

> "The handguns presently manufactured by Glock, Inc. ("Glock") are not in compliance with the Massachusetts Handgun Sales Regulations, *because they lack an effective load indicator* or magazine safety disconnect."  [Emphasis in italics.]

### 1. The AG Responded That There is Ample Information About Why She Proclaimed Gen3/4 Glock Pistols REGULATION Noncompliant

The AG's response to CONSUMER Brent Carlton's letter of inquiry regarding Gen3/4 Glock pistols' regulatory compliance (Complaint, ¶64 and exhibit thereto):

> "Handgun dealers in Massachusetts have *clear information* on this point *from Glock, EOPSS, and this Office*, and are operating on more than the 'rumor and speculation' you refer to in your letter when they inform prospective purchasers that Glock firearms cannot legally be sold to civilians in Massachusetts."  [Emphasis in italics.]

The AG responded to the DEALERS' inquiries regarding Gen3/4 Glock pistols' regulatory compliance (Complaint, ¶¶61 – 62 and exhibits thereto):

> "If you are unsure whether a handgun on the EOPS (sic) roster meets the additional safety requirements of our Office's regulations, you should contact the *manufacturer*, who should be able to provide you with that information." [Emphasis in italics.]

To DEALER Precision Point Firearms, LLC the AG wrote that her Office "has been clear and consistent in our communications to dealers and consumers about the reason that Glock firearms do not comply with the Regulations". Complaint ¶70.2.

## 2. The Sources of Information to Which the AG Directed Inquiries Regarding Why *She* Proclaimed Gen3/4 Glock Handgun "Load Indicators" REGULATION Noncompliant Provide No Such Information

Prior to her responses to the plaintiffs' requests for clarification regarding Gen3/4 Glock pistols' compliance with the REGULATION, *none* of the DEALERS and *none* of the CONSUMERS had ever received *any* communications from the AG, including "the reason that Glock firearms do not comply with the Regulations".

EOPSS, to whom the AG directed the plaintiffs' inquiries regarding *why* she proclaimed Gen3/4 Glock pistols' "load indicators" REGULATION noncompliant *explicitly disclaims responsibility for **any** handgun's compliance with the REGULATION* and expressly directs users back to the AG's website for that guidance. Complaint, ¶70.3. The AG's website, in turn, yields exactly *one (1)* result for the search term "Glock", *unrelated to any issue in this lawsuit.* Id., ¶66 and exhibits thereto.

Finally, the AG redirected the DEALERS' and CONSUMERS' inquiries to "Glock, Inc.", the "manufacturer, who should be able to provide you with that information". But Glock, Inc. is a private entity who is not subject to the REGULATION and who has no known legal duty to inform the DEALERS or CONSUMERS whether any of their products comply with any Massachusetts law or regulation.

///

///

///

///

///

///

///

///

## II. **PROCEDURAL HISTORY**

Plaintiffs filed their complaint on 11 June 2014. The defendant AG filed her motion to dismiss the complaint on 22 August 2014. Plaintiffs filed their opposition ("OPPOSITION") to the AG's motion to dismiss on 12 September 2014. The AG obtained leave of court and filed a response ("RESPONSE") to the plaintiffs' OPPOSITION on 2 October 2014 and the plaintiffs, too, obtained leave of court and filed a reply thereto ("REPLY") on 24 October 2014.

*Amicus curiae* Brady Center to Prevent Gun Violence ("BRADY") obtained leave of court and filed a brief in support of the AG's motion to dismiss on 6 October 2014. Plaintiffs filed their opposition to BRADY's amicus brief on 31 October 2014.

A hearing on the AG's motion to dismiss was held on 19 February 2015. BRADY did not participate in the hearing. The District Court issued its memorandum and order ("Dismissal Memorandum") (Addendum #1), and order of dismissal (Addendum #2), on 5 March 2015. The plaintiffs timely filed their notice of appeal.

///

///

///

# III. RULINGS BY THE DISTRICT COURT

Massachusetts Federal District Court made the following eight (8) rulings in dismissing the complaint on the AG's F.R.C.P. Rule 12(b)(6) motion to dismiss:

1. Organizational plaintiff Second Amendment Foundation, Inc. ("SAF") lacks standing through the standing of its members because SAF "has not identified [ ] any specific members who have attempted to purchase Glocks in the Commonwealth or who were dissuaded from selling Glocks because of the regulation." Dismissal Memorandum, p. 5 – 6.

2. The DEALERS' facial void-for-vagueness challenge to the REGULATION's definition of "load indicator" fails the Salerno "no set of circumstances" standard because the "defendant offered several examples of firearms where it is clear that they word fail to meet the regulation's standards." Dismissal Memorandum, p. 10.

3. The Court "conclude[d] that the plaintiffs' knowledge and receipt of actual notice that the Gen3/4 Glock pistols are [REGULATION] noncompliant defeat their as-applied challenge to the regulation." Dismissal Memorandum, p. 12.

4. "The plaintiffs' argument that the AG never explained why the Glock load indicators fail the regulatory standard is irrelevant to the constitutional vagueness challenge [because] [t]he vagueness doctrine is concerned with whether the plaintiffs, as people of ordinary intelligence, can determine if the Gen3/4 Glock pistols comply with the regulation and not with why or how the AG reached her conclusion." Dismissal Memorandum, p. 13.

5.      "The regulatory language at issue here, 'a device which plainly indicates,' is composed of words in common usage and with common meaning.  The words are straightforward both individually and in context because they describe that the purpose of a load indicator in a handgun is to inform a user unequivocally that the gun is loaded.  The Court concludes that the language of the regulation provides clear guidance for and fair notice to firearms dealers of ordinary intelligence."  Dismissal Memorandum, p. 13 – 14.

6.      "The [REGULATION] fits comfortably among the categories of regulation that <u>Heller</u> suggested would be 'presumptively lawful' because it 'impos[es] conditions and qualifications on the commercial sale of arms.'"  Dismissal Memorandum, p. 16.

7.      "The regulation does not substantially burden the right to bear arms in self-defense in one's home because the ban on two kinds of Glock pistols in no way prevents citizens from obtaining a wide array of firearms."  Dismissal Memorandum, p. 16 – 17.

8.      "Even if the regulation did  impinge on Second Amendment rights, the Court finds that it passes constitutional muster under any standard of scrutiny [because] [t]he defendant has demonstrated a strong showing of a 'substantial relationship' between the restrictions imposed by the regulation and the important government objective of protecting the safety of its citizens."  Dismissal Memorandum, p. 17.

///

# SUMMARY OF ARGUMENT

## Preamble

The core issue in this case is whether the words "device which plainly indicates", as they are used in the REGULATION to define the "load indicator" alternative design requirement for pistols sold in Massachusetts, meet the Fourteenth Amendment due process standard of clarity to provide fair notice of what complies and what does not comply with the "load indicator" alternative design requirement. Derivative of that issue is the burden on the Second Amendment right of the CONSUMERS, who cannot acquire Gen3/4 Glock pistols ("firearms in common use") because of the chilling effect the unconstitutionally vague definition of "load indicator" has on the DEALERS' firearm sales.

## Organizational Standing

Organizational plaintiff Second Amendment Foundation, Inc. ("SAF) sought to participate in this lawsuit through the standing of its Massachusetts dealer and consumer members. The District Court ruled that SAF did not establish organizational standing through the standing of its members because it did not, at the Rule 12(b)(6) stage, identify any individual members who were affected by the unconstitutional vagueness of the REGULATION.

The District Court erred by relying on an inapplicable authority holding that an organization seeking standing through injury to its members must identify

individual injured members by the Rule 56 motion for summary judgment stage, *after* discovery has developed the facts.

The District Court also ignore well-established authority that the plausibility requirement for pleadings "simply calls for enough fact to raise a *reasonable expectation that discovery will reveal evidence* of the [alleged fact]."  <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 566 (2007)  (emphasis in italics).  SAF's affidavit provided detailed numbers and specific injuries alleged by its Massachusetts members and the plaintiffs promised to identify individual injured members during discovery. Because discovery would readily have provided the necessary information the District Court abused its discretion by prematurely rejecting SAF's standing.

## Dealers' *Facial* Void for Vagueness Challenge

The DEALERS alleged that the words "device which plainly indicates", as they are used in the definition of the REGULATION's "load indicator" alternative design requirement, are so vague that neither they nor anyone else can determine with reasonable certainty whether *any* implementation of "load indicator" complies or does not comply.  This ambiguity, they argue, created the circumstances for the AG to proclaim, without explanation (and refusal to explain), that Gen3/4 Glock pistols' "load indicator" are noncompliant while tacitly approving virtually identical "load indicator" implementation of several other makes and models of pistols sold in Massachusetts.

The District Court dismissed the DEALERS' facial void for vagueness claim by relying on an outdated authority that facial void for vagueness claims are limited primarily to the First Amendment.  In <u>Chicago v. Morales</u>, 527 U.S. 41, 55 (1999), however, the Supreme Court declared that "[w]hen vagueness permeates the text of [ ] a law, it is subject to facial attack."  In <u>City of Los Angeles v. Patel</u>, No. 13-1175, (22 June 2015) the Supreme Court declared that "[it] has allowed [facial] challenges to proceed under a diverse array of constitutional provisions," including the Second Amendment (referring to <u>District of Columbia v. Heller</u>, 554 U.S. 570 (2008)).

The District Court also based its dismissal of the DEALER's facial void for vagueness claim on the infamous "no set of circumstances" standard of <u>United States v. Salerno</u>, 481 U.S. 739, 745 (1987).  The District Court admitted dicta from two out-of-circuit state appellate cases as *fact evidence* of examples of "applications under which the REGULATION would not be vague".

First, per F.R.C.P. Rule 12(d), the District Court converted the AG's Rule 12(b)(6) motion to dismiss into a Rule 56 motion for summary judgment by admitting fact evidence from outside of the pleadings.  However, the District Court did not affording the plaintiffs an opportunity to refute the admitted *fact evidence* as Rule 12(d) requires.

Second, even with the improperly admitted *fact evidence*, "stare decisis demands that two panels faced with the same *legal* question and identical facts reach the same outcome."  <u>U.S. v. Cardales-Luna</u>, 632 F. 3d 731, 734 (1st Cir. 2011).

Neither of the two cases relied on by the District Court have any *factual* or *legal* issues in common with one another, or with the facts or legal issues in this case. One was a products liability case and the other a prosecution for murder. Neither case dealt with any regulatory compliance requirements for load indicators or anything else for that matter. In short, the cases cited by the District Court as examples of "applications under which the REGULATION would not be vague" under the Salerno "no set of circumstances" standard are completely different and have no stare decisis effect whatsoever in this case.

Moreover, the Supreme Court in <u>Johnson v. US</u>, No. 13-7120 (26 June 2015) struck down a law as void for vagueness despite recognizing that "there will be straightforward cases" in which proper application of the law is clear. Indeed, the <u>Johnson</u> Court, rejected the commonly misapplied <u>Salerno</u> "requirement of vagueness in all applications", calling it a "tautology: If we hold a statute to be vague, it is vague in all its applications (and never mind the reality)."

**Dealers' *As-Applied* Void for Vagueness Challenge**

The District Court dismissed the DEALERS' as-applied void for vagueness claim based on *standing*: "the [DEALERS'] knowledge and receipt of actual notice that the Gen3/4 Glock pistols are noncompliant [with the REGULATION]" defeat their as-applied challenge.

The District Court fundamentally erred by *presuming* the correctness of the AG's baseless conclusion that Gen3/4 Glock pistols' "load indicators" are *actually*

REGULATION noncompliant, thereby attributing to the DEALERS "actual knowledge" of that *presumed* noncompliance from the AG's responses to their letters of inquiry. Thus, the District Court implicitly issued a *factual finding* that Gen3/4 Glock pistols' "load indicators" *are* REGULATION noncompliant *without itself* confronting how the challenged words "device which plainly indicates" apply to Gen3/4 Glock pistols' "load indicators".

Relying on the fact that "civil regulations that govern commercial conduct are held to a lower standard than criminal statutes in the vagueness analysis", the District Court concluded that the challenged words "device which plainly indicates" in the definition of "load indicator" are "straightforward both individually and in context because they describe [ ] the purpose of a load indicator…" The District Court, however, did not refer to any facts, legal authorities, industry standards or anything else to explain how the *purpose* of the REGULATION's "load indicator" alternative design requirement establishes a *standard* of compliance *as applied to Gen3/4 Glock pistols.*

## CONSUMERS' Second Amendment Claim

The CONSUMERS alleged that the DEALERS declined their solicitations to buy Gen3/4 Glock pistols (firearms in common use) because the unconstitutional vagueness in the REGULATION caused the DEALERS to fear an enforcement action by the AG should she disagree with their reasoned opinion that Gen3/4 Glock pistols do comply with the REGULATION. Thus, the CONSUMERS' Second Amendment

claim is entirely derivative of and dependent on the DEALERS' Fourteenth Amendment claim.

The CONSUMERS' Second Amendment claim was mooted upon the District Court's dismissal of the DEALERS' Fourteenth Amendment due process claims. Accordingly, *all* of the District Court's Second Amendment related rulings were improper because there was no "live" Second Amendment controversy for the District Court to resolve.  <u>Chafin v. Chafin</u>, 568 U.S. __, 133 S. Ct. 1017, 2023 (2013). Indeed, the District Court's rulings and findings regarding all Second Amendment related issues amounted to "advisory opinions" prohibited by Article III of the Constitution.  Finally, the District Court's rulings and findings regarding all Second Amendment related issues violated the canon of constitutional avoidance because recognizing the mootness of the CONSUMERS' Second Amendment claim upon the dismissal of the DEALERS' Fourteenth Amendment claim was the far simpler and easier alternative to deciding substantive constitutional issues.

*///*

*///*

*///*

*///*

## The Analytical Lens Through Which to Review the
## District Court's Rulings:  Their *Practical* Result

The District Court's dismissal of the DEALERS' facial and as-applied void-for-vagueness challenges to the REGULATION's definition of "load indicator" (especially so at the pleading stage *before* discovery) is best viewed through its practical result: The definition stands.  The District Court concluded words "device which plainly indicates…" in the definition of "load indicator" "is composed of words in common usage and with common meaning … [and] are straightforward both individually *and in context*…"  (Emphasis in italics.)  The District Court, however, made no mention at all of the "context" in which these "words in common usage and with common meaning" translate *in practice* into the constitutionally required notice of *what* implementation of "load indicator" complies and which does not comply?  While finding clarity in the words themselves, the District Court completely avoided the real world standard of compliance totally standardless.

> "[The] supposed requirement of vagueness in all applications is not a requirement at all, but a tautology:  If we hold a statute to be vague, it is vague in all its applications (*and never mind the reality*).  <u>Johnson v. United States</u>, Docket No. 13-7120, 576 U.S. ___ (decided 26 June 2015) (emphasis in italics) (Addendum #13).

Both DEALERS are Type 07 FFLs (licensed manufacturers) and gunsmiths.  Addendum, 115 & 117.  Now that the District Court has ruled that the words "device which plainly indicates" are "straightforward both individually and in context", *what* must the DEALERS do to render Gen 3/4 Glock pistols REGULATION compliant?  Are

they to paint some unspecified component or components of the pistols some color or other or some combination of colors?  Are they to drill a hole in the base of the firing chamber?  Are they to thicken, extend, serrate or smooth the tab on the extractor that protrudes from the slide when the extractor engages the rim of a cartridge?  Are they to attach a -depth gauge to be inserted into the barrel to check for the presence of a cartridge?  *What* are they to do?  What guidance do the DEALERS—anyone—have to render Gen 3/4 Glock pistols REGULATION complaint if the District Court's ruling that the words a "device which plainly indicates…" is all the guidance they need?

> "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved;  but rather the indeterminacy of precisely *what* that fact is."  <u>U.S. v. Williams</u>, 553 U.S. 285, 306 (2008), emphasis in italics.

///

///

///

///

# ARGUMENT

## I.  <u>STANDARD OF REVIEW</u>

### A.  De Novo Standard of Review for a Rule 12(b)(6) Motion to Dismiss

"We review the district court's grant of a Rule 12(b)(6) motion de novo." <u>Wilson v. HSBC Mortg. Services, Inc.</u>, 744 F. 3d 1, 7 (2015) (string cite omitted). "The de novo standard of review does not limit [the Court of Appeal] to the district court's rationale…" <u>Rosaura Bldg. Corp. v. Municipality of Mayaguez</u>, 778 F.3d 55 (1st Cir. 2015) (string cite omitted).

"In deciding whether the district court properly dismissed a claim, we ask whether the complaint 'state[s] a claim to relief that is plausible on its face,' accepting the plaintiff's factual allegations and drawing all reasonable inferences in the plaintiff's favor." <u>Debnam v. FedEx Home Delivery</u>, 766 F.3d 93, 96 (1st Cir. 2014) (string cite omitted).  "In determining whether a complaint crosses the plausibility threshold, 'the reviewing court [must] draw on its judicial experience and common sense.'" <u>García-Catalán v. United States</u>, 734 F.3d 100, 103 (1st Cir. 2013) (string cite omitted).  "This context-specific inquiry does not demand 'a high degree of factual specificity.'" <u>Id.</u>

> "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim." <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1992) (internal quotation marks omitted) .

## B.  Abuse of Discretion Standard of Review

An abuse of discretion exists when the district court makes an error of law (Rosario-Urdaz v. Rivera-Hernandez, 350 F.3d 219, 221 (1st Cir. 2003)), or "relies significantly on an improper factor, omits a significant factor, or makes a clear error of judgment in weighing the relevant factors."  Smilow v. Southwestern Bell Mobile Sys., Inc., 323 F.3d 32, 37 (1st Cir.2003)."  Abuse of discretion is a deferential standard of review, and the deference it entails is most appropriate with respect to issues of judgment and the balancing of conflicting factors.  Cablevision of Boston, Inc. v. Pub. Improvement Comm'n, 184 F.3d 88, 96 (1st Cir. 1999).

"Even then, however, appellate courts must be careful to ensure that deference does not mutate into blind allegiance."  Charlesbank Equity Fund II v. Blinds to Go, 370 F. 3d 151, 158 (1st Cir. 2004).

> "The trial court's discretion is not unbridled and '[a]buse occurs when a material factor deserving significant weight is ignored, when an improper factor is relied upon, or when all proper and no improper factors are assessed, but the court makes a serious mistake in weighing them.'"  Id. (internal citation omitted).

"An error of law is, of course, always an abuse of discretion."  Id., citing Rosario-Urdaz v. Rivera-Hernandez, *supra*, at 221.


///


///

## II. <u>ORGANIZATIONAL STANDING</u>

"Standing is ... a threshold question in every case...."  <u>McInnis-Misenor v. Me. Med. Ctr.</u>, 319 F.3d 63, 67 (1st Cir. 2003).  "Because the question of whether certain facts establish standing is a question of law, we review the district court's resolution of the issue de novo."  <u>Culhane v. Aurora Loan Servs. of Neb.</u>, 708 F.3d 282, 289 (1st Cir. 2013).

For an organization to sue on behalf of its members, it must show that

> "(1) at least one of its members would have standing to sue as an individual, (2) 'the interests at stake are germane to the organization's purpose,' and (3) individual members' participation is not necessary to either the claim asserted or the relief requested."

<u>Animal Welfare Inst. v. Martin</u>, 623 F.3d 19, 25 (1st Cir. 2010) (string cite omitted).

In the instant matter, the District Court ruled *at the motion to dismiss stage* that organizational plaintiff SAF did not establish standing to sue through the standing of its members because "[SAF] has not identified any specific members" who were allegedly injured by the REGULATION.  Dismissal Memorandum, p. 5.

### A. The District Court Relied on Inapplicable Authorities to Deny SAF Organizational Standing Through the Standing of its Members

The District Court relied on <u>Summers v. Earth Island Inst.</u>, 555 U.S. 488, 498-99 (2009) to deny SAF standing to sue through the standing of its members, quoting

> "... 'the affidavit provided by the [organization] to establish standing would be insufficient *because it did not name the individuals who were harmed by the challenged [regulation]*'".  Dismissal Memo, p. 5 (emphasis in italics).

The language quoted by the District Court from <u>Summers</u> originates from <u>FW/PBS, Inc. v. Dallas</u>, 493 U.S. 215 (1990) where at p. 235 the Supreme Court provided context for its ruling (with emphasis in italics): "*Following expedited discovery*, petitioners' constitutional claims were resolved through cross-motions for *summary judgment*."

But in this case *no discovery of any kind had been accomplished when the District Court dismissed SAF for lack of standing*. More importantly, the District Court's ruling was on the AG's Rule 12(b)(6) motion to dismiss, not at the never-reached *fact-developed* Rule 56 motion for summary judgment stage. "Nowhere in Summers did the Court require 'naming the affected member' at the initial pleading stage, nor is 'motion to dismiss' mentioned anywhere in the decision." RESPONSE, 1–2 (Addendum #8, 257–258).

"An abuse of discretion [ ] occurs if the court adopts an incorrect legal rule." <u>Waste Mgmt. Holdings, Inc. v. Mowbray</u>, 208 F.3d 288, 295 (1st Cir. 2000). The District Court abused its discretion by adopting the legal rule applicable to Rule 56 motions for summary judgment to deny SAF standing at the much more forgiving Rule 12(b)(6) motion to dismiss stage.

### B. Facts Alleged in the Complaint and in SAF's Affidavit Establish SAF's Organizational Standing

"When reviewing a pre-discovery grant of a motion to dismiss for lack of standing, 'we accept as true all well-pleaded fact[s] ... and *indulge all reasonable*

*inferences' in the plaintiff's favor*." <u>Kerin v. Titeflex Corp.</u>, 770 F. 3d 978, 981 (1st Cir. 2014) (internal citations omitted, emphasis in italics).  "[W]here ... standing is at issue we may consider '"further particularized allegations of fact deemed *supportive of [plaintiffs'] standing*,"' such as those contained within an affidavit." <u>Wilson v. HSBC Mortg. Services, Inc.</u>, 744 F.3d 1, 7 (1st Cir. 2014) (internal and string cites omitted, emphasis in italics).  "The requirement of plausibility on a motion to dismiss under Rule 12(b)(6) 'simply calls for enough fact to *raise a reasonable expectation that discovery will reveal evidence* of the [complained of conduct].'" <u>Ocasio-Hernández v. Fortuño-Burset</u>, 640 F. 3d 1, 17 (1st Cir. 2011) (string cite omitted, emphasis in italics).

SAF's affidavit listed detailed numbers of its Massachusetts members, and of those, the number who "contacted SAF ... specifically regarding the Massachusetts Handgun Sales Regulation."  Addendum #6b, 243 – 246.  Indeed, the District Court even quoted directly from ¶7 of SAF's affidavit that SAF "claims to have 8,066 'members and supporters' in Massachusetts, of which 1,847 are current paid members".  Dismissal Memorandum, p. 5.  Inexplicably, however, the District Court ignored SAF's "further particularized allegations of fact deemed supportive of [it's] standing" in the affidavit's very next paragraph (¶8):  "Approximately 40 to 70 SAF members have contacted SAF within the past year specifically regarding the Massachusetts Handgun Sales Regulation that is at issue in this lawsuit."

The District Court also ignored the even more "particularized allegations of fact" in ¶9 of SAF's affidavit:

> "Many of SAF's [firearms dealer] members … cannot determine whether they may sell or transfer Gen3/4 Glock pistols to Massachusetts residents, or as [SAF's] Massachusetts resident[ ] [members] want to but cannot purchase Gen3/4 Glock pistols because of … the Massachusetts Handgun Sales Regulation."

The District Court seemingly disregard of SAF's explicit promise to "comply with [discovery] requests asking for the identification of [SAF's] members and/or supporters described in [its] declaration…" RESPONSE, 2 (Addendum #8, 258).

An abuse of discretion exists when the district court "… makes a clear error of judgment in weighing the relevant factors." <u>Smilow v. Southwestern Bell Mobile Sys.</u>, *supra*, at 37. With so many detailed facts alleged in the Complaint and in SAF's affidavit—sans only the names of particular members  but with the express promise to provide that information during discovery—the District Court made a clear error of judgment that there was no reasonable expectation that "*discovery will reveal evidence* of [specific SAF members]" whose standing would provide standing to SAF.

///

///

///

# III. FACIAL VOID-FOR-VAGUENESS CHALLENGE

### A. The District Court Analyzed the DEALERS' Facial Vagueness Challenge Through a Flawed Analytical Framework

"In deciding whether the district court properly dismissed a claim, we ask whether the complaint 'state[s] a claim to relief that is plausible on its face,' *accepting the plaintiff's factual allegations and drawing all reasonable inferences in the plaintiff's favor*." Debnam v. FedEx Home Delivery, *supra*, 96 (emphasis in italics). At the *motion to dismiss stage* claims are presumptively to be kept alive.

But the District Court, citing Washington State Grange v. Washington State Republican Party, 552 U.S. 442, 450 (2008), framed its analysis of the DEALERS' facial challenge from the opposite, *negative perspective*:

> "As a preliminary matter, facial challenges are typically disfavored because they 'often rest on speculation,' which lead to the risk of premature interpretation of statutes and regulations." Dismissal Memorandum, p. 9.

There is no risk of "speculation" here because the DEALERS' facial invalidity claim does not rest on speculation; it rests on the AG's *final proclamation* that Gen 3/4 Glock pistols' "load indicators" are not REGULATION compliant. Indeed, the AG was and remains unequivocal about the *clarity* of her REGULATION, as she wrote to CONSUMER Brent Carlton that "Handgun dealers in Massachusetts have *clear information* on this point…" and to DEALER Precision Point Firearms, LLC that her Office "has been *clear and consistent* … about the *reason* that Glock firearms do not comply with the Regulations". Complaint ¶70.2 (emphasis in italics).

The AG's defense of the *clarity* of her REGULATION is her final stance. She adamantly refused and refused to explain **what**, *pursuant to the REGULATION*, she concluded renders Gen3/4 Glock "load indicators" "not effective", and deflected all further inquiries on the subject to another executive branch agency, EOPSS, *which explicitly directs that inquiry back to the defendant AG*! Complaint ¶70.3(a) and exhibit thereto. More incredibly, the AG redirected such inquiries to Glock, Inc., a private party who is not subject to the REGULATION, does not have any known legal duty or authority to render such judgments, and has no known public enforcement authority.[4] Finally, the Complaint at ¶¶ 65–66 and the exhibits thereto thoroughly document the "clear information on this point from ... this Office": there is _**none whatsoever**_. The AG's determined *avoidance* of this entire issue eliminates any risk of "speculation".

Nor is there any risk of "premature interpretation" here. Citing <u>Crooker v. Magaw</u>, 41 F. Supp. 2d 87, 92 (D. Mass. 1999), the AG argued in her motion to dismiss (Addendum #5, p. 198) that "generally speaking, administrative agencies do not have an enforceable obligation to perform this sort of advisory mission..." The District Court in <u>Crooker</u>, however, stated quite plainly that the case before it concerned a "plaintiff [who] merely expresses a desire to take some action *in the future* and wishes to know whether he will be breaking the law." <u>Id.</u>, 92.

---

[4] The deflection of questions regarding regulatory compliance to a private party is, in its own right, an unlawful abdication of the defendant AG's *governmental* authority and inherent *state* police power vested solely in the defendant AG's *public* office. Complaint, ¶71.

"[D]eclaratory judgment actions cannot be used to obtain answers to hypothetical questions." Id., 92. In contrast, the DEALERS in this case did not make hypothetical inquiries of the AG; they asked why—what *criteria* the AG used—to proclaim Gen3/4 Glock pistols *presently* noncompliant.

But even this discussion is superfluous. The DEALERS argued and argue that *any* interpretation of "load indicator" is impermissible because the REGULATION's use of the words "device which plainly indicates" *in the context in which they are used* is so standardless that any interpretation is actually a ***rewriting*** of the REGULATION.

> "In considering a facial challenge, this Court may impose a limiting construction on a statute only if it is 'readily susceptible' to such a construction... This Court 'will not rewrite a ... law to conform it to constitutional requirements.'" Reno v. American Civil Liberties Union, 521 U.S. 844, 884 – 885 (1997) (internal and string cite omitted).

The District Court read into Washington State Grange, *supra*, that which is not there and omitted critical dicta. Contrary to the District Court's reliance on Washington State Grange for avoiding facial challenges to "statutes and regulations", that case dealt only with *statutes—**not** regulations*. "[F]acial challenges threaten to short circuit the *democratic process* by preventing *laws* embodying the *will of the people* from being implemented in a manner consistent with the Constitution.'" Id., 451 (emphasis in italics, internal quotations omitted.) But the risk of "short circuit[ing] the democratic process" is not present regarding regulations—*executive agency* pronouncements—as opposed to *statutes* which are the result of the

legislative "*democratic process*".  The District Court's entire analytical framework of the DEALERS' facial challenge was from the wrong perspective.

### B. The District Court Misapplied the Salerno "No Set of Circumstances" Analytical Framework for Facial Challenges

Relying on the now infamous language from <u>United States v. Salerno</u>, 481 U.S. 739, 745 (1987) that for a "regulation to be facially void, plaintiffs must prove that 'no set of circumstances exists under which the [regulation] would be valid'" (Dismissal Memorandum, p. 8), the District Court enunciated that "so long as there is some application under which the regulation would *not* be vague, a facial vagueness claim cannot stand." <u>Id.</u>, 10.

Adopting the AG's motion to dismiss authority <u>Love v. Butler</u>, 952 F.2d 10, 13 (1st Cir. 1991), the District Court quoted that "vagueness challenges to statutes not threatening First Amendment interests are examined in light of the facts of the case at hand;  the statute is judged on an as-applied basis."  In <u>City of Los Angeles v. Patel</u>, No. 13-1175 (22 June 2015), however, the Supreme Court elucidated the *current* state of the law regarding the breadth of facial challenges:

> "[T]he [Supreme] Court has allowed [facial] challenges to proceed under a diverse array of constitutional provisions.  *See*, e.g., <u>Sorrell v. IMS Health Inc.</u>, 564 U.S. __ (2011) (First Amendment);  <u>District of Columbia v. Heller</u>, 554 U.S. 570 (2008) (Second Amendment);  <u>Chicago v. Morales</u>, 527 U.S. 41 (1999) (Due Process Clause of the Fourteenth Amendment);  <u>Kraft Gen. Foods, Inc. v. Iowa Dept. of Revenue and Finance</u> 505 U. S. 71 (1992) (Foreign Commerce Clause).  ¶ Fourth Amendment challenges ... are no exception."

An even younger case, <u>Johnson v. US</u>, No. 13-7120 (26 June 2015) struck down the residual clause of the Armed Career Criminal Act as void for vagueness despite recognizing that "there will be straightforward cases" in which the application of the clause is clear. Slip Op. 10. The Supreme Court explained:

> "[A]lthough statements in some of our opinions could be read to suggest otherwise, our *holdings* squarely contradict the theory that a vague provision is constitutional merely because there is **some** conduct that clearly falls within the provision's grasp." <u>Id.</u> at p. 11, original emphasis in italics, local emphasis in bolded text.

The Supreme Court further expressly rejected a "requirement of vagueness in all applications", calling it a "tautology: If we hold a statute to be vague, it is vague in all its applications (and never mind the reality)." <u>Id.</u>, 12.

A regulation is void-for-vagueness if it "fails to give ordinary people fair notice of the conduct it punishes, or [is] so standardless that it invites arbitrary enforcement." <u>Johnson</u>, 3. If anything, that standard is more exacting in this case because of the burden on the CONSUMERS' Second Amendment right.

### C. The District Court Converted the Defendant AG's Rule 12(b)(6) Motion to Dismiss into a Rule 56 Motion for Summary Judgment, But Without Affording Plaintiffs A Reasonable Opportunity to Present All Pertinent Material

The "defendant [ ] offered" and the District Court admitted as ***fact evidence*** "several examples of firearms where it is clear that they would fail to meet the regulation's standards". Dismissal Memorandum, p. 10. From <u>Smith *ex rel.* Smith v. Bryco Arms</u>, 33 P.3d 638 (N.M. App. 2001) , cited by the AG in her motion to dismiss

(Addendum, 191), the District Court admitted dicta "[T]he J-22 handgun does not incorporate a ... a 'chamber load indicator,'..." as *fact evidence*.  From <u>Pitonyak v. State</u>, 253 S.W.3d 834, 845 (Tex. App. 2008) cited by the AG in her motion to dismiss (Addendum, 191) the District Court, too, admitted dicta "The pistol in question did not have ... a loading indicator to show that a bullet is in the firing chamber" as *fact evidence*.  This *evidence* of "applications under which the REGULATION would not be vague" was the District Court's basis for dismissing the DEALERS' facial vagueness challenge.

F.R.C.P. Rule 12(d) requires a district court to advise the parties if, in ruling on a Rule 12(b)(6) motion to dismiss, it is taking into consideration materials outside the pleadings:

> "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.  All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."

It is not required to "mechanistically enforce the requirement of express notice of a district court's intention to convert a Rule 12(b)(6) motion into a motion for summary judgment" (<u>Bartlett v. IRS</u>, 749 F.3d 1 (1st Cir. 2014)) as long as "the opponent has received the [evidence], has had an opportunity to respond to [it], and has not controverted [its] accuracy."  <u>Boateng v. InterAmerican Univ., Inc.</u>, 210 F. 3d 56, 60 (1st Cir. 2000).

But the District Court did not inform the parties of its intention to convert the defendant AG's Rule 12(b)(6) motion to dismiss into a Rule 56 motion for summary judgment by treating *dicta* from cases cited by the defendant AG as *fact evidence* in *this* case. The Plaintiffs were not afforded an opportunity to "controvert[ ] [the] accuracy" of the evidence of "several examples of firearms ... that [ ] would fail to meet the regulation's standards" that the "defendant has offered." Dismissal Memorandum, p. 10.

### D. The District Court Misapplied the Doctrine of Stare Decisis to the Improperly Admitted and Irrelevant Fact Evidence

In general, "accepted principles of stare decisis militate strongly in favor of resolving identical points in the same way for identically situated defendants." United States v. Diaz-Bastardo, 929 F.2d 798, 799 (1st Cir.1991). "Even the narrowest conception of stare decisis demands that two panels faced with the same *legal* question and identical facts reach the same outcome." U.S. v. Cardales-Luna, 632 F. 3d 731, 734 (1st Cir. 2011) (original emphasis, internal citations omitted). "[A] decision dependent upon its underlying facts is not necessarily controlling precedent as to a subsequent analysis of the same question on different facts and a different record." Gately v. Massachusetts, 2 F.3d 1221, 1227 (1st Cir.1993).

"[T]he *exact same* evidence" admitted for a particular purpose in an earlier case may be stare decisis in a subsequent case, but only for the *same legal issue*. Cardales-Luna, at 735 (emphasis in italics).

The District Court in the instant matter did not parallelize the "*legal* question" in this case (constitutionality of the REGULATION's *definition* of "load indicator") with the *legal* questions in in <u>Smith</u> and <u>Pitonyak</u>.  Nor could it.

<u>Smith</u> was a products liability case.  The text quoted and relied upon by the District Court reads, *in context* (with the text **omitted** by the District Court in bolded italics):

> **"Plaintiff raises strict products liability and negligence theories of recovery** ...  predicated upon the fact that [t]he J-22 handgun does not incorporate ... a 'chamber load indicator' ... alerting users *that the J-22 can fire even though the magazine has been removed*." <u>Id.</u>, 641.

<u>Smith</u> is otherwise silent about its *definition* of "chamber load indicator".  The purpose of the "chamber load indicator" in this products liability case was different than that of the REGULATION's in this case.  For what it's worth, New Mexico does not have a "chamber load indicator" requirement for firearms.

<u>Pitonyak</u> was a murder case in which the appellant argued that he could not have had the intent to murder when he pulled the trigger of his handgun (identified only as a ".380 semiautomatic pistol") because he had not checked and therefore did not know whether it was loaded.  The text quoted and relied upon by the District Court reads, *in context* (with the text **omitted** by the District Court in bolded italics):

> "**[Pitonyak] also cites the testimony of defense firearms expert Edward Hueske, who testified that** the pistol in question did not have a safety or a loading indicator to show that a bullet is in the firing chamber." <u>Id.</u>, 845.

There is *nothing* more in <u>Pitonyak</u> regarding *what*, according to "firearms expert Edward Hueske", constitutes a "loading indicator", how it is defined by Texas law and/or regulation (it is not) or anything else about this contraption mentioned only twice *in passing*. Nothing indicates that anyone even asserted that the *unidentified* handgun *had* a "loading indicator".

*Neither* the law nor the facts in <u>Smith</u> and <u>Pitonyak</u> are remotely related to anything in the instant matter. The District Court made an error of law in admitting their dicta as fact evidence and relying on them for some form of stare decisis.

### E. The Standard for Facial Vagueness Challenges and the REGULATION's Complete Failure to Meet that Standard

"A law that does not reach constitutionally protected conduct and therefore satisfies the overbreadth test may nevertheless be challenged on its face as unduly vague, in violation of due process." <u>Hoffman Estates v. Flipside, Hoffman Estates, Inc.</u>, 455 U.S. 489, 497 (1982). "To the extent we have consistently articulated a clear standard for facial challenges, it is *not* the <u>Salerno</u> formulation, *which has never been the decisive factor in any decision of this Court, including <u>Salerno</u> itself*...." <u>Chicago v. Morales</u>, 527 U.S. 41, 54, fn. 22 (1999) (emphasis in italics). "In reviewing a business regulation for facial vagueness ... the principal inquiry is whether the law affords fair warning of what is proscribed." <u>Hoffman</u>, 503. "[W]e have struck down statutes that tied criminal culpability to whether the defendant's conduct was 'annoying' or 'indecent'–wholly *subjective* judgments *without statutory definitions,*

*narrowing context, or settled legal meanings*." <u>Williams</u>, *supra*, 304 (internal citations omitted, emphasis in italics).

There is nothing *whatsoever* that provides the DEALERS—or anyone else—with notice of what is permitted and what is proscribed by the words "device which plainly indicates" as they are used in the definition of "load indicator". Nowhere in the Massachusetts General Laws nor in the Code of Massachusetts Regulation is there *any* limiting construction for the words "device," "plainly," and "indicate" as they are used alone or in any combination in the "narrowing context" of firearms. Opposition, 15-16 (Addendum #6, 226–227).

- **Mr. Flig (Hearing Transcript 18:19 – 24) (Addendum #11, 317):**

  "Your Honor, I think, to make the issue clearer, we can go back to the old adage of a real estate adage, location, location, location. The words by themselves are straightforward, there's no argument with that. The context in which they are used makes them inherently vague.

"Device" is such an amorphous term that it can mean anything, including just "thing". The AG has not objected to a "load indicator" consisting of nothing more than a small hole at the base of a firing chamber allowing for its visual inspection (under certain conditions). Nor has she objected to a protruding tab at the top of a slide to serve as a "load indicator". The AG has not objected to an extractor-based "load indicator" that protrudes slightly from the slide when a cartridge is in the firing chamber (the mechanism employed by Glock pistols). Searching the REGULATION and its enabling statute for "precisely *what* that fact is" that transforms an ordinary thing into a REGULATION-compliant "device which plainly

indicates" (<u>U.S. v. Williams</u>, 553 U.S. 285, 306 (2008)) reveals that nothing requires that it be *built into to the pistol itself*.  A weight scale can allow for the comparison of the pistol's weight with and without a cartridge in the firing chamber.  A simple rod can "plainly indicate" the presence or absence of a cartridge based on how far down the barrel it can be inserted.

The REGULATION's vague use of the word "device" to define "load indicator" is made all the more glaring when analyzed next to the unobjectionable use of the same word in the REGULATION's definition of "magazine safety disconnect" in the same subsection.  Section 16.05(1) defines a "magazine safety disconnect" as "a *device* that prevents the firing of the handgun when the magazine is detached from the handgun". [Emphasis in italics.]  The clear *purpose* of this "device" shifts focus from what it must *be* to its unmistakable mission and binary *standard* by which its accomplishment can be ***measured***:  the "device" *either* prevents the firing of the handgun when the magazine is detached *or* it does not.  There is no grey area.  A cartridge cannot be "a little" fired or "a lot" fired.  *How* the magazine safety disconnect "device" accomplishes its mission, where it is located, what it actually is, its size, color, shape, etc. are not germane to whether it accomplishes its *unambiguous* mission measured by an equally unambiguous *standard*.

But the words "plainly indicates" are as hopelessly vague as "device" as used to define "load indicator".  One need not venture to extremes to conceive of a multitude of simple and very reasonable interpretations.  "Indicate" can be visual

and the adverb "plainly" can be from any range of distances and/or angles. "Indicate" can be audible and the adverb "plainly" can be any range of decibels and frequencies. "Indicate" can be tactile and the adverb "plainly" can be anything from feeling a slight projection with a bare fingertip to a sensation in the palm through a thick glove.

The REGULATION's definition of "load indicator" is less than standardless; it is *meaningless*. That is why the <u>Salerno</u> "no set of circumstances" standard is inapplicable. Indeed, the *opposite* of the <u>Salerno</u> standard is applicable: under "no set of circumstances" can any semi-automatic pistol (including Gen 3/4 Glock pistols ***not*** comply with the REGULATION's "load indicator" requirement because (1) the definition of "load indicator" is so vulnerable to "wholly *subjective* judgments *without statutory definitions, narrowing context, or settled legal meanings*" (<u>Williams</u>, *supra*, 304) that anything complies, or (2) more practically, *all semi-automatic pistols* have "load indicators" inherent in their design—the slide.[5]

The REGULATION is incurably vague, not in the sense that it requires conformance "to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all, [and] [a]s a result, 'men of

---

[5]     The slide is the top part of a semi-automatic pistol that moves to the rear during the operating cycle and returns to its starting position through spring tension. The slide houses the firing pin or striker and the extractor, and serves as the pistol's bolt. Pulling the slide back always exposes the firing chamber for both visual and tactile inspection. This is invariably the surest method (and many would strenuously argue the *only* method) to confirm the presence or absence of a cartridge in the firing chamber.

common intelligence must necessarily guess at its meaning.'" <u>Coates v. Cincinnati</u>, 402 U.S. 611, 614 (1971) (string cite omitted). "[T]he vice of the [REGULATION] lies not alone in its violation of the due process standard of vagueness[;] [t]he [REGULATION] also violates the constitutional right" of the CONSUMERS. <u>Id.</u>, 615.

The REGULATION's use of the words "device which plainly indicates" in the definition of "load indicator" render it incurably vague. Any interpretation is inherently an impermissible rewriting of the REGULATION because it has no narrowing context and is inherently susceptible to infinite interpretations. The Court should strike this portion of the REGULATION as facially void-for-vagueness, thus rendering it "vague in all its applications (and never mind the reality)." <u>Johnson</u>, *supra*, Slip Op. 12.

///

///

///

///

///

# IV. AS-APPLIED VOID-FOR-VAGUENESS CHALLENGE

An as-applied challenge does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right. Wis. Right to Life, Inc. v. FEC, 546 U.S. 410, 411-12 (2006) (per curiam). The facts underlying the plaintiffs' as-applied vagueness challenge—the AG's proclamation that Gen3/4 Glock pistols' "load indicators" are REGULATION noncompliant while tacitly permitting virtually identical "load indicators" on other pistols—are the manifestation of the arbitrary and capricious enforcement made possible by an unconstitutionally vague regulation as-applied to Gen3/4 Glock pistols.

The District Court dismissed the DEALERS's as-applied vagueness challenge because it concluded that: (1) "the plaintiffs' knowledge and receipt of actual notice that the Gen3/4 Glock pistols *are* noncompliant defeat their as-applied challenge to the regulation", and (2) "the language of the regulation provides clear guidance for and fair notice to firearms dealers of ordinary intelligence." Dismissal Memorandum, p. 12. Both conclusions are wrong. Moreover, the District Court did not actually rule whether the REGULATION is unconstitutionally vague as-applied to Gen3/4 Glock pistols.

*///*

**A. The District Court's Conclusion that the DEALERS Had Notice and Knowledge That Gen3/4 Glock Pistols are REGULATION Noncompliant is Based on a False Factual Assumption and on an Inapplicable Legal Authority**

The District Court dismissed the DEALERS' as-applied vagueness claim based on the ruling in <u>United States v. Zhen Zhou Wu</u>, 711 F.3d 1, 15 (1st Cir. 2013) cert. denied sub nom. <u>Yufeng Wei v. United States</u>, 134 S. Ct. 365 (2013) that "challengers of [a] regulation cannot claim they lacked fair notice [from an allegedly vague law] because they 'knew they were violating U.S. export regulations.'" Dismissal Memorandum, 12. The District Court concluded that "the plaintiffs' knowledge and receipt of actual notice that the Gen3/4 Glock pistols *are* noncompliant defeat their as-applied challenge to the regulation." <u>Id.</u>, italicized emphasis.

The District Court *assumed*—without referring to *any* facts or *any* legal authorities—that "Gen3/4 Glock pistols *are* [actually] noncompliant." This implicit factual "finding" is the baseless foundation for all of the District Court's erroneous rulings on the DEALERS' as-applied challenge. It appears that the District adopted the AG's *petitio principia* based syllogism in which she **presumed the answer to very question this lawsuit sought to resolve**. "There is no vagueness here and no injury that may be attendant to it" because "the Attorney General's Office *informed* the dealers ... that *these Glock pistols in fact violated the regulation*". Motion to dismiss, 5 (Addendum, 189). The plaintiff forcefully responded that:

> "[t]he sham logic leading to this false conclusion would require this Court to adopt the un-established premise that '*Glock pistols in fact violated the regulation*' as true because, just as the [AG] applied this

reasoning to the DEALERS, *she said so*." Opposition, 9, original emphasis (Addendum, 220).

The DEALERS did *not* have "knowledge … that the Gen3/4 Glock pistols are [regulation] noncompliant" (assuming their noncompliance was an established fact) *before* they made their inquiries of the AG. That is precisely *why* they sent letters to the AG pointedly asking for clarification. Addendum, 115 & 117. The DEALERS referred to "discussions with other dealers and distributors" from whom they formed an "*anecdotal* understanding that [Gen3/4 Glock pistols] are not compliant [with the REGULATION]" but without being able to "explain what features make them noncompliant".

The DEALERS did *not*, as the District Court stated, "admit that they were aware that the *regulation* foreclosed the transfer or sale of the Glock pistols at issue." The DEALERS admitted "that they were aware that [*the AG capriciously* ***proclaimed*** *that Glock pistols are regulation non-compliant which*] foreclosed the transfer or sale of the Glock pistols at issue."

The DEALERS did not gain knowledge from their "receipt of actual notice [AG's response letters] that the Gen3/4 Glock pistols are noncompliant." What the DEALERS received from the AG was "actual notice that [*the AG capriciously* ***proclaimed*** *that*] that the Gen3/4 Glock pistols are noncompliant."

Finally, the District Court's reliance on <u>U.S. v. Zhen Zhou Wu</u>, *supra*, is misplaced. The defendants in <u>U.S. v. Zhen Zhou Wu</u>

"... *repeatedly attempted to disguise* the fact that they were exporting to China and that *they lacked the necessary licenses* to do so—further evidence that the defendants *knew* they were violating U.S. export regulations when they shipped the phase shifters to China without government permission."  711 F.3d at 16, emphasis in italics.

In contrast, the DEALERS in this case did *not* sell or transfer any Gen3/4 Glock pistols to the CONSUMERS, were *actually* confused by an *actually* vague regulation made all-the-more-so confusing by the AG's baffling proclamation that Gen3/4 Glock pistols' "load indicators" are not REGULATION compliant while tacitly approving the virtually identical "load indicator" implementations of several other pistol makes and models.  The facts of Zhen Zhou Wu are completely different from the facts in this case.

### B. The District Court Concluded That the Words Defining "Load Indicator" are Constitutionally Valid Without Referring to Any Facts or Legal Authorities

The Complaint explicitly stated (¶69.3) and all of the plaintiffs' subsequent submissions to the District Court (including representations at the hearing on the AG's motion to dismiss) emphatically argued that the AG's unexplained proclamation that Glock "load indicators" are not REGULATION compliant—while permitting sales of other makes of pistols with virtually identical "load indicators"— amounted to a *proclamation* that only deepens the existing confusion of *what* is required to comply with the already hopelessly vague "load indicator" alternative design requirement.  Either they are all complaint or they are all noncompliant. "What renders a statute vague is not the possibility that it will sometimes be difficult

to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely *what* that fact is." <u>U.S. v. Williams</u>, 553 U.S. 285, 306 (2008), emphasis in italics.

The District Court ruled that "[t]he words ['a device which plainly indicates'] are straightforward both individually and *in context because* they describe that the *purpose* of a load indicator in a handgun is to inform a *user* unequivocally that the gun is loaded." Dismissal Memorandum, p. 13-14, emphasis in italics.

First, ignoring the plaintiffs' opposition to the Brady Center's amicus brief, the District Court read into the REGULATION that which is not there, that the "load indicator's" intended audience is the *user*. The REGULATION does not specify the intended *audience* of the "load indicator". This is an *interpretation* by the District Court without reference to how (facts) or why (law) *based on the text of the REGULATION* it arrived at this interpretation—and more so, *without having considered evidence from either party* (because it dismissed the lawsuit before commencement of discovery).

Second, nowhere does the REGULATION require that the "load indicator" indicate "that the gun is loaded." The REGULATION requires whatever this contraption is supposed to be to "plainly indicate" that "there is a cartridge within the firing chamber of the handgun." A pistol can be considered "loaded" if a magazine with cartridges is in the pistol grip but there is no "cartridge within the firing chamber" (e.g. the pistol is not "in battery"). This interpretation by the

District Court, again, is without reference to how (facts) or why (law) *based on the text of the REGULATION* it arrived at this interpretation

Third, the fact that the "load indicator" alternative design requirement has a clear *purpose* but no standard for compliance does nothing to inform anyone— including the AG—*what* is required to comply with the REGULATION. U.S. v. Williams, *supra*. This is starkly manifested by the practical result of the District Court's ruling:

Both DEALERS are Type 07 FFLs ("Title 1 manufacturer of firearms and ammunition, who may also act as dealer") and are licensed gunsmiths in the Commonwealth of Massachusetts. Complaint Exhibits 15 & 16 (Addendum, 115 & 117). Each is licensed and capable to modify firearms, including Gen3/4 Glock pistols, to bring them into compliance with the REGULATION's "load indicator" alternative design requirement. Following the District Court's ruling that the words "device which plainly indicates" are "straightforward both individually and in context" because they "describe the purpose of a load indicator" and therefore provide constitutionally sufficient notice to the DEALERS what is required and what is forbidden to comply with the REGULATION, ***what should the DEALERS do to bring Gen3/4 Glock pistols into compliance?*** Should they make the Gen3/4 Glock "load indicators" longer or shorter? —thicker or thinner? —brighter or duller? — rougher or smoother? —paint them yellow, purple, orange or fire engine red? *Where* should that ***what*** "device which plainly indicates" be located on the pistol?

—on the right, left, top or bottom?  —on the slide or on the frame?  —at the muzzle or at the breach?  Should this **what** be visual, tactile, audible or some combination of each?  *How* will compliance of this **what** be *measured*?  With a ruler?  —a protractor?  —a depth gauge?  —a photometer?  —a scale?  —a sound meter?

The practical result of the District Court's faulty reasoning and fact-less premises is a self-evident morass of compliance and sanction for the AG to declare any implementation of "load indicator" noncompliant.

## C.  The District Court's Flawed Analysis

The District Court started its discussion of the DEALERS' as-applied vagueness challenge by stating that "Outside of the First Amendment context, the Court need only determine whether the regulation is vague as applied to the *particular facts at issue*, i.e. 'whether [plaintiffs] in fact had fair notice that the [regulation] proscribed their [proposed] conduct."  Dismissal Memorandum, 11 (emphasis in italics).  The District Court then analyzed the DEALERS' *as-applied* vagueness challenge (contrasted from their facial vagueness challenge) by focusing on the *DEALERS* rather than the "particular facts at issue", e.g. Gen3/4 Glock pistols:

> "[T]he vagueness doctrine is concerned with whether the *plaintiffs*, as people of ordinary intelligence, can determine if the Gen3/4 Glock pistols comply with the regulation and not with why or how the AG reached her conclusion."  Dismissal Memorandum, 13 (Addendum, 14), emphasis in italics.

But, the DEALERS' as-applied vagueness challenge is not about whether or how the REGULATION applies to *them* (a diversion from the kernel issue) but about how it applies to *Gen3/4 Glock pistols*. More specifically, the DEALERS claim that the REGULATION's use of the words "device which plainly indicates" in the definition of "load indicator" is vague as applied to Gen3/4 Glock pistols because it is impossible to determine *from the text* of the REGULATION *what* about Gen3/4 Glock pistols would render them REGULATION compliant or noncompliant.

Unable to discern *from the text* of the REGULATION why Gen3/4 Glock pistols' "load indicators" would *not* be compliant, the DEALERS sent letters of inquiry to the AG seeking clarification. They wanted to dispel rumors regarding the AG's position on Gen3/4 Glock pistol's compliance with the REGULATION and to learn what *criteria* she used to come to her conclusion regarding *those* pistols (as applied). The AG's hollow response, devoid of explanation, that Gen3/4 Glock pistol's "load indicators" are not "effective" and banned from sale in Massachusetts only deepened the DEALERS' confusion because the AG tacitly approved the virtually identical "load indicator" implementation of several other pistol makes and models.

The District Court's dismissal of the DEALERS' as-applied challenge based on the false premise that they had "knowledge and [ ] actual notice that the Gen3/4 Glock pistols are noncompliant" focused on the *DEALERS* instead of focusing on the application of the REGULATION to Gen3/4 Glock pistols. The District Court's

erroneous analysis avoided the issue entirely, rendering no ruling on the application of the REGULATION to Gen3/4 Glock pistols.

### D. The District Court Did Not Rule Whether the REGULATION is Unconstitutionally Vague As Applied to Gen3/4 Glock Pistols

Dismissing the DEALERS' as-applied challenge on the false premise that they had "knowledge and [ ] actual notice that the Gen3/4 Glock pistols are noncompliant" allowed the District Court to avoid having to *itself* confront whether Gen3/4 Glock pistols *actually* comply with the "device which plainly indicates" standard that the District Court concluded is constitutionally sound. In practicality, the District Court assumed the *correctness* of the AG's *proclamation* that Gen3/4 Glock pistols' "load indicators" are REGULATION noncompliant *without itself examining any facts whatsoever* that purportedly inform that assumption—***because there are none***. The AG never explained *what* about Gen3/4 Glock pistols' "load indicators" rendered them noncompliant in her opinion. The District Court, however, declared that "why or how the AG reached her conclusion" that Gen3/4 Glock pistols' "load indicators" are noncompliant is "irrelevant to the constitutional vagueness challenge." Dismissal Memorandum, 13 (Addendum, 14). The outcome is zero insight from the AG as to *what* about Gen3/4 Glock pistols' "load indicators" she determined renders them noncompliant and an implicit ruling by the District Court, without reference to any facts (because there are none) that the AG is correct.

Although the District Court correctly observed that "[i]n the field of regulatory statutes governing business activities, where the acts limited are in a narrow category, greater leeway is allowed" (Dismissal Memorandum, p. 13)

> "deference [to an agency] is [ ] unwarranted when there is reason to suspect that the agency's interpretation 'does not reflect the agency's fair and considered judgment on the matter in question… This might occur when … it appears that the interpretation is nothing more than a 'convenient litigating position' … or a 'post hoc rationalizatio[n]' advanced by an agency seeking to defend past agency action against attack.'"

Christopher v. SmithKline Beecham Corp., 132 S. Ct. 2156, 2166 (2012) (internal citations and quotations omitted).  The foregoing concerns deference to an agency interpreting its own vague regulation but in this case not only has the AG has not provided *any* interpretation of the words "device which plainly indicates" and *refuses* to do so, she also refuses to disclose (and the District Court has permitted her not to) the criteria she used to proclaim Gen3/4 Glock pistols' "load indicators" noncompliant.

Whether intentionally or inadvertently the AG did provide a glimpse *not* into *what* is required to comply with the REGULATION's hopelessly vague definition of "load indicator" (Williams, *supra*, at 306), but what about Gen3/4 Glock pistols' load indicators she determined renders them "not effective".  Even more remarkably, rather than describe how she came to her conclusion through a "fair and considered judgment on the matter in question" (Auer v. Robbins, 519 U.S. 452, 462 (1997)) the AG candidly revealed the extent of her analysis:  she pointed out the differences in

the "[p]*ictures* of the Glock load indicator device shown in Complaint exhibits 42 and 43", "*manual excerpts* [Complaint exhibits 39-41]", and "*appear[ance] from the exhibits….*"  Motion to Dismiss, 12 &14 (Addendum 196 &198).

///

///

///

///

///

///

///

///

///

# V. **VIOLATION OF THE SECOND AMENDMENT**

The CONSUMERS' Second Amendment claim is entirely derivative of the chilling effect on firearms transactions between the DEALERS and the CONSUMERS caused by the unconstitutional vagueness in the REGULATION.

> "The unconstitutionally vague and ambiguous 'load indicator' [alternative] design requirement of the Handgun Sales Regulation and the Attorney General's capricious conclusion that 3rd and 4th generation Glock pistols lack an 'effective load indicator' device have prevented the DEALERS and CONSUMERS from engaging in purchase and sale transactions of firearms in common use (i.e. Glock pistols) thereby directly infringing on the CONSUMERS' core fundamental rights protected by the Second Amendment." Complaint, ¶4.

To the extent the *absence* in the Complaint of *any* additional bases for the CONSUMERS' Second Amendment claim did not convey that unconstitutional vagueness was the *only* basis for their claim—"[o]ur review on a motion to dismiss is confined to the face of the complaint." <u>Decotiis v. Whittemore</u>, 635 F. 3d 22, 33 (1st Cir. 2011) — their explicit declaration should have foreclosed that question: "[T]he Complaint does not challenge … the REGULATION's "load indicator" requirement (*independent of its unconstitutionally vague definition*) is unconstitutional *per se*." OPPOSITION, 10, original emphasis (Addendum, 221).

The District Court understood that the CONSUMERS' Second Amendment claim was wholly derivative of, and contingent on, the DEALERS' Fourteenth Amendment due process claim. It was clear in all of the plaintiffs' submissions to

the Court and explicitly acknowledged at the oral hearing on the AG's motion to dismiss:

- **Court (Hearing Transcript 16:8 – 10):**

  "[P]lease clarify your position with respect to your Second Amendment claim.  Is it wholly derivative of your vagueness challenge or not?"

- **Mr. Flig (Hearing Transcript 17:19 – 21):**

  "[The CONSUMERS'] Second Amendment claim is in fact derivative of the Fourteenth Amendment due process claim by the dealer Plaintiffs."

## A.  The District Court Issued Rulings on a Moot Cause of Action

"There is [ ] no case or controversy, and a suit becomes moot, when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome."  <u>Chafin v. Chafin</u>, 568 U.S. ___, 133 S. Ct. 1017, 2023 (2013), (internal citations and quotation marks omitted).  "The doctrine of mootness enforces the mandate 'that an actual controversy must be extant at *all stages of the review, not merely at the time the complaint is filed.*'"  <u>Mangual v. Rotger-Sabat</u>, 317 F.3d 45, 60 (1st Cir.2003) (emphasis in italics).  Moreover, "[m]ootness is a ground which should ordinarily be decided *in advance of any determination on the merits.*"  <u>ACLUM v. Conf. of Catholic Bishops</u>, 705 F. 3d 44, 52 (1st Cir. 2013) (emphasis in italics).  But the District Court ignored these jurisdictional precepts and issued rulings on the CONSUMERS' moot Second Amendment claim.

The District Court's dismissal of the DEALERS' Fourteenth Amendment due process cause of action mooted the CONSUMERS' Second Amendment cause of

action upon which it was *wholly* predicated.  Nevertheless, the District Court issued three separate erroneous rulings on the mooted Second Amendment claim.

## B.  The District Court Violated the Article III Canon of Prohibiting Advisory Opinions

In addition to being moot the District Court's Second Amendment related rulings were improper advisory opinions.

"Article III of the Constitution restricts the power of federal courts to 'Cases' and 'Controversies.'"  Chafin v. Chafin, *supra*, 2023.  In so limiting the jurisdiction of the federal courts, Article III "ensures that courts do not render advisory opinions." Overseas Military Sales Corp. v. Giralt-Armada, 503 F.3d 12, 17 (1st Cir. 2007) (citing U.S. Const. art. III, § 2, cl. 1).  Federal courts may not "decide questions that cannot affect the rights of litigants in the case before them" or give "opinion[s] advising what the law would be upon a hypothetical state of facts."  Lewis v. Continental Bank Corp., 494 U.S. 472, 477, (1990).  The distinction between a "conclusive decree" and an "advisory opinion" was reiterated in Johansen v. U.S., 506 F.3d 65 (1st Cir. 2007) (string citations omitted, original emphasis):

> "The real value of the judicial pronouncement—what makes it a proper judicial resolution of a 'case or controversy' rather than an advisory opinion—is in the settling of some dispute *which affects the behavior of the defendant towards the plaintiff.*"

None of the District Court's three Second-Amendment-related rulings are related to the *only* Second Amendment-related issue in this lawsuit:  the *impact of*

*the unconstitutional vagueness in the REGULATION's definition of "load indicator" on the CONSUMERS' Second Amendment right.* In fact, the District Court ruled on issues specifically *disclaimed* by the plaintiffs.

### 1. The District Court's First Advisory Ruling

The District Court's first improper Second Amendment-related ruling was that the REGULATION meets constitutional muster because it is "among the categories of regulation that <u>Heller</u> suggested would be 'presumptively lawful' because it 'impos[es] conditions and qualifications on the commercial sale of arms.'" Dismissal Memorandum, 16 (Addendum, 17). Alas, the plaintiffs did not challenge the presumptive lawfulness of the REGULATION to regulate commercial sales of firearms. On the contrary, the plaintiffs explicitly demurred that the they do "not challenge … that the REGULATION's "load indicator" requirement (*independent of its unconstitutionally vague definition*) is unconstitutional *per se*." OPPOSITION, 10, original emphasis (Addendum, 221).

Moreover, the plaintiffs disentangled the AG's motion to dismiss conflation of the "presumptive validity of regulations over the 'commercial sale of arms' [from] the presumptive validity of the *implementation* and *impact* of such regulations." <u>Id.</u> "The *effect* of the REGULATION's unconstitutional vagueness on the DEALERS' commercial activity (sales of firearms) renders it impossible for the CONSUMERS to acquire [Gen3/4 Glock pistols]." <u>Id.</u>, 11. Whether the REGULATION is "'presumptively lawful' because it 'impos[es] conditions and qualifications on the

commercial sale of arms'" [Dismissal Memorandum, 16] is not the subject of this lawsuit;  this ruling by the District Court settles no "dispute *which affects the behavior of the defendant towards the plaintiff*."  Johansen v. U.S., *supra*.  It is a purely advisory opinion.

## 2.  The District Court's Second Advisory Ruling

The District Court's second improper Second Amendment-related ruling was that "[t]he regulation does not substantially burden the [Second Amendment] because the ban on two kinds of Glock pistols in no way prevents citizens from obtaining a wide array of firearms."  Dismissal Memorandum, 16 – 17.  The District Court erred both factually and in its legal analysis in this ruling.

### a.  Wrong and Nonexistent Facts

The District Court misapprehended the *plaintiffs'* alleged facts by adopting the *AG's misrepresentation* of the plaintiffs' alleged facts at p. 18 of her motion to dismiss, in which she wrote "plaintiffs themselves explain that although the regulation makes two models of handguns unmerchantable in Massachusetts…" Nowhere in any court submissions or at oral argument did the plaintiffs allege that "two kinds of Glock pistols" are at issue.  On the contrary, plaintiffs clearly alleged that **all** Gen3/4 models of Glock pistols listed on the EOPSS Approved Firearms Roster—of which there are ***53 (fifty three)*** models—are the subject of the Complaint.  Complaint, ¶38 and **Exhibit "1"** thereto.  Even if the District Court

misunderstood the allegation, it is one of a quantum order of severity regarding the *impact* of the REGULATION's unconstitutional vagueness.

Far more importantly, the District Court's conclusion that the "regulation does not substantially burden the [Second Amendment]…" presupposes that the plaintiffs allege that it *does* so burden "*independent of its unconstitutionally vague definition [of 'load indicator']*." OPPOSITION, 10. Yet again, nowhere in any court submissions or at oral argument did the plaintiffs claim that the REGULATION is unconstitutional *independent of its unconstitutional vague definition of "load indicator".*

The District Court declared that the REGULATION's burden on the Second Amendment is not "substantial[ ]", because (based on the incorrect assumption that the "ban [is] on *two* kinds of Glock pistols" [Dismissal Memorandum, 16]) it leaves a "wide array of firearms" available to the CONSUMERS that the AG did not ban—*yet* (*see* discussion below). That assumption about the availability of a "wide array of firearms" is unfounded because no evidence has been admitted regarding what pistols are *not* available because of the unconstitutionally vague REGULATION. Nor did the District Court articulate what *is* included in the "wide array of firearms" that it *assumed* remains available. The foregoing is the result of the District Court's dismissal of this lawsuit *prior* to developing the facts through discovery. This entire aspect of the District Court's ruling based on false assumptions and on never-presented evidence is just wrong.

### b. Flawed Analysis

Instead of focusing on the *vagueness* in the REGULATION and the challenged *conduct* which it makes possible (arbitrary and capricious enforcement), the District Court's Second Amendment burden analysis—conspicuously lacking any citation to legal authorities for its approach—focuses on the *non-categorical* impact (purportedly a "wide array of firearms" remains available) *despite* the REGULATION. By the District Court's logic, the REGULATION is cured of its unconstitutionality and/or the AG's ban of Gen3/4 Glock pistols is cured of its arbitrariness and capriciousness so long as alternative pistols remain available to the CONSUMERS: "The regulation does not substantially burden the right to bear arms ... *because [it] in no way prevents citizens from obtaining a wide array of firearms*." Dismissal Memorandum, 18 (Addendum, 17–18).

This is the exact *opposite* of the Second Amendment burden analysis prescribed by the Supreme Court in the now famous <u>District of Columbia v. Heller</u>, 554 U.S. 570 (2008) case. There, the Supreme Court sharply criticized Justice Breyer's proposed

> "... judge-empowering 'interest-balancing inquiry' that 'asks whether the statute burdens a protected interest in a way or to an extent that is *out of proportion* to the statute's salutary effects upon other important governmental interests.'" <u>Id.</u>, 634 (emphasis in italics).

Whether it is a "salutary effect" or a non-categorical arbitrary and capricious ban on certain brands or models of firearms, the discrete variable <u>Heller</u> unambiguously

excluded from the burden on constitutional rights analysis in general—and the Second Amendment in particular—is "*proportion[ality]*" between the offending law or regulation (and/or its enforcement) and its *result* or *impact*.[6]

> "We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding 'interest-balancing' approach. The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon. A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." Id., 634 – 635 (emphasis in the original).

The District Court also based its holding that the REGULATION "does not violate the Second Amendment… [because it] does not substantially burden the right to bear arms…" [Dismissal Memorandum, 16] on an inapplicable holding in a sister District Court. The District Court cited Kampfer v. Cuomo, 993 F. Supp. 2d 188, 196 (N.D.N.Y. 2014) which:

> "… dismiss[ed] a constitutional challenge to a state statute 'because the provisions at issue attempt only to decrease in number *certain firearms deemed particularly dangerous by the legislature for the sake of public safety*, which interests are clearly advanced by the legislation, they do not infringe the Second Amendment right to keep and bear arms." Dismissal Memorandum, 17 (emphasis in italics).

---

[6]     The Supreme Court expressly rejected this District Court's very reasoning that "[t]he regulation does not substantially burden the right to bear arms … *because [it] in no way prevents citizens from obtaining a wide array of firearms*." Dismissal Memorandum, 18 (Addendum, 17–18): "It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed." Heller, *supra*, 629.

But the plaintiffs did not challenge the *purpose* of the REGULATION, whatever it is (or the AG purports it to be), or whether the REGULATION *advances* whatever the AG purports it to advance. The plaintiffs specifically disclaimed such allegations: "[W]hether a regulatory 'load indicator' requirement is or is not closely or substantially related to an important or compelling government purpose ... is not the subject of the Complaint..." Opposition, 10. The District Court thus conflated a non-issue in this lawsuit—whether the REGULATION (assuming it meets constitutional *clarity* standards) fulfills its purported purpose—with its incorrect ruling that the DEALERS' Fourteenth Amendment due process cause of action fails because "[t]he words ['device which plainly indicates'] are straightforward both individually and in context."

This Court explained in <u>Powell v. Tompkins</u>, Docket No. 13-1310 (1st Cir. 2015) at footnote 9 that "[s]everal circuits have adopted a two-part framework for evaluating a claim of Second Amendment infringement in the post-<u>Heller</u> era" and "thus far [we] have ... hewed closely and cautiously to Heller's circumscribed analysis and holding."

> "Broadly speaking, some courts first consider whether the challenged law imposes a burden on conduct that falls within the scope of the Second Amendment's guarantee as historically understood, and if so, courts next determine the appropriate form of judicial scrutiny to apply (typically, some form of either intermediate scrutiny or strict scrutiny). [Multiple citations omitted.]" <u>Id.</u>

Applying the first prong of this framework to the facts of this case immediately exposes the incorrectness of the District Court's holding that the

REGULATION "does not violate the Second Amendment… [because it] does not substantially burden the right to bear arms…" [Dismissal Memorandum, 16]:

> ***Does "the challenged [REGULATION] imposes a burden on conduct that falls within the scope of the Second Amendment's guarantee as historically understood?"***

The Second Amendment extends to firearms "in common use". <u>Heller</u>, *supra*, at 627. Handguns are a "class of 'arms' that Americans overwhelmingly choose for the lawful purpose of self-defense." <u>Heller</u>, *supra*, at 571. Glock pistols are handguns "in common use." Complaint, ¶34 (and subparagraphs detailing the ubiquity of Glock handguns). Thus, the Second Amendment extends to Glock pistols.

At the "core [of the Second Amendment is the] lawful purpose of self-defense…" <u>Heller</u>, *supra*, at 630. Each of the CONSUMERS, duly permitted to acquire and possess firearms in Massachusetts, sought to acquire a Gen3/4 Glock pistol for "competitive shooting and self-defense purposes." Complaint, ¶¶39.2, 40.2, 41.2, 42.2, 43.2 & 44.2. Thus, in seeking to purchase Gen3/4 Glock pistols (firearms "in common use") from the DEALERS, the CONSUMERS were exercising a right protected by the Second Amendment.

The REGULATION's unconstitutionally vague "load indicator" alternative design requirement and the Attorney General's capricious ban of Gen3/4 Glock pistols have prevented the DEALERS and CONSUMERS from engaging in purchase and sale transactions of firearms in common use. Complaint, ¶4. The CONSUMERS have been prevented from exercising a right protected by the Second Amendment.

The REGULATION burdens conduct that falls within the scope of the Second Amendment's guarantee.

Upon establishing burden on the Second Amendment "some form of either intermediate scrutiny or strict scrutiny" is applied to the challenged law or regulation.  Powell v. Tompkins, *supra*.

The District Court erred that "[c]ivil regulations that govern commercial conduct are held to a lower standard than criminal statutes in the vagueness analysis."  Dismissal Memorandum, 13.  The "civil regulation governing commercial conduct" in this lawsuit directly affects and has actually burdened a *constitutional right*.  Where a constitutional right is burdened, logic dictates the triggering of some form of heightened scrutiny analysis, which necessitates a correspondingly higher level of "precision and guidance [in the challenged regulation] so that those enforcing the law do not act in an arbitrary or discriminatory way."  FCC v. Fox Television Stations, Inc., 567 U.S. __, 132 S. Ct. 2307, 2317 (2012) (string citation omitted).  Heller foreclosed the application of any reduced level of scrutiny to analyze burdens on the fundamental right to keep and bear arms.[7]


*///*


---

[7]    The Supreme Court made clear that reduced levels of scrutiny, such as the rational basis test, may not be used to evaluate burdens on constitutionally enumerated rights.  Heller, *supra*, 628 n.27.

### 3. The District Court's Third Advisory Ruling

The District Court's third and final Second Amendment-related ruling was also improper. The District Court stated that "[e]ven if the regulation did impinge on Second Amendment rights" it survives "under any standard of scrutiny" because

> "[t]he defendant has demonstrated a strong showing of a 'substantial relationship' between the restrictions imposed by the regulation and the important government objective of protecting the safety of its citizens." Dismissal Memorandum, 17.

The District Court did not make any findings or cite any facts constituting the AG's "strong showing" upon which this ruling is based. Nor did it cite any argument by either the plaintiffs or the AG for or against the subject of this ruling. The District Court cited no authorities to support this ruling. Worse yet, this ruling defies the Supreme Court's ruling in <u>Heller</u>, in which it bluntly said "***Obviously*** ["rational basis" scrutiny] could ***not*** be used to evaluate the extent to which a legislature may regulate a specific, enumerated right ... [including] the right to keep and bear arms." <u>Id.</u>, 628 n.27

### C. The District Court Violated the Canon of Constitutional Avoidance

Under the doctrine of constitutional avoidance federal courts are not to reach constitutional issues where alternative grounds for resolution are available. <u>ACLUM v. Conf. of Catholic Bishops</u>, 705 F. 3d 44, 52 (1st Cir. 2013).

> "The desire to resolve more constitutional questions ought not lead to altering our jurisdictional rules. That is the precise object that our legal tradition tells us we should resist. Haste to resolve constitutional

issues has never been thought advisable.  We instead have encouraged the Courts of Appeals to follow 'that older, wiser judicial counsel not to pass on questions of constitutionality … unless such adjudication is unavoidable.'"

Camreta v. Greene, 564 U.S. ___, 131 S. Ct. 2020, 2045 (2011) (internal citations and quotation marks omitted.)

Faced with acknowledging the mootness of the CONSUMERS' Second Amendment claim upon the dismissal of the DEALER's due process claims or addressing the CONSUMERS' Second Amendment constitutional claims (and non-issues at that), the District Court abused its discretion by choosing the latter.

///

///

///

///

///

///

# CONCLUSION

A danger of allowing vague laws to remain in effect is that "[u]ncertain meanings inevitably lead citizens to steer far wider of the unlawful zone ... than if the boundaries of the forbidden areas were clearly marked." Grayned v. City of Rockford, 408 U.S. 104, 108 fn. (1972) and quotation marks omitted.

That is precisely the situation here. The CONSUMERS were unable to obtain Gen3/4 Glock pistols, firearms "in common use", because the unconstitutional vagueness in the REGULATION caused the DEALERS to avoid selling these pistols. The DEALERS feared an enforcement action should the AG disagree with their reasoned opinion that *based on the text* of the REGULATION that Gen3/4 Glock pistols are in compliance. The AG's vacuous responses to the plaintiffs' letters seeking clarification only plunged the issue of compliance further down into the vagueness abyss, as she proclaimed—without explanation—Gen3/4 Glock pistols' "load indicators" noncompliant while tacitly approving the virtually identical "load indicator" implementations of several other pistol makes and models. Vagueness in the REGULATION makes such capricious enforcement possible.

> "Even when speech is not at issue, the void for vagueness doctrine addresses at least two connected but discrete due process concerns: first, that *regulated parties should know what is required of them so they may act accordingly*;  second, precision and guidance are necessary *so that those enforcing the law do not act in an arbitrary or discriminatory way*." FCC v. Fox Television Stations, 567 U.S. __, 132 S.Ct. 2307, 2317 (2012) (emphasis in italics).

For the foregoing reasons, plaintiffs respectfully request that the judgment of the District Court be reversed and the case remanded with instructions to enter a judgment that the REGULATION's definition of "load indicator" is facially void for vagueness and as applied to Gen3/4 Glock pistols, and that all of the District Court's Second Amendment related rulings be reversed. Alternatively, all of the District Court's rulings should be reversed and the case remanded for further proceedings consistent with the findings of this Court.

Respectfully submitted,

Dated: 18 September 2015.

**ROBERT DRAPER; ARIEL WEISBERG; DONNA MAJOR; ERIC NOTKIN; ROBERT BOUDRIE; BRENT CARLTON; CONCORD ARMORY, LLC; PRECISION POINT FIREARMS, LLC, and SECOND AMENDMENT FOUNDATION, INC.**

By and through their attorney of record

**/s/ Alexander A. Flig**

Alexander A. Flig, Esq
1st Circuit No. 1169830
BBO No. 669132
490 Chapman Street, Suite 201
Canton, Massachusetts 02021-2039
Telephone:    (781) 352-7260
Facsimile:    (781) 583-5080
E-Mail:     alex@fliglaw.com

# CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

### Type-Volume Limitation, Typeface Requirements
### and Type Style Requirements

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

| | |
|---|---|
| **X** | This brief contains 14,103 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). |
| | This brief uses a monospaced typeface and contains lines 800 of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). |

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

| | |
|---|---|
| **X** | This brief has been prepared in a proportionally spaced typeface using Cambria font, size 13 (the equivalent of Times New Roman, size 14, but with better screen readability). |
| | This brief has been prepared in a monospaced typeface using [state name and version of word processing program] with [state number of characters per inch and name of type style]. |

Dated:  18 September 2015

**/s/ Alexander A. Flig**
_____
Attorney for Plaintiffs – Appellants

# <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date I electronically filed the foregoing **BRIEF OF PLAINTIFFS - APPELLANTS** with the Clerk of the Court using the CM/ECF system which will send notification of this filing to the following registered participants in this matter:

| Appellee's Counsel | Amicus' Counsel |
|---|---|
| **William Porter, Esq.** <br> **Attorney General of Massachusetts** <br> 1 Ashburton Place <br> Boston, Massachusetts 02108 <br> bill.porter@state.ma.us | **L. Scott Harshbarger, Esq.** <br> **Proskauer Rose, LLP** <br> 1 International Place, 22nd Floor <br> Boston, Massachusetts 02110-0000 <br> sharshbarger@proskauer.com |
| **Julia Eleanor Kobick** <br> **Attorney General of Massachusetts** <br> 1 International Place, 22nd Floor <br> Boston, Massachusetts 02110-0000 <br> julia.kobick@state.ma.us | **John E. Roberts, Esq.** <br> **Proskauer Rose, LLP** <br> 1 International Place, 22nd Floor <br> Boston, Massachusetts 02110-0000 <br> jroberts@proskauer.com |

Dated:  18 September 2015

**Counsel for Plaintiffs - Appellants**

**/s/ Alexander A. Flig**

Alexander A. Flig, Esq
1st Circuit No. 1169830
BBO No. 669132
490 Chapman Street, Suite 201
Canton, Massachusetts 02021-2039
Telephone:   (781) 352-7260
Facsimile:   (781) 583-5080
E-Mail:   alex@fliglaw.com

# UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

## Case No. 15-1429

Robert Draper, Ariel Weisberg, Donna Major, Eric Notkin, Robert Boudrie and Brent Carlton (collectively the "CONSUMERS"); Concord Armory, LLC and Precision Point Armory, LLC (collectively the "DEALERS"), and Second Amendment Foundation, Inc.

*Plaintiffs – Appellants*

v.

MAURA HEALEY, in her capacity as
The Attorney General of the Commonwealth of Massachusetts

*Defendant – Appellee*

ON APPEAL FROM A JUDGMENT OF THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS
Civil Action No. 1:14-CV-12471-NMG

## ADDENDUM TO BRIEF OF PLAINTIFFS-APPELLANTS

**Alexander Aron Flig**
Law Office of Alexander A. Flig
1st Circuit No. 1169830
MA BBO No. 669132
490 Chapman Street,Suite 201
Canton, Massachusetts 02021
(781) 352-7260

# TABLE OF CONTENTS

| Tab | Description | Page(s) |
|:---:|:---|:---:|
| 1 | **Dist. Ct. Doc. #45:  Memorandum & Order** | 1–19 |
| 2 | **Dist. Ct. Doc. #46:  Order of Dismissal** | 20– 21 |
| 3 | **Dist. Ct. Doc. #47:  Notice of Appeal** | 22–24 |
| 4 | **Complaint** | 25–53 |
| 4a | **Exhibits to Complaint** | 54–181 |
| 5 | **Motion to Dismiss**<br>(by defendant Attorney General) | 182–208 |
| 6 | **Opposition to Motion to Dismiss**<br>(by plaintiffs) | 209–237 |
| 6a | **Declaration in Support of Opposition to Motion to Dismiss**<br>(by Commonwealth Second Amendment, Inc.) | 238–241 |
| 6b | **Declaration in Support of Opposition to Motion to Dismiss**<br>(by Second Amendment Foundation, Inc.) | 242–246 |
| 7 | **Reply to Opposition to Motion to Dismiss**<br>(by defendant Attorney General) | 247–255 |
| 8 | **Response to Reply to Opposition to Motion to Dismiss**<br>(by plaintiffs) | 256–265 |

| 9 | **Amicus Brief in Support of Motion to Dismiss** <br> (by Brady Center to Prevent Gun Violence, Inc.) | 266–286 |
|---|---|---|
| **10** | **Opposition to Amicus Brief in Support of Motion to Dismiss** <br> (by plaintiffs) | 287–298 |
| **11** | **Transcript of Oral Argument - Hearing on Motion to Dismiss** | 299–333 |
| **12** | **<u>Massachusetts Handgun Sales Regulation</u>** <br> 940 C.M.R. 16, *et seq.* (pertinent sections highlighted) | 334–340 |
| **13** | **<u>Johnson v. U.S.</u>** <br> No. 13-7120, Slip Opinion (S.Ct., 26 JUN 2015) | 341–399 |
| **14** | **<u>City of Los Angeles v. Patel</u>** <br> No. 13–1175 Slip Opinion (S.Ct., 22 JUN 2015) | 400–441 |

# Tab 1

Dist. Ct. Doc. #45:

## Memorandum & Order

United States District Court
District of Massachusetts

| | |
|---|---|
| ROBERT DRAPER, ARIEL WEISBERG, <br> DONNA MAJOR, ERIC NOTKIN, <br> ROBERT BOUDRIE, BRENT CARLTON, <br> CONCORD ARMORY, LLC, <br> PRECISION POINT FIREARMS, LLC, <br> COMMONWEALTH SECOND AMENDMENT, <br> INC. and SECOND AMENDMENT <br> FOUNDATION, INC., <br><br>          Plaintiffs, <br><br>          v. <br><br> MAURA T. HEALEY, <br><br>          Defendant. | Civil Action No. <br> 14-12471-NMG |

<u>MEMORANDUM & ORDER</u>

GORTON, J.

Plaintiffs bring this action challenging the enforceability of 940 C.M.R § 16.05(3) ("the regulation"), a state regulation promulgated by defendant Attorney General of the Commonwealth of Massachusetts ("the AG") that requires load indicators or magazine disconnects on handguns sold by handgun dealers.[1]

There are three categories of plaintiffs: 1) individuals: Robert Draper, Ariel Weisberg, Donna Major, Eric Notkin, Robert Boudrie and Brent Carlton (collectively "consumer plaintiffs"), 2) business entities: Concord Armory, LLC and Precision Point

---

[1] This case was initially brought against former Attorney General of Massachusetts, Martha Coakley.  In January, 2015, she was succeeded in office by Maura Healey.

AD Page 2 of 441

Firearms, LLC (collectively "dealer plaintiffs") and 3) non-profit organizations: Commonwealth Second Amendment, Inc. and Second Amendment Foundation, Inc. (collectively "organization plaintiffs").

I.   **Background**

    A.   **Challenged regulation**

In 1997, the Attorney General of Massachusetts promulgated 940 CMR 16.00 <u>et</u> <u>seq</u>, a series of regulations relating to the sale of handguns within the Commonwealth.  Plaintiffs bring constitutional challenges to subsection (3) of 940 C.M.R § 16.05: Sale of Handguns Without Childproofing or Safety Devices which states that

> [i]t shall be an unfair or deceptive practice for a handgun-purveyor to transfer or offer to transfer to any customer located within the Commonwealth any handgun which does not contain a load indicator or magazine safety disconnect.

940 CMR 16.05(3).  The complaint specifically challenges the portion of the regulation that offers a load indicator as one alternative way to meet the safety standard.  A load indicator is defined within the regulation as

> a device which plainly indicates that a cartridge is in the firing chamber within the handgun.

940 CMR 16.01.

-2-

AD Page 3 of 441

**B.    Procedural history**

Between December, 2013 and May, 2014, various dealer and consumer plaintiffs sent letters to the AG inquiring whether the Generations 3 and 4 Glock pistols ("Gen3/4 Glock pistols") violate the regulation.  In April and May, 2014, the Deputy Chief of the Attorney General's Consumer Protection Division responded to those letters explaining that the handguns presently manufactured by Glock are noncompliant "because they lack an effective load indicator or magazine safety disconnect."

In June, 2014, plaintiffs filed a complaint seeking declaratory judgments that the regulation 940 CMR 16.05(3) 1) violates the rights to due process under the Fourteenth Amendment of the dealer and organization plaintiffs because it is void for vagueness and void as applied and 2) violates the Second Amendment rights of the consumer plaintiffs.  Defendant, in response, moved to dismiss the case and extensive briefing ensued.  The Brady Center to Prevent Gun Violence also submitted an amicus brief in support of the defendant.

Oral argument on defendant's motion to dismiss was held in February, 2015.  For the reasons that follow, defendant's motion will be allowed.

## II.  <u>Standing</u>

Defendant contends that the case should be dismissed because all plaintiffs lack standing.

AD Page 4 of 441

**A.   Legal standard**

Standing is a prerequisite for Article III jurisdiction and must be determined before addressing the merits of the case. <u>See</u> <u>Sutliffe</u> v. <u>Epping Sch. Dist.</u>, 584 F.3d 314, 325 (1st Cir. 2009).  In order to establish standing, a plaintiff must show 1) an injury in fact, 2) a causal connection between the injury and the conduct complained of and 3) a likelihood that the injury will be redressed by a favorable decision. <u>Lujan</u> v. <u>Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1992).  An injury in fact is one that is "concrete and particularized [and] actual or imminent, not conjectural or hypothetical". <u>Id.</u> at 560 (internal citations and quotations omitted).

**B.   Application**

**1.   Organization plaintiffs**

An organization may bring suit on behalf of itself or its members

> when its members would otherwise have standing to sue
> in their own right, the interests at stake are germane
> to the organization's purpose, and neither the claim
> asserted nor the relief requested requires the
> participation of individual members in the lawsuit.

<u>Friends of the Earth, Inc.</u> v. <u>Laidlaw Envtl. Servs. (TOC), Inc.</u>, 528 U.S. 167, 181 (2000).

Defendant contends that the two organization plaintiffs lack standing because they do not allege harm to themselves or

AD Page 5 of 441

to their members.  The AG further notes that none of the claims
in the complaint is brought by the organizations.

Organization plaintiffs respond that they have standing to
sue in their own right despite never having attempted to
purchase a Gen3/4 Glock pistol in Massachusetts because they
have spent time and resources analyzing the regulation and that
they have incurred financial loss in sponsoring the lawsuit.
These investments do not, however, serve as a concrete injury to
the organizations.  Plaintiff Second Amendment Foundation also
alleges injury based on the fact that it raffles firearms to its
members every year, including at least one Glock pistol, and if
the winner of that pistol were in Massachusetts, then it could
not transfer the prize to the winner due to the regulation.  The
Court concludes that this injury is too speculative to qualify
as an "injury in fact".  The organization plaintiffs therefore
lack standing to sue on their own behalf.

With respect to its standing to sue on behalf of its
members, Second Amendment Foundation claims to have 8,066
"members and supporters" in Massachusetts, of which 1,847 are
current paid members.  It has not identified, however, any
specific members who have attempted to purchase Glocks in the
Commonwealth or who were dissuaded from selling Glocks because
of the regulation. See Summers v. Earth Island Inst., 555 U.S.
488, 498-99 (2009) (noting that "the affidavit provided by the

-5-

city to establish standing would be insufficient because it did
not name the individuals who were harmed by the challenged
[regulation]"); <u>Fletcher</u> v. <u>Haas</u>, 851 F. Supp. 2d 287, 291 (D.
Mass. 2012) ("Plaintiff organizations fall short of
demonstrating Article III standing. Neither SAF nor CSA has
identified a *single* member who sought to obtain a license to
carry a firearm in Massachusetts, let alone was denied.")
(emphasis in the original).

Commonwealth Second Amendment likewise has failed to
identity affected members.  In fact, it not does appear to have
members.  The organization only claims to have 835 donors, many
of whom reside in Massachusetts.  The organization cannot,
therefore, sue on behalf of members who do not exist.

Accordingly, the organization plaintiffs will be dismissed
for lack of standing.

### 2.   Dealer plaintiffs

Defendant asserts that the dealer plaintiffs do not have
standing because they fail to make a sufficient allegation of
injury related to their challenge of the regulation.  The AG
contends that her office made clear that the handguns at issue
violated the regulation and therefore the plaintiffs' injury
could not be their uncertainty as to the pistols' compliance.

Plaintiffs respond that although they were informed that
the Gen3/4 Glock pistols were noncompliant with the regulation,

AD Page 7 of 441

they have standing because there is ongoing uncertainty as to
which firearms contain an acceptable load indicator.

The Court agrees that the dealer plaintiffs have
sufficiently alleged an injury caused by the regulation and
redressable by injunctive relief.

### 3.   Consumer plaintiffs

Finally, defendant contends that consumer plaintiffs lack
standing because the regulation does not implicate the Second
Amendment and therefore they have failed to allege a cognizable
injury.

Plaintiffs respond that defendant conflates standing to sue
with stating a cognizable injury under the Second Amendment.
Instead, they argue that the injury results from the
regulation's vague definition of load indicator which makes it
more difficult or impossible for consumers to purchase Gen3/4
Glock pistols.

The Court concludes that the consumer plaintiffs have
standing because they have submitted evidence indicating that
various consumer plaintiffs attempted to purchase a Gen3/4 Glock
pistol but were unable or dissuaded to do so because of the
regulation.

AD Page 8 of 441

## III.  <u>Defendant's motion to dismiss for failure to state a claim</u>

### A.   Legal standard

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." <u>Bell Atl. Corp.</u> v. <u>Twombly</u>, 550 U.S. 544, 570 (2007).  The Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. <u>Langadinos</u> v. <u>Am. Airlines, Inc.</u>, 199 F.3d 68, 69 (1st Cir. 2000).  The Court, however, need not accept legal conclusions as true. <u>Ashcroft</u> v. <u>Iqbal</u>, 129 S. Ct. 1937, 1949 (2009).  Threadbare recitals of the legal elements, supported by mere conclusory statements, do not suffice to state a cause of action. <u>Id.</u>  Accordingly, a complaint does not state a claim for relief where the well-pled facts fail to warrant an inference of any more than the mere possibility of misconduct. <u>Id.</u> at 1950.

### B.   Application

#### 1.   Due Process under the Fourteenth Amendment (Count I)

##### a.   Facial challenge

For a regulation to be facially void, plaintiffs must prove that "no set of circumstances exists under which the [regulation] would be valid." <u>United States</u> v. <u>Salerno</u>, 481 U.S. 739, 745 (1987).  This standard amounts to a "dauntingly high

AD Page 9 of 441

hurdle." <u>Donovan</u> v. <u>City of Haverhill</u>, 311 F.3d 74, 77 (1st Cir.
2002).

The dealer plaintiffs contend that the regulation's
definition of "load indicator" is facially vague in violation of
the Fourteenth Amendment's Due Process Clause.  They aver that
the regulation does not provide any guidance about what the load
indicator "device" must be and how it is to "plainly indicate"
that a cartridge is in the firing chamber.  They claim that the
vagueness in the definition creates the potential for absurd
results and arbitrary enforcement because no one can determine
with any reasonable degree of certainty whether a handgun
complies with the regulation.

As a preliminary matter, facial challenges are typically
disfavored because they "often rest on speculation," which lead
to the risk of premature interpretation of statutes and
regulations. <u>Washington State Grange</u> v. <u>Washington State</u>
<u>Republican Party</u>, 552 U.S. 442, 450 (2008).  Accordingly, facial
challenges outside of the First Amendment context have been rare
in this circuit.  As the First Circuit Court of Appeals has
stated,

> [i]t is well-established that vagueness challenges to
> statutes not threatening First Amendment interests are
> examined in light of the facts of the case at hand;
> the statute is judged on an as-applied basis.

AD Page 10 of 441

Love v. Butler, 952 F.2d 10, 13 (1st Cir. 1991) (citing Maynard v. Cartwright, 486 U.S. 356, 361 (1988)).

In any event, so long as there is some application under which the regulation would not be vague, a facial vagueness claim cannot stand. See Richmond Boro Gun Club, Inc. v. City of New York, 97 F.3d 681, 684 (2d Cir. 1996) (a restriction on firearms where the pistol grip "protrudes conspicuously" is not facially vague under the "no circumstances" test when "it is obvious in this case that there exist numerous conceivably valid applications").

Here, defendant has offered several examples of firearms where it is clear that they would fail to meet the regulation's standards. See, e.g., Smith ex rel. Smith v. Bryco Arms, 33 P.3d 638, 641 (N.M. App. 2001) ("the J-22 handgun does not incorporate a 'magazine-out safety,' a 'chamber load indicator,' or a written warning on the gun itself alerting users that the J-22 can fire even though the magazine has been removed"); Pitonyak v. State, 253 S.W.3d 834, 845 (Tex. App. 2008) ("the pistol in question did not have a safety or a loading indicator to show that a bullet is in the firing chamber").

Accordingly, plaintiffs' facial challenge to the regulation will be dismissed.

### b.   Vague as-applied

A regulation is unconstitutionally vague as applied to

plaintiffs if it fails to provide

> a person of ordinary intelligence fair notice of what
> is prohibited, or is so standardless that it
> authorizes or encourages seriously discriminatory
> enforcement.

Holder v. Humanitarian Law Project, 561 U.S. 1, 18 (2010)

(quoting United States v. Williams, 553 U.S. 285, 304 (2008)).

Outside of the First Amendment context, the Court need only

determine whether the regulation is vague as applied to the

particular facts at issue, i.e. "whether [plaintiffs] in fact

had fair notice that the [regulation] proscribed their

[proposed] conduct." United States v. Zhen Zhou Wu, 711 F.3d 1,

15 (1st Cir.) cert. denied sub nom. Yufeng Wei v. United States,

134 S. Ct. 365 (2013).

The dealer plaintiffs contend that the regulation is vague

as applied because they cannot determine with any reasonable

certainty whether Gen3/4 Glock pistols are compliant.  Although

they do not dispute that they received actual notice from the AG

that the Gen3/4 Glocks fail to comport with the regulation, they

claim lack of fair notice because the AG's response failed to

explain why the Gen3/4 Glock pistols do not meet the regulatory

standard or how she came to that conclusion.

AD Page 12 of 441

Defendant responds that the plaintiffs have failed to
allege a viable vague as-applied claim under either prong of the
vague as-applied inquiry because 1) the plaintiffs had actual
knowledge that the Gen3/4 Glock pistols violated the regulation,
2) the phrases in the definition of "load indicator" have
meanings in common usage that meet the requirements of fair
notice and 3) plaintiffs have failed to make any allegation of
discriminatory enforcement.

The Court concludes that the plaintiffs' knowledge and
receipt of actual notice that the Gen3/4 Glock pistols are
noncompliant defeat their as-applied challenge to the
regulation. See Zhen Zhou Wu, 711 F.3d at 16 (holding that the
challengers of the regulation cannot claim they lacked fair
notice because they "knew they were violating U.S. export
regulations."); United States v. Saffo, 227 F.3d 1260, 1270
(10th Cir. 2000) (holding that a statute is not
unconstitutionally vague as applied to defendant Saffo because
"evidence produced at trial demonstrates that Saffo had
knowledge of the illegality of her activities, and thus this is
not a situation where she could not reasonably understand that
her contemplated conduct is proscribed." (internal citation and
quotation omitted)).

In this case, the dealer plaintiffs admit that they were
aware that the regulation foreclosed the transfer or sale of the

-12-

AD Page 13 of 441

Glock pistols at issue.  The plaintiffs' argument that the AG
never explained why the Glock load indicators fail the
regulatory standard is irrelevant to the constitutional
vagueness challenge.  The vagueness doctrine is concerned with
whether the plaintiffs, as people of ordinary intelligence, can
determine if the Gen3/4 Glock pistols comply with the regulation
and not with why or how the AG reached her conclusion.  See
Williams, 553 U.S. 285, 304 (2008).

To the extent that the dealer plaintiffs contend that the
regulation is vague with respect to potential sales restrictions
of other handguns, their argument fails.  Civil regulations that
govern commercial conduct are held to a lower standard than
criminal statutes in the vagueness analysis.  See Papachristou v.
City of Jacksonville, 405 U.S. 156, 162 (1972) ("In the field of
regulatory statutes governing business activities, where the
acts limited are in a narrow category, greater leeway is
allowed"); Home Depot, Inc. v. Guste, 773 F.2d 616, 629 (5th
Cir. 1985) ("lax vagueness standard [is] applicable to statutes
regulating economic activity").  The regulatory language at
issue here, "a device which plainly indicates," is composed of
words in common usage and with common meaning.  The words are
straightforward both individually and in context because they
describe that the purpose of a load indicator in a handgun is to
inform a user unequivocally that the gun is loaded.  The Court

-13-

concludes that the language of the regulation provides clear guidance for and fair notice to firearms dealers of ordinary intelligence.

Plaintiffs' vague as-applied challenge to the regulation will therefore be dismissed.

### 2.   Second Amendment (Count II)

The Second Amendment to the United States Constitution provides:

> A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

U.S. Const. amend. II.

The consumer plaintiffs contend that the regulation burdens their Second Amendment rights because the vague regulatory definition of "load indicator" prevents them from purchasing Gen3/4 Glock pistols. They acknowledge, however, that although the regulation renders two models of handguns unmerchantable in Massachusetts, it otherwise permits the purchase of a variety of handguns with appropriate safety devices.

Defendant responds that the load indicator regulation does not implicate the Second Amendment because it does not impinge on the right to bear arms in self-defense. She avers, moreover, that even if it does, the regulation withstands constitutional scrutiny. The Court agrees.

-14-

The United States Supreme Court has held that the "core" of the Second Amendment protects a citizen's right to keep and bear arms for self-defense in the home. <u>Dist. of Columbia</u> v. <u>Heller</u>, 554 U.S. 570, 630, 635 (2008); <u>United States</u> v. <u>Barton</u>, 633 F.3d 168, 170 (3d Cir. 2011) ("At the core of the Second Amendment is the right of law-abiding, responsible citizens to use arms in defense of hearth and home" (internal quotations and citation omitted)).  It does not guarantee "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." <u>Heller</u>, 554 U.S. at 626.  The <u>Heller</u> Court provided examples of "longstanding" restrictions that were "presumptively lawful" under the Second Amendment, such as 1) laws prohibiting the possession of firearms by felons and the mentally ill, 2) laws forbidding the carrying of firearms in sensitive places such as schools and 3) laws imposing conditions and qualifications on the commercial sale of arms. <u>Id.</u> at 626-27 & n. 26.

When analyzing challenges brought under the Second Amendment, a majority of the courts of appeals inquire as to whether the challenged law burdens conduct falling within the Second Amendment's protection and, if so, whether the law passes constitutional muster under an appropriate level of means-end scrutiny. <u>See</u> <u>Davis</u> v. <u>Grimes</u>, 2014 WL 1278082, at *10 (D. Mass. Mar. 26, 2014) (noting that the Third, Fourth, Fifth, Sixth,

-15-

Seventh, Ninth, Tenth, Eleventh and D.C. Circuit Courts of Appeals have explicitly adopted the two-step inquiry).  Although the First Circuit Court of Appeals has not expressly adopted the two-step framework, its analysis of Second Amendment issues

> appear to fall under either the first or second step of the analysis performed by the other circuits.

Id.  In United States v. Rene E., for example, the court conducted an analysis similar to that performed by other circuits in the first step of the two-step inquiry and held that a statute criminalizing firearm possession by juveniles did not violate the Second Amendment because it was one of the "longstanding prohibitions" that Heller found to be "presumptively lawful". 583 F.3d 8, 12 (1st Cir. 2009).

The regulation at issue requiring a load indicator or magazine safety disconnect in handguns sold or transferred in the Commonwealth similarly does not violate the Second Amendment for three reasons:

1.  The regulation fits comfortably among the categories of regulation that Heller suggested would be "presumptively lawful" because it "impos[es] conditions and qualifications on the commercial sale of arms." Heller, 554 U.S. at 626-27;

2.  The regulation does not substantially burden the right to bear arms in self-defense in one's home because the ban on two kinds of Glock pistols in no way prevents citizens from

-16-

obtaining a wide array of firearms. See Kampfer v. Cuomo, 993 F. Supp. 2d 188, 196 (N.D.N.Y. 2014) (dismissing a constitutional challenge to a state statute "because the provisions at issue attempt only to decrease in number certain firearms deemed particularly dangerous by the legislature for the sake of public safety, which interests are clearly advanced by the legislation, they do not infringe the Second Amendment right to keep and bear arms"); and

3.  Even if the regulation did impinge on Second Amendment rights, the Court finds that it passes constitutional muster under any standard of scrutiny.  The defendant has demonstrated a strong showing of a "substantial relationship" between the restrictions imposed by the regulation and the important government objective of protecting the safety of its citizens. See United States v. Booker, 644 F.3d 12, 25 (1st Cir. 2011).

Accordingly, Count II of the plaintiffs' complaint will be dismissed.

AD Page 18 of 441

## ORDER

For the foregoing reasons, the defendant's motion to dismiss (Docket No. 9) is **ALLOWED**.


**So ordered.**

　　　　　　　　　　　　　　　　　/s/ Nathaniel M. Gorton
　　　　　　　　　　　　　　　　　Nathaniel M. Gorton
　　　　　　　　　　　　　　　　　United States District Judge

Dated March 5, 2015

-18-

# Tab 2

Dist. Ct. Doc. #46:

## Order of Dismissal

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

**Robert Draper, Ariel Weisberg,**
**Donna Major, Eric Notkin,**
**Robert Boudrie, Brent Carlton,**
**Concord Armory, LLC,**
**Precision Point Firearms, LLC,**
**Commonwealth Second Amendment,**
**Inc., and Second Amendment**
**Foundation, Inc.,**
               **Plaintiffs,**

     v.                           **CIVIL ACTION 1:14-12471-NMG**

**Maura T. Healey,**
               **Defendant.**

## ORDER OF DISMISSAL

     **Gorton     D.J.**

     In accordance with the Court's Memorandum and Order (dkt. no. 45)  dated

3/5/2015, granting the defendant's Motion to Dismiss (dkt. no. 9),  it is hereby ORDERED

that the above-entitled action be and hereby is DISMISSED.

     **3/5/2015**                              **By the Court,**
         **Date**

                                        **/s/Christopher Danieli**
                                        **Deputy Clerk**

# Tab 3

Dist. Ct. Doc. #47:

## Notice of Appeal

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **(1)  ROBERT DRAPER;** | Civil Action No. |
| **(2)  ARIEL WEISBERG;** | **1:14-CV-12471** |
| **(3)  DONNA MAJOR;** | |
| **(4)  ERIC NOTKIN;** | |
| **(5)  ROBERT BOUDRIE;** | |
| **(6)  BRENT CARLTON,** | |

*collectively, the*
"**CONSUMERS**", *and*

**(7)  CONCORD ARMORY, LLC;**

**(8)  PRECISION POINT FIREARMS, LLC,**

*collectively, the*
"**DEALERS**", *and*

**(9)  SECOND AMENDMENT
FOUNDATION, INC.,**

Plaintiffs

**V.**

**MAURA HEALEY** (substituted for former
defendant MARTHA COAKLEY),

*in her official capacity as*
**ATTORNEY GENERAL OF
MASSACHUSETTS**

Defendant

# NOTICE OF APPEAL

1      **NOTICE IS HEREBY GIVEN** that individual plaintiffs **ROBERT DRAPER**;   **ARIEL**

2   **WEISBERG**;   **DONNA MAJOR**;   **ERIC NOTKIN**;   **ROBERTY BOUDRIE** and **BRENT CARLTON**

3   (collectively the "CONSUMERS"), business entities **CONCORD ARMORY, LLC** and **PRECISION**

4   **POINT ARMORY, LLC** (collectively the "DEALERS"), and non-profit organization **SECOND**

5   **AMENDMENT FOUNDATION, INC.** hereby appeal to the United States Court of Appeals for the

6   First Circuit from the Order of Dismissal entered in this action on 5 March 2015.

7

8                                                               Respectfully submitted,

9   Dated:  3 April 2015.                        **ROBERT DRAPER;  ARIEL WEISBERG;**
                                                 **DONNA MAJOR;  ERIC NOTKIN;  ROBERT**
10                                               **BOUDRIE;  BRENT CARLTON;  CONCORD**
                                                 **ARMORY, LLC;  PRECISION POINT**
11                                               **FIREARMS, LLC, and SECOND AMENDMENT**
                                                 **FOUNDATION, INC.**
12
                                                 By and through their attorney of record
13

14                                               **/s/ Alexander A. Flig**

15                                               Alexander A. Flig, Esq (BBO #669132)
                                                 490 Chapman Street, Suite 201
16                                               Canton, Massachusetts 02021-2039
                                                 Telephone:    (781) 352-7260
17                                               Facsimile:    (781) 583-5080
                                                 E-Mail:     alex@fliglaw.com
18

19

20

21

22

23

24

25

26

27

28

---

**NOTICE OF APPEAL OF ORDER OF DISMISSAL**

Page 1 of 1

# Tab 4

Complaint

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

(1)  **ROBERT DRAPER;**

(2)  **ARIEL WEISBERG;**

(3)  **DONNA MAJOR;**

(4)  **ERIC NOTKIN;**

(5)  **ROBERT BOUDRIE;**

(6)  **BRENT CARLTON,**

> *collectively, the*
> **"CONSUMERS"**, *and*

(7)  **CONCORD ARMORY, LLC;**

(8)  **PRECISION POINT FIREARMS, LLC;**

> *collectively, the*
> **"DEALERS"**, *and*

(9)  **SECOND AMENDMENT FOUNDATION, INC.,**

(10) **COMMONWEALTH SECOND AMENDMENT, INC.**

> *collectively, the*
> **"ORGANIZATIONS"**, *and*

Plaintiffs

v.

**MARTHA COAKLEY,**

> *in her official capacity as*
> **ATTORNEY GENERAL OF MASSACHUSETTS**

Defendant

---

Civil Action No.

# 1:14-CV-12471

# COMPLAINT

## FOR DECLARATORY AND INJUNCTIVE RELIEF

# (42 U.S.C. §1983)

Individual plaintiffs **ROBERT DRAPER**; **ARIEL WEISBERG**; **DONNA MAJOR**; **ERIC NOTKIN**; **ROBERTY BOUDRIE** and **BRENT CARLTON** (collectively hereafter the "CONSUMERS"), business entities **CONCORD ARMORY, LLC** and **PRECISION POINT ARMORY, LLC** (collectively hereafter the "DEALERS"), , and non-profit organizations **SECOND AMENDMENT FOUNDATION, INC.** and **COMMONWEALTH SECOND AMENDMENT, INC.** (collectively hereafter the "ORGANIZATIONS") by and through their attorney complain of defendant **MARTHA COAKLY** in her official capacity as the **ATTORNEY GENERAL OF MASSACHUSETTS** (hereafter "ATTORNEY GENERAL), as follows:

# **INTRODUCTION**

**1.** This lawsuit is a 42 U.S.C. §1983 action seeking declaratory and injunctive relief from the Massachusetts <u>Handgun Sales Regulation's</u> (940 C.M.R. §16.00, *et seq*.) deprivation of Massachusetts firearms dealers' 14th Amendment right to due process and the infringement on Massachusetts consumers' Second Amendment rights.

**2.** The <u>Handgun Sales Regulation</u> at 940 C.M.R. §16.05(3) is ***facially void*** for its use of the unconstitutionally vague and ambiguous word "device" to define the "load indicator" alternative design requirement for handguns sold or transferred to Massachusetts consumers. Other than specifying what this load indicator "device" is intended to ***do***—i.e. "plainly indicate[] that a cartridge is in the firing chamber within the handgun"—there is nothing in the Regulation indicating ***how*** this "device" is to provide that "plain[] indicat[ion]", i.e. visually, tactilely, passively, actively, etc.;  what this "device" actually ***is***, i.e. a button, tab, notch, hole, etc.;  ***where*** on the handgun this "device" must be located, i.e. on the slide, on the frame, on the trigger, right/left/top, bottom, breach/muzzle, etc., nor is the size, any dimension, color, shape or anything else specified anywhere in the <u>Handgun Sales Regulation</u>.  The DEALERS are deprived of due process because the vague and ambiguous word "device" does not permit them to determine which handguns comply with the REGULATION and which do not, thereby exposing them to enforcement actions by the defendant ATTORNEY GENERAL.

**3.**     The <u>Handgun Sales Regulation</u> at 940 C.M.R. §16.05(3) is **void as applied** to the DEALERS and CONSUMERS because the defendant ATTORNEY GENERAL has concluded, without explanation or elucidation, that 3rd and 4th generation Glock pistols which the CONSUMERS wish to purchase and which the DEALERS wish to sell, lack an "effective load indicator" device.  The defendant ATTORNEY GENERAL has not explained how or why she came to that conclusion.  Indeed, she refuses to provide any such explanation or guidance, while making no objection to the use of virtually identical load indicator "devices" on other handgun makes and models sold throughout Massachusetts.

**4.**     The unconstitutionally vague and ambiguous "load indicator" design requirement of the <u>Handgun Sales Regulation</u> and the Attorney General's capricious conclusion that 3rd and 4th generation Glock pistols lack an "effective load indicator" device have prevented the DEALERS and CONSUMERS from engaging in purchase and sale transactions of firearms in common use (i.e. Glock pistols) thereby directly infringing on the CONSUMERS' core fundamental rights protected by the Second Amendment.

# PARTIES AND JURISDICTION

## A.   The "DEALERS"

**5.**     The following two (2) business entities are collectively referred to herein as the "**DEALERS**".

> **5.1.    Precision Point Firearms, LLC** (hereafter "PRECISION") is a Massachusetts limited liability company with a principal place of business in Woburn, Massachusetts. PRECISION is duly licensed by the Bureau of Alcohol, Tobacco, Firearms and Explosives (hereafter "BATFE") as a "Federal Firearms Licensee" (commonly referred to as an "FFL") and by the Commonwealth of Massachusetts Executive Office of Public Safety and Security (hereafter "EOPSS") as a Massachusetts firearms dealer.

**5.2.** **Concord Armory, LLC** (hereafter "CONCORD") is a Massachusetts limited liability company with a principal place of business in Concord, Massachusetts. CONCORD is duly licensed by BATFE as an FFL and by EOPSS as a Massachusetts firearms dealer.

## B. The "CONSUMERS"

**6.** The following list of six (6) individuals are collectively referred to herein as the "**CONSUMERS**":

**6.1.** **Robert Draper** (hereafter "DRAPER") is a resident of Framingham, Massachusetts, and is duly licensed to acquire and own firearms in Massachusetts.

**6.2.** **Ariel Weisberg** (hereafter "WEISBERG") is a resident of Stoneham, Massachusetts, and is duly licensed to acquire and own firearms in Massachusetts.

**6.3.** **Donna Major** (hereafter "MAJOR") is a resident of Boston, Massachusetts, and is duly licensed to acquire and own firearms in Massachusetts.

**6.4.** **Eric Notkin** (hereafter "NOTKIN") is a resident of Canton, Massachusetts, and is duly licensed to acquire and own firearms in Massachusetts.

**6.5.** **Robert Boudrie** (hereafter "BOUDRIE") is a resident of Natick, Massachusetts, and is duly licensed to acquire and own firearms in Massachusetts.

**6.6.** **Brent Carlton** (hereafter "CARLTON") is a resident of Boston, Massachusetts, and is duly licensed to acquire and own firearms in Massachusetts.

## C. The "ORGANIZATIONS"

**7.** The following two (2) non-profit organizations are collectively referred to herein as the "**ORGANIZATIONS**":

**7.1.** **Second Amendment Foundation, Inc.** (hereafter "SAF") is a non-profit membership organization incorporated under the laws of the State of Washington with its principal place of business in Bellevue, Washington. SAF has over 600,000 members and supporters nationwide, including thousands in Massachusetts. SAF's purposes

include education, research, publishing and legal action regarding the fundamental Constitutional right to the private ownership and possession of firearms. SAF represents itself and its members in this lawsuit.

**7.2.** **Commonwealth Second Amendment, Inc.** (hereafter "COMM2A") is a non-profit organization incorporated under the laws of the Commonwealth of Massachusetts with its principal place of business in Natick, Massachusetts. COMM2A has supporters throughout the Commonwealth. COMM2A's purposes include educational programs and legal action regarding the fundamental Constitutional right to the private ownership and possession of firearms guaranteed by the Second Amendment. COMM2A represents itself and its supporters in this lawsuit.

**8.** Jurisdiction for this lawsuit is founded on 28 U.S.C. § 1331 in that this action arises under the Constitution and laws of the United States, and under 28 U.S.C. § 1343(3) in that this action seeks to redress the deprivation, under color of the laws, statute, ordinances, regulations, customs, and usages of the Commonwealth of Massachusetts of rights, privileges and/or immunities secured by the United States Constitution and by Acts of Congress. Furthermore, his lawsuit seeks relief pursuant to 28 U.S.C. §§ 2201-2202 and 42 U.S.C. § 1983.

**9.** Venue lies in this District pursuant to 28 U.S.C. § 1391.

## <u>STATURY AND REGULATORY CONTEXT</u>

**10.** Unlike federal law, Massachusetts state law does not provide a separate definition of "handgun". Instead, Massachusetts state law at M.G.L. c140 §121 groups handguns with all "firearms" having a barrel length of less than 16 inches:

> "Firearm", a pistol, revolver or other weapon of any description, loaded or unloaded, from which a shot or bullet can be discharged and of which the length of the barrel or barrels is less than 16 inches or 18 inches in the case of a shotgun as originally manufactured...

## A. The Constitution's Fourteenth Amendment Due Process Clause and its Application to Ambiguous Regulations

**11.**     The <u>Fourteenth Amendment</u> to the United States Constitution provides, *inter alia*:  "No state shall … deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

**12.**     The United States Supreme Court summarized the law of "void-for-vagueness" regulations in <u>FCC v. Fox Television Stations</u>, 567 U.S. __, 132 S.Ct. 2307 (2012) (quoted verbatim in the following shaded text):

> A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required.  *See* <u>Connally v. General Constr. Co.</u>, 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926) ("[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law"); <u>Papachristou v. Jacksonville</u>, 405 U.S. 156, 162, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972) ("Living under a rule of law entails various suppositions, one of which is that '[all persons] are entitled to be informed as to what the State commands or forbids;'" (quoting <u>Lanzetta v. New Jersey</u>, 306 U.S. 451, 453, 59 S.Ct. 618, 83 L.Ed. 888 (1939) (alteration in original))).  This requirement of clarity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment.  *See* <u>United States v. Williams</u>, 553 U.S. 285, 304, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008).  It requires the invalidation of laws that are impermissibly vague….  ¶ Even when speech is not at issue, the void for vagueness doctrine addresses at least two connected but discrete due process concerns:  first, that regulated parties should know what is required of them so they may act accordingly;   second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way.  *See* <u>Grayned v. City of Rockford</u>, 408 U.S. 104, 108-109, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).

**13.**     "When an agency interprets its own regulation, the Court, as a general rule, defers to it 'unless that interpretation is "plainly erroneous or inconsistent with the regulation."'"  Decker v. Northwest Environmental Defense Center, __ U.S. __, 133 S. Ct. 1326, (2013), citing Chase Bank USA, N. A. v. McCoy, 562 U. S. __ , __ (2011) quoting Auer v. Robbins, 519 U. S. 452, 461(1997).

**14.** In <u>Christopher v. Smithkline Beecham Corp.</u>, 567 U.S. __, 132 S. Ct. 2156, (2012) the United States Supreme Court explained the limits of "Auer deference" (quoted verbatim in the following shaded text):

> Although <u>Auer</u> ordinarily calls for deference to an agency's interpretation of its own ambiguous regulation, even when that interpretation is advanced in a legal brief, *see* <u>Chase Bank USA, N.A. v. McCoy</u>, 562 U.S. __, __, 131 S.Ct. 871, 880, 178 L.Ed.2d 716 (2011); <u>Auer</u>, 519 U.S., at 461-462, 117 S.Ct. 905, this general rule does not apply in all cases. Deference is undoubtedly inappropriate, for example, when the agency's interpretation is "'plainly erroneous or inconsistent with the regulation.'" <u>Id.</u>, at 461, 117 S.Ct. 905 (quoting <u>Robertson v. Methow Valley Citizens Council</u>, 490 U.S. 332, 359, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989)). And deference is likewise unwarranted when there is reason to suspect that the agency's interpretation "does not reflect the agency's fair and considered judgment on the matter in question." <u>Auer</u>, *supra*, at 462, 117 S.Ct. 905; *see* also, *e.g.*, <u>Chase Bank</u>, *supra*, at __, 131 S.Ct. at 881. This might occur when the agency's interpretation conflicts with a prior interpretation, *see*, *e.g.*, <u>Thomas Jefferson Univ. v. Shalala</u>, 512 U.S. 504, 515, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994), or when it appears that the interpretation is nothing more than a "convenient litigating position," <u>Bowen v. Georgetown Univ. Hospital</u>, 488 U.S. 204, 213, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988), or a "'post hoc rationalizatio[n]' advanced by an agency seeking to defend past agency action against attack," <u>Auer</u>, *supra*, at 462, 117 S.Ct. 905 (quoting <u>Bowen</u>, 2167*2167 *supra*, at 212, 109 S.Ct. 468; alteration in original).

## B. The Application and Extent of the Protections of the <u>Second Amendment to the United States Constitution</u>

**12.** The <u>Second Amendment</u> to the United States Constitution proclaims: "A WELL REGULATED MILITIA, BEING NECESSARY TO THE SECURITY OF A FREE STATE, THE RIGHT OF THE PEOPLE TO KEEP AND BEAR ARMS, SHALL NOT BE INFRINGED."

**13.** In <u>District of Columbia v. Heller</u>, 554 U.S. 570 (2008), the United States Supreme Court held that:

> **13.1.** "The Second Amendment protects an individual right to possess a firearm unconnected with service in a militia, and to use that firearm for traditionally lawful purposes, such as self-defense within the home." <u>Id.</u>, 576-626.

**13.2.**   The Second Amendment's protection of an individual right to possess firearms applies to "the type of weapon [ ] used by the militia, *i.e.,* those in common use for lawful purposes."  Id., 576-626.

**14.**   "Unless considerations of *stare decisis* counsel otherwise, a provision of the Bill of Rights that protects a right that is fundamental from an American perspective applies equally to the Federal Government and the States," and therefore "the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in Heller."  McDonald v. Chicago, 561 U.S. 3025, 3046 (2010).

**15.**   A law that "threatens to inhibit the exercise of constitutionally protected rights" demands that "a more stringent vagueness test should apply."  Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498-99 (1982).

## C.   The Federal Statutory Framework for Retail Sales and Interstate Transfers of Firearms

**16.**   Federal law at 18 U.S.C. 923(a) requires that any person who "engage[s] in the business of … dealing in firearms…" be licensed to do so by the Attorney General of the United States. Such a licensed firearms dealer is generally known as a "Federal Firearms Licensee", or is more commonly referred to as an "FFL".

**17.**   A non-FFL (i.e. a consumer) may purchase a handgun at retail only within the consumer's own state.  18 U.S.C. 922(a)(3) and (5), 922(b)(3).

**18.**   A non-FFL (i.e. a consumer) may purchase or otherwise acquire a handgun from an out-of-state source **only if** the handgun is shipped to an FFL in the purchasing consumer's state of residence, **and** the purchasing consumer also takes delivery of the handgun from the FFL in the purchasing consumer's state of residence.  18 U.S.C. 922(a)(3) and (5), 922(b)(3).

**19.**   Thus, per federal law, a Massachusetts consumer wishing to acquire a handgun at retail in Massachusetts, or at retail or through a private party transaction outside of Massachusetts, must take delivery of that handgun in Massachusetts from an FFL whose **licensed premises are located in Massachusetts**.

## D. The Massachusetts *Two Layer* Statutory and Regulatory Scheme for Retail Sales and Transfers of Handguns

**20.** Massachusetts firearms dealers who sell and/or transfer handguns to Massachusetts consumers may offer for sale or transfer to eligible Massachusetts residents only those handguns that comply with *two independent standards*: (1) M.G.L. c.140 §123 (hereafter the "STATUTE"), *and* (2) the Massachusetts Attorney General's <u>Handgun Sales Regulation</u> codified at 940 CMR 16.00, *et seq.* (hereafter the "REGULATION").

**21.** Massachusetts firearms dealers may not sell or transfer any handgun into Massachusetts that does not comply with *<u>both</u>* the STATUTE and the REGULATION.

## The *STATUTORY*
## *Handgun Design and Performance Requirements*

**22.** Subsections 18 through 21 of the STATUTE prohibit the sale of handguns in Massachusetts which do not comply with specific design or performance criteria (subsections 18, 20 and 21), *<u>and</u>* which have not passed a "drop test" (subsection 19).

**23.** The STATUTE at Section 131¾ (with certain exceptions, none of which are pertinent to the issues in this Complaint) requires that the Executive Office of Public Safety and Security ("EOPSS") periodically publish a list of handguns passing the requirements of the STATUTE. The enabling regulation at 501 CMR 7.00, *et seq.* provides further criteria for such conforming firearms to be included on this list known as the <u>Approved Firearms Roster</u>.

**24.** The inclusion of a handgun make and model on the <u>Approved Firearms Roster</u> means that it is fully compliant with the requirements of the STATUTE. A copy of the current (as of the date of this Complaint) <u>Approved Firearms Roster</u> is attached hereto as **Exhibit "1"**.

**25.** The current <u>Approved Firearms Roster</u> (**Exhibit "1"**) at page 1 at paragraph 3 provides the an admonition to Massachusetts licensed firearms dealers (quoted verbatim in the following shaded text) that inclusion of a handgun make and model on the <u>Approved Firearms Roster</u> does not necessarily mean that that handgun make and model also complies with the Attorney General's <u>Handgun Sales Regulation</u>:

Massachusetts licensed firearms dealers should note that the transfers of handguns are also subject to the Attorney General's Handgun Sales Regulations, 940 CMR 16.00, et seq. Firearms on this Approved Firearms Roster do not necessarily comply with the requirements of the Attorney General's Handgun Sales Regulations. Information about those regulations, as well as the Enforcement Notice may be obtained from the Office of the Attorney General and may be accessed on the website of the Attorney General (www.ago.state.ma.us).

### The *REGULATORY* <br> *Handgun Design and Performance Requirements*

**26.** The Massachusetts Attorney General's <u>Handgun Sales Regulation</u> codified at 940 CMR 16.00, *et seq*. also contains handgun design requirements, most of which overlap with those of the STATUTE and some of which do not.

**27.** The REGULATION at §16.01 defines a "handgun-purveyor" (with certain exceptions, none of which are applicable to the issues in this lawsuit) as "any person or entity that transfers handguns to a customer located within the Commonwealth of Massachusetts."

> **27.1.** Pursuant to M.G.L. c.140 §§ 122, 123 and 124, a "handgun-purveyor" is a Massachusetts licensed firearms dealer.

> **27.2.** Per EOPSS' explicit instructions, one "must have a federal firearms license in order to obtain and hold a state firearms dealer license." (*See* **Exhibit "2"** at p. 1.)

> **27.3.** Thus, per the REGULATION, a "handgun-purveyor" is necessarily both an FFL and a Massachusetts licensed firearms dealer.

**28.** The REGULATION at §16.01 defines a "load indicator" as "a device which plainly indicates that a cartridge is in the firing chamber within the handgun."

**29.** The REGULATION at §16.05(3) provides (with very limited exception) that:

> "It shall be an unfair or deceptive practice for a handgun-purveyor to transfer or offer to transfer to any customer located within the Commonwealth any handgun which does not contain a load indicator or magazine safety disconnect."

**30.** The REGULATION at §16.05(4) states that the "load indicator" alternative design requirement of §16.05(3) "applies only to handguns that have a mechanism to load cartridges

via a magazine." Thus, the § 16.05(3) "load indicator" alternative design requirement applies only to semi-automatic pistols but not to revolvers of any kind, nor to single-shot handguns.

**31.** The REGULATION at §16.09(3) provides that §16.05 applies to "acts committed or practices in force as of September 30, 1998."

**32.** The enabling statute for the Handgun Sales Regulation is Chapter 93A of the Massachusetts General Laws, commonly known as the "Consumer Protection Act". Violation of Chapter 93A exposes the violator to double or treble damages and reimbursement of attorney fees. M.G.L. c.93A §9(3A).

# **FACTS**

## **A.  Glock, Inc.**

**33.** Glock, Inc., located in Smyrna, Georgia, is a manufacturer of semi-automatic handguns.

**33.1.** As of the April version of the Listing of Federal Firearms Licensees (FFLs) – 2014 published monthly by the BATFE, Glock, Inc. holds a Type 07 FFL (firearm manufacturer license) tied to its address at 6000 Highlands Parkway, Smyrna, Georgia 30082.[1] It also holds a Type 08 FFL (firearm importer license) tied to its address at 6000 Highlands Parkway, Smyrna, Georgia 30082.

**33.2.** As of the April version of the Listing of Federal Firearms Licensees (FFLs) – 2014 published online by the BATFE, Glock Professional, Inc. holds a Type 01 FFL (firearm dealer) tied to its address at 5300 Highlands Parkway, Smyrna, Georgia 30082. Glock Professional, Inc. is Glock, Inc.'s training affiliate which provides professional training to law enforcement, military, licensed security and other personnel.

**33.3.** Neither Glock, Inc. nor Glock Professional, Inc. maintains any type of FFL in the Commonwealth of Massachusetts. [*See* footnote 1.] Thus, pursuant to federal law at 18 U.S.C. 922(a), *et seq.*, **neither Glock, Inc. nor Glock Professional, Inc. may sell or transfer any firearm to a Massachusetts consumer**.

---

[1]  https://www.atf.gov/content/firearms/firearms-industry/listing-FFLs

## B. __Glock Handguns__

**34.** Since their introduction to the U.S. market in 1984, Glock handguns have enjoyed enormous popularity in Massachusetts and throughout the country due to their widely reputed quality, reliability and ability to function under adverse conditions.

**34.1.** Glock handguns are prized for their reliability and accuracy by competitive shooters. They almost invariably dominate the list of production handguns used in most popular national and international sport shooting competitions.

**A.** At the USPSA (United States Practical Shooting Association) Production National Championships, Glock pistols accounted for 56.84% of all pistols used in the 2005 competition; 55.12% of pistols used in the 2006 competition; 57.94% of pistols in the 2007 competition; 51.59% of pistols used in the 2008 competition, and 49.26% of all pistols used in the 2009 competition.

**B.** Glock pistols accounted for more than 37% of the handguns in the inaugural IDPA (International Defensive Pistol Association) World Shoot in 2011, among the 28 handgun manufacturers' handguns used by competitors there.

**34.2.** Glock handguns are extremely popular self-defense firearms because of their simplicity and reliability, contributing to the fulfillment of the central purpose of the Second Amendment right.

**A.** Glock enjoys an amazing 65% market share of all handguns used by law enforcement agencies throughout the United States, from local police departments to the BATFE itself.

**B.** Many Massachusetts police departments issue Glock pistols to their officers as duty firearms.

**35.** Like many popular handgun manufacturers, Glock offers a variety of handguns models.

**35.1.** Glock handgun models are distinguished primarily by their size and the caliber of ammunition they use.

**35.2.** Otherwise, with few exceptions, all Glock pistol models are nearly identical in design; they are scaled up or scaled down versions of the same pistol. Glock, Inc.

markets the fact that "A significant level of interchangeability applies to the internal component parts of the different GLOCK pistol models."[2]

**36.**   Glock handguns have undergone several design improvements since their introduction in the mid-1980s, with major model changes known as "Generations" (referred to conventionally as "Gen#" with the "#" symbol substituted for the generation number).

    **36.1.**   First Generation (i.e. "Gen1") Glock handguns were introduced to the U.S. market in 1984.[3]

    **36.2.**   Second Generation (i.e. "Gen2") Glock handguns were introduced in 1988.

    **36.3.**   Third Generation (i.e. "Gen3") Glock handguns were introduced in 1998.

    **36.4.**   Fourth Generation (i.e. "Gen4") Glock handguns were introduced in 2010.  Gen4 pistols improved upon the already legendary durability of earlier generation pistols. Gen4 pistols also reduced felt recoil, thereby making them even easier to handle than earlier generation pistols.

**37.**   All Glock handguns are semi-automatic pistols employing box magazines as feeding devices for cartridges.

    **37.1.**   Thus, to be offered for sale or transfer to Massachusetts consumers by handgun purveyors (as they are defined by the REGULATION), Glock handguns must comply with the design requirements of ***both*** M.G.L. c.140 §123 (the STATUTE) and the Massachusetts <u>Handgun Sales Regulation</u> (the REGULATION).


## B.   Virtually <u>ALL</u> Production (consumer oriented) Gen3 and <u>Gen4 Glock Pistols Comply with the STATUTE</u>

**38.**   Virtually ALL production Gen3 and Gen4 Glock handguns (those that are not designed and sold strictly to law enforcement, military and/or government agencies) comply with the handgun design and performance requirements of the STATUTE, and are therefore included on

---

[2]   [Source:  http://us.glock.com/technology]

[3]   Glock pistols were conceived in 1982 and initially produced in Austria by GLOCK Ges.m.b.H. for the Austrian Army.  The first Glock subsidiary in the United States was formed in 1985.

the Approved Firearms Roster compiled by the Executive Office of Public Safety and Security pursuant to M.G.L. c.140, § 131¾ and 501 CMR 7.00.[4]  [*See* **Exhibit "1"** attached hereto.]

## C.  Each of the CONSUMERS Sought to Purchase Gen3 or Gen4 Glock Pistols from the DEALERS

**39.**  CONSUMER DRAPER attempted to purchase a Gen4 Model 17 Glock pistol.

    **39.1.**  On 16 April 2014, CONSUMER DRAPER e-mailed DEALER CONCORD seeking to purchase a new Gen4 Model 17 Glock pistol.  [*See* **Exhibit "3"** attached hereto.]

    **39.2.**  DRAPER is a licensed Massachusetts firearm owner.  He retired from the Railroad Police at the rank of Lieutenant after 33 years of service.  DRAPER was a military police officer in the U.S. Air Force for four years.  Draper is a member of and is currently involved in training activities for the Massachusetts Law Enforcement Firearms Instructors and Armorers Association ("MLEFIAA").  He is a Glock Certified Armorer, a Massachusetts State Police and National Rifle Association (hereafter "NRA") certified basic firearms safety instructor and a competitive shooter.  DRAPER sought to purchase a Gen4 Model 17 Glock pistol for competitive shooting and self-defense purposes.

**40.**  CONSUMER WEISBERG attempted to purchase a Gen4 Model 34 Glock pistol.

    **40.1.**  On 22 April 2014, CONSUMER WEISBERG e-mailed DEALERS CONCORD and PRECISION seeking to purchase a Gen4 Model 34 Glock pistol.  [*See* **Exhibit "4"** attached hereto.]

    **40.2.**  WEISBERG is a licensed Massachusetts firearm owner.  He has been involved in the shooting sports for approximately nine years and competes in the U.S. Practical Shooting Association's (hereafter "USPSA") competitions.  WEISBERG is a Massachusetts State Police certified basic firearms safety instructor, an NRA certified basic pistol and home firearm safety instructor, and a National Range Officers Institute ("NROI") Range

---

[4]   Two production Glock handgun models (Models 25 and 28) are not on the Approved Firearms Roster because ***federal law*** enacted in 1968 prohibits their import into the U.S.  Glock production handgun models 41 and 42 were introduced in early 2014 and have not yet completed EOPSS' performance evaluations.  The Glock model 18 pistol is a <u>*selective fire*</u> handgun (capable of fully automatic fire) and has never been available to the consumer market—it is available ***only*** to law enforcement and military agencies, and is ***not*** the subject of his complaint.

Officer 4. WEISBERG has been a software engineer for about 10 years. WEISBERG sought to purchase a Gen4 Model 34 Glock pistol for competitive shooting and self-defense purposes.

**41.** CONSUMER MAJOR attempted to purchase a Gen4 Glock pistol.

**41.1.** On 22 April 2014, CONSUMER MAJOR e-mailed DEALERS **CONCORD** and **PRECISION** seeking to purchase or have transferred a Gen4 Glock pistol. [*See* **Exhibit "5"** attached hereto.]

**41.2.** MAJOR is a licensed Massachusetts firearm owner. She has been involved in the shooting sports for approximately 12 years. MAJOR has been a Massachusetts State Police certified basic firearms safety instructor for 10 years, is an NRA certified basic pistol instructor, and has been an NROI Range Officer for about four years. MAJOR shoots competitively at USPSA competitions and was a founding member of Boston Urban Action Shooter, a USPSA-affiliated club. MAJOR has been an MRI staff technologist at a major Boston teaching hospital for approximately 24 years. MAJOR sought to purchase a Gen4 Glock 17 pistol for competitive shooting and self-defense purposes.

**42.** CONSUMER NOTKIN attempted to purchase a Gen3/Gen4 Glock pistol.

**42.1.** On 1 June 2014, CONSUMER NOTKIN e-mailed DEALERS CONCORD and PRECISION seeking to purchase new Gen3 or Gen4 Model 17 Glock pistol. [*See* **Exhibit "6"** attached hereto.]

**42.2.** NOTKIN is a licensed Massachusetts firearm owner. He has been involved in the shooting sports for at least 48 years and shoots competitively. NOTKIN is a Massachusetts State Police certified basic firearms safety instructor and an NRA certified basic pistol instructor. NOTKIN has been a perioperative (surgical, operating room) nurse at a major Boston medical center for approximately 22 years. NOTKIN sought to purchase a Gen3/Gen4 Model 17 Glock pistol for competitive shooting and self-defense purposes. [*See* **Exhibit "8"** attached hereto.]

**43.** CONSUMER BOUDRIE attempted to purchase a Gen4 Model 34 Glock pistol.

**43.1.** On 19 April 2014, CONSUMER BOUDRIE e-mailed DEALERS CONCORD and PRECISION, seeking to purchase a Gen4 Model 34 Glock pistol. [*See* **Exhibit "7"** attached hereto.]

**43.2.** BOUDRIE is a licensed Massachusetts firearm owner. He is a Glock Certified Armorer, an Armalite certified armorer, a Massachusetts State Police certified basic firearms safety instructor for more than 12 years, an NRA certified basic pistol instructor for more than 21 years, and a USPSA practical handgun competitor. BOUDRIE served as a director of the USPSA and is a technology consultant to three firearms manufacturers. BOUDRIE has worked in the computer and high technology industry for 30 years and is currently employed as a consulting engineer for a Fortune 500 technology firm. BOUDRIE sought to purchase a Gen4 Model 34 Glock pistol for competitive shooting and self-defense purposes. [*See* **Exhibit "8"** attached hereto.]

**44.** CONSUMER CARLTON attempted to purchase a Gen4 Model 34 Glock pistol.

**44.1.** On 16 April 2014, CONSUMER CARLTON e-mailed DEALERS CONCORD and PRECISION seeking to purchase a Gen4 Model 34 Glock pistol. [*See* **Exhibit "8"** attached hereto.]

**44.2.** CARLTON is a licensed Massachusetts firearm owner. He is a Massachusetts State Police certified basic firearms safety instructor, an NRA certified basic pistol instructor, an NRA certified Range Safety Officer, a SigSauer certified Armorer, a USPSA competitor and Range Officer. CARLTON has worked for software and technology companies in a services management role and is a partner in a CRM technology consulting firm. CARLTON sought to purchase a Gen4 Model 34 Glock pistol for competitive shooting and self-defense purposes. [*See* **Exhibit "8"** attached hereto.]

## D. All of the DEALERS Declined or Refused to Sell or Transfer Gen3 or Gen4 Glock Pistols to the CONSUMERS

**45.** On 16 April 2014, DEALER CONCORD sent CONSUMER DRAPER an e-mail declining to sell DRAPER the Glock pistol he requested to purchase. [*See* **Exhibit "9"** attached hereto.]

**46.** On 16 April 2014 and 19 April 2014, respectively, DEALERS CONCORD and PRECISION each sent CONSUMER WEISBERG e-mails declining to sell WEISBERG the Glock pistol he requested to purchase. [*See* **Exhibit "10"** attached hereto.]

**47.** On 29 April 2014, DEALER PRECISION sent CONSUMER MAJOR an e-mail declining to sell MAJOR the Glock pistol she requested to purchase. [*See* **Exhibit "11"** attached hereto.]

**48.** On 1 June 2014 and 2 June 2014, respectively, DEALERS CONCORD and PRECISION each sent CONSUMER NOTKIN an e-mail declining to sell NOTKIN the Glock pistol he requested to purchase. [*See* **Exhibit "12"** attached hereto.]

**49.** On 22 April 2014 DEALER PRECISION sent CONSUMER BOUDRIE an e-mail declining to sell BOUDRIE the Glock pistol he requested to purchase. [*See* **Exhibit "13"** attached hereto.]

**50.** On 16 April 2014 and 21 April 2014, respectively, DEALERS CONCORD and PRECISION each sent CONSUMER CARLTON e-mails declining to sell CARLTON the Glock pistol he requested to purchase. [*See* **Exhibit "14"** attached hereto.]

### E. The DEALERS Declined to Sell Gen3/ Gen4 Glock Pistols to the CONSUMERS Because the DEALERS did NOT Know <u>Whether These Pistols Comply with the REGULATION</u>

**51.** DEALER CONCORD rejected to sell or transfer the Gen3 and Gen4 Glock pistols that CONSUMERS DRAPER, WEISBERG, NOTKIN and CARLTON sought to purchase from CONCORD because CONCORD did not know whether Gen3 and Gen4 Glock pistols comply with the REGULATION. [*See* **Exhibits "9"**, **"10"**, **"12"** and **"14"** attached hereto.]

**52.** DEALER PRECISION rejected to sell or transfer the Gen3 and Gen4 Glock pistols that CONSUMERS WEISBERG, MAJOR, NOTKIN, BOUDRIE and CARLTON sought to purchase from PRECISION because PRECISION did not know whether Gen3 and Gen4 Glock pistols comply with the REGULATION. [*See* **Exhibits "10"**, **"11"**, **"12"**, **"13"** and **"14"** attached hereto.]

///

## F. The DEALERS and CONSUMERS Sought Clarification Directly from the Defendant ATTORNEY GENERAL Whether Gen3 and/or Gen4 Glock Pistols Comply with <u>the REGULATION, and if Not, Why Not</u>

**53.** On 3 December 2013, DEALER CONCORD wrote to the defendant ATTORNEY GENERAL asking her to clarify whether Gen3 and/or Gen4 Glock pistols comply with the REGULATION, and if not, why not. [*See* **Exhibit "15"** attached hereto.]

**54.** On 16 May 2014, DEALER PRECISION wrote to the defendant ATTORNEY GENERAL asking her to clarify whether Gen3 and/or Gen4 Glock pistols comply with the REGULATION, and if not, why not. [*See* **Exhibit "16"** attached hereto.]

**55.** On 28 April 2014, CONSUMER DRAPER wrote to the defendant ATTORNEY GENERAL asking her to clarify whether Gen3 and/or Gen4 Glock pistols comply with the REGULATION, and if not, why not. [*See* **Exhibit "17"** attached hereto.]

**56.** On 28 April 2014, CONSUMER WEISBERG wrote to the defendant ATTORNEY GENERAL asking her to clarify whether Gen3 and/or Gen4 Glock pistols comply with the REGULATION, and if not, why not. [*See* **Exhibit "18"** attached hereto.]

**57.** On 16 May 2014, CONSUMER MAJOR wrote to the defendant ATTORNEY GENERAL asking her to clarify whether Gen3 and/or Gen4 Glock pistols comply with the REGULATION, and if not, why not. [*See* **Exhibit "19"** attached hereto.]

**58.** On 22 April 2014, CONSUMER NOTKIN wrote to the defendant ATTORNEY GENERAL asking her to clarify whether Gen3 and/or Gen4 Glock pistols comply with the REGULATION, and if not, why not. [*See* **Exhibit "20"** attached hereto.]

**59.** On 24 April 2014, CONSUMER BOUDRIE wrote to the defendant ATTORNEY GENERAL asking her to clarify whether Gen3 and/or Gen4 Glock pistols comply with the REGULATION, and if not, why not. [*See* **Exhibit "21"** attached hereto.]

**60.** On 28 April 2014, CONSUMER CARLTON wrote to the defendant ATTORNEY GENERAL asking her to clarify whether Gen3 and/or Gen4 Glock pistols comply with the REGULATION, and if not, why not. [*See* **Exhibit "22"** attached hereto.]

## G. Defendant ATTORNEY GENERAL'S Dismissive Responses to the CONSUMERS' and the DEALERS' Inquiries Whether Gen3 and/or Gen4 Glock Pistols Comply with the <u>REGULATION, and if Not, Why Not</u>

**61.** On 2 April 2014, defendant **ATTORNEY GENERAL** responded to DEALER CONCORD'S request for clarification of whether Gen3 and/or Gen4 Glock pistols comply with the REGULATION by stating: "If you are unsure whether a handgun on the EOPS (sic) roster meets the additional safety requirements of our Office's regulations, you should contact the manufacturer, who should be able to provide you with that information." [*See* **Exhibit "23"** attached hereto.]

**62.** On 21 May 2014, defendant **ATTORNEY GENERAL** responded to DEALER PRECISION'S request for clarification of whether Gen3 and/or Gen4 Glock pistols comply with the REGULATION by stating: "If you are unsure whether a handgun on the EOPS (sic) roster meets the additional safety requirements of our Office's regulations, you should contact the manufacturer, who should be able to provide you with that information." [*See* **Exhibit "24"** attached hereto.]

**63.** On 6 May 2014 defendant ATTORNEY GENERAL issued her responses [*see* **Exhibits "25"**, **"26"**, **"27"** and **"28"** attached hereto] to CONSUMERS' DRAPER'S, WEISBERG'S, NOTKIN'S and CARLTON'S respective letters requesting clarification of whether Gen3 and/or Gen4 Glock pistols comply with the REGULATION. Defendant ATTORNEY GENERAL sent identical boilerplate letters to CONSUMERS BOUDRIE and MAJOR on 14 and 21 May 2014, respectively. [*See* **Exhibits "29"** and **"30"** attached hereto.] In each of her responses defendant ATTORNEY GENERAL wrote (quoted verbatim in the following shaded text):

> The handguns presently manufactured by Glock, Inc. ("Glock") are not in compliance with the Massachusetts Handgun Sales Regulations, because they lack an effective load indicator or magazine safety disconnect. This Office notified Glock of this fact in 2004, and since that time Glock has not notified this Office of any change in the features of their firearms nor attempted to certify any firearm model as compliant with the Massachusetts Handgun Sales Regulations. Therefore, newly manufactured Glock handguns may not be transferred by a handgun dealer to a Massachusetts civilian.

**64.** Defendant ATTORNEY GENERAL's letter to CONSUMER CARLTON contained the additional text:

> Handgun dealers in Massachusetts have clear information on this point from Glock, EOPSS, and this Office, and are operating on more than the "rumor and speculation" you refer to in your letter when they inform prospective purchasers that Glock firearms cannot legally be sold to civilians in Massachusetts.

**65.** The EOPSS website yielded exactly five (5) search results on 21 May 2014 for the search term "Glock". [*See* **Exhibit "31"** attached hereto.] ***None*** of the search results clarify anything whatsoever regarding the CONSUMERS' inquiries to the Defendant ATTORNEY GENERAL.

    **65.1.** The first search result is the <u>Approved Firearms Roster</u> **Exhibit "1"** attached hereto. As stated in paragraph , *supra*, EOPSS entire guidance in **Exhibit "1"** is:

> Massachusetts licensed firearms dealers should note that the transfers of handguns are also subject to the Attorney General's Handgun Sales Regulations, 940 CMR 16.00, et seq. Firearms on this Approved Firearms Roster do not necessarily comply with the requirements of the Attorney General's Handgun Sales Regulations. Information about those regulations, as well as the Enforcement Notice may be obtained from the Office of the Attorney General and may be accessed on the website of the Attorney General (www.ago.state.ma.us)."

    **65.2.** The second search result is the <u>Chiefs Newsletter</u> of the Municipal Police Training Committee dated October 2011 (Volume 7, Issue 1) in an article about a citizen and police joint training exercise in California in which "Glock Simunitions pistols" was used.

    **65.3.** The third search result is the <u>Standard MPTC Academy Equipment List 2012</u>, which includes "Sidearm, sponsored, Glock Model 23 40 Cal" as an alternative to "Sidearm, department issue".

    **65.4.** The fourth search result is a scholarly article dated March 2011 by Northeastern University entitled <u>USING SOCIAL MEDIA TO PREVENT GANG VIOLENCE AND ENGAGE YOUTH</u>. The search term "gloc/glock" is used once in the Appendix of "Slang Terms Responding Agencies Have Seen Online."

**65.5.** The fifth search result is the EOPSS <u>LARGE CAPACITY WEAPONS ROSTER 06-2011</u> which lists Glock pistol models 17, 19, 20, 21, 22, 23 and 24 as those requiring their possessor to have been issued a Massachusetts Class A license to carry firearms.[5]

**66.** The defendant ATTORNEY GENERAL's website, to which the EOPSS <u>Approved Firearms Roster</u> (**Exhibit "1"**) directed inquiries regarding the "requirements of the Attorney General's Handgun Sales Regulations", yielded exactly **one** (**1**) search result for the search term "Glock" on 23 May 2014. [*See* **Exhibit "32"** attached hereto.] That single result does not in the remotest way relate to any of the CONSUMERS' inquiries.

**66.1.** The single search result is the <u>BRIEF OF [nine states, including Massachusetts and the District of Columbia] AS AMICI CURIAE IN SUPPORT OF RESPONDENT [United States of America]</u> in a writ of certiorari to the United States Supreme Court from the Court of Appeals for the **Fourth Circuit** in a case entitled <u>Abramski v. U.S.</u> (No. 12-1493).

**66.2.** The term "Glock" is mentioned **one time** in this 50 page memorandum. The issue presented to the Supreme Court concerns the identity of a firearm **purchaser**, not the identity of a **firearm**.

## CLAIMS FOR RELIEF

### A. First Claim for Relief:

*United States Constitution, 14th Amendment*
*42 U.S.C. §1983*

**67.** PLAINTIFFS restate and incorporate by reference herein each of the allegations set forth in Paragraphs 1 through 66 above.

**68.** The REGULATION at 940 CMR 16.05(3) is **void for vagueness** and therefore violates the DEALERS' right to due process under the Fourteenth Amendment because the DEALERS cannot determine with any reasonable certainty whether Gen3 and/or Gen4 Glock pistols comply with

---

[5] As of February 2014, Class A firearm licenses comprised 88.7% of all five active firearm license types issued in Massachusetts. In 2013, the most recent year for which complete firearm license statistics are available, 92.0% of all five firearm license types issued in Massachusetts were Class A licenses.

the REGULATION.

**68.1.** Specifically, 940 CMR §16.01 defines the "load indicator" design requirement for pistols sold or transferred into Massachusetts as "a device which plainly indicates that a cartridge is in the firing chamber within the handgun."

**A.** The 940 CMR §16.01 definition of "load indicator" specifies what the load indicator "device" is intended to ***do***, i.e. "plainly indicate[] that a cartridge is in the firing chamber within the handgun."

**B.** The 940 CMR §16.01 definition of "load indicator" does ***not*** in any way specify ***how*** this load indicator "device" must indicate what it is intended to indicate, i.e. visually, tactilely, or otherwise.

**C.** The 940 CMR §16.01 definition of "load indicator" does ***not*** in any way specify what this load indicator "device" must ***be***, i.e. a button, a tab, a notch, a hole, a projection, etc.

**D.** The 940 CMR §16.01 definition of "load indicator" does ***not*** in any way specify the ***size***, ***dimensions***, ***color***, ***shape***, ***sound***, etc. of this load indicator "device".

**E.** The 940 CMR §16.01 definition of "load indicator" does not specify ***where*** on the pistol this load indicator "device" must be, i.e. on the frame, the grip, the slide, the trigger, at the breach, at the muzzle, on right or left side or on both sides of the pistol, etc.

**F.** Nowhere in 940 CMR §16.00, *et seq.* is there any ***criteria*** by which the "effectiveness" of a "load indicator" can be determined, either by the DEALERS or by the defendant ATTORNEY GENERAL herself.

**69.** The REGULATION at 940 CMR 16.05(3) is ***void as applied*** because the defendant ATTORNEY GENERAL has proclaimed, *without explanation or elaboration*, that Gen3 and Gen4 Glock pistols which the CONSUMERS wish to purchase and which the DEALERS wish to sell, lack an "effective load indicator" device.

**69.1.**  The defendant ATTORNEY GENERAL has not explained *how* or *why* she came to that conclusion.  Indeed, she refuses to provide any such explanation or guidance.

**69.2.**  On the other hand, defendant ATTORNEY GENERAL has ***not*** objected to an array of load indicator "devices" on various handguns lawfully sold throughout Massachusetts.  For example, defendant ATTORNEY GENERAL has not to the best of the PLAINTIFFS' knowledge objected to any of the following handgun models or series of handgun models on the EOPSS Approved Firearms Roster (**Exhibit "1"** attached hereto) for *not* complying with the "load indicator" requirement:[6]

>    **A.**     **FMK** model 9C1 (page 2 of the Approved Firearms Roster):  the loaded chamber indicator is a protruding pin on the breach end of the slide.  [*See* **Exhibit "33"** attached hereto.]

>    **B.**     **Ruger SR** series of models (pages 12-16 of the Approved Firearms Roster):  the loaded chamber indicator is a protruding tab on top of the slide, behind the ejection port.  [*See* **Exhibit "34"** attached hereto.]

>    **C.**     **Sig Sauer** model 226 Mk-25 (pages 6-7 of the Approved Firearms Roster):  the loaded chamber indicator is a hole at the rear of the barrel (chamber) through which one must look to observe whether there is a cartridge in the chamber.  [*See* **Exhibit "35"** attached hereto.]

>    **D.**     **Remington Arms** model 1911R1 (page 6 of the Approved Firearms Roster):  the loaded chamber indicator is a hole at the rear of the barrel (chamber) through which one must look to observe whether there is a cartridge in the chamber.  [*See* **Exhibit "36"** attached hereto.]

>    **E.**     **Smith & Wesson** Bodyguard 380 (pages 7-11 of the Approved Firearms Roster):  the loaded chamber indicator is a hole at the rear of the barrel (chamber) through which one must look to observe whether there is a cartridge in the chamber.  [*See* **Exhibit "37"** attached hereto.]

---

[6]    For clarify and to reduce the size of the exhibits attached to this Complaint, only the cover page and the relevant pages concerning "load indicators" from the cited owner/instruction manuals are included in the attached exhibits.  Complete exemplars of the cited owner/instruction manuals will be immediately produced upon request.

F.   **Walther Arms** model P99 (page 16 of the <u>Approved Firearms Roster</u>): the loaded chamber indicator is a colored recess in the right side of the slide behind the ejection port which comes into view when the extractor engages the rim of a cartridge in the chamber.  [*See* **Exhibit "38"** attached hereto.]

G.   **Kahr Arms** (all models) (pages 3-4 of the <u>Approved Firearms Roster</u>):  the loaded chamber indicator is part of the extractor, and protrudes from the right side of the slide behind the ejection port.  [*See* **Exhibit "39"** attached hereto.]

H.   **Heckler & Koch** USP series of models (pages 3 of the <u>Approved Firearms Roster</u>):  the loaded chamber indicator is part of the extractor, and protrudes from the right side of the slide behind the ejection port.  [*See* **Exhibit "40"** attached hereto.]

I.   **Beretta** 92 series of models (pages 1-2 of the <u>Approved Firearms Roster</u>): the loaded chamber indicator is part of the extractor, and protrudes from the right side of the slide behind the ejection port.  [*See* **Exhibit "41"** attached hereto.]

**69.3.**  But the load indicator "device" employed on all Glock handguns is *virtually identical to other such devices* on various handguns to which the defendant ATTORNEY GENERAL has *not* objected as complying with the "load indicator" alternative design requirement.  In particular:

A.   Glock pistols employ an extractor-based load indicator that is *virtually identical* to the extractor-based load indicator "device" of Kahr Arms pistols on the <u>Approved Firearms Roster</u>.  [*See* **Exhibit "39"**.]

B.   Glock pistols employ an extractor-based load indicator that is *virtually identical* to the extractor-based load indicator "device" of the Heckler & Koch USP and P-series of pistols on the <u>Approved Firearms Roster</u>.  [*See* **Exhibit "40"**.]

C.   Glock pistols employ an extractor-based load indicator that is virtually identical to the extractor-based load indicator "device" of the Beretta 92-series of pistols on the <u>Approved Firearms Roster</u>.  [*See* **Exhibit "41"**.]

**70.**     To the DEALERS' and CONSUMERS' inquiries whether and why or why Glock pistols do not comply with *her* REGULATION, the defendant ATTORNEY GENERAL:

>  **70.1.**   responded with the vacant proclamation "The handguns presently manufactured by Glock, Inc. ("Glock") are not in compliance with the Massachusetts Handgun Sales Regulations, because they lack an effective load indicator or magazine safety disconnect", but made no effort to explain why the Glock load indicator "device" is ineffective as such;

>  **70.2.**   responded that her Office "has been clear and consistent in our communications to dealers and consumers about the reason that Glock firearms do not comply with the Regulations", though **none** of the DEALERS and **none** of the CONUMERS have **ever** received **any** communications from the defendant ATTORNEY GENERAL, including "the reason that Glock firearms do not comply with the Regulations";

>  **70.3.**   declared that "Handgun dealers in Massachusetts have **clear information** on [Glock pistols' alleged noncompliance with the REGULATION] from Glock, EOPSS, and this Office" [emphasis in bolded italics]

>>  **A.**   while the EOPSS specifically disclaims responsibility for any handgun's compliance with the REGULATION and specifically directs users back to the defendant ATTORNEY GENERAL's website for that guidance,

>>  **B.**   which website yields exactly **<u>one (1)</u>** result for the search term "Glock" and even that search result is in no conceivable way related to any of the issues in this lawsuit.

>  **70.4.**   and redirected the DEALERS' and CONSUMERS' inquiries to "the manufacturer, who should be able to provide you with that information", and directly to "Glock, Inc.", a private party who:

>>  **A.**   does not have any known legal duty to inform the DEALERS or CONSUMERS whether any of their products comply with any particular Massachusetts regulation;

>>  **B.**   does not have any known legal power to enforce any states' laws and/or

regulations, including those of Massachusetts;

    **C.**    is not subject to the REGULATION because neither Glock, Inc. nor Glock Performance, Inc. maintains FFLs and state firearm dealer licenses in the Commonwealth and are therefore not "handgun purveyors", and

    **D.**    even whose compelled presence in Massachusetts is dubious for a lack of minimum contacts (if that were even an issue).

**71.**    The Defendant ATTORNEY GENERAL's deflection of questions regarding regulatory compliance to a private party is an unlawful abdication of her ***governmental*** authority and inherent ***state*** police power vested solely in her ***public*** office as the Attorney General of Massachusetts.

**72.**    By maintaining and enforcing 940 CMR §16.05(3), defendant ATTORNEY GENERAL is denying fair notice to the DEALERS whether they may lawfully sell or transfer Gen3 and/or Gen4 Glock pistols to the CONSUMERS who have requested them. DEALERS thereby risk an enforcement action by the defendant ATTORNEY GENERAL for disobeying her vacuous decree based on a regulation that is constitutionally void for vagueness.

**73.**    By maintaining and enforcing 940 CMR §16.05(3), defendant ATTORNEY GENERAL is propagating policies, customs and practices that violate the Fourteenth Amendment to the United States Constitution, ***facially*** and ***as applied*** against the DEALERS in this action, damaging the DEALERS in violation of U.S.C. §1983. As such, the DEALERS' Fourteenth Amendment rights have been infringed, burdened, violated and/or unlawfully limited. DEALERS are therefore entitled to permanent injunctive relief against such policies, customs and practices.

## B.  Second Claim for Relief:

*United States Constitution, 2nd Amendment*
<u>*42 U.S.C. §1983*</u>

**74.**    PLAINTIFFS restate and incorporate by reference herein each of the allegations set forth in Paragraphs 1 through 73 above.

**75.**     Gen3 and Gen4 Glock pistols are arms in common use throughout the United States. District of Columbia v. Heller, 554 U.S. 570, 624-628 (2008).

**76.**     Gen3 and Gen4 Glock pistols are arms whose possession is protected by the Second Amendment to the United States Constitution.

**77.**     By maintaining and enforcing 940 CMR §16.05(3), the defendant ATTORNEY GENERAL is preventing CONSUMERS from obtaining and possessing handguns, i.e. Glock pistols, whose acquisition and possession is protected by the Second Amendment to the United States Constitution.

**78.**     Because federal and Massachusetts regulations limit the CONSUMERS' sources of handguns at retail (and for interstate transfers) to "handgun purveyors" located in Massachusetts, the CONSUMERS have no practical alternative source to acquire Gen3 and Gen4 Glock pistols, whose acquisition and possession is protected by the Second Amendment to the United States Constitution

**79.**     By maintaining and enforcing 940 CMR §16.05(3), defendant ATTORNEY GENERAL is propagating policies, customs and practices that violate the Second Amendment to the United States Constitution, facially and as applied against the CONSUMERS in this action, damaging the CONSUMERS in violation of U.S.C. §1983.  As such, the CONSUMERS' Second Amendment rights have been infringed, burdened, violated and/or unlawfully limited.  CONSUMERS are therefore entitled to permanent injunctive relief against such policies, customs and practices.


## **PRAYER FOR RELIEF**


WHEREFORE the CONSUMERS, DEALERS and ORGANIZATIONS request that judgment be entered in their favor and against defendant ATTORNEY GENERAL as follows:

1.     An order permanently enjoining the defendant ATTORNEY GENERAL, her officers, agents, servants, employees, and all persons in active concert or participation with her from enforcing 940 CMR §16.05(3).

2.    Declaratory relief consistent with the injunction;

3.    Costs of suit, including attorney fees and costs pursuant to 42 U.S.C. §1983, and

4.    Any other further relief as this Court deems just and appropriate.


                                              Respectfully submitted,

Dated:  11 June 2014.                **ROBERT DRAPER;  ARIEL WEISBERG;
                                     DONNA MAJOR;  ERIC NOTKIN;  ROBERT
                                     BOUDRIE;  BRENT CARLTON;  CONCORD
                                     ARMORY, LLC;  PRECISION POINT
                                     FIREARMS, LLC;  SECOND AMENDMENT
                                     FOUNDATION, INC. and COMMONWEALTH
                                     SECOND AMENDMENT, INC.**

                                     By and through their attorney of record

                                     **/s/ Alexander A. Flig**
                            _____
                                     Alexander A. Flig, Esq (BBO #669132)
                                     490 Chapman Street, Suite 201
                                     Canton, Massachusetts 02021-2039
                                     Telephone:    (781) 352-7260
                                     Facsimile:    (781) 583-5080
                                     E-Mail:       alex@fliglaw.com

# Tab 4a

Exhibits to Complaint

# Index of Exhibits

## DRAPER, *et al.* v. COAKLEY

### United States District Court, District of Massachusetts

| Exhibit | Description |
|:---:|:---|
| **1** | <u>APPROVED FIREARMS ROSTER 02-2014</u>, published by the Massachusetts Executive Office of Public Safety and Security ("EOPSS"). |
| **2** | EOPSS Firearms Dealer Application – 20130911. |
| **Exhibits 3 – 8 are e-mails from the CONSUMERS to the DEALERS seeking to acquire Gen3/Gen4 Glock pistols.** | |
| **3** | • **16 April 2014**<br><br>E-mail from CONSUMER **DRAPER** to DEALER **CONCORD** seeking to purchase a new Gen3 or Gen4 Model 17 Glock pistol. |
| **4** | • **16 April 2014**<br><br>Two (2) e-mails from CONSUMER **WEISBERG** to DEALERS **CONCORD** and **PRECISION**, seeking to purchase a Gen4 Model 34 Glock pistol. |
| **5** | • **22 April 2014**<br><br>Two (2) e-mails from CONSUMER **MAJOR** to DEALERS **CONCORD** and **PRECISION** seeking to purchase or have transferred a Gen4 Glock pistol. |
| **6** | • **1 June 2014**<br><br>Two (2) e-mail from CONSUMER **NOTKIN** to DEALERS **CONCORD** and **PRECISION** seeking to purchase a Gen3 or Gen4 Model 17 Glock pistol. |
| **7** | • **19 April 2014**<br><br>Two (2) e-mails from CONSUMER **BOUDRIE** to DEALERS **CONCORD** and **PRECISION** seeking to purchase a Gen4 Model 34 Glock pistol. |
| **8** | • **19 April 2014**<br><br>Two (2) e-mails from CONSUMER **CARLTON** to DEALERS **CONCORD** and **PRECISION** seeking to purchase a Gen4 Model 34 Glock pistol. |

| Exhibit | Description |
|---|---|
| | **Exhibits 9 – 14 are e-mails from the DEALERS to the PLAINTIFFS rejecting to sell/transfer Gen3/Gen4 Glock pistols, because the DEALERS do not know whether these pistols comply with the REGULATION** |
| **9** | • <u>**16 April 2014**</u><br><br>E-mail from DEALER **CONCORD** to CONSUMER **DRAPER** rejecting to sell or transfer a Gen4 Model 34 Glock pistol. |
| **10** | • <u>**16 April 2014**</u> and <u>**19 April 2014**</u>, respectively<br><br>E-mails from DEALERS **CONCORD** and **PRECISION** to CONSUMER **WEISBERG** rejecting to sell or transfer a Gen4 Model 34 Glock pistol. |
| **11** | • <u>**29 April 2014**</u><br><br>E-mail from DEALER **PRECISION** to CONSUMER **MAJOR** rejecting to sell or transfer any post 21 October 1998 Glock pistol. |
| **12** | • <u>**1 June 2014**</u> and <u>**2 June 2014**</u><br><br>E-mails from DEALERS **PRECISION** and **CONCORD** to CONSUMER **NOTKIN** rejecting to sell or transfer a Gen3 or Gen4 Model 17 Glock pistol. |
| **13** | • <u>**22 April 2014**</u><br><br>E-mail from DEALER **PRECISION** to CONSUMER **BOUDRIE** rejecting to sell or transfer a Gen4 Model 34 Glock pistol. |
| **14** | • <u>**16 April 2014**</u> and <u>**21 April 2014**</u>, respectively<br><br>E-mails from DEALERS **CONCORD** and **PRECISION** to CONSUMER **CARLTON** rejecting to sell or transfer a Gen4 Model 34 Glock pistol. |
| | **Exhibits 15 – 22 are from the DEALERS and CONSUMERS to the defendant ATTORNEY GENERAL seeking clarification of whether Gen3 and/or Gen4 Glock pistols comply with the Handgun Sales Regulation** |
| **15** | • <u>**3 December 2013**</u><br><br>DEALER **CONCORD'S** letter to the defendant **ATTORNEY GENERAL** seeking clarification of whether Gen 3 and/or Gen4 Glock pistols comply with the Handgun Sales Regulation, and if not, why not. |

| Exhibit | Description |
|---------|-------------|
| **16** | - **16 May 2014**<br><br>DEALER **PRECISION'S** letter to the defendant **ATTORNEY GENERAL** seeking clarification of whether Gen 3 and/or Gen4 Glock pistols comply with the Handgun Sales Regulation, and if not, why not. |
| **17** | - **28 April 2014**<br><br>CONSUMER **DRAPER'S** letter to the defendant **ATTORNEY GENERAL** seeking clarification of whether Gen 3 and/or Gen4 Glock pistols comply with the Handgun Sales Regulation, and if not, why not. |
| **18** | - **28 April 2014**<br><br>CONSUMER **WEISBERG'S** letter to the defendant **ATTORNEY GENERAL** seeking clarification of whether Gen 3 and/or Gen4 Glock pistols comply with the Handgun Sales Regulation, and if not, why not. |
| **19** | - **16 May 2014**<br><br>CONSUMER **MAJOR'S** letter to the defendant **ATTORNEY GENERAL** seeking clarification of whether Gen 3 and/or Gen4 Glock pistols comply with the Handgun Sales Regulation, and if not, why not. |
| **20** | - **22 April 2014**<br><br>CONSUMER **NOTKIN'S** letter to the defendant **ATTORNEY GENERAL** seeking clarification of whether Gen 3 and/or Gen4 Glock pistols comply with the Handgun Sales Regulation, and if not, why not. |
| **21** | - **24 April 2014**<br><br>CONSUMER **BOUDRIE'S** letter to the defendant **ATTORNEY GENERAL** seeking clarification of whether Gen 3 and/or Gen4 Glock pistols comply with the Handgun Sales Regulation, and if not, why not. |
| **22** | - **28 April 2014**<br><br>CONSUMER **CARLTON'S** letter to the defendant **ATTORNEY GENERAL** seeking clarification of whether Gen 3 and/or Gen4 Glock pistols comply with the Handgun Sales Regulation, and if not, why not. |

**Exhibits 23 – 30 are the defendant ATTORNEY GENERAL's responses to the DEALERS' and CONSUMERS' requests for clarification of whether Gen3 and/or Gen4 Glock pistols comply with the Handgun Sales Regulation**

| Exhibit | Description |
|---------|-------------|
| **23** | - **2 April 2014**<br><br>Defendant **ATTORNEY GENERAL'S** response to DEALER **CONCORD'S** letter seeking clarification of Gen 3 and/or Gen4 Glock pistols' compliance with the Handgun Sales Regulation. |
| **24** | - **21 May 2014**<br><br>Defendant **ATTORNEY GENERAL'S** response to DEALER **PRECISION'S** letter seeking clarification of Gen 3 and/or Gen4 Glock pistols' compliance with the Handgun Sales Regulation. |
| **25** | - **6 May 2014**<br><br>Defendant **ATTORNEY GENERAL'S** response to CONSUMER **DRAPER'S** letter seeking clarification of Gen 3 and/or Gen4 Glock pistols' compliance with the Handgun Sales Regulation. |
| **26** | - **6 May 2014**<br><br>Defendant **ATTORNEY GENERAL'S** response to CONSUMER **WEISBERG'S** letter seeking clarification of Gen 3 and/or Gen4 Glock pistols' compliance with the Handgun Sales Regulation. |
| **27** | - **6 May 2014**<br><br>Defendant **ATTORNEY GENERAL'S** response to CONSUMER **NOTKIN'S** letter seeking clarification of Gen 3 and/or Gen4 Glock pistols' compliance with the Handgun Sales Regulation. |
| **28** | - **6 May 2014**<br><br>Defendant **ATTORNEY GENERAL'S** response to CONSUMER **CARLTON'S** letter seeking clarification of Gen 3 and/or Gen4 Glock pistols' compliance with the Handgun Sales Regulation. |
| **29** | - **14 May 2014**<br><br>Defendant **ATTORNEY GENERAL'S** response to CONSUMER **BOUDRIE'S** letter seeking clarification of Gen 3 and/or Gen4 Glock pistols' compliance with the Handgun Sales Regulation. |
| **30** | - **21 April 2014**<br><br>Defendant **ATTORNEY GENERAL'S** response to CONSUMER **MAJOR'S** letter seeking clarification of Gen 3 and/or Gen4 Glock pistols' compliance with the Handgun Sales Regulation. |

| Exhibit | Description |
|---------|-------------|
| **31** | • **21 May 2014**<br><br>Results for the search term "Glock" retrieved from the website of the Massachusetts Executive Office of Public Safety and Security ("EOPSS"). |
| **32** | • **16 May 2014**<br><br>Results for the search term "Glock" retrieved from the website of the defendant ATTORNEY GENERAL. |
| **Exhibits 33 – 40 are handgun models or series of handgun models on the EOPSS <u>Approved Firearms Roster</u> with various types of load indicator "devices" to which the defendant ATTORNEY GENERAL has not objected.**<br><br>[For clarify and to reduce the size of the exhibits attached to this motion, only the cover page and the relevant pages concerning "load indicators" from the cited owner/instruction manuals are included in the attached exhibits.] | |
| **33** | **FMK** model 9C1 (page 2 of the <u>Approved Firearms Roster</u>):  the loaded chamber indicator is a protruding pin on the breach end of the slide. |
| **34** | **Ruger SR** series of models (pages 12-16 of the <u>Approved Firearms Roster</u>):  the loaded chamber indicator is a protruding tab on top of the slide, behind the ejection port. |
| **35** | **Sig Sauer** model 226 Mk-25 (pages 6-7 of the <u>Approved Firearms Roster</u>):  the loaded chamber indicator is a protruding tab on top of the slide, behind the ejection port. |
| **36** | **Remington Arms** model 1911R1 (page 6 of the <u>Approved Firearms Roster</u>):  the loaded chamber indicator is a hole at the rear of the barrel (chamber) through which one must look to observe whether there is a cartridge in the chamber. |
| **37** | **Smith & Wesson** Bodyguard 380 (pages 7-11 of the <u>Approved Firearms Roster</u>):  the loaded chamber indicator is a hole at the rear of the barrel (chamber) through which one must look to observe whether there is a cartridge in the chamber. |
| **38** | **Walther Arms** model P99 (page 16 of the <u>Approved Firearms Roster</u>):  the loaded chamber indicator is a colored recess in the right side of the slide behind the ejection port which comes into view when the extractor engages the rim of a cartridge in the chamber. |

| Exhibit | Description |
|:---:|:---|
| **39** | **Kahr Arms** (all models) (pages 3-4 of the <u>Approved Firearms Roster</u>):  the loaded chamber indicator is part of the extractor, and protrudes from the right side of the slide behind the ejection port. |
| **40** | **Heckler & Koch** USP series of models (pages 3 of the <u>Approved Firearms Roster</u>):  the loaded chamber indicator is part of the extractor, and protrudes from the right side of the slide behind the ejection port. |
| **41** | **Beretta** 92 series of models (pages 1-2 of the <u>Approved Firearms Roster</u>): the loaded chamber indicator is part of the extractor, and protrudes from the right side of the slide behind the ejection port. |

**1**

Commonwealth of Massachusetts
**Executive Office of Public Safety and Security**

# APPROVED FIREARMS ROSTER   02-2014

### This Roster Supersedes All Previous Rosters

This roster has been compiled in accordance with M.G.L. c.140, § 131¾ and 501 CMR 7.00.  It contains weapons determined by Massachusetts approved independent testing laboratories to have satisfactorily completed the testing requirements of M.G.L. c. 140, § 123; clauses 18th; 19th; 20th; and 21st.  The reports resulting from said tests were reviewed by the Gun Control Advisory Board and those makes and models listed herein were subsequently approved by the Secretary of Public Safety and Security as having complied with the statutory handgun testing provisions of M.G.L. c. 140, § 123.

Modifications to this roster are likely to occur periodically, and licensees and law enforcement personnel should always utilize the most recent roster for purposes of determining statutory compliance.  The Approved Firearms Roster posted on the website of the Executive Office of Public Safety and Security (www.mass.gov/EOPS) will contain the most recently approved models.

Massachusetts licensed firearms dealers should note that the transfers of handguns are also subject to the Attorney General's Handgun Sales Regulations, 940 CMR 16.00, et seq.  Firearms on this Approved Firearms Roster do not necessarily comply with the requirements of the Attorney General's Handgun Sales Regulations.  Information about those regulations, as well as the Enforcement Notice may be obtained from the Office of the Attorney General and may be accessed on the website of the Attorney General (www.ago.state.ma.us)."

| Manufacturer | Model | Caliber |
|---|---|---|
| Armscor Precision | Rock Island 1911 A-1 GI | .45 ACP |
| Armscor Precision | Rock Island 1911 A-1 GS CS Blue | .45 ACP |
| Armscor Precision | Rock Island 1911 A-2 GI FS Blue | .45 ACP |
| Armscor Precision | Rock Island 1911 A-2 GI MS Blue | .45 ACP |
| Auto Ordnance | 1911-A1 | .45 ACP |
| Beretta | 84FS Cheetah | .380 ACP |
| Beretta | 84FS Cheetah – Nickel | .380 ACP |
| Beretta | 85FS Cheetah | .380 ACP |
| Beretta | 85FS Cheetah – Nickel | .380 ACP |
| Beretta | 92FS | 9mm |
| Beretta | 92FS Brigadier Inox | 9mm |
| Beretta | 92FS Compact Inox | 9mm |
| Beretta | 92FS Compact Type M | 9mm |
| Beretta | 92FS Compact Type M Inox | 9mm |
| Beretta | 92FS Inox | 9mm |

| Beretta | 92FS Vertec | 9mm |
|---|---|---|
| Beretta | 92FS Vertec Inox | 9mm |
| Beretta | 9000S | 9mm |
| Beretta | 96 | .40 S&W |
| Beretta | 96 Brigadier | .40 S&W |
| Beretta | 96 Brigadier Inox | .40 S&W |
| Beretta | 96 Inox | .40 S&W |
| Beretta | 96 Vertec | .40 S&W |
| Beretta | 96 Vertec Inox | .40 S&W |
| Beretta | 9000S Type F | .40 S&W |
| Browning | Buck Mark Camper SS | .22 LR |
| Browning | Buck Mark SE MS Lt Splash 7.25 | .22 LR |
| Charter 2000 | 14420 | .44 Spl |
| Charter 2000 | 74420 | .44 Spl |
| Charter Arms | 53820 Under Cover Lite | .38 Spl |
| Charter Arms | 53823 Under Cover Lite | .38 Spl |
| Charter Arms | 53824 Under Cover Lite | .38 Spl |
| Charter Arms | 53830 Pink Lady | .38 Spl |
| Charter Arms | 53833 Cougar | .38 Spl |
| Charter Arms | 53838 Gunblaster | .38 Spl |
| Charter Arms | 53840 Lavender Lady | .38 Spl |
| Charter Arms | 53844 Shamrock | .38 Spl |
| Charter Arms | 53850 All American | .38 Spl |
| Charter Arms | 53860 Santa Fe Sky | .38 Spl |
| Charter Arms | 53864 Santa Fe Sky | .38 Spl |
| Charter Arms | 53870 Under Cover Lite | .38 Spl |
| Charter Arms | 53873 Panther | .38 Spl |
| Charter Arms | 53883 Under Cover Lite | .38 Spl |
| Charter Arms | 53834 Under Cover Lite | .38 Spl |
| Charter Arms | 53890 Goldfinger | .38 Spl |
| FMK | 9C-1 | 9mm |
| FMK | 9C1 GEN II | 9mm |
| Glock | 17 | 9mm |
| Glock | 17C | 9mm |
| Glock | 17RTF | 9mm |
| Glock | 17 GEN4 | 9mm |
| Glock | 19 | 9mm |
| Glock | 19 GEN4 | 9mm |
| Glock | 19C | 9mm |
| Glock | 19RTF2 | 9mm |
| Glock | 26 | 9mm |
| Glock | 26 GEN4 | 9mm |
| Glock | 34 | 9mm |
| Glock | 34 GEN4 | 9mm |
| Glock | 31 | .357 Sig |
| Glock | 31C | .357 Sig |
| Glock | 31 GEN4 | .357 Sig |
| Glock | 32 | .357 Sig |
| Glock | 32C | .357 Sig |
| Glock | 32 Gen4 | .357 Sig |
| Glock | 33 | .357 Sig |
| Glock | 33 Gen4 | .357 Sig |
| Glock | 22 | .40 S&W |

| Glock | 22C | .40 S&W |
|---|---|---|
| Glock | 22RTF2 | .40 S&W |
| Glock | 22 GEN4 | .40 S&W |
| Glock | 23 | .40 S&W |
| Glock | 23C | .40 S&W |
| Glock | 23RTF | .40 S&W |
| Glock | 23 GEN4 | .40 S&W |
| Glock | 27 | .40 S&W |
| Glock | 27 GEN4 | .40 S&W |
| Glock | 35 | .40 S&W |
| Glock | 35 GEN4 | .40 S&W |
| Glock | 20 | 10mm |
| Glock | 20C | 10mm |
| Glock | 20SF | 10mm |
| Glock | 20 Gen4 | 10mm |
| Glock | 29 | 10mm |
| Glock | 29SF | 10mm |
| Glock | 29 Gen4 | 10mm |
| Glock | 21SF | .45 ACP |
| Glock | 21C | .45 ACP |
| Glock | 21 GEN4 | .45 ACP |
| Glock | 30 | .45 ACP |
| Glock | 30SF | .45 ACP |
| Glock | 30S | .45 ACP |
| Glock | 30 Gen4 | .45 ACP |
| Glock | 36 | .45 ACP |
| Glock | 37 | .45 GAP |
| Glock | 37 Gen4 | .45 GAP |
| Glock | 38 | .45 GAP |
| Glock | 39 | .45 GAP |
| Heckler & Koch | P30S-V3 | 9mm |
| Heckler & Koch | P30LS-V3 | 9mm |
| Heckler & Koch | P2000 | .357 Sig |
| Heckler & Koch | P2000SK | .357 Sig |
| Heckler & Koch | USP | .40 S&W |
| Heckler & Koch | USP Comp LEM | .40 S&W |
| Heckler & Koch | P30S-V3 | .40 S&W |
| Heckler & Koch | P30LS-V3 | .40 S&W |
| ISSC | M22 | .22 LR |
| ISSC | M22D | .22 LR |
| ISSC | M22DC | .22 LR |
| ISSC | M22PT | .22 LR |
| ISSC | M22BT | .22 LR |
| Kahr Arms | CWP9 | 9mm |
| Kahr Arms | P9 | 9mm |
| Kahr Arms | PM9 | 9mm |
| Kahr Arms | M9093 | 9mm |
| Kahr Arms | K9093 | 9mm |
| Kahr Arms | K9093A | 9mm |
| Kahr Arms | K9093NA | 9mm |
| Kahr Arms | K9096 | 9mm |
| Kahr Arms | K9096A | 9mm |
| Kahr Arms | K9096NA | 9mm |

| Kahr Arms | M9093A | 9mm |
|---|---|---|
| Kahr Arms | M9093NA | 9mm |
| Kahr Arms | M9096 | 9mm |
| Kahr Arms | M9096A | 9mm |
| Kahr Arms | M9096NA | 9mm |
| Kahr Arms | P40 | .40 S&W |
| Kahr Arms | PM40 | .40 S&W |
| Kahr Arms | M4043A | .40 S&W |
| Kahr Arms | K4043 | .40 S&W |
| Kahr Arms | K4043A | .40 S&W |
| Kahr Arms | K4043NA | .40 S&W |
| Kahr Arms | K4046 | .40 S&W |
| Kahr Arms | K4046A | .40 S&W |
| Kahr Arms | K4046NA | .40 S&W |
| Kahr Arms | M4043 | .40 S&W |
| Kahr Arms | M4043NA | .40 S&W |
| Kahr Arms | M4046 | .40 S&W |
| Kahr Arms | M4046A | .40 S&W |
| Kahr Arms | M4046NA | .40 S&W |
| Kahr Arms | KP45 | .45 ACP |
| Mauser | M2 | .40 S&W |
| Mauser | M2 | .45 ACP |
| Para  Ordnance | C6 Stainless | .45 ACP |
| Para  Ordnance | C7 Stainless | .45 ACP |
| Para  Ordnance | 189 Steel | 9mm |
| Para  Ordnance | D189 Steel | 9mm |
| Para  Ordnance | RHX129E | 9mm |
| Para  Ordnance | PX189S | 9mm |
| Para  Ordnance | TX189S | 9mm |
| Para  Ordnance | RX189E | 9mm |
| Para  Ordnance | DX189E | 9mm |
| Para  Ordnance | TX189E | 9mm |
| Para  Ordnance | CTX189B | 9mm |
| Para  Ordnance | DX189S | 9mm |
| Para  Ordnance | RX189S | 9mm |
| Para  Ordnance | PX938P | .38 Super |
| Para  Ordnance | PX938S | .38 Super |
| Para  Ordnance | 1440 Steel | .40 S&W |
| Para  Ordnance | L1440 Steel | .40 S&W |
| Para  Ordnance | 1640 Steel | .40 S&W |
| Para  Ordnance | 1640 Stainless | .40 S&W |
| Para  Ordnance | D1640 Stainless | .40 S&W |
| Para  Ordnance | 1640 Steel | .40 S&W |
| Para  Ordnance | D1640 Steel | .40 S&W |
| Para  Ordnance | S1640 Stainless | .40 S&W |
| Para  Ordnance | P1640 Steel | .40 S&W |
| Para  Ordnance | SX1640E | .40 S&W |
| Para  Ordnance | RHX1640E | .40 S&W |
| Para  Ordnance | SX1640S | .40 S&W |
| Para  Ordnance | RX1640S | .40 S&W |
| Para  Ordnance | 745 Stainless | .45 ACP |
| Para  Ordnance | 745 Steel | .45 ACP |
| Para  Ordnance | D745 Steel | .45 ACP |

| Para Ordnance | D745 Stainless | .45 ACP |
|---|---|---|
| Para Ordnance | 1045 Alloy | .45 ACP |
| Para Ordnance | 1045 Stainless | .45 ACP |
| Para Ordnance | P1045 Steel | .45 ACP |
| Para Ordnance | P1045 Alloy | .45 ACP |
| Para Ordnance | S1045 Stainless | .45 ACP |
| Para Ordnance | 1245 Alloy | .45 ACP |
| Para Ordnance | 1245 Stainless | .45 ACP |
| Para Ordnance | 1245 Steel | .45 ACP |
| Para Ordnance | L1245 Steel | .45 ACP |
| Para Ordnance | P1245 Steel | .45 ACP |
| Para Ordnance | S1245 Stainless | .45 ACP |
| Para Ordnance | P1245 Alloy | .45 ACP |
| Para Ordnance | 1345 Stainless | .45 ACP |
| Para Ordnance | 1345 Steel | .45 ACP |
| Para Ordnance | CT1345 Stainless | .45 ACP |
| Para Ordnance | S1345 Stainless | .45 ACP |
| Para Ordnance | P1345 Steel | .45 ACP |
| Para Ordnance | 1445 Alloy | .45 ACP |
| Para Ordnance | 1445 Stainless | .45 ACP |
| Para Ordnance | 1445 Steel | .45 ACP |
| Para Ordnance | S1445 Stainless | .45 ACP |
| Para Ordnance | P1445 Steel | .45 ACP |
| Para Ordnance | P1445 Alloy | .45 ACP |
| Para Ordnance | P1445RR | .45 ACP |
| Para Ordnance | P1445ER | .45 ACP |
| Para Ordnance | P1445SR | .45 ACP |
| Para Ordnance | D1445 Steel | .45 ACP |
| Para Ordnance | D1445ER | .45 ACP |
| Para Ordnance | D1445SR | .45 ACP |
| Para Ordnance | Companion Stainless | .45 ACP |
| Para Ordnance | Carry Stainless | .45 ACP |
| Para Ordnance | PX745E | .45 ACP |
| Para Ordnance | PX745EM | .45 ACP |
| Para Ordnance | PX745EMB | .45 ACP |
| Para Ordnance | PX144EMB | .45 ACP |
| Para Ordnance | RHX1045E | .45 ACP |
| Para Ordnance | PCX745R | .45 ACP |
| Para Ordnance | WHX129R | .45 ACP |
| Para Ordnance | NHX1045N | .45 ACP |
| Para Ordnance | PCX745S | .45 ACP |
| Para Ordnance | PSHX645S | .45 ACP |
| Para Ordnance | WHX1045S | .45 ACP |
| Para Ordnance | PX1445S | .45 ACP |
| Para Ordnance | SX1445S | .45 ACP |
| Para Ordnance | SX1245S | .45 ACP |
| Para Ordnance | PRX745B | .45 ACP |
| Para Ordnance | PRX745S | .45 ACP |
| Para Ordnance | DCX745E | .45 ACP |
| Para Ordnance | DX1445E | .45 ACP |
| Para Ordnance | DCX1445E | .45 ACP |
| Para Ordnance | RX1445E | .45 ACP |
| Para Ordnance | DX745S | .45 ACP |

| | | |
|---|---|---|
| Para  Ordnance | CWX745S | .45 ACP |
| Para  Ordnance | CCWX745S | .45 ACP |
| Para  Ordnance | CX745S | .45 ACP |
| Para  Ordnance | DX1445S | .45 ACP |
| Para  Ordnance | RX1445S | .45 ACP |
| Para  Ordnance | TX1640S | .45 ACP |
| Para  Ordnance | CWX745S | .45 ACP |
| Para  Ordnance | CCWX745S | .45 ACP |
| Para  Ordnance | CTX1345S Stainless | .45 ACP |
| Para  Ordnance | CTX1345G Stainless | .45 ACP |
| Para  Ordnance | CTX1245N Stainless | .45 ACP |
| Para  Ordnance | CWX645S Stainless | .45 ACP |
| Para  Ordnance | CWX645B Stainless | .45 ACP |
| Para  Ordnance | TX745S Stainless | .45 ACP |
| Para  Ordnance | PCWX745S Stainless | .45 ACP |
| Para  Ordnance | PCWX745E Steel | .45 ACP |
| Para  Ordnance | WHX1045R Steel/Alloy | .45 ACP |
| Remington Arms | 1911R1 | .45 ACP |
| Remington Arms | 1911R1 Chain Ramac 96325 | .45 ACP |
| Remington Arms | 1911R1 Centennial/Ramac 96340 | .45 ACP |
| Remington Arms | 1911R1 Limited/Ramac 96341 | .45 ACP |
| Remington Arms | 1911R1 OD Frame/Ramac 96350 | .45 ACP |
| Remington Arms | 1911R1 Stainless/Ramac 96324 | .45 ACP |
| Remington Arms | 1911R1 Talo/Ramac 96343 | .45 ACP |
| Remington Arms | 1911R1 Enhanced/Ramac 96328 | .45 ACP |
| Remington Arms | 1911R1 Enhanced Threaded Barrel/Ramac 96339 | .45 ACP |
| Seecamp | LWS32 | .32 ACP |
| Sig Arms | Mosquito | .22 LR |
| Sig Arms | P232 Stainless | .380 ACP |
| Sig Arms | P238 | .380 ACP |
| Sig Arms | P225 | 9mm |
| Sig Arms | P226 | 9mm |
| Sig Arms | P226 Rail | 9mm |
| Sig Arms | P226 Stainless | 9mm |
| Sig Arms | P228 | 9mm |
| Sig Arms | P229 | 9mm |
| Sig Arms | P239 | 9mm |
| Sig Arms | SP2009 | 9mm |
| Sig Arms | 250C-9-BSS-MA | 9mm |
| Sig Arms | P938 | 9mm |
| Sig Arms | P226 | .357 Sig |
| Sig Arms | P226 Rail | .357.Sig |
| Sig Arms | P226 Stainless | .357 Sig |
| Sig Arms | P229 | .357 Sig |
| Sig Arms | P239 | .357 Sig |
| Sig Arms | SP2340 | .357 Sig |
| Sig Arms | 250C-357-BSS-MA | .357 Sig |
| Sig Arms | P226 | .40 S&W |
| Sig Arms | P226 Rail | .40 S&W |
| Sig Arms | P226 DAK | .40 S&W |
| Sig Arms | P229 | .40 S&W |
| Sig Arms | P229 DAK | .40 S&W |

| Sig Arms | P239 | .40 S&W |
|----------|------|---------|
| Sig Arms | P239 DAK | .40 S&W |
| Sig Arms | SP2022 | .40 S&W |
| Sig Arms | SP2340 | .40 S&W |
| Sig Arms | 250C-40-BSS-MA | .40 S&W |
| Sig Arms | P220 | .45 ACP |
| Sig Arms | P220 Stainless | .45 ACP |
| Sig Arms | P245 | .45 ACP |
| Sig Arms | P250C | .45 ACP |
| Sig Arms | P250F | .45 ACP |
| Sig Arms | 1911-45-S | .45 ACP |
| Smith & Wesson | 647 | .17 Hornady |
| Smith & Wesson | 647-1 | .17 Hornady |
| Smith & Wesson | 648-2 | .22 MRF |
| Smith & Wesson | 17-9 | .22 LR |
| Smith & Wesson | 22A-1 | .22 LR |
| Smith & Wesson | 22S-1 | .22 LR |
| Smith & Wesson | 41 | .22 LR |
| Smith & Wesson | 63-4 | .22 LR |
| Smith & Wesson | 317-2 | .22 LR |
| Smith & Wesson | 317-3 | .22 LR |
| Smith & Wesson | 317LS | .22 LR |
| Smith & Wesson | 617-5 | .22 LR |
| Smith & Wesson | 617-6 | .22 LR |
| Smith & Wesson | 351 PD | .22 WMR |
| Smith & Wesson | 351C | .22 WMR |
| Smith & Wesson | 331-2 | .32 H&R Mag. |
| Smith & Wesson | 332-1 | .32 H&R Mag. |
| Smith & Wesson | 431 PD | .32 H&R Mag. |
| Smith & Wesson | 432 PD | .32 H&R Mag. |
| Smith & Wesson | 632-1 | .327 Mag. |
| Smith & Wesson | Bodyguard 380 | .380 ACP |
| Smith & Wesson | 908 | 9mm |
| Smith & Wesson | 908S | 9mm |
| Smith & Wesson | 910 | 9mm |
| Smith & Wesson | 910S | 9mm |
| Smith & Wesson | 952-1 | 9mm |
| Smith & Wesson | 952-2 | 9mm |
| Smith & Wesson | 1911 | 9mm |
| Smith & Wesson | 3913LS | 9mm |
| Smith & Wesson | 3913TSW | 9mm |
| Smith & Wesson | 5903TSW | 9mm |
| Smith & Wesson | 5906TSW | 9mm |
| Smith & Wesson | CS9 | 9mm |
| Smith & Wesson | SD9 VE | 9mm |
| Smith & Wesson | SW99 | 9mm |
| Smith & Wesson | SW9E | 9mm |
| Smith & Wesson | SW9G | 9mm |
| Smith & Wesson | SW9GVE | 9mm |
| Smith & Wesson | SW9P | 9mm |
| Smith & Wesson | SW9VE | 9mm |
| Smith & Wesson | M&P9 (Mag Safety) | 9mm |
| Smith & Wesson | M&P9 (Mag Safety, Internal Lock) | 9mm |

| Smith & Wesson | M&P9c | 9mm |
|---|---|---|
| Smith & Wesson | M&P9c (Mag Safety) | 9mm |
| Smith & Wesson | M&P9 | 9mm |
| Smith & Wesson | M&P9 Shield | 9mm |
| Smith & Wesson | Bodyguard 38 | .38 Spl |
| Smith & Wesson | 10-14 | .38 Spl |
| Smith & Wesson | 14-8 | .38 Spl |
| Smith & Wesson | 15-10 | .38 Spl |
| Smith & Wesson | 36-10 | .38 Spl |
| Smith & Wesson | 36-10LS | .38 Spl |
| Smith & Wesson | 40-1 | .38 Spl |
| Smith & Wesson | 42-2 | .38 Spl |
| Smith & Wesson | 64-7 | .38 Spl |
| Smith & Wesson | 64-8 | .38 Spl |
| Smith & Wesson | 67-5 | .38 Spl |
| Smith & Wesson | 67-6 | .38 Spl |
| Smith & Wesson | 67-7 | .38 Spl |
| Smith & Wesson | 315 | .38 Spl |
| Smith & Wesson | 337-2 | .38 Spl |
| Smith & Wesson | 337-2PD | .38 Spl |
| Smith & Wesson | 342 | .38 Spl |
| Smith & Wesson | 342 PD | .38 Spl |
| Smith & Wesson | 342-1 PD | .38 Spl |
| Smith & Wesson | 360 | .38 Spl |
| Smith & Wesson | 438 | .38 Spl |
| Smith & Wesson | 442-1 | .38 Spl |
| Smith & Wesson | 442-2 | .38 Spl |
| Smith & Wesson | 637-2 | .38 Spl |
| Smith & Wesson | 638-3 | .38 Spl |
| Smith & Wesson | 642-1 | .38 Spl |
| Smith & Wesson | 642-2 | .38 Spl |
| Smith & Wesson | 642-2 LS | .38 Spl |
| Smith & Wesson | 337-3 | .38 Spl +P |
| Smith & Wesson | 627-4 | .38 Super |
| Smith & Wesson | 686-7 | .38 Super |
| Smith & Wesson | 1911-2 | .38 Super |
| Smith & Wesson | 27-9 | .357 Mag. |
| Smith & Wesson | 60-14 | .357 Mag. |
| Smith & Wesson | 60-14LS | .357 Mag. |
| Smith & Wesson | 60-15 | .357 Mag. |
| Smith & Wesson | 60-18 | .357 Mag. |
| Smith & Wesson | 65-7 | .357 Mag. |
| Smith & Wesson | 65-7LS | .357 Mag. |
| Smith & Wesson | 65-8 | .357 Mag. |
| Smith & Wesson | 65-8 LS | .357 Mag. |
| Smith & Wesson | 66-6 | .357 Mag. |
| Smith & Wesson | 66-7 | .357 Mag. |
| Smith & Wesson | 327 | .357 Mag. |
| Smith & Wesson | 327-1 | .357 Mag. |
| Smith & Wesson | 327PD | .357 Mag. |
| Smith & Wesson | 360 SC | .357 Mag. |
| Smith & Wesson | 386 | .357 Mag. |
| Smith & Wesson | 386NG | .357 Mag. |

| | | |
|---|---|---|
| Smith & Wesson | 386PD | .357 Mag. |
| Smith & Wesson | 386SC | .357 Mag. |
| Smith & Wesson | 386Sc/S | .357 Mag. |
| Smith & Wesson | 386 XL Hunter | .357 Mag. |
| Smith & Wesson | 340 PD | .357 Mag. |
| Smith & Wesson | 340 SC | .357 Mag. |
| Smith & Wesson | 360 PD | .357 Mag. |
| Smith & Wesson | 520 | .357 Mag. |
| Smith & Wesson | 586-8 | .357 Mag. |
| Smith & Wesson | 619 | .357 Mag. |
| Smith & Wesson | 620 | .357 Mag. |
| Smith & Wesson | 627-5 | .357 Mag. |
| Smith & Wesson | 640-1 | .357 Mag. |
| Smith & Wesson | 640-3 | .357 Mag. |
| Smith & Wesson | 649-5 | .357 Mag. |
| Smith & Wesson | 686-6 | .357 Mag. |
| Smith & Wesson | 686-6 Plus | .357 Mag. |
| Smith & Wesson | 686-6 Power Port | .357 Mag. |
| Smith & Wesson | 686-6 SSR | .357 Mag. |
| Smith & Wesson | M&P360 | .357 Mag. |
| Smith & Wesson | M&P340 | .357 Mag. |
| Smith & Wesson | M&P340 (no internal lock) | .357 Mag. |
| Smith & Wesson | M&P357 | .357 Sig |
| Smith & Wesson | 410 | .40 S&W |
| Smith & Wesson | 410S | .40 S&W |
| Smith & Wesson | CS40 | .40 S&W |
| Smith & Wesson | M&P40 (Mag Safety) | .40 S&W |
| Smith & Wesson | M&P40 | .40 S&W |
| Smith & Wesson | M&P40 (Mag Safety, Internal Lock) | .40 S&W |
| Smith & Wesson | M&P40c (Mag Safety) | .40 S&W |
| Smith & Wesson | M&P40 Shield | .40 S&W |
| Smith & Wesson | 4003TSW | .40 S&W |
| Smith & Wesson | 4006TSW | .40 S&W |
| Smith & Wesson | 4013TSW | .40 S&W |
| Smith & Wesson | 4040 PD | .40 S&W |
| Smith & Wesson | SD40 VE | .40 S&W |
| Smith & Wesson | SW40E | .40 S&W |
| Smith & Wesson | SW40G | .40 S&W |
| Smith & Wesson | SW40GVE | .40 S&W |
| Smith & Wesson | SW40P | .40 S&W |
| Smith & Wesson | SW40VE | .40 S&W |
| Smith & Wesson | SW99 | .40 S&W |
| Smith & Wesson | SW99QA | .40 S&W |
| Smith & Wesson | SW990 | .40 S&W |
| Smith & Wesson | SW990L Compact | .40 S&W |
| Smith & Wesson | 945-40 | .40 S&W |
| Smith & Wesson | 610-3 | 10mm |
| Smith & Wesson | 57-5 | .41 Mag. |
| Smith & Wesson | 57-6 | .41 Mag. |
| Smith & Wesson | 58-1 | .41 Mag. |
| Smith & Wesson | 357 NG | .41 Mag. |
| Smith & Wesson | 357 PD | .41 Mag. |
| Smith & Wesson | 657-5 | .41 Mag. |

| Smith & Wesson | 21-4 | .44 Spl |
|---|---|---|
| Smith & Wesson | 24-6 | .44 Spl |
| Smith & Wesson | 396NG | .44 Spl |
| Smith & Wesson | 396-1 | .44 Spl |
| Smith & Wesson | 696 | .44 Spl |
| Smith & Wesson | 29-8 | .44 Mag. |
| Smith & Wesson | 29-10 | .44 Mag. |
| Smith & Wesson | 329PD | .44 Mag. |
| Smith & Wesson | 329-1 | .44 Mag. |
| Smith & Wesson | 629-6 | .44 Mag. |
| Smith & Wesson | 629-6 Classic | .44 Mag. |
| Smith & Wesson | 629-6 Classic DX | .44 Mag. |
| Smith & Wesson | 629-6 Power Port | .44 Mag. |
| Smith & Wesson | 629-7 | .44 Mag. |
| Smith & Wesson | 22-4 | .45 ACP |
| Smith & Wesson | 325 | .45 ACP |
| Smith & Wesson | 325PD | .45 ACP |
| Smith & Wesson | 457 | .45 ACP |
| Smith & Wesson | 457S | .45 ACP |
| Smith & Wesson | 625-8 | .45 ACP |
| Smith & Wesson | 625-8 JM | .45 ACP |
| Smith & Wesson | 625-10 | .45 ACP |
| Smith & Wesson | 945-1 | .45 ACP |
| Smith & Wesson | M&P45 | .45 ACP |
| Smith & Wesson | M&P45c | .45 ACP |
| Smith & Wesson | 1911 | .45 ACP |
| Smith & Wesson | 1911 (Steel) | .45 ACP |
| Smith & Wesson | 1911 DK | .45 ACP |
| Smith & Wesson | 1911 PD | .45 ACP |
| Smith & Wesson | 1911 Sc (Black) | .45 ACP |
| Smith & Wesson | 1911 SC | .45 ACP |
| Smith & Wesson | 1911 Pro Series | .45 ACP |
| Smith & Wesson | 1911 Compact ES | .45 ACP |
| Smith & Wesson | 1911 TFP | .45 ACP |
| Smith & Wesson | PC1911 | .45 ACP |
| Smith & Wesson | 4513TSW | .45 ACP |
| Smith & Wesson | 4563TSW | .45 ACP |
| Smith & Wesson | 4566TSW | .45 ACP |
| Smith & Wesson | CS45 | .45 ACP |
| Smith & Wesson | SW99 | .45 ACP |
| Smith & Wesson | SW1911 | .45 ACP |
| Smith & Wesson | SW1911TA | .45 ACP |
| Smith & Wesson | SW1911CT | .45 ACP |
| Smith & Wesson | SW1911 Sub Compact | .45 ACP |
| Smith & Wesson | SW1911SC | .45 ACP |
| Smith & Wesson | M3 Schofield | .45 S&W Schofield |
| Smith & Wesson | Governor | .45 Long Colt |
| Smith & Wesson | 25-13 | .45 Long Colt |
| Smith & Wesson | 25-15 | .45 Long Colt |
| Smith & Wesson | 625-9 | .45 Long Colt |
| Smith & Wesson | 460 ES | 460 S&W Mag. |
| Smith & Wesson | 460V | 460 S&W Mag. |
| Smith & Wesson | 460XVR | 460 S&W Mag. |

| Smith & Wesson | 500 | 500 S&W |
|---|---|---|
| Smith & Wesson | 500 ES | 500 S&W |
| Steyr Arms | M9A1 | 9mm |
| Steyr Arms | M357-A1 | .357 Sig. |
| Steyr Arms | M40-A1 | .40 S&W |
| Steyr Arms | S-A1 | .40 S&W |
| Strayer Voigt | Infinity Traditional | .45 ACP |
| Strayer Voigt | Infinity Competition | .45 ACP |
| Sturm, Ruger & Co. | NR617 | 17 HMR |
| Sturm, Ruger & Co. | KNR-717H | 17 HMR |
| Sturm, Ruger & Co. | KNR-717HX | 17 Mach 2 |
| Sturm, Ruger & Co. | LCR-22 | .22 LR |
| Sturm, Ruger & Co. | SR22PB | .22 LR |
| Sturm, Ruger & Co. | KSP-242-8 | .22 LR |
| Sturm, Ruger & Co. | KSP241X | .22 LR |
| Sturm, Ruger & Co. | MK4 | .22 LR |
| Sturm, Ruger & Co. | KMK4 | .22 LR |
| Sturm, Ruger & Co. | KP4 | .22 LR |
| Sturm, Ruger & Co. | MK6 | .22 LR |
| Sturm, Ruger & Co. | KMK6 | .22 LR |
| Sturm, Ruger & Co. | MK678 | .22 LR |
| Sturm, Ruger & Co. | KMK678 | .22 LR |
| Sturm, Ruger & Co. | P4 | .22 LR |
| Sturm, Ruger & Co. | P512 | .22 LR |
| Sturm, Ruger & Co. | KP512 | .22 LR |
| Sturm, Ruger & Co. | MK512 | .22 LR |
| Sturm, Ruger & Co. | KMK512 | .22 LR |
| Sturm, Ruger & Co. | KMK512GCUS | .22 LR |
| Sturm, Ruger & Co. | MK10 | .22 LR |
| Sturm, Ruger & Co. | KMK10 | .22 LR |
| Sturm, Ruger & Co. | MK678G | .22 LR |
| Sturm, Ruger & Co. | KMK678G | .22 LR |
| Sturm, Ruger & Co. | KMK678GC | .22 LR |
| Sturm, Ruger & Co. | MK8 | .22 LR |
| Sturm, Ruger & Co. | P678GC | .22 LR |
| Sturm, Ruger & Co. | P8GC | .22 LR |
| Sturm, Ruger & Co. | MKIII4 | .22 LR |
| Sturm, Ruger & Co. | MKIII6 | .22 LR |
| Sturm, Ruger & Co. | P512MKIII | .22 LR |
| Sturm, Ruger & Co. | KP512MKIII | .22 LR |
| Sturm, Ruger & Co. | KP45HMKIII | .22 LR |
| Sturm, Ruger & Co. | KP678HMKIII | .22 LR |
| Sturm, Ruger & Co. | P4MKIII | .22 LR |
| Sturm, Ruger & Co. | P45GCMKIII | .22 LR |
| Sturm, Ruger & Co. | MKIII 512 | .22 LR |
| Sturm, Ruger & Co. | MKIII512GCL | .22 LR |
| Sturm, Ruger & Co. | MKIII678 | .22 LR |
| Sturm, Ruger & Co. | KMKIII45HCL | .22 LR |
| Sturm, Ruger & Co. | KMKIII678GC | .22 LR |
| Sturm, Ruger & Co. | KMKIII678H | .22 LR |
| Sturm, Ruger & Co. | SBC4 | .22 LR |
| Sturm, Ruger & Co. | KSBC4 | .22 LR |
| Sturm, Ruger & Co. | RB22AW | .22 LR |

| | | |
|---|---|---|
| Sturm, Ruger & Co. | KMKIII 512 | .22 LR |
| Sturm, Ruger & Co. | KNR-5-10 | .22 LR |
| Sturm, Ruger & Co. | SR22P-R | .22 LR |
| Sturm, Ruger & Co. | SR22PS | .22 LR |
| Sturm, Ruger & Co. | LCR-22-F | .22 LR |
| Sturm, Ruger & Co. | 05410 (No Lock) | .22 LR |
| Sturm, Ruger & Co. | LCR-22-LG (Model 5413) | .22 LR |
| Sturm, Ruger & Co. | LCR-22-LM (Model 5416) | .22 LR |
| Sturm, Ruger & Co. | LCR-22-OD (Model 5417) | .22 LR |
| Sturm, Ruger & Co. | NR4L | .22 LR / 22 Mag. |
| Sturm, Ruger & Co. | NR4F50 | .22 LR / 22 Mag. |
| Sturm, Ruger & Co. | NR5 | .22 LR / 22 Mag. |
| Sturm, Ruger & Co. | NR5L | .22 LR / 22 Mag. |
| Sturm, Ruger & Co. | NR6 | .22 LR / 22 Mag. |
| Sturm, Ruger & Co. | NR6L | .22 LR / 22 Mag. |
| Sturm, Ruger & Co. | NR9 | .22 LR / 22 Mag. |
| Sturm, Ruger & Co. | NR9L | .22 LR / 22 Mag. |
| Sturm, Ruger & Co. | KNR5 | .22 LR / 22 Mag. |
| Sturm, Ruger & Co. | KNR6 | .22 LR / 22 Mag. |
| Sturm, Ruger & Co. | NR5F | .22 LR / 22 Mag. |
| Sturm, Ruger & Co. | NR5FL | .22 LR / 22 Mag. |
| Sturm, Ruger & Co. | NR6F | .22 LR / 22 Mag. |
| Sturm, Ruger & Co. | KNR-7H | .22 LR / 22 Mag. |
| Sturm, Ruger & Co. | NR6FL | .22 Mag. |
| Sturm, Ruger & Co. | KNR-6-9M | .22 Mag. |
| Sturm, Ruger & Co. | 05414 (Internal Lock) | .22 Mag. |
| Sturm, Ruger & Co. | 05414 (No Lock) | .22 Mag. |
| Sturm, Ruger & Co. | SSM4FSI | .32 H&R |
| Sturm, Ruger & Co. | KSSM4FSI | .32 H&R |
| Sturm, Ruger & Co. | KSP3231X | .32 Mag. |
| Sturm, Ruger & Co. | KSP3241X | .32 Mag. |
| Sturm, Ruger & Co. | LC9 | 9mm |
| Sturm, Ruger & Co. | P89 | 9mm |
| Sturm, Ruger & Co. | KP89 | 9mm |
| Sturm, Ruger & Co. | P89D | 9mm |
| Sturm, Ruger & Co. | KP89D | 9mm |
| Sturm, Ruger & Co. | P94 | 9mm |
| Sturm, Ruger & Co. | KP94 | 9mm |
| Sturm, Ruger & Co. | P95D | 9mm |
| Sturm, Ruger & Co. | KP95D | 9mm |
| Sturm, Ruger & Co. | BSR9C-10L | 9mm |
| Sturm, Ruger & Co. | KSR9-10-L | 9mm |
| Sturm, Ruger & Co. | KSR9C-10-L | 9mm |
| Sturm, Ruger & Co. | KODBSR9-10-L | 9mm |
| Sturm, Ruger & Co. | KBSR9-10-L | 9mm |
| Sturm, Ruger & Co. | SR9B-10-L | 9mm |
| Sturm, Ruger & Co. | KSR9C-10-CF | 9mm |
| Sturm, Ruger & Co. | KGPF840 | .38 Spl |
| Sturm, Ruger & Co. | LCR | .38 Spl |
| Sturm, Ruger & Co. | LCR-LG | .38 Spl |
| Sturm, Ruger & Co. | LCR-XS 5405 | .38 Spl |
| Sturm, Ruger & Co. | LCR-F | .38 Spl |
| Sturm, Ruger & Co. | LCR-BGXS | .38 Spl +P |

| | | |
|---|---|---|
| Sturm, Ruger & Co. | KSP821X | .38 Spl +P |
| Sturm, Ruger & Co. | KSP831X | .38 Spl +P |
| Sturm, Ruger & Co. | 05401 (No Lock) | .38 Spl +P |
| Sturm, Ruger & Co. | LCR-LG (Model 5402) | .38 Spl +P |
| Sturm, Ruger & Co. | LCR-OD (Model (5404) | .38 Spl +P |
| Sturm, Ruger & Co. | LCR-XS (Model 5405) | .38 Spl +P |
| Sturm, Ruger & Co. | LCR-TG (Model 5407) | .38 Spl +P |
| Sturm, Ruger & Co. | LCR-P (Model 5409) | .38 Spl +P |
| Sturm, Ruger & Co. | LCR-LM (Model 5415) | .38 Spl +P |
| Sturm, Ruger & Co. | LCR-F (Model 5418) | .38 Spl +P |
| Sturm, Ruger & Co. | LCR-FR (Model 5419) | .38 Spl +P |
| Sturm, Ruger & Co. | KSP32731X | .327 Federal Mag. |
| Sturm, Ruger & Co. | KGP-4327-7 | .327 Federal Mag. |
| Sturm, Ruger & Co. | KBN-3275 | .327 Federal Mag. |
| Sturm, Ruger & Co. | KSP-341 | .357 Mag. |
| Sturm, Ruger & Co. | GP141 | .357 Mag. |
| Sturm, Ruger & Co. | KGP141 | .357 Mag. |
| Sturm, Ruger & Co. | GP160 | .357 Mag. |
| Sturm, Ruger & Co. | KGP160 | .357 Mag. |
| Sturm, Ruger & Co. | GP161 | .357 Mag. |
| Sturm, Ruger & Co. | KGP161 | .357 Mag. |
| Sturm, Ruger & Co. | KGPF330 | .357 Mag. |
| Sturm, Ruger & Co. | GPF331 | .357 Mag. |
| Sturm, Ruger & Co. | KGPF331 | .357 Mag. |
| Sturm, Ruger & Co. | GPF340 | .357 Mag. |
| Sturm, Ruger & Co. | KGPF340 | .357 Mag. |
| Sturm, Ruger & Co. | GPF341 | .357 Mag. |
| Sturm, Ruger & Co. | KGPF341 | .357 Mag. |
| Sturm, Ruger & Co. | KSP321X | .357 Mag. |
| Sturm, Ruger & Co. | KSP331X | .357 Mag. |
| Sturm, Ruger & Co. | KSP321XL | .357 Mag. |
| Sturm, Ruger & Co. | KSP321X-CT 5766 | .357 Mag. |
| Sturm, Ruger & Co. | BNV34 | .357 Mag. |
| Sturm, Ruger & Co. | KBNV34 | .357 Mag. |
| Sturm, Ruger & Co. | BNV35 | .357 Mag. |
| Sturm, Ruger & Co. | KBVN35 | .357 Mag. |
| Sturm, Ruger & Co. | BNVBH34 | .357 Mag. |
| Sturm, Ruger & Co. | RBNV35 | .357 Mag. |
| Sturm, Ruger & Co. | KRBNV35 | .357 Mag. |
| Sturm, Ruger & Co. | NV34 | .357 Mag. |
| Sturm, Ruger & Co. | KNV34 | .357 Mag. |
| Sturm, Ruger & Co. | KNV34 Stainless | .357 Mag |
| Sturm, Ruger & Co. | KNV34SASS Stainless | .357 Mag |
| Sturm, Ruger & Co. | NV35 | .357 Mag. |
| Sturm, Ruger & Co. | KNV35 | .357 Mag. |
| Sturm, Ruger & Co. | KNV35 Stainless | .357 Mag. |
| Sturm, Ruger & Co. | BN34 | .357 Mag. |
| Sturm, Ruger & Co. | BN34L | .357 Mag. |
| Sturm, Ruger & Co. | BN34XL | .357 Mag. |
| Sturm, Ruger & Co. | KBN34 | .357 Mag. |
| Sturm, Ruger & Co. | BN36 | .357 Mag. |
| Sturm, Ruger & Co. | BN36L | .357 Mag. |
| Sturm, Ruger & Co. | KBN36 | .357 Mag. |

| Sturm, Ruger & Co. | BN34X | .357 Mag. |
|---|---|---|
| Sturm, Ruger & Co. | BN36X | .357 Mag. |
| Sturm, Ruger & Co. | RB35W | .357 Mag. |
| Sturm, Ruger & Co. | NVB34-50 | .357 Mag. |
| Sturm, Ruger & Co. | KLCR-357 | .357 Mag. |
| Sturm, Ruger & Co. | KNV-35 | .357 Mag. |
| Sturm, Ruger & Co. | KNV-34 | .357 Mag. |
| Sturm, Ruger & Co. | NV-35 | .357 Mag. |
| Sturm, Ruger & Co. | NV-34 | .357 Mag. |
| Sturm, Ruger & Co. | KLCR-357 | 357 Mag. |
| Sturm, Ruger & Co. | KNV-34-SASS | 357 Mag. |
| Sturm, Ruger & Co. | KNVRB-35 | 357 Mag. |
| Sturm, Ruger & Co. | KLCR-357-LG (Model 5451) | 357 Mag. |
| Sturm, Ruger & Co. | BN31 | .30 Carbine |
| Sturm, Ruger & Co. | BN31L | .30 Carbine |
| Sturm, Ruger & Co. | P944 | .40 S&W |
| Sturm, Ruger & Co. | KP944 | .40 S&W |
| Sturm, Ruger & Co. | KP944D | .40 S&W |
| Sturm, Ruger & Co. | BSR40-10L | .40 S&W |
| Sturm, Ruger & Co. | KSR40-10L | .40 S&W |
| Sturm, Ruger & Co. | BSR40C-9L | .40 S&W |
| Sturm, Ruger & Co. | KSR40C-9L | .40 S&W |
| Sturm, Ruger & Co. | BN41 | .41 Mag. |
| Sturm, Ruger & Co. | BN42 | .41 Mag. |
| Sturm, Ruger & Co. | BNV40 | 44/40 |
| Sturm, Ruger & Co. | KBNV40 | 44/40 |
| Sturm, Ruger & Co. | BNV405 | 44/40 |
| Sturm, Ruger & Co. | KBNV405 | 44/40 |
| Sturm, Ruger & Co. | BNV407 | 44/40 |
| Sturm, Ruger & Co. | KBNV407 | 44/40 |
| Sturm, Ruger & Co. | NVB-444-SPCL | .44 Special |
| Sturm, Ruger & Co. | NVB-445-SPCL | .44 Special |
| Sturm, Ruger & Co. | RH445 | .44 Mag. |
| Sturm, Ruger & Co. | RH44 | .44 Mag. |
| Sturm, Ruger & Co. | RH44R | .44 Mag. |
| Sturm, Ruger & Co. | KRH44 | .44 Mag. |
| Sturm, Ruger & Co. | KRH44R | .44 Mag. |
| Sturm, Ruger & Co. | KRH-444 | .44 Mag. |
| Sturm, Ruger & Co. | KRH-445 | .44 Mag. |
| Sturm, Ruger & Co. | KSRH7 | .44 Mag. |
| Sturm, Ruger & Co. | KSRH9 | .44 Mag. |
| Sturm, Ruger & Co. | RB44W | .44 Mag. |
| Sturm, Ruger & Co. | BNV474 | .44 Mag. |
| Sturm, Ruger & Co. | KBNV474 | .44 Mag. |
| Sturm, Ruger & Co. | BNV475 | .44 Mag. |
| Sturm, Ruger & Co. | KBNV475 | .44 Mag. |
| Sturm, Ruger & Co. | BNV477 | .44 Mag. |
| Sturm, Ruger & Co. | KBNV477 | .44 Mag. |
| Sturm, Ruger & Co. | RBNV474 | .44 Mag. |
| Sturm, Ruger & Co. | KRBNV474 | .44 Mag. |
| Sturm, Ruger & Co. | RBNV475 | .44 Mag. |
| Sturm, Ruger & Co. | KRBNV475 | .44 Mag. |
| Sturm, Ruger & Co. | S458N | .44 Mag. |

| | | |
|---|---|---|
| Sturm, Ruger & Co. | S45N | .44 Mag. |
| Sturm, Ruger & Co. | S47N | .44 Mag. |
| Sturm, Ruger & Co. | S411N | .44 Mag. |
| Sturm, Ruger & Co. | KS458N | .44 Mag. |
| Sturm, Ruger & Co. | KS45N | .44 Mag. |
| Sturm, Ruger & Co. | KS47N | .44 Mag. |
| Sturm, Ruger & Co. | KS411N | .44 Mag. |
| Sturm, Ruger & Co. | KS-47NHNN | .44 Mag. |
| Sturm, Ruger & Co. | KSRH2 | .44 Mag. |
| Sturm, Ruger & Co. | P90 | .45 ACP |
| Sturm, Ruger & Co. | KP90 | .45 ACP |
| Sturm, Ruger & Co. | KP90D | .45 ACP |
| Sturm, Ruger & Co. | KP345PR | .45 ACP |
| Sturm, Ruger & Co. | P97D | .45 ACP |
| Sturm, Ruger & Co. | KP97D | .45 ACP |
| Sturm, Ruger & Co. | KP345 | .45 ACP |
| Sturm, Ruger & Co. | P345PR | .45 ACP |
| Sturm, Ruger & Co. | KP345DPR | .45 ACP |
| Sturm, Ruger & Co. | SR1911 | .45 ACP |
| Sturm, Ruger & Co. | SR1911CMD | .45 ACP |
| Sturm, Ruger & Co. | KSR45 | .45 ACP |
| Sturm, Ruger & Co. | RB45W | .45 Long Colt |
| Sturm, Ruger & Co. | KRH455 | .45 Long Colt |
| Sturm, Ruger & Co. | KRH45 | .45 Long Colt |
| Sturm, Ruger & Co. | KRH45R | .45 Long Colt |
| Sturm, Ruger & Co. | KRH-45-4 | .45 Long Colt |
| Sturm, Ruger & Co. | BNV44 | .45 Long Colt |
| Sturm, Ruger & Co. | KBNV44 | .45 Long Colt |
| Sturm, Ruger & Co. | BNV455 | .45 Long Colt |
| Sturm, Ruger & Co. | KBNV455 | .45 Long Colt |
| Sturm, Ruger & Co. | BNV45 | .45 Long Colt |
| Sturm, Ruger & Co. | KBNV45 | .45 Long Colt |
| Sturm, Ruger & Co. | BNVBH453 | .45 Long Colt |
| Sturm, Ruger & Co. | KBNVBH453 | .45 Long Colt |
| Sturm, Ruger & Co. | RBNV44 | .45 Long Colt |
| Sturm, Ruger & Co. | KRBNV44 | .45 Long Colt |
| Sturm, Ruger & Co. | RBNV455 | .45 Long Colt |
| Sturm, Ruger & Co. | KRBNV455 | .45 Long Colt |
| Sturm, Ruger & Co. | NV44 | .45 Long Colt |
| Sturm, Ruger & Co. | KNV44 | .45 Long Colt |
| Sturm, Ruger & Co. | KNV44 Stainless | .45 Long Colt |
| Sturm, Ruger & Co. | NV45 | .45 Long Colt |
| Sturm, Ruger & Co. | KNV45 | .45 Long Colt |
| Sturm, Ruger & Co. | NV455 | .45 Long Colt |
| Sturm, Ruger & Co. | NV455NRAL | .45 Long Colt |
| Sturm, Ruger & Co. | NV455NRAR | .45 Long Colt |
| Sturm, Ruger & Co. | KNV455 | .45 Long Colt |
| Sturm, Ruger & Co. | KNV455 Stainless | .45 Long Colt |
| Sturm, Ruger & Co. | KNV455E Stainless | .45 Long Colt |
| Sturm, Ruger & Co. | BN44 | .45 Long Colt |
| Sturm, Ruger & Co. | KBN44 | .45 Long Colt |
| Sturm, Ruger & Co. | BN455 | .45 Long Colt |
| Sturm, Ruger & Co. | BN45 | .45 Long Colt |

| | | |
|---|---|---|
| Sturm, Ruger & Co. | BN45L | .45 Long Colt |
| Sturm, Ruger & Co. | KBN45 | .45 Long Colt |
| Sturm, Ruger & Co. | BN44X | .45 Long Colt |
| Sturm, Ruger & Co. | BN455X | .45 Long Colt |
| Sturm, Ruger & Co. | KNV-45 | .45 Long Colt |
| Sturm, Ruger & Co. | KNV-44 | .45 Long Colt |
| Sturm, Ruger & Co. | NV-44 | .45 Long Colt |
| Sturm, Ruger & Co. | KNV-455-SASS | .45 Long Colt |
| Sturm, Ruger & Co. | KNVRB-455 | .45 Long Colt |
| Sturm, Ruger & Co. | NVB-44X | .45 Long Colt & .45 ACP |
| Sturm, Ruger & Co. | KSRH2454 | 454 Casull |
| Sturm, Ruger & Co. | KSRH7454 | 454 Casull & 45 Long Colt |
| Sturm, Ruger & Co. | KSRH9454 | 454 Casull & 45 Long Colt |
| Sturm, Ruger & Co. | KSRH7480 | 480 Ruger |
| Sturm, Ruger & Co. | KSRH9480 | 480 Ruger |
| Sturm, Ruger & Co. | KSRH-2480 | 480 Ruger |
| Walther | P22 | .22 LR |
| Walther | P22 (no internal lock / Q style grip) | .22 LR |
| Walther | P22 (no internal lock) | .22 LR |
| Walther | SP22 | .22 LR |
| Walther | PPK/S-1 | .32 ACP |
| Walther | PPK | .380 ACP |
| Walther | PPK (Blue) | .380 ACP |
| Walther | PPK/S-1 | .380 ACP |
| Walther | PPK/S-1 Two Tone | .380 ACP |
| Walther | PK380 | .380 ACP |
| Walther | PK380 (no internal lock) | .380 ACP |
| Walther | PPK/S (Blue) | .380 ACP |
| Walther | P99 | 9mm |
| Walther | P99C AS | 9mm |
| Walther | P990 | 9mm |
| Walther | P99 AS | 9mm |
| Walther | P99 c AS | 9mm |
| Walther | P99C QA | 9mm |
| Walther | P99 QA | 9mm |
| Walther | PPS | 9mm |
| Walther | P99 | .40 S&W |
| Walther | P99 AS | .40 S&W |
| Walther | P99C QA | .40 S&W |
| Walther | P99 QA | .40 S&W |
| Walther | PPS | .40 S&W |

**2**



**THE COMMONWEALTH OF MASSACHUSETTS**
**EXECUTIVE OFFICE OF PUBLIC SAFETY AND SECURITY**
**Department of Criminal Justice Information Services**
200 Arlington Street, Suite 2200, Chelsea, MA 02150
TEL: 617-660-4600 | TTY: 617-660-4606 | FAX: 617-660-4613
mass.gov/cjis

# Application
### for License to Sell Rent or Lease Firearms, RIfles, Shotguns, and Machine Guns, to Perform Services as a Gunsmith, or to Sell Ammunition. (M.G.L. c.140 s.122, s.123, s.124)

DATE: _____

CITY OR TOWN OF: _____     STATE LICENSE #: _____

*FEDERAL FIREARMS LICENSE #: _____

*You must have a federal firearms license in order to obtain and hold a state firearms dealer license.

I, _____
First Name                     Middle Name                     Last Name                          Suffix

DBA: _____
Name of Firm or Corporation                              Business Telephone Number

_____
Business Address                              City                     State          Zip Code

**Herby Make Application To: (check appropriate box)**

__   Sell, Rent, or Lease Firearms, Rifles, Shotguns, and Machine Guns

__   Perform Services as a Gunsmith

__   Sell Ammunition

_____
Residential Address                              City                     State          Zip Code

_____
Date of Birth          Place of Birth

_____
Mother's First Name          Mother's Maiden Name          Father's First Name          Father's Last Name

_____
Height          Weight          Build          Complexion          Hair Color          Eye Color

_____
Occupation                              Social Security Number (Optional) Drivers License Number

_____
Employed By                              Business Address

_____
City/Town          State          Zip          Telephone Number

AD Page 79 of 441

# Please Answer the Following Questions Completely and Accurately

1. Is the location of your business zoned for business, or do you have a special waiver to oporate a business there?  ____

2. Are you a citizen of the United States?  ____

3. If naturalized, give date, place, and naturalization number

   | Date | Place | Naturalization No. |
   |------|-------|--------------------|

4. Have you ever used or been known by another name?  ____

   If yes, provide name and explain: _____

   _____

5. What is your age? *You must be 21 years of age to apply for a Dealer's License.  ____

6. Have you ever been convicted of a felony?  ____

7. Have you ever been convicted of the unlawful use, possession, or sale of narcotics or harmful drugs as defined in M.G.L. c. 94C?  ____

8. Have you ever been convicted of a crime punishable by more than one (1) year?  ____

8. In any state or federal jurisdiction have you ever been convicted as an adult or adjudicated a youthful offender or delinquent child for the commission of (a) a felony; (b) a misdemeanor punishable by imprisonment for more than 2 years; (c) a violent crime as defined in MGL C140.s.121; (d) a violation of any law regulating the use, possession, ownership, sale, transfer, rental, receipt or transportation of weapons or ammunition for which a term of imprisonment may be imposed; or (e) a violation of any law regulating the use, possession or sale of controlled substances as defined in section 1 of MGL 94C?  ____

9. Have you ever been confined to any hospital or institution for mental illness?  ____

10. Are you or have you ever been under treatment for or confinement for drug addiction or habitual drunkenness?  ____

11. Have you ever appeared in any court as a defendant for any criminal offense (excluding non-criminal traffic offenses)?  ____

12. Are you now under any charge(s) for any offense(s) against the law?  ____

13. Are you now or have you ever been the subject of a M.G.L. C209A restraining order or involved in a domestic violence charge?  ____

14. Has any License to Carry Firearms, Permit to Possess Firearms, or Firearms Identification Card, License to sell, rent, or leases firearms, rifles, shotguns, machine guns, License to perform services as a gunsmith or license to sell ammunition issued under the laws of any state or territory ever been suspended, revoked, or denied?  ____

15. Are you currently the subject of any outstanding arrest warrant in any state or federal jurisdiction?  ____

**If you answered "YES" to any of the above questions, please provide details, which must include dates, circumstances, and locations, in the space below.** (Please attach additional sheets if necessary)

_____

_____

_____

_____

Other than Massachusetts, in what state, territory or jurisdiction have you resided?  _____

_____

Have you ever held a License to sell, rent, or leases firearms, rifles, shotguns and machine guns, a license to perform services as a gunsmith or a license to sell ammunition issued under the laws of any state or territory?  ____

If "YES", please provide date(s), location(s), and license number(S):  _____

_____


## List the Name and Addresses of Two References


1. _____
   Last Name                              First Name

   _____
   Address                    City/Town                    State      Zip

2. _____
   Last Name                              First Name

   _____
   Address                    City/Town                    State      Zip

Reason(s) for requesting the issuance of a card or license: _____

_____

_____

*WARNING* Any person who knowingly files an application containing false information shall be punished by a fine of not less than $500 nor more than $1,000 or by imprisonment for not less than 6 months nor more than 2 years in a house of correction, or by both such fine and imprisonment (MGL c.140, s.131).

I declare the above facts are true and complete to the best of my knowledge and belief and I understand that any false answer(s) will be just cause for denial or revocation of my License to Carry Firearms and may be used in a criminal proceeding pursuant to Massachusetts General Law Chapter 140, Section 129 and 131.

Signed under the penalties of perjury this  _____  day of  _____   _____
                                                    day                            month                    year

Signature of Applicant: _____

Title: (Proprietor, Manager, etc.) _____

**3**

| | |
|---|---|
| **From:** | Sooth123@aol.com |
| **Sent:** | Wednesday, April 16, 2014 11:49 AM |
| **To:** | mike@concordarmory.com |
| **Cc:** | sooth123@aol.com |
| **Subject:** | availability |
| | |
| **Categories:** | (042-A) Interpretation Case |

Mike:

Does your shop have a Glock, Model 17, generation 3 or 4 available for sale?

Regards

Bob Draper
E:sooth123@aol.com

**4**

**Alexander A. Flig, Esq.**

| | |
|---|---|
| **From:** | Ariel Weisberg <ariel@weisberg.ws> |
| **Sent:** | Wednesday, April 16, 2014 4:58 PM |
| **To:** | mike@concordarmory.com |
| **Cc:** | arielweisberg@gmail.com |
| **Subject:** | Re: Purchasing a new unmodified OEM Glock 34 |
| | |
| **Categories:** | (042-A) Interpretation Case |

Hi,

I should also specify I am looking to purchase a 4th generation Glock.

Thanks,
Ariel

On Wed, Apr 16, 2014, at 04:53 PM, Ariel Weisberg wrote:
> Hi,
>
> My name is Ariel Weisberg. I would like to purchase a new unmodified
> OEM Glock 34 pistol. Do you have any that you can sell me?
>
> Thanks,
> Ariel

**Alexander A. Flig, Esq.**

| | |
|---|---|
| **From:** | Ariel Weisberg <ariel@weisberg.ws> |
| **Sent:** | Wednesday, April 16, 2014 4:58 PM |
| **To:** | johnny@precisionpointfirearms.com |
| **Cc:** | arielweisberg@gmail.com |
| **Subject:** | Re: Purchasing a new unmodified OEM Glock 34 |
| | |
| **Categories:** | (042-A) Interpretation Case |

Hi,

I should also specify I am looking to purchase a 4 generation Glock.

Thanks,
Ariel

On Wed, Apr 16, 2014, at 04:53 PM, Ariel Weisberg wrote:
> Hi,
>
> My name is Ariel Weisberg. I would like to purchase a new unmodified
> OEM Glock 34 pistol. Do you have any that you can sell me?
>
> Thanks,
> Ariel

1

**5**

**Alexander A. Flig, Esq.**

| | |
|---|---|
| **From:** | donna <deehmah@aol.com> |
| **Sent:** | Tuesday, April 22, 2014 10:37 PM |
| **To:** | mike@concordarmory.com |
| **Subject:** | would like to purchase a glock pistol |
| **Categories:** | (042-A) Interpretation Case |

Mr. Concannon:

I am currently in the market for an unmodified (OEM) 3rd or 4th generation Glock pistol.  I was told that you may have one that I could purchase or you would be able to help me locate one which you could transfer for me.

Please let me know at your earliest convenience if you can assist me.  I have a current Massachusetts LTC class A.

Thank you very much and look forward to hearing from you.

Donna Major

**Alexander A. Flig, Esq.**

| | |
|---|---|
| **From:** | donna <deehmah@aol.com> |
| **Sent:** | Tuesday, April 22, 2014 10:33 PM |
| **To:** | alex@fliglaw.com |
| **Subject:** | Fwd: Would like to purchase a Glock |
| | |
| **Categories:** | (042-A) Interpretation Case |

-----Original Message-----
From: donna <deehmah@aol.com>
To: johnny <johnny@precisionpointfirearms.com>
Sent: Tue, Apr 22, 2014 10:31 pm
Subject: Would like to purchase a Glock

Mr. Donnelly,

I am currently in the market for an unmodified (OEM) 3rd or 4th generation Glock pistol. I was told that you may have one that I could purchase or you would be able to help me locate one which you could transfer for me.

Please let me know at your earliest convenience if you can assist me. I have a current Massachusetts LTC class A.

Thank you very much and look forward to hearing from you.

Donna Major



**6**

## Alexander A. Flig, Esq.

| | |
|---|---|
| **From:** | Michael Concannon <mike@concordarmory.com> |
| **Sent:** | Monday, June 02, 2014 10:31 AM |
| **To:** | Rick Notkin |
| **Subject:** | Re: Pistol request |
| | |
| **Categories:** | (042-A) Interpretation Case |

Rick, I am sorry, but we cannot sell or transfer Glock pistols.

While that model does appear on page 2 of the Approved Firearms Roster, it is Concord Armory's understanding that we would be at risk of Enforcement Action and/or criminal prosecution by the Attorney General of Massachusetts if we were to sell or transfer this pistol to you.

/mike

On 6/1/14, 10:00 PM, Rick Notkin wrote:
> Mike,
>
> I just learned of your shop and I wonder if you have, or could order for me, a new 3rd or 4th generation Glock 17 (9mm) pistol?
>
> I await your reply.
>
> Thank you for your time.
>
> Rick Notkin

1

**Alexander A. Flig, Esq.**

| | |
|---|---|
| **From:** | Rick Notkin <progun38@verizon.net> |
| **Sent:** | Sunday, June 01, 2014 10:02 PM |
| **To:** | Alexander Flig |
| **Cc:** | bcarlton@comm2a.org |
| **Subject:** | Fwd: I'm seeking a pistol |
| | |
| **Categories:** | (042-A) Interpretation Case |

FYI. Rick

Begin forwarded message:

**From:** Precision Point Firearms <Johnny@PrecisionPointFirearms.com>
**Date:** June 1, 2014 8:58:21 PM EDT
**To:** Rick Notkin <progun38@verizon.net>
**Subject: Re: I'm seeking a pistol**

Hi Rick,

Unfortunately I don't believe I am able to transfer that as it is my understanding that there is some sort of discrepancy with what the attorney general considers a loaded chamber indicator on newer glocks. As any confusion could mean it is not compliant with the AG's regulations I unfortunately can't transfer or sell any until I am sure it meets expectations of the attorney general's handgun. I am trying to find a solution but those who I have contacted have been anything but helpful. Sorry I can not help you out at this time.

Respectfully,

**Johnny Donnelly**, Owner
Precision Point Firearms
www.precisionpointfirearms.com


On Jun 1, 2014, at 7:52 PM, Rick Notkin <progun38@verizon.net> wrote:

> Johnny,
>
> I just learned of your shop and I wonder if you have, or could order for me, a new 3rd or 4th generation Glock 17 (9mm) pistol?
>
> I await your reply.
>
> Thank you for your time.
>
> Rick Notkin

1

**7**

**Alexander A. Flig, Esq.**

| | |
|---|---|
| **From:** | Rob Boudrie <rob@boudrie.com> |
| **Sent:** | Saturday, April 19, 2014 12:26 AM |
| **To:** | mike@concordarmory.com |
| **Subject:** | Glock purchase |

Sir –

I am interested in purchasing a new Gen 4 Glock Model 34 handgun (which is on the current 2/2014 EOPS approved gun roster).   I reside in MA and hold a valid LTC-A.

I am not interested in a used Glock or one other than this model in Gen 4, as I want the additional design improvements (reduced muzzle flip; increased accuracy and extended recoil spring life) that are not present in pre-Gen 4 models.

Is this something you can help me with?  If so, please send pricing info.

Thanks

Robert Boudrie
rob@boudrie.com

**Alexander A. Flig, Esq.**

| | |
|---|---|
| **From:** | Rob Boudrie <rob@boudrie.com> |
| **Sent:** | Saturday, April 19, 2014 12:25 AM |
| **To:** | johnny@precisionpointfirearms.com |
| **Subject:** | Glock purchase |

Sir –

I am interested in purchasing a new Gen 4 Glock Model 34 handgun (which is on the current 2/2014 EOPS approved gun roster).   I reside in MA and hold a valid LTC-A.

I am not interested in a used Glock or one other than this model in Gen 4, as I want the additional design improvements (reduced muzzle flip; increased accuracy and extended recoil spring life) that are not present in pre-Gen 4 models.

Is this something you can help me with?  If so, please send pricing info.

Thanks

Robert Boudrie
rob@boudrie.com

8

**Alexander A. Flig, Esq.**

| | |
|---|---|
| **From:** | Brent Carlton <bmcarlton@comcast.net> |
| **Sent:** | Wednesday, April 16, 2014 8:57 AM |
| **To:** | mike@concordarmory.com |
| **Subject:** | Looking for a Glock34 - Gen4 |
| | |
| **Categories:** | (042-A) Interpretation Case |

Hello,

I'm looking to acquire a Gen4 Glock 34 for use in USPSA pistol competition. This is the preferred handgun for USPSA Production Division and represents a significant improvement over what I'm now using.

I am, of course, a MA LTC/A holder as well as a state certified firearms instruction. I am also quite familiar with Glock handguns we use them in the basic firearm safety classes I teach.

Thanks,
Brent

**Alexander A. Flig, Esq.**

| | |
|---|---|
| **From:** | Brent Carlton <bmcarlton@comcast.net> |
| **Sent:** | Wednesday, April 16, 2014 8:52 AM |
| **To:** | johnny@precisionpointfirearms.com |
| **Subject:** | Looking for a Glock 34 |
| | |
| **Categories:** | (042-A) Interpretation Case |

Hello Johnny,

I'm looking to acquire a Gen4 Glock 34  for use in USPSA pistol competition.  This is the preferred handgun for USPSA Production Division and represents a significant improvement over what I'm now using.

I am, of course, a MA LTC/A holder as well as a state certified firearms instruction.  I am also quite familiar with Glock handguns we use them in the basic firearm safety classes I teach.

Thanks,
Brent

9

| From: | Michael Concannon |
|---|---|
| To: | Sooth123@aol.com |
| Subject: | Re: availability |
| Date: | Wednesday, April 16, 2014 5:09:37 PM |

Bob, I am sorry, but we cannot sell or transfer Glock pistols.

While that model does appear on page 2 of the Approved Firearms Roster, it is Concord Armory's understanding that we would be at risk of Enforcement Action and/or criminal prosecution by the Attorney General of Massachusetts if we were to sell or transfer this pistol to you.

/mike

On 4/16/14, 11:48 AM, Sooth123@aol.com wrote:

> Mike:
>
> Does your shop have a Glock, Model 17, generation 3 or 4 available for sale?
>
> Regards
>
> Bob Draper
> E: sooth123@aol.com

# 10

| | |
|---|---|
| **From:** | Michael Concannon |
| **To:** | Ariel Weisberg |
| **Cc:** | arielweisberg@gmail.com |
| **Subject:** | Re: Purchasing a new unmodified OEM Glock 34 |
| **Date:** | Wednesday, April 16, 2014 5:08:16 PM |

Ariel, I am sorry, but we cannot sell or transfer Glock pistols.

While that model does appear on page 2 of the Approved Firearms Roster, it is Concord Armory's understanding that we would be at risk of Enforcement Action and/or criminal Prosecution by the Attorney General of Massachusetts if we were to sell or transfer this pistol to you.

/mike

On 4/16/14, 4:58 PM, Ariel Weisberg wrote:
> Hi,
>
> I should also specify I am looking to purchase a 4th generation Glock.
>
> Thanks,
> Ariel
>
> On Wed, Apr 16, 2014, at 04:53 PM, Ariel Weisberg wrote:
>> Hi,
>>
>> My name is Ariel Weisberg. I would like to purchase a new unmodified OEM
>> Glock 34 pistol. Do you have any that you can sell me?
>>
>> Thanks,
>> Ariel

| From: | johnny@precisionpointfirearms.com |
|---|---|
| To: | Ariel Weisberg |
| Subject: | RE: Purchasing a new unmodified OEM Glock 34 |
| Date: | Monday, April 21, 2014 4:50:00 PM |

Hi Ariel,

I unfortunately can't transfer any gen 4 clock firearm as I am finding conflicting information with regards to whether or not the Loaded Chamber indicator meets the Attorney Generals requirements of actually being a loaded chamber indicator. I am fully aware that glock markets this as a loaded chamber indicator, however until I can find out if it meets the requirements for sure, I would rather not take the risk of selling the firearm you are requesting as I would fear potential penalties from the Attorney Generals office if it turns out it is not compliant.

I will get back to you as soon as I find out any additional information.

Thanks!

Johnny

> -------- Original Message --------
> Subject: Re: Purchasing a new unmodified OEM Glock 34
> From: Ariel Weisberg <ariel@weisberg.ws>
> Date: Wed, April 16, 2014 4:57 pm
> To: johnny@precisionpointfirearms.com
> Cc: arielweisberg@gmail.com
>
> Hi,
>
> I should also specify I am looking to purchase a 4 generation Glock.
>
> Thanks,
> Ariel
>
> On Wed, Apr 16, 2014, at 04:53 PM, Ariel Weisberg wrote:
> > Hi,
> >
> > My name is Ariel Weisberg. I would like to purchase a new unmodified OEM
> > Glock 34 pistol. Do you have any that you can sell me?
> >
> > Thanks,
> > Ariel

**11**

| From: | johnny@precisionpointfirearms.com |
| To: | donna |
| Subject: | RE: Would like to purchase a Glock |
| Date: | Tuesday, April 29, 2014 11:56:36 PM |

Hi Donna,

Sorry for the delayed response. I have had multiple people ask me to get them newer Glock firearms and I am in the process of looking deeper into whether or not they comply with the regulations put forward by the Attorney General. From my research I am finding that Glocks may not be compliant as the AG's office does not believe that there is a loaded chamber indicator in Glock pistols.  As a Glock Armorer, I am fully aware that newly manufactured Glocks do come with a Loaded Chamber Indicator but until I am 100% certain that these pistols are in compliance, I can not sell nor transfer Post 10/21/98 Glock Firearms. I know this is a inconvenience for you and I do apologize, but I would rather not chance violating those regulations as I could face some serious penalties.


Respectfully,

Johnny
Owner,
Precision Point Firearms

> -------- Original Message --------
> Subject: Would like to purchase a Glock
> From: donna <deehmah@aol.com>
> Date: Tue, April 22, 2014 10:31 pm
> To: johnny@precisionpointfirearms.com
> Mr. Donnelly,
>
> I am currently in the market for an unmodified (OEM) 3rd or 4th generation Glock pistol.  I was told that you may have one that I could purchase or you would be able to help me locate one which you could transfer for me.
>
> Please let me know at your earliest convenience if you can assist me.  I have a current Massachusetts LTC class A.
>
> Thank you very much and look forward to hearing from you.
>
> Donna Major

**12**

**Alexander A. Flig, Esq.**

| | |
|---|---|
| **From:** | Rick Notkin <progun38@verizon.net> |
| **Sent:** | Sunday, June 01, 2014 10:02 PM |
| **To:** | Alexander Flig |
| **Cc:** | bcarlton@comm2a.org |
| **Subject:** | Fwd: I'm seeking a pistol |
| | |
| **Categories:** | (042-A) Interpretation Case |

FYI. Rick

Begin forwarded message:

**From:** Precision Point Firearms <Johnny@PrecisionPointFirearms.com>
**Date:** June 1, 2014 8:58:21 PM EDT
**To:** Rick Notkin <progun38@verizon.net>
**Subject: Re: I'm seeking a pistol**

Hi Rick,

Unfortunately I don't believe I am able to transfer that as it is my understanding that there is some sort of discrepancy with what the attorney general considers a loaded chamber indicator on newer glocks. As any confusion could mean it is not compliant with the AG's regulations I unfortunately can't transfer or sell any until I am sure it meets expectations of the attorney general's handgun. I am trying to find a solution but those who I have contacted have been anything but helpful. Sorry I can not help you out at this time.

Respectfully,

**Johnny Donnelly**, Owner
Precision Point Firearms
www.precisionpointfirearms.com

On Jun 1, 2014, at 7:52 PM, Rick Notkin <progun38@verizon.net> wrote:

> Johnny,
>
> I just learned of your shop and I wonder if you have, or could order for me, a new 3rd or 4th generation Glock 17 (9mm) pistol?
>
> I await your reply.
>
> Thank you for your time.
>
> Rick Notkin

1

**Alexander A. Flig, Esq.**

| | |
|---|---|
| **From:** | Michael Concannon <mike@concordarmory.com> |
| **Sent:** | Monday, June 02, 2014 10:31 AM |
| **To:** | Rick Notkin |
| **Subject:** | Re: Pistol request |
| **Categories:** | (042-A) Interpretation Case |

Rick, I am sorry, but we cannot sell or transfer Glock pistols.

While that model does appear on page 2 of the Approved Firearms Roster, it is Concord Armory's understanding that we would be at risk of Enforcement Action and/or criminal prosecution by the Attorney General of Massachusetts if we were to sell or transfer this pistol to you.

/mike

On 6/1/14, 10:00 PM, Rick Notkin wrote:
> Mike,
>
> I just learned of your shop and I wonder if you have, or could order for me, a new 3rd or 4th generation
Glock 17 (9mm) pistol?
>
> I await your reply.
>
> Thank you for your time.
>
> Rick Notkin

**13**

Hi Rob,

Sorry for the delay in getting back to you, I have been looking into your request and to be honest I am conflicted as to whether or not I can actually transfer the firearm you are requesting.  As you mentioned, it is on the EOPSS List, however I am hearing conflicting information with regards to whether or not it meets the requirements to be compliant with the Attorney General's standards.  The requirement I need clarification on is the Loaded Chamber indicator.  I will see if I can get some information if I can transfer this or not but in the mean time I have to politely decline to sell you the Gen 4 Glock 34 as I can not risk (or afford) the penalties associated with transferring anything that may not be in compliance with the Attorney general's requirements of handguns. Unfortunately no Gen 4 Glocks were made prior to October, 21 1998 so I can't even hunt down one that's grandfathered in.

Sorry,

Johnny

-------- Original Message --------
Subject: Glock purchase
From: "Rob Boudrie" <rob@boudrie.com>
Date: Sat, April 19, 2014 12:25 am
To: <johnny@precisionpointfirearms.com>

Sir –

I am interested in purchasing a new Gen 4 Glock Model 34 handgun (which is on the current 2/2014 EOPS approved gun roster).   I reside in MA and hold a valid LTC-A.

I am not interested in a used Glock or one other than this model in Gen 4, as I want the additional design improvements (reduced muzzle flip; increased accuracy and extended recoil spring life) that are not present in pre-Gen 4 models.

Is this something you can help me with?  If so, please send pricing info.

Thanks

Robert Boudrie
rob@boudrie.com

**14**

Brent, I am sorry, but we cannot sell or transfer Glock pistols.

While that model does appear on page 2 of the Approved Firearms Roster, it is Concord Armory's understanding that we would be at risk of Enforcement Action and/or criminal Prosecution by the Attorney General of Massachusetts if we were to sell or transfer this pistol to you.

/mike

On 4/16/14, 8:56 AM, Brent Carlton wrote:

> Hello,
>
> I'm looking to acquire a Gen4 Glock 34  for use in USPSA pistol competition.  This is the preferred handgun for USPSA Production Division and represents a significant improvement over what I'm now using.
>
> I am, of course, a MA LTC/A holder as well as a state certified firearms instruction.  I am also quite familiar with Glock handguns we use them in the basic firearm safety classes I teach.
>
> Thanks,
> Brent

| From: | johnny@precisionpointfirearms.com |
| To: | Brent Carlton |
| Subject: | RE: Looking for a Glock 34 |
| Date: | Monday, April 21, 2014 6:30:00 PM |

Brent-

As much as I would love to sell you a Gen4 Glock 34 I can't as it may not fit the attorney
generals compliancy requirements (specifically the loaded chamber indicator requirement)
Although I am aware Glocks do indeed have a loaded chamber indicator, it is the general
consensus that for some reason it does not meet the requirements which aren't exactly clear.

I fear that If I did sell this I could possibly face consequences from the AG'a office so therefor
I apologize as I cannot sell this firearm.

Thanks!

**Johnny Donnelly**, Owner
Precision Point Firearms
www.precisionpointforearms.com

> -------- Original Message --------
> Subject: Looking for a Glock 34
> From: "Brent Carlton" <bmcarlton@comcast.net>
> Date: Wed, April 16, 2014 8:52 am
> To: <johnny@precisionpointfirearms.com>
> Hello Johnny,
>
> I'm looking to acquire a Gen4 Glock 34  for use in USPSA pistol competition.  This is
> the preferred handgun for USPSA Production Division and represents a significant
> improvement over what I'm now using.
>
> I am, of course, a MA LTC/A holder as well as a state certified firearms instruction.  I
> am also quite familiar with Glock handguns we use them in the basic firearm safety
> classes I teach.
>
> Thanks,
> Brent

# 15

Concord Armory, LLC
40 Beharrell Street Suite 12
Concord, MA 01742

December 3, 2013

Office of Attorney General Martha Coakley
One Ashburton Place
Boston, MA 02108 -1518

RE: Approved Firearms Roster and Attorney General's Handgun Sales Regulations.

Concord Armory, LLC is a Federal Firearms Licensed Manufacturer (FFL07) as well as a
Massachusetts licensed Dealer and Gunsmith located in Concord, Massachusetts.  We are new
to the industry, but understand from the text of the Approved Firearms Roster, published by the
Executive Office of Public Safety, that there are various firearms listed on the Approved Roster,
but still prohibited from sale in Massachusetts by the Attorney General's Handgun Sales
Regulations.

We followed the link to your site, provided in the Approved Firearms Roster, but could not find
any Enforcement Notice or other means of positively identifying those firearms approved for
sale or transfer by the Attorney General's office.  As a result, we and our customers are left
confused and unable to proceed with purchases and/or transfers where we cannot confirm, or
we receive conflicting information regarding the compliance of a given firearm.

In particular, we have had multiple inquires regarding Glock pistols which appear on the
Approved Firearms Roster and, as gunsmiths, appear to us to be functionally identical to
Smith&Wesson M&P pistols.  From our discussions with other dealers and distributors, we
understand Glock pistols are not compliant with the Attorney General's Handgun Sales
Regulations.  However, when customers ask, we cannot explain what features make them non-
compliant, nor can we direct them to any published information from your office to confirm our
anecdotal understanding that they are not compliant.

We are writing to ask clarification for the following:

1. Are we correct in our understanding that Glock Pistols are non-compliant?
2. If so, can you clarify the features of Glock pistols make them non-compliant?
3. Does your office provide a list to dealers or consumers clarifying how to identify whether
   a given firearm is compliant, either by feature, model or serial number?

Thank you for your assistance in this matter.

Sincerely,



Michael Concannon - Concord Armory, LLC

**16**

# PRECISION POINT FIREARMS, LLC

155 New Boston St. Suite 180U      Woburn, Massachusetts 01801      339.927.5527

---

Precision Point Firearms
155 New Boston St. Suite 180U
Woburn, Ma 01801

May 7th, 2014

Dear Attorney General:

On 4/16/2014 my Company, Precision Point Firearms LLC, was approached by yet another customer seeking to purchase a Fourth generation Glock pistol. I turned the customer away because it has been my practice to not sell or transfer third and fourth generation Glock pistols since as far as I understand it, Glocks do not comply with the Massachusetts Handgun Sales Regulations. The customer wanted to know what it is about fourth generation Glock pistols that render them non-complaint. I did not have an answer. We have simply "known" for years that these third and fourth-generation Glock pistols do not comply with the Handgun Sales Regulation and so I have been turning potential customers away or suggesting alternate handguns.

Would you please clarify whether my perception regarding the legality of Fourth generation Glocks is correct? If they are not regulation compliant, what is it that renders them non-compliant? Can they be made compliant by a Type 07 FFL? I am an FFL 07, Licensed Gunsmith and Current Glock Armorer.

I have turned away substantial business because of our belief that later-generation Glocks cannot be sold or transferred into the Commonwealth. It would be very helpful if you could clarify this issue as these pistols are in demand and their salability would have a substantial impact on our business.

Very truly yours,

John Donnelly,

Owner, Precision Point Firearms

**17**

April 28, 2014

Robert R. Draper
26 Jodie Road
Framingham, Ma 01702

Attorney General Martha Coakley
1 Ashburton Place
Boston, MA 02108-1598

Dear Attorney General Coakley:

My Name is Robert Draper. I am a licensed Massachusetts firearms owner, a Certified Glock Armorer, a Licensed Massachusetts firearms instructor, and competitive shooter.

On April 16, 2014, I approached Michael Concannon at the Concord Armory seeking to purchase a fourth generation Glock Model 17, in the very common 9mm caliber. Mr. Cannon would not sell me the fourth (4th) generation Glock. He told me that the Glock generation four is not legal for sale in Massachusetts. I asked why and the dealer responded that they apparently do not comply with the Massachusetts Attorney General's regulation or regulations.

Are the fourth (4th) generation Glock Pistols forbidden for sale in Massachusetts? If these Glock pistols do not comply with the Attorney General's regulation or regulations, what are the regulations with which such fourth (4th) generation Glock pistols do not comply. What is it about these fourth generation Glock Pistols that renders them regulation non-compliant.

If the fourth (4th) generation Glock Pistols are regulation complaint, I would like to give the dealer, Mike Concannon this information so that he will sell me such a pistol.

Thank You for your consideration.

Very truly yours,

Robert R. Draper

**18**

email:
ariel@weisberg.w:
address:
Ariel Weisberg
220 Central st.
Apartment #4
Stoneham, MA 02180

Dear Attorney General:

My name is Ariel Weisberg. I am a licensed Massachusetts firearm owner and firearms enthusiast.

On April 16 2014, I approached Michael Concannon seeking to purchase a fourth generation Glock pistol. Specifically, I wanted to purchase a Glock 34 which is a very common 9MM pistol. However, Michael Concannon would not sell me a fourth generation Glock 34. He told me that Glock 34s are not legal for sale in Massachusetts. I asked why and Michael Concannon responded that they apparently do not comply with the Massachusetts Attorney General's regulation or regulations.

Are fourth-generation Glock pistols forbidden for sale in Massachusetts? If these Glock pistols do not comply with the Attorney General's regulation or regulations, what are the regulations with which such fourth-generation Glock pistols do not comply? What is it about these fourth-generation Glock pistols that renders them regulation non-compliant?

If such fourth-generation Glock pistols are regulation-compliant, I would like to give Michael Concannon this information so that he will sell me such a pistol.

Thank you for your consideration.

Very truly yours,

Ariel Weisberg
April 28, 2014

**19**

3 Holborn Park

Boston, MA 02121

May 15, 2014

Dear Attorney General,

My name is Donna M. Major. I am a licensed Massachusetts firearm owner, a competitive shooter and a Massachusetts State certified Pistol Safety Instructor.

On April 22, 2014, I approached Precision Point Firearms seeking to purchase a fourth generation Glock pistol, specifically to be used for teaching purposes with the women that I train. I specifically wanted to purchase a Glock 17, which is a very common 9mm pistol. I have found that it is an easy pistol for women to handle and a good firearm with which to introduce new shooters to a semi-automatic firearm. In response to my inquiry about purchasing this model firearm, Precision Point Firearms said that they could not sell me a fourth generation Glock 17. I was told by them that third and fourth generation Glock 17's are not legal for sale in Massachusetts. According to Precision Point Firearms, third and fourth generation Glock pistols apparently do not comply with the Massachusetts Attorney General's regulations.

I would like to clarify with you as to whether or not fourth generation pistols are legal to sell and/or buy in Massachusetts. If these Glock pistols do not comply with the Attorney General's regulations, exactly which regulations do fourth generation Glock not comply with? What, exactly, makes these firearms non-compliant?

If fourth generation Glock 17 pistols are, indeed, regulation-compliant, I would like to pass on this information to Precision Point Firearms so that I can then purchase the firearm from them.

Thank you for your help and consideration in this matter.

Sincerely,

Donna M. Major

Donna M. Major

**20**

Attorney General Martha Coakley
One Ashburton Place
Boston, MA 02108-1518

63 Trayer Road
Canton, MA 02021

April 22, 2014

Dear Attorney General Coakley,

My name is Eric Notkin. I hold a Massachusetts Class A license to carry firearms.

I was recently taken aback when I tried to purchase a Glock 17 pistol. Michael
Skidmore of Ephesian Arms, Inc. informed me that third or fourth generation Glock
pistols may not be sold in Massachusetts because they do not comply with the
Attorney General's Handgun Sales Regulation. I was surprised to learn this because
before going out to purchase this Glock model I checked the latest "Approved
Weapons Roster" (the 10-2013 version) and Glock 17s are on the EOPS list. That is
why I am confused by Mr. Skidmore informing me that I cannot purchase such a pistol
here in Massachusetts. Why do Glock 17 pistols not comply with the Handgun Sales
Regulation? Is it just Glock 17s or it is all Glock pistols (since they are pretty much
the same except for size and caliber)?

Would you kindly confirm or deny that Glock 17s comply or don't comply with the
Handgun Sales Regulation (or any other regulation of which the Attorney General is
aware) and why or why not. I am quite interested in purchasing this particular pistol
model.

Thank you in advance.

Sincerely,

Eric Notkin

**21**

Robert A Boudrie
20 Wellesley Avenue
Natick MA 01760

April 24, 2014

Ms. Martha Coakley
Attorney General
One Ashburton Place
Boston MA 02108-1518

Dear Attorney General:

I have a few questions regarding the legality of selling handguns in MA.

I currently hold a MA LTC-A, and interested in purchasing certain handguns (specifically Gen 4 Glocks) that are on the EOPS roster of approved handguns.

My questions are as follows:

1. May a dealer lawfully sell me a new Glock handgun?

2. If new Glocks do not comply with some part of the Handgun Sales Regulation (940 CMR 16.00), which part and why not? What specifically renders a Glock non-compliant with the regulations issued by your office?

3. If a MA licensed dealer arranges to have a gunsmith modify a new handgun that is not in compliance with the AG's regulations prior to sale to bring it into compliance, may the dealer then sell me that handgun without violating your regulations?

4. Some manufacturers I have spoken to are unwilling to make their own determination as to the compliance of their guns with the AG regulations as they are concerned that your opinion will not match theirs and they will face problems despite a good faith attempt at compliance.

   Is there a mechanism for such manufacturers to obtain an a priori determination as to compliance from your office, or are they required make their own interpretation and take their chances you will agree?

5. It is my understanding that the regulations exist to protect me from unfair and deceptive trade practices. As a factory certified Glock armorer, I am fully cognizant as to all functional, safety and design aspects Glock pistols, so it is not possible for me to be *__deceived__* in a sale. Furthermore, prohibition of the sale of a new Glock limits my choices to used Glocks of an earlier model, which sell at a significant premium over what new Glock would cost absent a

regulatory prohibition and also lack recent design improvements.  Preventing
me from purchasing a new Glock is certainly not protecting me from a _**unfair**_
trade practice.   Given this, can you please explain how a dealer from selling
me a new Glock is protecting me from something that is _**unfair**_ or _**deceptive**_?

I look forward to your answer to each of these five questions.


Regards,



Robert A. Boudrie

**22**

28 April 2014

Brent Carlton
248 Arborway #1
Jamaica Plain, MA 02130

Attorney General Martha Coakley
1 Ashburton Place
Boston, MA 02108-1598

Dear Attorney General Coakly,

I am hoping you can clear up some confusion regarding a handgun I would like to purchase. I would like to purchase a Gen4 Glock34 for competitive use. This handgun is one of the most widely used, if not the most widely used, handgun in the Production Division of the United States Practical Shooting Association (USPSA) in which I compete. I am very familiar with Glock handguns. As a state certified basic firearms safety instructor, I have used Glock handguns to teach firearm safety to thousands of Bay State residents.

However, when attempting to purchase a new Glock34 I ran into an unexpected obstacle. At least two retailers (Concord Armory and Precision Point Firearms) have declined to transfer newer model Glock handguns to me because they are unsure as to whether these firearms comply with the Massachusetts Handgun Sales Regulation promulgated by your office.

After being turned away I attempted to research this issue on line. I found that although the Glock34 Gen4 is on the Approved Firearms Roster published by the Executive Office of Public Safety and Security, there seems to be a prevailing view that post-1998 Glocks do not comply with regulations published by your office. However, there is no clear understanding of why these handguns are not compliant.

Since these regulations come under your office, I'm hoping that you can provide some guidance. Do current generation Glock handguns comply with your Safe Handgun Regulations? If they do not please help me understand why they do not. At least I'll be able to let these two retailers to know if they are correct or not as I'll have an 'official' source of the information rather than rumor and speculation.

Thank you in advance for your clarification.

Kind Regards,

Brent Carlton

**23**



# THE COMMONWEALTH OF MASSACHUSETTS
# OFFICE OF THE ATTORNEY GENERAL
### ONE ASHBURTON PLACE
### BOSTON, MASSACHUSETTS 02108

MARTHA COAKLEY
ATTORNEY GENERAL

(617) 727-2200
www.mass.gov/ago

April 2, 2014

Michael Concannon
Concord Armory, LLC
40 Beharrell Street, Suite 12
Concord, MA 01742

Re: <u>Handgun Sales Regulations</u>

Dear Mr. Concannon:

I am writing in response to your letter to this Office regarding Massachusetts firearms laws and their application to Glock firearms.

As this Office has stated publicly in the past, the handguns presently manufactured by Glock, Inc. are not in compliance with the Massachusetts Handgun Sales Regulations, because they lack an effective load indicator or magazine safety disconnect.

As you know, the roster of guns compiled and published by the Executive Office of Public Safety (EOPS) are those that meet the criteria stated in G. L. c. 140. If a handgun is listed on the EOPS roster, it can be sold in Massachusetts by a handgun dealer if it meets the additional safety-related requirements under the handgun sales regulations, 940 CMR 16.00, or is otherwise exempt from those requirements.

In response to your question, the Attorney General's Office has not issued a list of handguns that meet the safety requirements of the regulations. If you are unsure whether a handgun on the EOPS roster meets the additional safety requirements of our Office's regulations, you should contact the manufacturer, who should be able to provide you with that information.

Thank you for very much for contacting this Office with your comments and questions.

Sincerely,

David Monah

David W. Monahan
Deputy Chief
Consumer Protection Division

**24**



# THE COMMONWEALTH OF MASSACHUSETTS
## OFFICE OF THE ATTORNEY GENERAL
### ONE ASHBURTON PLACE
### BOSTON, MASSACHUSETTS 02108

MARTHA COAKLEY
ATTORNEY GENERAL

May 21, 2014

(617) 727-2200
www.mass.gov/ago

John Donnelly
Precision Point Firearms, LLC
155 New Boston Street, Suite 180U
Woburn, MA 01801

Re: Massachusetts handgun laws

Dear Mr. Donnelly:

I am writing in response to your letter to Attorney General Coakley, inquiring about whether Glock handguns comply with the Attorney General's Handgun Sales regulations.

In order for a handgun to be sold or transferred legally in Massachusetts, it must be in compliance with both federal and state laws. The "Approved Firearms Roster" of guns compiled and published by the Executive Office of Public Safety and Security (EOPSS) are those that meet the criteria stated in G. L. c. 140. If a handgun is listed on the EOPSS roster, it can be sold in Massachusetts by a handgun dealer if it meets the additional safety-related requirements under the Attorney General's regulations, 940 CMR 16.00, or is otherwise exempt from those requirements.

The Attorney General's Handgun Sales regulations fall under the state's consumer protection law and are designed to protect consumers and their families from unsafe handguns and unfair or deceptive practices by handgun dealers and manufacturers. The regulations effectively ban cheap "Saturday Night Specials" and require all handguns sold in Massachusetts to include child-proofing measures, tamper-proof serial numbers, and safety warnings.

The handguns presently manufactured by Glock, Inc. ("Glock") are not in compliance with the Massachusetts Handgun Sales Regulations, because they lack an effective load indicator or magazine safety disconnect. This Office notified Glock of this fact in 2004, and since that time Glock has not notified this Office of any change in the features of their firearms nor attempted to certify any firearm model as compliant with the Massachusetts Handgun Sales Regulations. Therefore, newly manufactured Glock handguns may not be transferred by a handgun dealer to a Massachusetts civilian.

This Office has been clear and consistent in our communications to dealers and consumers about the reason that Glock firearms do not comply with the Regulations. You could also have obtained the information directly from Glock, Inc. at any time. To the extent that your business could benefit from the ability to sell Glock firearms, you may want to communicate that to Glock, Inc., and ask if they have plans to employ an effective load indicator or magazine safety disconnect as many other firearms manufacturers have done. Thank you for taking the time to contact this Office regarding your question.

Sincerely,

David W. Monahan
Deputy Chief
Consumer Protection Division

**25**



# THE COMMONWEALTH OF MASSACHUSETTS
## OFFICE OF THE ATTORNEY GENERAL
### ONE ASHBURTON PLACE
### BOSTON, MASSACHUSETTS 02108

MARTHA COAKLEY
ATTORNEY GENERAL

May 6, 2014

(617) 727-2200
www.mass.gov/ago

Robert Draper
26 Jodie Road
Framingham, MA 01702

Re: <u>Massachusetts handgun laws</u>

Dear Mr. Draper:

I am writing in response to your letter to Attorney General Coakley, inquiring about whether Glock handguns comply with the Attorney General's Handgun Sales regulations.

In order for a handgun to be sold or transferred legally in Massachusetts, it must be in compliance with both federal and state laws. The "Approved Firearms Roster" of guns compiled and published by the Executive Office of Public Safety and Security (EOPSS) are those that meet the criteria stated in G. L. c. 140. If a handgun is listed on the EOPSS roster, it can be sold in Massachusetts by a handgun dealer if it meets the additional safety-related requirements under the Attorney General's regulations, 940 CMR 16.00, or is otherwise exempt from those requirements.

The Attorney General's Handgun Sales regulations fall under the state's consumer protection law and are designed to protect consumers and their families from unsafe handguns and unfair or deceptive practices by handgun dealers and manufacturers. The regulations effectively ban cheap "Saturday Night Specials" and require all handguns sold in Massachusetts to include child-proofing measures, tamper-proof serial numbers, and safety warnings.

The handguns presently manufactured by Glock, Inc. ("Glock") are not in compliance with the Massachusetts Handgun Sales Regulations, because they lack an effective load indicator or magazine safety disconnect. This Office notified Glock of this fact in 2004, and since that time Glock has not notified this Office of any change in the features of their firearms nor attempted to certify any firearm model as compliant with the Massachusetts Handgun Sales Regulations. Therefore, newly manufactured Glock handguns may not be transferred by a handgun dealer to a Massachusetts civilian.

Thank you for taking the time to contact this Office regarding your question.

Sincerely,

David W. Monahan
Deputy Chief
Consumer Protection Division

**26**



# THE COMMONWEALTH OF MASSACHUSETTS
## OFFICE OF THE ATTORNEY GENERAL
### ONE ASHBURTON PLACE
### BOSTON, MASSACHUSETTS 02108

MARTHA COAKLEY
ATTORNEY GENERAL

May 6, 2014

(617) 727-2200
www.mass.gov/ago

Ariel Weisberg
220 Central Street, #4
Stoneham, MA 02180

Re: Massachusetts handgun laws

Dear Mr. Weisberg:

I am writing in response to your letter to Attorney General Coakley, inquiring about whether Glock handguns comply with the Attorney General's Handgun Sales regulations.

In order for a handgun to be sold or transferred legally in Massachusetts, it must be in compliance with both federal and state laws. The "Approved Firearms Roster" of guns compiled and published by the Executive Office of Public Safety and Security (EOPSS) are those that meet the criteria stated in G. L. c. 140. If a handgun is listed on the EOPSS roster, it can be sold in Massachusetts by a handgun dealer if it meets the additional safety-related requirements under the Attorney General's regulations, 940 CMR 16.00, or is otherwise exempt from those requirements.

The Attorney General's Handgun Sales regulations fall under the state's consumer protection law and are designed to protect consumers and their families from unsafe handguns and unfair or deceptive practices by handgun dealers and manufacturers. The regulations effectively ban cheap "Saturday Night Specials" and require all handguns sold in Massachusetts to include child-proofing measures, tamper-proof serial numbers, and safety warnings.

The handguns presently manufactured by Glock, Inc. ("Glock") are not in compliance with the Massachusetts Handgun Sales Regulations, because they lack an effective load indicator or magazine safety disconnect. This Office notified Glock of this fact in 2004, and since that time Glock has not notified this Office of any change in the features of their firearms nor attempted to certify any firearm model as compliant with the Massachusetts Handgun Sales Regulations. Therefore, newly manufactured Glock handguns may not be transferred by a handgun dealer to a Massachusetts civilian.

Thank you for taking the time to contact this Office regarding your question.

Sincerely,

David W. Monahan
Deputy Chief
Consumer Protection Division

**27**



# THE COMMONWEALTH OF MASSACHUSETTS
# OFFICE OF THE ATTORNEY GENERAL

ONE ASHBURTON PLACE
BOSTON, MASSACHUSETTS 02108

MARTHA COAKLEY
ATTORNEY GENERAL

(617) 727-2200
www.mass.gov/ago

May 6, 2014

Eric Notkin
63 Trayer Road
Canton, MA 02021

Re: <u>Massachusetts handgun laws</u>

Dear Mr. Notkin:

I am writing in response to your letter to Attorney General Coakley, inquiring about whether Glock handguns comply with the Attorney General's Handgun Sales regulations.

In order for a handgun to be sold or transferred legally in Massachusetts, it must be in compliance with both federal and state laws. The "Approved Firearms Roster" of guns compiled and published by the Executive Office of Public Safety and Security (EOPSS) are those that meet the criteria stated in G. L. c. 140. If a handgun is listed on the EOPSS roster, it can be sold in Massachusetts by a handgun dealer if it meets the additional safety-related requirements under the Attorney General's regulations, 940 CMR 16.00, or is otherwise exempt from those requirements.

The Attorney General's Handgun Sales regulations fall under the state's consumer protection law and are designed to protect consumers and their families from unsafe handguns and unfair or deceptive practices by handgun dealers and manufacturers. The regulations effectively ban cheap "Saturday Night Specials" and require all handguns sold in Massachusetts to include child-proofing measures, tamper-proof serial numbers, and safety warnings.

The handguns presently manufactured by Glock, Inc. ("Glock") are not in compliance with the Massachusetts Handgun Sales Regulations, because they lack an effective load indicator or magazine safety disconnect. This Office notified Glock of this fact in 2004, and since that time Glock has not notified this Office of any change in the features of their firearms nor attempted to certify any firearm model as compliant with the Massachusetts Handgun Sales Regulations. Therefore, newly manufactured Glock handguns may not be transferred by a handgun dealer to a Massachusetts civilian.

Thank you for taking the time to contact this Office regarding your question.

Sincerely,

David Monahan

David W. Monahan
Deputy Chief
Consumer Protection Division

# 28



# THE COMMONWEALTH OF MASSACHUSETTS
## OFFICE OF THE ATTORNEY GENERAL

ONE ASHBURTON PLACE
BOSTON, MASSACHUSETTS 02108

MARTHA COAKLEY
ATTORNEY GENERAL

May 6, 2014

(617) 727-2200
www.mass.gov/ago

Brent Carlton
248 Arborway, #1
Jamaica Plain, MA 02130

Re: <u>Massachusetts handgun laws</u>

Dear Mr. Carlton:

I am writing in response to your letter to Attorney General Coakley, inquiring about whether Glock handguns comply with the Attorney General's Handgun Sales regulations.

In order for a handgun to be sold or transferred legally in Massachusetts, it must be in compliance with both federal and state laws. The "Approved Firearms Roster" of guns compiled and published by the Executive Office of Public Safety and Security (EOPSS) are those that meet the criteria stated in G. L. c. 140. If a handgun is listed on the EOPSS roster, it can be sold in Massachusetts by a handgun dealer if it meets the additional safety-related requirements under the Attorney General's regulations, 940 CMR 16.00, or is otherwise exempt from those requirements.

The Attorney General's Handgun Sales regulations fall under the state's consumer protection law and are designed to protect consumers and their families from unsafe handguns and unfair or deceptive practices by handgun dealers and manufacturers. The regulations effectively ban cheap "Saturday Night Specials" and require all handguns sold in Massachusetts to include child-proofing measures, tamper-proof serial numbers, and safety warnings.

The handguns presently manufactured by Glock, Inc. ("Glock") are not in compliance with the Massachusetts Handgun Sales Regulations, because they lack an effective load indicator or magazine safety disconnect. This Office notified Glock of this fact in 2004, and since that time Glock has not notified this Office of any change in the features of their firearms nor attempted to certify any firearm model as compliant with the Massachusetts Handgun Sales Regulations. Therefore, newly manufactured Glock handguns may not be transferred by a handgun dealer to a Massachusetts civilian.

Handgun dealers in Massachusetts have clear information on this point from Glock, EOPSS, and this Office, and are operating on more than the "rumor and speculation" you refer to in your letter when they inform prospective purchasers that Glock firearms cannot legally be sold to civilians in Massachusetts.

Thank you for taking the time to contact this Office regarding your question.

Sincerely,

David Monahan

David W. Monahan
Deputy Chief
Consumer Protection Division

**29**



# THE COMMONWEALTH OF MASSACHUSETTS
## OFFICE OF THE ATTORNEY GENERAL
### ONE ASHBURTON PLACE
### BOSTON, MASSACHUSETTS 02108

MARTHA COAKLEY
ATTORNEY GENERAL

May 14, 2014

(617) 727-2200
www.mass.gov/ago

Robert A. Boudrie
20 Wellesley Avenue
Natick, MA 01760

Re: <u>Massachusetts handgun laws</u>

Dear Mr. Boudrie:

I am writing in response to your letter to Attorney General Coakley, inquiring about whether Glock handguns comply with the Attorney General's Handgun Sales regulations.

In order for a handgun to be sold or transferred legally in Massachusetts, it must be in compliance with both federal and state laws. The "Approved Firearms Roster" of guns compiled and published by the Executive Office of Public Safety and Security (EOPSS) are those that meet the criteria stated in G. L. c. 140. If a handgun is listed on the EOPSS roster, it can be sold in Massachusetts by a handgun dealer if it meets the additional safety-related requirements under the Attorney General's regulations, 940 CMR 16.00, or is otherwise exempt from those requirements.

The Attorney General's Handgun Sales regulations fall under the state's consumer protection law and are designed to protect consumers and their families from unsafe handguns and unfair or deceptive practices by handgun dealers and manufacturers. The regulations effectively ban cheap "Saturday Night Specials" and require all handguns sold in Massachusetts to include child-proofing measures, tamper-proof serial numbers, and safety warnings.

The handguns presently manufactured by Glock, Inc. ("Glock") are not in compliance with the Massachusetts Handgun Sales Regulations, because they lack an effective load indicator or magazine safety disconnect. This Office notified Glock of this fact in 2004, and since that time Glock has not notified this Office of any change in the features of their firearms nor attempted to certify any firearm model as compliant with the Massachusetts Handgun Sales Regulations. Therefore, newly manufactured Glock handguns may not be transferred by a handgun dealer to a Massachusetts civilian.

Thank you for taking the time to contact this Office regarding your question.

Sincerely,

David W. Monahan
Deputy Chief
Consumer Protection Division

**30**



# THE COMMONWEALTH OF MASSACHUSETTS
## OFFICE OF THE ATTORNEY GENERAL
### ONE ASHBURTON PLACE
### BOSTON, MASSACHUSETTS 02108

MARTHA COAKLEY
ATTORNEY GENERAL

(617) 727-2200
www.mass.gov/ago

May 21, 2014

Donna M. Major
3 Holborn Park
Boston, MA 02121

Re: Massachusetts handgun laws

Dear Ms. Major

I am writing in response to your letter to Attorney General Coakley, inquiring about whether Glock handguns comply with the Attorney General's Handgun Sales regulations.

In order for a handgun to be sold or transferred legally in Massachusetts, it must be in compliance with both federal and state laws. The "Approved Firearms Roster" of guns compiled and published by the Executive Office of Public Safety and Security (EOPSS) are those that meet the criteria stated in G. L. c. 140. If a handgun is listed on the EOPSS roster, it can be sold in Massachusetts by a handgun dealer if it meets the additional safety-related requirements under the Attorney General's regulations, 940 CMR 16.00, or is otherwise exempt from those requirements.

The Attorney General's Handgun Sales regulations fall under the state's consumer protection law and are designed to protect consumers and their families from unsafe handguns and unfair or deceptive practices by handgun dealers and manufacturers. The regulations effectively ban cheap "Saturday Night Specials" and require all handguns sold in Massachusetts to include child-proofing measures, tamper-proof serial numbers, and safety warnings.

The handguns presently manufactured by Glock, Inc. ("Glock") are not in compliance with the Massachusetts Handgun Sales Regulations, because they lack an effective load indicator or magazine safety disconnect. This Office notified Glock of this fact in 2004, and since that time Glock has not notified this Office of any change in the features of their firearms nor attempted to certify any firearm model as compliant with the Massachusetts Handgun Sales Regulations. Therefore, newly manufactured Glock handguns may not be transferred by a handgun dealer to a Massachusetts civilian.

Thank you for taking the time to contact this Office regarding your question.

Sincerely,

David W. Monahan
Deputy Chief
Consumer Protection Division

# 31



The Official Website of the Executive Office of Public Safety and Security

## Public Safety

☰ Home  ›  Search Results

# Search Results

🔍 glock                                                     **SEARCH**        [Advanced Search](#)

Results **1 - 5** of about **5** in **Secretary of Public Safety**

1. [PDF] **Commonwealth of Massachusetts**
   ... FMK 9C-1 9mm FMK 9C1 GEN II 9mm **Glock** 17 9mm **Glock** 17C 9mm **Glock** 17RTF 9mm **Glock** 17 GEN4 9mm **Glock** 19 9mm **Glock** 19 GEN4 9mm ...

2. [PDF] **Chiefs Newsletter**
   ... Partnered up and armed with **Glock** Simunitions pistols in a shoot house built by the Alameda County Sher- iff's Office, they're in- structed to ...

3. [PDF] **Standard MPTC Academy Equipment List**
   ... Sidearm, department issue Sidearm, sponsored, **Glock** Model 23 40Cal (Must be approved by Lead Firearms Instructor) Socks, white ...

4. [PDF] **USING SOCIAL MEDIA TO PREVENT GANG VIOLENCE AND ENGAGE YOUTH**
   ... boys, ninja GUN/FIREARM gat/gatt, burner, heat/heaters, hammer, ratchet, piece, strap, gloc/**glock**, toy, toast, Banger, rat ...

5. [PDF] **LARGE CAPAICTY**
   ... Desert Industries War Eagle EAA Witness EA22T FEG B9R FP9 P9R PJK-9HP **Glock** 17 19 20 21 22 23 24 Grendel P-12 P-30 P-31 ...

**Other ways to find what you are looking for:**

Massachusetts laws

Libraries

Cities & towns, comprehensive information

**Our Organization**

Office of the Secretary

Architectural Access Board

Commonwealth Public Safety Broadband Office (PSBO)

Department of Correction

Dept. of Criminal Justice Information Services

Department of Fire Services

Department of Public Safety

Massachusetts State Police

Harbormaster Training Council

Mass Emergency Management Agency

Massachusetts National Guard

Municipal Police Training Committee

Office of the Chief Medical Examiner

Office of Grants & Research

Parole Board

Sex Offender Registry Board

State 911 Department

State Police Crime Laboratory/Forensic Services Group

**Search Tips**

© 2014 Commonwealth of Massachusetts.

Mass.Gov® is a registered service mark of the Commonwealth of Massachusetts.

Contact Us    Site Policies

**32**



The Official Website of the Attorney General of Massachusetts

# Attorney General
## Martha Coakley

⌂ Home  ›  Search Results

# Search Results

| 🔍 glock | SEARCH | [Advanced Search](#) |

Results **1 - 1** of about **1** in **Attorney General**

1. [PDF] **Supreme Court of the United States**
   **...** 2. In this action, the United States prosecuted pe- titioner Bruce Abramski for his role in purchasing a **Glock** firearm on his uncle's behalf. **...**

## Attorney General's Office Databases and Lookups

Public Charities Annual Filings

Open Meeting Law Determinations Lookup

Community Benefits

Motorcycle Insurance Settlements

Bid Protest Decision Lookup

Municipal Law Unit (MLU) Decision Lookup

## Press Releases

Drywall Company Sued for Misclassifying Workers

Dorchester Bar Resolves Race Discrimination Lawsuit

Man Pleads Guilty to Stealing More Than $37,000

AG Urges FHFA to Use Programs to Keep People in Homes

**See All**

Subscribe  |  Learn more


File a Complaint

---

© 2014 Commonwealth of Massachusetts.

Mass.Gov® is a registered service mark of the Commonwealth of Massachusetts.

Site Policies    Contact the Attorney General's Office

**33**



# Model 9C1

## Instruction Manual and Safety Features
Read this manual completely before using this handgun.

**FMK FIREARMS**

PROUDLY AMERICAN

AD Page 152 of 441



### Loaded Chamber Indicator

#### When Chamber Loaded:

A red pin will protrude out the back of the slide when a round is in the chamber. Text "**LOADED IF OUT**" warns the user of the condition. The loaded condition is visually apparent in light and readily apparent in dark by feel.



#### When Chamber Unloaded:

The red pin will not protrude out the back of the slide if no round is in the chamber. The unloaded condition is visually apparent in light and readily apparent in dark by feel.



## Striker Indicator

The 9C1 handgun is a Double Action Only pistol. In one stroke of the trigger, the firing element (the striker) is pulled back (action 1) and released (action 2) firing the weapon. When the striker moves back, it will show in the large hole within the slide end cap *warning: discharge is imminent.*





Discharge is imminent.

© 2009 Model 9C1 is a registered trademark of FMK Firearms, Inc. All rights reserved. Made in USA. AD Page 154 of 9 of 441

**34**

S

# INSTRUCTION MANUAL FOR



BLUED &
STAINLESS
STEEL

CALIBER
9mm, 40 S&W, &
45 Auto

# RUGER® SR-SERIES

## SR9®, SR9c™, SR40®, SR40c™ & SR45™

## MANUAL SAFETY MODEL PISTOLS



## – Rugged, Reliable Firearms –



**READ THE INSTRUCTIONS AND WARNINGS IN THIS MANUAL CAREFULLY BEFORE USING THIS FIREARM**

© 2013 Sturm, Ruger & Co., Inc.

This manual may not be reproduced in whole or in part without the express written permission of Sturm, Ruger & Co., Inc.

### For Service on This Model Please Call:
### (928) 778-6555 (See p. 34)

THIS INSTRUCTION MANUAL SHOULD ALWAYS ACCOMPANY THIS FIREARM AND BE TRANSFERRED WITH IT UPON CHANGE OF OWNERSHIP, OR WHEN THE FIREARM IS LOANED OR PRESENTED TO ANOTHER PERSON

## www.ruger.com

VS & KVS 4/13A  C
R5

# NOMENCLATURE



**Sights** have high-visibility white dots both front and rear. Both sights can be adjusted for windage.

**Slide's** open-top design minimizes possibility of jamming, enables shooter to clear any malfunction easily by hand.

Elevation click-adjustable **rear sight** is drift adjustable for windage.

When ambidextrous **manual safety** is in "safe" position, locks the trigger and trigger bar.

**Frame** is a rigid one-piece glass reinforced nylon.

**Takedown pin**.

Oversize **trigger guard** permits shooting with gloved hand.

**Slide stop** holds the slide open and is activated automatically when last shot is fired (if magazine is in pistol), or can be manually operated.

Ambidextrous **magazine latch** permits positive retention and quick removal of magazine.

Magazine has **gripping grooves** on floorplate.

**Loaded Chamber Indicator** protrudes from the top of the slide and provides a visual and tactile indication when a round is present in the firing chamber.

Ambidextrous **manual safety**.

The **Accessory Rail** accepts most lights and sighting devices designed to fit the M1913 Picatinny Standard Rail.

**Trigger safety** and **firing pin block** prevent firing unless trigger is completely pulled.

The **Magazine latch**.

Unique **Reversible Backstrap** changes from flat to arched (shown) in seconds.

The **Magazine Disconnect** is designed to prevent the pistol from being fired when the magazine is removed, even if a live round remains in the firing chamber.

7

**AD Page 157 of 441**

# OPERATION OF
# LOADED CHAMBER INDICATOR

You should always treat every gun as though it is loaded and always keep the muzzle pointed in a safe direction. Never rely upon any safety or mechanical device to justify unsafe or careless gun handling. In order to assist you in determining the presence of a cartridge in the chamber of your **RUGER**® **SR–SERIES** pistol, and to comply with state laws, the **SR–SERIES** is equipped with a loaded chamber indicator. The indicator appears on the top of the slide. (See "Nomenclature," p. 7.)

When the chamber is empty, the loaded chamber indicator should be flush with the top of the slide. (See Figure 8a, below.)

When the chamber is loaded, the forward portion of the loaded chamber indicator should protrude from the top of the slide. When the chamber contains a cartridge, a red bar should be visible on either side of the loaded chamber indicator. (See Figure 8b, below.)

## OPERATION OF LOADED CHAMBER INDICATOR

**Indicator Flush With Top**



Figure 8a

**Chamber Empty**

**Indicator Protrudes From Top - Red Bar Visible**



Figure 8b

**"Loaded When Up"**

**Cartridge in Chamber**

⚠ **NEVER RELY ON YOUR MEMORY OR ANY LOADED CHAMBER INDICATOR TO KNOW IF A GUN IS LOADED. ANY MECHANICAL DEVICE CAN FAIL. ALWAYS VISUALLY CHECK THE CHAMBER BY RETRACTING THE SLIDE AND EXAMINING THE CHAMBER TO BE <u>SURE</u> WHETHER IT IS EMPTY OR LOADED.**

17

**35**

# MK-25

## 3,000,000 ROUNDS.
## CONSIDER IT BASIC TRAINING.

To be America's first line of defense, the MK-25 needed to prove its mettle. It did and then some with durability, reliability and accuracy. At the range or in the heat of combat, this high-capacity, full-size pistol is a force to be reckoned with.

**FULL-SIZE FRAME**

**HIGH-CAPACITY MAGAZINE**

**DOUBLE-ACTION/SINGLE-ACTION**

**INTEGRAL ACCESSORY RAIL**

Corrosion Resistant Internal Parts

Loaded Chamber Indicator

Anchor Engraving

SIGLITE® Night Sights

Nitron Coated Stainless Slide

Integral 1913 Accessory Rail

## MK-25 CALIFORNIA MODEL

Black Polymer Grips

Black Hard Coat Anodized Aluminum Frame

Front Strap Serrations

10 Round Double Stack Magazine





*UID Label Affixed to Left Side of Frame*



*SIGLITE Night Sights or Contrast Sights*

SIG SAUER®

*when it counts™*

# MK-25 CALIFORNIA MODEL SPECIFICATIONS

| | |
|---|---|
| **Caliber** | 9MM |
| **Overall Length** | 7.7 in |
| **Overall Height** | 5.5 in |
| **Overall Width** | 1.5 in |
| **Barrel Length** | 4.4 in |
| **Sight Radius** | 6.3 in |
| **Sights** | SIGLITE® Night Sights |
| **Weight w/Magazine** | 34.0 oz |
| **Frame Material** | Alloy |
| **Frame Finish** | Black Hard Coat Anodized |
| **Slide Material** | Stainless Steel |
| **Slide Finish** | Nitron® |
| **Magazine Capacity** | 10 Rounds |
| **Trigger** | DA/SA |
| **Trigger Pull** | DA 10.0 lbs / SA 4.4 lbs |
| **Item Number(s)** | MK-25-CA |

**DA/SA –** Double-Action/Single-Action • **Additional Features For California -** Loaded Chamber Indicator, Magazine Safety.



*Anchor Engraving*



*Black Hard Coat Anodized Alloy Frame, Nitron
Coated Stainless Slide, with Anchor Engraving*
***CALIFORNIA FEATURES:***
*Loaded Chamber indicator, Magazine Safety*

## ACCESSORIES





Roto Paddle Holster          Double Magazine Pouch          STL-900 Tactical Light & Laser



*when it counts™*

**SIG SAUER, Inc., 18 Industrial Drive, Exeter, NH, USA 03833 USA • (603) 772-2302**

An ISO 9001: 2008 Certified Company, Manufacturing in Exeter, New Hampshire
SIG SAUER, Inc. reserves the right to correct any errors or inaccuracies contained herein, and to revoke stated offers at any time without notice.
Prices, availability, specifications, and promotional offers are subject to change or cancellation at any time without notice.

**36**



MODEL 1911 R1 Series
Autoloading Pistols

# Owner's Manual

Instruction Book for:
MODEL 1911 R1
AUTOLOADING PISTOLS

Remington.

BY E·R·P·C

# Remington.

Remington is a Trademark Registered in the United States Patent and
Trademark Office By Remington Arms Company, Inc.

Printed in the U.S.A.                    402833 2.10 ORIG

## IMPORTANT!

This manual contains operating, care, and
maintenance instructions. To assure safe
operation, any user of this firearm must read
and understand this manual before using the
firearm. Failure to follow the instructions and
heed the warnings in this manual can cause
property damage, personal injury, and/or
death.

This manual should always accompany this
firearm, and be transferred with it upon
change of ownership.

WARNING! Keep this firearm out of the
reach of children, unauthorized individuals,
and others unfamiliar with the safe handling
of firearms.

Page 2    ..... The Ten Command-
              ments of Firearm Safety
Page 10  ......Important Parts of the
              Firearm
Page 14  ......Safe Firearm Handling
Page 15  ......To Load Firearm
Page 18  ......To Unload Firearm
Page  20  ......Cleaning, Lubrication,
              and Maintenance
Page 30  ......How to Obtain Parts
              and Service

**AT REST** - this position is when the face of the hammer is resting on the firing pin stop.

**QUARTER COCK** - this position is when the hammer is pulled to the first stageable position, functioning as the Hammer Stop.

Note: Always control hammer with your thumb.

**FULLY COCKED** - this position is when the hammer is pulled to the second stageable position. The full cocked position is the FIRE position.

**WARNING!** Lowering the hammer from fully cocked to rest (decocking) position is not recommended, but if performed should only be attempted when the chamber is empty. Always keep the firearm pointed in a safe direction. See "*To Unload the Firearm"*, page 18.

## The Hammer Stop / Quarter Cock Position

The Hammer Stop or the quarter-cock position of the hammer is a passive system which prevents unintended discharge by stopping the hammer from hitting the firing pin in the event your thumb slips off the hammer during manual cocking or in case of internal component damage.

If the hammer stop is activated, without touching the trigger, move the hammer to the full cock position by moving the hammer fully rearward. Engage the safety mechanism by moving the Safety Lock up fully into the slide's Safety Engagement Notch. Always keep the firearm pointed in a safe direction. See Picture 4.

**WARNING!** Do NOT use the quarter cock position of the hammer as a manual safety device. Do NOT carry the firearm at anytime with hammer in the quarter cocked position. The hammer's quarter cock position was not designed to be a primary manual safety mechanism.

## The Chamber Indicator

The Chamber Indicator is located at the rear of the barrel seen through the ejection port. See Picture 7. Observing the



Chamber Indicator

**Picture 7**

Chamber Indicator opening allows the user to observe if brass is present, indicating a chambered cartridge. Providing there is adequate lighting and the handgun is clean and in good working order. Never RELY on the Chamber Indicator alone to determine if a cartridge is chambered. Always open the slide and visually check the chamber and magazine to verify the presence of a cartridge. Always keep the firearm pointed in a safe direction. See "*Safe Firearm Handling"*, page 14.

**WARNING! Do NOT rely upon the chamber indicator alone to verify the presence or absence of a cartridge in the chamber**. See "*The Ten Commandments of Firearm Safety"*, on page 2.

**The Chamber Indicator may help to determine whether a cartridge**

**is present in the chamber. The lighting conditions, cleanliness of the handgun, discoloration of the ammunition, and other factors may limit the effectiveness of the Chamber Indicator.**

## The Locking Device

This firearm was originally sold with a key-operated locking device to assist the owner in protecting against unauthorized use. For proper installation of the locking device, see separate instructions provided in packaging. These are storage locking devices. The firearm should be completely unloaded when stored or not in use.

**WARNING!** The locking device does not eliminate the need for safe firearm handling and storage, including keeping this and every firearm un-loaded and locked in a secure place when not in use. Read and follow these and other safety rules in this instruction book. Failure to read, understand, and obey these rules can result in serious personal injury or death. Always keep the firearm pointed in a safe direction. See *The Ten Commandments of Firearm Safety*, on page 2.

Keep your locking device engaged when your firearm is not in use. See Picture 8. Keep the keys in a separate and secure place, inaccessible to others. Do NOT leave your keys or any ammunition with your firearm, which should be kept unloaded and locked in a safe place.



**Picture 8**



Magazine Catch

Magazine

**Picture 9**

## The Magazine Catch

The Magazine Catch is used to release the magazine from the firearm. The Magazine Catch is located on the shooter's left behind the trigger. To release a magazine from the receiver, hold one hand under the magazine while pushing the Magazine Catch. See Picture 9.

## Trigger Assembly

*Pulling the trigger DISCHARGES the firearm.*

The trigger assembly of the Model 1911 R1 series handguns have been designed for optimal trigger pull. The factory settings provide a crisp, clean trigger pull for superior performance. The factory settings is not adjustable. All repairs to the trigger assembly must be made by the factory or a E-RPC Authorized Repair Center.

12

13

**37**



# Smith & Wesson®

## Safety & Instruction Manual

# BODYGUARD® 380



<div style="background:#f9d9c0;border:1px solid #000;">

⚠️ **Read the instructions and warnings in this manual CAREFULLY BEFORE using this firearm.**

</div>

**2100 Roosevelt Avenue · Springfield, MA  01104**
**1-800-331-0852 · Fax:  413-747-3317**
**www.smith-wesson.com**

**Copyright © 2013 Smith & Wesson®**
**All rights reserved.**

# *LOADED CHAMBER INDICATOR*

⚠ **WARNING: NEVER RELY UPON THE LOADED CHAMBER INDICATOR ALONE TO VERIFY THE PRESENCE OR ABSENCE OF A ROUND IN THE CHAMBER. THE SUREST METHOD TO DETERMINE THE PRESENCE OR ABSENCE OF A ROUND IN THE CHAMBER IS TO VISUALLY CHECK THE CHAMBER OF YOUR FIREARM BY REMOVING THE MAGAZINE AND PULLING AND LOCKING THE SLIDE IN THE OPEN POSITION.**

The BodyGuard 380 Pistols come with a loaded chamber indicator. This indicator can be observed by looking at the top of the slide/ejection port (FIGURE 11), noting an opening at the rear of the barrel. By looking into this opening, you can observe whether or not a round is in the firearm's chamber. If a round is in the chamber, you should be able to see the cartridge rim through this opening.



**FIGURE 11**

⚠ **WARNING: ALWAYS TREAT EVERY FIREARM AS IF IT IS LOADED AND WILL FIRE IF THE TRIGGER IS PULLED. A LOADED CHAMBER INDICATOR MAY HELP DETERMINE WHETHER THE CHAMBER IS LOADED OR UNLOADED. THE AMOUNT OF LIGHT, CLEANLINESS OF THE PISTOL, DISCOLORATION OF THE AMMUNITION AND OTHER FACTORS MAY LIMIT THE EFFECTIVENESS OF THE LOADED CHAMBER INDICATOR.**

# *PREPARATION FOR FIRING*

 **WARNING:THE FAILURE TO FOLLOW THESE FIREARM SAFETY REQUIREMENTS WILL CAUSE SERIOUS PERSONAL INJURY OR DEATH TO YOU OR OTHERS.**

• **ALWAYS TREAT ALL FIREARMS AS IF THEY ARE LOADED.**

• **ALWAYS BE SURE THAT THE CHAMBER IS CLEAR OF A CARTRIDGE, THE MAGAZINE IS REMOVED OR UNLOADED, AND THAT THE FIREARM IS POINTING IN A SAFE DIRECTION.**

• **ALWAYS KEEP FINGERS AND OTHER PARTS OF YOUR BODY AWAY FROM THE MUZZLE AND AWAY FROM THE PISTOL SLIDE AND EJECTION PORT.**

## 15

**38**

AD Page 168 of 441



SAFETY & INSTRUCTION MANUAL

# **P99** PISTOL





 Read the instructions and warnings in this manual
CAREFULLY BEFORE using this firearm.

**WALTHER ARMS, INC.**



### 3.2.1. Loaded Chamber Indicator

The loaded chamber indicator is on the right side of the slide.
The loaded chamber indicator can be observed when the rear of the extractor is recessed, revealing a red colored marking (3.2.1. Fig. 1).



*3.2.1. Fig. 1*

**⚠ WARNING** DO NOT RELY UPON THE LOADED CHAMBER INDICATOR TO VERIFY THE PRESENCE OR ABSENCE OF A ROUND IN THE CHAMBER. ALWAYS CHECK THE CHAMBER OF THE FIREARM BY REMOVING THE MAGAZINE AND LOCKING THE SLIDE IN THE OPEN POSITION.

**⚠ WARNING** ALWAYS TREAT EVERY FIREARM AS IF IT WERE LOADED AND WOULD FIRE IF THE TRIGGER IS PULLED: THE AMOUNT OF LIGHT, CLEANLINESS OF THE PISTOL AND OTHER FACTORS MAY LIMIT THE EFFECTIVENESS OF THE LOADED CHAMBER INDICATOR. CLEANING SOLVENTS OR WEAR MAY DARKEN OR REMOVE THE RED COLOR, OR POWDER RESIDUE OR DIRT MAY COVER IT UP. IF YOU DO NOT SEE THE RED DOT, DO NOT ASSUME THE CHAMBER IS EMPTY. AFTER FIRST CHECKING THAT THE MAGAZINE HAS BEEN REMOVED, PULL THE SLIDE BACK UNTIL YOU CAN LOOK INTO THE CHAMBER AND VERIFY WHETHER IT IS EMPTY OR NOT.

### 3.2.2. Striker Status Indicator

The P99 has a cocking indicator in the rear of the slide. The pistol uses an internal striker with a tip that protrudes out of the slide end cap when the striker is cocked.

- In the de-cocked state, the tip can be neither seen nor felt (3.2.2. Fig. 1, left side).
- The tip protrudes from the rear of the slide when the pistol is cocked (3.2.2. Fig. 1, middle).
- The tip is approximately .04" (1 mm) inside the slide end cap on cocked P99 QA (3.2.2. Fig. 1, right side). It can be seen, but not felt.



*3.2.2. Fig. 1, from left to right: de-cocked, cocked, cocked (P99 QA only)*

AD Page 170 of 441

**39**

# Operating Instructions

## Kahr Semi-Auto Double Action Only (DAO) Pistols



## Parts & Accessories Ordering
FAX: 508-795-7046

## Secure Internet ordering for parts & accessories: www.kahr.com



# Warning!

Read and fully understand this manual before removing this firearm from its package.

## THIS PISTOL WILL FIRE IF THE TRIGGER IS PULLED!

It should be considered loaded and ready to fire until the magazine has been removed and the chamber has been checked to verify that the firearm is unloaded.

Be sure to read and fully understand all "Important Safety Instructions" shown in red type.

Discharging firearms in poorly ventilated areas, cleaning firearms, or handling ammunition may result in exposure to lead or other substances known to the State of California to cause birth defects, reproductive harm, and other serious physical injury. Have adequate ventilation at all times. Wash hands thoroughly after exposure.

The Magazine is now completely disassembled (see photo #13). Clean all parts thoroughly with solvent. Wipe all parts lightly with lubricant-moistened cloth before reassembly.

CAUTION! DO NOT OVER LUBRICATE.

Lubricant can penetrate the primer of ammunition and render it inoperative causing a failure to fire.

Inspect the Magazine Base and Magazine Base Lock for cracks. Inspect the Magazine Tube for cracks or voids in the seam weld area.
Inspect Magazine Follower for chips and cracks. Check the metal follower pin in the Magazine Follower for correct depth and tightness of fit (see photo #13). Ensure that the Magazine Follower moves freely inside the Magazine Tube. Replace components as required.

Check the Magazine feed lips for distortion, burrs or nicks, and especially for smoothness at the magazine catch slot.

Note: Magazines should always be handled with care. If a Magazine becomes damaged as a result of being dropped on a hard surface, it should be replaced. Do not attempt to repair it.



**Photo 13**

E

A

Magazine Follower Pin

B    C    D

### Reassembly

After cleaning, inspection and lubrication, reassemble the Magazine in reverse order from disassembly, again using a pin or wire through the lowest sight holes to contain the Magazine Spring for ease of fitting the Magazine Base Lock and Magazine Base.

Ensure the empty, reassembled Magazine seats fully when inserted in the pistol, and ejects freely from its well when the Magazine Catch is depressed.

# Checking Safety Devices

The following safety check is to be carried out at regular intervals and before the pistol is used:

With the Slide removed and the Barrel dismantled, the Striker is drawn back manually about 1/4 inch and then eased forward again. The tip of the Striker must not project beyond the breech face of the Slide.

    

Correct    Wrong!

Note: When easing the Striker forward, be careful not to depress the Striker Block which sits next to the Striker. If it is depressed during the safety check, it will allow the Striker to project beyond the breech face.

### Note Regarding Primer Indent and Distorted Spent Cases

Upon examining fired cases, you may notice that the primer indent appears distorted or elongated. This is normal for the striker system design of the KAHR pistols. You may also  notice that the spent case becomes slightly deformed into the shape of a "D" instead of an "O" shape. This is considered normal for the KAHR pistol and is caused by the spent case touching the bottom of the ejection port when exiting the gun. Neither of these two situations are a cause for concern and it is not necessary to contact the service department.

# Extractor as a Loaded Chamber Indicator (except P380)

The extractor on all Kahr pistols protrudes outward from the surface of the slide when the properly designated caliber ammunition marked on the barrel is loaded in the chamber. The extractor is located on the right side of the slide

directly behind the ejection port (see photo #14). The extractor protrusion allows the extractor to be used as a loaded chamber indicator (LCI). The extractor protrusion permits visual and tactile (felt) confirmation of a chambered round.



**Photo 14**

## SAFETY WARNING



The loaded chamber indicator should <u>never</u> be used as an "unloaded chamber indicator" - meaning that it should <u>never</u> be used by a firearm handler to confirm that a chamber is <u>empty</u>, to the exclusion of manually checking the chamber as explained on page 17 in the Unloading section of this manual. The user must know that the surest method to determine the absence of a round in the chamber is to visually and manually check the chamber of the firearm by pulling and locking the slide to the rear.

## Kahr External Safety & Loaded Chamber Indicator (LCI) Model

### Loaded Chamber Indicator

This model is designed to provide physical indication if there is a bullet loaded in the chamber. The product is designed with a lever mounted on the top of slide. The lever is marked as Indicator in red lettering. When a bullet is chambered it pushes the lever upward and out of position. The operator will visually see the lever



**Empty Chamber**

**Loaded Chamber**

as it is raised up. Also the operator will be able to feel the indicator as being out of its normal resting position as it will not be flush with the top of the slide, thus warning the operator that the firearm is loaded.

### External Safety

This model has, in addition to the internal safety, an external safety that will prevent the firearm from firing when the safety is in safe position. The product has an external lever with two settings. When the lever is pushed completely up and the red dot is fully visible, the firearm is in the armed position and ready to fire with the pull of the trigger. When the lever is pushed down, and the red dot is hidden the firearm is in safe position and will not function with the pull of the trigger. The safety works in the following manner. When the lever is in down (Safe) position the connecting cam on the lever pushes the trigger bar out of position, disconnecting it from the cocking cam. If the trigger is pulled in safe mode, the cocking cam will not release the striker and the firearm will not fire. When the lever is pushed up (Fire/armed position) the cam moves out of place and the trigger bar moves up, again connecting with the cocking cam. The firearm is then ready to fire with the pull of the trigger.




Safe Mode                Fire Mode

## Cleaning & Lubrication

Before the initial shooting of the new KAHR Pistol, the pistol should be disassembled following the instructions in this manual and cleaned with a commercial gun cleaning solvent. After each shooting session, the cleaning process should be repeated to remove firing residue from the inside and outside of the Barrel, Slide, Frame and Magazine.

Once cleaned, all parts should be lightly lubricated with a commercial gun lubricant. Follow solvent and lubricant manufacturer's instructions.

**AD Page 174 of 441**

**40**

# USP SERIES

## OPERATOR'S MANUAL



**HECKLER & KOCH**

**Covering USP, USP Compact, and USP Specialized Models**

ejection port on the slide. The breech is now locked closed and the next shot can be fired.

**CAUTION: A pair of Universal Mounting Grooves located on the front of the USP's frame allows for a variety of accessories to be used with the pistol. Improperly designed or installed accessories may result in damage to the mounting grooves and/or the pistol. Such damage is not covered under warranty. Be certain to use only HK authorized accessories and follow installation and precautions carefully.**

## OPERATING CONTROLS & COMPONENTS

**WARNING: USP series pistols incorporates single-action and/or double-action modes of operation. Anytime the trigger is pulled with the control lever in the fire (horizontal) position and a cartridge in the chamber, the pistol will fire from either the hammer down or cocked positions.**

**Trigger (in Double/Single-Action modes)**
In the double-action mode, pulling the trigger will cock the hammer and immediately release it firing the first chambered cartridge. All subsequent cartridges will be fired in the single-action mode because the slide automatically recocks the hammer after each shot is fired. To fire the first chambered cartridge in the single-action mode, the hammer must be manually cocked before pulling the trigger. All shots after the first shot will be fired single-action because the slide automatically recocks the hammer after each shot is fired.

In the double-action only mode, the hammer always returns to the uncocked (forward) position after each shot. All shots are fired in the double-action mode. The HK LEM (Law Enforcement Modification) mode functions similar to double-action only mode.

| | USP | USP Compact | USP LEM | USP Tactical | USP Expert | MARK 23 | P2000 P2000SK DA/SA | P2000 P2000SK LEM |
|---|---|---|---|---|---|---|---|---|
| **Single Action Trigger Pull (pounds)** | 4.5 | 4.5 | N/A | 4.5 | 3.8 | 5.2 | 4.04 | N/A |
| **Double Action Trigger Pull (pounds)** | 11.5 | 11.5 | 7.42 optional 5.5 | 11.5 | 11.5 | 11.5 | 10.34 | 7.42 optional 5.5 |

**Control Lever**
This manually operated lever is located on the side of the frame below the rear sight. This lever is operated with the firing thumb and can perform both functions of a safety lever and a decocking lever, depending on the parts installed.

**NOTE: Some variants do not have a control lever. On some USPs, including some of the specialized USP models (USP Elite USP Expert), a control lever is present on both sides of the frame.**

**Control lever as a safety lever**
On HK USPs with the "SAFE" position (Variants 1, 2, 5, 6, 9, & 10), the front of this lever is fully raised above horizontal so that the "S" on the lever itself aligns with the reference line on the frame (see Figure 3 ). With this control lever engaged, the release of the hammer is blocked in the single-action mode of fire. In the double-action mode, the hammer will partially cock but will not release to fire the pistol.

**WARNING: The USP Series Pistol fitted with LEM parts incorporates double-action only mode of operation. Anytime the trigger is pulled with a cartridge in the chamber, the pistol will fire from the hammer down position.**

In the double-action only mode, the hammer always returns to the uncocked (forward) position after each shot. All shots are fired in the double-action mode.

  

Fig. 3
Control Lever "SAFE"

Fig. 4
Control Lever "FIRE"

Fig. 5
Control Lever "DECOCK"

**Magazine**
Depending on the model, USP series magazines are constructed of high-strength, light-weight polymer or metal. Polymer magazines have a metal insert located in the upper third of the housing for increased strength and durability. Cartridges are positioned within the magazine in a staggered arrangement but are fed into the pistol from a single row under the feed lips. The cartridges are visible through the numbered viewing holes located in the back of the magazine. For maintenance and cleaning, USP Series magazines can be easily disassembled. Interchangeable floorplates are available for the magazines of the many USP Series Pistols. A standard flat floorplate and an extended magazine floorplate with a finger extension provide a choice of grip options with each pistol. Magazine floorplates can be easily removed and changed without tools during disassembly.

**Extractor**
The extractor on the some USP models acts as a loaded chamber indicator. When a cartridge is in the chamber, the red colored forward edge of the extractor protrudes approximately 1 mm from the slide and is visible to the operator.

**CAUTION: Do not depend on the presence of a loaded chamber indicator to determine if a pistol is loaded. Treat all weapons as if they loaded!**

**Slide Release**
This lever is located on the left side of the frame directly above the trigger. This lever is used to lock the slide open, to release the slide, and to disassemble the pistol.

As a slide stop, it is lifted upward by the magazine follower or the operators finger as the slide travels rearward during recoil or manual manipulation. The slide release engages in the recess located on the left side of the slide at its midpoint. The slide release is spring actuated and is held down out of engagement with the slide until required. The slide release will automatically hold the slide open when the last shot is fired. As a disassembly lever, the slide release is removed from the left side of the frame when the slide is held partially rearward.

**Magazine Release Lever**
This ambidextrous, spring actuated lever holds the magazine in place within the grip by engaging in the notch found on the front of the magazine housing. Depressing this lever

**41**



# 92FS

# WORLD DEFENDER

*Sweltering heat.*
*Howling wind.*
*Sand that fouls every moving part.*
*This is where we perfected our firearms.*

Including the:
92 FS
M9
M9AI
92AI/96AI



BERETTA
500 YEARS. ONE PASSION.

## 92FS WORLD DEFENDER



The 92 series of semiautomatic pistols operates on a short recoil, delayed blowback system, which yields; faster cycle times, exceptional accuracy and greater reliability. Double/Single action provides a very safe and time-proven design. High-capacity steel magazines are durable and drop-free when the magazine button is depressed, even when empty. Chrome-lined barrels provide extreme corrosion resistance, as well as ease of cleaning. Barrels also feature a deeply recessed combat muzzle crown to protect the rifling.

**A. Open Slide Design:** Open top slide virtually eliminates jamming and stove piping. Allows the user to load and chamber one cartridge at a time should the magazine be lost or damaged.

**B. Disassembly Latch:** Simplifies field stripping for maintenance by allowing quick and easy disassembly. Stays on the gun, preventing accidental dropping and loss.

**C. Visible Automatic Firing Pin Block:** The front part of the firing pin is blocked from any forward movement until the trigger is pulled completely back. The block is located rearward, far away from the fouling and debris of the breech face. Since the block is visible, the user may ascertain its proper operation at any time. Even if the pistol falls and strikes the ground muzzle down, the firing pin will not strike the primer.

**D. Rear Sight Profile:** The rear sight is designed to provide a front projection so that in an emergency, the user may retract the slide single-handedly by pushing the rear sight against the edge of a table, door, etc.

**E. External Hammer Design:** A traditional feature of Beretta pistols, this design provides the energy to the firing pin, virtually eliminating the possibility of misfires due to light primer. Also provides an immediate visual and tactile indicator as to the cocked/uncocked status of the pistol.

**F. No Glare Finish:** Beretta's exclusive Bruniton™ non-reflective black coating is a superior corrosion and wear resistant finish.

**G. Light Aluminum Frame:** Each pistol features a lightweight, forged frame made from extremely strong aircraft-quality aluminum alloy.

**H. Reversible Magazine Release:** Positioned next to the trigger guard for either right or left-handed shooters, allowing rapid reloading. Magazine drops clear when released.

**I. Unique Ultra Safe Design:** The ambidextrous safety lever, easily accessible by the thumb of a right or left handed shooter, is spring loaded so it's either positively "on" or "off". The safety lever also functions as the pistol's decocking lever. When pushed down, the rear part of the firing pin (striker) is rotated out of alignment with the front part of the firing pin. Additional hammer drop catch (half-cock notch prevents striking of the firing pin unit) in the remote chance of unintentional hammer drop.

**J. Sure, Firm Grip:** The front and back of the grip are grooved on the 92FS and M9, while the M9A1 and 90-Two feature checkering. The grip frame is flared slightly at the base to enhance pointability and control.

**K. High-Capacity Magazines:** The 92 family magazines are interchangeable within caliber, and range in capacity from 10 to 20 rounds in 9mm.

**L. Chamber-loaded Indicator:** When a round is chambered, the extractor protrudes slightly to show a red indicator. In the dark, the user can feel the protruding extractor.

Y ou won't find a more inhospitable place than Iraq. Beretta has been there since day one, on active duty with the U.S. Armed Forces. In fact, Beretta's M9 (military designation for the 92FS pistol) has been in the service of the U.S. Military for almost twenty five years. It is estimated that more than 3,500,000 Model 92 series pistols have been sold worldwide in the military and civilian markets. Military and police agencies of 25 nations (not including the United States) have purchased more than one million 92 series pistols.

Since 1987, Beretta U.S.A. has made 1.4 million Model 92 pistols. 540,000 of these have been delivered to the U.S. Armed Forces and to U.S. foreign military customers worldwide, including U.S. allies like Kuwait, Iraq, Colombia, Panama and other countries throughout the Caribbean.

Each pistol is subjected to hundreds of dimensional inspections and dozens of performance tests. Military pistols particularly go through a battery of performance tests including durability and reliability testing, testing for compatibility with different types of ammunition, and targeting and accuracy testing at a range of 54 yards (50 meters).

Almost 10 million rounds have been fired through military-issue Beretta M9 pistols at Beretta U.S.A. During the course of this testing, these pistols have averaged only one malfunction every 21,500 rounds. Law enforcement and military officers across the United States have relied upon the street-tested and battle-proven design of the 92/M9.

The 92 series is currently available in five configurations:
• **92FS**      • **M9**   • **M9A1**     • **92A1/96A1**



## WORLD DEFENDER TIMELINE

### 2010

Beretta launches the new Model 92A1 and 96A1 pistol in 9mm and 40 S&W calibers. This evolution of the world famous 92FS integrates the best features of the 90-Two pistol: increased capacity magazines (THREE included per pistol), removable front sight, accessory rail, captive recoil spring assembly, rounded trigger guard and frame recoil buffer. Beretta U.S.A. continues to deliver Model 92FS pistols against the contract awarded by the U.S. Army in 2009.



*92FS*

BERETTA U.S.A. CORP. ACKK_MO.-14408 W US.

Optional extended high-capacity
magazine holds 20 rounds

**2009**
Beretta U.S.A. Corp. announces its receipt of a U.S. Army contract to provide up to 450,000 Beretta Model 92FS pistols to U.S. military customers throughout the world. The total value of the contract, if all pistol quantities and associated spare parts are ordered, is $220 million, making it the largest U.S. military pistol contract awarded since WWII. The contract is awarded along with a first delivery order for 20,000 pistols intended for the Iraqi military. Delivery of pistols against the contract has already begun, with over 50,000 pistols now scheduled for delivery by the end of 2010.

**2007**
In September, another contract, to provide 10,576 series 92 pistols to the US Army to the US Navy, is awarded.

**2005**
Beretta U.S.A. wins 13 separate U.S. military contracts to provide M9 pistols and parts to all branches of the U.S. Armed Forces, including a contract to provide 60,000 M9 pistols to the U.S. Air Force and Army as well as a contract to provide 3,500 M9A1 pistols and over 140,000 special sand and corrosion-resistant magazines to the U.S. Marine Corps.

# Tab 5

**Motion to Dismiss**

(by defendant Attorney General)

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

|  |  |
|---|---|
| ROBERT DRAPER, et al. | ) |
|  | ) |
| Plaintiffs, | ) |
|  | ) |
| v. | ) |
|  | ) |
| MARTHA COAKLEY, in her official capacity as | ) |
| ATTORNEY GENERAL OF MASSACHUSETTS | ) |
|  | ) |
| Defendant. | ) |

_____

Civil Action No.
1:14-CV-12471-NMG

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION
TO DISMISS ALL CLAIMS OR STAY PROCEEDINGS ON ABSTENTION GROUNDS**

MARTHA COAKLEY
ATTORNEY GENERAL

/s/ Glenn Kaplan
Glenn Kaplan, BBO# 567308
Assistant Attorney General
Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
(617) 727-2200
Glenn.Kaplan@state.ma.us

Dated:  August 22, 2014

AD Page 183 of 441

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................1

II.   STATUTORY AND REGULATORY FRAMEWORK ............................2

III.  PLAINTIFFS LACK STANDING ......................................................3

      A.  Organizational Plaintiffs Lack Standing ...............................3

      B.  Dealer Plaintiffs Lack Standing .............................................4

      C.  Consumers Lack Standing .......................................................5

IV.   PLAINTIFFS FAIL TO STATE CLAIMS UPON WHICH RELIEF MAY BE GRANTED ........6

      A.  The Facial Vagueness Claim Must Be Dismissed ...................6

      B.  The As-Applied Vagueness Claim Must Be Dismissed As Well .......................8

          i.   Dealers cannot show they lacked "fair notice" .....................8

          ii.  Dealers cannot show that 16.05(3) encourages "seriously
               discriminatory enforcement" ..............................................13

      C.  Consumer-Plaintiffs' Second Amendment Claim Must Be Dismissed ..........16

          i.   The Load Indicator Regulation Does Not Implicate the Second
               Amendment ..........................................................................16

          ii.  Even If the Load Indicator Regulation Implicates Second Amendment
               Rights, It Remains Constitutionally Permissible Because It Is
               Substantially Related to the Important Interest in Promoting Public
               Safety ....................................................................................18

V.    IN THE ALTERNATIVE, THE COURT SHOULD EXERCISE ABSTENTION ...................22

VI.   CONCLUSION ................................................................................24

## I.   __INTRODUCTION__

In the current litigation, plaintiffs bring constitutional challenges to 940 Mass. Code Regs. (hereinafter, "CMR") 16.05(3),  a state safety regulation requiring load indicators or magazine disconnects on handguns sold by handgun dealers.[1]  The regulation is a civil restriction, issued under the state Consumer Protection Act.  It does not limit the guns that consumers may own.

Plaintiffs do not challenge the full regulatory provision.  The Complaint targets only the portion of the regulation that offers a "load indicator" (defined in 940 CMR 16.01 as "a device which plainly indicates that a cartridge is in the firing chamber within the handgun") as one alternative way to meet the safety standard.[2]  The Complaint alleges that consumers are unable to obtain Generations 3 and 4 Glock brand pistols from dealers because of 16.05(3).[3]  Compl. Exs. 6, 9–14.

From this premise, different plaintiffs conclude that different constitutional rights have been infringed.  The dealer-plaintiffs claim that the load indicator provision violates due process because it is void for vagueness, facially and as-applied.  Compl. ¶¶ 68, 69, 73.  The consumer-plaintiffs claim that the provision violates the Second Amendment.  Compl. ¶ 79.  Plaintiffs Second Amendment Foundation ("SAF") and Commonwealth Second Amendment, Inc. ("Comm2A") do not seem to make any legal claims at all.  Although the Complaint focuses on the alleged regulatory limitation on dealer sales of Generations 3 and 4 Glock pistols, no plaintiff asserts any state law claim.  In particular, plaintiffs do not challenge whether or not these Glock pistols in fact meet the regulatory requirement as a matter of state law.

---

[1] The regulation applies to "handgun purveyors," defined in 940 CMR 16.01 as persons or entities that transfer five or more handguns per year to customers in Massachusetts.  Any individual selling more than four firearms per year must be a licensed dealer.  Mass. Gen. Laws ch. 140, §§ 122, 128A.  Thus, the regulation governs handgun dealers.

[2] The other way to meet the standard is to include a "magazine safety disconnect," which prevents the firearm from discharging if the magazine (the rectangular box that holds extra ammunition and feeds it into the pistol) is removed from the gun.  See 940 CMR 16.05(3).  Plaintiffs mention but do not appear to challenge the magazine disconnect alternative in their Complaint.  Compl. ¶ 29.

[3] Glock itself is not a plaintiff to this suit.  The company brought void for vagueness and state law claims against the regulations when they were first enacted, and lost.  See Am. Shooting Sports Council, Inc. v. Attorney Gen., 429 Mass. 871, 711 N.E. 2d 899 (1999).

1

The Commonwealth moves to dismiss this suit.  Plaintiffs lack standing and do not bring claims upon which relief can be granted, since there is no basis for their insupportable constitutional challenges. In addition, if the Court does not dismiss the claims, it should exercise abstention and have a state court definitively interpret the scope and meaning of the load indicator regulation, so as to avoid unnecessary and premature constitutional adjudication.

## II.   STATUTORY AND REGULATORY FRAMEWORK

The Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A, authorizes the Attorney General to promulgate regulations defining unfair and deceptive practices by entities in trade or commerce.  Mass. Gen. Laws ch. 93A, § 2(c).  In 1997, using this authority, the Attorney General promulgated a set of regulations applicable to handgun dealers.  See 940 CMR 16.00, et seq.  The gun industry challenged the regulations, and the Supreme Judicial Court upheld the Attorney General's authority to set product standards for firearms using chapter 93A.  See Am. Shooting Sports Council, Inc. v. Attorney Gen., 429 Mass. 871, 711 N.E. 2d 899 (1999).  The regulations require that handguns sold by handgun dealers, with some exceptions, meet safety tests and include safety features.  One provision requires that any semi-automatic pistol include either a "load indicator" or a "magazine safety disconnect."  940 CMR 16.05(3).  The regulation defines a load indicator as "a device which plainly indicates that a cartridge is in the firing chamber within the handgun."  940 CMR 16.01.

This past year, plaintiff-dealers in this case contacted the Attorney General's Office inquiring whether Generation 3 and 4 Glock semi-automatic pistols meet the "load indicator" requirement.  The Deputy Chief of the Consumer Protection Division responded to the inquiries, noting "As this Office has stated publicly in the past, the handguns presently manufactured by Glock, Inc. are not in compliance with the Massachusetts Handgun Sales Regulations, because they lack an effective load indicator or magazine safety disconnect."  Compl. Ex. 23; see also Compl. Ex. 24.   After receiving this response, plaintiffs filed the present suit.

AD Page 186 of 441

III.   **PLAINTIFFS LACK STANDING**

Article III standing is jurisdictional, and the burden of establishing it is on plaintiffs.  Clapper v. Amnesty Int'l USA, 133 S. Ct. 1138, 1146 (2013) ([P]laintiffs "must establish that they have standing to sue.") (quoting Raines v. Byrd, 521 U.S. 811, 818 (1997)).  In order to demonstrate standing, plaintiffs must show an injury that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling."  Id. at 1147 (quoting Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 149 (2010)).  Here, none of the plaintiffs show the requisite injury, and thus do not satisfy their burden of showing subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1).  Thus, plaintiffs' claims should be dismissed.

A.  **Organizational Plaintiffs Lack Standing**

The organizational plaintiffs state that they represent themselves and their members[4] (Compl. ¶¶ 7.1, 7.2), but do not allege harm to themselves or to their members, as is required for organizational standing.  Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 181 (2000); Simon v. E. Kentucky Welfare Rights Org., 426 U.S. 26, 39–40 (1976); Warth v. Seldin, 422 U.S. 490, 511 (1975).  Allegations merely setting out an organization's purpose and the geographic location of its members are insufficient.  Warth, 422 U.S. at 511; Fletcher v. Haas, 851 F. Supp. 2d 287, 291 (D. Mass. 2012) (SAF did not have standing); Kachalsky v. Cacace, 817 F. Supp. 2d 235, 251 (S.D.N.Y. 2011), aff'd sub nom. Kachalsky v. County of Westchester, 701 F.3d 81 (2d Cir. 2012) (SAF did not have standing).  Here, none of the counts of the Complaint indicate they are being brought by the organizations.  Neither do the Complaint's counts even directly mention the organizations.[5]  There can be no case or controversy under Article III for plaintiffs who do not allege any injury or cause of action.  Given that jurisdiction may not be inferred, neither organization has standing.  FW/PBS, Inc. v. City of Dallas, 493

---

[4] In fact, Comm2A does not even allege that it has any members.  It references only its "supporters," does not allege it is a membership organization or the functional equivalent of a membership organization, and does not allege that its "supporters" have control over any aspect of the organization.  See Fund Democracy, LLC v. SEC, 278 F.3d 21, 25–26 (D.C. Cir. 2002) (where association had no members or "any equivalent affiliates," there was no representational standing).

[5] The Counts do "incorporate by reference" the rest of the body of the Complaint, see, e.g., Compl. ¶¶ 67, 74, but nowhere in the rest of the body do the organizations identify themselves as bringing any claims.

3

U.S. 215, 231 (1990); McNutt v. Gen. Motors Acceptance Corp. of Indiana, 298 U.S. 178, 189 (1936).

### B. Dealer Plaintiffs Lack Standing

Similarly, the dealer-plaintiffs fail to make a sufficient allegation of injury related to their vagueness challenge.  In the Complaint, they assert that they "cannot determine with any reasonable certainty whether Gen3 and/or Gen4 pistols comply with the REGULATION."  Compl. ¶ 68.  The dealers then allege they are injured because they have eschewed selling Generations 3 and 4 Glocks due to their questions over the applicability of the regulation.  Compl. Exs. 15, 16.  Whether any purported lost sales were caused by the dealer-plaintiffs' alleged uncertainty is crucial.  To be a relevant injury for purposes of standing, the injury must be one that relates to the specific claim—in this case, supposed uncertainty—on which plaintiffs seek recovery.  Katz v. Pershing, LLC, 672 F.3d 64, 71–72 (1st Cir. 2012) ("[C]ausation…requires the plaintiff to show a sufficiently direct causal connection between the challenged action and the identified harm.").  Here, however, there was no actual uncertainty about how the regulation would apply to the dealers.  The Complaint makes clear that the dealers in fact knew that sale of the relevant Glocks violated 16.05(3).  Compl. ¶ 70.1.  The Attorney General's Office, in response to their inquiries, directly informed them of this fact.  Compl. Exs. 23, 24.  See Ward v. Rock Against Racism, 491 U.S. 781, 795–96 (1989) (in connection with a facial vagueness challenge, administrative interpretation and implementation of a regulation are highly relevant, as they can serve as a limiting construction that remedies any possible vagueness).

The Attorney General's Office is the relevant regulatory authority for Mass. Gen. Laws ch. 93A, see Am. Shooting Sports Council, 429 Mass. 871, 875, 711 N.E.2d 899, 902 (1999), and its letters should therefore provide content to the regulation as applied to the dealers.[6]  The letters make clear that the regulation applies to the Glocks the dealers want to sell.  Moreover, materials attached to the Complaint note that dealer Precision Point was aware "for years" that Generations 3 and 4 Glocks

---

[6] See Crooker v. Magaw, 41 F. Supp. 2d 87, 89–90 (D. Mass. 1999) (in challenge to Bureau of Alcohol, Tobacco, and Firearms ("ATF") interpretation of firearms statute, deferring to interpretive letter written by ATF).

4

AD Page 188 of 441

violated the regulation.  Compl. Ex. 16.  The dealers' alleged injury, therefore, could not have been related to any vagueness or uncertainty about the applicability of 16.05(3) to them.[7]  To the contrary, any loss of sales would have flowed from the very clarity of the Attorney General's (negative) construction of the statute as applied to Glock.  Loss of sales may provide standing for a state-law claim (albeit meritless) that the Office of the Attorney General's interpretation violates the regulation, but it cannot supply standing for a constitutional claim that the regulation is vague.

The Supreme Court has emphasized that a litigant seeking to challenge a statue for vagueness must demonstrate that the statute is vague as applied to his own conduct, regardless of its potentially vague application to others.  See Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495 (1982).  Because the Attorney General's Office informed the dealers, relating to the very circumstances at issue in their vagueness challenge, that these Glock pistols in fact violated the regulation, there is no vagueness here and no injury that may be attendant to it.  The dealers may well have lost sales due to an inability to sell weapons under the law, but again they did not sue seeking a ruling that the Generations 3 and 4 Glocks comply with the statute or that the Attorney General was erroneous in the determination that these Glocks do not comply.[8]  Instead, they allege only that the regulation is unconstitutionally vague and that this vagueness left them adrift, unable to decide whether they could sell the weapons.  The Complaint does not sustainably allege an injury traceable to such claimed vagueness.  Thus, the dealers fail to meet the Clapper requirements for standing.

### C.  **Consumers Lack Standing**

Finally, the consumers fail to allege a cognizable Second Amendment injury.  As discussed infra, Section IV(C), the regulation here does not impinge on any Second Amendment right.  Therefore, the consumer-plaintiffs, just like the organizations and dealers, lack standing to bring suit.

---

[7] Plaintiffs may also intend to claim the threat of enforcement under the civil regulation as an injury.  Such a claim of injury would be fatally flawed for the same reason – it is causally unrelated to any purported vagueness.

[8] The dealers likely recognize that the Eleventh Amendment bars any such state-law claim against a state official in federal court.  Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 117 (1984).

5

AD Page 189 of 441

## IV.   PLAINTIFFS FAIL TO STATE CLAIMS UPON WHICH RELIEF MAY BE GRANTED

Even if plaintiffs have standing, they fail to state any claims on which relief can be granted.  Thus, this Court should dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6).

Under Fed. R. Civ. P. 8(a)(2), a pleading that states a claim for relief must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  While detailed factual allegations are not required, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'" in order to survive a motion to dismiss under 12(b)(6).  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  Plaintiffs must allege more than a "sheer possibility" of defendant's unlawful behavior; "unadorned" accusations or legal conclusions will not suffice.  Id. at 678.  Moreover, while the Court must accept all well-pleaded factual allegations in the complaint as true, it is not obligated to accept the truth of any unsupported conclusory statements or legal suppositions.  Id.  When plaintiffs plead sufficient factual content to lead the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged," and where other conclusions are not more likely, the claim is facially plausible. Id. at 678, 680.  Plaintiffs' Complaint fails to meet these pleading requirements, and their claims, therefore, should be dismissed.

### A.   The Facial Vagueness Claim Must Be Dismissed

The dealers opine that 16.05(3)'s load indicator provision is "facially vague" and thus violates the Fourteenth Amendment's Due Process Clause.  Compl. ¶¶ 2, 73.  However, to succeed on a facial claim, the dealers must show that "no set of circumstances exists under which the Act would be valid."[9]  United States v. Salerno, 481 U.S. 739, 745 (1987).[10]  Facial challenges are very much disfavored,[11] and have been greatly restricted in the First Circuit outside of the First Amendment context.  See, e.g., Love v. Butler, 952 F.2d 10, 13 (1st Cir. 1991); United States v. Angiulo, 897 F.2d 1169, 1179 (1st Cir. 1990).

---

[9] Several courts have refined the Salerno "no set of circumstances" standard to mean that a statute is vague where it lacks any "plainly legitimate sweep."  Hightower v. City of Boston, 693 F.3d 61, 77–78 (1st Cir. 2012); Washington State Grange v.

6

Here, Plaintiffs cannot meet the facial vagueness test.  By the regulation's very terms, it is clear that there are specific instances where firearms will fail to meet the standards.  For instance, firearms that clearly lack any "device that plainly indicates that there is a cartridge in the firing chamber within the handgun" would obviously not meet the requirements of 16.05(3).  And such guns do exist.  See Pitonyak v. State, 253 S.W.3d 834, 845 (Tex. App. 2008) ("testimony of defense firearms expert…who testified that the pistol in question did not have a safety or a loading indicator to show that a bullet is in the firing chamber"); Bell v. Glock, Inc. (USA), 92 F. Supp. 2d 1067, 1068 (D. Mont. 2000) ("The Glock Model 20 handgun is a semi-automatic 10mm pistol…. The Model 20 does not have a conventional manual external safety or a loaded chamber indicator."[12]); Smith ex rel. Smith v. Bryco Arms,  33 P.3d 638, 641 (N.M. App. 2001) ("[T]he J-22 handgun does not incorporate a 'magazine-out safety,' a 'chamber load indicator,' or a written warning on the gun itself alerting users that the J-22 can fire even though the magazine has been removed.").  So long as there is some application under which the regulation would not be vague, a facial vagueness claim is inappropriate.  Hoffman Estates, 455 U.S. at 495, 497; URI Student Senate v. Town of Narragansett, 631 F.3d 1, 13 (1st Cir. 2011).  See Richmond Boro Gun Club, Inc. v. City of New York, 97 F.3d 681, 684 (2d Cir. 1996) (a restriction on firearms where the pistol grip "protrudes conspicuously" is not facially vague under the "no circumstances" test when "it is obvious in this case that there exist numerous conceivably valid applications of [the local law]").  Here, the facial

---

Washington State Republican Party, 552 U.S. 442, 449 (2008).  The Supreme Court implied in Washington State Grange that either Salerno or the "plainly legitimate sweep" test would suffice.

[10] But see City of Chicago v. Morales, 527 U.S. 41 (1999) (plurality opinion characterizing Salerno standard as dictum and applying a new standard: where a criminal statute with no mens rea requirement threatens constitutionally protected liberty interests, it is subject to facial attack if "vagueness permeates" the law).  Morales analyzed a criminal loitering statute, unlike the civil law at issue here, and, in any event, has been limited or distinguished.  See, e.g., United States v. Inzunza, 638 F.3d 1006 (9th Cir. 2009); Roark & Hardee LP v. City of Austin, 522 F.3d 533 (5th Cir. 2008); Doctor John's Inc. v. City of Roy, 465 F.3d 1150 (10th Cir. 2006);  Lytle v. Doyle, 326 F.3d 463 (4th Cir. 2003); Horton v. City of St. Augustine, Fla., 272 F.3d 1318 (11th Cir. 2001).

[11] Washington State Grange, 552 U.S. at 450–51 (facial challenges often result in premature interpretation of statutes, rest on speculation, are contrary to judicial restraint principles, and "short circuit the democratic process"); Sabri v. United States, 541 U.S. 600, 609 (2004); Hightower, 693 F.3d at 81.

[12] The Glock Model 20 referenced in the cited case is not one of the Generation 3 or 4 Glocks at issue here.  Bell, 92 F. Supp. 2d at 1068.

AD Page 191 of 441

vagueness claim should be dismissed.

## B.  <u>The As-Applied Vagueness Claim Must Be Dismissed As Well</u>

The dealers also seek to abrogate the load indicator provision because it is unconstitutionally vague "as applied."  Compl. ¶ 73.  However, plaintiffs making such a claim in a pre-enforcement, civil business context again have a high burden to overcome.[13]  To make an as-applied claim, plaintiffs must demonstrate that, in their own circumstances, the regulation "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."  <u>United States v. Williams</u>, 553 U.S. 285, 304 (2008) (hereinafter the "<u>Williams</u> test").  While <u>Williams</u> involved a facial vagueness challenge, its criteria have since provided the basis for as-applied challenges as well.  <u>See</u> <u>Holder v. Humanitarian Law Project</u>, 561 U.S. 1, 18–19 (2010) (applying a variation of <u>Williams</u> standard to an as-applied pre-enforcement challenge).[14] Here, the dealers have not met the <u>Williams</u> test.

### i.      <u>Dealers cannot show they lacked "fair notice"</u>

The dealers cannot show that the regulation failed to provide them with the "fair notice" required by <u>Williams</u> for two reasons.  First, they cannot meet this requirement because they were directly informed by the relevant enforcement authority that the regulation applied to them and their contemplated conduct.  Compl. ¶ 70.1; Exs. 23, 24.  Actual knowledge can defeat a claim that "fair notice" is lacking. <u>See</u> <u>United States v. Zhen Zhou Wu</u>, 711 F.3d 1, 15–16 (1st Cir. 2013), <u>cert. denied,</u> 134 S. Ct. 365 (2013) (court need only determine whether regulation is vague as applied to the particular defendants; actual belief of defendants regarding certain claims at issue in the case, demonstrated in part by their receipt of warnings of potential violation, established "fair notice" for those claims); <u>United States v.</u>

---

[13] In fact, in non-First Amendment cases, some courts have implied that pre-enforcement as-applied challenges are inappropriate, even when examining laws with criminal penalties.  <u>Shew v. Malloy</u>, 2014 WL 346859, at *12 n.67 (D. Conn. 2014) ("[C]hallenges mounted 'pre-enforcement,' that is before the plaintiffs have been charged with a crime under the legislation, are properly labeled a facial challenge." (quoting <u>Richmond Boro Gun Club</u>, 97 F.3d at 685)).

[14] Indeed, regulations in the as-applied, pre-enforcement, non-First Amendment, commercial, civil context may not even need to meet the <u>Williams</u> test.  Because <u>Williams</u> is in any event met here, we cite to cases applying the <u>Williams</u> test in various contexts to support our argument.

AD Page 192 of 441

<u>Saffo</u>, 227 F.3d 1260, 1270 (10th Cir. 2000) ("The evidence produced at trial demonstrates that Saffo had knowledge of the illegality of her activities, and thus this is not a situation where she 'could not reasonably understand that [her] contemplated conduct is proscribed'. . . .  We conclude that, as applied to Saffo, the statute is not unconstitutionally vague.") (citing <u>Parker v. Levy</u>, 417 U.S. 733, 757 (1974)).[15] The Complaint admits that the dealers were aware of how the regulation would be applied to the Glock pistols at issue.  <u>See</u> Compl. ¶ 70.1.  In fact, as noted in Section II, <u>supra</u>, the Complaint's exhibits directly address this issue.  These exhibits include letters to both dealers from the Deputy Chief of the Attorney General's Consumer Protection Division declaring, "As this Office has stated publicly in the past, the handguns presently manufactured by Glock, Inc. are not in compliance with the Massachusetts Handgun Sales Regulations, because they lack an effective load indicator or magazine safety disconnect."  Compl. Ex. 23; <u>see also</u> Compl. Ex., 24.  In <u>Zhen Zhou Wu</u>, 711 F.3d 1 at 15, the court noted that even in the absence of actual notice on certain claims, the existence of a process for getting government clarifications mitigated concerns about how the law might otherwise trap an unwary dealer.  Here, the dealers have not just an available process but an actual answer from a government official that is unquestionably clear as to the particular conduct in which they allegedly wish to engage.  The dealers have no basis for bringing an as-applied vagueness challenge.

Second, even if their undisputed actual knowledge did not foreclose this issue, the dealers still would be unable to meet the <u>Williams</u> "fair notice" requirement.  That standard is less restrictive when applied to civil statutes.  <u>Winters v. New York</u>, 333 U.S. 507, 515 (1948); <u>Shew</u>, 2014 WL 346859, at *12 (D. Conn. 2014) ("[V]agueness in statutes with criminal penalties is tolerated less than vagueness in those with civil penalties.").  This is especially true when statutes regulate economic or commercial activities.

---

[15] <u>See also</u> <u>Advance Pharm., Inc. v. United States</u>, 391 F.3d 377, 397 (2d Cir. 2004) (statute not unconstitutionally vague where, among other reasons, "[D]efendants…in fact had [the challenged] language clarified for them in no less than three meetings with federal authorities."); <u>United States v. Clinical Leasing Serv., Inc.</u>, 925 F.2d 120, 122–23 (5th Cir. 1991); <u>cf.</u> <u>United States v. Blake</u>, 288 F. App'x 791, 795 n.4 (3d Cir. 2008) (noting that "while the vagueness inquiry is an objective one," defendant demonstrated "actual knowledge" that his conduct was prohibited by criminal statute).

AD Page 193 of 441

Hoffman Estates, 455 U.S. at 498-99; Papachristou v. City of Jacksonville, 405 U.S. 156, 162 (1972) ("In the field of regulatory statutes governing business activities, where the acts limited are in a narrow category, greater leeway is allowed."); Home Depot, Inc. v. Guste, 773 F.2d 616, 629 (5th Cir. 1985) ("[L]ax vagueness standard [is] applicable to statutes regulating economic activity."); United Cos. Lending Corp. v. Sargeant, 20 F. Supp. 2d 192, 204 (D. Mass. 1998) (facial challenge to business regulation promulgated under ch. 93A held to lower standard for "fair notice").  As a result, phrases that have meanings in common usage will readily pass such requirements, see Austin Commercial v. Occupational Safety & Health Review Comm'n, 610 F.2d 200, 201–02 (5th Cir. 1979) ("Defective rigging equipment" and "inspection" are not vague, as they have natural and plain meanings), and statutes and regulations are not expected to be written with "perfect clarity."  Williams, 553 U.S. at 304; accord Nat'l Org. for Marriage v. McKee, 649 F.3d 34, 62 (1st Cir. 2011) ( "[I]n most English words and phrases there lurk uncertainties" and such a level of vagueness is not one that "rises to the level of constitutional concern.").  Given these standards, "the mere fact that a regulation requires interpretation does not make it vague." Ridley v. Massachusetts Bay Transp. Auth., 390 F.3d 65, 93 (1st Cir. 2004).

The regulatory language at issue here, "a device which plainly indicates that a cartridge is in the firing chamber within the handgun," readily meets these requirements.  Its wording is straightforward, and it describes the purpose of a load indicator—to let a user know if the gun is loaded.  While the phrase "device which plainly indicates" is the key language to which plaintiffs object, all its words are within common everyday usage, and their meanings are hardly obscure.  For instance, the word "plain" has a meaning that is readily accessible.  See Webster's 7th New Collegiate Dictionary 646 (1967) ("evident to the mind or senses: obvious"); Am. Heritage College Dictionary 1063 (4th ed. 2004) ("Free from obstruction, open; clear: in plain view[;] Obvious to the mind; evident").  The words "plain" or "plainly" are indeed used over 100 times in the Massachusetts General Laws and over 150 times in the U.S. Code.[16]

---

[16] See, e.g., 21 U.S.C. § 209 (2012) ("[The] package shall be **plainly** labeled with the name of the substance….") (emphasis added);  Mass. Gen. Laws ch. 160, § 176A ("Every railroad corporation shall equip each of its track motor cars… with an electric headlight of sufficient candle power when lighted to render **plainly** visible during clear weather") (emphasis added).

AD Page 194 of 441

The word "indicates" also has a readily accessible common meaning.  See Webster's at 427 ("to point out or point to with more or less exactness[;] to be a sign, symptom, or index of"); Am. Heritage at 705 ("To show the way to or the direction of; point out[;] To serve as a sign, symptom, or token of; signify"). "Indicate" is used over 500 times in the Massachusetts General Laws and over 700 times in the U.S. Code.[17] Finally, the word "device" has a common meaning.  See Webster's at 227 ("a piece of equipment or a mechanism designed to serve a special purpose or perform a special function"); Am. Heritage at 388 ("A contrivance or an invention serving a particular purpose"); Black's Law Dictionary 483 (8th ed. 2004) ("A mechanical invention, as differentiated in patent law from a chemical discovery. A device may be an apparatus or an article of manufacture").  "Device" appears over 600 times in the Massachusetts General Laws and over 1,000 times in the U.S. Code.[18]

In general, the use of words like "device," "plainly," and "indicate" cannot form the basis for a claim of unconstitutional vagueness "as-applied."  Even in the criminal context, words of similar common usage have been held to pass the "fair notice" test.  See  United States v. Farhane, 634 F.3d 127, 140 (2d Cir. 2011) ("training" and "personnel" not unconstitutionally vague in context of statute prohibiting providing training to terrorist organizations; person of ordinary intelligence would recognize the meaning in the context); Colorado Outfitters Ass'n v. Hickenlooper, 2014 WL 3058518, at *22 (D. Colo. 2014) ("'possession' and 'continuous' are in common usage and have readily defined meanings"); New York State Rifle & Pistol Ass'n, v. Cuomo, 990 F. Supp. 2d 349, 376 (W.D.N.Y. 2013) ("can be restored or converted" is not vague).  For a civil provision like 16.05(3), the issue is therefore not even a close one.

---

[17] See, e.g., 23 U.S.C. § 321 (2012) ("If a State has a practice of erecting on projects under actual construction without Federal-aid highway assistance signs which indicate the source or sources of any funds used to carry out such projects, such State shall erect … signs which are visible to highway users and which **indicate** each governmental source of funds being used….") (emphasis added); Mass. Gen. Laws ch. 255B, § 15 ("After the payment of all sums for which the buyer is obligated under a retail instalment contract, the holder of such contract shall mail to the buyer at his last known address, good and sufficient instruments to **indicate** payment in full and to release all security in the motor vehicle.") (emphasis added).

[18] See, e.g., 30 U.S.C. § 871(g) (2012) ("The Secretary shall, within sixty days after the operative date of this subchapter, require that **devices** be installed on all such belts which will give a warning automatically when a fire occurs on or near such belt") (emphasis added); Mass. Gen. Laws ch. 166, § 21B(3) ("[An] insulated cagetype guard or other effective protective **device** of a type approved by the commissioner of labor and industries shall be installed about the boom or arm of all hoisting or other such construction equipment, except backhoes or dippers, being operated in proximity of overhead high voltage lines.") (emphasis added).

11

See Hoffman Estates, 455 U.S. at 489-99 (allowing greater tolerance for imprecise word choices in the

civil context).  This is particularly true where the challenged regulation applies only to professional

licensed gun dealers in the Commonwealth.  As previously noted, civil regulations that govern

commercial conduct are treated even less strictly in vagueness analysis.  See Papachristou 405 U.S. at

162; Zhen Zhou Wu, 711 F.3d at 14; United Cos. Lending Corp., 20 F. Supp. 2d at 204-05 ("otherwise

unconscionable" not vague in civil business regulation under 93A).  That is because courts rightly expect

that merchants in a regulated industry should have a higher level of sophistication regarding the subject

matter of their wares, and that those merchants can be more readily expected to interpret the rules that

govern their transactions.  See Zhen Zhou Wu, 711 F.3d at 14 ("It is not too much to ask these

businessmen and businesswomen to comply with export control regulations, even if the meaning of those

regulations might not be immediately obvious to someone lacking the same sophistication."); see also

McGowan v. Maryland, 366 U.S. 420, 428 (1961) ("We believe that business people of ordinary

intelligence…would be able to know what exceptions are encompassed by the statute either as a matter of

ordinary commercial knowledge or by simply making a reasonable investigation….").

Pictures of the Glock load indicator device shown in Complaint exhibits 42 and 43 do not show

any discernible difference in the load indicator before the gun is loaded and after the gun is loaded, let

alone an "obvious" or "evident" one.  See Webster's at 646 (definition of "plain").  As a result, in the as-

applied context that is set forth in the Complaint itself, there is ample "fair notice" of how the regulation

applies to such weapons.  Section 16.05(3) is a readable, straightforward regulation that provides

sufficient guidance for firearms dealers of ordinary intelligence, while still allowing for flexibility.  It

accordingly meets the Williams "fair notice" standard.[19]

---

[19] The dealers also allege that the load indicator provision does not specifically require where on the firearm the device should
be, the shape the device must take, etc. Compl. ¶ 68.1. The fact that there may be a variety of ways to satisfy the objective
standard in the regulation, however, is not a ground for an as-applied challenge.  Regulations can leave regulated entities with
choices for compliance, and they indeed can leave those entities with some flexibility on how to meet the requirements.  See,
e.g., Am. Export-Isbrandtsen Lines, Inc. v. Federal Mar. Comm'n, 389 F.2d 962, 967 (D.C. Cir. 1968) ("Any vagueness in the
Commission's order should make compliance with it that much easier. . . .  It hardly behooves them to complain that they have
been left too many options in undertaking this task."); Henkes v. Fisher, 314 F. Supp. 101, 108 (D. Mass. 1970), aff'd, 400

AD Page 196 of 441

ii.    **Dealers cannot show that 16.05(3) encourages "seriously discriminatory enforcement"**

In the pre-enforcement, civil, commercial context that is present here, the key inquiry for as-applied vagueness is the "fair notice" aspect of the <u>Williams</u> test.  As the Eighth Circuit has specified, "Laws regulating business behavior are held to a lesser standard of definiteness…. Consequently, the prospect of discriminatory enforcement of such a law is especially speculative in a pre-enforcement challenge, and therefore 'the princip[al] inquiry is whether the law affords fair warning of what is proscribed.'"  <u>Garner v. White</u>, 726 F.2d 1274, 1278 (8th Cir. 1984) (quoting <u>Hoffman Estates</u>, 455 U.S. at 503); <u>see also</u> <u>Gonzales v. Carhart</u>, 550 U.S. 124, 150 (2007) ("Respondents' arguments concerning arbitrary enforcement, furthermore, are somewhat speculative.  This is a pre-enforcement challenge, where no evidence has been, or could be, introduced to indicate whether the [Act] has been enforced in a discriminatory manner or with the aim of inhibiting [constitutionally protected conduct.]") (internal quotations omitted).  Thus, in this case, it is not even clear that the second <u>Williams</u> prong could provide a basis for an as-applied vagueness challenge.  In any event, a review of the "discriminatory enforcement" aspect of the <u>Williams</u> test shows that plaintiffs have failed to establish vagueness here under the second prong as well.

This aspect of <u>Williams</u> asks whether the regulation in question "is so standardless that it authorizes or encourages seriously discriminatory enforcement."  <u>Williams</u>, 553 U.S. at 304.  In the Complaint, the dealers never even allege this.  The closest they come is an allegation that the Attorney General "has not objected" to certain pistols that they claim contain "virtually identical" safety devices to those on the Glock Generations 3 and 4 handguns.  Compl. ¶ 69.3 (emphasis omitted).[20]  Such an allegation falls short of the mark.  Opining that the Attorney General "has not objected" to certain pistols

---

U.S. 985 (1971) ("The language that plaintiffs contend is indefinite is simply the means provided to produce the flexibility necessary when such value judgments must be made.").

[20] To the extent that the dealers allege that the availability of choices regarding such considerations as where to place the load indicator make 16.05(3) standardless, <u>see</u> Compl. ¶ 68.1, the fact that a regulation provides flexibility for compliance does not render it susceptible to "seriously discriminatory enforcement."  <u>See</u> note 19.

AD Page 197 of 441

is not the same as alleging that the Attorney General has either approved them or given any indication that they meet the load indicator standards.  "[G]enerally speaking, administrative agencies do not have an enforceable obligation to perform this sort of advisory mission, for good and practical reasons."  Crooker v. Magaw, 41 F. Supp. 2d 87, 92 (D. Mass. 1999).

Moreover, while the dealers opine that the load indicators of these other guns are "virtually identical" to devices on Generations 3 and 4 Glock pistols, the materials attached to the Complaint[21]— excerpts from the manuals for these other weapons—belie that assertion.  Yacubian v. United States, 750 F.3d 100, 107–08 (1st Cir. 2014) (stating that if an exhibit contradicts allegations in the complaint, the exhibit contents trump the complaint allegations) (internal citations omitted).  These manual excerpts show guns with colored indicators that provide a shading contrast to demonstrate (1) the location of the load indicator and (2) that cartridges are in the firing chamber.  See Compl. Exs 39–41.  On the other hand, the Glock device, as seen in the Exhibits to the Complaint, is not colored and does not provide such a contrast.  The extent of protrusion, the shape, the size, and the exact placement of the load indicator device also appear from the exhibits to differ between Glocks and those purportedly "virtually identical" firearms.  Compare Exs. 39–41 with Exs. 42, 43.  Broad conclusory allegations in a complaint are again not entitled to deference, even at a motion to dismiss stage, when they are contradicted by other materials in the Complaint.  Iqbal, 556 U.S. at 678–79; In re Lane, 937 F.2d 694 (1st Cir.1991) (citing Fed. R. Civ. P. 10(c)) (exhibits are part of pleadings, to be considered with the complaint on a 12(b)(6) motion to dismiss); Yacubian, 750 F.3d at 107–08 (exhibits' contents trump complaint's allegations) (internal citations omitted).  The dealers therefore do not make a viable allegation that the regulation "is so standardless that it authorizes or encourages seriously discriminatory enforcement."

Plaintiffs include in the Complaint a variety of other allegations that appear unrelated to the elements in the Williams test.  See, e.g., Compl. ¶¶ 3, 69 (AG "proclaimed, without explanation or elaboration" that Generations 3 and 4 Glock pistols did not contain a load indicator (emphasis omitted));

---

[21] Compl. Exs. 39–41.

14

Compl. ¶¶ 3, 69.1, 70.1 (AG did not explain why Generations 3 and 4 Glocks did not meet the load indicator requirement); Compl.¶ 71 (describing AG "deflection of questions"); Compl. ¶ 4 (AG conclusions were "capricious"); Compl. ¶ 65–70.3 (AG said dealers had clear information from Glock and the Executive Office of Public Safety regarding Generations 3 and 4 Glock status under the regulations when allegedly this was not the case).  It is possible that plaintiffs are attempting to allege that the letters from the Attorney General's Office somehow show that the regulation encourages discriminatory enforcement.  If so, the allegation is insufficient.[22]  Nothing about the letters demonstrates discriminatory enforcement.  Plaintiffs made an inquiry about a single type of handgun, and were told that it violated the regulation.  There is nothing discriminatory about that.[23]  Thus, even this indirect attempt to show the regulation fails the <u>Williams</u> test, if indeed that is what the plaintiff dealers intended, falls short.  None of these assertions provides support for the vagueness challenge or cures its obvious deficiencies.

Dealer-plaintiffs accordingly can make no viable showing under the second <u>Williams</u> prong either.  Given that their Complaint fails to state an as-applied vagueness claim upon which relief can be granted, it is fully appropriate to dismiss the claim at this stage of the proceedings.  <u>See, e.g.</u>, <u>Horn v. Burns & Roe</u>, 536 F.2d 251, 254–55 (8th Cir. 1976) (rejecting as-applied void for vagueness challenge at motion to dismiss stage); <u>Graffam v. Town of Harpswell</u>, 250 F. Supp. 2d 1, 8–9 (D. Me. 2003) (rejecting as-applied vagueness claim as not sufficiently developed).

---

[22] It may be that plaintiffs are attempting to base their vagueness claim not on the regulation, but on purported vagueness of the response to their inquiries to the Attorney General about the Generations 3 and 4 Glocks.  If so, they make no claim at all.  The letters were perfectly clear—the dealers may not sell the Glocks at issue because they fail to meet the requirements of 16.05(3).  <u>See</u> Compl. Exs. 23, 24.  The Attorney General was under no obligation to respond to their inquiries at all, and having done so was under no obligation to offer analysis or explanation to accompany the answer to the questions. <u>Magaw</u>, 41 F. Supp. 2d at 92; <u>cf.</u> <u>Neighborhood Ass'n of The Back Bay, Inc. v. Fed. Transit Admin.</u>, 463 F.3d 50, 60 (1st Cir. 2006) ("[N]o specific requirement in the statute, the regulations or the APA that the FTA provide detailed explanations for its decision…."); <u>Rhode Island Hosp. v. Sebelius</u>, 670 F. Supp. 2d 148, 154 (D.R.I. 2009) (under the APA, "the Secretary is not obligated to provide 'guidance' about all aspects of Medicare reimbursement").  To the extent that the governing regulation itself is not vague, it cannot be challenged as vague because a letter (which indicates that a specific firearm fails the regulatory standard) does not explain its reasoning to the dealers' satisfaction. <u>See Magaw</u>,  41 F. Supp. 2d at 92.

[23] Moreover, it is important to remember the full text of the second <u>Williams</u> prong:  the challenged regulation must be "so **standardless** that it … encourages seriously discriminatory enforcement."  <u>Williams</u>, 553 U.S. at 304 (emphasis added).  As noted at pages 9–12,  <u>supra</u>, the regulation has a plain meaning sufficient to give "fair notice" of what is prohibited to firearms dealers of ordinary intelligence, and the Attorney General's letters have given them unequivocal guidance in any event.

AD Page 199 of 441

**C. Consumer-Plaintiffs' Second Amendment Claim Must Be Dismissed**

The consumer-plaintiffs separately claim that 16.05(3) violates their Second Amendment rights, both facially and as-applied. Compl. ¶ 79.  Their claim fails as a matter of law because the load indicator regulation does not implicate the Second Amendment.  And even if it did, the regulation would withstand constitutional scrutiny because it is substantially related to the Commonwealth's important interest in promoting public safety.

### i.   The Load Indicator Regulation Does Not Implicate the Second Amendment

In McDonald v. City of Chicago, 130 S. Ct. 3020, 3036 (2010), and District of Columbia v. Heller, 554 U.S. 570, 635 (2008), the Supreme Court recognized the limited Second Amendment right, incorporated against the States, of an individual to possess a handgun in the home for self-defense.  Since Heller and McDonald, courts have analyzed Second Amendment claims by first asking whether the challenged enactment burdens conduct falling within the Second Amendment's protection, and if so, whether the enactment passes constitutional muster under an appropriate level of means-end scrutiny. See, e.g., Heller v. District of Columbia (Heller II), 670 F.3d 1244, 1252–53 (D.C. Cir. 2011); Ezell v. City of Chicago, 651 F.3d 684, 701–04 (7th Cir. 2011); United States v. Chester, 628 F.3d 673, 680 (4th Cir. 2010); United States v. Marzzarella, 614 F.3d 85, 89 (3d Cir. 2010).

The consumers' claim in this case fails at the first step of the analysis because the load indicator regulation does not implicate Second Amendment protections.  Heller emphasized that "the right secured by the Second Amendment is not unlimited." 554 U.S. at 626.  Accordingly, the Court explained,

> nothing in [Heller] should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

Id. at 626–27.  Moreover, "th[o]se presumptively lawful regulatory measures only [served] as examples"; the Court's "list [did] not purport to be exhaustive."  Id. at 627 n.26; see also Marzzarella, 614 F.3d at 91 (certain gun laws regulate conduct outside the scope of the Second Amendment and are "exceptions to the

16

AD Page 200 of 441

right to bear arms").  Since <u>Heller</u>, courts have concluded that many laws restricting access to firearms are beyond the scope of the Second Amendment.  <u>See, e.g.</u>, <u>Peterson v. Martinez</u>, 707 F.3d 1197, 1211 (10th Cir. 2013) (concealed carry ban); <u>United States v. White</u>, 593 F.3d 1199, 1205–06 (11th Cir. 2010) (ban on firearms possession by convicted perpetrators of domestic violence); <u>United States v. Rene E.</u>, 583 F.3d 8, 16 (1st Cir. 2009) (ban on juvenile possession of handguns); <u>Commonwealth v. McGowan</u>, 464 Mass. 232, 244, 982 N.E.2d 495, 503 (2013) (Massachusetts safe storage law).

The load indicator regulation ranks among those measures that fall outside the scope of the Second Amendment.  <u>Heller</u> made clear that "laws imposing conditions and qualifications on the commercial sales of arms" are "presumptively lawful."  554 U.S. at 626–27 & n.26.[24]  The Attorney General's Handgun Sales Regulations require only that state-licensed firearm dealers sell to the public handguns that are not defective and do not "perform[] in a deviantly unsafe or unexpected way." <u>Am. Shooting Sports Council</u>, 429 Mass. at 877, 711 N.E.2d 899, 904.  The purpose of the regulations "is to assure consumers that the products they are purchasing, although dangerous, nonetheless are merchantable."  <u>Id.</u> at 883, n.19, at 907 n.19.  The challenged regulation, requiring a handgun to contain a load indicator or magazine safety disconnect prior to sale, therefore qualifies as a presumptively valid law that "impos[es] conditions . . . on the commercial sale of arms" and does not implicate the Second Amendment.  <u>Heller</u>, 554 U.S. at 626–27 & n.26.

Moreover, nothing in <u>Heller</u> suggests that the Second Amendment guarantees consumers the right to have access to any particular guns they desire.  To the contrary, <u>Heller</u> stressed that the Second Amendment does not guarantee "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  554 U.S. at 626; <u>accord</u> <u>Rene E.</u>, 583 F. 3d at 12.  Consistent with <u>Heller</u>, courts have concluded that firearms regulations that preserve citizens' access to handguns, even if not the particular handgun a citizen might desire, do not infringe any Second Amendment right.  <u>See, e.g.</u>,

---

[24] <u>Accord</u> <u>United States v. Chafin</u>, 423 F. App'x 342, 344 (4th Cir. 2011) (nothing "remotely suggests that, at the time of its ratification, the Second Amendment was understood to protect an individual's right to *sell* a firearm"); <u>Teixeira v. County of Alameda</u>, 2013 WL 707043, at *6 (N.D. 2013) (ordinance placing limited qualifications on the sale of firearms was presumptively lawful and did not implicate the Second Amendment).

AD Page 201 of 441

Kampfer v. Cuomo, 2014 WL 49961, at *6 (N.D.N.Y. 2014) ("[B]ecause the provisions at issue attempt only to decrease in number certain firearms deemed particularly dangerous by the legislature for the sake of public safety, . . . they do not infringe the Second Amendment").  "[T]he Second Amendment 'right to keep and bear arms,'" courts reason, does not "guarantee an individual right to possess whatever firearm he or she subjectively perceives to be necessary or useful for self-defense." Colorado Outfitters Ass'n, 2014 WL 3058518, at *13.

The load indicator regulation preserves citizens' access to handguns that may be used for self-defense.  It is not a ban on guns.  It does not make possession of any gun illegal.  Nor does it limit the right of any consumer to buy a handgun that contains a load indicator or magazine safety disconnect from a licensed dealer.  Indeed, plaintiffs themselves explain that although the regulation makes two models of handguns unmerchantable in Massachusetts, it otherwise allows for the purchase of a variety of handguns with appropriate safety devices.  Compl. ¶¶ 45–52, 69.2, 69.3.  Thus, the Complaint admits that plaintiff-consumers have a choice of handguns with which to exercise their Second Amendment rights.[25]  The fact that 16.05(3) bars sale by a licensed dealer of a particular model of a particular brand of handgun that plaintiffs want to buy does not give rise to a Second Amendment claim.  Marzzarella, 614 F.3d at 94 ("The mere fact that some firearms possess a nonfunctional characteristic should not create a categorically protected class of firearms on the basis of that characteristic.").

>    **ii.    Even If the Load Indicator Regulation Implicates Second Amendment Rights, It Remains Constitutionally Permissible Because It Is Substantially Related to the Important Interest in Promoting Public Safety**

Even if this Court assumes that the load indicator regulation does implicate the consumer-plaintiffs' Second Amendment rights, it should nevertheless dismiss the Second Amendment claim because the regulation withstands constitutional scrutiny.  The First Circuit, like the other courts of appeals, has "consistently recognized that Heller established that the possession of operative firearms for

---

[25] Plaintiffs merely allege that they wish to buy from certain dealers a specific model of a specific brand of firearm that lacks safety devices. Their claim is that the Commonwealth's requirements thus interfere with (what they believe is) their Second Amendment right to have licensed dealers sell a particular defective make and model gun.

AD Page 202 of 441

use in defense of the home constitutes the 'core' of the Second Amendment." Hightower v. City of

Boston, 693 F.3d 61, 72 (citing United States v. Booker, 644 F.3d 12, 25 n.17 (1st Cir. 2011)); see Heller,

554 U.S. at 634–35 (stating that the "core" protection of the Second Amendment is the "right of law-

abiding, responsible citizens to use arms in defense of hearth and home").  Other restrictions on the sale,

possession or use of firearms affect interests that are "distinct from this core interest emphasized in

Heller." Hightower, 693 F.3d at 72.

The load indicator regulation and similar firearms safety measures fall well outside the "core"

Second Amendment right identified in Heller—to possess a firearm for self-defense in the home.

Restrictions on firearms storage, a species of firearms safety regulation, Heller explained, "do not

remotely burden the right of self-defense as much as an absolute ban on handguns."  554 U.S. at 632.

Indeed, Heller emphasized that its holding did not "suggest the invalidity of laws regulating the storage of

firearms to prevent accidents."  Id.

Since Heller, most courts have reviewed firearms safety regulations under, at most, intermediate

scrutiny. See, e.g., United States v. Masciandaro, 638 F.3d 458, 471, 473–74 (4th Cir. 2011) (regulation

prohibiting the carrying of a loaded handgun in a motor vehicle while in a national park upheld under

intermediate scrutiny); Colo. Outfitters Ass'n, 2014 WL 3058518, at *12, n. 19, 15–20 (upholding under

intermediate scrutiny statutes limiting the size of magazines and extending background checks).  Under

that standard, a court must ask whether the challenged enactment is "substantially related to an important

governmental objective." Clark v. Jeter, 486 U.S. 456, 461 (1988); see also Kachalsky, 701 F.3d at 96.

The test requires "substantial deference to the predictive judgments" of the lawmaker.  Turner

Broadcasting Sys., Inc. v. FCC, 512 U.S. 622, 665 (1994).  To survive intermediate scrutiny, the fit

between the challenged regulation and the government interest "need only be substantial, not perfect."

Kachalsky, 701 F.3d at 97 (internal quotation marks omitted).

The regulation requiring load indicators or magazine safety disconnects on handguns sold in

Massachusetts, like the firearms storage regulations discussed in Heller, is a classic safety measure

19

designed "to prevent accidents." <u>Heller</u>, 554 U.S. at 632. It does "not severely limit the possession of firearms," <u>Marzzarella</u>, 614 F.3d at 97; indeed, it does not restrain a consumer from possessing a firearm in her home or elsewhere, whether for self-defense or any other lawful purpose. <u>See</u> <u>Heller II</u>, 670 F.3d at 1258. It therefore merits, at most, intermediate scrutiny. <u>See</u> <u>Masciandaro</u>, 638 F.3d at 471; <u>Colo. Outfitters Ass'n</u>, 2014 WL 3058518 at *15, *19.

Assessed under that standard (indeed, assessed under any standard of review), the load indicator regulation is constitutionally sound. In promulgating the regulation, the Attorney General sought to protect consumers from handguns that "fail fundamental requirements of safety and performance." <u>Am. Shooting Sports Council</u>, 429 Mass. at 877. He aimed to promote public safety by prohibiting state-licensed dealers from selling handguns with "harmful or unexpected risks or dangers" that "cannot be detected by the average user or cannot be avoided by adequate disclosures or warnings." <u>Id.</u> This goal—to promote public safety and prevent accidents caused by unsafe guns—is an important, and indeed, compelling government interest. <u>See</u> <u>Hodel v. Virginia Surface Mining</u>, 452 U.S. 264, 300 (1981) ("protection of the health and safety of the public is a paramount government interest"); <u>Schenck v. Pro-Choice Network</u>, 519 U.S. 357, 376 (1997) (referring to the "significant governmental interest in public safety"); <u>Salerno</u>, 481 U.S. at 745 (noting the government's "compelling interes[t] in public safety"); <u>Masciandaro</u>, 638 F.3d at 473 ("[T]he government has a substantial interest in providing for the safety of individuals."); <u>McGuire v. Reilly</u>, 260 F.3d 36, 48 (1st Cir. 2001) ("[I]ncreas[ing] public safety" is an interest "firmly rooted in the state's traditional police powers" and is "precisely the sort of interest[] that justif[ies] some incidental burdening" of rights.).

The load indicator regulation is substantially related to that interest. It identifies certain widely accepted safety devices that address firearm-related hazards,[26] and requires that a firearm sold in-state by

---

[26] Accidental firearm discharges are a serious safety concern. <u>See</u> <u>Commonwealth. v. McGowan</u>, 464 Mass. 232, 242 n.7, 982 N.E.2d 495, 502 n.7 (2013) ("[I]n 2009 . . . firearm accidents killed an additional 114 children and teenagers.") (citing Children's Defense Fund, <u>Protect Children Not Guns</u>, 2012, at 38). Load indicators have been recognized as effective safety devices in preventing accidental discharges. See Brian J. Siebel, <u>City Lawsuits Against the Gun Industry: A Roadmap for Reforming Gun Industry Misconduct</u>, 18 St. Louis U. Pub. L. Rev. 247, 254–55 (1999) (citing 1991 GAO Report that found

AD Page 204 of 441

a licensed dealer contain those devices.  It preserves choice for manufacturers and dealers:  Handguns

may be sold with either a load-indicator or a magazine safety disconnect.  940 CMR 16.05(3).  And it

preserves significant choice for consumers.  As plaintiffs admit, the regulation leaves individuals with a

wide range of firearms that may be legally purchased.  Compl. ¶¶ 69.2, 69.3.  Because consumers may

choose from any number of handguns that comply with the load indicator or magazine safety release

requirements, 16.05(3) leaves intact the right to possess and carry firearms for self-defense in the home.

Moreover, the Handgun Regulations include several exemptions that allow sophisticated users to

purchase handguns without safety devices if they so choose.  For example, consumers who are

educational collectors or military and law enforcement personnel buying guns for their official duties are

exempt from the requirements.  940 CMR 6.01.  The regulations also permit the transfer of "firearms

solely designed and sold specifically for formal target shooting competition" and the private sale of

firearms.  Id.  Thus, the regulations protect less experienced handgun users from the "harmful or

unexpected risks" of handguns lacking safety devices, while allowing certain more experienced users to

assume the risk of acquiring handguns without the challenged safety devices.  Cf. Springfield Armory,

Inc. v. City of Columbus, 29 F.3d 250, 253 (6th Cir. 1994) ("[T]he average gun owner knows very little

about how his gun operates or its design features.").

These features of the challenged regulation—its minimal impact on the range of firearms available

for purchase in Massachusetts, coupled with the exemptions available for various experienced handgun

users—demonstrate that it is "reasonably adapted to a substantial government interest."  Masciandaro,

---

certain types of injuries "could have been prevented by the incorporation of two simple safety devices into firearms—a grip safety and a chamber-loaded indicator").  Indeed, load indicators are included on a variety of semi-automatic handguns. See State v. Smith, 714 S.E.2d 275 (N.C. Ct. App. 2011) (referencing load indicator on Jimenez Arms 9 mm pistol); State v. Lewis, 48 So. 3d 1073, 1075 (La. 2010) ("[T]he expert testified that the [.22 caliber handgun] had a loaded chamber indicator and a cocked indicator, which make it 'pretty obvious [when] this weapon is cocked and loaded and ready to fire.'"); Smith ex rel. Smith v. Bryco Arms, 131 N.M. at 98, 33 P.3d at 649  ("Documents and advertisement flyers showed that recent handguns manufactured and distributed by Defendants have incorporated a magazine-out safety that blocks the trigger bar and disables the handgun so that it cannot fire when the magazine is removed, and a chamber load indicator device."); People v. Branion, 265 N.E.2d 1, 3 (Ill. 1970) (noting expert testimony that Walther PPK handgun has a load indicator). California prohibits the sale of pistols that lack either a load indicator or a magazine disconnect mechanism, and a range of firearms remain available for sale in that state.  See CAL. PENAL CODE § 31910; CAL. ROSTER OF HANDGUNS CERTIFIED FOR SALE, http://certguns.doj.ca.gov/.

21

AD Page 205 of 441

638 F.3d at 471, 473–74 (regulation preventing the carrying of *loaded* firearms in cars traveling through national parks upheld in part because it preserved the option of carrying *unloaded* firearms).  The fit between the regulation and the public safety interest is apparent.  Many firearms remain available for purchase in Massachusetts, so long as they have one of two safety devices designed to prevent accidents and injuries.  The plaintiff-consumers' Second Amendment claim should accordingly be dismissed for the additional reason that the load indicator regulation is substantially related to the Attorney General's public safety objective.

## V.    IN THE ALTERNATIVE, THE COURT SHOULD EXERCISE ABSTENTION

If the Court determines that the meaning of 16.05(3) remains uncertain and does not dismiss this case, the Attorney General requests that the Court exercise Pullman abstention and refer the matter to the State Court system for adjudication of the underlying state law issues in the first instance.  Abstention under the Pullman doctrine is invoked by federal courts in order to avoid declaring a state statute unconstitutional and deciding a constitutional issue unnecessarily.  The doctrine recognizes federalism concerns, respect for state sovereignty, and the value of getting an authoritative decision on a question of state law from the state court.  Railroad Comm'n of Tex. v. Pullman Co., 312 U.S. 496 (1941).  See also Harrison v. NAACP, 360 U.S. 167, 176 (1959) ("this now well-established procedure is aimed at the avoidance of unnecessary interference by the federal courts with proper and validly administered state concerns, a course so essential to the balanced working of our federal system.); Pustell v. Lynn Pub. Schs., 18 F.3d 50, 53 (1st Cir. 1994) ("We decline to create 'needless friction' with state and local policies.") (quoting Pullman).  Pullman abstention is appropriate when there is substantial uncertainty over the meaning of the state law in question[27] and settling the state law question may obviate the need to resolve a significant federal constitutional question or significantly modify a federal question.  See Bellotti v. Baird, 428 U.S. 132, 146-48 (1976) (Massachusetts statute); Harrison, 360 U.S. at 177 (where

---

[27] Ford Motor Co. v. Meredith Motor Co., 257 F.3d 67, 71 (1st Cir. 2001); cf. Hawaii Hous. Auth. v. Midkiff, 467 U.S. 229, 236 (1984); Rivera-Puig v. Garcia-Rosario, 983 F.2d 311, 322 (1st Cir. 1992).

AD Page 206 of 441

Court could not agree whether the statutes left room for state court construction, abstention was

appropriate); Ford Motor Co. v. Meredith Motor Co.Inc, 257 F.3d 67, 71 (1st Cir. 2001).

If plaintiffs' claims are to be taken at face value, substantial uncertainty exists over the meaning of

the load indicator provision.  This uncertainty is relevant both for the vagueness claims (where an

interpretation may eliminate vagueness) and the Second Amendment claims (where an interpretation may

have an impact on the scope and therefore the purported burden imposed by the regulation).[28]  A federal

court faced with a constitutional challenge to a regulation that requires further interpretation "should

abstain, absent compelling circumstances, in order to allow the state agency and the state courts first

review of the interpretation of state law at issue and to avoid unnecessary constitutional adjudication."

United Home Rentals, Inc. v. Texas Real Estate Comm'n, 716 F.2d 324, 334 (5th Cir. 1983).  Such a

course can bring the scope of the regulations "within the bounds of permissible constitutional certainty."

Babbitt v. United Farm Workers Nat. Union, 442 U.S. 289, 308 (1979) (quoting Baggett v. Bullitt, 377

U.S. 360, 378 (1964)); see also Casiano-Montanez v. State Ins. Fund Corp.,707 F.3d 124, 129 (1st Cir.

2013); Greater New York Metro. Food Council v. McGuire, 6 F.3d 75, 77–78 (2d Cir. 1993).  Indeed,

even when it is only possible (rather than likely or reasonably possible) that the state court can construe

the state law, courts have found Pullman abstention warranted.  Reetz v. Bozanich, 397 U.S. 82, 86–87

(1970); cf. Fornaris v. Ridge Tool Co., 400 U.S. 41, 44 (1970).

If the case is not dismissed, abstention is appropriate here.  The regulation being interpreted was

promulgated under Massachusetts General Law Chapter 93A, an area in which the state courts have

played an important interpretive role.  See, e.g., Tyler v. Michaels Stores, Inc., 464 Mass. 492, 984

N.E.2d 737 (2013) (interpreting provisions of 93A); Jeffreys v. Cooney, 61 Mass. App. Ct. 1113, 810

N.E.2d 1288 (2004) (unpublished) (interpreting real estate regulations in 93A claim); Knapp Shoes, Inc.

v. Sylvania Shoe Mfg. Corp., 418 Mass. 737, 738, 640 N.E.2d 1101, 1102 (1994) (certification of

questions interpreting regulations promulgated under 93A).  Under the Consumer Protection Act, the

---

[28] Of course, this relevance only applies if the Court allows the claims to survive a motion to dismiss. The Commonwealth
maintains that the vagueness and Second Amendment claims fail, and seeks abstention only in the alternative.

AD Page 207 of 441

Supreme Judicial Court is expected by the legislature "to discover and make explicit those unexpressed standards of fair dealing which the conscience of the community may progressively develop."  Com. v. DeCotis, 366 Mass. 234, 242, 316 N.E.2d 748, 754  (1974) (quoting Federal Trade Comm'n. v. Standard Educ. Soc., 86 F.2d 692, 696 (2d Cir. 1936)).  Further interpretation of such a statute and its regulations is an ongoing project, and should be left to the state courts in the first instance.  Cf. Kansallis Finance Ltd. v. Fern, 40 F. 3d 476, 481 (1st Cir. 1994) ("We have found no controlling Massachusetts precedent on this issue, which is determinative of the 93A claim.  We therefore think it is appropriate to certify the question to the [Supreme Judicial Court].").

## VI.  **CONCLUSION**

Plaintiffs lack standing and have not pled claims upon which relief can be granted.  Therefore, the Complaint should be dismissed.  In the alternative, the Court should abstain from deciding the case until Massachusetts courts have had a full opportunity to interpret the underlying regulation.

<div align="right">

Respectfully Submitted,
MARTHA COAKLEY
ATTORNEY GENERAL

 /s/ Glenn Kaplan
Glenn Kaplan, BBO# 567308
Assistant Attorney General
Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
(617) 727-2200
Glenn.Kaplan@state.ma.us

</div>

Dated: August 22, 2014

24

# Tab 6

Opposition to
Motion to Dismiss

(by plaintiffs)

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

**(1) ROBERT DRAPER;**

**(2) ARIEL WEISBERG;**

**(3) DONNA MAJOR;**

**(4) ERIC NOTKIN;**

**(5) ROBERT BOUDRIE;**

**(6) BRENT CARLTON,**

> *collectively, the*
> **"CONSUMER PLAINTIFFS"**, *and*

**(7) CONCORD ARMORY, LLC;**

**(8) PRECISION POINT FIREARMS, LLC;**

> *collectively, the*
> **"DEALER PLAINTIFFS"**, *and*

**(9) SECOND AMENDMENT FOUNDATION, INC.,**

**(10) COMMONWEALTH SECOND AMENDMENT, INC.**

> *collectively, the*
> **"ORGANIZATIONS"**, *and*

> Plaintiffs

v.

**MARTHA COAKLEY,**
> *in her official capacity as*
> **ATTORNEY GENERAL OF MASSACHUSETTS**

> Defendant

Civil Action No.
1:14-CV-12471-NMG

# PLAINTIFFS' OPPOSITION TO THE DEFENDANT ATTORNEY GENERAL'S MOTION TO DISMISS

# __Table of Contents__

INTRODUCTION ................................................................................................. 1

ARGUMENT ...................................................................................................... 3

    I.     Legal Standard for a Motion to Dismiss ............................................... 3

    II.    Standing ................................................................................................. 3

          A.    Both SAF and COMM2A Have Organizational Standing
               on Behalf of Themselves and their Members ................................ 4

          B.    The DEALERS' Standing ............................................................... 6

          C.    The CONSUMERS' Standing and Implication of the
               Second Amendment ..................................................................... 10

    III.   Vagueness ............................................................................................. 12

          A.    The REGULATION is Facially Void for Vagueness
               on Behalf of Themselves and their Members ................................ 12

          B.    The REGULATION is Void As Applied to Glock Pistols ............... 17

    IV.   _Pullman_ Abstention ............................................................................. 12

CONCLUSION .................................................................................................. 25

# INTRODUCTION AND SUMMARY OF ARGUMENT

Faced with a challenge to 16 years of license to trample on Massachusetts firearms dealers' right to due process and Massachusetts citizens' fundamental Second Amendment right to acquire firearms in common use, the defendant ATTORNEY GENERAL's Motion to Dismiss—a collection of straw man arguments, misapplied or wholly irrelevant authorities, and tangle of circular reasoning—distracts from the single question at issue in this lawsuit:

> **Do the words "device which plainly indicates", as they are used to define the "load indicator" alternative design requirement for semi-automatic pistols sold and/or transferred to Massachusetts consumers, provide Massachusetts licensed firearms dealers reasonable notice of what is required to comply with the "load indicator" alternative design requirement?**

The ATTORNEY GENERAL's arguments in her Motion to Dismiss are unavailing to answer the foregoing basic question of regulatory interpretation. Instead she argues (emphasis in italics):

- Neither the DEALERS *who are subject to the REGULATION*, nor the CONSUMERS *who cannot purchase firearms in common use because of the REGULATION*, nor the ORGANIZATIONS who represent many of their members and supporters in the *identical circumstances as the DEALERS and CONSUMERS with respect to the REGULATION*, have standing to challenge the REGULATION.

  o The defendant ATTORNEY GENERAL's argument would have this Court come to the absurd conclusion that *no one has standing to challenge the REGULATION.*

- Though it is the *sole* reason for the CONSUMERS' *inability to acquire firearms in common use*, e.g. Gen3/4 Glock pistols, the REGULATION does not and cannot infringe on and/or burden their Second Amendment right because it applies only to the DEALERS' *commercial* activities (i.e. sale and transfer of firearms).

  o The defendant ATTORNEY GENERAL speciously severs cause from its direct *impact/effect* by ignoring the *reality* that for every inhibited sale is a corresponding inhibited purchase.

- Each of the challenged words in the REGULATION's definition of "load indicator" has a plain meaning and even several synonyms. Thus, argues the defendant ATTORNEY GENERAL, it is impossible for the DEALERS to *not* understand the definition of "load indicator".

  o Nowhere in the REGULATION nor in the statute (the Massachusetts Consumer Protection Act) which it implements, nor anywhere in all of the Massachusetts General Laws, nor

anywhere in the entirety of the Code of Massachusetts Regulation, is there any context or limiting construction for the challenged words *as applied to firearms in general and to semi-automatic pistols in particular*. Worse, the defendant ATTORNEY GENERAL refused and refuses to provide *any* guidance at all—even when specifically asked for clarification.

- The defendant ATTORNEY GENERAL claims that it is unnecessary for her to explain *how* and *why* she *decreed* that Gen3/4 Glock pistols do not comply with the REGULATION's definition of "load indicator". But this is a moot point anyway, since the DEALERS actually knew/know that Gen3/4 Glock pistols do not comply with the REGULATION's definition of "load indicator" because the defendant ATTORNEY GENERAL *told them they do not, and that is enough*.

    o The defendant ATTORNEY GENERAL asks this Court to rubberstamp her administrative ukase that Gen3/4 Glock pistols are not REGULATION-compliant, without reference to any limiting construction, context, *text-based* interpretation, or standard of any kind.

- This Court "should [exercise <u>Pullman</u> abstention], absent compelling circumstances, in order to allow the *state agency* and the *state courts* first review of the interpretation of state *law* at issue and to avoid unnecessary constitutional adjudication." Motion to Dismiss, p. 23.

    o <u>Pullman</u> abstention is inapplicable to a challenge of a state law on *parallel federal and state constitutional grounds*, which in this case is the 14th Amendment due process clause whose direct parallel is Article XII of the Massachusetts Constitution. But that is not the issue here since the REGULATION implements Massachusetts state law which *by its own explicit terms* implements *federal* law. Irrespective, were the Massachusetts state courts asked to interpret the REGULATION's definition of "load indicator" it is expected that the defendant ATTORNEY GENERAL would urge the state court to exercise <u>Auer</u> deference, to abstain from interpreting the unconstitutionally vague REGULATION and defer its interpretation back to the same defendant ATTORNEY GENERAL who insists that it is clear as is, argues that she is not required to interpret it and refuses to render any interpretation (if that were possible) even now. But that, too, would be a dead end as agencies are not entitled to <u>Auer</u> deference if the interpreted regulation is so vague as to invite arbitrariness or "post hoc rationalizations ... seeking to defend past agency action against attack."

It is instructive to keep in mind while reading this Opposition that even after having been served with this lawsuit the defendant ATTORNEY GENERAL has *still not proffered any interpretation of what a "load indicator" must actually <u>be</u>*. On the contrary, she continues to insist that Gen3/4 Glock pistols do not comply with her mystery definition of "load indicator"—whatever it is—***not by reference to any <u>standard</u>*** but by an impotent attempt to contrast them from her *interpretation* of ***pictures*** in the exhibits to the Complaint of virtually identical load indicators on pistols to which the defendant GENERAL has *not* objected.

# ARGUMENT

## I. <u>Legal Standard for a Motion to Dismiss</u>

A complaint need not allege every fact necessary to win at trial, but need only include sufficient facts to make it "'plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678, (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570, (2007)). "In determining whether a complaint crosses the plausibility threshold, 'the reviewing court [must] draw on its judicial experience and common sense.'" <u>García-Catalán v. United States</u>, 734 F.3d 100, 103 (1st Cir. 2013) (quoting, <u>Iqbal</u>, 556 U.S. at 679). "This context-specific inquiry does not demand 'a high degree of factual specificity.'" <u>Id.</u> (quoting <u>Grajales v. P.R. Ports Auth.</u>, 682 F.3d 40, 44 (1st Cir.2012)). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim." <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1992) (internal quotation marks omitted); accord <u>Bennett v. Spear</u>, 520 U.S. 154, 168 (1997). Even so, the complaint "must contain more than a rote recital of the elements of a cause of action." <u>Rodríguez-Reyes v. Molina- Rodríguez</u>, 711 F.3d 49, 53, (1st Cir. 2013).

## II. <u>Standing</u>

"Standing—a litigant's right to be in the courtroom—must be established in every case, as the Constitution permits the federal courts to address only 'actual cases and controversies.'" <u>Wilson v. HSBC Mortg. Services, Inc.</u>, 744 F. 3d 1, 8 (1st Cir. 2014), citing <u>Culhane v. Aurora Loan Servs. of Neb.</u>, 708 F.3d 282, 289 (1st Cir. 2013). Standing is a prerequisite for Article III jurisdiction, and thus must be determined before addressing the merits of a case. <u>Sutliffe v. Epping Sch. Dist.</u>, 584 F.3d 314, 325 (1st Cir. 2009). To establish standing, a plaintiff must "present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged action; and redressable by a favorable ruling." <u>Ramírez-Lebrón v. Int'l Shipping Agency, Inc.</u>, 593 F.3d 124, 130 (1st Cir. 2010), quoting <u>Horne v. Flores</u>, 557 U.S. 433, 129 (2009). Where a court decides a Rule 12(b)(1) motion on the pleadings, it must "construe the Complaint liberally

and treat all well-pleaded facts as true[,] according the plaintiff the benefit of all reasonable inferences."  Murphy v. United States, 45 F.3d 520, 522 (1st Cir. 1995);  accord Calderon-Serra v. Wilmington Trust Co., 715 F.3d 14, 17 (1st Cir. 2013).

## A.  Both SAF and COMM2A Have Organizational Standing on Behalf of Themselves and on Behalf of Their Members

The Defendant ATTORNEY GENERAL contends that the two entity plaintiffs, Second Amendment Foundation, Inc. (hereafter "SAF") and Commonwealth Second Amendment, Inc. (hereafter "COMM2A") do not have standing to maintain the current lawsuit because there is insufficient evidence that either ORGANIZATION has itself been personally injured by the REGULATION, and/or that any of the ORGANIZATIONS' respective members have been so injured.

"It is well-accepted in the standing context that organizations may have interests of their own, separate and apart from the interests of their members.  See, e.g., Havens Realty Corp. v. Coleman, 455 U.S. 363, 378-79 (1982);  NAACP v. Button, 371 U.S. 415, 428 (1963);  13A Wright & Miller, Federal Practice and Procedure §3531.9.5 (3rd ed. 2011) ('[A]n organization can assert standing to protect against injury to its own organizational interests,' separate and apart from an organization's ability to 'borrow ... the standing that could be established by individual members.')" Massachusetts Delivery Ass'n v. Coakley, 671 F.3d 33, n.7 (1st Cir. 2012).

Both SAF and COMM2A have standing to sue on behalf of themselves regarding the issues raised in this lawsuit.  The Complaint explicitly states at ¶7.1, "SAF's purposes include education, research, publishing and legal action regarding the fundamental Constitutional right to the private ownership and possession of firearms."  The attached Declaration of Mikolaj Tempski, SAF's general counsel [hereafter "Tempski Declaration"] outlines SAF's direct involvement in this lawsuit.  SAF conducts research on state and federal firearms laws, including existing and proposed firearms laws and regulations in Massachusetts.  Tempski Declaration at ¶4.  Over the last several years, SAF has itself and in concert with the other organizational plaintiff herein (COMM2A), researched the specific REGULATION at issue in this lawsuit.  Id., at ¶5. SAF expends funds to prosecute civil rights lawsuits involving the Second Amendment, and is funding the prosecution of this lawsuit which is

directly related to SAF's unambiguous mission statement, duly posted on its website:

> The Second Amendment Foundation (SAF) is dedicated to promoting a better understanding about our Constitutional heritage to privately own and possess firearms. To that end, we carry on many educational and legal action programs designed to better inform the public about the gun control debate.

SAF has not itself attempted to purchase a Gen3/4 Glock pistol in Massachusetts. It does, however, raffle firearms to its members every year, including at least one Glock pistol. If the winner of the Glock pistol would be in Massachusetts, SAF would not be able to transfer the prize to the winner because of the REGULATION.

The Complaint likewise explicitly states at ¶7.2 that "COMM2A's purposes include educational programs and legal action regarding the fundamental Constitutional right to the private ownership and possession of firearms guaranteed by the Second Amendment." The attached Declaration of Thomas Bolioli, COMM2A's director of operations, [hereafter "Bolioli Declaration"] outlines COMM2A's direct involvement in this lawsuit. COMM2A conducts research on state and federal firearms laws, including existing and proposed firearms laws and regulations in Massachusetts. Bolioli Declaration at ¶3. Over the last several years, COMM2A has itself and in concert with SAF researched the specific REGULATION at issue in this lawsuit. Id., at ¶9. COMM2A expends funds to prosecute civil rights lawsuits involving the Second Amendment. Id., at ¶10. The constitutional law challenge of the instant lawsuit is directly related to COMM2A's unambiguous mission statement, which is posted on its website:

> Commonwealth Second Amendment (Comm2A) is a grassroots civil rights organization dedicated to promoting a better understanding of rights guaranteed by the Second Amendment to the United States Constitution. Our activities include educational programs designed to promote a better understanding of Massachusetts and Federal firearms laws and rights as well as programs to defend and protect the civil rights of Massachusetts gun owners.

Besides each having standing to sue on behalf of themselves, both SAF and COMM2A have standing to sue on behalf of their members and supporters regarding the issues raised by this lawsuit. In the context of an organization suing on behalf of its members, the organization must demonstrate "(1) at least one of its members would have standing to sue as an individual, (2) 'the interests at stake are germane to the organization's purpose,' and (3) individual members'

participation is not necessary to either the claim asserted or the relief requested." Animal Welfare Inst. v. Martin, 623 F.3d 19, 25 (1st Cir. 2010) quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 181, (2000).

As of the date of this Opposition, SAF has 8,066 members and supporters in Massachusetts. Of these, 1,847 are current-year and lifetime paid members. Tempski Declaration at ¶7. Approximately 40 to 70 SAF members have contacted SAF specifically regarding the REGULATION within the past year. Id., at ¶8. Many of these members have asked SAF to take legal action over the REGULATION because as Massachusetts firearms dealers they cannot determine which pistols (including specifically Gen3/4 Glock pistols) are/are not REGULATION-compliant due to the REGULATION's vagueness, or as Massachusetts residents who want to but cannot purchase Gen3/4 Glock pistols because of Massachusetts firearms dealers' reticence to subject themselves to enforcement actions by the defendant ATTORNEY GENERAL. Id., at ¶9.

As of the date of this Opposition, COMM2A has 835 donors predominantly from Massachusetts. Bolioli Declaration at ¶11. Many of COMM2A's donors have contacted COMM2A specifically regarding the REGULATION within the past few years. Many of these donors have asked COMM2A to take legal action specifically to challenge the constitutionality of the REGULATION because they are directly affected by it. Id., at ¶12. COMM2A has also spent considerable resources in efforts to educate attorneys admitted in the Commonwealth regarding the REGULATION challenged by this lawsuit.

Per ample recent authority in this Circuit regarding an organization's standing to sue for injury to its own organizational interests (i.e. Massachusetts Delivery Ass'n v. Coakley, *supra*), and an organization's standing to sue on behalf of its members (Animal Welfare Inst. v. Martin, *supra*), both SAF and COMM2A have standing to participate in this lawsuit.

## B. The DEALERS' Standing

The ATTORNEY GENERAL's attack on the DEALERS' standing is *doubly* false: (1) it sets up and knocks down a straw man argument by *misrepresenting the facts alleged and legal issues raised in the Complaint*, and (2) presents a false premise (that the REGULATION's definition of "load

indicator" is *not* unconstitutionally vague—the *sole* issue at the heart of the Complaint) as the basis for the spurious conclusion that the DEALERS could not have been confused by any alleged vagueness since the defendant ATTORNEY GENERAL informed them that Gen3/4 Glocks do not comply with the REGULATION.

The defendant ATTORNEY GENERAL rewrites the nature of the COMPLAINT's vagueness allegation—which she summarized *correctly* at p. 4 of her Motion to Dismiss "… [The DEALERS] 'cannot determine with any reasonable certainty whether Gen3 and/or Gen4 pistols *comply* with the REGULATION'…" (emphasis in italics)—into a non-existent claim that the complained-of vagueness in the REGULATION concerns its *application* to the DEALERS and to Gen3/4 Glock pistols. The defendant ATTORNEY GENERAL builds her straw man argument as follows (specific emphasis in italicized text):

- "The dealers [ ] allege they are injured because they have eschewed selling Generations 3 and 4 Glocks due to their questions *over the applicability of the regulation*. Compl. Exs. 15, 16." Motion to Dismiss, p. 4.

- "Here, however, there was no actual uncertainty about *how the regulation would apply to the dealers*." Id.

- "The Attorney General's Office is the relevant regulatory authority for Mass. Gen. Laws ch. 93A … and its letters should therefore provide content to the regulation *as applied to the dealers*." Id.

- "The letters make clear that the regulation *applies to the Glocks* the dealers want to sell." Id.

- "[A]ny loss of sales would have flowed from the very clarity of the Attorney General's (negative) construction of the statute *as applied to Glock*." Id., p. 5.

- "The Supreme Court has emphasized that a litigant seeking to challenge a statue for vagueness must demonstrate that the statute is vague *as applied to his own conduct*…" Id.

But the DEALER PLAINTIFFS never questioned (1) *whether* the REGULATION *applies* to them, (2) *how* the REGULATION *applies* to them, (3) *whether* the REGULATION *applies* to Glock pistols or (4) *how* the REGULATION *applies* to Glock pistols. There is not a hint in the Complaint that the DEALERS did not always *explicitly* acknowledge that the REGULATION applies to them:

> "The REGULATION at §16.01 defines a 'handgun-purveyor' [ ] as 'any person or entity that transfers handguns to a customer located within the Commonwealth of Massachusetts'" and "[p]ursuant to M.G.L. c.140 §§ 122, 123 and 124, a 'handgun-purveyor' is a Massachusetts licensed firearms dealer."  Complaint at ¶27, et seq.

Likewise, the Court will not find anything in the Complaint denying the PLAINTIFFS' express acknowledgement that the REGULATION applies to Glock pistols:[1]

> "Thus, to be offered for sale or transfer to Massachusetts consumers by handgun purveyors [ ] Glock handguns must comply with the design requirements of ... the Massachusetts Handgun Sales Regulation (the REGULATION)."  Complaint, ¶¶30, 37.

It is unnecessary to address the defendant ATTORNEY GENERAL's authorities in support of her reformulated non-existent straw man argument that the DEALERS cannot establish standing because "there was no actual uncertainty about how the regulation would apply to the dealers ... [and] ... to Glock pistols."  The PLAINTIFFS never made such allegations.

The defendant ATTORNEY GENERAL's second argument challenging the DEALERS' standing is that among the three constitutional requirements for standing, i.e. (1) injury in fact; (2) causation; and (3) redressibility (Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992); accord Katz v. Pershing LLC, 672 F.3d 64, 71-72 (1st Cir. 2012), the DEALERS lack the elements of causation and injury.  She writes "[w]hether any purported lost sales were caused by the dealer-plaintiffs' alleged uncertainty is crucial" [Motion to Dismiss, p. 5], and then declares that even if the DEALERS really were uncertain as to whether Gen3/4 Glock pistols comply with the REGULATION, she eliminated any such uncertainty through her response letters to the DEALERS in which she wrote "[t]he handguns presently manufactured by Glock, Inc. [ ] are not in compliance with the Massachusetts Handgun Sales Regulations".  Complaint **Exhibits "23"** and **"24"**.

There are two problems with this fallacious reasoning.  First, the defendant ATTORNEY GENERAL conflates the Article III justiciability requirements of standing and mootness.  After establishing standing through a "personal stake" in the lawsuit at the commencement of an action,

---

[1]     The REGULATION at 940 CMR 16.05(4) states that the "load indicator" and/or magazine safety disconnect alternative design requirement "applies only to handguns that have a mechanism to load cartridges via a magazine."  The PLAINTIFFS expressly acknowledge that the REGULATION applies to *all* pistols—not just Glock pistols—since only pistols employ magazines as feeding devices.

"the doctrine of mootness measures whether the plaintiff's interest remains sufficient to justify continuing federal jurisdiction." U.S. Parole Comm'n v. Geraghty, 445 U.S. 388, 397 (1980). Mootness is aptly described as "the doctrine of standing set in a time frame. Ramirez v. Sanchez Ramos, 438 F. 3d 92, 97 (1st Cir. 2006) quoting U.S. Parole Comm'n v. Geraghty, supra, at 397. The defendant ATTORNEY GENERAL's conflation (and substitution, really) of standing with mootness is self-evident from her purported cure of any vagueness in the REGULATION through her response letters to the dealers (Complaint **Exhibits "23"** and **"24"**):

- "Because the Attorney General's Office informed the dealers, relating to the very circumstances at issue in their vagueness challenge, that *these Glock pistols in fact violated the regulation*, there is *no vagueness here* and *no injury* that may be attendant to it." Motion to Dismiss, p. 5, emphasis in italics.

- "Moreover, materials attached to the Complaint note that dealer Precision Point was aware 'for years' that Generations 3 and 4 Glocks *violated the regulation*." Id., p. 3-4.[2]

- "The Complaint makes clear that the dealers in fact knew that *sale of the relevant Glocks violated 16.05(3)*. Compl. ¶ 70.1" because "The Attorney General's Office, in response to their inquiries, directly *informed them of this fact*. Compl. Exs. 23, 24." Id., p. 4.

The second problem with the defendant ATTORNEY GENERAL's contention that the DEALERS lack the justiciability elements of causation and injury is that she uses a *petitio principia* based syllogism to spuriously presume—*proclaim* rather—the answer to very question this lawsuit seeks to resolve, e.g. "there is no vagueness here and no injury that may be attendant to it" because "the Attorney General's Office *informed* the dealers ... that *these Glock pistols in fact violated the regulation*". The sham logic leading to this false conclusion would require this Court to adopt the un-established premise that "*Glock pistols in fact violated the regulation*" as true because, just as the defendant ATTORNEY GENERAL applied this reasoning to the DEALERS, *she said so*. It borders on absurd to conceive that those subject to the REGULATION do not have standing to challenge it.

---

[2]    The defendant ATTORNEY GENERAL misrepresented even this immediately verifiable statement by dealer plaintiff PRECISION POINT (Complaint **Exhibit "16"**). *In context*, PRECISION POINT wrote to the defendant ATTORNEY GENERAL (with emphasis in italics):

> *[A]s far as I understand it*, Glocks do not comply with the [REGULATION]... We have simply *'known'* for years that these third and fourth-generation Glock pistols do not comply with the [REGULATION]... Would you please *clarify* whether my *perception* regarding the legality of Fourth general Glocks is correct? ... I have turned away substantial business because of our *belief* that later-generation Glocks cannot be sold or transferred into the Commonwealth. It would be very helpful if you could *clarify* this issue.

## C.     The CONSUMERS' Standing and Implication
## Of the Second Amendment

The defendant ATTORNEY GENERAL conflates the CONSUMERS' *standing* to sue with (1) the argument that "the consumers fail to allege a cognizable Second Amendment injury" because "the regulation here does not impinge on any Second Amendment right," (Motion to Dismiss, p. 5) and (2) "even if it did, the regulation would withstand constitutional scrutiny…" <u>Id.</u>, p. 16.

The defendant ATTORNEY GENERAL's second argument, another straw man fabricated from nonexistent claims she attributes to the PLAINTIFFS, may be dispensed with quickly: the Complaint does not challenge the ATTORNEY GENERAL's authority to promulgate firearm-related regulations or that the REGULATION's "load indicator" requirement (*independent of its unconstitutionally vague definition*) is unconstitutional *per se*. "Our review on a motion to dismiss is confined to the face of the complaint." Decotiis v. Whittemore, 635 F. 3d 22, 33 (1st Cir. 2011). Thus, whether a regulatory "load indicator" requirement is or is not closely or substantially related to an important or compelling government purpose, or what level of scrutiny should be applied to such a regulation, is not the subject of the Complaint and is irrelevant to the issues before this Court. On the other hand what is relevant and what is the subject of this lawsuit is whether the REGULATION'S *definition* of "load indicator" meets constitutional scrutiny, i.e. it is not impermissibly vague or ambiguous. The implication of the CONSUMERS' Second Amendment rights by the unconstitutional *definition* of "load indicator" is a jurisdictional issue.

Turning to the defendant ATTORNEY GENERAL's first argument, she refers to the landmark case of <u>District of Columbia v. Heller</u>, 554 U.S. 570 (2008) to argue that the "challenged regulation, requiring a handgun to contain a load indicator or magazine safety disconnect prior to sale [ ] qualifies as a presumptively valid law that 'impos[es] conditions … on the commercial sale of arms' and does not implicate the Second Amendment." But this is a logical contortion attempting to swage the presumptive validity of regulations over the "commercial sale of arms" into the presumptive validity of the *implementation* and *impact* of such regulations.

If this Court were to adopt the defendant ATTORNEY GENERAL's approach, it would have to ignore reality, to wit, that on the opposite face of every firearm *sale* is a firearm *purchase*; it is thus

literally impossible to separate the effect of the unconstitutionally vague REGULATION on the DEALERS' *sales* from its impact on the CONSUMERS' ability to *purchase* firearms. "It is of no moment that the statute does not impose a complete prohibition. The distinction between laws burdening and laws banning speech is but a matter of degree." United States v. Playboy Entm't Group, Inc., 529 U.S. 803, 812 (2000). Although expressed in the context of a First Amendment claim, the principle that "laws burdening and laws banning [constitutionally protected conduct, i.e. the CONSUMERS' Second Amendment right] is but a matter of degree" is equally applicable here.

Thus, the appropriate inquiry in this matter is:

**"Does the REGULATION's unconstitutionally vague definition of load indicator make it more difficult or impossible for the CONSUMMERS to purchase firearms in common use (i.e. Gen3/4 Glock pistols)?"**

The answer to this question is unequivocally "yes" and is painstakingly detailed in the Complaint and its supporting exhibits. Glock pistols are firearms in "common use". Complaint ¶34. Each of the CONSUMERS sought to purchase a Gen3/4 Glock pistol from one or more of the DEALERS. Complaint ¶¶ 39–44. The DEALERS declined to sell the CONSUMERS Gen3/4 Glock pistols (Complaint ¶¶ 45–50) because they did not know whether these pistols comply with the REGULATION's "load indicator" alternative design requirement. Complaint ¶¶ 51, 52. Thus, the CONSUMERS were prevented from acquiring firearms "common use" because of the unconstitutionally vague REGULATION's chilling effect on the DEALERS' sales. The CONSUMERS' injury is "(a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical." Katz v. Pershing, LLC, 672 F. 3d 64, 71 (1st Cir. 2012).

The effect of the REGULATION's unconstitutional vagueness on the DEALERS' commercial activity (sales of firearms) renders it impossible for the CONSUMERS to acquire those firearms. In the instant lawsuit, those firearms happen to be Gen3/4 pistols, the most commonly purchased pistols in America. Complaint ¶34. The CONSUMERS established standing to sue in this matter based on the burden of the REGULATION's impact on their Second Amendment rights.

*///*

# III. <u>Vagueness</u>

PLAINTIFFS challenge the REGULATION's load indicator alternative design requirement both *facially* and *as applied* to them in particular.  A facial attack tests a law's constitutionality based on its text alone and does not consider the facts or circumstances of a particular case.  <u>City of Lakewood v. Plain Dealer Publ'g Co.</u>, 486 U.S. 750, 770 n. 11 (1988).  An as-applied attack, in contrast, does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right.  <u>Wis. Right to Life, Inc. v. FEC</u>, 546 U.S. 410, 411-12 (2006) (per curiam).  The REGULATION is unconstitutional from *both* the facial and as-applied perspectives.

## A.  The REGULATION is Facially Void for Vagueness

In <u>FCC v. Fox Television Stations</u>, 567 U.S. __, 132 S.Ct. 2307 (2012) the Supreme Court summarized the axiomatic "void-for-vagueness" precept of due process, which requires that statutes and regulations be sufficiently clear and precise so that persons of ordinary intelligence subject to them can reasonably ascertain what conduct is required and/or what conduct is forbidden.  *More importantly, such clarity is necessary to set sufficient limits **on those tasked with their enforcement** from doing so capriciously or discriminatorily*:

> A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required.  *See* <u>Connally v. General Constr. Co.</u>, 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926) ("[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law");  <u>Papachristou v. Jacksonville</u>, 405 U.S. 156, 162, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972) ("Living under a rule of law entails various suppositions, one of which is that '[all persons] are entitled to be informed as to what the State commands or forbids;'" (quoting <u>Lanzetta v. New Jersey</u>, 306 U.S. 451, 453, 59 S.Ct. 618, 83 L.Ed. 888 (1939) (alteration in original))).  This requirement of clarity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment.  *See* <u>United States v. Williams</u>, 553 U.S. 285, 304, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008).  It requires the invalidation of laws that are impermissibly vague....  ¶ ***Even when speech is not at issue, the void for vagueness doctrine addresses at least two connected but discrete due process concerns:  first, that regulated parties should***

***know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way***. *See* <u>Grayned v. City of Rockford</u>, 408 U.S. 104, 108-109, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). [Emphasis added in bolded italics.]

The REGULATION's definition of "load indicator" is *facially* void for vagueness under the due process clause of the Fourteenth Amendment because the DEALERS cannot (nor can *anyone*) determine under any circumstances with any reasonable degree of certainty whether Gen3/4 Glock pistols (or *any* of the pistols on the <u>Approved Firearms Roster</u>) comply with the REGULATION.

The REGULATION defines "load indicator" as "a device which plainly indicates that a cartridge is in the firing chamber within the handgun." This hollow definition prescribes what this "device" (whatever it is) must *do*—"plainly indicate"—but does not specify or even suggest *how* this "device" must do that, i.e. visually, tactilely, or otherwise. Nor does the REGULATION or its enabling statute (G.L. c.93A) provide any *standard* at all against which anyone, especially the defendant ATTORNEY GENERAL, can measure compliance with the amorphous words "plainly indicates". Failing to explain how this "device" must actually *do* what it is supposed to do is but one of the REGULATION's defects. Worse, it fails to explain what this mystery "device" thing must **be**.

"What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely **what** that fact is." <u>U.S. v. Williams</u>, 553 U.S. 285, 306 (2008), emphasis in bolded italics.[3] That is exactly the problem with the REGULATION's definition of "load indicator".

"Device" is such a broad term that it can mean almost anything including just "thing". The defendant ATTORNEY GENERAL has not objected to a "load indicator" consisting of nothing more than a small hole at the base of a firing chamber which makes it possible to see (under certain conditions) the rim of a cartridge casing if one is present. Nor has she objected to a protruding tab at the top of a slide to serve as a "load indicator". She has not objected to an extractor-based "load indicator" that protrudes slightly from the slide when a cartridge is in the firing chamber (the mechanism employed by Glock pistols). Searching the REGULATION and its enabling statute for

---

[3] Though <u>U.S. v. Williams</u> involved a criminal statute, the principle of voiding a government mandate or prohibition for vagueness is directly applicable to regulations. <u>FCC v. Fox Television Stations</u>, *supra*.

"precisely **what** that fact is" that transforms an ordinary thing into a REGULATION-compliant "device which plainly indicates" (<u>Williams</u>, *supra*, at 306) reveals that nothing requires that it be *built into to the pistol itself*. Thus, a sensitive weight scale could conceivably be supplied with a pistol to allow for the comparison of the pistol's weight with a cartridge in the firing chamber and its weight without a cartridge in the firing chamber. An indicating rod could be included with a pistol that when inserted into the barrel with a cartridge in the chamber would expose a colored region that would otherwise be concealed by the barrel if the chamber is empty.

The total lack of standards in the REGULATION's definition of "load indicator" creates the potential for absurd results, capricious and arbitrary enforcement. Looking down the barrel through the muzzle will visually reveal a loaded chamber more clearly than peering through a small hole at the base of the chamber (which the defendant ATTORNEY GENERAL has accepted as a valid "load indicator"). The reality is that *all semi-automatic pistols*, including Gen 3/4 Glock pistols, have "load indicators" built into them that is inherent in their designs—the slide. No firearm enthusiast would seriously argue that pulling the slide to the rear is not the most reliable (and many would ardently insist, *only*) way to determine whether there is a cartridge in the firing chamber.

The REGULATIONS' vague use of the word "device" to define "load indicator" is made all the more glaring when analyzed side-by-side with the unobjectionable use of the same word "device" in the REGULATION's definition of "magazine safety disconnect" in the same subsection. Section 16.05(1) defines a "magazine safety disconnect" as "a *device* that prevents the firing of the handgun when the magazine is detached from the handgun". [Emphasis in italics.] The clearly understandable *purpose* of this "device" shifts focus from what it must *be* to its unmistakable mission and purely binary *standard* by which its accomplishment can be measured. The "device" *either* prevents the firing of the handgun when the magazine is detached from the handgun *or* it does not. There is no grey area. A cartridge cannot be "a little" fired or "a lot" fired; it is either fired or it is not fired. *How* the magazine safety disconnect "device" accomplishes its mission, where it is located, what it actually is, its color, size, shape, dimensions, etc. are not germane to whether it accomplishes its *unambiguous* mission measured by an equally unambiguous *standard*.

Further, the REGULATION's use of the words "plainly indicates" in the definition of "load

indicator" is likewise hopelessly vague. "Plainly indicates" can mean anything and one need not venture to extremes to conceive of a multitude of reasonable and simple interpretations. The defendant ATTORNEY GENERAL herself offers a number of synonyms at p. 10 of her in her Motion to Dismiss. "Indication" can be done visually and the adverb "plainly" can be from any range of distances and/or angles. "Indication" can be done audibly and the adverb "plainly" can be any range of audible decibels and frequencies. "Indication" can be done tactilely and the adverb "plainly" can be anything from feeling a slight projection with a bare fingertip to a sensation in the palm through a thick glove. But there is *nothing whatsoever* in the REGULATION or its enabling statute to "indicate" to *anyone* "precisely *what* that fact is" [Id.] that qualifies as "plainly indicates".

The defendant ATTORNEY GENERAL argues that "the mere fact that a regulation requires interpretation does not make it vague" and that words like "device," "plainly," and "indicate" cannot form the basis for a claim of unconstitutional vagueness. Motion to Dismiss, pp. 10-11. To prove her point she lists the prevalence of the challenged words "indicate" and "device" in the both Massachusetts and Federal laws. While interesting it does nothing to clarify the vagueness herein.

The defendant ATTORNEY GENERAL was specifically asked to clarify whether Gen3/4 Glock pistols comply with the REGULATION, and if not, *why* not. Complaint, ¶¶53–60 and **Exhibits "15"–"22"** thereto. The defendant ATTORNEY GENERAL responded with a boilerplate letter that Gen3/4 Glock pistols "are not in compliance with the [REGULATION] because they lack an effective load indicator or magazine safety disconnect." Complaint, ¶¶61–64 and **Exhibits "23"–"30"** thereto. The defendant ATTORNEY GENERAL has not provided *any* interpretation of "load indicator" as of this date, more than three months after having been made explicitly aware by the Complaint of the nature of the PLAINTIFFS' allegations of unconstitutional vagueness. So her claim that "the mere fact that a regulation requires interpretation does not make it vague" fails outright as moot because the defendant ATTORNEY GENERAL has not, and refuses, to provide *any* such interpretation.

"[W]e have struck down statutes that tied criminal culpability to whether the defendant's conduct was 'annoying' or 'indecent' – wholly *subjective* judgments *without statutory definitions, narrowing context, or settled legal meanings*." Williams, 553 U.S. at 304, (internal citations omitted, emphasis in italics). PLAINTIFFS are unaware of any statutory or regulatory definitions of the

words "device", "plainly" or "indicate" as no such definitions exist anywhere in the REGULATION or its enabling statute, Chapter 93A of the Massachusetts General Laws. The Court will search far and wide in the Massachusetts General Laws and in the Code of Massachusetts regulation for *any* limiting construction for the words "device," "plainly," and "indicate" as they are used alone or in any combination in the "narrowing context" of firearms in general, semi-automatic firearms more particularly, and semi-automatic handguns specifically. Nor will this Court find any regulatory or statutory definitions for these words used alone or in any combination.[4]

The defendant ATTORNEY GENERAL resorts to synonyms in an attempt to redeem her hopelessly vague definition of "load indicator". But these synonyms do nothing to bring anyone closer to an understanding of *what* the REGULATION requires and *what* it forbids. <u>Williams</u>, *supra*, at 306. For example, substituting some the defendant ATTORNEY GENERAL's suggested synonyms yields the following alternative definitions for "device which plainly indicates":

- "A contrivance free from obstruction that serves as a symptom" that a cartridge is in the firing chamber within the handgun.

- "A mechanism that obviously signifies" that a cartridge is in the firing chamber within the handgun.

- "An apparatus that in a manner that makes it evident to the mind or senses points out with more or less exactness" that a cartridge is in the firing chamber within the handgun.

Contrast these incurable vagaries with the REGULATION's other wholly *understandable* words. No one will argue that the words "cartridge", "firing chamber" and "handgun" are vague or ambiguous, especially as they are used in the *narrowing context of a firearm regulation*. It is unlikely that anyone would think that the word "cartridge" as it is used here really means *printer* cartridge. No one will argue that the words "is in" as they are used to connect "cartridge" and "firing chamber" mean anything other than "presently inside that portion of the barrel in which the

---

[4]    Another closely related stark example of a Massachusetts statutory definition deviating from the common knowledge, traditional and *common sense* meaning of an everyday word is the ***absence*** of a definition of "handgun" in the General Laws, though the word is used in three separate sections, including one that imposes felony criminal liability for its violation. In fact, M.G.L. c140 §121 inexplicably substitutes the word "firearm" (an entire genre of arms, i.e. "edged weapons") for one of its members—"handguns"—while providing separate definitions for other members of the genre, e.g. rifles and shotguns. This unique feature of Massachusetts law defies logic and common sense: it is similar to substituting "fowl" for "chickens" while providing separate definitions for ducks and geese.

cartridge is inserted prior to being fired".  Going one step further, the preceding interpretation "presently inside that portion of the barrel…" is the *only* possible interpretation, because revolvers have multiple firing chambers which are *not* integral with the barrel, and per §16.05(4), subsection (3) "applies only to handguns that have a mechanism to load cartridges via a magazine"—pistols.

The defendant ATTORNEY GENERAL asserts that regulations concerning commercial activities need not be precise because "courts rightly expect that merchants in a regulated industry should have a higher level of sophistication regarding the subject matter of their wares, and that those merchants can be more readily expected to interpret the rules that govern their transactions." Motion to Dismiss, p. 12.  The PLAINTIFFS are unaware of any firearm industry, field or trade terms of art, jargon or colloquialisms for the words "device", "plainly" and "indicates".  Nor has the defendant ATTORNEY GENERAL, who advances this argument, provided any such references.

In sum, neither the REGULATION nor its enabling statute specify or even suggest what the load indicator "device" must *be* and *how* it is to accomplish its nebulous "plainly indicate" purpose. The REGULATION and its enabling statute are silent with respect to the standards against which compliance with what the "load indicator" must *be* and its accomplishment of what it must *do* can be measured.  The REGULATION does not provide *any* guidance whatsoever about *anything it requires*, nor can any such guidance be dragged out of its promulgator, the defendant ATTORNEY GENERAL.  The REGULATION'S definition of "load indicator" is clearly facially void for vagueness.

## B.  The REGULATION is Void As Applied to Glock Pistols

So what about Gen3/4 Glock pistols caused the defendant ATTORNEY GENERAL to decree that they do not comply with the REGULATION?  She generously provided the reason in her letters to the DEALERS [Complaint **Exhibits "23"** and **"24"**]:  Gen3/4 Glock pistols "are not in compliance with the [REGULATION] because they lack an effective load indicator or magazine safety disconnect."  Complaint, ¶¶61–64 and **Exhibits "23"–"30"** thereto.  Each of the defendant ATTORNEY GENERAL's response letters to the PLAINTIFFS is silent as to "precisely ***what*** that fact is" (Williams, *supra*, at 306) that makes the load indicators of Gen3/4 Glock pistols "not effective".

*How* the defendant ATTORNEY GENERAL came to the conclusion that Gen3/4 Glock pistols

"lack an effective load indicator" is critically important.  We gain an important insight into this from her Motion to Dismiss arguments:

- "*Pictures* of the Glock load indicator device shown in Complaint exhibits 42 and 43 do not show any discernible difference in the load indicator before the gun is loaded and after the gun is loaded, let alone an 'obvious' or 'evident' one."  Motion to Dismiss, p. 12.

- "These *manual excerpts* show guns with *colored indicators* that provide a *shading contrast* to demonstrate (1) the *location* of the load indicator and (2) that cartridges are in the firing chamber."[5] Id., 14.

- On the other hand, the Glock device, *as seen in the Exhibits* to the Complaint, is *not colored* and does not provide such a *contrast*."  Id.

- "The extent of *protrusion*, the *shape*, the *size*, and the *exact placement* of the load indicator device also *appear from the exhibits* to differ between Glocks and those purportedly 'virtually identical' firearms."  Id.

Whether intentionally or inadvertently, for the first time in the 15 years that the REGULATION has been in place, the defendant ATTORNEY GENERAL provides a glimpse *not* into *what* is required to comply with the REGULATION's hopelessly vague definition of "load indicator" (Williams, *supra*, at 306), but what about Gen3/4 Glock pistols' load indicators she determined renders them "not effective".  Even more remarkably, rather than describe how she came to her conclusion through a "fair and considered judgment on the matter in question" [Auer v. Robbins, 519 U.S. 452, 462 (1997)], the defendant ATTORNEY GENERAL candidly revealed the extent of her analysis:  pointing out the differences in the "[p]ictures of the Glock load indicator device shown in Complaint exhibits 42 and 43", "*manual excerpts* [Complaint exhibits 39-41]", and "*appear[ance] from the exhibits... [Compare* Exs. 39-41 with Exs. 42, 43]."

Even "post hoc rationalization" cannot rescue the defendant ATTORNEY GENERAL's capricious decree that Gen3/4 Glock load indicators are "not effective".  Neither the REGULATION nor its enabling statute specifies or even *suggests **what*** the load indicator must *be*, i.e. a button, tab, notch, hole, projection, etc.  Williams, *supra*, at 306.  Neither the REGULATION nor its enabling

---

[5]     "... that cartridges [plural] are in the firing chamber" is a physical impossibility, as firing chambers can accommodate only one cartridge at a time.  If by "cartridges [plural]" the defendant ATTORNEY GENERAL meant a *double feed malfunction*, then no load indicator would be necessary to determine that condition as the slide of the pistol would remain to the rear, prevented from sliding back into battery by the second cartridge lodged behind the one in the firing chamber.

statute specifies or even *suggests* what the minimum, maximum or range of **sizes**, **dimensions**, **colors**, **shapes**, etc. the load indicator must **be**.  Id.  Nor is it specified or even *suggested* **where** on the pistol the load indicator must be located, i.e. on the frame, grip, slide, trigger, at the breach, at the muzzle, on right or left side or on both sides of the pistol, etc.  Id.  In short, the REGULATION is incurably vague not only with what the "load indicator" must **do**, but what it must **be** and **how** it is to do it.  There is just no way the defendant ATTORNEY GENERAL could have decreed that Gen3/4 Glock pistols do not comply with the REGULATION without doing so capriciously and arbitrarily.

> We have never applied the principle of [Chevron deference[6]] to agency litigating positions that are wholly unsupported by regulations, rulings, or administrative practice.  To the contrary, we have declined to give deference to an agency counsel's interpretation of a statute where the agency itself has articulated no position on the question…  Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate.

Bowen v. Georgetown Univ. Hospital, 488 U.S. 204, 212-213 (1988).  It is obvious that the defendant ATTORNEY GENERAL's explanation of how Glock pistols do not comply with the vague definition of "load indicator", *for the first time ever*, and by reference to pictures and manual excerpts in the Complaint's exhibits, is precisely the "'post hoc rationalizatio[n]' advanced by an agency seeking to defend past agency action against attack" that the Supreme Court warned about in Auer v. Robbins, *supra*, 462.  The defendant ATTORNEY GENERAL has not provided anything whatsoever in her Motion to Dismiss to defeat the PLAINTIFFS' as-applied challenge as it concerns Glock pistols.

Finally, even *arguendo* there was some conceivable way to give the words "device which plainly indicates" some limiting construction, all such hope was vanquished by the defendant ATTORNEY GENERAL in singling out Gen3/4 Glock pistols' load indicators as "not effective".  Inferring from her *not* having similarly construed as "not effective" the virtually identical extractor-based load indicators of Kahr Arms pistols (Complaint ¶69.3.A., **Exhibit "39"**), Heckler & Koch USP and P-series of pistols (Complaint ¶69.3.B., **Exhibit "40"**) and Beretta 92-series of pistols (Complaint ¶69.3.C., **Exhibit "41"**), the DEALERS reasonably believed that the virtually identical extractor-based load indicators on Gen3/4 Glock pistols are likewise REGULATION-complaint.  The

---

[6] Chevron U. S. A. Inc. v. Natural Resources Defense Council, Inc., 467 U. S. 837, 842-844 (1984).

defendant ATTORNEY GENERAL's removal of Glock pistols from the compliant category for wholly unexplained reasons confounds any possibility of ever knowing how *any* pistol can comply with the "load indicator" alternative design requirement, other than maybe through clairvoyance.

# IV. **Pullman Abstention**

The defendant ATTORNEY GENERAL urges that "[i]f the Court determines that the meaning of 16.05(3) remains uncertain" it should exercise <u>Pullman</u> Abstention to "allow Massachusetts courts a full opportunity to interpret the regulation" because "if Massachusetts courts could offer an interpretation of 940 Mass. Code Regs. 16.05(3) that would render the constitutional issues moot."

<u>Pullman</u> abstention, implicated when a federal court is confronted with an allegation that a state law violates federal rights, "'is warranted where (1) *substantial* uncertainty exists over the meaning of the state *law* in question, and (2) settling the question of state *law* will or may well obviate the need to resolve a significant federal constitutional question.'" <u>Barr v. Galvin</u>, 626 F. 3d 99, 107-108 (1st Cir. 2010), quoting <u>Batterman v. Leahy</u>, 544 F.3d 370, 373 (1st Cir. 2008) (emphasis in italics). "<u>Pullman</u> recognizes the importance of state sovereignty by limiting federal judicial intervention in state affairs to cases where intervention is necessary. If an open question of state-law would resolve a dispute, then federal courts may wait for the resolution of the state-law issue before adjudicating the merits." <u>Virginia Office for Protection and Advocacy v. Stewart</u>, 563 U.S. ___, ___, 131 S. Ct. 1632, 1644 (2011) (Kennedy, J., concurring)).

"Abstention is, of course, the exception and not the rule…" <u>Houston v. Hill</u>, 482 U.S. 451 (1987) cf., <u>Colorado River Water Conservation Dist. v. United States</u>, 424 U.S. 800, 813 (1976). Abstention is "an *extraordinary and narrow exception* to the duty of the District Court to adjudicate a controversy properly before it." <u>Quackenbush v. Allstate Ins. Co.</u>, 517 U.S. 706, 728 (1996) (internal citations omitted, emphasis in italics). "Concurrent federal-state jurisdiction over the same controversy does not generally lessen the federal courts' 'virtually unflagging obligation ... to exercise the jurisdiction given them.'" <u>Jimenez v. Rodriguez Pagan</u>, 597 F. 3d 18, 27 (1st Cir. 2010), quoting <u>Colo. River</u>, 424 U.S. at 817.

There are several important reasons, each of which by itself is enough, to militate against

the application of <u>Pullman</u> abstention in this case. Indeed, just two years ago this very Court was urged to exercise <u>Pullman</u> abstention in a lawsuit challenging a state law as violating the Equal Protection Clauses of the United States Constitution and the Massachusetts Declaration of Rights. <u>KG Urban Enterprises, LLC. v. Patrick</u>, 839 F. Supp. 2d 388 (D. Mass. 2012). This Court declared that challenges of state laws based on violations of corollary federal and state constitutional protections

> "... do not require abstention because they implicate parallel equal protection provisions of the Massachusetts and United States constitutions. <u>Guiney v. Roache</u>, 833 F.2d 1079, 1082-83 (1st Cir. 1987) ('[W]here state and federal constitutional provisions are parallel, the state provision is unlikely to be any more ambiguous than the federal provision, and abstention is unnecessary.')" <u>Id.</u>, at 399.

The PLAINTIFFS in this matter allege that the REGULATION violates the DEALERS' 14th Amendment right to due process. Like its federal corollary, Article XII of the Massachusetts Constitution provides "And no subject shall be ... deprived of his property, immunities, or privileges ... or deprived of his life, liberty, or estate, but by the judgment of his peers, or the law of the land." To be sure, "...the due process provisions of the Massachusetts Constitution [ ] afford protection comparable to that supplied by the Fourteenth Amendment, *especially in the cases of economic regulation*..." <u>Boston v. Keene Corp.</u>, 406 Mass. 301, 308 n. 8 (1989) (emphasis in italics).

There is more. "The Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A, authorizes the Attorney General to promulgate regulations defining unfair and deceptive practices by entities in trade or commerce. Mass. Gen. Laws ch. 93A, § 2(c)." Motion to Dismiss, p. 2. But M.G.L. ch.93A, § 2(b) provides that (emphasized in italics) "It is the intent of the legislature that in construing paragraph (a) of this section ... the courts will be guided by the interpretations given by the *Federal* Trade Commission and the *Federal* Courts to section 5(a)(1) of the *Federal* Trade Commission Act (15 U.S.C. § 45(a)(1))" which proscribes "unfair or deceptive acts or practices in or affecting commerce." Thus, the REGULATION at issue in this lawsuit is the direct *implementation of federal law*; Massachusetts' direct implementation of federal law renders unnecessary the need to resort to *parallel* state and federal constitutional provisions to reject <u>Pullman</u> abstention herein.

Further, a federal court confronted with a motion to abstain must consider whether the transferee forum will adequately protect the rights of the party seeking to invoke federal

jurisdiction.  U.S. v. Fairway Capital Corp., 483 F. 3d 34, 43-44 (1st Cir. 2007) (internal citations omitted).  The mere "*possibility* that the state court proceeding *might* adequately protect the interests of the parties is not enough to justify the district court's deference to the state action."  Id., (internal citations omitted) (emphasis in italics).  The adequacy of another forum is "important only when it *disfavors* abstention."  Id., emphasis in italics.

The defendant ATTORNEY GENERAL plays fast and loose with her ever-alternating use of the words "law", "statute" and "regulation" in referring to the REGULATION and casually argues for the exercise of Pullman abstention because of "substantial uncertainty over the meaning of the state *law* in question and settling the state *law* question may obviate the need to resolve a significant federal constitutional question…"  Motion to Dismiss, p. 22 (emphasized in italics).  Her Motion to Dismiss is peppered with the words "law" and "statute" referring to the REGULATION's "load indicator" alternative design requirement.  These are just a few examples:

- "[A]ny loss of sales would have flowed from the very clarity of the Attorney General's (negative) construction of the *statute* as applied to Glock."  Motion to Dismiss, p. 5.

- "Loss of sales may provide standing for a state-*law* claim (albeit meritless) that the Office of the Attorney General's interpretation violates the *regulation*…"  Id.

- "The dealers may well have lost sales due to an inability to sell weapons under the *law*, but again they did not sue seeking a ruling that the Generations 3 and 4 Glocks comply with the *statute*."[7]  Id.

- "… facial challenges often result in premature interpretation of *statutes*, rest on speculation, are contrary to judicial restraint principles…"  Id., 7.

- "That [Williams "fair notice"] standard is less restrictive when applied to civil *statutes*…  This is especially true when statutes regulate economic or commercial activities."  Id., 9.

- "…"training" and "personnel" not unconstitutionally vague in context of *statute* prohibiting providing training to terrorist organizations…"  Id., 11.

---

[7]     The defendant ATTORNEY GENERAL is ***correct*** that the DEALERS "did not sue seeking a ruling that the Generations 3 and 4 Glocks comply with the ***statute***."  That is because Gen3/4 Glock pistols, always listed on the Executive Office of Public Safety and Security Approved Firearms Roster, were "reviewed by the Gun Control Advisory Board and … approved by the Secretary of Public Safety and Security ***as having complied with the statutory handgun testing provisions of M.G.L. c. 140, § 123***."  Emphasis in italics.  Gen 3/4 Glock pistols have always complied with the ***statute*** and there is nothing regarding such compliance that requires resolution here.

- " … the Attorney General requests that the Court exercise Pullman abstention and refer the matter to the State Court system for adjudication of the underlying state *law* issues in the first instance." Id., p. 22.

- "…where Court could not agree whether the *statutes* left room for state court construction, abstention was appropriate…" Id., p. 23.

The significance of the defendant ATTORNEY GENERAL's interfusion of the words "law", "statute" and "regulation" cannot be understated, as it undermines any "possibility that the state court proceeding might adequately protect the interests of the parties" (U.S. v. Fairway Capital Corp., *supra*). The defendant ATTORNEY GENERAL brings a Fifth Circuit case from 1983 and decades-old authorities to support her argument that "even when it is only possible (rather than likely or reasonably possible) that the state court can construe the state law, courts have found Pullman abstention warranted." Motion to Dismiss, p. 23, citing Reetz v. Bozanich, 397 U.S. 82, 86–87 (1970). But in Reetz the Supreme Court applied abstention to allow the Alaska state courts to interpret the "[t]he constitutional provisions relate[d] to fish resources, an asset unique in its abundance in Alaska … the management of which is a matter of great state concern."

It is therefore no wonder why the defendant ATTORNEY GENERAL avoids bringing abundant recent and applicable authorities of which she is explicitly aware[8], that require state courts to generally defer the interpretation of an ambiguous *regulation* to the agency that promulgated it. Auer v. Robbins, 519 U.S. 452 (1997). Thus, if this Court were to exercise Pullman abstention as the defendant ATTORNEY GENERAL urges, it is expected that she would argue to the Massachusetts state court that it should exercise this so-named Auer deference doctrine and defer the interpretation of the hopelessly ambiguous "load indicator" alternative design requirement to the very same defendant ATTORNEY GENERAL who refused to interpret it [Complaint Exhibits **"23–30"**], argues that she does not have to interpret it [Motion to Dismiss, p. 14], contends that the REGULATION is clear as is [Motion to Dismiss, pp. 10-12], and who explicitly informed the PLAINTIFFS of that fact: "Handgun dealers in Massachusetts have clear information on [how Glock

---

[8] **Exhibit "A"** to this Opposition is a packet of materials entitled *Researching, Interpreting, Challenging, and Applying Regulations in Massachusetts* from a 24 October 2013 presentation at the Social Law Library in Boston, Massachusetts by Robert L. Quinan, Jr., Managing Attorney, Office of the Attorney General. The presentation materials contain voluminous authorities and speak for themselves regarding judicial deference to agency interpretations of their own ambiguous regulations.

pistols do not comply with the "load indicator" alternative design requirement] from Glock, EOPSS, and this Office, and are operating on more than the 'rumor and speculation' you refer to in your letter." [Complaint **Exhibit "28"**.] Under the circumstances in this case, it <u>Pullman</u> abstention would open the door to the defendant ATTORNEY GENERAL manipulating the state court system to bring this crucial matter right back into her lap.

The <u>Auer</u> deference general rule of deferring to an agency's interpretation of its own ambiguous regulation does not apply in all cases. Deference is undoubtedly inappropriate, for example, when the agency's interpretation is "'plainly erroneous or inconsistent with the regulation.'" <u>Chase Bank USA, N.A. v. McCoy</u>, 562 U.S. __, __, 131 S.Ct. 871, 880 (2011) (internal quotes omitted). In the instant case, "plainly erroneous" *cannot* be implicated *because the defendant ATTORNEY GENERAL has never provided **any** interpretation of "load indicator"*.

Deference is likewise unwarranted when there is reason to suspect that the agency's interpretation "does not reflect the agency's fair and considered judgment on the matter in question." <u>Auer</u>, *supra*, at 462; *see also* <u>Chase Bank</u>, *supra*, at 881. This might occur when the agency's interpretation conflicts with a prior interpretation, *see*, e.g., <u>Thomas Jefferson Univ. v. Shalala</u>, 512 U.S. 504, 515 (1994). In the instant matter the ATTORNEY GENERAL has not provided *any* reason for her decree that Gen3/4 Glocks do not comply with the "load indicator" alternative design requirement, instantly condemning her decree to "not reflect[ing] the agency's fair and considered judgment on the matter in question." Moreover, the defendant ATTORNEY GENERAL's singling out Gen3/4 Glock pistols as not complying with her mystery definition of "load indicator" while tacitly approving the virtually identical load indicators on other pistols (*see* Complaint at ¶¶ 68 & 69) is nothing less than the prototypical example of the very "inconsistency and conflict with a prior interpretation" discussed in <u>Thomas Jefferson Univ. v. Shalala</u>, *supra*.

Finally, the defendant ATTORNEY GENERAL argues that "the existence of a process for getting government clarifications mitigate[ ] concerns about how the law might otherwise trap an unwary dealer" and that "[h]ere, the dealers have [ ] an available process…" Motion to Dismiss, p. 9. The DEALERS did not send their letters seeking clarification of the REGULATION to the defendant ATTORNEY GENERAL pursuant to some "available process" for "getting government clarifications".

Contrary to the defendant ATTORNEY GENERAL's assertion, no such "process" exist in the REGULATION.

Removing _Auer_ deference for multiple reasons from the ATTORNEY GENERAL's arsenal of defenses sends the interpretation of the vague definition of "load indicator" right back to the judiciary for interpretation. But "[c]oncurrent federal-state jurisdiction over the same controversy" is not sufficient to "lessen the federal courts' 'virtually unflagging obligation ... to exercise the jurisdiction given them.'" _Jimenez v. Rodriguez Pagan_, _supra_, at 27. This Court should retain jurisdiction of this critically important case on abundant legal authority and clear reasons of equity.

# CONCLUSION

The defendant ATTORNEY GENERAL's Motion to Dismiss fails for multiple reasons. At its core, it argues that (1) an agency may rule by administrative fiat without having to explain how or why it came to its conclusions; (2) that an agency need not establish or resort to any standards against which to measure regulated conduct, and (3) that as long as a constitutionally valid end is desired or achieved, unconstitutional means to achieve that end are tolerable.

On the other hand, the Complaint succeeds in clearly establishing each of the PLAINTIFFS' standing to sue, injury caused by the unconstitutionally vague REGULATION, and that redressibility is possible striking the REGULATION's definition of "load indicator" as unconstitutional. The PLAINTIFFS respectfully ask that this Court deny the defendant ATTORNEY GENERAL's Motion to Dismiss in its entirety.

///

///

///

Respectfully submitted,

Dated: 17 September 2014.

**ROBERT DRAPER; ARIEL WEISBERG; DONNA MAJOR; ERIC NOTKIN; ROBERTY BOUDRIE; BRENT CARLTON; CONCORD ARMORY, LLC; PRECISION POINT ARMORY, LLC; SECOND AMENDMENT FOUNDATION, INC.** and **COMMONWEALTH SECOND AMENDMENT, INC.**

By and through their attorney of record

**/s/ Alexander A. Flig**

_____

Alexander A. Flig, Esq (BBO #669132)
490 Chapman Street, Suite 201
Canton, Massachusetts 02021-2039
Telephone:    (781) 352-7260
Facsimile:    (781) 583-5080
E-Mail:    alex@fliglaw.com

# **CERTIFICATE OF SERVICE**

I hereby certify that this document was filed through the Electronic Case Filing (ECF) system and thus copies will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF); paper copies will be sent to those indicated on the NEF as non-registered participants on or before 1 July 2014.

**/s/ Alexander A. Flig**

_____

# Tab 6a

Declaration in Support of
Opposition to Motion to
Dismiss

(by Commonwealth Second
Amendment, Inc.)

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

**(1) ROBERT DRAPER;**

**(2) ARIEL WEISBERG;**

**(3) DONNA MAJOR;**

**(4) ERIC NOTKIN;**

**(5) ROBERT BOUDRIE;**

**(6) BRENT CARLTON,**

    *collectively, the*
       **"CONSUMERS"**, *and*

**(7) CONCORD ARMORY, LLC;**

**(8) PRECISION POINT FIREARMS, LLC;**

    *collectively, the*
       **"DEALERS"**, *and*

**(9) SECOND AMENDMENT FOUNDATION, INC.,**

**(10) COMMONWEALTH SECOND AMENDMENT, INC.**

    *collectively, the*
       **"ORGANIZATIONS"**, *and*

                         Plaintiffs

    v.

**MARTHA COAKLEY,**

    *in her official capacity as*
       **ATTORNEY GENERAL OF MASSACHUSETTS**

                        Defendant

---

Civil Action No.
**1:14-CV-12471**

# DECLARATION OF COMMONWEALTH SECOND AMENDMENT

## IN SUPPORT OF PLAINTIFFS' OPPOSITION TO THE DEFENDANT ATTORNEY GENERAL'S MOTION TO DISMISS

I, **Thomas Bolioli**, am a Director of Commonwealth Second Amendment, Inc. I make this declaration in my capacity as plaintiff Comm2A's Director of Operations. I have personal knowledge of the matters set forth in this declaration, and as to those matters of which I do not have direct personal knowledge, I state them based on a good-faith belief based on other facts of which I do have direct personal knowledge. If called upon to do so, I would truthfully and competently testify regarding the contents of this declaration in a court of law.

1. Comm2A was founded in 2009.

2. Comm2A is a tax-exempt Massachusetts-state non-profit corporation organized under §501(c)(3) of the IRS code.

3. Comm2A conducts research and provides training on state and federal firearms laws, including existing and proposed firearms laws and regulations in Massachusetts.

4. Comm2A hosts a number of invitation only law seminars on a semi-annual basis, at which legislative and judicial actions of the previous year are reviewed and strategies are discussed for the coming months.

5. At these seminars, Comm2A provides information to attorneys and other entities involved in public outreach and litigation directly relevant to the issues raised in this case, along with other issues directly related to civil rights and Second Amendment.

6. Comm2A funds these seminars from our coffers and provides all materials and expertise free of charge to the participants, all at a significant cost to Comm2A.

7. At a significant cost to itself, Comm2A provides relevant information to the public on the nature, scope and breadth of the Second Amendment, as well as relevant information on the status of various State and Federal laws affecting the free exercise of our supporter's rights.

8. Comm2A serves as a resource for authors of newspaper and magazine articles as well as television and radio programs dealing with various aspects of the right to keep and bear arms.

9. Over the last several years, Comm2A has itself, and in concert with the Washington-based Second Amendment Foundation, researched and analyzed the Massachusetts Handgun Sales Regulation (940 CMR 16.00, *et seq*.) that is at issue in this lawsuit.

**DECLARATION OF Comm2A**
**In Support of PLAINTIFFS' Opposition to Defendant ATTORNEY GENERAL'S Motion to Dismiss**
Page 1 of 2

AD Page 240 of 441

10.    Comm2A has been and is involved in legal action regarding the fundamental Constitutional right to the private ownership and possession of firearms.

    A.    Comm2A has sponsored multiple lawsuits in Massachusetts, all involving or related to the Second Amendment.

    B.    Comm2A is currently sponsoring four lawsuits in Federal Court within the District of Massachusetts, including the instant lawsuit, <u>Draper, et al. v. Coakley</u>.

11.    Comm2A is not a membership-based organization but as of on or about the date of this Declaration , 835 donors, the vast majority being MA based or having significant connections to MA, have made substantive donations averaging about $166 dollars each.

12.    Many Comm2A supporters have contacted Comm2A within the past few years specifically regarding the Massachusetts Handgun Sales Regulation that is at issue in this lawsuit.

13.    Many of Comm2A's supporters have asked Comm2A to take legal action to challenge the constitutionality of the Massachusetts Handgun Sales Regulation because as firearms dealers they cannot determine whether they may sell or transfer Gen3/4 Glock pistols to Massachusetts residents, or as Massachusetts residents want to but cannot purchase Gen3/4 Glock pistols because of Massachusetts firearms dealers' inability to determine whether and why or why not such pistols comply or do not comply with the Massachusetts Handgun Sales Regulation.


    I declare under penalty of perjury under the laws of the Commonwealth of Massachusetts that the foregoing is true and correct to the best of my knowledge.


9/17/14

_____          _____
Date                                                    Thomas Bolioli.
                                                    Commonwealth Second Amendment, Inc.

_____          _____

**DECLARATION OF Comm2A**
**In Support of PLAINTIFFS' Opposition to Defendant ATTORNEY GENERAL'S Motion to Dismiss**
Page 2 of 2

AD Page 241 of 441

# Tab 6b

Declaration in Support of
Opposition to Motion to
Dismiss

(by Second Amendment
Foundation, Inc.)

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

(1)  ROBERT DRAPER;

(2)  ARIEL WEISBERG;

(3)  DONNA MAJOR;

(4)  ERIC NOTKIN;

(5)  ROBERT BOUDRIE;

(6)  BRENT CARLTON,

> collectively, the
> "CONSUMERS", and

(7)  CONCORD ARMORY, LLC;

(8)  PRECISION POINT FIREARMS, LLC;

> collectively, the
> "DEALERS", and

(9)  SECOND AMENDMENT
     FOUNDATION, INC.,

(10) COMMONWEALTH SECOND
     AMENDMENT, INC.

> collectively, the
> "ORGANIZATIONS", and

Plaintiffs

v.

MARTHA COAKLEY,
> in her official capacity as
> ATTORNEY GENERAL OF
> MASSACHUSETTS

Defendant

Civil Action No.
**1:14-CV-12471**

# DECLARATION OF SECOND AMENDMENT FOUNDATION

## [Through Mikolaj Tempski, Esq., its General Counsel]

## IN SUPPORT OF PLAINTIFFS' OPPOSITION TO THE DEFENDANT ATTORNEY GENERAL'S MOTION TO DISMISS

I, **Mikolaj Tempski, Esq.,** am an attorney duly admitted in all courts of the State of Washington, the United States Courts of Appeal for the Ninth and Tenth Circuits, and the United States Supreme Court, and am the general counsel for plaintiff Second Amendment Foundation (hereafter "SAF"). I make this declaration in my capacity as plaintiff SAF's general counsel. I have personal knowledge of the matters set forth in this declaration, and as to those matters of which I do not have direct personal knowledge, I state them based on a good-faith belief based on other facts of which I do have direct personal knowledge. If called upon to do so, I would truthfully and competently testify regarding the contents of this declaration in a court of law.

1. SAF was founded in 1974.

2. SAF is a tax-exempt Washington-state non-profit corporation organized under §501(c)(3) of the IRS code.

3. SAF produces publications regarding the fundamental Constitutional right to the private ownership and possession of firearms, and maintains websites regarding such issues.

    A. SAF publishes TheGunMag.Com which is recognized as the source publication for the firearms community and firearm industry.

    B. SAF publishes the world's only women's firearms magazine, the bi-monthly Women & Guns, as well as the monthly newsletter, The Gottlieb-Tartaro Report, and the quarterly member/supporter newsletter SAF Reporter.

    C. SAF publishes the premier annual reference book of key firearm-issue articles, the Journal on Firearms and Public Policy.

4. SAF conducts research and provides training on state and federal firearms laws, including existing and proposed firearms laws and regulations in Massachusetts.

    A. SAF hosts or co-sponsors with other groups a number of free grassroots seminars and meetings, including the annual Gun Rights Policy Conferences (GRPC) at which legislative and judicial actions of the previous year are reviewed and strategies are discussed for the coming year by leaders of national, state and local pro-gun organizations.

**DECLARATION OF SAF (Through Mikolaj Tempski, Esq., its General Counsel)**
**In Support of PLAINTIFFS' Opposition to Defendant ATTORNEY GENERAL'S Motion to Dismiss**
Page 1 of 3

AD Page 244 of 441

B.      Each year SAF also sponsors—in cooperation with the Citizens Committee for the Right to Keep and Bear Arms, and other organizations—state and regional Leadership Training Conferences for grassroots activists.

C.      SAF disseminates information and reference packets to high school and college students preparing class papers on firearms-related questions and has a library resource program that places pro-gun reference books and monographs in public and school libraries.

D.      SAF serves as a resource for authors of books, newspaper and magazine articles and television and radio programs dealing with various aspects of the right to keep and bear arms.

E.      Over the last several years, SAF has itself, and in concert with the Massachusetts-based Commonwealth Second Amendment, researched and analyzed the Massachusetts Handgun Sales Regulation (940 CMR 16.00, *et seq.*) that is at issue in this lawsuit.

5.      SAF has been and is involved in legal action regarding the fundamental Constitutional right to the private ownership and possession of firearms.

A.      SAF has sponsored multiple lawsuits throughout the United States, including in Massachusetts, involving the Second Amendment. It sponsors and is an active participant in as many as two dozen active court cases at any one time.

B.      Most notably, SAF authored an *amicus curiae* brief in support of the plaintiff in the landmark decision of <u>District of Columbia v. Heller</u>, 554 U.S. 570 (2008), in which the Supreme Court held that the Second Amendment protects an individual right to possess a firearm unconnected with service in a militia, and to use that arm for traditionally lawful purposes, and that the sorts of weapons protected are those "in common use at the time".

C.      SAF then participated as a plaintiff in and prosecuted the landmark case <u>McDonald v. Chicago</u>, 561 U.S. 742 (2010) in which the Supreme Court extended its decision in <u>District of Columbia v. Heller</u>, holding that the Second Amendment right of an individual to "keep and bear arms" is incorporated by the Due Process Clause of the

**DECLARATION OF SAF (Through Mikolaj Tempski, Esq., its General Counsel)**
**In Support of PLAINTIFFS' Opposition to Defendant ATTORNEY GENERAL'S Motion to Dismiss**
Page 2 of 3

AD Page 245 of 441

1    Fourteenth Amendment and applies to the states.

2         D.    SAF is currently sponsoring several lawsuits throughout the United States,

3    including the instant lawsuit, Draper, et al. v. Coakley.

4    6.    SAF currently has approximately 650,000 members and supporters nationwide.

5    7.    As of the date of this Declaration, SAF has 8,066 members and supporters in

6    Massachusetts. Of these, 1,847 are 2014 paid members/donors or life members.

7    8.    Approximately 40 to 70 SAF members have contacted SAF within the past year

8    specifically regarding the Massachusetts Handgun Sales Regulation that is at issue in this

9    lawsuit.

10   9.    Many of SAF's members have asked SAF to take legal action to challenge the

11   constitutionality of the Massachusetts Handgun Sales Regulation because as firearms dealers

12   they cannot determine whether they may sell or transfer Gen3/4 Glock pistols to

13   Massachusetts residents, or as Massachusetts residents want to, but cannot, purchase Gen3/4

14   Glock pistols because of Massachusetts firearms dealers' inability to determine whether and

15   why or why not such pistols comply or do not comply with the Massachusetts Handgun Sales

16   Regulation.

17

18        I declare under penalty of perjury under the laws of the State of Washington that the

19   foregoing is true and correct to the best of my knowledge.

20

21   _September 17TH, 2014_____          _____

22            Date                                     Mikolaj Tempski, Esq.

23                                                     General Counsel

24                                                     Second Amendment Foundation, Inc.

25

26

27

28

**DECLARATION OF SAF (Through Mikolaj Tempski, Esq., its General Counsel)**
**In Support of PLAINTIFFS' Opposition to Defendant ATTORNEY GENERAL'S Motion to Dismiss**
Page 3 of 3

AD Page 246 of 441

# Tab 7

**Reply to Opposition to Motion to Dismiss**

(by defendant Attorney General)

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROBERT DRAPER, et al. ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | 1:14-CV-12471-NMG |
| ) | |
| MARTHA COAKLEY, in her official capacity as ) | |
| ATTORNEY GENERAL OF MASSACHUSETTS ) | |
| ) | |
| Defendant. ) | |

## DEFENDANT'S REPLY MEMORANDUM ON MOTION TO DISMISS

This reply memorandum addresses the faulty assertions in Plaintiffs' Opposition regarding organizational standing, constitutional vagueness, the Second Amendment, and abstention. Each issue is dealt with briefly below.

### A. **Organizational Standing**

Plaintiffs Second Amendment Foundation ("SAF") and Commonwealth Second Amendment ("Comm2A") failed to establish standing in the Complaint in this action. See Memorandum in Support of Motion to Dismiss ("AG's Memo"), filed Aug. 25, 2014, at 3-4. Neither organization identified an injury to its members[1] or to itself. In an effort to cure this

---

[1] In fact, Comm2A confirmed that it does not even have members, just donors. Opposition to Motion to Dismiss ("Opposition"), filed Sept. 18. 2014, at 6; Bolioli Decl. ¶ 11.

defect, Plaintiffs have now submitted affidavits from these organizations,[2] but the affidavits are insufficient.  They do not identify any concrete injury to organization members or to the organizations.  They simply note that organization members and supporters have questions about the legality of purchasing and selling Glocks.  There is no indication that any specific members actually attempted to purchase Glocks, nor do the affidavits name any members who were dissuaded from selling Glocks because of the handgun sales regulations.  Without a specific injury to their members or to themselves, the organizations lack standing.[3]  See Summers v. Earth Island Institute, 555 U.S. 488, 498-99 (2009) (the "requirement of naming the affected member has never been dispensed with in light of statistical probabilities"); Kachalsky v. Cacace, 817 F. Supp. 2d 235, 251 (S.D.N.Y. 2011) (SAF failed to identify particular members who had standing), aff'd sub nom. on other grounds Kachalsky v. Cnty. of Westchester, 701 F.3d 81 (2d Cir. 2012).

**B. <u>Vagueness</u>**

Plaintiffs' central claims in this litigation are facial and as-applied constitutional vagueness challenges against the load indicator provision of 940 Mass. Code Regs. 16.05(3). See Compl. ¶¶ 2, 68, 73.  The Attorney General moved to dismiss both claims under Fed. R. Civ. P. 12(b)(1) and (6).  AG's Memo at 6, 8.  Plaintiffs' Opposition misapprehends the standards for these constitutional claims, and its arguments do not save the Complaint.

_____

[2] Plaintiffs also failed to amend their Complaint to reflect any claims made by SAF or Comm2A.

[3] Plaintiffs also point to their general advocacy work in the Second Amendment arena and argue that this provides them with standing to bring suit.  Opposition at 4-6.  Cases cited by Plaintiffs on this point are inapplicable.  In each of those cases the organization suffered a concrete injury which provided the basis for standing.  Simply wanting a forum in which to advocate on policy is insufficient.  See Sierra Club v. Morton, 405 U.S. 727, 739-40 (1972) (mere "interest in a problem" is insufficient to confer standing); Hodgkins v. Holder, 677 F. Supp. 2d 202, 206 (D.D.C. 2010) (SAF's voluntary act of teaching constituents about the laws at issue "cannot plausibly be the basis for a claim of constitutional injury").

AD Page 249 of 441

To defeat a regulation based on facial vagueness, a plaintiff must show that "no set of circumstances exists under which the Act would be valid." United States v. Salerno, 481 U.S. 739, 745 (1987). That is not the case here. See AG's Memo at 7.[4]  Plaintiffs respond by citing and quoting extensively from FCC v. Fox Television Stations, Inc., 132 S. Ct. 2307 (2012). Opposition at 12-13. However, Fox addresses an as applied challenge, and Plaintiffs do not discuss the Salerno test, which is the standard for facial claims. Plaintiffs have failed to meet the constitutional standard, and the facial vagueness claim must be dismissed.

Similarly, Plaintiffs provide no support for their as-applied challenge to the regulation and instead make two arguments. The first argument mischaracterizes the Attorney General's reference to various Complaint Exhibits, and the second argument suggests that the Attorney General impermissibly failed to explain *why* she determined that the Gen 3 and 4 Glock pistols fail the regulatory standard. Opposition at 17-20. Neither argument saves Plaintiffs' as-applied claim.

Plaintiffs argue that the Attorney General's references to various Complaint Exhibits in the Motion to Dismiss provide insight into the Attorney General's thought process in rejecting the Glock firearms under 940 Mass. Code Regs. 16.05(3), and that this somehow assists their as-applied challenge. The Complaint Exhibits in question are copies of manuals from non-Glock firearms, as well as a copy of the Glock manual. See AG's Memo at 12-14; Compl. Exs. 39-43. The Attorney General cited to these manuals simply to refute an allegation in the Complaint: Plaintiffs alleged that the Attorney General had approved the Kahr Arms, Heckler & Koch, and Beretta 92-series load indicators, while rejecting a "virtually identical" load indicator from

---

[4] For a discussion of post-Salerno developments in this area of law, see AG's Memo at 6-7, nn. 9-10.

AD Page 250 of 441

Glock.[5]  Compl. ¶ 69.3 (emphasis omitted).  Indeed, Plaintiffs' own Exhibits show that the load

indicators from these different manufacturers are in fact quite different from the Glock load

indicator.  AG's Memo at 13-14.[6]  The statements in the Memorandum do not undercut the

Attorney General's Motion or supply support for Plaintiffs' position.

The only other defense Plaintiffs have for their as-applied vagueness challenge focuses

on the Attorney General's alleged refusal to provide an explanation for *why* the Glock load

indicators fail the regulatory standard.  This is not relevant to Plaintiffs' constitutional vagueness

challenge.  The vagueness doctrine is concerned with *whether* the Plaintiffs, as people of

ordinary intelligence, can determine if Glocks comply with the regulation, not *why* the Attorney

General reached her conclusion that they do not.  See United States v. Williams, 553 U.S. 285,

304 (2008).  The Complaint acknowledges that the Attorney General provided Plaintiff-dealers

with letters well before the filing of this suit that stated clearly that the Glocks in question do not

meet the regulatory standard.  Compl. ¶ 70.1; AG's Memo at 4.  These letters were sufficient to

give the dealers fair, actual notice that selling Gen 3 and 4 Glock pistols was prohibited.  See

Ward v. Rock Against Racism, 491 U.S. 781, 795-96 (1989); United States v. Zhen Zhou Wu,

711 F.3d 1, 15-16 (1st Cir. 2013).  Thus, there is no as-applied vagueness claim available here.

Plaintiffs attempt to twist the issue—claiming that the Attorney General's decision that

the Glock load indicator fails the regulatory requirement was arbitrary and capricious.  But, this

is not the test for vagueness.  Plaintiffs are essentially arguing that the application of the

regulation is incorrect, rather than that Plaintiffs are uncertain whether the Attorney General will

allow them to buy Glocks under the regulation.  The correctness of the Attorney General's

---

[5] Even if it were relevant, any argument or discussion regarding the Attorney General's reasons
would be more suitably raised in a motion for summary judgment.

[6] Our discussion also noted that even with Exhibits chosen by the Plaintiffs, one can see how the
regulation applied to Glocks.  AG's Memo at 12.

interpretation of the regulation is a state law substantive claim, one that Plaintiffs are not entitled to bring in federal court. Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 117 (1984). There is no constitutional vagueness claim here, and the matter should be dismissed.

**C. Second Amendment**

Plaintiffs have substantially limited their Second Amendment claim, stating that:

> [W]hether a regulatory "load indicator" requirement is or is not closely or substantially related to an important or compelling government purpose, or what level of scrutiny should be applied to such a regulation, is not the subject of the Complaint and is irrelevant to the issues before this Court.

Opposition at 10. Thus, in this litigation, it is now not necessary to engage in the constitutional scrutiny analysis or to determine whether or not the Second Amendment even reaches safety restrictions that limit dealer sales of Glocks, while allowing the sales of numerous other handguns. As Plaintiffs now cabin it, the Second Amendment claim is wholly derivative of the dealers' vagueness claim, Opposition at 10-11, and must be dismissed if the vagueness claim is dismissed.

Plaintiffs also opine that consumers' Second Amendment rights are "chilled" by the alleged uncertainty surrounding the implementation of the regulation. Opposition at 11. This argument fails to advance Plaintiffs' cause. First, there is no uncertainty surrounding the application of the regulation to Glock pistols. See supra at 4, ¶ 2. Second, Plaintiffs have not cited any authority for the proposition that the "chilling effect" doctrine applies to the Second Amendment. This is a First Amendment doctrine. See, e.g., National Organization for Marriage v. McKee, 649 F.3d 34, 62 (1st Cir. 2011). It has not been expanded into the Second Amendment arena. See Hightower v. City of Boston, 693 F.3d 61, 80-81 (1st Cir. 2012). Cf. United States v. Chester, 628 F.3d 673, 688 (4th Cir. 2010) (Davis, J., concurring) ("[O]verbroad regulations can easily encourage speakers to modify their speech. . . . No analogous arguments obtain in the Second Amendment context. As there can be little doubt that advocates of a robust

AD Page 252 of 441

individual right to bear arms will continue to challenge *all* firearm regulations, importing the over-breadth doctrine . . . into the Second Amendment context would be inappropriate.").

###    D.    <u>Abstention</u>

In their Opposition, Plaintiffs claim that the Attorney General's request for abstention is inappropriate because interpretation of the state regulation is "a direct implementation of federal law."  Opposition at 21.[7]  Plaintiffs reach this conclusion based on a misunderstanding of the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A, which is the source of authority for the load indicator regulation.  940 Mass. Code Regs. 16.00.  Plaintiffs point to the text of c. 93A, which notes that regulations under c. 93A "shall not be inconsistent with the rules, regulations and decisions of the Federal Trade Commission and the Federal Courts interpreting the provisions of 15 U.S.C. 45(a)(1) (The Federal Trade Commission Act), as from time to time amended."  Mass. Gen. Laws ch. 93A, § 2(c).  Regarding suits brought under c. 93A, the Act also notes, "It is the intent of the legislature that . . . in actions brought under [c. 93A], the courts will be guided by the interpretations given by the Federal Trade Commission and the Federal Courts to section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)), as from time to time amended."  Mass. Gen. Laws ch. 93A, § 2(b).  Based on these provisions, Plaintiffs argue that the key text for the Court to interpret in this case must actually be the Federal Trade Commission Act.  <u>See</u> Opposition at 21.  This is simply incorrect.

While the state statute does indeed reference the Federal Trade Commission Act in § 2, it merely notes that regulations cannot be "inconsistent"[8] with FTC Act requirements and that

---

[7] Plaintiffs also allege that the state action would be based upon the parallel state due process claim, but the state court's substantive interpretation of the regulation would precede a constitutional interpretation under the doctrine of constitutional avoidance.

[8] Inconsistency has been interpreted to mean actual conflict.  <u>See</u> <u>Purity Supreme, Inc. v. Attorney Gen.</u>, 380 Mass. 762, 780 (1980) ("States are not forbidden, however, from adopting rules more restrictive than those of the FTC.").

AD Page 253 of 441

courts interpreting c. 93A in litigation should look to the FTC Act for "guidance."  Neither restriction prevents the state court from fashioning its own, more expansive, views of the meaning of c. 93A.  Indeed, the definition of unfairness itself, the central pillar of c. 93A, is different under federal and state case law.  Compare Gossels v. Fleet Nat. Bank, 453 Mass. 366, 373 (2004), with In the Matter of Int'l Harvester Co., 104 F.T.C. 949 (1984).

The Supreme Judicial Court has noted that c. 93A and its regulations may differ from the FTC Act and its interpretations.  The state law may be more restrictive of businesses and handle issues to which the federal statute has not been applied.  See Purity Supreme, Inc., 380 Mass. at 780; cf. Mobil Oil Corp v. Attorney Gen., 361 Mass. 401, 411-412 (1972).  In fact, the Supreme Judicial Court has held that the Attorney General's regulations may cover new ground specifically on firearms, because the federal consumer protection statutes do not cover these issues.  Am. Shooting Sports Council, Inc. v. Attorney Gen., 429 Mass 871, 875-76 (1999).  Thus, the regulation here is not a "direct implementation of federal law,"[9] and if interpretation of the regulation is necessary, that is a matter of state law.[10]

---

[9] Opposition at 21.

[10] Plaintiffs also insinuate that the Attorney General is hiding the possibility that it would seek deference to the Attorney General's interpretation should the Plaintiffs bring an action in state court.  In fact, as has been true here in this court, the Attorney General does indeed seek deference to its interpretation.  The terms in the regulation are straightforward and in common use, and we advocate for the Court to accept this and reject the vagueness challenge. AG's Memo at 8-12.  However, if the Court does decide that there needs to be judicial interpretation of the language beyond this point, in order, for instance, to limit the construction and avoid the Constitutional issue, that interpretation should be done by a state court rather than a federal court.  See AG's Memo at 22-24.

AD Page 254 of 441

## **Conclusion**

For the foregoing reasons and those set forth in the AG's Memo, the Complaint should be

dismissed, and, if not dismissed, this Court should exercise abstention.

MARTHA COAKLEY
ATTORNEY GENERAL

 /s/ Glenn Kaplan
Glenn Kaplan, BBO# 567308
Assistant Attorney General
Office of the Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 727-2200
glenn.kaplan@state.ma.us

Dated:  October 1, 2014

## **CERTIFICATE OF SERVICE**

I hereby certify that this document was filed through the Electronic Case Filing (ECF)
system and thus copies will be sent electronically to the registered participants as identified on
the Notice of Electronic Filing (NEF); paper copies will be sent to those indicated on the NEF as
non registered participants on or before October 1, 2014.

 /s/ Glenn Kaplan
Glenn Kaplan, BBO# 567308
Assistant Attorney General

AD Page 255 of 441

# Tab 8

Response to Reply
to Opposition to
Motion to Dismiss

(by plaintiffs)

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **(1)  ROBERT DRAPER;** | **Civil Action No.** |
| **(2)  ARIEL WEISBERG;** | 1:14-CV-12471-NMG |
| **(3)  DONNA MAJOR;** | |
| **(4)  ERIC NOTKIN;** | |
| **(5)  ROBERT BOUDRIE;** | |
| **(6)  BRENT CARLTON,** | |

*collectively, the*
          **"CONSUMER PLAINTIFFS"***, and*

**(7)  CONCORD ARMORY, LLC;**

**(8)  PRECISION POINT FIREARMS, LLC;**

*collectively, the*
          **"DEALER PLAINTIFFS"***, and*

**(9)  SECOND AMENDMENT FOUNDATION, INC.,**

**(10) COMMONWEALTH SECOND AMENDMENT, INC.**

*collectively, the*
          **"ORGANIZATIONS"***, and*

# PLAINTIFFS' RESPONSE TO DEFENDANT'S REPLY MEMORANDUM

                              Plaintiffs

v.

**MARTHA COAKLEY,**
     *in her official capacity as*
          **ATTORNEY GENERAL OF MASSACHUSETTS**

                              Defendant

---

# INTRODUCTION AND SUMMARY OF ARGUMENT

Now that the defendant ATTORNEY GENERAL (hereafter "AG") has extensively and exhaustively briefed this Court on the alleged defects in the PLAINTIFFS' Complaint, the core issue to be determined is whether the Complaint's "combined allegations, taken as true" state a "plausible, not merely a conceivable, case for relief"[1] warranting the continued litigation of this matter for resolution *on the merits*.  The answer to this fundamental question is a resounding "yes".

# ARGUMENT

## I.   The AG Invents a New Pleading Standard to <u>Challenges the ORGANIZATIONS' Standing</u>

The AG alleges in her REPLY (pp. 1-2) that the ORGANIZATIONS have not "identified ... any concrete injury to [their] members...  [Their members] simply ... have questions about the legality of purchasing and selling Glocks."  But the language in the ORGANIZATIONS' respective declarations [SAF Dec., ¶9;  COMM2A Dec., ¶13] is to the contrary:

> "Many of [SAF's and COMM2A's members who are] firearms dealers [ ] cannot determine whether they may sell or transfer Gen3/4 Glock pistols to Massachusetts residents... [and SAF's and COMM2A's members who are] Massachusetts residents want to but cannot purchase Gen3/4 Glock pistols because of Massachusetts firearms dealers' inability to determine whether and why or why not such pistols comply or do not comply with the Massachusetts Handgun Sales Regulation."

Relying on a single authority applicable in this Circuit (<u>Summers v. Earth Island Institute</u>, 555 U.S. 488 (2009)), the AG further attacks the ORGANIZATIONS' declarations for "not identif[ying] ... any specific members [who] actually attempted to purchase Glocks [or who were] dissuaded from selling Glocks because of the handgun sales regulations."  REPLY, p. 2.  But that level of specificity is not required at this stage of litigation.  Indeed, <u>Ocasio-Hernández v. Fortuño-Burset</u>, 640 F. 3d 1, 14 (1st Cir. 2011) cited the *actual* level of fact specificity required to overcome a *motion to dismiss* in both <u>Iqbal</u> and <u>Twombly</u>:

---

[1]   <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009), quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)).

[C]f. Iqbal, 129 S.Ct. at 1951 (accepting allegations that the FBI "arrested and detained **thousands of Arab Muslim men**" pursuant to a policy that was "approved by [the defendants] in discussions in the **weeks** after September 11, 2001") (internal quotation marks omitted);  Twombly, 550 U.S. at 550-51, 564-65, 127 S.Ct. 1955 (accepting allegations that defendants "engaged in **parallel conduct**" and failed to "meaningfully … pursue **attractive business opportunities**") (alterations omitted) (internal quotation marks omitted)…"  [New emphasis in bolded italics.]

It is now understandable why the AG failed to mention in her REPLY that the dicta from Summers upon which she relies—"the 'requirement of naming the affected member has never been dispensed with in light of statistical probabilities'" (Id., 498-499)—concerned the District Court's "**adjudicat[ion] [of] the merits** of Earth Island's challenges" (Id., p. 492, emphasis in bolded italics), not a motion to dismiss.   Nowhere in Summers did the Court require "naming the affected member" at the initial pleading stage, nor is "motion to dismiss" mentioned anywhere in the decision.

The AG also alleges that the OPPOSITION affidavits do not identify "any concrete injury to … the organizations."  REPLY, pp. 1-2.  This, too, is wrong.  SAF and COMM2A both identified specific injuries to themselves.  SAF and COMM2A have spent their own time and their own resources researching and analyzing the very REGULATION at the heart of this lawsuit.  SAF Dec., ¶4.E;  COMM2A Dec, ¶9.  Both organizations have incurred financial loss because of the REGULATION and in sponsoring the current lawsuit.  SAF Dec., ¶5.D;  COMM2A Dec., ¶10.B.

Unlike the AG's invented pleading standard, "the requirement of plausibility on a motion to dismiss under Rule 12(b)(6) 'simply calls for enough fact to raise a *reasonable expectation that discovery will reveal evidence* of the [complained of conduct].'"  Ocasio-Hernández v. Fortuño-Burset, 17, quoting from Twombly, *supra*, at 556 (emphasis added in italics).  The ORGANIZATIONS will comply with requests asking for the identification of their members and/or supporters described in their respective declarations, but the case must progress to discovery.

## II.  The AG Contorts the Complaint's Facial and <u>As-Applied Vagueness Claims</u>

The AG asserts that "Plaintiffs' Opposition misapprehends the standards for [facial and as-applied constitutional vagueness] claims."  REPLY, p. 2.  She relies on United States v. Salerno, 481 U.S. 739, 745 (1987) to announce that "To defeat a **regulation** based on facial vagueness, a plaintiff must

show that 'no set of circumstances exists under which the Act would be valid.'"  REPLY, p. 3, emphasis in bolded italics.  But Salerno itself, *in the very same sentence* no less, explicitly states "A facial challenge to a **legislative Act** ... must establish that no set of circumstances exists under which the **Act** would be valid."  Surely even the AG would concede that a legislative branch Act is not the same as an executive branch regulation.  But she is wrong even if the Salerno 'no set of circumstances' standard does apply because *all semi-automatic pistols*, including the Gen 3/4 Glock pistols that are the subject of this lawsuit, have "load indicators" inherent in their design—the slide.  OPPOSITION, pp. 13-14.  Phrased in Salerno language, "Under 'no set of circumstances' can semi-automatic pistols *not* comply with the REGULATION's load indicator requirement."  The meaninglessness of the "load indicator" requirement due to the incurably vague "device which plainly indicates" language violates even rational-basis scrutiny since "'rational basis' is not just [a] standard of scrutiny, but the very substance of the constitutional guarantee."  District of Columbia v. Heller, 554 U.S. 570, 628 n. 27 (2008).  The AG chides the OPPOSITION's reliance on FCC v. Fox Television Stations, Inc., 132 S. Ct. 2307 (2012) which she states "addresses an as applied challenge."  REPLY, p. 3.  This is irrelevant, as the OPPOSITION made clear (p. 10), as its reliance on FCC v. Fox Television Stations, Inc. was for "the Supreme Court['s] summarize[y] [of] the axiomatic 'void-for-vagueness' precept of due process, which requires that statutes and regulations be sufficiently clear and precise so that persons of ordinary intelligence subject to them can reasonably ascertain what conduct is required and/or what conduct is forbidden."

The REPLY's gripes with the PLAINTIFFS' *as-applied* vagueness challenges only amplify the PLAINTIFFS' facial vagueness claim.  The REPLY repeats the Motion to Dismiss [pp. 13-14] contention that "Plaintiffs' own Exhibits show that the load indicators from these different manufacturers are **in fact** quite different from the Glock load indicator."  REPLY, p. 4, emphasis in bolded italics.  This is not a *legal* argument for a motion to dismiss;  it is a denial of fact properly made in an Answer.  The AG then alleges that it is the "Plaintiffs [who] attempt to twist the issue—claiming that the Attorney General's decision that the Glock load indicator fails the regulatory requirement was arbitrary and capricious [which] is not the test for vagueness."  Id.  She is right that the test for vagueness is not her arbitrary and capricious "decision that the Glock load indicator fails the regulatory requirement" but her allegation that PLAINTIFFS claimed that this is the test for vagueness is flat-out wrong.  The

PLAINTIFFS claimed and continue to vociferously claim that *facially* vague definition of "load indicator" created the circumstances for the "Attorney General[ ] [*as-applied* arbitrary and capricious] decision that the Glock load indicator fails the regulatory requirement."  Stated more succinctly, the AG's arbitrary and capricious decision that Gen3/4 Glock pistols do not comply with the REGULATION's "load indicator" alternative design requirement ***is the result or product of*** the REGULATION's vagueness.

It is understandable, then, that the AG seeks to avoid discovery (e.g. her Motion to Dismiss and Motion to Stay Discovery Pending Resolution of her Motion to Dismiss [Document No. 13 (29 August 2014)]) to not have to answer questions along the lines of:

> Identify in the REGULATION, CMR, MGL, on the Firearms Bureaus' website, on YOUR website or any non-government source referenced in any of these government sources, the *criteria* (i.e. size, shape, location, color, texture, mechanical activeness/passiveness, etc.) for complying with the "load indicator" alternative design requirement of 940 CMR 16.05(3).

The Complaint's "combined allegations, taken as true" much more than adequately state a "plausible, not merely a conceivable, case for relief" on its facial and as-applied void-for-vagueness challenges to the REGULATION's "load indicator" alternative design requirement.

### III.  The AG Hijacks this Lawsuit to Argue Her Own Second Amendment Agenda

While conceding "that 16.05(3) bars sale (sic) … of a particular model of a particular brand of handgun that plaintiffs want to buy…" [Motion to Dismiss, p. 20][2], the AG continues in her REPLY to deflect attention from the CONSUMERS' *actual* claim of the cause of the burden/infringement on their Second Amendment right—the ***unconstitutional vagueness*** in the REGULATION's definition of "load indicator".  The AG attempted in her Motion to Dismiss to transform the CONSUMERS' Second Amendment claim into a controversy over the "the Commonwealth's important interest in promoting public safety" [Id., 16] in requiring "that a firearm sold in-state by a licensed dealer contain those [safety] devices" (Id., pp. 20-21) and concluded that even if it violated the Second Amendment the "load indicator" alternative design requirement withstands intermediate constitutional scrutiny

---

[2]   The AG barred the sale of ***all*** Gen3/4 Glock pistol models.  Complaint, ¶38.

because it is "substantially related to the Attorney General's public safety objective."  Id., p. 22.

Chanting the same non-issue safety mantra, the AG rejoices in her REPLY over the false assertion that

the CONSUMERS have "substantially limited their Second Amendment claim ... [so] it is now not

necessary to engage in the constitutional scrutiny analysis ..."  REPLY p. 5.  She cites out-of-context

language from the OPPOSITION [REPLY, p. 5] which, back in its context, exposes her ruse:

> "[T]he Complaint does not challenge the ATTORNEY GENERAL's **authority to
> promulgate firearm-related regulations** or that the REGULATION's "load indicator"
> requirement (*independent of its unconstitutionally vague definition*) is unconstitutional
> **per se**."  OPPOSITION, p. 10 (new emphasis in bolded text;  original italics).

Neither of these allegations is the subject of this lawsuit.  The AG is flat wrong in asserting that "it is

now not necessary to engage in the constitutional scrutiny analysis".  Once the Second Amendment is

burdened or infringed—as it clearly is since the CONSUMERS have been and are being unjustifiably

deprived of firearms in common use, i.e. Gen3/4 Glock pistols (Complaint, ¶34)—"we evaluate the law

under some form of means-end scrutiny."  Fletcher v. Haas, 851 F.Supp.2d 287, 292 (2012).

If the AG seeks a declaration that a regulatory 'load indicator' requirement "is substantially

related to the Commonwealth's important interest in promoting public safety" [Motion to Dismiss, p.

16] and that some specific level of scrutiny should be applied to such a regulation [Id., p. 20] she

should file her own lawsuit rather than hijack this case to advance her cause.

The REPLY contends that the Second Amendment cannot have been implicated by "uncertainty

surrounding the application of the regulation to Glock pistols" because the AG "provided [DEALERS]

with letters ... that stated clearly that the Glocks in question do not meet the regulatory standard."  The

regurgitation of this constitutionally scornful Motion to Dismiss "because I said so" standard for

determining compliance with the REGULATION" is not a Second Amendment issue and is addressed by

the OPPOSITION at Section II.B (pp. 6-9).

Relying on two authorities in this Circuit (Hightower v. City of Boston, 639 F.3d 61 (1st Cir.

2012) and Nat'l Org. for Marriage v. McKee, 649 F. 3d 34 (1st Cir. 2011)), the REPLY contends that

"Plaintiffs have not cited any authority for the proposition that the 'chilling effect' doctrine applies to

the Second Amendment."  Id., p. 5.  But there is nothing in Nat'l Org. for Marriage *confining* the

avoidance of chilling the exercise of a constitutional right to the First Amendment.  Hightower did not

even involve a vagueness challenge;  the word "vague" (in any form) appears *once* in the decision.  If that were not enough, a search of federal cases for the term "chilling effect doctrine" referred to in the REPLY yields 24 results *nationwide*, with a 1972 Rhode Island District Court case in which the term is used in passing one time (and which case was reversed by the Court of Appeal that same year) and a single Supreme Court case from 1967 in which the term was used one time in passing, in a footnote.

<u>Hightower</u> is important for a different reason:  the Court of Appeal highlighted the Supreme Court's analysis in <u>Heller</u>, *supra*, of an instance of the application of a facially unconstitutional law:

> "<u>Heller</u> involved a challenge to a 'total ban' on handgun possession in the home, brought by an individual whose attempt to register the handgun was denied based on this ban. <u>Heller</u>, 128 S.Ct. at 2788.  That was not an overbreadth challenge;  <u>Heller's</u> argument was that the total ban was unconstitutional, *including* as applied to his registration attempt." <u>Id.</u>, p. 82, original emphasis.

The PLAINTIFFS' claim of "facial invalidity" of the REGULATION is very similar to that in <u>Heller</u>, but from a subtly different perspective:  because ***no one*** can reasonably determine what does and does not comply with the words "device which plainly indicates" in the definition of "load indicator", ***all*** pistols offered for sale or transfer in Massachusetts by ***all*** handgun purveyors (including the DEALERS herein) are subject to the very same capricious and arbitrary enforcement by the AG, which in turn affects ***all*** Massachusetts consumers (including the CONSUMERS herein).  The REGULATION is "unconstitutional, *including* as applied to" the Glock pistols which the CONSUMES attempted to purchase, but which the DEALERS would not sell to them because of compliance uncertainty caused by the facially void-for-vagueness REGULATION.

At this early stage of this lawsuit where "plausibility" is the pleading standard (<u>Twombly</u> and <u>Iqbal</u>, *supra*) it borders on preposterous to argue that the direct, non-incidental chilling *impact* of the facially void-for-vagueness REGULATION does not implicate all Massachusetts consumers' (including the CONSUMERS' herein) Second Amendment right to acquire firearms in common use.

## IV.    The AG Misstates the OPPOSITION's Abstention Argument

The AG argues that the PLAINTIFFS "misunderstand" the Mass. Gen. Laws Chapter 93A § 2(c) requirement that "regulations under c. 93A "shall not be inconsistent with the rules, regulations and decisions of the Federal Trade Commission and the Federal Courts interpreting the provisions of 15

U.S.C. 45(a)(1) (The Federal Trade Commission Act)…"  REPLY, p. 6.  Citing <u>ASSC, Inc. v. Attorney Gen.</u>, 429 Mass 871, 875-76 (1999), she argues that "the Supreme Judicial Court has held that the Attorney General's regulations may cover new ground specifically on firearms, *because the federal consumer protection statutes do not cover these issues*."

The AG paints the holding in <u>ASSC</u> with too broad a stroke.  The <u>ASSC</u> Court held that the AG had authority to promulgate the REGULATION "in the interests of consumer protection" (<u>Id.</u>, 877) and "St. 1998, c. 180, 'An Act relative to gun control in the commonwealth' (Act)" which was enacted "*subsequent* to the issuance of the [REGULATION]."  <u>Id.</u>, 878-879.  The <u>ASSC</u> Court allowed the implementation of those provisions of the REGULATION "which *exactly or substantially replicate* provisions of the Act…" <u>Id.</u>, 884.  But the Act does **not** contain the "load indicator" requirement so the "load indicator" requirement is subsumed by the alternative "regulations under c. 93A "shall not be inconsistent with … the provisions of 15 U.S.C. 45(a)(1) (The Federal Trade Commission Act)…"

Even if, *arguendo*, the REGULATIONS' "load indicator" alternative design requirement is deemed not be the direct implementation of federal law, avoidance of <u>Pullman</u> abstention is nevertheless very much warranted in this case on multiple independent grounds enumerated in the OPPOSITION (pp., 20-25), not the least of which is the federal courts' "virtually unflagging obligation … to exercise the jurisdiction given them.'" <u>Jimenez v. Rodriguez Pagan</u>, 597 F. 3d 18, 27 (1st Cir. 2010).

# CONCLUSION

"A complaint need not allege every fact necessary to win at trial, but need only include sufficient facts to make it "'plausible on its face.'" <u>Rodríguez-Vives v. Puerto Rico Firefighters Corps.</u>, 743 F. 3d 278, 283 (1st Cir. 2014), quoting <u>Ashcroft</u> and <u>Twombly</u>, *supra*.  In this case the COMPLAINT pleads *facts* which go much further than merely making plausible facial and as-applied void-for-vagueness claims against the REGULATION's "load indicator" design requirement.  The OPPOSITION to the AG's Motion to Dismiss further articulates the practical defectiveness of the definition of "load indicator" in explicit detail.  The PLAINTIFFS respectfully submit that the AG's Motion to Dismiss should be denied and the case should be allowed to proceed to resolution on the merits.

Respectfully submitted,

Dated:  17 September 2014.

**ROBERT DRAPER;  ARIEL WEISBERG;  DONNA MAJOR;  ERIC NOTKIN;  ROBERTY BOUDRIE; BRENT CARLTON;  CONCORD ARMORY, LLC; PRECISION POINT ARMORY, LLC;  SECOND AMENDMENT FOUNDATION, INC.** and **COMMONWEALTH SECOND AMENDMENT, INC.**

By and through their attorney of record

**/s/ Alexander A. Flig**

_____

Alexander A. Flig, Esq (BBO #669132)
490 Chapman Street, Suite 201
Canton, Massachusetts 02021-2039
Telephone:    (781) 352-7260
Facsimile:     (781) 583-5080
E-Mail:      alex@fliglaw.com

## CERTIFICATE OF SERVICE

I hereby certify that this document was filed through the Electronic Case Filing (ECF) system and thus copies will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF);  paper copies will be sent to those indicated on the NEF as non-registered participants on or before 1 July 2014.

**/s/ Alexander A. Flig**

_____

# Tab 9

Amicus Brief in
Support of Motion
to Dismiss

(by Brady Center to Prevent Gun
Violence, Inc.)

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

ROBERT DRAPER, et al.,

      *Plaintiff,*

v.

MARTHA COAKLEY, in her official
capacity as ATTORNEY GENERAL OF
MASSACHUSETTS,

      *Defendant.*

Civil Action No. 1:14-cv-12471-NMG

Leave to file granted
on 10/6/2014

## BRIEF OF *AMICUS CURIAE* BRADY CENTER TO
## PREVENT GUN VIOLENCE
## IN SUPPORT OF DEFENDANT'S MOTION
## TO DISMISS ALL CLAIMS

Scott Harshbarger (BBO# 224000)
John E. Roberts (*Pro Hac Vice* pending)
Laura Stafford (BBO# 685347)
PROSKAUER ROSE LLP
One International Place
Boston, Massachusetts 02110
(617) 526-9600 (telephone)
(617) 526-9800 (facsimile)
sharshbarger@proskauer.com

*Attorneys for Amicus Curiae Brady
Center to Prevent Gun Violence*

# <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ....................................................................................................1

INTEREST OF *AMICUS CURIAE*...........................................................................................2

BACKGROUND ..........................................................................................................................2

     A.     Load Indicators Inform a User that a Gun is Loaded..............................................3

     B.     Load Indicators Have Been Used for More than a Century.....................................4

     C.     Load Indicators are Effective at Preventing Accidental Shootings ........................5

ARGUMENT .................................................................................................................................9

     A.     The Second Amendment Does Not Enshrine A Right to Unsafe Guns..................9

     B.     The Challenged Regulation Does Not Implicate Second Amendment Rights ......10

     C.     The Massachusetts Load-Indicator Regulation Is Substantially Related to the Government's Interest in Protecting its Citizens. ..................................................12

CONCLUSION............................................................................................................................14

i

AD Page 268 of 441

# TABLE OF AUTHORITIES

Page(s)

CASES

*Am. Shooting Sports Council v. Harshbarger*,
 711 N.E.2d 899 (Mass. 1999) .................................................................................................8

*Armstrong v. United States*,
 134 S. Ct. 1759 (2014).....................................................................................................10

*Colo. Outfitters Ass'n v. Hickenlooper*,
 ___ F. Supp. 2d __, No. 13-cv-01300, 2014 WL 3058518 (D. Colo. June 26,
 2014) ...................................................................................................................................11

*Davis v. Grimes*,
 __ F. Supp. 2d ___, No. 13-cv-10246, 2014 WL 1278082 (D. Mass Mar. 26,
 2014) ...............................................................................................................10, 12, 13

*Dist. of Columbia v. Heller*,
 554 U.S. 570 (2008)................................................................................................. passim

*Fletcher v. Haas*,
 851 F. Supp. 2d 287 (D. Mass. 2012) .....................................................................................9

*Heller v. Dist. of Columbia*,
 670 F.3d 1244 (D.C. Cir. 2011) ..........................................................................................13

*Hightower v. City of Boston*,
 693 F.3d 61 (1st Cir. 2012)....................................................................................................9

*IMS Health Inc. v. Ayotte*,
 550 F.3d 42 (1st Cir. 2008)..................................................................................................14

*Jackson v. City & Cnty. of San Francisco*,
 746 F.3d 953 (9th Cir. 2014) ...............................................................................................13

*Madsen v. Women's Health Ctr., Inc.*,
 512 U.S. 753 (1994).............................................................................................................13

*McDonald v. City of Chicago*,
 130 S. Ct. 3020 (2010)......................................................................................................9, 11

*Nat'l Treasury Emps. Union v. Von Raab*,
 489 U.S. 656 (1989).............................................................................................................13

ii

*Sorrell v. IMS Health Inc.*,
   131 S. Ct. 2653 (2011) ...................................................................................14

*United States v. Armstrong*,
   706 F.3d 1 (1st Cir. 2013) ..............................................................................10

*United States v. Booker*,
   644 F.3d 12 (1st Cir. 2011) ......................................................................10, 12

*United States v. Chovan*,
   735 F.3d 1127 (9th Cir. 2013) ........................................................................10

*United States v. Pruess*,
   703 F.3d 242 (4th Cir. 2012) ..........................................................................10

*United States v. Skoien*,
   614 F.3d 638 (7th Cir. 2010) (en banc) ..........................................................13

**CONSTITUTION AND STATUTES**

Cal. Penal Code §§3200 ............................................................................................8

Cal. Penal Code §§16380 ..........................................................................................8

Cal. Penal Code §§31910 ..........................................................................................8

Mass Gen. Laws Chapter 140, § 123 ......................................................................11

U.S. Const. Amendment 2 ................................................................................ passim

**OTHER AUTHORITIES**

940 C.M.R. § 16.05 ...................................................................................................7

Associated Press, *Pa. Dad Accidentally Shoots, Kills 7-year-old Son After
   Leaving Gun Store*, PennLive, Dec. 10, 2012 ..................................................3

Bianca Cain Johnson, *Teen Charged with Involuntary Manslaughter in Fatal
   Shooting Monday*, Augusta Chronicle, Nov. 12, 2013 .....................................3

Blake Bell, *Walnut Hill Man Accidentally Killed while Cleaning Gun*, The
   Atmore Advance, June 12, 2013 .......................................................................3

Chris Kirk & Dan Kois, *How Many People Have Been Killed by Guns Since
   Newtown?*, Slate.com, Dec. 31, 2013 ............................................................2, 9

Ctrs. for Disease Control & Prevention, *Age-Adjusted Death Rates from
   Firearms, By State: United States*, 2010 ..........................................................8

iii

Ctrs. for Disease Control & Prevention, *Number of Deaths from 113 Selected Causes, Enterocolitis Due to Clostridium Difficile, Drug-induced Causes, Alcohol-induced Causes, and Injury by Firearms, by Age: United States, 2011*......................................................................................................................2, 5, 6, 7

Garen J. Wintemute et al., *Unintentional Firearm Deaths in California*, 29 J. Trauma 457 (1989) .....................................................................................................7

Garen J. Wintemute et al., *When Children Shoot Children: 88 Unintended Deaths in California*, 257 JAMA 3107 (June 1987) ...........................................................7

Joe Heaney & Jason B. Johnson, *Gun Tragedy Leaves Toddler Dead; Youth Accidentally Shot 2-year-old, Police Say*, Boston Herald, Mar. 22, 1996................................8

Jon S. Vernick et al., *I Didn't Know the Gun Was Loaded: An Examination of Two Safety Devices that Can Reduce the Risk of Unintentional Firearm Injuries*, J. Public Health Pol'y 427, 427-40 (1999) ...................................................7

Jon S. Vernick, et al., *Unintentional and Undetermined Firearm Related Deaths: A Preventable Death Analysis for Three Safety Devices*, Injury Prevention 307 (2003) .......................................................................................................................7

Judy Rakowski, *Gun Control Urged as 2 Families Mourn*, Boston Globe, Mar. 17, 1996.....................................................................................................................8

Law Ctr. to Prevent Gun Violence, *The California Model: Twenty Years of Putting Safety First* (2013).....................................................................................8

Law Ctr. to Prevent Gun Violence, *Design Safety Standards Policy Summary*, Dec. 1, 2013 ........................................................................................................6

Law Ctr. to Protect Gun Violence, *Post-Heller Litigation Summary*, Aug. 4, 2014 ......................9

Office of the Attorney Gen., Cal. Dep't of Justice, Roster of Handguns Certified for Sale .................................................................................................................5

U.S. Patent No. 385,360.............................................................................................4

iv

## PRELIMINARY STATEMENT

Hundreds of Americans die each year from accidental shootings.  In an effort to combat this public-health problem, the Massachusetts Attorney General in 1997 promulgated a series of common-sense regulations designed to make guns and their users safer.  One of these regulations—the sole regulation challenged here—requires all guns sold by dealers in the Commonwealth to feature a load indicator, a device that alerts the user when the weapon is loaded and ready to discharge.  Numerous studies have concluded that load indicators reduce accidental shootings and save lives because they prevent the unintentional shootings that occur when people misperceive a gun to be unloaded.

Although the safety benefits of load indicators cannot be denied, Plaintiffs protest that the Massachusetts regulation treads on their Second Amendment rights.    Plaintiffs allege that the challenged regulation causes a single harm:  Their favorite model of handgun is not available for sale in the Commonwealth because it does not have a load indicator.  That alleged harm is insufficient to establish a Second Amendment violation for at least two reasons:

*First*, the Second Amendment protects only a citizen's right to keep and bear arms for self-defense, and the challenged regulation does not prevent anyone from purchasing or using a handgun for protection.  Indeed, Plaintiffs admit that a panoply of handguns are available for them to purchase in Massachusetts and use for self-protection notwithstanding the challenged regulation.  There is no right to unsafe or unreasonably dangerous guns.  The load-indicator regulation accordingly does not impede the right to self-defense enshrined in the Second Amendment.

*Second*, even if the load-indicator regulation did implicate the Second Amendment, it is substantially related to a significant government interest.  It is beyond doubt that protecting the

1

safety of its citizenry is a compelling purpose for the Commonwealth, and load indicators have proven to be an effective means of reducing accidental shootings. Consequently, the challenged regulation would easily survive any form of intermediate scrutiny.

## INTEREST OF *AMICUS CURIAE*[1]

The Brady Center to Prevent Gun Violence is a non-profit organization dedicated to reducing gun violence through education, research, and legal advocacy. The Brady Center has a substantial interest in ensuring that gun laws are properly interpreted to allow strong government action to prevent gun violence. Through its Legal Action Project ("LAP"), the Brady Center has filed numerous *amicus curiae* briefs in cases concerning gun-violence prevention and firearms laws, including in the Massachusetts Supreme Judicial Court's gun storage case, *Jupin v. Kask*, and the U.S. Supreme Court's Second Amendment cases, *District of Columbia v. Heller* and *McDonald v. City of Chicago*. The Brady Center has also advocated for gun manufacturers to utilize safety features that could save lives, including load indicators.

## BACKGROUND

Hundreds of Americans die each year after being shot by a firearm that accidentally discharged.[2] One man in Walnut Hill, Alabama, was recently killed when his shotgun

---

[1] No counsel for any party authored this brief in whole or in part, and no person or entity other than *Amicus* made a monetary contribution to its preparation or submission.

[2] Ctrs. for Disease Control & Prevention, *Number of Deaths from 113 Selected Causes, Enterocolitis Due to Clostridium Difficile, Drug-induced Causes, Alcohol-induced Causes, and Injury by Firearms, by Age: United States*, 2011, *available at* http://www.cdc.gov/nchs/data/nvsr/nvsr63/nvsr63_03.pdf; *see also* Chris Kirk & Dan Kois, *How Many People Have Been Killed by Guns Since Newtown?*, Slate.com, Dec. 31, 2013, *available at* http://www.slate.com/articles/news_and_politics/crime/2012/12/gun_death_tally_every_america n_gun_death_since_newtown_sandy_hook_shooting.htm.

2

accidentally discharged while he was cleaning it.[3]  In Richmond County, Georgia, a teenager

recently accidentally shot and killed a friend while playing with a handgun.  The teenager "took

the gun, removed the magazine, pointed the gun back at [the victim] and pulled the trigger.

Police said [the shooter] believed the gun was unloaded."[4]  In Pennsylvania, a seven-year-old

boy was recently shot and killed when a handgun accidentally fired as his father was climbing

into the front seat of the family's truck.  His father had unloaded the magazine at home but failed

to realize that a bullet was still in the chamber.[5]

It was precisely to prevent accidental shootings like these that the Massachusetts

Attorney General promulgated the challenged regulation in 1997.  The regulation mandates that

all handguns sold in the Commonwealth contain a load indicator, a device that has been proven

to reduce fatalities by accidental gunshot.

### A.    Load Indicators Inform a User that a Gun is Loaded.

A load indicator, or "loaded-chamber indicator," is a device that alerts a gun user that a

cartridge is in the chamber.  Unlike traditional safety devices that disable a weapon from firing, a

load indicator is "an appendage on the firearm that presents itself when a cartridge is loaded in

the chamber or when the action is cocked."  Robert E. Walker, Cartridges and Firearm

---

[3] Blake Bell, *Walnut Hill Man Accidentally Killed while Cleaning Gun*, The Atmore Advance, June 12, 2013, *available at* http://www.atmoreadvance.com/2013/06/12/walnut-hill-man-accidentally-killed-while-cleaning-gun/.

[4] Bianca Cain Johnson, *Teen Charged with Involuntary Manslaughter in Fatal Shooting Monday*, Augusta Chronicle, Nov. 12, 2013, *available at* http://chronicle.augusta.com/news/crime-courts/2013-11-12/teen-charged-involuntary-manslaughter-monday-fatal-shooting?v=1384267618.

[5] Associated Press, *Pa. Dad Accidentally Shoots, Kills 7-year-old Son After Leaving Gun Store*, PennLive, Dec. 10, 2012*, available at* http://www.pennlive.com/midstate/index.ssf/2012/12/pa_dad_accidentally_shoots_kil.html

AD Page 274 of 441

Identification 332 (2013) ("Walker").  Its sole objective is to quickly and easily communicate to the gun holder that the weapon is loaded.

Load indicators can take many forms.  For example, Ruger SR series handguns feature a tab on the top of each gun that rises when the gun is loaded.  *Id.* at 333.  Jimenez Arms incorporates into its pistols a red plastic knob that emerges from the rear of the slide when a magazine is loaded into the gun.  *Id.*  Frequently, load indicators also feature written warnings: On the Ruger SR series handgun, for instance, the load indicator tab is bright red and reads "LOADED WHEN UP."  *See* Figure 1.



Fig. 1.  A loaded chamber indicator on the Ruger SR9c handgun provides clear instructions to the gun handler.  Source: Gunblast.com/Ruger-SR9c.htm.

### B.  Load Indicators Have Been Used for More than a Century.

Load indicators have a long pedigree.  The first load indicator was patented in 1888 and was described as "a simple and effective device for the purpose of indicating, without breaking the arm, the presence of a charge in the barrel or barrels" of a firearm.  U.S. Patent No. 385,360 at 1:12-14; *see also* Sean Madden, Guns in American Society:  An Encyclopedia of History, Politics, Culture, and the Law 515 (2012) ("Madden").  The original load indicator consisted of a

4

AD Page 275 of 441

lever that elevated when a cartridge entered the barrel. Madden at 515. The primary purpose of the original load indicator was to improve safety: According to the patent, the load indicator provided "an effective means for the prevention of accidental discharges . . . since the person handling the arm is immediately made aware of the fact that the arm is charged by the said indicator, and therefore warned to be careful in handling the arm." US Patent No. 385,360 at 2:32-38.

Load indicators caught on quickly. Many gun models designed in the late 1800s and early 1900s had this feature, including those manufactured by Browning, Colt, Winchester, Luger, Walther, and Sauer. Walker at 333; Madden at 515. Today, hundreds, if not thousands, of gun models contain load indicators. *See* Madden at 515 (estimating that as many as 20% of all guns manufactured in the United States have load indicators); Office of the Attorney Gen., Cal. Dep't of Justice, Roster of Handguns Certified for Sale (listing hundreds of models of handguns that meet California's gun safety requisites, including its load-indicator requirement).[6]

### C. Load Indicators are Effective at Preventing Accidental Shootings.

Accidental shootings are a serious public health issue. In 2011 (the year for which the most recent government data is available), 591 Americans died as a result of the accidental discharge of a gun. Ctrs. for Disease Control & Prevention, *Number of Deaths from 113 Selected Causes, Enterocolitis Due to Clostridium Difficile, Drug-induced Causes, Alcohol-*

---

[6] http://certguns.doj.ca.gov/ (last accessed Sept. 24, 2014). As discussed below, California mandates that all semiautomatic pistols sold in the state have load indicators. *See* Background Section D, *infra*.

AD Page 276 of 441

*induced Causes, and Injury by Firearms, by Age: United States*, *2011*.[7]  Of those killed, seventy-four were children under the age of 15.  *Id.*

According to a study by the U.S. Government Accountability Office, accidental shootings often occur because the user is unaware that a weapon is loaded.  U.S. Gov't Accountability Office, Accidental Shootings:  Many Deaths and Injuries Caused by Firearms Could Be Prevented 2 (1991) ("GAO Report").  Indeed, even the most responsible gun owner can have difficulty knowing whether there are any rounds in the chamber.  For example, on guns requiring magazines, a cartridge "can remain in the chamber even after the magazine is removed, leading a person to believe the gun is unloaded."  Law Ctr. to Prevent Gun Violence, *Design Safety Standards Policy Summary*, Dec. 1, 2013.[8]  Moreover, a prudent gun owner might typically leave his weapon unloaded and therefore assume that it is always free of ammunition.  GAO Report at 4.  Furthermore, some guns are prone to "dry-firing", or failing to discharge even when the trigger has been pulled several times; when dry-firing occurs, even a prudent gun owner might assume that the chamber is empty even though it is not.  *Id.*  In all of these instances, a load indicator would alert a gun owner that a potentially lethal cartridge remains in the chamber.

The effectiveness of load indicators in preventing accidental deaths cannot be gainsaid.  The GAO has concluded that load indicators could "save many lives and [] undoubtedly also prevent many injuries."  *Id.* at 1.  Indeed, nearly a quarter of the accidental firearms fatalities analyzed in the GAO study could have been prevented by a load indicator.  *Id.* at 2-3.

---

[7] *Available at* http://www.cdc.gov/nchs/data/nvsr/nvsr63/nvsr63_03.pdf.

[8] *Available at* http://smartgunlaws.org/gun-design-safety-standards-policy-summary/#footnote_22_5929.

AD Page 277 of 441

Extrapolating from this data, the GAO estimated that load indicators could prevent hundreds of death per year. *Id.* at 24.

The conclusions of the GAO report are borne out by more recent studies. For example, a 2003 study performed on a sample of gun deaths in Maryland and Wisconsin conducted by Johns Hopkins' Bloomberg School of Public Health came to nearly the same conclusion as the GAO report: Approximately 20% of accidental gun deaths could be prevented by the inclusion of a load indicator.[9] Similarly, two studies from the late 1980s concluded that in more than one-fifth of accidental shootings in which children were involved, the child who shot the gun was not aware that the gun was loaded.[10]

### D. Load-Indicator Regulations Have Saved Lives.

In 1997, the Massachusetts Attorney General promulgated the regulation at issue here, which requires all handguns sold in the Commonwealth to feature a load indicator. *See* 940 C.M.R. § 16.05. The load-indicator requirement was part of a larger set of regulations designed to eliminate from the Commonwealth guns that "failed to satisfy certain safety and performance requirements." *Mass. Regs Target Gun Makers, Dealers*, Massachusetts Lawyer Weekly, April

---

[9] Jon S. Vernick, et al., *Unintentional and Undetermined Firearm Related Deaths: A Preventable Death Analysis for Three Safety Devices*, Injury Prevention 307, 307-11 (2003); *see also* Jon S. Vernick et al., *I Didn't Know the Gun Was Loaded: An Examination of Two Safety Devices that Can Reduce the Risk of Unintentional Firearm Injuries*, J. Public Health Pol'y 427, 427-40 (1999).

[10] Garen J. Wintemute et al., *Unintentional Firearm Deaths in California*, 29 J. Trauma 457 (1989); Garen J. Wintemute et al., *When Children Shoot Children: 88 Unintended Deaths in California*, 257 JAMA 3107 (June 1987).

AD Page 278 of 441

10, 2000.[11]   The regulations were adopted after three children were killed in accidental shootings in Massachusetts over a ten-day period in 1996; each of those shootings was attributed to a minor discharging a handgun thought to be unloaded.[12]

Massachusetts is not alone in recognizing the life-saving potential of load indicators.  In 2003, California passed legislation requiring that semiautomatic pistols have a "chamber load indicator," or a "device that plainly indicates that a cartridge is in the firing chamber."  Cal. Penal Code §§3200, 16380, 31910.  These load indicators must either be readily visible or have "incorporated or adjacent explanatory text or graphics, or both."  *Id.* § 16380.

California implemented its load-indicator requirement as part of a substantial overhaul to its gun laws. These reforms have brought real results for Californians:  Between 1993 and 2010, the state's gun death rate was cut by 56%, "a reduction that translates to thousands of lives saved every single year."  Law Ctr. to Prevent Gun Violence, *The California Model: Twenty Years of Putting Safety First*, at 4 (2013).[13]

At bottom, it is no coincidence that the two states with load-indicator laws have some of the lowest gun death rates in the country.  In fact, Massachusetts and California rank 49th and 42nd, respectively, in gun deaths, according to the Centers for Disease Control and Prevention.  Ctrs. for Disease Control & Prevention, *Age-Adjusted Death Rates from Firearms, By State:*

---

[11] In a 1999 decision, the Massachusetts Supreme Judicial Court rejected arguments that the Attorney General exceeded his authority in promulgating the gun-safety regulations.  *Am. Shooting Sports Council v. Harshbarger*, 711 N.E.2d 899 (Mass. 1999).

[12] Joe Heaney & Jason B. Johnson, *Gun Tragedy Leaves Toddler Dead; Youth Accidentally Shot 2-year-old, Police Say*, Boston Herald, Mar. 22, 1996, at 1; Judy Rakowski, *Gun Control Urged as 2 Families Mourn*, Boston Globe, Mar. 17, 1996, at 76.

[13] *Available at* http://smartgunlaws.org/wp-content/uploads/2013/07/20YearsofSuccess_ForWebFINAL5.pdf.

8

*United States*, 2010.[14]  And of the hundreds of accidental shooting deaths that occurred in 2013, only one took place in the Commonwealth.[15]

## ARGUMENT

### A.     The Second Amendment Does Not Enshrine A Right to Unsafe Guns.

The Second Amendment protects a citizen's right to keep and bear arms for the limited purpose of self-defense.  *Dist. of Columbia v. Heller*, 554 U.S. 570, 599 (2008); *see also* U.S. Const. amend. 2.  Courts have held that the right of citizens to defend themselves from harm is the "central component" of the Second Amendment.  *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3036 (2010); *Hightower v. City of Boston*, 693 F.3d 61, 72 (1st Cir. 2012) (holding that "the possession of operative firearms for use in defense of the home constitutes the 'core' of the Second Amendment").  Consequently, "laws that do not implicate the central self-defense concern of the Second Amendment may be more easily justified."  *Fletcher v. Haas*, 851 F. Supp. 2d 287, 302 (D. Mass. 2012) (quoting *United States v. Chester*, 628 F.3d 673, 682 (4th Cir. 2010)).

The right to keep and bear arms is far from unlimited.  *Heller*, 554 U.S. at 625.  That is to say, the Second Amendment does not enshrine "a right to keep and carry any weapon whatsoever in any manner whatsoever for whatever purpose."  *Id.*  To the contrary, gun use and ownership may be restricted so long as responsible, law-abiding citizens are not effectively prevented from using a firearm to protect themselves.  *See, e.g.*, Law Ctr. to Protect Gun Violence, *Post-Heller Litigation Summary* 6-13 & nn.23-75 (Aug. 4, 2014) (collecting cases and concluding that

---

[14] A*vailable at* http://www.cdc.gov/nchs/pressroom/states/FIREARMS_STATE_2010.pdf

[15] Kirk & Kois, *supra* note 1.

AD Page 280 of 441

"nearly all" gun regulations have been upheld in the wake of *Heller*).[16]  In particular, "laws imposing conditions and qualifications on the commercial sale of arms" are "presumptively lawful."  *Heller*, 554 U.S. at 626-27 & n.26.

The circuits have developed a two-step inquiry for analyzing challenges brought under the Second Amendment post-*Heller*.  *See United States v. Chovan*, 735 F.3d 1127, 1136-37 (9th Cir. 2013) (collecting cases).  Although the First Circuit has not explicitly endorsed this two-tiered approach, its analysis has proceeded along precisely the same lines as the other circuits, as this Court recently recognized.  *See Davis v. Grimes*, __ F. Supp. 2d ___, ___, No. 13-cv-10246, 2014 WL 1278082, at * 10 (D. Mass Mar. 26, 2014).

In the first step of the Second Amendment analysis, a court must ask whether "the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee."  *United States v. Pruess*, 703 F.3d 242, 245 (4th Cir. 2012).  If the challenged law does not implicate conduct protected by the Second Amendment, it will be upheld.  If, however, the law does burden Second Amendment rights, the court must proceed to apply an "appropriate form of means-end scrutiny."  *Pruess*, 703 F.3d at 245; *see also United States v. Armstrong*, 706 F.3d 1, 8 (1st Cir. 2013), *vacated on other grounds*, 134 S. Ct. 1759 (2014) (applying intermediate scrutiny to law that implicated Second Amendment rights); *United States v. Booker*, 644 F.3d 12, 25 (1st Cir. 2011) (same).

### B.     The Challenged Regulation Does Not Implicate Second Amendment Rights.

As Plaintiffs concede, the regulation under attack in this litigation does not prevent Massachusetts residents from purchasing a handgun to defend themselves and their families.

---

[16] *Available at* http://issuu.com/mikemclively/docs/post-heller_litigation_summary_-_au_34aa22c4588a82?e=12582649/8920654.

10

AD Page 281 of 441

Indeed, Plaintiffs in their complaint identify at least *nine different manufacturers* whose "series" of handgun models satisfy the challenged regulation and are therefore available for purchase in Massachusetts.  (Compl. ¶ 69.2.)  The load-indicator regulation is thus a far cry from laws that "totally ban[] handgun possession in the home," which are the only laws that the Supreme Court has found inconsistent with the Second Amendment.  *Heller*, 554 U.S. at 628; *see also McDonald*, 561 U.S. at 3026 (invalidating law "effectively banning handgun possession" in Chicago).

Plaintiffs' sole alleged Second Amendment injury is that they cannot purchase *two specific models* of handguns because those models do not feature load indicators.  (*E.g.*, Compl. ¶ 77.)  In effect, Plaintiffs contend that the Second Amendment enshrines an absolute right to purchase the precise handgun model of one's choosing, even if it has been deemed unsafe and too dangerous for the public.  But the Supreme Court has already squarely rejected that notion.  *See Heller*, 554 U.S. at 625 (noting that Second Amendment does not bestow the right "to carry any weapon whatsoever").  And Plaintiffs' position moreover flies in the face of common sense:  If Plaintiffs' argument carries the day, the Commonwealth would be powerless to ban the sale of a handgun that consistently failed safety testing because it, say, frequently blows up in the user's hand.  *See* Mass Gen. Laws ch. 140, § 123.

At bottom, Plaintiffs and other Massachusetts residents are free to defend themselves with a variety of firearms notwithstanding the challenged regulation.  The regulation therefore cannot be said to impede Plaintiffs' Second Amendment right to self-defense.  *See McDonald*, 561 U.S. at 3036 (noting that the Second Amendment protects the "basic right" of self-defense).  Where a law does not hinder "the general ability of a person to defend him or herself," it does not run afoul of the Second Amendment.  *Colo. Outfitters Ass'n v. Hickenlooper*, ___ F. Supp.

11

2d __, ___, No. 13-cv-01300, 2014 WL 3058518, at *14 (D. Colo. June 26, 2014) (upholding law limiting magazines to 15 rounds because 15 shots is sufficient for self-defense).

Far from impeding the right to self-defense, the challenged safety regulation is no more than a rule "imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626-27. Under *Heller*, such regulations are "presumptively lawful." *Id.* at 627 n.26. Indeed, *Heller* explicitly stated that its holding did not preclude states from passing laws designed to make the use of guns safer. *See id.* at 632 (noting that "laws regulating the storage of firearms to prevent accidents" are likely valid).

**C.** **The Massachusetts Load-Indicator Regulation Is Substantially Related to the Government's Interest in Protecting its Citizens.**

Even if the load-indicator regulation does somehow impede conduct protected by the Second Amendment, it passes constitutional muster because it is substantially related to a significant government interest.

First Circuit precedent does not expressly dictate the level of scrutiny that would apply if the Massachusetts load-indicator regulation were found to tread upon Second Amendment rights. In *Booker*, the First Circuit subjected to intermediate scrutiny a law that totally banned an entire subset of the population (those convicted of domestic violence) from possessing a gun. 644 F.3d at 25 (requiring "substantial relationship between the restriction and an important governmental objective"); *Grimes*, ___ F. Supp. 2d at ___, 2014 WL 1278082, at *13 (noting that *Booker* formulation is effectively intermediate scrutiny).

Certainly, the load-indicator regulation—which does not limit any citizen's ability to possess a handgun for self-defense but rather merely demands that such handguns include a particular safety feature—would not be subject to *greater* scrutiny than the law in *Booker*.

12

Indeed, other circuits uniformly apply intermediate scrutiny to laws that do not implicate the "core" Second Amendment right of self-defense in the home. *Grimes*, ___ F. Supp. 2d at ___, 2014 WL 1278082, at *13-14 (collecting cases). The challenged regulation does not trespass on this "core" right because it does not prevent any citizen from possessing a handgun at home for the purpose of self-protection. *See* Point I.A, *supra*.

Consequently, the maximum level of scrutiny that could apply to the challenged regulation is intermediate scrutiny.[17] That is, the load-indicator regulation passes muster if it is substantially related to a significant government interest. *See, e.g.*, *Heller v. Dist. of Columbia*, 670 F.3d 1244, 1258 (D.C. Cir. 2011) ("*Heller II*"); *United States v. Skoien*, 614 F.3d 638, 641-42 (7th Cir. 2010) (en banc). In this case, the load-indicator regulation survives intermediate scrutiny, and it is not close.

As an initial matter, there can be little doubt that the Commonwealth has a substantial interest in protecting its citizenry from physical harm. *See, e.g.*, *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 768 (1994) ("The State [] has a strong interest in ensuring the public safety and order . . . ."); *see also Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 670-71, 677 (1989) (citing government's substantial interest in public safety in upholding practice of drug testing border agents who carry firearms). Indeed, "'[i]t is self-evident' that public safety is an important government interest." *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 965 (9th Cir. 2014).

---

[17] Mindful of *Heller*'s admonition that rational basis review is too lenient for a law implicating Second Amendment rights, 554 U.S. at 629 n.27, we do not suggest that anything less than intermediate scrutiny would be in order.

13

AD Page 284 of 441

Moreover, the challenged regulation is substantially related to the Commonwealth's important interest in protecting the safety of its citizens. To establish the requisite nexus between the load-indicator regulation and the public-safety interest, the Commonwealth "must demonstrate that the harms it recites are real and that [the] restriction will in fact alleviate them to a material degree." *IMS Health Inc. v. Ayotte*, 550 F.3d 42, 55 (1st Cir. 2008), *abrogated on other grounds by Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653 (2011). "A state need not go beyond the demands of common sense to show that a statute promises directly to advance an identified governmental interest." *Id.* "While empirical data must plausibly point to a conclusion, that data need not be accompanied by a surfeit of background information," and the required connection between law and government interest can be shown "based solely on history, consensus, and simple common sense." *Id.* (quotation marks and citations omitted).

Here, as explained above, extensive data supports the Attorney General's conclusion that accidental shootings are a serious public health problem. *See* Point I, *supra*. Moreover, substantial evidence demonstrates that many accidental gunshots would be prevented—and many lives saved—if every gun featured a load indicator. *See id.* Indeed, it is "common sense" that a person holding a gun will be exceedingly careful if he knows that the gun is loaded and that one wrong move could kill himself or a companion. *Ayotte*, 550 F.3d at 55. The challenged regulation therefore directly advances public safety and saves lives by ensuring that every gun owner knows when his weapon has the potential to make a fatal discharge. That is to say, the load-indicator regulation is substantially related to a substantial government interest in public safety and accordingly comports with the demands of the Second Amendment.

## CONCLUSION

For the foregoing reasons, the Court should grant the defendant's motion to dismiss.

14

Dated: October 3, 2014

Respectfully submitted,

/s/ Scott Harshbarger

Scott Harshbarger (BBO # 224000)
John E. Roberts (*Pro Hac Vice* pending)
Laura Stafford (BBO # 685347)
PROSKAUER ROSE LLP
One International Place
Boston, Massachusetts 02110
(617) 526-9600 (telephone)
(617) 526-9800 (facsimile)
sharshbarger@proskauer.com
jroberts@proskauer.com
lstafford@proskauer.com

*Attorneys for Amicus Curiae Brady Center to
Prevent Gun Violence*

## CERTIFICATE OF SERVICE

I hereby certify that on October 3, 2014 this document was filed through the Electronic
Case Filing (ECF) system and thus copies will be sent electronically to the registered participants
as identified on the Notice of Electronic Filing (NEF).

Martha Coakley
Attorney General
Glenn Kaplan
Assistant Attorney General
Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
(617) 727-2200
Glenn.Kaplan@state.ma.us

Alexander A. Flig, Esq.
490 Chapman Street, Suite 201
Canton, MA 02021-2039
(781) 352-7260
alex@fliglaw.com

/s/ Scott Harshbarger

Scott Harshbarger

15

AD Page 286 of 441

# Tab 10

Opposition to Amicus Brief in Support of Motion to Dismiss

(by plaintiffs)

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

**(1)  ROBERT DRAPER;**

**(2)  ARIEL WEISBERG;**

**(3)  DONNA MAJOR;**

**(4)  ERIC NOTKIN;**

**(5)  ROBERT BOUDRIE;**

**(6)  BRENT CARLTON,**

*collectively, the*
**"CONSUMER PLAINTIFFS"**, *and*

**(7)  CONCORD ARMORY, LLC;**

**(8)  PRECISION POINT FIREARMS, LLC;**

*collectively, the*
**"DEALER PLAINTIFFS"**, *and*

**(9)  SECOND AMENDMENT FOUNDATION, INC.,**

**(10) COMMONWEALTH SECOND AMENDMENT, INC.**

*collectively, the*
**"ORGANIZATIONS"**, *and*

Plaintiffs

v.

**MARTHA COAKLEY,**
*in her official capacity as*
**ATTORNEY GENERAL OF MASSACHUSETTS**

Defendant

Civil Action No.

1:14-CV-12471-NMG

# PLAINTIFFS' OPPOSITION TO AMICUS' BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

[With Corrected Exhibit]

# INTRODUCTION AND SUMMARY OF ARGUMENT

The bulk of Amicus Curiae's, the BRADY CENTER TO PREVENT GUN VIOLENCE (hereafter "BRADY"), Brief in Support of Defendant's Motion to Dismiss (hereafter "AMICUS BRIEF") concerns that are not present in this lawsuit and are therefore irrelevant. Regarding what little in the AMICUS BRIEF is relevant in this case, BRADY's AMICUS BRIEF only highlights and strengthens the PLAINTIFFS' claim that REGULATION's definition "load indicator" is incurably defective.

# ARGUMENT

## I. BRADY'S AMICUS BRIEF Highlights the REGULATION's Unconstitutionally Vague Definition of "Load Indicator"

BRADY admiringly points to recent (2003) California legislation requiring that "semiautomatic pistols have a 'chamber load indicator,' or a 'device that plainly indicates that a cartridge is in the firing chamber.' Cal. Penal Code §§3200, 16380, 31910." AMICUS BRIEF, p. 8. BRADY omits, however, the text of California's "chamber load indicator" requirement. For ease of reference, it is reproduced side-by-side with its Massachusetts cousin, with their common language highlighted in yellow:

| Massachusetts 940 CMR 16.05(1) | California Penal Code §16380 |
|---|---|
| Load indicator: shall mean a device which plainly indicates that a cartridge is in the firing chamber within the handgun. | As used in this part, "chamber load indicator" means a device that plainly indicates that a cartridge is in the firing chamber. A device satisfies this definition if it is readily visible, has incorporated or adjacent explanatory text or graphics, or both, and is designed and intended to indicate to a reasonably foreseeable adult user of the pistol, without requiring the user to refer to a user's manual or any other resource other than the pistol itself, whether a cartridge is in the firing chamber. |

As is immediately obvious, California's definition of "chamber load indicator" is **_substantially_** _more detailed_ than that of Massachusetts, which provides no restrictions on what this "device which plainly indicates" must be.

## II. The "Background" Section of the AMICUS BRIEF is Mostly Irrelevant to the Issues in This Lawsuit

### A. BRADY's Definition of "Load Indicator" is <u>NOT</u> the Same as, and Only Punctuates, the Vagueness in the REGULATION's Definition of "Load Indicator"

BRADY defines "[a] load indicator, or 'loaded-chamber indicator'" alternatively as:

1. "[A] device that alerts a *gun user* that a cartridge is in the chamber", or

2. "[A]n appendage on the firearm that *presents itself* when a cartridge is loaded in the chamber *or when the action is cocked*."

AMICUS BRIEF, p. 3-4 (emphasis in italics). "Its sole objective is to quickly and easily communicate to the gun holder that the weapon is loaded." Id., 4.

These AMICUS BRIEF definition(s) of "load indicator" are different from the definition of "load indicator" in the REGULATION at 940 CMR 16.01: "[A] device which plainly indicates that a cartridge is in the firing chamber within the handgun". Specifically, BRADY's first definition "[A] device that alerts a *gun user* that a cartridge is in the chamber" and its stated objective of "communicat[ing] to the *gun holder* that the weapon is loaded" both specify that the *gun user/holder* is the intended recipient of that communication. But the definition of "load indicator" in the REGULATION at issue in *this* lawsuit is silent as *to whom* it is intended to "indicate". Is it really unexpected that the ATTORNEY GENERAL would not use such vagueness to deem an implementation of "load indicator" noncompliant because it does not in her unilateral estimation adequately communicate to *bystanders* that "a cartridge is in the firing chamber..."? After all, persons near an individual handling a pistol are potential victims of that individual's ***mishandling*** of the firearm, and should be able to alert the *gun user/holder* of the chambered round and/or to take other evasive action to avoid being shot by the ***negligent*** individual.

BRADY's second definition "[A]n appendage on the firearm that *presents itself* when a cartridge is loaded in the chamber *or when the action is cocked*" is even more distinct from the REGULATION's definition of "load indicator" because it introduces a new functionality that is *not* required by the REGULATION at issue in *this* lawsuit—the indication that "the action is cocked". This second function is senseless by its own terms. The actions of *all* known modern pistols may be cocked *without the*

*presence of a cartridge in the firing chamber*, so a "load indicator" whose "sole objective is to … communicate … that the weapon is *loaded*" would communicate a falsehood when it "*presents itself*" on an *unloaded* pistol. Pistols use a protruding external hammer or internal striker to initiate the mechanical firing sequence when the trigger is pulled. No one will seriously argue that the position of an external hammer is not *the* most obvious, intuitive and foolproof way of determining whether "the action is cocked". The striker of a hammerless pistol is *always* either partially pre-cocked or fully tensioned by design, so the *absence* of an external hammer is itself an indicator that the "action is cocked". It is dangerous, misleading and confusing to define a "load indicator" as an "appendage on the firearm that presents itself … *when the action is cocked*" for the "sole objective [of communicating] … that the weapon is *loaded*" when the firing chamber is *empty*, a magazine is *not* present, and/or a "load indicator" is *inherent* in the functional design of the pistol.

BRADY's second definition of "load indicator" requires that it be an *active* device, to wit, it "*presents itself* when a cartridge is loaded in the chamber". Though equally as vague in *how* this "appendage … *presents* itself", this BRADY definition excludes *passive* "load indicator" designs, i.e. a small hole at the base of the firing chamber through which the rim of a cartridge case may be seen under certain conditions if one is present. Oddly, BRADY's second definition of "load indicator" contradicts her policy of *apparently* permitting the passive hole-at-the-base-of-the-firing-chamber "load indicator" design.[1] But even that is unclear because the defendant ATTORNEY GENERAL's non-objection to the active extractor-based "load indicator" design used by Kahr Arms, Heckler & Koch, and Beretta 92-series pistols—while rejecting the virtually identical "load indicator" design implemented on Gen3/4 Glock pistols—is not to be construed or mistaken as her tacit approval of those pistols. REPLY, p. 3.[2] Indeed, the defendant ATTORNEY GENERAL asserts that she does not even have to

---

[1] The defendant ATTORNEY GENERAL has not initiated any enforcement actions, nor has she issued any decrees against the various pistol models currently sold in Massachusetts using this passive "load indicator" design.

[2] In her Motion to Dismiss and Reply memoranda, the defendant ATTORNEY GENERAL has, in not so many words, declared—and as her incurably vague definition of "load indicator" gives her license to do—that she has absolute, exclusive and indisputable authority to decree at whim that any pistol sold or transferred into Massachusetts does not comply with the REGULATION's definition of "load indicator". The defendant ATTORNEY GENERAL mocks the PLAINTIFFS' allegation that her ban of Gen3/4 Glock pistols is capricious and arbitrary by contrasting her *not* having objected "to certain pistols that [PLAINTIFFS] claim contain 'virtually identical' safety devices to those on the Glock Generations 3 and 4 handguns." [Motion to Dismiss, p. 13.] She explains that "Opining that the Attorney General 'has not objected' to certain pistols is not the same as alleging that the Attorney General has

provide any guidance, information or limiting instructions about her definition of "load indicator" because "administrative agencies do not have an enforceable obligation to perform this sort of advisory mission, for good and practical reasons." Motion to Dismiss, p. 14, citing Crooker v. Magaw, 41 F. Supp. 2d 87, 92 (D. Mass. 1999).[3] Even BRADY's unconstitutionally vague definitions of "load indicator" are more informative than the REGULATIONS' "device which plainly indicates" language.

## B. The Historical Purpose of "Load Indicators" is **NOT** Relevant to Any of the Issues in This Lawsuit

The present lawsuit revolves around the singular issue of the vagueness in the REGULATION's definition of "load indicator". The alleged historical purpose of "load indicator" and the evolvement of that purpose into modern times is not an issue in this lawsuit and need not be addressed herein.

## C. The Effectiveness/Non-Effectiveness of "Load Indicators" is **NOT** Relevant to Any of the Issues in This Lawsuit

Neither the Complaint nor the Opposition to the defendant ATTORNEY GENERAL's Motion to Dismiss, nor the PLAINTIFFS' Sur-Reply to the defendant ATTORNEY GENERAL's Reply to the PLAINTIFFS' Opposition, challenge the effectiveness or non-effectiveness of "load indicators" in preventing accidental discharges. This is a red herring intended to confuse the simple issue herein: does the REGULATION's definition of "load indicator" comply with the constitutional requirement that

---

either **approved them or given any indication that they meet the load indicator standards**." Id., 13-14 (emphasis in bolded italics). Thus, more than 16 years of silence regarding non-Glock pistols' compliance with the "load indicator" alternative design requirement is expressly **not** to be taken as the defendant ATTORNEY GENERAL having "approved them or given any indication that they meet the load indicator standards." Stated differently, *no pistol model in Massachusetts* is safe from a *future* decree that it *never* met the "load indicator" alternative design requirement and may no longer be sold in or transferred into Massachusetts.

[3]     In context (again), this authority does *not* stand for the principle in the cited language *as it applies to the facts in the instant lawsuit*: "[The situation] ... before the court now [is one in which] the plaintiff merely expresses a desire to take some action in the future and wishes to know whether he will be breaking the law." Crooker v. Magaw, 41 F. Supp. 2d 87, 92 (D. Mass. 1999). In *this* lawsuit, the defendant ATTORNEY GENERAL already decreed that Gen3/4 Glock pistols do not comply with her "because I said so" standard. Incapable of discerning from the text of the REGULATION and the inconsistency of decreeing Glock "load indicators" non-compliant while other pistols employing virtually identical "load indicators" *apparently* compliant, PLAINTIFFS are entitled to understand *why* the sought pistols do not comply—the DEALERS may find a way to comply, i.e. by modifying Gen3/4 Glock pistols. Much more importantly, *all* Massachusetts "handgun purveyors", *including* DEALERs herein, must be afforded a reasonable way of discerning whether *any* pistol make and model is permissible for sale of transfer in Massachusetts.

---

**PLAINTIFFS' OPPOSITION TO BRADY'S AMICUS BRIEF IN SUPPORT OF THE DEFENDANT'S MOTION TO DISMISS**

it be sufficiently clear to provide reasonable notice of what is required and what is forbidden by the "load indicator" alternative design requirement to those who are subject to the REGULATION.

### III. BRADY's Argument that the Second Amendment Does Not Enshrine a Right to Unsafe Guns is Irrelevant to the Issues in This Lawsuit

Not unlike the defendant ATTORNEY GENERAL who it endorses, BRADY supports its AMICUS BRIEF's arguments with non-existent holdings and out-of-context dicta in the authorities it cites. Its AMICUS BRIEF opening sentence to the Argument section, BRADY asserts that "The Second Amendment protects a citizen's right to keep and bear arms for the *limited* purpose of self-defense." That is a rather bold assertion from the *actual* language in District of Columbia v. Heller, 554 U.S. 570, 599 (2008) upon which it relies:

> "It is [ ] entirely sensible that the Second Amendment's prefatory clause announces the purpose for which the right was codified: to prevent elimination of the militia… [T]he prologue … only show[s] that self-defense had little to do with the right's *codification*; it was the *central component* of the right itself." [Original emphasis.]

The Court can search but will not find any holding or language in Heller *limiting* the Second Amendment's guarantee of the right to keep and bear arms to "the core lawful purpose of self-defense." Id., 630. Nor will the court find in the canonical language of the Second Amendment to which BRADY also cites to support its limitation-to-self-defense argument, any *limits* on its purpose *at all*: "A WELL REGULATED MILITIA, BEING NECESSARY TO THE SECURITY OF A FREE STATE, THE RIGHT OF THE PEOPLE TO KEEP AND BEAR ARMS, SHALL NOT BE INFRINGED."

Exactly as the defendant ATTORNEY GENERAL argued in her Motion to Dismiss and then in her Reply to the PLAINTIFFS' Opposition thereto, BRADY argues that "laws that do not implicate the central self-defense concern of the Second Amendment may be more easily justified." Fletcher v. Haas, 851 F. Supp. 2d 287, 302 (D. Mass. 2012). This irrelevant straw man argument attempts to reformulate the PLAINTIFFS' contention regarding the *unconstitutional vagueness in the definition* of the REGULATION's "load indicator" alternative design requirement into a challenge of the "load indicator" alternative design requirement *per se*. For judicial economy, PLAINTIFFS submit that this

issue was adequately addressed in both their Opposition to the Attorney General's Motion to Dismiss and their Sur-Reply to the defendant ATTORNEY GENERAL's Reply Memorandum to their Opposition to her Motion to Dismiss.

## IV.   BRADY Argues Disingenuously that the REGULATION Does not Implicate the Second Amendment

BRADY argues that Plaintiffs "concede [that] the regulation under attack in this litigation does not prevent Massachusetts residents from purchasing *a* handgun to defend themselves and their families."  AMICUS BRIEF, p. 10 (emphasis in bolded italics).  Extended to its natural conclusion, BRADY argues that as long as Massachusetts residents may purchase *a* handgun, restricting the selection to even a single model would not implicate the Second Amendment because it would "not prevent Massachusetts residents from purchasing *a* handgun to defend themselves and their families." Who would determine what type of handgun that would be (i.e. pistol or revolver) and its design?  A muzzle-loading single shot flintlock pistol is a handgun.  Limiting ownership of firearms to one per person does not violate BRADY's logic.  As extreme as this initially sounds, it is not that far from what BRADY actually suggests:  "The load-indicator regulation is [ ] a far cry from laws that '*totally* ban[] handgun possession in the home,' which are the *only* laws that the Supreme Court has found inconsistent with the Second Amendment.  Heller, 554 U.S. at 628."  AMICUS BRIEF, p. 11 (emphasis in italics).  BRADY omits exactly where on the continuum of firearms—from the "dangerous or unusual weapons" which the Supreme Court forbade in Heller, *supra*, to muzzle-loading single shot flintlock pistols, REGULATION is permissible without burdening or infringing on the Second Amendment.

## V.   Whether the REGULATION's "Load Indicator" Alternative Design Requirement is Substantially Related to the Government's Interest in Protecting its Citizens is Irrelevant to the Issues in This Lawsuit

Parroting the defendant ATTORNEY GENERAL's Motion to Dismiss, BRADY argues that even if the REGULATION's "load indicator" alternative design requirement burdens or infringes the Second

Amendment rights of Massachusetts residents (including the CONSUMERS herein) it should nevertheless not be struck because it is substantially related to the "significant government interest" of protecting its citizens. AMICUS BRIEF, p. 12-14. Like the defendant ATTORNEY GENERAL, BRADY tries to hijack this lawsuit to argue its own anti-Second Amendment agenda.

Neither the Complaint nor the Opposition to the defendant ATTORNEY GENERAL's Motion to Dismiss, nor the PLAINTIFFS' Sur-Reply to the defendant ATTORNEY GENERAL's Reply to the PLAINTIFFS' Opposition, questions whether a "load indicator" alternative design requirement "passes constitutional muster because it is substantially related to a significant government interest." Id., 12. That could be an interesting issue to debate in future lawsuit *if the PLAINTIFFS could actually understood **what** the REGULATION requires* through its unconstitutionally vague definition of "load indicator"—or rather, if the REGULATION's definition of "load indicator" is **capable of being understood**. The PLAINTIFFS addressed this issue in the OPPOSITION at Section III.A., p. 12-20. The CONSUMER's Second Amendment right is infringed as a *product of* the REGULATION's violation of the DEALERS' right to due process under the Fourteenth Amendment.

# CONCLUSION

For all of the foregoing reasons, PLAINTIFFS respectfully submit that BRADY's AMICUS BRIEF adds nothing to the instant lawsuit, only confuses the issues, and should be disregarded in its entirety.

///

///

///

///

Respectfully submitted,

Dated: 31 October 2014.

**ROBERT DRAPER; ARIEL WEISBERG; DONNA MAJOR; ERIC NOTKIN; ROBERTY BOUDRIE; BRENT CARLTON; CONCORD ARMORY, LLC; PRECISION POINT ARMORY, LLC; SECOND AMENDMENT FOUNDATION, INC.** and **COMMONWEALTH SECOND AMENDMENT, INC.**

By and through their attorney of record

**/s/ Alexander A. Flig**

_____

Alexander A. Flig, Esq (BBO #669132)
490 Chapman Street, Suite 201
Canton, Massachusetts 02021-2039
Telephone:    (781) 352-7260
Facsimile:    (781) 583-5080
E-Mail:    alex@fliglaw.com

# CERTIFICATE OF SERVICE

I hereby certify that this document was filed through the Electronic Case Filing (ECF) system and thus copies will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF); paper copies will be sent to those indicated on the NEF as non-registered participants on or before 1 July 2014.

**/s/ Alexander A. Flig**

_____

# Exhibit "A"

California
LEGISLATIVE INFORMATION

**Quick Search:**
Bill Number ▾ [                    ] go

Bill Information    California Law    My Subscriptions    My Favorites

California Law >> Code Search >> Code Section

Code: PEN ▾    Section: 16380.    [ Search ]   ⓘ

**Code Search**    Text Search

Up^    << Previous    Next >>    cross-reference chaptered bills    Add To My Favorites    🖨

[                    ] [ Highlight ]

**PENAL CODE - PEN**
**PART 6. CONTROL OF DEADLY WEAPONS [16000 - 34370]**  *( Part 6 added by Stats. 2010, Ch. 711, Sec. 6. )*
**TITLE 1. PRELIMINARY PROVISIONS [16000 - 17360]**  *( Title 1 added by Stats. 2010, Ch. 711, Sec. 6. )*
**DIVISION 2. DEFINITIONS [16100 - 17360]**  *( Division 2 added by Stats. 2010, Ch. 711, Sec. 6. )*

**16380.**  As used in this part, "chamber load indicator" means a device that plainly indicates that a cartridge is in the firing chamber. A device satisfies this definition if it is readily visible, has incorporated or adjacent explanatory text or graphics, or both, and is designed and intended to indicate to a reasonably foreseeable adult user of the pistol, without requiring the user to refer to a user's manual or any other resource other than the pistol itself, whether a cartridge is in the firing chamber.

*(Added by Stats. 2010, Ch. 711, Sec. 6. Effective January 1, 2011. Operative January 1, 2012, by Sec. 10 of Ch. 711.)*

# Tab 11

Transcript of Oral
Argument at
Hearing on Motion
to Dismiss

1        IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF MASSACHUSETTS

3


4
     * * * * * * * * * * * *    14CV12471-NMG
5    ROBERT DRAPER, et al    *
                             *
6    VS.                     *    FEBRUARY 19, 2015
                             *    3:07 P.M.
7    MAURA T. HEALEY,  et al *
                             *
8    * * * * * * * * * * * *    BOSTON, MA

9


10      BEFORE THE HONORABLE NATHANIEL M. GORTON

11               DISTRICT JUDGE

12          (Defendants' Motion to Dismiss)

13


14   **APPEARANCES**:

15

     FOR THE PLAINTIFFS:    ALEXANDER A. FLIG, ESQ.
16                          Law Office of Alexander A. Flig
                            Suite 201
17                          490 Chapman Street
                            Canton, MA 02021-2039
18
     FOR THE DEFENDANTS:    GLENN S. KAPLAN, AAG
19                          LYDIA E. FRENCH, AAG
                            Massachusetts Office of the
20                          Attorney General
                            One Ashburton Place
21                          18th Flr.
                            Boston, MA 02108
22
     Court Reporter:        Debra D. Lajoie, RPR-FCRR-CRI-RMR
23                          One Courthouse Way
                            Boston, MA  02210
24
            Proceeding reported and produced by
25                computer-aided stenography

1      19 FEBRUARY 2015 -- 3:07 P.M.

2      THE CLERK:  This is Civil Action No. 14-12471,

3  Robert Draper, et al v. Coakley.

4      Will counsel please identify themselves for the

5  record.

6      MR. KAPLAN:  Glenn Kaplan, Assistant Attorney

7  General, for the Commonwealth.

8      THE COURT:  Mr. Kaplan, good afternoon.

9      MS. FRENCH:  Lydia French, also for the

10  Commonwealth.

11      THE COURT:  Ms. French.

12      MR. FLIG:  Good afternoon, Your Honor.

13  Alex Flig on behalf of the Plaintiffs in this lawsuit.

14      THE COURT:  And Mr. Flig, good afternoon to you.

15      MR. FLIG:  Good afternoon, Your Honor.

16      THE COURT:  Please be seated.

17      We are here on a hearing on the Defendants'

18  motion to dismiss, and that is a motion to dismiss the

19  Plaintiffs' complaint that challenges the

20  enforceability of a State regulation that forbids the

21  sale of handguns that don't have load indicators, which

22  in turn is defined as a device that plainly indicates

23  that a cartridge is in the firing chamber.

24      What I'm going to do this afternoon is allow

25  both sides to have oral arguments of about ten minutes

1    each.  I will give each side a brief rebuttal time.

2    The Defendant is the moving party and, therefore, will

3    go first.  And counsel may assume that I have read the

4    briefs and that I am familiar with their arguments.

5         Before we begin, I will announce my current

6    inclinations and pose a few questions to focus your

7    arguments.  At this point, I am largely persuaded by

8    the arguments made by the Commonwealth.  I do not,

9    however -- rather, I do have several questions for the

10   parties.  And before I even get to that, I think that

11   you don't need to spend a great deal of time on the

12   subject of standing because, although I believe the

13   organizational Plaintiffs don't have standing, I

14   believe the consumer and dealer Plaintiffs do, so that

15   ultimately we will need to address the merits of your

16   claims.  However, if you wish to address the issues of

17   standing, you can do so, understanding that it will

18   come out of your time.

19        Now, with respect to the Defendants, I have a

20   couple of questions before I ask them to address the

21   Court:  Why is it appropriate for the Court to address

22   the merits of Plaintiffs' claims at the motion to

23   dismiss stage?  And, secondly, if Plaintiffs cannot

24   either facially challenge the regulation because it

25   does not implicate the First Amendment or challenge it

1    as applied due to actual notice, how can anyone bring a
2    constitutional challenge to this regulation?
3         So, with that, will it be Mr. Kaplan for the
4    Commonwealth?
5         MR. KAPLAN:  Yes, Your Honor.
6         THE COURT:  Mr. Kaplan.
7         MR. KAPLAN:  Well, Your Honor, if I can, I think
8    I'd like to start by trying to address your questions.
9    The issue about addressing the merits at this stage in
10   the proceeding I think stems straight from *Iqbal* and
11   from *Twombly* before it in terms of, What is the
12   standard for a motion to dismiss on a 12(b)6?  The
13   Plaintiff is required to set out sufficient facts that
14   would plausibly entitle them to relief, and under that
15   standard, we have moved and believe that, actually,
16   just based on the face of the complaint, arguably added
17   by the declarations that Plaintiff has now put in, that
18   there just simply isn't enough to meet the requirements
19   for stating a vagueness claim.  And I'll use some of my
20   time going through why I believe that to be the case.
21        There are, as we've noted in our initial brief,
22   I believe it was on Page 15, instances where vagueness
23   of claims were dismissed at the motion to dismiss
24   stage, and I believe those are similar to this
25   situation in that they just simply didn't put down what

1    they needed to, to make their claim.

2         As to the second issue, the one about, well,

3    when would somebody be able to raise such a claim now,

4    I think that, that also depends on the facts that are

5    alleged.  Indeed, one could conceive of a set of facts

6    where it would be completely appropriate to bring it

7    through and survive a motion to dismiss.  Here that

8    doesn't happen because I think there's simply no claim

9    to be had on vagueness.

10        THE COURT:  Give me an example of what you would

11   conceive of --

12        MR. KAPLAN:  Well, if, for instance, under the

13   *Williams* standard, one were dealing, let's say, with a

14   different regulation where it would not be clear to an

15   ordinary person what -- you know, whether the

16   regulation would apply or not.  If, for instance, the

17   Commonwealth had not actually told the Defendants in

18   this instance that the Glock doesn't pass the

19   regulation, that would create a whole separate set of

20   facts.

21        Similarly, if you had a situation where there

22   really was an allegation supported, for instance, if

23   there were oral statements and it was contradicted by

24   them that there was a pattern of discriminatory

25   enforcement, that would also create a claim.  But the

basic requirement to make the claim needs to be put
out, and I think in this circumstance, given the facts
that Plaintiff alleges, and I think one has to assume
they've put out the facts in their complaint they think
they'll be able to move forward with, there just simply
isn't a vagueness claim, which arguably brings us to
the crux of the matter, which is in part is why we're
here.

What may really have been going on here is that
the Plaintiffs really don't -- just don't like the
Attorney General's decision about the Glock, which is
really a State law issue. Is the Attorney General
right in terms of where it falls within factually
whether this thing, whether this load indicator really
is something that one can plainly see or not? Is there
an issue about whether the regulation goes too far
beyond the statute? But those are, again, all State
law claims.

I think to be here in Federal Court, you have to
raise a Federal claim, the claim that gets raised as a
vagueness claim, but I think in these circumstances,
there really isn't a vagueness claim to be had. There
could certainly be other situations, you know, other
regulations or other facts where there could be a
vagueness claim to be had, but I just don't think

1  that -- the Commonwealth doesn't think that this one is

2  it.

3      If I could go ahead and talk a little bit about

4  the substance, Your Honor laid out very well what the

5  main focus of the case was.  I would point out that the

6  load indicator is not actually required under the

7  regulations; it's a choice under the regulations.

8      THE COURT:  Yeah, but it seems to be the thrust.

9  We don't seem to be talking about magazine disconnects.

10     MR. KAPLAN:  Right, and I don't believe that

11 that's part of Plaintiffs' claim, but just for pointing

12 out, relating to the regulation itself, the load

13 indicator is one of alternative ways that one can

14 comply with the regulation.

15     The definition is placed in there to help, you

16 know, implementation go smoothly.  But the load

17 indicator, as the magazine disconnect, are very common

18 safety devices that appear on different guns.  We cited

19 in our brief various instances where courts have, you

20 know, identified or recognized that these devices are

21 out there.  And the real issue here is whether or not

22 there really is a vagueness claim here.

23     Now, Plaintiff raises two different kinds of

24 vagueness claims or two flavors of vagueness.  The

25 Commonwealth, in its motion to dismiss, believes that

1    the Plaintiff didn't actually make the required

2    pleadings relating to either of them because there are

3    some specific requirements relating to both facial and

4    as-applied vagueness and that, even if one gets past

5    that issue, if one just looks at the language and

6    compares it to the case law, one can see that these --

7    this definition is actually not unconstitutionally

8    vague.

9          To start, if we look at the facial vagueness

10   claim, the requirement there, which is set out in

11   *Salerno* and it is all out in *Hightower* by this Circuit,

12   the Plaintiffs' allegations have to show that no set of

13   circumstance exists where the regulation is valid.

14         One can certainly straightforwardly conceive of

15   a set of circumstances where it is valid, for instance,

16   just where there are firearms that don't even purport

17   to have a load indicator, as, for instance, I'd point

18   out was the case with the older versions of Glocks.

19   I'd cite the *Bell v. Glock* as an example of that.

20   Earlier versions of Glock, they didn't even claim that

21   there was a load indicator on the gun.  There are going

22   to be guns that very clearly -- semi-automatic pistols

23   that very clearly don't have load indicators.

24         To the extent that the allegations don't state

25   that none of this is -- that there is no way to apply

the regulation, then you don't meet the requirement for facial vagueness.  You, again, have to show, in the test under *Salerno* that there are no set of circumstances existing where the regulation is valid that doesn't come out from the complaint.  Therefore, under *Iqbal*, the complaint doesn't pass muster on that claim, just on the specifics of the requirements of the pleadings.  Again, I'll get to this issue of the language itself in a moment.

Similarly, there are shortcomings in the as-applied claim.  If one is just looking at the test, there the test is the *Williams* put into the as-applied context in *Holder v. Humanitarian Law Project*, a Supreme Court case from 2010.  There, the Plaintiff is responsible for showing that no -- that there is no fair notice to a person of ordinary intelligence or that it's so standardless as to encourage seriously discriminatory enforcement, again, in the as-applied context, meaning as applied to the Glock issue that's in play here.

So the first question out of that, that would come out when looking at the complaint is:  Well, are they saying that they were confused relating to the Glock?  And the answer, again, is no.  The complaint itself as well as the exhibits show that indeed the

1    Commonwealth told them that the Glock did not pass the
2    regulation, and this Circuit's decision in *Zhen Zhou Wu*
3    from the First Circuit 2013 indicates that even if
4    the information that you don't comply with the
5    standard comes out of a supplier, as opposed to the
6    Government, that that's going to be enough to kill
7    your as-applied vagueness.
8         THE COURT:  How do you answer their argument, or
9    I think the argument that I expect to hear from
10   Mr. Flig, that they did not receive fair notice because
11   the Attorney General's response failed to explain why
12   the Glock pistols do not meet the regulatory standard
13   or how she came to that conclusion?  It's the why and
14   how they want to know about.
15        MR. KAPLAN:  Right, and understood, Your Honor.
16   And I think the response to that is they're not
17   entitled to know the why and how under a vagueness
18   analysis.  If they want to figure out the why and how,
19   the way to deal with this is to bring a State law claim
20   and say the Attorney General was wrong and put the
21   Attorney General to her proof.  But you don't get a
22   constitutional out of that -- a constitutional issue
23   out of that.
24        And, again, I think the *Crooker v. Magaw* case,
25   which we we cited in our brief, also deals with that

1       issue, that the Government is not required to opine on

2       its reasoning and explain things, again, in the context

3       of one of these types of claims.  It is a very specific

4       and strict standard, and here it's simply not met.

5       It's not just *Zhen Zhou Wu;* this issue about when the

6       Government tells you comes up in other cases cited in

7       our brief, *US v. Saffo*, *US v. Blake*, et cetera.  Again,

8       it just ends up being a block to the as-applied

9       challenge relating to fair notice.

10              One could, though, move and say, All right.

11      Well, what about the idea that it's so standardless

12      that it encourages seriously discriminatory

13      enforcement?  Again, there, the complaint simply

14      doesn't have allegations that will get you past *Iqbal*.

15              In the briefing, what Plaintiffs do imply, what

16      they kind of begin to get to is this idea that the

17      Commonwealth vetoed the Glock but approved a bunch of

18      other load indicators that were virtually

19      indistinguishable.  However, when you read the

20      complaint, that's not what's actually alleged.  What's

21      alleged is that the Commonwealth vetoed the Glock but

22      didn't say anything about these other load indicators,

23      which Plaintiff has picked out and placed in exhibits

24      in the complaint.

25              The fact that the Commonwealth didn't say

anything about some load indicators that Plaintiff just
happened to pick out doesn't actually tell you anything
in terms of discriminatory enforcement.  And more
importantly, even if the Commonwealth had gone ahead
and said, Well, those are affirmatively okay but the
Glock is affirmatively no good, it wouldn't have shown
seriously discriminatory enforcement because, again,
while Plaintiffs say these are virtually
indistinguishable, the exhibits contradict the broad
statements made in the complaint, and the exhibits are
actually what would govern relating to, you know, a
motion to dismiss when trying to make these
determinations.

When I say the exhibits, I'd refer the Court to
Exhibits 39 and 41, which are the non-Glock load
indicators that Plaintiff has chosen to say are
virtually identical, compared to Exhibits 42 and 43,
which are the Glock load indicators, quote, unquote,
load indicators.

Now, looking at these exhibits, one can see
right away that -- from the information that's there,
that the non-Glock indicators, you know, they have
color, they have shading, from the way they're
described and shown, they sort of stick right out and
announce, Hey, this gun is loaded.

1    If one looks at what's listed for the Glock,

2 there's no color, there's nothing that really jumps out

3 that, if you looked at it in one position versus

4 another, you would necessarily know that there's

5 something to be worried about.

6    Now, that in and of itself is not to say that

7 there's anything bad about the Glock, but it does say

8 that these are not virtually indistinguishable; they

9 are different, and our purpose for looking at this

10 issue here is simply whether or not there is

11 discriminatory enforcement.

12    And, again, for that, Plaintiff says, Hey, it's

13 discriminatory if we've got the same thing and they're

14 treated differently.  Well, number one, again, the

15 Commonwealth never said that the non-Glocks were okay,

16 but even if they had, they're not the same.  It's

17 apples and oranges.

18    Aside from those specific requirements relating

19 to the pleadings for the facial and the as-applied

20 challenges, we can take a step back and also just look

21 at the case law for the language itself.  If you look

22 at the language, it's clear that it just doesn't meet a

23 vagueness standard under constitutional law.  It's hard

24 to get a statute declared unconstitutionally vague

25 under the case law to begin with.  It's even harder

1    when you're talking about when it's civil, even harder

2    than that when you're talking about one that is not

3    only civil but is also just regulatory governing

4    business behavior and even harder still if what you're

5    talking about is a civil statute that deals with

6    business and regulatory matters and uses common words.

7         The First Circuit in *National Organization of*

8    *Women v. McGee* said that most English phrases end up

9    having some level of uncertainty tucked into them and

10   that that's not enough to make a constitutional

11   vagueness claim.  The phrase here, if one sort of

12   shoved it together, that's relevant in this case is "a

13   device which plainly indicates."  They're all common

14   words.  I've pointed out in the brief they are defined

15   in Webster's, "Plain, just evident and obvious;

16   indicates, point out with exactness; device," under

17   Webster's, "a mechanism designed to serve a special

18   function."  These are terms that are used in common

19   parlance, people know what they mean, they're used --

20        THE COURT:  I need you to wrap up Mr. Kaplan;

21   okay?

22        MR. KAPLAN:  Okay.  They're used hundreds of

23   times.  And given that, in both Massachusetts statutes

24   and in the United States Code, they're not vague by a

25   long shot.  Even in an instance where, when we're

1    looking criminally in the gun context, I would point

2    the court to *New York State Rifle* from the Western

3    District of New York and *Colorado Outfitters*, both of

4    which use words that are, you know, certainly more

5    esoteric than these and yet were found even in the

6    criminal context not to be vague.

7            If I can have just one more quick point that I

8    would raise?  Second Amendment here, Your Honor, is

9    just a completely derivative claim, the way Plaintiff

10   has worked it out through Plaintiffs' briefs,

11   essentially just saying that, Well, the constitutional

12   vagueness now infringes on our Second Amendment rights.

13   So if there is no constitutional vagueness, there is no

14   Second Amendment issue here either.

15           And if the Court believes that there's any

16   chance that this is vague, we would suggest that the

17   right thing to do would be to exercise abstention.  The

18   State Courts could put meat on the bone for what this

19   means.  It is a State statute, under State law, under a

20   statute that the Legislature says in *Decotis,* that the

21   Courts should be filling up the meaning of over time in

22   Massachusetts, and that could eliminate any potential

23   constitutional issue and would be a good use of

24   judicial economy.

25           THE COURT:  Thank you, Mr. Kaplan.

1          Mr. Flig, before I ask you to respond, I have a
2     couple of questions for the Plaintiffs.
3          MR. FLIG:  Yes, Your Honor.
4          THE COURT:  With respect to the organization
5     Plaintiffs, how is the sponsoring of this lawsuit and
6     the spending of resources in analyzing the regulations
7     enough to establish injury in fact?  And, secondly,
8     please clarify your position with respect to your
9     Second Amendment claim.  Is it wholly derivative of
10    your vagueness challenge or not?
11         MR. FLIG:  Certainly, Your Honor.  Thank you.
12         THE COURT:  Okay.
13         MR. FLIG:  If I may start with the standing
14    issue with the organizations, with respect to the
15    organizations, Your Honor, the case precedent clearly
16    requires that the organizations' members must have some
17    particularized injury in and of themselves by
18    themselves in order to confer some standing
19    derivatively to the organizations.
20         In this case, both organizations' members do
21    have injuries, have suffered injuries as a result of
22    the regulation being in place.  Both organizations have
23    dealer members, and both organizations have consumer
24    members.
25         THE COURT:  I thought one of them only had

1    contributors rather than members or donors or whatever

2    the word was.

3        MR. FLIG:  I believe, Your Honor, that the two

4    are, in this sense, synonymous.  But they are members.

5    They are contributors in both senses, and they're

6    dues-paying members, and they are represented by the

7    organizations.

8        The organizations themselves of course derive

9    their standing from their members but independently

10   have standing because of the fact that, on behalf of

11   their members who have asked them to challenge this

12   statute, they are contributing funds to sponsor this

13   lawsuit.  So that by itself is an injury in that

14   they're spending money on issues that they would not

15   have spent money on had this regulation not been in

16   place.  That's with respect to the organizational

17   standing.

18       With respect to the Second Amendment,

19   Your Honor, the Second Amendment claim is in fact

20   derivative of the Fourteenth Amendment due process

21   claim by the dealer Plaintiffs.  I think this requires

22   a little bit of clarification.  The way the regulation

23   is written, and I want to emphasize because I heard

24   several times during oral argument by the Attorney

25   General's Office the regulation being referred to as a

1   statute.  It is not a statute; it is a regulation, and

2   it is treated differently under the law and under the

3   abundant case authorities.

4          But the way the regulation is written makes it

5   impossible for dealers to determine whether or not

6   certain implementations of what we would call a load

7   indicator are compliant with the regulation.  The

8   dealers have shunned making sales and transferring

9   firearms, specifically Glock pistols, because of that

10  vagueness and because of the fear of enforcement action

11  by the Attorney General's Office.

12         The consumers, in turn, because a sale --

13         THE COURT:  What is so vague about the term "a

14  device that plainly indicates"?

15         MR. FLIG:  Okay.

16         THE COURT:  I mean, you know, they are pretty

17  simple English words that Mr. Kaplan has defined for

18  us.

19         MR. FLIG:  Your Honor, I think, to make the

20  issue clearer, we can go back to the old adage of a

21  real estate adage, location, location, location.  The

22  words by themselves are straightforward, there's no

23  argument with that.  The context in which they are used

24  makes them inherently vague.

25         Throughout the Plaintiffs' briefs, we've

1    indicated how the word "device" has been used by the

2    Attorney General's Office to -- let me say that

3    differently -- how the term "device" has been

4    implemented by various manufacturers to which the

5    Attorney General has not objected.

6         In some cases, it is a hole drilled into the

7    base of a firing chamber, in some cases it is an

8    extractor-based mechanism where the extractor protrudes

9    slightly from the slide, in some cases it is a tab

10   projecting up from the slide itself, in other cases

11   there is a button that pushes out from the rear of the

12   slide.  So there have been many implementations which

13   the Attorney General has not objected to.

14        The concern here is it's somewhat awkward

15   because, in reality, just about anything may be a

16   loaded -- a load indicator pursuant to the definition

17   of a device which plainly indicates.  Indeed, all

18   pistols inherently have load indicators built into

19   them.  That's the slide.  Anyone who has any experience

20   or no experience with firearms knows that, to determine

21   whether or not the firearm is loaded, you have to open

22   the slide.  Isn't the slide itself a device?  Isn't

23   that an implementation of load indicator?

24        Now, one may argue that it has to be something

25   other than what's inherently part of the design of any

1    pistol, but then if we have an implementation of a hole

2    drilled into the back of a firing chamber, why not look

3    down the barrel, as ridiculous as that may seem?  Why

4    not provide a little dowel with a marker on the end and

5    push it down the barrel?  Isn't that a device?

6          The whole point is that the regulation is so

7    vague in its context of the use -- in its use of the

8    word "device" and "indicates," that really anything can

9    be a device which plainly indicates, which opens up

10   kind of a Pandora's box to the issue of enforcement.

11         On the vagueness claim, the Attorney General's

12   Office discussed the standards for an as-applied claim.

13   The standards -- you know, there are other ways of

14   looking at this, and in fact the Supree Court, in a

15   rather landmark case, *Grayned v. City of Rockford*,

16   said, "Even when speech is not at issue, the void for

17   vagueness doctrine addresses at least two connected but

18   discrete due process concerns:  First, that the

19   regulated parties should know what is required of them

20   so they may act accordingly" -- in this case, they

21   don't because really anything and everything complies

22   with the regulation -- and then, second, "Precision and

23   guidance are necessary so that those enforcing the law

24   do not act in an arbitrary or discriminatory way.

25         The question -- how this entire case came up is:

1    Glocks have been forbidden, whereas other

2    implementations of pistols -- of load indicators on

3    other pistols have not been forbidden.  The question

4    is:  Why, based on the definition of load indicator as

5    it stands within the regulation?

6         The Attorney General's Office brought up an

7    interesting point, and that is that it has not -- it

8    has not banned other implementations of load indicators

9    in the State of Massachusetts and that, that somehow

10   indicates that it's possible for this regulation to

11   stand.  What the Attorney General has also written in

12   her brief, in the original motion to dismiss, not in

13   the response, was that the fact that the Attorney

14   General's Office has not, up till now, enforced any

15   such action does not preclude her from doing so in the

16   future.

17        That sounds like -- almost like -- like an

18   open-ended warning that just about anything that the

19   Attorney General determines does not comply with the

20   regulation based on the wording, on the vagueness of

21   "device which plainly indicates" gives her license to

22   do, there is nothing to prevent the Attorney General's

23   Office from tomorrow saying, you know, Pistol X doesn't

24   comply, Pistol Y doesn't comply or Pistol Z doesn't

25   comply, after having had this regulation in place for

1    16 years.

2            The reality is, Your Honor, a new firearms

3    dealer -- let's, you know, for the sake of argument,

4    say a new firearms dealer opens up shop today.  Does

5    that firearms dealer have sufficient notice of what is

6    required of a pistol that that firearms dealer sells or

7    transfers to a Massachusetts citizen by the words

8    "device which plainly indicates"?  If this were not a

9    Glock issue -- Glock just happens to be the one that

10   the Attorney General enforced.  This could be ABC

11   pistol manufacturer, or it could be, you know, 123

12   pistol manufacturer.  Looking at these words, does the

13   dealer know what does and does not comply?

14           In this specific case, the dealers actually

15   inquired of the Attorney General's Office.  The

16   Attorney General's Office response was, "They don't."

17   The Attorney General's Office position is that it's not

18   required to explain why the Glock pistols don't comply.

19   Well, we can project that reasoning to any pistol.

20   They don't have to explain anything because the

21   regulation permits the Attorney General, based on the

22   vague definition of "device which plainly indicates,"

23   to determine that any pistol doesn't comply.

24           THE COURT:  Well, what about taking Mr. Kaplan's

25   suggestion and challenging this in State Court,

1    challenging the regulation for just those reasons, that

2    you haven't been told how or why your particular pistol

3    doesn't comply with the standard "a device that plainly

4    indicates"?  Why can't you do that in State Court?

5            MR. FLIG:  For a couple of reasons, Your Honor.

6    One is the Second Amendment has been implicated here,

7    and that is that, as a result of the dealers' -- a

8    cloud over the dealers' sales and transfers, they have

9    shunned transferring or selling firearms to

10   Massachusetts citizens.  Massachusetts citizens have

11   been deprived of the opportunity for purchasing

12   firearms or acquiring firearms in common use, straight

13   out of the *Heller -- Washington DC v. Heller.*

14           Glock pistols are perhaps the most prototypical

15   pistols in the United States today.  They are by far

16   the most common pistols used in competitions, they have

17   a two-thirds market share for all law enforcement

18   agencies in the United States.  There's no question

19   that these pistols are firearms in common use.  By

20   having this regulation in place, Massachusetts citizens

21   specifically don't have access to firearms in common

22   use.  That's the Second Amendment piece.

23           With respect to the interpretation piece, I

24   would pose to the Court that the definition of load

25   indicator as a, quote, unquote, device which plainly

1    indicates, dot, dot, dot, is so defective as to be

2    incapable of interpretation.  That is because

3    "device" as I noted in the briefs, and using the

4    Attorney General's own synonyms that she has brought

5    up, can be anything.

6         So, to interpret something that is incapable of

7    interpretation without resort to additional facts or

8    additional descriptions, additional standards that are

9    provided nowhere in the regulation, nowhere in the

10   Massachusetts General Laws, nowhere in the regula --

11   Commonwealth of Massachusetts regulations anywhere, is

12   essentially saying rewrite the regulation.  If for

13   nothing other than equitable reasons, that would be

14   unjust, and the reason is the Attorney General's

15   position in this case is that the regulation is

16   abundantly clear as is.  Not only that, she's not

17   required to provide an explanation as to why she makes

18   a particular decision.

19        So, really, you know, this is sending the

20   regulation back to the very agency that is saying, Hey,

21   there's no problem here.  I mean, the reality is a

22   dealer looking at two pistols has to determine, Why

23   does this one work, and why does this one not work?

24   Under the --

25        THE COURT:  You have to wrap up now, Mr. Flig.

1          MR. FLIG:  Okay.  Thank you, Your Honor.

2          With respect to -- just a couple of alibi

3     issues.  With respect to the exhibits contradicting the

4     statements in the complaint, that is purely an issue of

5     opinion.  That is not an issue of fact.  At the motion

6     to dismiss stage, as brother counsel has so aptly put

7     it, the question is:  Is there a prima facie case --

8     are there sufficient facts alleged to make the

9     prima facie case that overcomes the motion to dismiss

10    standard?  And in that sense, there is a semantic

11    opinion, US Supreme Court precedent and precedent

12    within this Circuit that the allegations in the

13    complaint are to be taken as true and to be viewed in

14    the Plaintiffs' favor.

15          What I want to finally add, Your Honor, and if I

16    may, this case I think is rather simple.  I think the

17    Attorney General has made it much more than it actually

18    is.  And I can tell you what this case is not.  This

19    case is not an attack on the Attorney General's

20    authority to promulgate regulations with respect to the

21    commercial enterprise in firearms.  It is not regarding

22    the effectiveness of the load indicators in the

23    abstract or in reality, if there are any statistics or

24    any data that the Attorney General can put forth with

25    respect to their fulfilling the purpose for which the

1    regulation was put together.  This case is not about

2    whether a particular implementation of the load

3    indicator regulation is correct or incorrect

4    specifically with respect to Glock pistols.

5           This case is very simple, and that is, based on

6    the definition of load indicator that is in the reg --

7    within the regulation itself, again, coming back to

8    real estate, real estate, real estate because the

9    context means everything here, does a firearm dealer

10   within Massachusetts have enough notice as to what is

11   and what isn't permissible?  And does the Attorney

12   General's Office who is tasked with enforcing the

13   regulation have enough guidance?  Are there any

14   standards that enforcement is not capricious or

15   arbitrary?

16          Glock pistols have load indicators that are

17   virtually identical to several other implementations of

18   load indicators by other manufacturers.  I would ask

19   the Court in the future, should the Court be inclined,

20   and I would hope the Court would be, to deny the

21   Attorney General's motion to dismiss and allow this

22   case to move forward.  I would ask the Court for

23   permission to bring in exemplars of various

24   implementations so the Court can see for itself

25   because, you know, a picture is worth a thousand words.

1    THE COURT:  All right.  You need to be finished
2  at this point.
3    I'll give you a short rebuttal after
4  Mr. Kaplan's rebuttal, if he has one.
5    MR. FLIG:  Thank you, Your Honor.
6    MR. KAPLAN:  Yes, Your Honor.  Just a few quick
7  points based on what -- some of the things Mr. Flig
8  said.
9    One, just to address the issue of the standing
10  of the organizations briefly, Mr. Flig mentioned the
11  declarations that were submitted.  I would just point
12  out that those declarations never do what they need to
13  do.  Under the case law, they need to actually identify
14  that there is injury to the members.  If you read
15  through the declarations, they don't do it.  They also
16  don't identify individual members, which is also a
17  requirement.  I would point you to the case that the
18  Commonwealth cited in its brief, *Summers v. Earth*, and
19  that case from the Supreme Court indicates that, if
20  you're going to take this route with organizations,
21  you've got to be specific which individuals were
22  injured, how were they injured.  And none of that is
23  laid out even in the declarations that Plaintiffs put
24  forward.
25    Mr. Flig said several times and went back to

1    this idea of, Well, how is a new dealer supposed to
2    know about some other kind of gun, whether or not it
3    fits within the regulation or not?  And I would just
4    point out to Your Honor that, again, this might be a
5    more appropriate State law issue, a State Court issue.

6         But if we're here, we're here under the issue of
7    a constitutional vagueness, and there are very specific
8    parameters under which those claims can be brought.  It
9    can be brought facially, which means it would have to
10   be there is no implementation that works, or as applied
11   to their situation.  Their situation is the Glock.
12   They have been told, as a constitutional matter, that
13   the Glock doesn't meet the standard.  If they don't
14   like that, they can go into State Court, you know, and
15   they can, you know, bring the issue forward, Well, why
16   not the Glock?  And it's an entirely different kind of
17   issue than the issue that we have to deal with here.

18        But for a State -- I mean, for a Federal Court
19   claim, for the vagueness claim, it's just not good
20   enough to go ahead and say that.  And the idea that
21   generally there may be other things that the dealers
22   don't know about is not -- you know, is not good enough
23   when it's clear that facially, as I pointed out before,
24   the claim doesn't work, and as applied within the
25   Glock, it doesn't either.

1        The -- one other thing that I just want to make

2    sure that I explain to the Court is the nature of the

3    Attorney General's administrative and regulatory

4    authority.  The Attorney General's Office is not a

5    typical administrative agency.  When we go ahead and

6    say, for instance, that the Glock is no good under the

7    regulation, we're giving the Attorney General's view,

8    but it's not that the Attorney General has some sort of

9    self-executing enforcement power over this.  We're not

10    an administrative agency that has administrative

11    hearing officers.  We have to go to Superior Court to

12    enforce these things.  So it's very similar to the

13    cases instead where, you know, the DEA is, you know,

14    making statements about its statutes, etc.

15        In this instance, when we indicate these things,

16    it's not as if there isn't an opportunity for recourse.

17    Again, Plaintiff could easily go into State Court on

18    any of these issues and talk about it, and it's not

19    even as though there's already been an administrative

20    decision about a specific case; it's more a matter of

21    what the Attorney General interprets the regulation as

22    and what it indicates it would go ahead and move to

23    enforce on.

24        And then, finally, this issue about the exhibits

25    in the complaint, I think it is important to point out

1    to Your Honor that actually where exhibits are

2    attached, there is good authority that they will trump

3    the more general language in the complaint.  I would

4    point the Court to *Yacubian v. US*, which is a

5    First Circuit case from last year.  There it was a

6    bunch of scallop fishermen who sued NOAA, and they

7    indicated that there was, you know, abuse of process

8    and malicious prosecution.

9           But the written attachments to the complaint

10   demonstrated that, that was not the case, undercut it,

11   and there was no support for the generalized statement,

12   and it was the exhibits that actually would govern in

13   that case.  And I would just ask the Court to take a

14   look at that case.

15          THE COURT:  Thank you, Mr. Kaplan.

16          And finally, Mr. Flig, in rebuttal.

17          MR. FLIG:  Thank you, Your Honor.

18          Again, we come back to the issue that this is

19   not a State law.  The -- it is -- it was briefed in the

20   Plaintiffs' opposition and in their response to the

21   Attorney General's reply that -- I think it's somewhat

22   disingenuous to say that this is an issue that the

23   State Courts would handle because, under the concept of

24   our deference or Seminole Indian deference, that the

25   Attorney General would argue to the State Court that

1    the State Court not be granted jurisdiction to

2    interpret the regulation because it is not a statute.

3           And this is abundantly clear, you know, in the

4    most recent case of *Decker v. Oregon*.  The

5    United States Supreme Court confirmed our deference,

6    though questioning it, and that is that the case would

7    be not given to the State Courts, it would be sent

8    right back to the Attorney General's Office that says

9    it's absolutely clear.

10          With respect to the as-applied challenge and the

11   Plaintiffs having actual knowledge that Glock pistols

12   don't comply, the actual knowledge is -- and this is

13   critical here because the actual knowledge here is the

14   Attorney General saying they don't, Glock pistols don't

15   comply.  There's no explanation, there's no standard by

16   which noncompliance is measured; it's just a blanket

17   statement, "They don't."

18          This is akin to having a speed limit on the

19   freeway that says "Don't speed."  When the motorist is

20   stopped and argues to the police officer, "I wasn't

21   speeding," the police officer has every right in the

22   world to say, "Yes, you were.  It says, 'don't speed.'"

23          That's the problem here.  The problem here is

24   that there are no standards.  What renders a statute

25   vague is not the possibility that it will sometimes be

1    difficult to determine what the incriminating fact that
2    establishes has been proved but, rather, the
3    indeterminacy of precisely what that fact is.  This
4    is straight out of *US v. Williams* that the
5    Attorney General so approvingly speaks about.

6         The question of what that fact is in this case
7    is precisely the issue.  What shape does this device
8    have to be?  What size does it have to?  What color
9    does it have to be?  Does it have to be visual?  Does
10   it have to be tactile?  What is it?  There are no
11   standards.  And to glean from the words "device which
12   plainly indicates" in this context is really asking --
13   I mean, it's asking for divination.  It could be
14   anything, which is the -- which is precisely the
15   problem.

16        The concept of vagueness, Your Honor, as
17   briefed, I think is a very important constitutional
18   concept, not necessarily whether it's in the Federal
19   Court or the State Court, is a very important concept
20   because the question that it prompts is:  At what point
21   do those subject to statutes and regulations -- how
22   much clarity does that -- does a regulation or a
23   statute have to provide those who are subject to it to
24   be able to comply?  Because, otherwise, when you have
25   those that are tasked with enforcing that regulation or

1    statute, it opens up the potential for abuse.

2           You know, I don't know the Attorney General's

3    motivation in this case.  I dare not conjure any ideas

4    as to why Glocks were chosen in particular, as opposed

5    to other pistols that have very similar features or

6    virtually identical features, but this is precisely the

7    type of capricious or arbitrary enforcement that is

8    possible when you have this type of vagueness.  And I

9    don't think that, under of the concept of our republic,

10   that this is something that should stand.

11          THE COURT:  All right.  Thank you, Mr. Flig.

12          I will take the matter under advisement.  Thank

13   you, counsel, for your arguments.

14          MR. FLIG:  Thank you, Your Honor.

15          MR. KAPLAN:  Thank you, Your Honor.

16          THE CLERK:  All rise.

17          (Adjourned, 3:51 p.m.)

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T I O N

3

4

5

6

7

8

9         I, Debra D. Lajoie, RPR-FCRR-CRI-RMR, do

10   hereby certify that the foregoing pages are a true and

11   accurate transcription of my stenographic notes in the

12   above-entitled case.

13

14

15

16

17

18              /s/ Debra D. Lajoie

19

20

21

22

23              6/12/15

24

25

# Tab 12

| |
|---|
| **Massachusetts Handgun Sales Regulation** |
| |
| **940 C.M.R. 16, *et seq.*** |
| |
| (Pertinent Excerpts highlighted.) |

940 CMR 16.00:      HANDGUN SALES

Section

16.01:  Definitions
16.02:  Unfair or Deceptive Practices: General
16.03:  Tamper-Resistant Serial Numbers
16.04:  Sale of Handguns Made From Inferior Materials
16.05:  Sale of Handguns Without Childproofing or Safety Devices
16.06:  Safety Warning/Disclosures
16.07:  Transfers of Used Handguns
16.08:  Severability
16.09:  Enforcement Dates

The Attorney General of the Commonwealth of Massachusetts promulgates 940 CMR 16.00 pursuant to authority granted to him under M.G.L. c. 93A, § 2(c). 940 CMR 16.00 defines certain unfair acts or practices but is not intended to describe all types of practices prohibited by M.G.L. c. 93A, § 2. 940 CMR 16.00 does not legitimize acts that are not specifically prohibited by 940 CMR 16.00, and does not alter or amend common law rights and remedies available to consumers. 940 CMR 16.00 is designed to supplement existing statutes and regulations. References to statutes and other regulations shall include amendments thereto from time to time.

16.01:  Definitions

For purposes of 940 CMR 16.00, the following terms shall have the following meanings:

Average group diameter test result:  shall mean the arithmetic mean of three separate group diameter test results taken from a set distance.

Combination handle lock:  shall mean a device which precludes the use of the handgun unless the combination tumblers are properly aligned. This device may, for example, have the numbers for the combination tumblers protrude from the handle of the handgun.

Educational collector:  shall mean an individual who is properly licensed as a bonafide collector pursuant to 520 CMR 7.00, and whose collection is maintained for purposes of display, research, lecturing, demonstration, or historical significance, as opposed to being maintained for personal enjoyment and/or possible future profit.

Group diameter test result:  shall mean the largest spread in inches between the centers of any of the holes made in a test target after firing five rounds from the handgun in question at the target from a set distance. The ammunition used shall be the type recommended by the handgun manufacturer in its user manual, or if none is recommended, any standard ammunition of the correct caliber in new condition.

Hammer deactivation device:  shall mean a built-in device (or an extension of the hammer) which allows a user manually to lower the handgun's hammer into a deactivated position, and which must be manually re-toggled in order to re-cock the hammer before the handgun can be fired.

Handgun:  shall mean a weapon, designed to be fired by the use of a single hand, from which may be fired or ejected one or more solid projectiles propelled via a chemical ignition, and which has:
   (a)  a smooth bore with a barrel less than 18 inches long;
   (b)  a smooth bore and an overall weapon length of less than 26 inches; or
   (c)  a rifled bore with a barrel less than 16 inches.

16.01: continued

Handgun Drop Test: shall mean a test in which the handgun in question shall be:
   (a) test loaded;
   (b) set such that the handgun is ready to fire; and
   (c) dropped onto a solid slab of concrete from a height of one meter from each of the
following positions:
      1. normal firing position,
      2. upside down,
      3. on grip,
      4. on the muzzle,
      5. on either side, and
      6. on the exposed hammer or striker (or if there is no exposed hammer or striker, then
      the rearmost part of the firearm).
In addition, if the handgun is designed so that its hammer or striker may be set in other
positions, the handgun in question shall be tested with the hammer or striker in each such
position (but otherwise ready to fire). Alternatively, the tester may use different handguns
of the same make and model, in similar condition, for the test of each of these
hammer/striker settings.

Handgun Performance Test: shall mean a test in which the handgun in question shall fire 600
rounds, stopping every 100 rounds to tighten any loose screws and to clean the gun (if required
by the cleaning schedule in the user manual), and as needed to refill the empty magazine or
cylinder to capacity before continuing. For any handgun that loads other than via a detachable
magazine, the tester shall also pause every 50 rounds for ten minutes. The ammunition used
shall be the type recommended by the handgun manufacturer in its user manual, or if none is
recommended, any standard ammunition of the correct caliber in new condition. A handgun
shall pass this test if it:
   (a) fires the first 20 rounds without a malfunction, and
   (b) fires the full 600 rounds with no more than six malfunctions and without any crack or
breakage of an operating part of the handgun which increases the danger of injury to the
user.

Handgun-purveyor: shall mean any person or entity that transfers handguns to a customer
located within the Commonwealth of Massachusetts. However, handgun-purveyor shall not
include any of the aforementioned if:
   (a) the person or entity transfers less than five handguns per year,
   (b) the transfer in question is for the purpose of, and does, directly or indirectly, supply law
enforcement officials or United States military personnel with handguns for their official
duties,
   (c) the transfer in question is for the purpose of, and does, directly or indirectly, supply
museums or educational collectors with the handguns in question,
   (d) the transfer in question is undertaken to, and does, result in the surrender of handguns
to military or law enforcement personnel,
   (e) the transfer in question is of handguns that qualify as antique firearms as defined in 18
U.S.C. § 921, or
   (f) the transfer in question is of handguns that are solely designed and sold specifically for
formal target shooting competition.

Key activated trigger lock: shall mean a device that when locked in place by means of a key,
prevents a potential user from pulling the trigger of the handgun without first removing the
trigger lock by use of the trigger lock's key.

Load indicator: shall mean a device which plainly indicates that a cartridge is in the firing
chamber within the handgun.

Magazine safety disconnect: shall mean a device that prevents the firing of the handgun when
the magazine is detached from the handgun.

Make and model: shall mean any group of handguns, all of which are made by a manufacturer
by the same method and according to the same design pattern and specifications.

16.01: continued

Make and Model Performance Requirements: shall mean a test in which three handguns in new condition of the make and model being tested shall each pass the Handgun Performance Test.

Make and Model's Average Group Diameter Test Result: shall mean the arithmetic mean of the results of three Average Group Diameter Tests, each performed on a different handgun in new condition of the make and model being tested.

Malfunction: shall mean any failure to feed, chamber, fire, extract, or eject a round, or any failure to accept or eject a magazine, or any other failure which prevents the handgun, without manual intervention beyond that needed for routine firing and periodic reloading, from firing the chambered round or moving a new round into position so that the handgun is capable of firing the new round properly. Malfunction shall not include a misfire caused by a faulty cartridge whose primer fails to detonate when properly hit by the handgun's firing mechanism.

Passive use-limitation device: shall mean a device that automatically resets itself so that an unauthorized user cannot fire the handgun. As an example, a key activated trigger lock is not a passive use-limitation device because it needs to be re-locked manually after its key is used to unlock it; thus the next user can fire the handgun without having to unlock the handgun.

Prone to accidental discharge: shall mean unable to pass the following test: five handguns in new condition of the make and model in question shall each be subjected to, and none shall discharge during, the Handgun Drop Test.

Ready to fire: shall mean loaded, and in a condition such that pulling the trigger (and taking any action that must simultaneously accompany the pulling of the trigger as part of the firing procedure) will fire the handgun.

Serial number: shall mean the number stamped, inscribed, or placed upon a handgun by a handgun-purveyor pursuant to M.G.L. c. 269, § 11E.

Solenoid use-limitation device: shall mean a device which precludes, by use of a magnetically activated relay, the firing of the handgun unless a magnet of the appropriate strength is placed in proximity to the handle of the handgun. Such magnet may be embedded in a ring which can be worn on the user's gun hand.

Test loaded: shall mean loading each chamber of the handgun in question with an empty case with a primer installed.

Transfer: shall mean sell, rent, or lease. Transfer shall not include a sale to a business entity that is primarily a firearm wholesaler, so long as the sale, by its terms, prohibits the purchaser from reselling the handgun to a handgun retailer or consumer in the Commonwealth.

16.02: Unfair or Deceptive Practices: General

(1) It shall be an unfair or deceptive practice for any handgun-purveyor, in conjunction with the transfer (or offer to transfer) of a handgun to a consumer in the Commonwealth, to fail to comply with M.G.L. c. 93A, 940 CMR 16.00 et seq., or any other existing local, state, or federal statute, rule or regulation whose implementation serves to protect consumers from unfair and deceptive practices by means including, but not limited to, regulating conditions of sale, precluding the sale of products when such sale will place purchasers in violation of the law, demanding the disclosure of information, and ensuring the satisfactory condition and non-contraband status of goods proffered for sale. Examples of the above include laws, regulations, and rules that:
    (a) forbid the sale of handguns to juveniles, addicts, or mentally incompetent individuals,
    (b) forbid the sale of silencers, armor penetrating bullets, or machine-gun pistols (when possession by purchasers will be unlawful),
    (c) forbid participation in any way in the obliteration of serial numbers from handguns prior to sale,
    (d) forbid the sale of handguns whose serial numbers have been defaced,

16.02: continued

(e) require sellers to keep records of handgun sales,
(f) forbid sellers from delivering or transporting handguns loaded, or
(g) forbid the delivery of handguns to the custody of a minor.

(2) It shall be an unfair or deceptive practice for a handgun-purveyor to make material misrepresentations or make false certifications regarding any handgun offered for transfer.

16.03: Tamper-Resistant Serial Numbers

It shall be an unfair or deceptive practice for a handgun-purveyor to transfer or offer to transfer to any customer located within the Commonwealth any handgun on which the serial number has been placed solely in a location on the handgun that results in the number's susceptibility to eradication. A serial number shall be deemed not susceptible to eradication for purposes of 940 CMR 16.00 if:

(1) it is placed on the interior of the handgun, and the handgun-purveyor provides information regarding the location of the interior serial number to the Office of the Attorney General and other law enforcement officials upon request; or

(2) it is placed on the exterior of the handgun in a way that is not visible to the unaided eye, but is visible with the aid of an infrared detector or other device, and the handgun-purveyor provides information regarding the location of the nonvisible serial number or any method by which this number can be made viewable to the Office of the Attorney General and other law enforcement officials upon request.

16.04: Sale of Handguns Made From Inferior Materials

It shall be an unfair or deceptive practice for a handgun-purveyor to transfer or offer to transfer to any customer located within the Commonwealth any make and model of handgun that:

(1) has a frame, barrel, cylinder, slide or breechblock:
    (a) composed of any metal having a melting point of less than 900°F,
    (b) composed of any material having an ultimate tensile strength of less than 55,000 pounds per square inch, or
    (c) composed of any powdered metal having a density of less than 7.5 grams per cubic centimeter; or

(2) is prone to repeated firing based on a single pull of the trigger, prone to the explosion of the handgun during firing with standard ammunition, or prone to accidental discharge.

(3) 940 CMR 16.04(1) shall not apply to any make and model of handgun which satisfies the Make and Model Performance Requirements. The Attorney General may require that the handgun-purveyor, or the entity testing the make and model in question on behalf of the handgun-purveyor, provide a sworn certification verifying that the make and model met the performance requirements. At the Attorney General's discretion, he may, upon 60 days notice, require that any such test be performed again by an independent testing entity chosen by the Attorney General, upon three test guns of the make and model purchased at retail. In such a case, the prior certification shall be prospectively invalid at the conclusion of the notice period and the make and model in question may henceforth only meet the Make and Model Performance Requirements by obtaining a certification from the independent tester. A handgun-purveyor may resubmit a make and model to the independent tester for testing an unlimited number of times.

16.05: Sale of Handguns Without Childproofing or Safety Devices

(1) It shall be an unfair or deceptive practice to sell a handgun without a safety device in violation of M.G.L. c. 140, § 131K.

(2) It shall be an unfair or deceptive practice for a handgun-purveyor to transfer or offer to transfer to any customer located within the Commonwealth any handgun which does not contain

16.05: continued

a mechanism which effectively precludes an average five year old child from operating the handgun when it is ready to fire; such mechanisms shall include, but are not limited to: raising trigger resistance to at least a ten pound pull, altering the firing mechanism so that an average five year old child's hands are too small to operate the handgun, or requiring a series of multiple motions in order to fire the handgun.

(3) It shall be an unfair or deceptive practice for a handgun-purveyor to transfer or offer to transfer to any customer located within the Commonwealth any handgun which does not contain a load indicator or magazine safety disconnect.

(4) 940 CMR 16.05(2) shall not apply to handguns which have a hammer deactivation device. 940 CMR 16.05(3) applies only to handguns that have a mechanism to load cartridges via a magazine.

16.06: Safety Warning/Disclosures

(1) It shall be an unfair or deceptive practice for a handgun-purveyor to transfer or offer to transfer to any customer located within the Commonwealth any handgun unless that handgun is accompanied by the following warning, provided on a separate sheet of paper included within the packaging enclosing the gun, which, in at least 12 point type, states the following:

"WARNING FROM THE MASSACHUSETTS ATTORNEY GENERAL: This handgun is not equipped with a device that fully blocks use by unauthorized users. More than 200,000 firearms like this one are stolen from their owners every year in the United States. In addition, there are more than a thousand suicides each year by younger children and teenagers who get access to firearms. Hundreds more die from accidental discharge. It is likely that many more children sustain serious wounds, or inflict such wounds accidentally on others. In order to limit the chance of such misuse, it is imperative that you keep this weapon locked in a secure place and take other steps necessary to limit the possibility of theft or accident. Failure to take reasonable preventive steps may result in innocent lives being lost, and in some circumstances may result in your liability for these deaths."

Failure to include this warning in the packaging enclosing the gun shall not be a violation of 940 CMR 16.00 if the handgun in question complies with 940 CMR 16.05(1) by means of a built-in passive use-limitation device, including but not limited to a nondetachable solenoid use-limitation device.

(2) It shall be an unfair or deceptive practice for a handgun-purveyor to transfer a handgun directly to a retail customer located within the Commonwealth without demonstrating how to load, unload, and safely store the handgun, and how to engage and disengage all safety devices on the handgun. This shall include an explanation of the circumstances for which the safety devices are designed to prevent the firing of the handgun. The handgun-purveyor shall also note for the retail customer the absence, if any, of the following: a load indicator, a magazine safety disconnect or an internal safety.

(3) It shall be an unfair or deceptive practice for a handgun purveyor to transfer to a customer located within the Commonwealth a handgun that has a barrel shorter than three inches, unless the handgun purveyor discloses the limits of the accuracy of the make and model of handgun for sale by providing in writing to the customer (prior to sale) the make and model's average group diameter test result at seven yards, average group diameter test result at 14 yards, and average group diameter test result at 21 yards.

16.07: Transfers of Used Handguns

(1) 940 CMR 16.03 and 16.05(2) and (3) shall not apply to the transfer of (or offer to transfer) any handgun that previously has been sold at retail to a consumer and that was manufactured prior to the enforcement date for those provisions.

16.07:  continued

(2)  940 CMR 16.06(3) shall not apply to the transfer of (or offer to transfer) any handgun that previously has been sold at retail to a consumer, was manufactured prior to the enforcement date for 940 CMR 16.06(3), and for which the handgun-purveyor discloses the limits of the accuracy of the specific handgun for sale by providing in writing to the customer(prior to sale) the handgun's average group diameter test result at seven yards, average group diameter test result at 14 yards, and average group diameter test result at 21 yards.

(3)  940 CMR 16.04(2), as it pertains to any make and model prone to accidental discharge, shall not apply to the transfer of (or offer to transfer) any handgun that previously has been sold at retail to a consumer, was manufactured prior to the enforcement date for 940 CMR 16.04(2), and for which the handgun-purveyor provides to the buyer a sworn certification that the handgun-purveyor has performed the Handgun Drop Test on the handgun in question in fully cocked position, and on the same handgun (or on other handguns of the same make and model in similar condition) in all other hammer/striker positions, and that there were no discharges during the test.

(4)  940 CMR 16.04(1) shall not apply to the transfer of (or offer to transfer) any handgun that previously has been sold at retail to a consumer, was manufactured prior to the enforcement date for 940 CMR 16.04(1), and for which the handgun-purveyor provides a sworn certification to the buyer that the specific handgun purchased passed the Handgun Performance Test.

16.08:  Severability

If any section or subsection of 940 CMR 16.00 shall be held invalid, the validity of the remainder of 940 CMR 16.00 shall not be affected thereby.  If the application of any section or subsection of 940 CMR 16.00 to any person or circumstance shall be held invalid, the applicability of such section or subsection to any other person or circumstance shall not be affected thereby.

16.09:  Enforcement Dates

940 CMR 16.00 shall apply as follows:

(1)  940 CMR 16.01, 16.02, and 16.08, and 940 CMR 16.06(1) and (2) shall apply to acts committed or practices in force as of January 15, 1998;

(2)  940 CMR 16.04 and 940 CMR 16.06(3), 16.07(2), (3) and (4) shall apply to acts committed or practices in force as of June 30, 1998; and

(3)  940 CMR 16.03 and 16.05, and 940 CMR 16.07(1) shall apply to acts committed or practices in force as of September 30, 1998.

**REGULATORY AUTHORITY**

940 CMR 16.00:  M.G.L. c. 93A, § 2(c).

(PAGES 125 THROUGH 130 ARE RESERVED FOR FUTURE USE.)

# Tab 13

**<u>Johnson v. U.S.</u>**

No. 13-7120, Slip Opinion (S.Ct., 26 JUN 2015)

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## JOHNSON *v.* UNITED STATES

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

No. 13–7120. Argued November 5, 2014—Reargued April 20, 2015—
Decided June 26, 2015

After petitioner Johnson pleaded guilty to being a felon in possession of a firearm, see 18 U. S. C. §922(g), the Government sought an enhanced sentence under the Armed Career Criminal Act, which imposes an increased prison term upon a defendant with three prior convictions for a "violent felony," §924(e)(1), a term defined by §924(e)(2)(B)'s residual clause to include any felony that "involves conduct that presents a serious potential risk of physical injury to another." The Government argued that Johnson's prior conviction for unlawful possession of a short-barreled shotgun met this definition, making the third conviction of a violent felony. This Court had previously pronounced upon the meaning of the residual clause in *James* v. *United States*, 550 U. S. 192; *Begay* v. *United States*, 553 U. S. 137; *Chambers* v. *United States*, 555 U. S. 122; and *Sykes* v. *United States*, 564 U. S. 1, and had rejected suggestions by dissenting Justices in both *James* and *Sykes* that the clause is void for vagueness. Here, the District Court held that the residual clause does cover unlawful possession of a short-barreled shotgun, and imposed a 15-year sentence under ACCA. The Eighth Circuit affirmed.

*Held*: Imposing an increased sentence under ACCA's residual clause violates due process. Pp. 3–15.

 (a) The Government violates the Due Process Clause when it takes away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement. *Kolender* v. *Lawson*, 461 U. S. 352, 357–358. Courts must use the "categorical approach" when deciding whether an offense is a violent felony, looking "only to the fact that the defendant has been convicted

Syllabus

of crimes falling within certain categories, and not to the facts underlying the prior convictions." *Taylor* v. *United States*, 495 U. S. 575, 600. Deciding whether the residual clause covers a crime thus requires a court to picture the kind of conduct that the crime involves in "the ordinary case," and to judge whether that abstraction presents a serious potential risk of physical injury. *James, supra,* at 208. Pp. 3–5.

(b) Two features of the residual clause conspire to make it unconstitutionally vague. By tying the judicial assessment of risk to a judicially imagined "ordinary case" of a crime rather than to real-world facts or statutory elements, the clause leaves grave uncertainty about how to estimate the risk posed by a crime. See *James, supra,* at 211. At the same time, the residual clause leaves uncertainty about how much risk it takes for a crime to qualify as a violent felony. Taken together, these uncertainties produce more unpredictability and arbitrariness than the Due Process Clause tolerates. This Court's repeated failure to craft a principled standard out of the residual clause and the lower courts' persistent inability to apply the clause in a consistent way confirm its hopeless indeterminacy. Pp. 5–10.

(c) This Court's cases squarely contradict the theory that the residual clause is constitutional merely because some underlying crimes may clearly pose a serious potential risk of physical injury to another. See, *e.g., United States* v. *L. Cohen Grocery Co.,* 255 U. S. 81, 89. Holding the residual clause void for vagueness does not put other criminal laws that use terms such as "substantial risk" in doubt, because those laws generally require gauging the riskiness of an individual's conduct on a particular occasion, not the riskiness of an idealized ordinary case of the crime. Pp. 10–13.

(d) The doctrine of *stare decisis* does not require continued adherence to *James* and *Sykes*. Experience leaves no doubt about the unavoidable uncertainty and arbitrariness of adjudication under the residual clause. *James* and *Sykes* opined about vagueness without full briefing or argument. And continued adherence to those decisions would undermine, rather than promote, the goals of evenhandedness, predictability, and consistency served by *stare decisis*. Pp. 13–15.

526 Fed. Appx. 708, reversed and remanded.

SCALIA, J., delivered the opinion of the Court, in which ROBERTS, C. J., and GINSBURG, BREYER, SOTOMAYOR, and KAGAN, JJ., joined. KENNEDY, J., and THOMAS, J., filed opinions concurring in the judgment. ALITO, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports.  Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———————

No. 13–7120

———————

## SAMUEL JAMES JOHNSON, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE EIGHTH CIRCUIT

[June 26, 2015]

JUSTICE SCALIA delivered the opinion of the Court.

Under the Armed Career Criminal Act of 1984, a de-
fendant convicted of being a felon in possession of a fire-
arm faces more severe punishment if he has three or more
previous convictions for a "violent felony," a term defined
to include any felony that "involves conduct that presents
a serious potential risk of physical injury to another."  18
U. S. C. §924(e)(2)(B).  We must decide whether this part
of the definition of a violent felony survives the Constitu-
tion's prohibition of vague criminal laws.

I

Federal law forbids certain people—such as convicted
felons, persons committed to mental institutions, and drug
users—to ship, possess, and receive firearms.  §922(g).  In
general, the law punishes violation of this ban by up to 10
years' imprisonment.  §924(a)(2).  But if the violator has
three or more earlier convictions for a "serious drug of-
fense" or a "violent felony," the Armed Career Criminal
Act increases his prison term to a minimum of 15 years
and a maximum of life.  §924(e)(1); *Johnson* v. *United
States*, 559 U. S. 133, 136 (2010).  The Act defines "violent

felony" as follows:

> "any crime punishable by imprisonment for a term exceeding one year . . . that—
>
> "(i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or
>
> "(ii) is burglary, arson, or extortion, involves use of explosives, *or otherwise involves conduct that presents a serious potential risk of physical injury to another*." §924(e)(2)(B) (emphasis added).

The closing words of this definition, italicized above, have come to be known as the Act's residual clause. Since 2007, this Court has decided four cases attempting to discern its meaning. We have held that the residual clause (1) covers Florida's offense of attempted burglary, *James* v. *United States*, 550 U. S. 192 (2007); (2) does *not* cover New Mexico's offense of driving under the influence, *Begay* v. *United States*, 553 U. S. 137 (2008); (3) does *not* cover Illinois' offense of failure to report to a penal institution, *Chambers* v. *United States*, 555 U. S. 122 (2009); and (4) does cover Indiana's offense of vehicular flight from a law-enforcement officer, *Sykes* v. *United States*, 564 U. S. 1 (2011). In both *James* and *Sykes*, the Court rejected suggestions by dissenting Justices that the residual clause violates the Constitution's prohibition of vague criminal laws. Compare *James*, 550 U. S., at 210, n. 6, with *id.,* at 230 (SCALIA, J., dissenting); compare *Sykes*, 564 U. S., at ___ (slip op., at 13–14), with *id.,* at ___ (SCALIA, J., dissenting) (slip op., at 6–8).

This case involves the application of the residual clause to another crime, Minnesota's offense of unlawful possession of a short-barreled shotgun. Petitioner Samuel Johnson is a felon with a long criminal record. In 2010, the Federal Bureau of Investigation began to monitor him because of his involvement in a white-supremacist organi-

zation that the Bureau suspected was planning to commit acts of terrorism. During the investigation, Johnson disclosed to undercover agents that he had manufactured explosives and that he planned to attack "the Mexican consulate" in Minnesota, "progressive bookstores," and "'liberals.'" Revised Presentence Investigation in No. 0:12CR00104–001 (D. Minn.), p. 15, ¶16. Johnson showed the agents his AK–47 rifle, several semiautomatic firearms, and over 1,000 rounds of ammunition.

After his eventual arrest, Johnson pleaded guilty to being a felon in possession of a firearm in violation of §922(g). The Government requested an enhanced sentence under the Armed Career Criminal Act. It argued that three of Johnson's previous offenses—including unlawful possession of a short-barreled shotgun, see Minn. Stat. §609.67 (2006)—qualified as violent felonies. The District Court agreed and sentenced Johnson to a 15-year prison term under the Act. The Court of Appeals affirmed. 526 Fed. Appx. 708 (CA8 2013) (*per curiam*). We granted certiorari to decide whether Minnesota's offense of unlawful possession of a short-barreled shotgun ranks as a violent felony under the residual clause. 572 U. S. ___ (2014). We later asked the parties to present reargument addressing the compatibility of the residual clause with the Constitution's prohibition of vague criminal laws. 574 U. S. ___ (2015).

## II

The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." Our cases establish that the Government violates this guarantee by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement. *Kolender* v. *Lawson*, 461 U. S. 352, 357–358

(1983). The prohibition of vagueness in criminal statutes "is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law," and a statute that flouts it "violates the first essential of due process." *Connally* v. *General Constr. Co.*, 269 U. S. 385, 391 (1926). These principles apply not only to statutes defining elements of crimes, but also to statutes fixing sentences. *United States* v. *Batchelder*, 442 U. S. 114, 123 (1979).

In *Taylor* v. *United States*, 495 U. S. 575, 600 (1990), this Court held that the Armed Career Criminal Act requires courts to use a framework known as the categorical approach when deciding whether an offense "is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another." Under the categorical approach, a court assesses whether a crime qualifies as a violent felony "in terms of how the law defines the offense and not in terms of how an individual offender might have committed it on a particular occasion." *Begay*, *supra*, at 141.

Deciding whether the residual clause covers a crime thus requires a court to picture the kind of conduct that the crime involves in "the ordinary case," and to judge whether that abstraction presents a serious potential risk of physical injury. *James, supra,* at 208. The court's task goes beyond deciding whether creation of risk is an element of the crime. That is so because, unlike the part of the definition of a violent felony that asks whether the crime "has *as an element* the use . . . of physical force," the residual clause asks whether the crime "*involves conduct*" that presents too much risk of physical injury. What is more, the inclusion of burglary and extortion among the enumerated offenses preceding the residual clause confirms that the court's task also goes beyond evaluating the chances that the physical acts that make up the crime will

injure someone. The act of making an extortionate de-
mand or breaking and entering into someone's home
does not, in and of itself, normally cause physical injury.
Rather, risk of injury arises because the extortionist might
engage in violence *after* making his demand or because the
burglar might confront a resident in the home *after* break-
ing and entering.

We are convinced that the indeterminacy of the wide-
ranging inquiry required by the residual clause both de-
nies fair notice to defendants and invites arbitrary en-
forcement by judges. Increasing a defendant's sentence
under the clause denies due process of law.

### A

Two features of the residual clause conspire to make it
unconstitutionally vague. In the first place, the residual
clause leaves grave uncertainty about how to estimate the
risk posed by a crime. It ties the judicial assessment of
risk to a judicially imagined "ordinary case" of a crime, not
to real-world facts or statutory elements. How does one go
about deciding what kind of conduct the "ordinary case" of
a crime involves? "A statistical analysis of the state re-
porter? A survey? Expert evidence? Google? Gut in-
stinct?" *United States* v. *Mayer*, 560 F. 3d 948, 952 (CA9
2009) (Kozinski, C. J., dissenting from denial of rehearing
en banc). To take an example, does the ordinary instance
of witness tampering involve offering a witness a bribe?
Or threatening a witness with violence? Critically, pictur-
ing the criminal's behavior is not enough; as we have
already discussed, assessing "potential risk" seemingly
requires the judge to imagine how the idealized ordinary
case of the crime subsequently plays out. *James* illus-
trates how speculative (and how detached from statutory
elements) this enterprise can become. Explaining why
attempted burglary poses a serious potential risk of physi-
cal injury, the Court said: "An armed would-be burglar

may be spotted by a police officer, a private security guard, or a participant in a neighborhood watch program. Or a homeowner . . . may give chase, and a violent encounter may ensue." 550 U. S., at 211. The dissent, by contrast, asserted that any confrontation that occurs during an attempted burglary "is likely to consist of nothing more than the occupant's yelling 'Who's there?' from his window, and the burglar's running away." *Id.*, at 226 (opinion of SCALIA, J.). The residual clause offers no reliable way to choose between these competing accounts of what "ordinary" attempted burglary involves.

At the same time, the residual clause leaves uncertainty about how much risk it takes for a crime to qualify as a violent felony. It is one thing to apply an imprecise "serious potential risk" standard to real-world facts; it is quite another to apply it to a judge-imagined abstraction. By asking whether the crime "*otherwise* involves conduct that presents a serious potential risk," moreover, the residual clause forces courts to interpret "serious potential risk" in light of the four enumerated crimes—burglary, arson, extortion, and crimes involving the use of explosives. These offenses are "far from clear in respect to the degree of risk each poses." *Begay*, 553 U. S., at 143. Does the ordinary burglar invade an occupied home by night or an unoccupied home by day? Does the typical extortionist threaten his victim in person with the use of force, or does he threaten his victim by mail with the revelation of embarrassing personal information? By combining indeterminacy about how to measure the risk posed by a crime with indeterminacy about how much risk it takes for the crime to qualify as a violent felony, the residual clause produces more unpredictability and arbitrariness than the Due Process Clause tolerates.

This Court has acknowledged that the failure of "persistent efforts . . . to establish a standard" can provide evidence of vagueness. *United States* v. *L. Cohen Grocery*

*Co.,* 255 U. S. 81, 91 (1921). Here, this Court's repeated attempts and repeated failures to craft a principled and objective standard out of the residual clause confirm its hopeless indeterminacy. Three of the Court's previous four decisions about the clause concentrated on the level of risk posed by the crime in question, though in each case we found it necessary to resort to a different ad hoc test to guide our inquiry. In *James*, we asked whether "the risk posed by attempted burglary is comparable to that posed by its closest analog among the enumerated offenses," namely completed burglary; we concluded that it was. 550 U. S., at 203. That rule takes care of attempted burglary, but offers no help at all with respect to the vast majority of offenses, which have no apparent analog among the enumerated crimes. "Is, for example, driving under the influence of alcohol more analogous to burglary, arson, extortion, or a crime involving use of explosives?" *Id.,* at 215 (SCALIA, J., dissenting).

*Chambers*, our next case to focus on risk, relied principally on a statistical report prepared by the Sentencing Commission to conclude that an offender who fails to report to prison is not "significantly more likely than others to attack, or physically to resist, an apprehender, thereby producing a 'serious potential risk of physical injury.'" 555 U. S., at 128–129. So much for failure to report to prison, but what about the tens of thousands of federal and state crimes for which no comparable reports exist? And even those studies that are available might suffer from methodological flaws, be skewed toward rarer forms of the crime, or paint widely divergent pictures of the riskiness of the conduct that the crime involves. See *Sykes*, 564 U. S., at ___–___ (SCALIA, J., dissenting) (slip op., at 4–6); *id.,* at ___, n. 4 (KAGAN, J., dissenting) (slip op., at 6, n. 4).

Our most recent case, *Sykes*, also relied on statistics, though only to "confirm the commonsense conclusion that

Indiana's vehicular flight crime is a violent felony." *Id.*, at ___ (majority opinion) (slip op., at 8). But common sense is a much less useful criterion than it sounds—as *Sykes* itself illustrates. The Indiana statute involved in that case covered everything from provoking a high-speed car chase to merely failing to stop immediately after seeing a police officer's signal. See *id.,* at ___ (KAGAN, J., dissenting) (slip op., at 3–4). How does common sense help a federal court discern where the "ordinary case" of vehicular flight in Indiana lies along this spectrum? Common sense has not even produced a consistent conception of the degree of risk posed by each of the four enumerated crimes; there is no reason to expect it to fare any better with respect to thousands of unenumerated crimes. All in all, *James*, *Chambers*, and *Sykes* failed to establish any generally applicable test that prevents the risk comparison required by the residual clause from devolving into guesswork and intuition.

The remaining case, *Begay*, which preceded *Chambers* and *Sykes*, took an entirely different approach. The Court held that in order to qualify as a violent felony under the residual clause, a crime must resemble the enumerated offenses "in kind as well as in degree of risk posed." 553 U. S., at 143. The Court deemed drunk driving insufficiently similar to the listed crimes, because it typically does not involve "purposeful, violent, and aggressive conduct." *Id.,* at 144–145 (internal quotation marks omitted). Alas, *Begay* did not succeed in bringing clarity to the meaning of the residual clause. It did not (and could not) eliminate the need to imagine the kind of conduct typically involved in a crime. In addition, the enumerated crimes are not much more similar to one another in kind than in degree of risk posed, and the concept of "aggressive conduct" is far from clear. *Sykes* criticized the "purposeful, violent, and aggressive" test as an "addition to the statutory text," explained that "levels of risk" would normally be

dispositive, and confined *Begay* to "strict liability, negligence, and recklessness crimes." 564 U. S., at ___–___ (slip op., at 10–11).

The present case, our fifth about the meaning of the residual clause, opens a new front of uncertainty. When deciding whether unlawful possession of a short-barreled shotgun is a violent felony, do we confine our attention to the risk that the shotgun will go off by accident while in someone's possession? Or do we also consider the possibility that the person possessing the shotgun will later use it to commit a crime? The inclusion of burglary and extortion among the enumerated offenses suggests that a crime may qualify under the residual clause even if the physical injury is remote from the criminal act. But how remote is too remote? Once again, the residual clause yields no answers.

This Court is not the only one that has had trouble making sense of the residual clause. The clause has "created numerous splits among the lower federal courts," where it has proved "nearly impossible to apply consistently." *Chambers*, 555 U. S., at 133 (ALITO, J., concurring in judgment). The most telling feature of the lower courts' decisions is not division about whether the residual clause covers this or that crime (even clear laws produce close cases); it is, rather, pervasive disagreement about the nature of the inquiry one is supposed to conduct and the kinds of factors one is supposed to consider. Some judges have concluded that deciding whether conspiracy is a violent felony requires evaluating only the dangers posed by the "simple act of agreeing [to commit a crime]," *United States* v. *Whitson*, 597 F. 3d 1218, 1222 (CA11 2010) (*per curiam*); others have also considered the probability that the agreement will be carried out, *United States* v. *White*, 571 F. 3d 365, 370–371 (CA4 2009). Some judges have assumed that the battery of a police officer (defined to include the slightest touching) could "explode into violence

and result in physical injury," *United States* v. *Williams*, 559 F. 3d 1143, 1149 (CA10 2009); others have felt that it "do[es] a great disservice to law enforcement officers" to assume that they would "explod[e] into violence" rather than "rely on their training and experience to determine the best method of responding," *United States* v. *Carthorne*, 726 F. 3d 503, 514 (CA4 2013). Some judges considering whether statutory rape qualifies as a violent felony have concentrated on cases involving a perpetrator much older than the victim, *United States* v. *Daye*, 571 F. 3d 225, 230–231 (CA2 2009); others have tried to account for the possibility that "the perpetrator and the victim [might be] close in age," *United States* v. *McDonald*, 592 F. 3d 808, 815 (CA7 2010). Disagreements like these go well beyond disputes over matters of degree.

It has been said that the life of the law is experience. Nine years' experience trying to derive meaning from the residual clause convinces us that we have embarked upon a failed enterprise. Each of the uncertainties in the residual clause may be tolerable in isolation, but "their sum makes a task for us which at best could be only guesswork." *United States* v. *Evans*, 333 U. S. 483, 495 (1948). Invoking so shapeless a provision to condemn someone to prison for 15 years to life does not comport with the Constitution's guarantee of due process.

B

The Government and the dissent claim that there will be straightforward cases under the residual clause, because some crimes clearly pose a serious potential risk of physical injury to another. See *post,* at 14–15 (opinion of ALITO, J.). True enough, though we think many of the cases the Government and the dissent deem easy turn out not to be so easy after all. Consider just one of the Government's examples, Connecticut's offense of "rioting at a correctional institution." See *United States* v. *Johnson*,

616 F. 3d 85 (CA2 2010). That certainly sounds like a violent felony—until one realizes that Connecticut defines this offense to include taking part in "any disorder, disturbance, strike, riot or other organized disobedience to the rules and regulations" of the prison. Conn. Gen. Stat. §53a–179b(a) (2012). Who is to say which the ordinary "disorder" most closely resembles—a full-fledged prison riot, a food-fight in the prison cafeteria, or a "passive and nonviolent [act] such as disregarding an order to move," *Johnson*, 616 F. 3d, at 95 (Parker, J., dissenting)?

In all events, although statements in some of our opinions could be read to suggest otherwise, our *holdings* squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp. For instance, we have deemed a law prohibiting grocers from charging an "unjust or unreasonable rate" void for vagueness—even though charging someone a thousand dollars for a pound of sugar would surely be unjust and unreasonable. *L. Cohen Grocery Co.*, 255 U. S., at 89. We have similarly deemed void for vagueness a law prohibiting people on sidewalks from "conduct[ing] themselves in a manner annoying to persons passing by"—even though spitting in someone's face would surely be annoying. *Coates* v. *Cincinnati*, 402 U. S. 611 (1971). These decisions refute any suggestion that the existence of *some* obviously risky crimes establishes the residual clause's constitutionality.

Resisting the force of these decisions, the dissent insists that "a statute is void for vagueness only if it is vague in all its applications." *Post,* at 1. It claims that the prohibition of unjust or unreasonable rates in *L. Cohen Grocery* was "vague in all applications," even though one can easily envision rates so high that they are unreasonable by any measure. *Post,* at 16. It seems to us that the dissent's supposed requirement of vagueness in all applications is not a requirement at all, but a tautology: If we hold a

statute to be vague, it is vague in all its applications (and never mind the reality). If the existence of some clearly unreasonable rates would not save the law in *L. Cohen Grocery*, why should the existence of some clearly risky crimes save the residual clause?

The Government and the dissent next point out that dozens of federal and state criminal laws use terms like "substantial risk," "grave risk," and "unreasonable risk," suggesting that to hold the residual clause unconstitutional is to place these provisions in constitutional doubt. See *post,* at 7–8. Not at all. Almost none of the cited laws links a phrase such as "substantial risk" to a confusing list of examples. "The phrase 'shades of red,' standing alone, does not generate confusion or unpredictability; but the phrase 'fire-engine red, light pink, maroon, *navy blue,* or colors that otherwise involve shades of red' assuredly does so." *James,* 550 U. S., at 230, n. 7 (SCALIA, J., dissenting). More importantly, almost all of the cited laws require gauging the riskiness of conduct in which an individual defendant engages *on a particular occasion.* As a general matter, we do not doubt the constitutionality of laws that call for the application of a qualitative standard such as "substantial risk" to real-world conduct; "the law is full of instances where a man's fate depends on his estimating rightly . . . some matter of degree," *Nash* v. *United States*, 229 U. S. 373, 377 (1913). The residual clause, however, requires application of the "serious potential risk" standard to an idealized ordinary case of the crime. Because "the elements necessary to determine the imaginary ideal are uncertain both in nature and degree of effect," this abstract inquiry offers significantly less predictability than one "[t]hat deals with the actual, not with an imaginary condition other than the facts." *International Harvester Co. of America* v. *Kentucky*, 234 U. S. 216, 223 (1914).

Finally, the dissent urges us to save the residual clause

from vagueness by interpreting it to refer to the risk posed by the particular conduct in which the defendant engaged, not the risk posed by the ordinary case of the defendant's crime. See *post,* at 9–13. In other words, the dissent suggests that we jettison for the residual clause (though not for the enumerated crimes) the categorical approach adopted in *Taylor,* see 495 U. S., at 599–602, and reaffirmed in each of our four residual-clause cases, see *James,* 550 U. S., at 202; *Begay,* 553 U. S., at 141; *Chambers,* 555 U. S., at 125; *Sykes,* 564 U. S., ___ (slip op., at 5). We decline the dissent's invitation. In the first place, the Government has not asked us to abandon the categorical approach in residual-clause cases. In addition, *Taylor* had good reasons to adopt the categorical approach, reasons that apply no less to the residual clause than to the enumerated crimes. *Taylor* explained that the relevant part of the Armed Career Criminal Act "refers to 'a person who . . . has three previous convictions' for—not a person who has committed—three previous violent felonies or drug offenses." 495 U. S., at 600. This emphasis on convictions indicates that "Congress intended the sentencing court to look only to the fact that the defendant had been convicted of crimes falling within certain categories, and not to the facts underlying the prior convictions." *Ibid. Taylor* also pointed out the utter impracticability of requiring a sentencing court to reconstruct, long after the original conviction, the conduct underlying that conviction. For example, if the original conviction rested on a guilty plea, no record of the underlying facts may be available. "[T]he only plausible interpretation" of the law, therefore, requires use of the categorical approach. *Id.,* at 602.

## C

That brings us to *stare decisis*. This is the first case in which the Court has received briefing and heard argument from the parties about whether the residual clause is void

for vagueness. In *James*, however, the Court stated in a footnote that it was "not persuaded by [the principal dissent's] suggestion . . . that the residual provision is unconstitutionally vague." 550 U. S., at 210, n. 6. In *Sykes*, the Court again rejected a dissenting opinion's claim of vagueness. 564 U. S., at \_\_\_–\_\_\_ (slip op., at 13–14).

The doctrine of *stare decisis* allows us to revisit an earlier decision where experience with its application reveals that it is unworkable. *Payne* v. *Tennessee*, 501 U. S. 808, 827 (1991). Experience is all the more instructive when the decision in question rejected a claim of unconstitutional vagueness. Unlike other judicial mistakes that need correction, the error of having rejected a vagueness challenge manifests itself precisely in subsequent judicial decisions: the inability of later opinions to impart the predictability that the earlier opinion forecast. Here, the experience of the federal courts leaves no doubt about the unavoidable uncertainty and arbitrariness of adjudication under the residual clause. Even after *Sykes* tried to clarify the residual clause's meaning, the provision remains a "judicial morass that defies systemic solution," "a black hole of confusion and uncertainty" that frustrates any effort to impart "some sense of order and direction." *United States* v. *Vann*, 660 F. 3d 771, 787 (CA4 2011) (Agee, J., concurring).

This Court's cases make plain that even decisions rendered after full adversarial presentation may have to yield to the lessons of subsequent experience. See, *e.g., United States* v. *Dixon*, 509 U. S. 688, 711 (1993); *Payne*, 501 U. S., at 828–830 (1991). But *James* and *Sykes* opined about vagueness without full briefing or argument on that issue—a circumstance that leaves us "less constrained to follow precedent," *Hohn* v. *United States*, 524 U. S. 236, 251 (1998). The brief discussions of vagueness in *James* and *Sykes* homed in on the imprecision of the phrase "serious potential risk"; neither opinion evaluated the

uncertainty introduced by the need to evaluate the riskiness of an abstract ordinary case of a crime. 550 U. S., at 210, n. 6; 564 U. S., at ___ (slip op., at 13–14). And departing from those decisions does not raise any concerns about upsetting private reliance interests.

Although it is a vital rule of judicial self-government, *stare decisis* does not matter for its own sake. It matters because it "promotes the evenhanded, predictable, and consistent development of legal principles." *Payne, supra,* at 827. Decisions under the residual clause have proved to be anything but evenhanded, predictable, or consistent. Standing by *James* and *Sykes* would undermine, rather than promote, the goals that *stare decisis* is meant to serve.

\*    \*    \*

We hold that imposing an increased sentence under the residual clause of the Armed Career Criminal Act violates the Constitution's guarantee of due process. Our contrary holdings in *James* and *Sykes* are overruled. Today's decision does not call into question application of the Act to the four enumerated offenses, or the remainder of the Act's definition of a violent felony.

We reverse the judgment of the Court of Appeals for the Eighth Circuit and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 13–7120

_____

## SAMUEL JAMES JOHNSON, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

[June 26, 2015]

JUSTICE KENNEDY, concurring in the judgment.

In my view, and for the reasons well stated by JUSTICE ALITO in dissent, the residual clause of the Armed Career Criminal Act is not unconstitutionally vague under the categorical approach or a record-based approach. On the assumption that the categorical approach ought to still control, and for the reasons given by JUSTICE THOMAS in Part I of his opinion concurring in the judgment, Johnson's conviction for possession of a short-barreled shotgun does not qualify as a violent felony.

For these reasons, I concur in the judgment.

# SUPREME COURT OF THE UNITED STATES

————————

No. 13–7120

————————

## SAMUEL JAMES JOHNSON, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

[June 26, 2015]

JUSTICE THOMAS, concurring in the judgment.

I agree with the Court that Johnson's sentence cannot stand. But rather than use the Fifth Amendment's Due Process Clause to nullify an Act of Congress, I would resolve this case on more ordinary grounds. Under conventional principles of interpretation and our precedents, the offense of unlawfully possessing a short-barreled shotgun does not constitute a "violent felony" under the residual clause of the Armed Career Criminal Act (ACCA).

The majority wants more. Not content to engage in the usual business of interpreting statutes, it holds this clause to be unconstitutionally vague, notwithstanding the fact that on four previous occasions we found it determinate enough for judicial application. As JUSTICE ALITO explains, that decision cannot be reconciled with our precedents concerning the vagueness doctrine. See *post,* at 13–17 (dissenting opinion). But even if it were a closer case under those decisions, I would be wary of holding the residual clause to be unconstitutionally vague. Although I have joined the Court in applying our modern vagueness doctrine in the past, see *FCC* v. *Fox Television Stations, Inc.*, 567 U. S. \_\_\_, \_\_\_–\_\_\_ (2012) (slip op., at 16–17), I have become increasingly concerned about its origins and application. Simply put, our vagueness doctrine shares an uncomfortably similar history with substantive due pro-

cess, a judicially created doctrine lacking any basis in the Constitution.

## I

We could have easily disposed of this case without nullifying ACCA's residual clause. Under ordinary principles of statutory interpretation, the crime of unlawfully possessing a short-barreled shotgun does not constitute a "violent felony" under ACCA. In relevant part, that Act defines a "violent felony" as a "crime punishable by imprisonment for a term exceeding one year" that either

> "(i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or
>
> "(ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another." 18 U. S. C. §924(e)(2)(B).

The offense of unlawfully possessing a short-barreled shotgun neither satisfies the first clause of this definition nor falls within the enumerated offenses in the second. It therefore can constitute a violent felony only if it falls within ACCA's so-called "residual clause"—*i.e.*, if it "involves conduct that presents a serious potential risk of physical injury to another." §924(e)(2)(B)(ii).

To determine whether an offense falls within the residual clause, we consider "whether the conduct encompassed by the elements of the offense, in the ordinary case, presents a serious potential risk of injury to another." *James* v. *United States*, 550 U. S. 192, 208 (2007). The specific crimes listed in §924(e)(2)(B)(ii)—arson, extortion, burglary, and an offense involving the use of explosives—offer a "baseline against which to measure the degree of risk" a crime must present to fall within that clause. *Id.,* at 208. Those offenses do not provide a high threshold, see *id.*, at

203, 207–208, but the crime in question must still present a "'serious'"—a "'significant' or 'important'"—risk of physical injury to be deemed a violent felony, *Begay* v. *United States*, 553 U. S. 137, 156 (2008) (ALITO, J., dissenting); accord, *Chambers* v. *United States*, 555 U. S. 122, 128 (2009).

To qualify as serious, the risk of injury generally must be closely related to the offense itself. Our precedents provide useful examples of the close relationship that must exist between the conduct of the offense and the risk presented. In *Sykes* v. *United States*, 564 U. S. 1 (2011), for instance, we held that the offense of intentional vehicular flight constitutes a violent felony because that conduct always triggers a dangerous confrontation, *id.*, at ___ (slip op., at 8). As we explained, vehicular flights "by definitional necessity occur when police are present" and are done "in defiance of their instructions . . . with a vehicle that can be used in a way to cause serious potential risk of physical injury to another." *Ibid.* In *James*, we likewise held that attempted burglary offenses "requir[ing] an overt act directed toward the entry of a structure" are violent felonies because the underlying conduct often results in a dangerous confrontation. 550 U. S., at 204, 206. But we distinguished those crimes from "the more attenuated conduct encompassed by" attempt offenses "that c[an] be satisfied by preparatory conduct that does not pose the same risk of violent confrontation," such as "'possessing burglary tools.'" *Id.*, at 205, 206, and n. 4. At some point, in other words, the risk of injury from the crime may be too attenuated for the conviction to fall within the residual clause, such as when an additional, voluntary act (*e.g.*, the *use* of burglary tools to enter a structure) is necessary to bring about the risk of physical injury to another.

In light of the elements of and reported convictions for the unlawful possession of a short-barreled shotgun, this

crime does not "involv[e] conduct that presents a serious potential risk of physical injury to another," §924(e)(2)(B)(ii). The acts that form the basis of this offense are simply too remote from a risk of physical injury to fall within the residual clause.

Standing alone, the elements of this offense—(1) unlawfully (2) possessing (3) a short-barreled shotgun—do not describe inherently dangerous conduct. As a conceptual matter, "simple possession [of a firearm], even by a felon, takes place in a variety of ways (*e.g.*, in a closet, in a storeroom, in a car, in a pocket) many, perhaps most, of which do not involve likely accompanying violence." *United States* v. *Doe*, 960 F. 2d 221, 225 (CA1 1992). These weapons also can be stored in a manner posing a danger to no one, such as unloaded, disassembled, or locked away. By themselves, the elements of this offense indicate that the ordinary commission of this crime is far less risky than ACCA's enumerated offenses.

Reported convictions support the conclusion that mere possession of a short-barreled shotgun does not, in the ordinary case, pose a serious risk of injury to others. A few examples suffice. In one case, officers found the sawed-off shotgun locked inside a gun cabinet in an empty home. *State* v. *Salyers*, 858 N. W. 2d 156, 157–158 (Minn. 2015). In another, the firearm was retrieved from the trunk of the defendant's car. *State* v. *Ellenberger*, 543 N. W. 2d 673, 674 (Minn. App. 1996). In still another, the weapon was found missing a firing pin. *State* v. *Johnson*, 171 Wis. 2d 175, 178, 491 N. W. 2d 110, 111 (App. 1992). In these instances and others, the offense threatened no one.

The Government's theory for why this crime should nonetheless qualify as a "violent felony" is unpersuasive. Although it does not dispute that the unlawful possession of a short-barreled shotgun can occur in a nondangerous manner, the Government contends that this offense poses

a serious risk of physical injury due to the connection between short-barreled shotguns and other serious crimes. As the Government explains, these firearms are "weapons not typically possessed by law-abiding citizens for lawful purposes," *District of Columbia* v. *Heller*, 554 U. S. 570, 625 (2008), but are instead primarily intended for use in criminal activity. In light of that intended use, the Government reasons that the ordinary case of this possession offense will involve the *use* of a short-barreled shotgun in a serious crime, a scenario obviously posing a serious risk of physical injury.

But even assuming that those who unlawfully possess these weapons typically intend to use them in a serious crime, the risk that the Government identifies arises not from the act of possessing the weapon, but from the act of using it. Unlike attempted burglary (at least of the type at issue in *James*) or intentional vehicular flight—conduct that by itself often or always invites a dangerous confrontation—possession of a short-barreled shotgun poses a threat *only* when an offender decides to engage in additional, voluntary conduct that is not included in the elements of the crime. Until this weapon is assembled, loaded, or used, for example, it poses no risk of injury to others in and of itself. The risk of injury to others from mere possession of this firearm is too attenuated to treat this offense as a violent felony. I would reverse the Court of Appeals on that basis.

## II

As the foregoing analysis demonstrates, ACCA's residual clause can be applied in a principled manner. One would have thought this proposition well established given that we have already decided four cases addressing this clause. The majority nonetheless concludes that the operation of this provision violates the Fifth Amendment's Due Process Clause.

JUSTICE ALITO shows why that analysis is wrong under our precedents. See *post,* at 13–17 (dissenting opinion). But I have some concerns about our modern vagueness doctrine itself. Whether that doctrine is defensible under the original meaning of "due process of law" is a difficult question I leave for the another day, but the doctrine's history should prompt us at least to examine its constitutional underpinnings more closely before we use it to nullify yet another duly enacted law.

## A

We have become accustomed to using the Due Process Clauses to invalidate laws on the ground of "vagueness." The doctrine we have developed is quite sweeping: "A statute can be impermissibly vague . . . if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill* v. *Colorado*, 530 U. S. 703, 732 (2000). Using this framework, we have nullified a wide range of enactments. We have struck down laws ranging from city ordinances, *Papachristou* v. *Jacksonville*, 405 U. S. 156, 165–171 (1972), to Acts of Congress, *United States* v. *L. Cohen Grocery Co.*, 255 U. S. 81, 89–93 (1921). We have struck down laws whether they are penal, *Lanzetta* v. *New Jersey*, 306 U. S. 451, 452, 458 (1939), or not, *Keyishian* v. *Board of Regents of Univ. of State of N. Y.*, 385 U. S. 589, 597–604 (1967).[1] We have struck down laws addressing

---

[1] By "penal," I mean laws "authoriz[ing] criminal punishment" as well as those "authorizing fines or forfeitures . . . [that] are enforced through civil rather than criminal process." Cf. C. Nelson, Statutory Interpretation 108 (2011) (discussing definition of "penal" for purposes of rule of lenity). A law requiring termination of employment from public institutions, for instance, is not penal. See *Keyishian*, 385 U. S., at 597–604. Nor is a law creating an "obligation to pay taxes." *Milwaukee County* v. *M. E. White Co.*, 296 U. S. 268, 271 (1935). Conversely, a law imposing a monetary exaction as a punishment for noncompliance with

subjects ranging from abortion, *Colautti* v. *Franklin*, 439 U. S. 379, 390 (1979), and obscenity, *Winters* v. *New York*, 333 U. S. 507, 517–520 (1948), to the minimum wage, *Connally* v. *General Constr. Co.*, 269 U. S. 385, 390–395 (1926), and antitrust, *Cline* v. *Frink Dairy Co.*, 274 U. S. 445, 453–465 (1927). We have even struck down a law using a term that has been used to describe criminal conduct in this country since before the Constitution was ratified. *Chicago* v. *Morales*, 527 U. S. 41, 51 (1999) (invalidating a "loitering" law); see *id.,* at 113, and n. 10 (THOMAS, J., dissenting) (discussing a 1764 Georgia law requiring the apprehension of "all able bodied persons . . . who shall be found loitering").

That we have repeatedly used a doctrine to invalidate laws does not make it legitimate. Cf., *e.g., Dred Scott* v. *Sandford*, 19 How. 393, 450–452 (1857) (stating that an Act of Congress prohibiting slavery in certain Federal Territories violated the substantive due process rights of slaveowners and was therefore void). This Court has a history of wielding doctrines purportedly rooted in "due process of law" to achieve its own policy goals, substantive due process being the poster child. See *McDonald* v. *Chicago*, 561 U. S. 742, 811 (2010) (THOMAS, J., concurring in part and concurring in judgment) ("The one theme that links the Court's substantive due process precedents together is their lack of a guiding principle to distinguish 'fundamental' rights that warrant protection from nonfundamental rights that do not"). Although our vagueness doctrine is distinct from substantive due process, their histories have disquieting parallels.

### 1

The problem of vague penal statutes is nothing new.

───────────

a regulatory mandate is penal. See *National Federation of Independent Business* v. *Sebelius*, 567 U. S. ___, ___–___ (2012) (SCALIA, KENNEDY, THOMAS, and ALITO, JJ., dissenting) (slip op., at 16–26).

The notion that such laws may be void under the Constitution's Due Process Clauses, however, is a more recent development.

Before the end of the 19th century, courts addressed vagueness through a rule of strict construction of penal statutes, not a rule of constitutional law. This rule of construction—better known today as the rule of lenity— first emerged in 16th-century England in reaction to Parliament's practice of making large swaths of crimes capital offenses, though it did not gain broad acceptance until the following century. See Hall, Strict or Liberal Construction of Penal Statutes, 48 Harv. L. Rev. 748, 749– 751 (1935); see also 1 L. Radzinowicz, A History of English Criminal Law and Its Administration From 1750, pp. 10– 11 (1948) (noting that some of the following crimes triggered the death penalty: "marking the edges of any current coin of the kingdom," "maliciously cutting any hopbinds growing on poles in any plantation of hops," and "being in the company of gypsies"). Courts relied on this rule of construction in refusing to apply vague capital-offense statutes to prosecutions before them. As an example of this rule, William Blackstone described a notable instance in which an English statute imposing the death penalty on anyone convicted of "stealing sheep, *or other cattle*" was "held to extend to nothing but mere sheep" as "th[e] general words, 'or other cattle,' [were] looked upon as much too loose to create a capital offence." 1 Commentaries on the Laws of England 88 (1765).[2]

––––––––––

[2]At the time, the ordinary meaning of the word "cattle" was not limited to cows, but instead encompassed all "[b]easts of pasture; not wild nor domestick." 1 S. Johnson, A Dictionary of the English Language (4th ed. 1773). Parliament responded to the judicial refusal to apply the provision to "cattle" by passing "another statute, 15 Geo. II. c. 34, extending the [law] to bulls, cows, oxen, steers, bullocks, heifers, calves, and lambs, by name." 1 Blackstone, Commentaries on the Laws of England, at 88.

Vague statutes surfaced on this side of the Atlantic as well. Shortly after the First Congress proposed the Bill of Rights, for instance, it passed a law providing "[t]hat every person who shall attempt to trade with the Indian tribes, or be found in the Indian country with such merchandise in his possession as are usually vended to the Indians, without a license," must forfeit the offending goods. Act of July 22, 1790, ch. 33, §3, 1 Stat. 137–138. At first glance, punishing the unlicensed possession of "merchandise . . . usually vended to the Indians," *ibid.*, would seem far more likely to "invit[e] arbitrary enforcement," *ante,* at 5, than does the residual clause.

But rather than strike down arguably vague laws under the Fifth Amendment Due Process Clause, antebellum American courts—like their English predecessors—simply refused to apply them in individual cases under the rule that penal statutes should be construed strictly. See, *e.g., United States* v. *Sharp*, 27 F. Cas. 1041 (No. 16,264) (CC Pa. 1815) (Washington, J.). In *Sharp,* for instance, several defendants charged with violating an Act rendering it a capital offense for "any seaman" to "make a revolt in [a] ship," Act of Apr. 30, 1790, §8, 1 Stat. 114, objected that "the offence of making a revolt, [wa]s not sufficiently defined by this law, or by any other standard, to which reference could be safely made; to warrant the court in passing a sentence upon [them]." 27 F. Cas., at 1043. Justice Washington, riding circuit, apparently agreed, observing that the common definitions for the phrase "make a revolt" were "so multifarious, and so different" that he could not "avoid feeling a natural repugnance, to selecting from this mass of definitions, one, which may fix a crime upon these men, and that too of a capital nature." *Ibid.* Remarking that "[l]aws which create crimes, ought to be so explicit in themselves, or by reference to some other standard, that all men, subject to their penalties, may know what acts it is their duty to avoid," he refused

to "recommend to the jury, to find the prisoners guilty of making, or endeavouring to make a revolt, however strong the evidence may be." *Ibid.*

Such analysis does not mean that federal courts believed they had the power to invalidate vague penal laws as unconstitutional. Indeed, there is good evidence that courts at the time understood judicial review to consist "of a refusal to give a statute effect as operative law in resolving a case," a notion quite distinct from our modern practice of "'strik[ing] down' legislation." Walsh, Partial Unconstitutionality, 85 N. Y. U. L. Rev. 738, 756 (2010). The process of refusing to apply such laws appeared to occur on a case-by-case basis. For instance, notwithstanding his doubts expressed in *Sharp*, Justice Washington, writing for this Court, later rejected the argument that lower courts could arrest a judgment under the same ship-revolt statute because it "does not define the offence of endeavouring to make a revolt." *United States* v. *Kelly*, 11 Wheat. 417, 418 (1826). The Court explained that "it is . . . competent to the Court to give a judicial definition" of "the offence of endeavouring to make a revolt," and that such definition "consists in the endeavour of the crew of a vessel, or any one or more of them, to overthrow the legitimate authority of her commander, with intent to remove him from his command, or against his will to take possession of the vessel by assuming the government and navigation of her, or by transferring their obedience from the lawful commander to some other person." *Id.,* at 418–419. In dealing with statutory indeterminacy, federal courts saw themselves engaged in construction, not judicial review as it is now understood. [3]

---

[3] Early American state courts also sometimes refused to apply a law they found completely unintelligible, even outside of the penal context. In one antebellum decision, the Pennsylvania Supreme Court did not even attempt to apply a statute that gave the Pennsylvania state treasurer "'as many votes'" in state bank elections as "'were held by

2

Although vagueness concerns played a role in the strict construction of penal statutes from early on, there is little indication that anyone before the late 19th century believed that courts had the power under the Due Process Clauses to nullify statutes on that ground. Instead, our modern vagueness doctrine materialized after the rise of substantive due process. Following the ratification of the Fourteenth Amendment, corporations began to use that Amendment's Due Process Clause to challenge state laws that attached penalties to unauthorized commercial conduct. In addition to claiming that these laws violated their substantive due process rights, these litigants began—with some success—to contend that such laws were unconstitutionally indefinite. In one case, a railroad company challenged a Tennessee law authorizing penalties against any railroad that demanded "more than a just and reasonable compensation" or engaged in "unjust and unreasonable discrimination" in setting its rates. *Louisville & Nashville R. Co.* v. *Railroad Comm'n of Tenn.*, 19 F. 679, 690 (CC MD Tenn. 1884) (internal quotation marks deleted). Without specifying the constitutional authority for its holding, the Circuit Court concluded that "[n]o citizen . . . can be constitutionally subjected to penalties and despoiled of his property, in a criminal or quasi criminal proceeding, under and by force of such indefinite

––––––––––

*individuals*'" without providing guidance as to which individuals it was referring. *Commonwealth* v. *Bank of Pennsylvania*, 3 Watts & Serg. 173, 177 (1842). Concluding that it had "seldom, if ever, found the language of legislation so devoid of certainty," the court withdrew the case. *Ibid.*; see also *Drake* v. *Drake*, 15 N. C. 110, 115 (1833) ("Whether a statute be a public or a private one, if the terms in which it is couched be so vague as to convey no definite meaning to those whose duty it is to execute it, either ministerially or judicially, it is necessarily inoperative"). This practice is distinct from our modern vagueness doctrine, which applies to laws that are intelligible but vague.

legislation." *Id.,* at 693 (emphasis deleted).

Justice Brewer—widely recognized as "a leading spokesman for 'substantized' due process," Gamer, Justice Brewer and Substantive Due Process: A Conservative Court Revisited, 18 Vand. L. Rev. 615, 627 (1965)—employed similar reasoning while riding circuit, though he did not identify the constitutional source of judicial authority to nullify vague laws. In reviewing an Iowa law authorizing fines against railroads for charging more than a "reasonable and just" rate, Justice Brewer mentioned in dictum that "no penal law can be sustained unless its mandates are so clearly expressed that any ordinary person can determine in advance what he may and what he may not do under it." *Chicago & N. W. R. Co.* v. *Dey*, 35 F. 866, 876 (CC SD Iowa 1888).

Constitutional vagueness challenges in this Court initially met with some resistance. Although the Court appeared to acknowledge the possibility of unconstitutionally indefinite enactments, it repeatedly rejected vagueness challenges to penal laws addressing railroad rates, *Railroad Comm'n Cases*, 116 U. S. 307, 336–337 (1886), liquor sales, *Ohio ex rel. Lloyd* v. *Dollison*, 194 U. S. 445, 450–451 (1904), and anticompetitive conduct, *Nash* v. *United States*, 229 U. S. 373, 376–378 (1913); *Waters-Pierce Oil Co.* v. *Texas (No. 1)*, 212 U. S. 86, 108–111 (1909).

In 1914, however, the Court nullified a law on vagueness grounds under the Due Process Clause for the first time. In *International Harvester Co. of America* v. *Kentucky*, 234 U. S. 216 (1914), a tobacco company brought a Fourteenth Amendment challenge against several Kentucky antitrust laws that had been construed to render unlawful "any combination [made] . . . for the purpose or with the effect of fixing a price that was greater or less than the real value of the article," *id.,* at 221. The company argued that by referring to "real value," the laws pro-

vided "no standard of conduct that it is possible to know." *Ibid.* The Court agreed. *Id.,* at 223–224. Although it did not specify in that case which portion of the Fourteenth Amendment served as the basis for its holding, *ibid.,* it explained in a related case that the lack of a knowable standard of conduct in the Kentucky statutes "violated the fundamental principles of justice embraced in the conception of due process of law." *Collins* v. *Kentucky*, 234 U. S. 634, 638 (1914).

### 3

Since that time, the Court's application of its vagueness doctrine has largely mirrored its application of substantive due process. During the *Lochner* era, a period marked by the use of substantive due process to strike down economic regulations, *e.g., Lochner* v. *New York*, 198 U. S. 45, 57 (1905), the Court frequently used the vagueness doctrine to invalidate economic regulations penalizing commercial activity.[4] Among the penal laws it found to be impermissibly vague were a state law regulating the production of crude oil, *Champlin Refining Co.* v. *Corporation Comm'n*

---

[4] During this time, the Court would apply its new vagueness doctrine outside of the penal context as well. In *A. B. Small Co.* v. *American Sugar Refining Co.*, 267 U. S. 233 (1925), a sugar dealer raised a defense to a breach-of-contract suit that the contracts themselves were unlawful under several provisions of the Lever Act, including one making it "'unlawful for any person . . . to make any unjust or unreasonable . . . charge in . . . dealing in or with any necessaries,' or to agree with another 'to exact excessive prices for any necessaries,'" *id.,* at 238. Applying *United States* v. *L. Cohen Grocery Co.*, 255 U. S. 81 (1921), which had held that provision to be unconstitutionally vague, the Court rejected the dealer's argument. 267 U. S., at 238–239. The Court explained that "[i]t was not the criminal penalty that was held invalid, but the exaction of obedience to a rule or standard which was so vague and indefinite as really to be no rule or standard at all." *Id.,* at 239. That doctrine thus applied to penalties as well as "[a]ny other means of exaction, such as declaring the transaction unlawful or stripping a participant of his rights under it." *Ibid.*

*of Okla.*, 286 U. S. 210, 242–243 (1932), a state antitrust law, *Cline*, 274 U. S., at 453–465, a state minimum-wage law, *Connally*, 269 U. S., at 390–395, and a federal price-control statute, *L. Cohen Grocery Co.*, 255 U. S., at 89–93.[5]

Around the time the Court began shifting the focus of its substantive due process (and equal protection) jurisprudence from economic interests to "discrete and insular minorities," see *United States* v. *Carolene Products Co.*, 304 U. S. 144, 153, n. 4 (1938), the target of its vagueness doctrine changed as well. The Court began to use the vagueness doctrine to invalidate noneconomic regulations, such as state statutes penalizing obscenity, *Winters*, 333 U. S., at 517–520, and membership in a gang, *Lanzetta*, 306 U. S., at 458.

Successful vagueness challenges to regulations penalizing commercial conduct, by contrast, largely fell by the wayside. The Court, for instance, upheld a federal regulation punishing the knowing violation of an order instructing drivers transporting dangerous chemicals to "'avoid, so far as practicable . . . driving into or through congested thoroughfares, places where crowds are assembled, street car tracks, tunnels, viaducts, and dangerous crossings,'" *Boyce Motor Lines, Inc.* v. *United States*, 342 U. S. 337,

---

[5] Vagueness challenges to laws regulating speech during this period were less successful. Among the laws the Court found to be sufficiently definite included a state law making it a misdemeanor to publish, among other things, materials "'which shall tend to encourage or advocate disrespect for law or for any court or courts of justice,'" *Fox* v. *Washington*, 236 U. S. 273, 275–277 (1915), a federal statute criminalizing candidate solicitation of contributions for "'any political purpose whatever,'" *United States* v. *Wurzbach*, 280 U. S. 396, 398–399 (1930), and a state prohibition on becoming a member of any organization that advocates using unlawful violence to effect "'any political change,'" *Whitney* v. *California*, 274 U. S. 357, 359–360, 368–369 (1927). But see *Stromberg* v. *California*, 283 U. S. 359, 369–370 (1931) (holding state statute punishing the use of any symbol "'of opposition to organized government'" to be impermissibly vague).

338–339, 343 (1952). And notwithstanding its earlier conclusion that an Oklahoma law requiring state employees and contractors to be paid "'not less than the current rate of per diem wages in the locality where the work is performed'" was unconstitutionally vague, *Connally, supra,* at 393, the Court found sufficiently definite a federal law forbidding radio broadcasting companies from attempting to compel by threat or duress a licensee to hire "'persons in excess of the number of employees needed by such licensee to perform actual services,'" *United States* v. *Petrillo*, 332 U. S. 1, 3, 6–7 (1947).

In more recent times, the Court's substantive due process jurisprudence has focused on abortions, and our vagueness doctrine has played a correspondingly significant role. In fact, our vagueness doctrine served as the basis for the first draft of the majority opinion in *Roe* v. *Wade*, 410 U. S. 113 (1973), on the theory that laws prohibiting all abortions save for those done "for the purpose of saving the life of the mother" forced abortionists to guess when this exception would apply on penalty of conviction. See B. Schwartz, The Unpublished Opinions of the Burger Court 116–118 (1988) (reprinting first draft of *Roe*). *Roe*, of course, turned out as a substantive due process opinion. See 410 U. S., at 164. But since then, the Court has repeatedly deployed the vagueness doctrine to nullify even mild regulations of the abortion industry. See *Akron* v. *Akron Center for Reproductive Health, Inc.*, 462 U. S. 416, 451–452 (1983) (nullifying law requiring "'that the remains of the unborn child [be] disposed of in a humane and sanitary manner'"); *Colautti*, 439 U. S., at 381 (nullifying law mandating abortionists adhere to a prescribed standard of care if "there is 'sufficient reason to believe that the fetus may be viable'").[6]

———————

[6] All the while, however, the Court has rejected vagueness challenges to laws punishing those on the other side of the abortion debate. When

In one of our most recent decisions nullifying a law on vagueness grounds, substantive due process was again lurking in the background. In *Morales*, a plurality of this Court insisted that "the freedom to loiter for innocent purposes is part of the 'liberty' protected by the Due Process Clause of the Fourteenth Amendment," 527 U. S., at 53, a conclusion that colored its analysis that an ordinance prohibiting loitering was unconstitutionally indeterminate, see *id.,* at 55 ("When vagueness permeates the text of" a penal law "infring[ing] on constitutionally protected rights," "it is subject to facial attack").

I find this history unsettling. It has long been understood that one of the problems with holding a statute "void for 'indefiniteness'" is that "'indefiniteness' . . . is itself an indefinite concept," *Winters, supra,* at 524 (Frankfurter, J., dissenting), and we as a Court have a bad habit of using indefinite concepts—especially ones rooted in "due process"—to invalidate democratically enacted laws.

## B

It is also not clear that our vagueness doctrine can be reconciled with the original understanding of the term "due process of law." Our traditional justification for this doctrine has been the need for notice: "A conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited." *United States* v. *Williams*, 553 U. S. 285, 304 (2008); accord, *ante,* at 3. Presumably, that justification rests on the view expressed in

---

it comes to restricting the speech of abortion opponents, the Court has dismissed concerns about vagueness with the observation that "'we can never expect mathematical certainty from our language,'" *Hill* v. *Colorado*, 530 U. S. 703, 733 (2000), even though such restrictions are arguably "at least as imprecise as criminal prohibitions on speech the Court has declared void for vagueness in past decades," *id.,* at 774 (KENNEDY, J., dissenting).

*Murray's Lessee* v. *Hoboken Land & Improvement Co.*, 18 How. 272 (1856), that "due process of law" constrains the legislative branch by guaranteeing "usages and modes of proceeding existing in the common and statute law of England, before the emigration of our ancestors, and which are shown not to have been unsuited to their civil and political condition by having been acted on by them after the settlement of this country," *id.,* at 277. That justification assumes further that providing "a person of ordinary intelligence [with] fair notice of what is prohibited," *Williams*, *supra,* at 304, is one such usage or mode.[7]

To accept the vagueness doctrine as founded in our Constitution, then, one must reject the possibility "that the Due Process Clause requires only that our Government must proceed according to the 'law of the land'—that is, according to written constitutional and statutory provisions," which may be all that the original meaning of this provision demands. *Hamdi* v. *Rumsfeld*, 542 U. S. 507, 589 (2004) (THOMAS, J., dissenting) (some internal quotation marks omitted); accord, *Turner* v. *Rogers*, 564 U. S.

_____

[7] As a general matter, we should be cautious about relying on general theories of "fair notice" in our due process jurisprudence, as they have been exploited to achieve particular ends. In *BMW of North America, Inc.* v. *Gore*, 517 U. S. 559 (1996), for instance, the Court held that the Due Process Clause imposed limits on punitive damages because the Clause guaranteed "that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose," *id.,* at 574. That was true even though "when the Fourteenth Amendment was adopted, punitive damages were undoubtedly an established part of the American common law of torts," and "no particular procedures were deemed necessary to circumscribe a jury's discretion regarding the award of such damages, or their amount." *Pacific Mut. Life Ins. Co.* v. *Haslip*, 499 U. S. 1, 26–27 (1991) (SCALIA, J., concurring in judgment). Even under the view of the Due Process Clause articulated in *Murray's Lessee*, then, we should not allow nebulous principles to supplant more specific, historically grounded rules. See 499 U. S., at 37–38 (opinion of SCALIA, J.).

___, ___ (2011) (Thomas, J., dissenting) (slip op., at 2). Although *Murray's Lessee* stated the contrary, 18 How., at 276, a number of scholars and jurists have concluded that "considerable historical evidence supports the position that 'due process of law' was a separation-of-powers concept designed as a safeguard against unlicensed executive action, forbidding only deprivations not authorized by legislation or common law." D. Currie, The Constitution in the Supreme Court: The First Hundred Years 1789–1888, p. 272 (1985); see also, *e.g., In re Winship*, 397 U. S. 358, 378–382 (1970) (Black, J., dissenting). Others have disagreed. See, *e.g.,* Chapman & McConnell, Due Process as Separation of Powers, 121 Yale L. J. 1672, 1679 (2012) (arguing that, as originally understood, "the principle of due process" required, among other things, that "statutes that purported to empower the other branches to deprive persons of rights without adequate procedural guarantees [be] subject to judicial review").

I need not choose between these two understandings of "due process of law" in this case. Justice Alito explains why the majority's decision is wrong even under our precedents. See *post,* at 13–17 (dissenting opinion). And more generally, I adhere to the view that "'[i]f any fool would know that a particular category of conduct would be within the reach of the statute, if there is an unmistakable core that a reasonable person would know is forbidden by the law, the enactment is not unconstitutional on its face,'" *Morales*, *supra*, at 112 (Thomas, J., dissenting), and there is no question that ACCA's residual clause meets that description, see *ante,* at 10 (agreeing with the Government that "there will be straightforward cases under the residual clause").

*          *          *

I have no love for our residual clause jurisprudence: As I observed when we first got into this business, the Sixth

Amendment problem with allowing district courts to conduct factfinding to determine whether an offense is a "violent felony" made our attempt to construe the residual clause "'an unnecessary exercise.'" *James*, 550 U. S., at 231 (THOMAS, J., dissenting). But the Court rejected my argument, choosing instead to begin that unnecessary exercise. I see no principled way that, four cases later, the Court can now declare that the residual clause has become too indeterminate to apply. Having damaged the residual clause through our misguided jurisprudence, we have no right to send this provision back to Congress and ask for a new one. I cannot join the Court in using the Due Process Clause to nullify an Act of Congress that contains an unmistakable core of forbidden conduct, and I concur only in its judgment.

# SUPREME COURT OF THE UNITED STATES

––––––––––

No. 13–7120

––––––––––

## SAMUEL JAMES JOHNSON, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

[June 26, 2015]

JUSTICE ALITO, dissenting.

The Court is tired of the Armed Career Criminal Act of 1984 (ACCA) and in particular its residual clause. Anxious to rid our docket of bothersome residual clause cases, the Court is willing to do what it takes to get the job done. So brushing aside *stare decisis*, the Court holds that the residual clause is unconstitutionally vague even though we have twice rejected that very argument within the last eight years. The canons of interpretation get no greater respect. Inverting the canon that a statute should be construed if possible to avoid unconstitutionality, the Court rejects a reasonable construction of the residual clause that would avoid any vagueness problems, preferring an alternative that the Court finds to be unconstitutionally vague. And the Court is not stopped by the well-established rule that a statute is void for vagueness only if it is vague in all its applications. While conceding that some applications of the residual clause are straightforward, the Court holds that the clause is now void in its entirety. The Court's determination to be done with residual clause cases, if not its fidelity to legal principles, is impressive.

# I

## A

Petitioner Samuel Johnson (unlike his famous namesake) has led a life of crime and violence.  His presentence investigation report sets out a résumé of petty and serious crimes, beginning when he was 12 years old.  Johnson's adult record includes convictions for, among other things, robbery, attempted robbery, illegal possession of a sawed-off shotgun, and a drug offense.

In 2010, the Federal Bureau of Investigation (FBI) began monitoring Johnson because of his involvement with the National Socialist Movement, a white-supremacist organization suspected of plotting acts of terrorism.  In June of that year, Johnson left the group and formed his own radical organization, the Aryan Liberation Movement, which he planned to finance by counterfeiting United States currency.  In the course of the Government's investigation, Johnson "disclosed to undercover FBI agents that he manufactured napalm, silencers, and other explosives for" his new organization.  526 Fed. Appx. 708, 709 (CA8 2013) (*per curiam*).  He also showed the agents an AK–47 rifle, a semiautomatic rifle, a semiautomatic pistol, and a cache of approximately 1,100 rounds of ammunition.  Later, Johnson told an undercover agent: "You know I'd love to assassinate some . . . hoodrats as much as the next guy, but I think we really got to stick with high priority targets."  Revised Presentence Investigation Report (PSR) ¶15.  Among the top targets that he mentioned were "the Mexican consulate," "progressive bookstores," and individuals he viewed as "liberals." PSR ¶16.

In April 2012, Johnson was arrested, and he was subsequently indicted on four counts of possession of a firearm by a felon and two counts of possession of ammunition by a felon, in violation of 18 U. S. C. §§922(g) and 924(e).  He pleaded guilty to one of the firearms counts, and the Dis-

trict Court sentenced him to the statutory minimum of 15 years' imprisonment under ACCA, based on his prior felony convictions for robbery, attempted robbery, and illegal possession of a sawed-off shotgun.

## B

ACCA provides a mandatory minimum sentence for certain violations of §922(g), which prohibits the shipment, transportation, or possession of firearms or ammunition by convicted felons, persons previously committed to a mental institution, and certain others. Federal law normally provides a maximum sentence of 10 years' imprisonment for such crimes. See §924(a)(2). Under ACCA, however, if a defendant convicted under §922(g) has three prior convictions "for a violent felony or a serious drug offense," the sentencing court must impose a sentence of at least 15 years' imprisonment. §924(e)(1).

ACCA's definition of a "violent felony" has three parts. First, a felony qualifies if it "has as an element the use, attempted use, or threatened use of physical force against the person of another." §924(e)(2)(B)(i). Second, the Act specifically names four categories of qualifying felonies: burglary, arson, extortion, and offenses involving the use of explosives. See §924(e)(2)(B)(ii). Third, the Act contains what we have called a "residual clause," which reaches any felony that "otherwise involves conduct that presents a serious potential risk of physical injury to another." *Ibid.*

The present case concerns the residual clause. The sole question raised in Johnson's certiorari petition was whether possession of a sawed-off shotgun under Minnesota law qualifies as a violent felony under that clause. Although Johnson argued in the lower courts that the residual clause is unconstitutionally vague, he did not renew that argument here. Nevertheless, after oral argument, the Court raised the question of vagueness on its

own. The Court now holds that the residual clause is unconstitutionally vague in all its applications. I cannot agree.

## II

I begin with *stare decisis.* Eight years ago in *James* v. *United States*, 550 U. S. 192 (2007), JUSTICE SCALIA, the author of today's opinion for the Court, fired an opening shot at the residual clause. In dissent, he suggested that the residual clause is void for vagueness. *Id.*, at 230. The Court held otherwise, explaining that the standard in the residual clause "is not so indefinite as to prevent an ordinary person from understanding" its scope. *Id.*, at 210, n. 6.

Four years later, in *Sykes* v. *United States*, 564 U. S. 1 (2011), JUSTICE SCALIA fired another round. Dissenting once again, he argued that the residual clause is void for vagueness and rehearsed the same basic arguments that the Court now adopts. See *id., at* ___–___ (slip op., at 7–8); see also *Derby* v. *United States*, 564 U. S. ___, ___–___ (2011) (SCALIA, J., dissenting from denial of certiorari) (slip op., at 4–5). As in *James*, the Court rejected his arguments. See *Sykes*, 564 U. S., at ___ (slip op., at 13–14). In fact, JUSTICE SCALIA was the *only* Member of the *Sykes* Court who took the position that the residual clause could not be intelligibly applied to the offense at issue. The opinion of the Court, which five Justices joined, expressly held that the residual clause "states an intelligible principle and provides guidance that allows a person to 'conform his or her conduct to the law.'" *Id.*, at ___–___ (slip op., at 13–14) (quoting *Chicago* v. *Morales*, 527 U. S. 41, 58 (1999) (plurality opinion)). JUSTICE THOMAS's concurrence, while disagreeing in part with the Court's interpretation of the residual clause, did not question its constitutionality. See *Sykes*, 564 U. S., at ___ (opinion concurring in judgment). And JUSTICE KAGAN's dissent,

which JUSTICE GINSBURG joined, argued that a proper application of the provision required a different result. See *id.,* at ___. Thus, eight Members of the Court found the statute capable of principled application.

It is, of course, true that "[s]*tare decisis* is not an inexorable command." *Payne* v. *Tennessee,* 501 U. S. 808, 828 (1991). But neither is it an empty Latin phrase. There must be good reasons for overruling a precedent, and there is none here. Nothing has changed since our decisions in *James* and *Sykes*—nothing, that is, except the Court's weariness with ACCA cases.

Reprising an argument that JUSTICE SCALIA made to no avail in *Sykes, supra*, at ___ (dissenting opinion) (slip op., at 7), the Court reasons that the residual clause must be unconstitutionally vague because we have had trouble settling on an interpretation. See *ante,* at 7. But disagreement about the meaning and application of the clause is not new. We were divided in *James* and in *Sykes* and in our intervening decisions in *Begay* v. *United States,* 553 U. S. 137 (2008), and *Chambers* v. *United States,* 555 U. S. 122 (2009). And that pattern is not unique to ACCA; we have been unable to come to an agreement on many recurring legal questions. The Confrontation Clause is one example that comes readily to mind. See, *e.g., Williams* v. *Illinois,* 567 U. S. ___ (2012); *Bullcoming* v. *New Mexico,* 564 U. S. ___ (2011); *Melendez-Diaz* v. *Massachusetts,* 557 U. S. 305 (2009). Our disagreements about the meaning of that provision do not prove that the Confrontation Clause has no ascertainable meaning. Likewise, our disagreements on the residual clause do not prove that it is unconstitutionally vague.

The Court also points to conflicts in the decisions of the lower courts as proof that the statute is unconstitutional. See *ante,* at 9–10. The Court overstates the degree of disagreement below. For many crimes, there is no dispute that the residual clause applies. And our certiorari docket

provides a skewed picture because the decisions that we are asked to review are usually those involving issues on which there is at least an arguable circuit conflict. But in any event, it has never been thought that conflicting interpretations of a statute justify judicial elimination of the statute. One of our chief responsibilities is to resolve those disagreements, see Supreme Court Rule 10, not to strike down the laws that create this work.

The Court may not relish the task of resolving residual clause questions on which the Circuits disagree, but the provision has not placed a crushing burden on our docket. In the eight years since *James*, we have decided all of three cases involving the residual clause. See *Begay*, *supra*; *Chambers*, *supra*; *Sykes*, *supra*. Nevertheless, faced with the unappealing prospect of resolving more circuit splits on various residual clause issues, see *ante*, at 9, six Members of the Court have thrown in the towel. That is not responsible.

### III

Even if we put *stare decisis* aside, the Court's decision remains indefensible. The residual clause is not unconstitutionally vague.

### A

The Fifth Amendment prohibits the enforcement of vague criminal laws, but the threshold for declaring a law void for vagueness is high. "The strong presumptive validity that attaches to an Act of Congress has led this Court to hold many times that statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language." *United States* v. *National Dairy Products Corp.*, 372 U. S. 29, 32 (1963). Rather, it is sufficient if a statute sets out an "ascertainable standard." *United States* v. *L. Cohen Grocery Co.*, 255 U. S. 81, 89

(1921). A statute is thus void for vagueness only if it wholly "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States* v. *Williams*, 553 U. S. 285, 304 (2008).

The bar is even higher for sentencing provisions. The fair notice concerns that inform our vagueness doctrine are aimed at ensuring that a "'person of ordinary intelligence [has] a reasonable opportunity to know what is prohibited, so that he may act accordingly.'" *Hoffman Estates* v. *Flipside, Hoffman Estates, Inc.*, 455 U. S. 489, 498 (1982) (quoting *Grayned* v. *City of Rockford*, 408 U. S. 104, 108 (1972)). The fear is that vague laws will "'trap the innocent.'" 455 U. S., at 498. These concerns have less force when it comes to sentencing provisions, which come into play only after the defendant has been found guilty of the crime in question. Due process does not require, as Johnson oddly suggests, that a "prospective criminal" be able to calculate the precise penalty that a conviction would bring. Supp. Brief for Petitioner 5; see *Chapman* v. *United States*, 500 U. S. 453, 467–468 (1991) (concluding that a vagueness challenge was "particularly weak "since whatever debate there is would center around the appropriate sentence and not the criminality of the conduct").

## B

ACCA's residual clause unquestionably provides an ascertainable standard. It defines "violent felony" to include any offense that "involves conduct that presents a serious potential risk of physical injury to another." 18 U. S. C. §924(e)(2)(B)(ii). That language is by no means incomprehensible. Nor is it unusual. There are scores of federal and state laws that employ similar standards. The Solicitor General's brief contains a 99-page appendix

setting out some of these laws. See App. to Supp. Brief for United States; see also *James, supra,* at 210, n. 6. If all these laws are unconstitutionally vague, today's decision is not a blast from a sawed-off shotgun; it is a nuclear explosion.

Attempting to avoid such devastation, the Court distinguishes these laws primarily on the ground that almost all of them "require gauging the riskiness of conduct in which an individual defendant engages *on a particular occasion.*" *Ante,* at 12 (emphasis in original). The Court thus admits that, "[a]s a general matter, we do not doubt the constitutionality of laws that call for the application of a qualitative standard such as 'substantial risk' to real-world conduct." *Ibid.* Its complaint is that the residual clause "requires application of the 'serious potential risk' standard to an *idealized ordinary case of the crime.*" *Ibid.* (emphasis added). Thus, according to the Court, ACCA's residual clause is unconstitutionally vague because its standard must be applied to "an idealized ordinary case of the crime" and not, like the vast majority of the laws in the Solicitor General's appendix, to "real-world conduct."

ACCA, however, makes no reference to "an idealized ordinary case of the crime." That requirement was the handiwork of this Court in *Taylor* v. *United States,* 495 U. S. 575 (1990). And as I will show, the residual clause can reasonably be interpreted to refer to "real-world conduct."[1]

_____

[1] The Court also says that the residual clause's reference to the enumerated offenses is "confusing." *Ante,* at 12. But this is another argument we rejected in *James* v. *United States,* 550 U. S. 192 (2007), and *Sykes* v. *United States,* 564 U. S. 1 (2011), and it is no more persuasive now. Although the risk level varies among the enumerated offenses, all four categories of offenses involve conduct that presents a serious potential risk of harm to others. If the Court's concern is that some of the enumerated offenses do not seem especially risky, all that means is that the statute "sets a low baseline level for risk." *Id.,* at ___ (THOMAS, J., concurring in judgment) (slip op., at 2).

### C

When a statute's constitutionality is in doubt, we have an obligation to interpret the law, if possible, to avoid the constitutional problem. See, *e.g., Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Constr. Trades Council*, 485 U. S. 568, 575 (1988). As one treatise puts it, "[a] statute should be interpreted in a way that avoids placing its constitutionality in doubt." A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts §38, p. 247 (2012). This canon applies fully when considering vagueness challenges. In cases like this one, "our task is not to destroy the Act if we can, but to construe it, if consistent with the will of Congress, so as to comport with constitutional limitations." *Civil Service Comm'n* v. *Letter Carriers,* 413 U. S. 548, 571 (1973); see also *Skilling* v. *United States*, 561 U. S. 358, 403 (2010). Indeed, "'[t]he elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality.'" *Id.,* at 406 (quoting *Hooper* v. *California*, 155 U. S. 648, 657 (1895); emphasis deleted); see also *Ex parte Randolph*, 20 F. Cas. 242, 254 (No. 11,558) (CC Va. 1833) (Marshall, C. J.).

The Court all but concedes that the residual clause would be constitutional if it applied to "real-world conduct." Whether that is the *best* interpretation of the residual clause is beside the point. What matters is whether it is a reasonable interpretation of the statute. And it surely is that.

First, this interpretation heeds the pointed distinction that ACCA draws between the "element[s]" of an offense and "conduct." Under §924(e)(2)(B)(i), a crime qualifies as a "violent felony" if one of its "element[s]" involves "the use, attempted use, or threatened use of physical force against the person of another." But the residual clause, which appears in the very next subsection, §924(e)(2)(B)(ii), focuses on "conduct"—specifically, "con-

duct that presents a serious potential risk of physical injury to another." The use of these two different terms in §924(e) indicates that "conduct" refers to things done during the commission of an offense that are not part of the elements needed for conviction. Because those extra actions vary from case to case, it is natural to interpret "conduct" to mean real-world conduct, not the conduct involved in some Platonic ideal of the offense.

Second, as the Court points out, standards like the one in the residual clause almost always appear in laws that call for application by a trier of fact. This strongly suggests that the residual clause calls for the same sort of application.

Third, if the Court is correct that the residual clause is nearly incomprehensible when interpreted as applying to an "idealized ordinary case of the crime," then that is telling evidence that this is not what Congress intended. When another interpretation is ready at hand, why should we assume that Congress gave the clause a meaning that is impossible—or even, exceedingly difficult—to apply?

### D

Not only does the "real-world conduct" interpretation fit the terms of the residual clause, but the reasons that persuaded the Court to adopt the categorical approach in *Taylor* either do not apply or have much less force in residual clause cases.

In *Taylor*, the question before the Court concerned the meaning of "burglary," one of ACCA's enumerated offenses. The Court gave three reasons for holding that a judge making an ACCA determination should generally look only at the elements of the offense of conviction and not to other things that the defendant did during the commission of the offense. First, the Court thought that ACCA's use of the term "convictions" pointed to the categorical approach. The Court wrote: "Section 924(e)(1) refers to 'a person who

. . . has three previous convictions' for—not a person who has committed—three previous violent felonies or drug offenses." 495 U. S., at 600. Second, the Court relied on legislative history, noting that ACCA had previously contained a generic definition of burglary and that "the deletion of [this] definition . . . may have been an inadvertent casualty of a complex drafting process." *Id.*, at 589–590, 601. Third, the Court felt that "the practical difficulties and potential unfairness of a factual approach [were] daunting." *Id.*, at 601.

None of these three grounds dictates that the categorical approach must be used in residual clause cases. The second ground, which concerned the deletion of a generic definition of burglary, obviously has no application to the residual clause. And the first ground has much less force in residual clause cases. In *Taylor*, the Court reasoned that a defendant has a "conviction" for burglary only if burglary is the offense set out in the judgment of conviction. For instance, if a defendant commits a burglary but pleads guilty, under a plea bargain, to possession of burglar's tools, the *Taylor* Court thought that it would be unnatural to say that the defendant had a *conviction* for burglary. Now consider a case in which a gang member is convicted of illegal possession of a sawed-off shotgun and the evidence shows that he concealed the weapon under his coat, while searching for a rival gang member who had just killed his brother. In that situation, it is not at all unnatural to say that the defendant had a conviction for a crime that "involve[d] *conduct* that present[ed] a serious potential risk of physical injury to another." §924(e)(2)(B)(ii) (emphasis added). At the very least, it would be a reasonable way to describe the defendant's conviction.

The *Taylor* Court's remaining reasons for adopting the categorical approach cannot justify an interpretation that renders the residual clause unconstitutional. While the

*Taylor* Court feared that a conduct-specific approach would unduly burden the courts, experience has shown that application of the categorical approach has not always been easy. Indeed, the Court's main argument for overturning the statute is that this approach is unmanageable in residual clause cases.

As for the notion that the categorical approach is more forgiving to defendants, there is a strong argument that the opposite is true, at least with respect to the residual clause. Consider two criminal laws: Injury occurs in 10% of cases involving the violation of statute A, but in 90% of cases involving the violation of statute B. Under the categorical approach, a truly dangerous crime under statute A might not qualify as a violent felony, while a crime with no measurable risk of harm under statute B would count against the defendant. Under a conduct-specific inquiry, on the other hand, a defendant's actual conduct would determine whether ACCA's mandatory penalty applies.

It is also significant that the allocation of the burden of proof protects defendants. The prosecution bears the burden of proving that a defendant has convictions that qualify for sentencing under ACCA. If evidentiary deficiencies, poor recordkeeping, or anything else prevents the prosecution from discharging that burden under the conduct-specific approach, a defendant would not receive an ACCA sentence.

Nor would a conduct-specific inquiry raise constitutional problems of its own. It is questionable whether the Sixth Amendment creates a right to a jury trial in this situation. See *Almendarez-Torres* v. *United States*, 523 U. S. 224 (1998). But if it does, the issue could be tried to a jury, and the prosecution could bear the burden of proving beyond a reasonable doubt that a defendant's prior crimes involved conduct that presented a serious potential risk of injury to another. I would adopt this alternative interpre-

tation and hold that the residual clause requires an examination of real-world conduct.

The Court's only reason for refusing to consider this interpretation is that "the Government has not asked us to abandon the categorical approach in residual-clause cases." *Ante,* at 13. But the Court cites no case in which we have suggested that a saving interpretation may be adopted only if it is proposed by one of the parties. Nor does the Court cite any secondary authorities advocating this rule. Cf. Scalia, Reading Law §38 (stating the canon with no such limitation). On the contrary, we have long recognized that it is "our plain duty to adopt that construction which will save [a] statute from constitutional infirmity," where fairly possible. *United States ex rel. Attorney General* v. *Delaware & Hudson Co.*, 213 U. S. 366, 407 (1909). It would be strange if we could fulfill that "plain duty" only when a party asks us to do so. And the Court's refusal to consider a saving interpretation not advocated by the Government is hard to square with the Court's adoption of an argument that petitioner chose not to raise. As noted, Johnson did not ask us to hold that the residual clause is unconstitutionally vague, but the Court interjected that issue into the case, requested supplemental briefing on the question, and heard reargument. The Court's refusal to look beyond the arguments of the parties apparently applies only to arguments that the Court does not want to hear.

### E

Even if the categorical approach is used in residual clause cases, however, the clause is still not void for vagueness. "It is well established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined" on an as-applied basis. *United States* v. *Mazurie*, 419 U. S. 544, 550 (1975). "Objections to vagueness under the Due Process Clause rest

on the lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk." *Maynard* v. *Cartwright*, 486 U. S. 356, 361 (1988). Thus, in a due process vagueness case, we will hold that a law is facially invalid "only if the enactment is impermissibly vague in *all* of its applications." *Hoffman Estates*, 455 U. S., at 494–495 (emphasis added); see also *Chapman*, 500 U. S., at 467.[2]

In concluding that the residual clause is facially void for vagueness, the Court flatly contravenes this rule. The Court admits "that there will be straightforward cases under the residual clause." *Ante,* at 10. But rather than exercising the restraint that our vagueness cases prescribe, the Court holds that the residual clause is unconstitutionally vague even when its application is clear.

The Court's treatment of this issue is startling. Its facial invalidation precludes a sentencing court that is applying ACCA from counting convictions for even those specific offenses that this Court previously found to fall within the residual clause. See *James*, 550 U. S., at 203–209 (attempted burglary); *Sykes*, 564 U. S., at ___–___ (slip op., at 5–9) (flight from law enforcement in a vehicle).

---

[2]This rule is simply an application of the broader rule that, except in First Amendment cases, we will hold that a statute is facially unconstitutional only if "no set of circumstances exists under which the Act would be valid." *United States* v. *Salerno*, 481 U. S. 739, 745 (1987). A void-for-vagueness challenge is a facial challenge. See *Hoffman Estates* v. *Flipside, Hoffman Estates, Inc*., 455 U. S. 489, 494–495, and nn. 5, 6, 7 (1982); *Chicago* v. *Morales*, 527 U. S. 41, 79 (1999) (SCALIA, J., dissenting). Consequently, there is no reason why the no-set-of-circumstances rule should not apply in this context. I assume that the Court does not mean to abrogate the no-set-of-circumstances rule in its entirety, but the Court provides no justification for its refusal to apply that rule here. Perhaps the Court has concluded, for some undisclosed reason, that void-for-vagueness claims are different from all other facial challenges not based on the First Amendment. Or perhaps the Court has simply created an ACCA exception.

Still worse, the Court holds that vagueness bars the use of the residual clause in other cases in which its applicability can hardly be questioned.  Attempted rape is an example. See, *e.g., Dawson* v. *United States*, 702 F. 3d 347, 351–352 (CA6 2012).  Can there be any doubt that "an idealized ordinary case of th[is] crime" "involves conduct that presents a serious potential risk of physical injury to another"?  How about attempted arson,[3] attempted kidnapping,[4] solicitation to commit aggravated assault,[5] possession of a loaded weapon with the intent to use it unlawfully against another person,[6] possession of a weapon in prison,[7] or compelling a person to act as a prostitute?[8]  Is there much doubt that those offenses "involve conduct that presents a serious potential risk of physical injury to another"?

Transforming vagueness doctrine, the Court claims that we have never actually *held* that a statue may be voided for vagueness only when it is vague in all its applications. But that is simply wrong.  In *Hoffman Estates*, we reversed a Seventh Circuit decision that voided an ordinance prohibiting the sale of certain items.  See 455 U. S., at 491.  The Seventh Circuit struck down the ordinance because it was "unclear in *some* of its applications," but we reversed and emphasized that a law is void for vagueness "only if [it] is impermissibly vague in all of its applications." *Id.,* at 494–495; see also *id.,* at 495, n. 7 (collecting cases).  Applying that principle, we held that the "facial

---

[3] *United States* v. *Rainey*, 362 F. 3d 733, 735–736 (CA11) (*per curiam*), cert. denied, 541 U. S. 1081 (2004).

[4] *United States* v. *Kaplansky*, 42 F. 3d 320, 323–324 (CA6 1994) (en banc).

[5] *United States* v. *Benton*, 639 F. 3d 723, 731–732 (CA6), cert. denied, 565 U. S. ___ (2011).

[6] *United States* v. *Lynch*, 518 F. 3d 164, 172–173 (CA2 2008), cert. denied, 555 U. S. 1177 (2009).

[7] *United States* v. *Boyce*, 633 F. 3d 708, 711–712 (CA8 2011), cert. denied, 565 U. S. ___ (2012).

[8] *United States* v. *Brown*, 273 F. 3d 747, 749–751 (CA7 2001).

challenge [wa]s unavailing" because "at least some of the items sold . . . [we]re covered" by the ordinance. *Id.,* at 500. These statements were not dicta. They were the holding of the case. Yet the Court does not even mention this binding precedent.

Instead, the Court says that the facts of two *earlier* cases support a broader application of the vagueness doctrine. See *ante,* at 11. That, too, is incorrect. Neither case remotely suggested that mere overbreadth is enough for facial invalidation under the Fifth Amendment.

In *Coates* v. *Cincinnati*, 402 U. S. 611, 612 (1971), we addressed an ordinance that restricted free assembly and association rights by prohibiting "annoying" conduct. Our analysis turned in large part on those First Amendment concerns. In fact, we specifically explained that the "vice of the ordinance lies not alone in its violation of the due process standard of vagueness." *Id.,* at 615. In the present case, by contrast, no First Amendment rights are at issue. Thus, *Coates* cannot support the Court's rejection of our repeated statements that "vagueness challenges to statutes which *do not involve First Amendment freedoms* must be examined in light of the facts . . . at hand." *Mazurie*, *supra*, at 550 (emphasis added).

Likewise, *L. Cohen Grocery Co.*, 255 U. S. 81, proves precisely the opposite of what the Court claims. In that case, we struck down a statute prohibiting "'unjust or unreasonable rate[s]'" because it provided no "ascertainable standard of guilt" and left open "the widest conceivable inquiry, the scope of which no one can foresee and the result of which no one can foreshadow or adequately guard against." *Id.,* at 89. The clear import of this language is that the law at issue was impermissibly vague in all applications. And in the years since, we have never adopted the majority's contradictory interpretation. On the contrary, we have characterized the case as involving a statute that could "not constitutionally be applied to any set of

facts." *United States* v. *Powell*, 423 U. S. 87, 92 (1975). Thus, our holdings and our dicta prohibit the Court's expansion of the vagueness doctrine. The Constitution does not allow us to hold a statute void for vagueness unless it is vague in all its applications.

## IV

Because I would not strike down ACCA's residual clause, it is necessary for me to address whether Johnson's conviction for possessing a sawed-off shotgun qualifies as a violent felony. Under either the categorical approach or a conduct-specific inquiry, it does.

## A

The categorical approach requires us to determine whether "the conduct encompassed by the elements of the offense, in the ordinary case, presents a serious potential risk of injury to another." *James*, 550 U. S., at 208. This is an "inherently probabilistic" determination that considers the circumstances and conduct that ordinarily attend the offense. *Id.,* at 207. The mere fact that a crime *could* be committed without a risk of physical harm does not exclude it from the statute's reach. See *id.,* at 207–208. Instead, the residual clause speaks of "potential risk[s]," §924(e)(2)(B)(ii), a term suggesting "that Congress intended to encompass possibilities even more contingent or remote than a simple 'risk,' much less a certainty." *James, supra,* at 207–208.

Under these principles, unlawful possession of a sawed-off shotgun qualifies as a violent felony. As we recognized in *District of Columbia* v. *Heller*, 554 U. S. 570, 625 (2008), sawed-off shotguns are "not typically possessed by law-abiding citizens for lawful purposes." Instead, they are uniquely attractive to violent criminals. Much easier to conceal than long-barreled shotguns used for hunting and other lawful purposes, short-barreled shotguns can be

hidden under a coat, tucked into a bag, or stowed under a car seat.  And like a handgun, they can be fired with one hand—except to more lethal effect.  These weapons thus combine the deadly characteristics of conventional shotguns with the more convenient handling of handguns. Unlike those common firearms, however, they are not typically possessed for lawful purposes.  And when a person illegally possesses a sawed-off shotgun during the commission of a crime, the risk of violence is seriously increased. The ordinary case of unlawful possession of a sawed-off shotgun therefore "presents a serious potential risk of physical injury to another."  §922(e)(2)(B)(ii).

Congress' treatment of sawed-off shotguns confirms this judgment.  As the Government's initial brief colorfully recounts, sawed-off shotguns were a weapon of choice for gangsters and bank robbers during the Prohibition Era. See Brief for United States 4.[9]  In response, Congress enacted the National Firearms Act of 1934, which required individuals possessing certain especially dangerous weapons—including sawed-off shotguns—to register with the Federal Government and pay a special tax.  26 U. S. C. §§5845(a)(1)–(2).  The Act was passed on the understanding that "while there is justification for permitting the citizen to keep a pistol or revolver for his own protection without any restriction, there is no reason why anyone

---

[9]Al Capone's south-side Chicago henchmen used sawed-off shotguns when they executed their rivals from Bugs Moran's north-side gang during the infamous Saint Valentine's Day Massacre of 1929. See 7 Chicago Gangsters Slain by Firing Squad of Rivals, Some in Police Uniforms, N. Y. Times, Feb. 15, 1929, p. A1. Wild Bill Rooney was gunned down in Chicago by a "sawed-off shotgun [that] was pointed through a rear window" of a passing automobile.  Union Boss Slain by Gang in Chicago, N. Y. Times, Mar. 20, 1931, p. 52.  And when the infamous outlaws Bonnie and Clyde were killed by the police in 1934, Clyde was found "clutching a sawed-off shotgun in one hand."  Barrow and Woman are Slain by Police in Louisiana Trap, N. Y. Times, May 24, 1934, p. A1.

except a law officer should have a . . . sawed-off shotgun."
H. R. Rep. No. 1780, 73d Cong., 2d Sess., 1 (1934). As
amended, the Act imposes strict registration requirements
for any individual wishing to possess a covered shotgun,
see, *e.g.,* §§5822, 5841(b), and illegal possession of such a
weapon is punishable by imprisonment for up to 10 years.
See §§5861(b)–(d), 5871. It is telling that this penalty
exceeds that prescribed by federal law for quintessential
violent felonies.[10] It thus seems perfectly clear that Con-
gress has long regarded the illegal possession of a sawed-
off shotgun as a crime that poses a serious risk of harm to
others.

The majority of States agree. The Government informs
the Court, and Johnson does not dispute, that 28 States
have followed Congress' lead by making it a crime to
possess an unregistered sawed-off shotgun, and 11 other
States and the District of Columbia prohibit private pos-
session of sawed-off shotguns entirely. See Brief for
United States 8–9 (collecting statutes). Minnesota, where
petitioner was convicted, has adopted a blanket ban, based
on its judgment that "[t]he sawed-off shotgun has no
legitimate use in the society whatsoever." *State* v. *Ellen-
berger*, 543 N. W. 2d 673, 676 (Minn. App. 1996) (internal
quotation marks and citation omitted). Possession of a
sawed-off shotgun in Minnesota is thus an inherently
criminal act. It is fanciful to assume that a person who
chooses to break the law and risk the heavy criminal
penalty incurred by possessing a notoriously dangerous

---

[10] See, *e.g.,* 18 U. S. C. §111(a) (physical assault on federal officer
punishable by not more than eight years' imprisonment); §113(a)(7)
(assault within maritime or territorial jurisdiction resulting in substan-
tial bodily injury to an individual under the age of 16 punishable by up
to five years' imprisonment); §117(a) ("assault, sexual abuse, or serious
violent felony against a spouse or intimate partner" by a habitual
offender within maritime or territorial jurisdiction punishable by up to
five years' imprisonment, except in cases of "substantial bodily injury").

AD Page 397 of 441

weapon is unlikely to use that weapon in violent ways.

### B

If we were to abandon the categorical approach, the facts of Johnson's offense would satisfy the residual clause as well. According to the record in this case, Johnson possessed his sawed-off shotgun while dealing drugs. When police responded to reports of drug activity in a parking lot, they were told by two people that "Johnson and another individual had approached them and offered to sell drugs." PSR ¶45. The police then searched the vehicle where Johnson was seated as a passenger, and they found a sawed-off shotgun and five bags of marijuana. Johnson admitted that the gun was his.

Understood in this context, Johnson's conduct posed an acute risk of physical injury to another. Drugs and guns are never a safe combination. If one of his drug deals had gone bad or if a rival dealer had arrived on the scene, Johnson's deadly weapon was close at hand. The sawed-off nature of the gun elevated the risk of collateral damage beyond any intended targets. And the location of the crime—a public parking lot—significantly increased the chance that innocent bystanders might be caught up in the carnage. This is not a case of "mere possession" as Johnson suggests. Brief for Petitioner i. He was not storing the gun in a safe, nor was it a family heirloom or collector's item. He illegally possessed the weapon in case he needed to use it during another crime. A judge or jury could thus conclude that Johnson's offense qualified as a violent felony.

There should be no doubt that Samuel Johnson was an armed career criminal. His record includes a number of serious felonies. And he has been caught with dangerous weapons on numerous occasions. That this case has led to the residual clause's demise is confounding. I only hope that Congress can take the Court at its word that either

amending the list of enumerated offenses or abandoning the categorical approach would solve the problem that the Court perceives.

# Tab 14

**City of Los Angeles v. Patel**

No. 13-1175, Slip Opinion (S.Ct., 22 JUN 2015)

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## CITY OF LOS ANGELES, CALIFORNIA *v.* PATEL ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 13–1175.  Argued March 3, 2015—Decided June 22, 2015

Petitioner, the city of Los Angeles (City), requires hotel operators to record and keep specific information about their guests on the premises for a 90-day period. Los Angeles Municipal Code §41.49. These records "shall be made available to any officer of the Los Angeles Police Department for inspection . . . at a time and in a manner that minimizes any interference with the operation of the business," §41.49(3)(a), and a hotel operator's failure to make the records available is a criminal misdemeanor, §11.00(m). Respondents, a group of motel operators and a lodging association, brought a facial challenge to §41.49(3)(a) on Fourth Amendment grounds. The District Court entered judgment for the City, finding that respondents lacked a reasonable expectation of privacy in their records. The Ninth Circuit subsequently reversed, determining that inspections under §41.49(3)(a) are Fourth Amendment searches and that such searches are unreasonable under the Fourth Amendment because hotel owners are subjected to punishment for failure to turn over their records without first being afforded the opportunity for precompliance review.

*Held*:

  1. Facial challenges under the Fourth Amendment are not categorically barred or especially disfavored. Pp. 4–8.

    (a) Facial challenges to statutes—as opposed to challenges to particular applications of statutes—have been permitted to proceed under a diverse array of constitutional provisions. See, *e.g., Sorrell* v. *IMS Health Inc.*, 564 U. S. ___ (First Amendment); *District of Columbia* v. *Heller*, 554 U. S. 570 (Second Amendment). The Fourth Amendment is no exception. *Sibron* v. *New York*, 392 U. S. 40, distinguished. This Court has entertained facial challenges to statutes

authorizing warrantless searches, declaring them, on several occasions, facially invalid, see, *e.g., Chandler* v. *Miller*, 520 U. S. 305, 308–309. Pp. 4–7.

(b) Petitioner contends that facial challenges to statutes authorizing warrantless searches must fail because they will never be unconstitutional in all applications, but this Court's precedents demonstrate that such challenges can be brought, and can succeed. Under the proper facial-challenge analysis, only applications of a statute in which the statute actually authorizes or prohibits conduct are considered. See, *e.g., Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833. When addressing a facial challenge to a statute authorizing warrantless searches, the proper focus is on searches that the law actually authorizes and not those that could proceed irrespective of whether they are authorized by the statute, *e.g.,* where exigent circumstances, a warrant, or consent to search exists. Pp. 7–8.

2. Section 41.49(3)(a) is facially unconstitutional because it fails to provide hotel operators with an opportunity for precompliance review. Pp. 9–17.

(a) "'[S]earches conducted outside the judicial process . . . are *per se* unreasonable under the Fourth Amendment—subject only to a few . . . exceptions.'" *Arizona* v. *Gant*, 556 U. S. 332, 338. One exception is for administrative searches. See *Camara* v. *Municipal Court of City and County of San Francisco*, 387 U. S. 523, 534. To be constitutional, the subject of an administrative search must, among other things, be afforded an opportunity to obtain precompliance review before a neutral decisionmaker. See *See* v. *Seattle*, 387 U. S. 541, 545. Assuming the administrative search exception otherwise applies here, §41.49 is facially invalid because it fails to afford hotel operators any opportunity for precompliance review. To be clear, a hotel owner must only be afforded an opportunity for precompliance review; actual review need occur only when a hotel operator objects to turning over the records. This opportunity can be provided without imposing onerous burdens on law enforcement. For instance, officers in the field can issue administrative subpoenas without probable cause that a regulation is being infringed. This narrow holding does not call into question those parts of §41.49 requiring hotel operators to keep records nor does it prevent police from obtaining access to those records where a hotel operator consents to the search, where the officer has a proper administrative warrant, or where some other exception to the warrant requirement applies. Pp. 9–13.

(b) Petitioner's argument that the ordinance is facially valid under the more relaxed standard for closely regulated industries is rejected. See *Marshall* v. *Barlow's, Inc.*, 436 U. S. 307, 313. This Court has only recognized four such industries, and nothing inherent in the

Syllabus

operation of hotels poses a comparable clear and significant risk to the public welfare. Additionally, because the majority of regulations applicable to hotels apply to many businesses, to classify hotels as closely regulated would permit what has always been a narrow exception to swallow the rule. But even if hotels were closely regulated, §41.49 would still contravene the Fourth Amendment as it fails to satisfy the additional criteria that must be met for searches of closely regulated industries to be reasonable. See *New York* v. *Burger*, 482 U. S. 691, 702–703. Pp. 13–17.

738 F. 3d 1058, affirmed.

SOTOMAYOR, J., delivered the opinion of the Court, in which KENNEDY, GINSBURG, BREYER, and KAGAN, JJ., joined. SCALIA, J., filed a dissenting opinion, in which ROBERTS, C. J., and THOMAS, J., joined. ALITO, J., filed a dissenting opinion, in which THOMAS, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 13–1175

_____

## CITY OF LOS ANGELES, CALIFORNIA, PETITIONER *v.* NARANJIBHAI PATEL, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 22, 2015]

JUSTICE SOTOMAYOR delivered the opinion of the Court.

Respondents brought a Fourth Amendment challenge to a provision of the Los Angeles Municipal Code that compels "[e]very operator of a hotel to keep a record" containing specified information concerning guests and to make this record "available to any officer of the Los Angeles Police Department for inspection" on demand. Los Angeles Municipal Code §§41.49(2), (3)(a), (4) (2015). The questions presented are whether facial challenges to statutes can be brought under the Fourth Amendment and, if so, whether this provision of the Los Angeles Municipal Code is facially invalid. We hold facial challenges can be brought under the Fourth Amendment. We further hold that the provision of the Los Angeles Municipal Code that requires hotel operators to make their registries available to the police on demand is facially unconstitutional because it penalizes them for declining to turn over their records without affording them any opportunity for precompliance review.

## I

## A

Los Angeles Municipal Code (LAMC) §41.49 requires hotel operators to record information about their guests, including: the guest's name and address; the number of people in each guest's party; the make, model, and license plate number of any guest's vehicle parked on hotel property; the guest's date and time of arrival and scheduled departure date; the room number assigned to the guest; the rate charged and amount collected for the room; and the method of payment. §41.49(2). Guests without reservations, those who pay for their rooms with cash, and any guests who rent a room for less than 12 hours must present photographic identification at the time of check-in, and hotel operators are required to record the number and expiration date of that document. §41.49(4). For those guests who check in using an electronic kiosk, the hotel's records must also contain the guest's credit card information. §41.49(2)(b). This information can be maintained in either electronic or paper form, but it must be "kept on the hotel premises in the guest reception or guest check-in area or in an office adjacent" thereto for a period of 90 days. §41.49(3)(a).

Section 41.49(3)(a)—the only provision at issue here— states, in pertinent part, that hotel guest records "shall be made available to any officer of the Los Angeles Police Department for inspection," provided that "[w]henever possible, the inspection shall be conducted at a time and in a manner that minimizes any interference with the operation of the business." A hotel operator's failure to make his or her guest records available for police inspection is a misdemeanor punishable by up to six months in jail and a $1,000 fine. §11.00(m) (general provision applicable to entire LAMC).

### B

In 2003, respondents, a group of motel operators along with a lodging association, sued the city of Los Angeles (City or petitioner) in three consolidated cases challenging the constitutionality of §41.49(3)(a). They sought declaratory and injunctive relief. The parties "agree[d] that the sole issue in the . . . action [would be] a facial constitutional challenge" to §41.49(3)(a) under the Fourth Amendment. App. 195. They further stipulated that respondents have been subjected to mandatory record inspections under the ordinance without consent or a warrant. *Id.,* at 194–195.

Following a bench trial, the District Court entered judgment in favor of the City, holding that respondents' facial challenge failed because they lacked a reasonable expectation of privacy in the records subject to inspection. A divided panel of the Ninth Circuit affirmed on the same grounds. 686 F. 3d 1085 (2012). On rehearing en banc, however, the Court of Appeals reversed. 738 F. 3d 1058, 1065 (2013).

The en banc court first determined that a police officer's nonconsensual inspection of hotel records under §41.49 is a Fourth Amendment "search" because "[t]he business records covered by §41.49 are the hotel's private property" and the hotel therefore "has the right to exclude others from prying into the[ir] contents." *Id.,* at 1061. Next, the court assessed "whether the searches authorized by §41.49 are reasonable." *Id.,* at 1063. Relying on *Donovan* v. *Lone Steer, Inc.,* 464 U. S. 408 (1984), and *See* v. *Seattle,* 387 U. S. 541 (1967), the court held that §41.49 is facially unconstitutional "as it authorizes inspections" of hotel records "without affording an opportunity to 'obtain judicial review of the reasonableness of the demand prior to suffering penalties for refusing to comply.'" 738 F. 3d, at 1065 (quoting *See,* 387 U. S., at 545).

Two dissenting opinions were filed. The first dissent

argued that facial relief should rarely be available for Fourth Amendment challenges, and was inappropriate here because the ordinance would be constitutional in those circumstances where police officers demand access to hotel records with a warrant in hand or exigent circumstances justify the search. 738 F. 3d, at 1065–1070 (opinion of Tallman, J.). The second dissent conceded that inspections under §41.49 constitute Fourth Amendment searches, but faulted the majority for assessing the reasonableness of these searches without accounting for the weakness of the hotel operators' privacy interest in the content of their guest registries. *Id.,* at 1070–1074 (opinion of Clifton, J.).

We granted certiorari, 574 U. S. ___ (2014), and now affirm.

## II

We first clarify that facial challenges under the Fourth Amendment are not categorically barred or especially disfavored.

## A

A facial challenge is an attack on a statute itself as opposed to a particular application. While such challenges are "the most difficult . . . to mount successfully," *United States* v. *Salerno,* 481 U. S. 739, 745 (1987), the Court has never held that these claims cannot be brought under any otherwise enforceable provision of the Constitution. Cf. Fallon, Fact and Fiction About Facial Challenges, 99 Cal. L. Rev. 915, 918 (2011) (pointing to several Terms in which "the Court adjudicated more facial challenges on the merits than it did as-applied challenges"). Instead, the Court has allowed such challenges to proceed under a diverse array of constitutional provisions. See, *e.g., Sorrell* v. *IMS Health Inc.,* 564 U. S. ___ (2011) (First Amendment); *District of Columbia* v. *Heller,* 554 U. S. 570

(2008) (Second Amendment); *Chicago* v. *Morales*, 527 U. S. 41 (1999) (Due Process Clause of the Fourteenth Amendment); *Kraft Gen. Foods, Inc.* v. *Iowa Dept. of Revenue and Finance*, 505 U. S. 71 (1992) (Foreign Commerce Clause).

Fourth Amendment challenges to statutes authorizing warrantless searches are no exception. Any claim to the contrary reflects a misunderstanding of our decision in *Sibron* v. *New York*, 392 U. S. 40 (1968). In *Sibron*, two criminal defendants challenged the constitutionality of a statute authorizing police to, among other things, "'stop any person abroad in a public place whom [they] reasonably suspec[t] is committing, has committed or is about to commit a felony." *Id.,* at 43 (quoting then N. Y. Code Crim. Proc. §180–a). The Court held that the search of one of the defendants under the statute violated the Fourth Amendment, 392 U. S., at 59, 62, but refused to opine more broadly on the statute's validity, stating that "[t]he constitutional validity of a warrantless search is pre-eminently the sort of question which can only be decided in the concrete factual context of the individual case." *Id.,* at 59.

This statement from *Sibron*—which on its face might suggest an intent to foreclose all facial challenges to statutes authorizing warrantless searches—must be understood in the broader context of that case. In the same section of the opinion, the Court emphasized that the "operative categories" of the New York law at issue were "susceptible of a wide variety of interpretations," *id.,* at 60, and that "[the law] was passed too recently for the State's highest court to have ruled upon many of the questions involving potential intersections with federal constitutional guarantees," *id.,* at 60, n. 20. *Sibron* thus stands for the simple proposition that claims for facial relief under the Fourth Amendment are unlikely to succeed when there is substantial ambiguity as to what conduct a statute authorizes: Where a statute consists of "extraordinarily

AD Page 408 of 441

elastic categories," it may be "impossible to tell" whether and to what extent it deviates from the requirements of the Fourth Amendment. *Id.,* at 59, 61, n. 20.

This reading of *Sibron* is confirmed by subsequent precedents. Since *Sibron*, the Court has entertained facial challenges under the Fourth Amendment to statutes authorizing warrantless searches. See, *e.g., Vernonia School District 47J* v. *Acton*, 515 U. S. 646, 648 (1995) ("We granted certiorari to decide whether" petitioner's student athlete drug testing policy "violates the Fourth and Fourteenth Amendments to the United States Constitution"); *Skinner* v. *Railway Labor Executives' Assn.*, 489 U. S. 602, 633, n. 10 (1989) ("[R]espondents have challenged the administrative scheme on its face. We deal therefore with whether the [drug] tests contemplated by the regulation can *ever* be conducted"); cf. *Illinois* v. *Krull*, 480 U. S. 340, 354 (1987) ("[A] person subject to a statute authorizing searches without a warrant or probable cause may bring an action seeking a declaration that the statute is unconstitutional and an injunction barring its implementation"). Perhaps more importantly, the Court has on numerous occasions declared statutes facially invalid under the Fourth Amendment. For instance, in *Chandler* v. *Miller*, 520 U. S. 305, 308–309 (1997), the Court struck down a Georgia statute requiring candidates for certain state offices to take and pass a drug test, concluding that this "requirement . . . [did] not fit within the closely guarded category of constitutionally permissible suspicionless searches." Similar examples abound. See, *e.g., Ferguson* v. *Charleston*, 532 U. S. 67, 86 (2001) (holding that a hospital policy authorizing "nonconsensual, warrantless, and suspicionless searches" contravened the Fourth Amendment); *Payton* v. *New York*, 445 U. S. 573, 574, 576 (1980) (holding that a New York statute "authoriz[ing] police officers to enter a private residence without a warrant and with force, if necessary, to make a routine felony

arrest" was "not consistent with the Fourth Amendment"); *Torres* v. *Puerto Rico*, 442 U. S. 465, 466, 471 (1979) (holding that a Puerto Rico statute authorizing "police to search the luggage of any person arriving in Puerto Rico from the United States" was unconstitutional because it failed to require either probable cause or a warrant).

## B

Petitioner principally contends that facial challenges to statutes authorizing warrantless searches must fail because such searches will never be unconstitutional in all applications. Cf. *Salerno*, 481 U. S., at 745 (to obtain facial relief the party seeking it "must establish that no set of circumstances exists under which the [statute] would be valid"). In particular, the City points to situations where police are responding to an emergency, where the subject of the search consents to the intrusion, and where police are acting under a court-ordered warrant. See Brief for Petitioner 19–20. While petitioner frames this argument as an objection to respondents' challenge in this case, its logic would preclude facial relief in every Fourth Amendment challenge to a statute authorizing warrantless searches. For this reason alone, the City's argument must fail: The Court's precedents demonstrate not only that facial challenges to statutes authorizing warrantless searches can be brought, but also that they can succeed. See Part II–A, *supra*.

Moreover, the City's argument misunderstands how courts analyze facial challenges. Under the most exacting standard the Court has prescribed for facial challenges, a plaintiff must establish that a "law is unconstitutional in all of its applications." *Washington State Grange* v. *Washington State Republican Party*, 552 U. S. 442, 449 (2008). But when assessing whether a statute meets this standard, the Court has considered only applications of the

statute in which it actually authorizes or prohibits conduct. For instance, in *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833 (1992), the Court struck down a provision of Pennsylvania's abortion law that required a woman to notify her husband before obtaining an abortion. Those defending the statute argued that facial relief was inappropriate because most women voluntarily notify their husbands about a planned abortion and for them the law would not impose an undue burden. The Court rejected this argument, explaining: The "[l]egislation is measured for consistency with the Constitution by its impact on those whose conduct it affects. . . . The proper focus of the constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." *Id.,* at 894.

Similarly, when addressing a facial challenge to a statute authorizing warrantless searches, the proper focus of the constitutional inquiry is searches that the law actually authorizes, not those for which it is irrelevant. If exigency or a warrant justifies an officer's search, the subject of the search must permit it to proceed irrespective of whether it is authorized by statute. Statutes authorizing warrantless searches also do no work where the subject of a search has consented. Accordingly, the constitutional "applications" that petitioner claims prevent facial relief here are irrelevant to our analysis because they do not involve actual applications of the statute.[1]

---

[1] Relatedly, the United States claims that a statute authorizing warrantless searches may still have independent force if it imposes a penalty for failing to cooperate in a search conducted under a warrant or in an exigency. See Brief for United States as *Amicus Curiae* 19. This argument gets things backwards. An otherwise facially unconstitutional statute cannot be saved from invalidation based solely on the existence of a penalty provision that applies when searches are not actually authorized by the statute. This argument is especially unconvincing where, as here, an independent obstruction of justice statute imposes a penalty for "willfully, resist[ing], delay[ing], or obstruct[ing]

## III

Turning to the merits of the particular claim before us, we hold that §41.49(3)(a) is facially unconstitutional because it fails to provide hotel operators with an opportunity for precompliance review.

### A

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." It further provides that "no Warrants shall issue, but upon probable cause." Based on this constitutional text, the Court has repeatedly held that "'searches conducted outside the judicial process, without prior approval by [a] judge or [a] magistrate [judge], are *per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" *Arizona* v. *Gant*, 556 U. S. 332, 338 (2009) (quoting *Katz* v. *United States*, 389 U. S. 347, 357 (1967)). This rule "applies to commercial premises as well as to homes." *Marshall* v. *Barlow's, Inc.*, 436 U. S. 307, 312 (1978).

Search regimes where no warrant is ever required may be reasonable where "'special needs . . . make the warrant and probable-cause requirement impracticable,'" *Skinner*, 489 U. S., at 619 (quoting *Griffin* v. *Wisconsin*, 483 U. S. 868, 873 (1987) (some internal quotation marks omitted)), and where the "primary purpose" of the searches is "[d]istinguishable from the general interest in crime control," *Indianapolis* v. *Edmond*, 531 U. S. 32, 44 (2000). Here, we assume that the searches authorized by §41.49 serve a "special need" other than conducting criminal investigations: They ensure compliance with the record-

_____

any public officer . . . in the discharge or attempt to discharge any duty of his or her office of employment." Cal. Penal Code Ann. §148(a)(1) (West 2014).

keeping requirement, which in turn deters criminals from operating on the hotels' premises.[2]  The Court has referred to this kind of search as an "administrative searc[h]." *Camara* v. *Municipal Court of City and County of San Francisco*, 387 U. S. 523, 534 (1967).  Thus, we consider whether §41.49 falls within the administrative search exception to the warrant requirement.

The Court has held that absent consent, exigent circumstances, or the like, in order for an administrative search to be constitutional, the subject of the search must be afforded an opportunity to obtain precompliance review before a neutral decisionmaker.  See *See*, 387 U. S., at 545; *Lone Steer*, 464 U. S., at 415 (noting that an administrative search may proceed with only a subpoena where the subpoenaed party is sufficiently protected by the opportunity to "question the reasonableness of the subpoena, before suffering any penalties for refusing to comply with it, by raising objections in an action in district court").  And, we see no reason why this minimal requirement is inapplicable here.  While the Court has never attempted to prescribe the exact form an opportunity for precompliance review must take, the City does not even attempt to argue that §41.49(3)(a) affords hotel operators any opportunity whatsoever.   Section  41.49(3)(a) is,  therefore,  facially invalid.

A hotel owner who refuses to give an officer access to his or her registry can be arrested on the spot.  The Court has held that business owners cannot reasonably be put to this kind of choice.  *Camara*, 387 U. S., at 533 (holding that "broad statutory safeguards are no substitute for individualized review, particularly when those safeguards may

––––––––––

[2]Respondents contend that §41.49's principal purpose instead is to facilitate criminal investigation.  Brief for Respondents 44–47.  Because we find that the searches authorized by §41.49 are unconstitutional even if they serve the City's asserted purpose, we decline to address this argument.

only be invoked at the risk of a criminal penalty"). Absent an opportunity for precompliance review, the ordinance creates an intolerable risk that searches authorized by it will exceed statutory limits, or be used as a pretext to harass hotel operators and their guests. Even if a hotel has been searched 10 times a day, every day, for three months, without any violation being found, the operator can only refuse to comply with an officer's demand to turn over the registry at his or her own peril.

To be clear, we hold only that a hotel owner must be afforded an *opportunity* to have a neutral decisionmaker review an officer's demand to search the registry before he or she faces penalties for failing to comply. Actual review need only occur in those rare instances where a hotel operator objects to turning over the registry. Moreover, this opportunity can be provided without imposing onerous burdens on those charged with an administrative scheme's enforcement. For instance, respondents accept that the searches authorized by §41.49(3)(a) would be constitutional if they were performed pursuant to an administrative subpoena. Tr. of Oral Arg. 36–37. These subpoenas, which are typically a simple form, can be issued by the individual seeking the record—here, officers in the field—without probable cause that a regulation is being infringed. See *See*, 387 U. S., at 544 ("[T]he demand to inspect may be issued by the agency"). Issuing a subpoena will usually be the full extent of an officer's burden because "the great majority of businessmen can be expected in normal course to consent to inspection without warrant." *Barlow's, Inc.*, 436 U. S., at 316. Indeed, the City has cited no evidence suggesting that without an ordinance authorizing on-demand searches, hotel operators would regularly refuse to cooperate with the police.

In those instances, however, where a subpoenaed hotel operator believes that an attempted search is motivated by illicit purposes, respondents suggest it would be suffi-

cient if he or she could move to quash the subpoena before any search takes place. Tr. of Oral Arg. 38–39. A neutral decisionmaker, including an administrative law judge, would then review the subpoenaed party's objections before deciding whether the subpoena is enforceable. Given the limited grounds on which a motion to quash can be granted, such challenges will likely be rare. And, in the even rarer event that an officer reasonably suspects that a hotel operator may tamper with the registry while the motion to quash is pending, he or she can guard the registry until the required hearing can occur, which ought not take long. *Riley* v. *California*, 573 U. S. ___ (2014) (slip op., at 12) (police may seize and hold a cell phone "to prevent destruction of evidence while seeking a warrant"); *Illinois* v. *McArthur*, 531 U. S. 326, 334 (2001) (citing cases upholding the constitutionality of "temporary restraints where [they are] needed to preserve evidence until police could obtain a warrant"). Cf. *Missouri* v. *McNeely*, 569 U. S. ___ (2013) (slip op., at 12) (noting that many States have procedures in place for considering warrant applications telephonically).[3]

Procedures along these lines are ubiquitous. A 2002 report by the Department of Justice "identified approximately 335 existing administrative subpoena authorities held by various [federal] executive branch entities." Office of Legal Policy, Report to Congress on the Use of Administrative Subpoena Authorities by Executive Branch Agencies and Entities 3, online at http://www.justice.gov/archive/olp/rpt_to_congress.htm (All Internet materials as visited June 19, 2015, and available in Clerk of Court's case file). Their prevalence

─────────

[3] JUSTICE SCALIA professes to be baffled at the idea that we could suggest that in certain circumstances, police officers may seize something that they cannot immediately search. *Post*, at 10–11 (dissenting opinion). But that is what this Court's cases have explicitly endorsed, including *Riley* just last Term.

confirms what common sense alone would otherwise lead us to conclude: In most contexts, business owners can be afforded at least an opportunity to contest an administrative search's propriety without unduly compromising the government's ability to achieve its regulatory aims.

Of course administrative subpoenas are only one way in which an opportunity for precompliance review can be made available. But whatever the precise form, the availability of precompliance review alters the dynamic between the officer and the hotel to be searched, and reduces the risk that officers will use these administrative searches as a pretext to harass business owners.

Finally, we underscore the narrow nature of our holding. Respondents have not challenged and nothing in our opinion calls into question those parts of §41.49 that require hotel operators to maintain guest registries containing certain information. And, even absent legislative action to create a procedure along the lines discussed above, see *supra,* at 11, police will not be prevented from obtaining access to these documents. As they often do, hotel operators remain free to consent to searches of their registries and police can compel them to turn them over if they have a proper administrative warrant—including one that was issued *ex parte*—or if some other exception to the warrant requirement applies, including exigent circumstances.[4]

## B

Rather than arguing that §41.49(3)(a) is constitutional

---

[4] In suggesting that our holding today will somehow impede law enforcement from achieving its important aims, JUSTICE SCALIA relies on instances where hotels were used as "prisons for migrants smuggled across the border and held for ransom" or as "rendezvous sites where child sex workers meet their clients on threat of violence from their procurers." See *post*, at 2. It is hard to imagine circumstances more exigent than these.

under the general administrative search doctrine, the City and JUSTICE SCALIA contend that hotels are "closely regulated," and that the ordinance is facially valid under the more relaxed standard that applies to searches of this category of businesses. Brief for Petitioner 28–47; *post,* at 5. They are wrong on both counts.

Over the past 45 years, the Court has identified only four industries that "have such a history of government oversight that no reasonable expectation of privacy . . . could exist for a proprietor over the stock of such an enterprise," *Barlow's, Inc.,* 436 U. S., 313. Simply listing these industries refutes petitioner's argument that hotels should be counted among them. Unlike liquor sales, *Colonnade Catering Corp.* v. *United States*, 397 U. S. 72 (1970), firearms dealing, *United States* v. *Biswell*, 406 U. S. 311, 311–312 (1972), mining, *Donovan* v. *Dewey*, 452 U. S. 594 (1981), or running an automobile junkyard, *New York* v. *Burger*, 482 U. S. 691 (1987), nothing inherent in the operation of hotels poses a clear and significant risk to the public welfare. See, *e.g., id.,* at 709 ("Automobile junkyards and vehicle dismantlers provide the major market for stolen vehicles and vehicle parts"); *Dewey*, 452 U. S., at 602 (describing the mining industry as "among the most hazardous in the country").[5]

Moreover, "[t]he clear import of our cases is that the closely regulated industry . . . is the exception." *Barlow's, Inc.*, 436 U. S., at 313. To classify hotels as pervasively regulated would permit what has always been a narrow exception to swallow the rule. The City wisely refrains from arguing that §41.49 itself renders hotels closely regulated. Nor do any of the other regulations on which

---

[5] JUSTICE SCALIA's effort to depict hotels as raising a comparable degree of risk rings hollow. See *post*, at 1, 14. Hotels—like practically all commercial premises or services—can be put to use for nefarious ends. But unlike the industries that the Court has found to be closely regulated, hotels are not intrinsically dangerous.

petitioner and JUSTICE SCALIA rely—regulations requiring hotels to, *inter alia*, maintain a license, collect taxes, conspicuously post their rates, and meet certain sanitary standards—establish a comprehensive scheme of regulation that distinguishes hotels from numerous other businesses. See Brief for Petitioner 33–34 (citing regulations); *post*, at 7 (same). All businesses in Los Angeles need a license to operate. LAMC §§21.03(a), 21.09(a). While some regulations apply to a smaller set of businesses, see *e.g.* Cal. Code Regs., tit. 25, §40 (2015) (requiring linens to be changed between rental guests), online at http://www.oal.ca.gov/ccr.htm, these can hardly be said to have created a "'comprehensive'" scheme that puts hotel owners on notice that their "'property will be subject to periodic inspections undertaken for specific purposes,'" *Burger*, 482 U. S., at 705, n. 16 (quoting *Dewey*, 452 U. S., at 600). Instead, they are more akin to the widely applicable minimum wage and maximum hour rules that the Court rejected as a basis for deeming "the entirety of American interstate commerce" to be closely regulated in *Barlow's, Inc.* 436 U. S., at 314. If such general regulations were sufficient to invoke the closely regulated industry exception, it would be hard to imagine a type of business that would not qualify. See Brief for Google Inc. as *Amicus Curiae* 16–17; Brief for the Chamber of Commerce of United States of America as *Amicus Curiae* 12–13.

Petitioner attempts to recast this hodgepodge of regulations as a comprehensive scheme by referring to a "centuries-old tradition" of warrantless searches of hotels. Brief for Petitioner 34–36. History is relevant when determining whether an industry is closely regulated. See, *e.g., Burger*, 482 U. S., at 707. The historical record here, however, is not as clear as petitioner suggests. The City and JUSTICE SCALIA principally point to evidence that hotels were treated as public accommodations. Brief for Petitioner 34–36; *post*, at 5–6, and n. 1. For instance, the

Commonwealth of Massachusetts required innkeepers to "'furnish[] . . . suitable provisions and lodging, for the refreshment and entertainment of strangers and travellers, pasturing and stable room, hay and provender . . . for their horses and cattle.'" Brief for Petitioner 35 (quoting An Act For The Due Regulation Of Licensed Houses (1786), reprinted in Acts and Laws of the Commonwealth of Massachusetts 209 (1893)). But laws obligating inns to provide suitable lodging to all paying guests are not the same as laws subjecting inns to warrantless searches. Petitioner also asserts that "[f]or a long time, [hotel] owners left their registers open to widespread inspection." Brief for Petitioner 51. Setting aside that modern hotel registries contain sensitive information, such as driver's licenses and credit card numbers for which there is no historic analog, the fact that some hotels chose to make registries accessible to the public has little bearing on whether government authorities could have viewed these documents on demand without a hotel's consent.

Even if we were to find that hotels are pervasively regulated, §41.49 would need to satisfy three additional criteria to be reasonable under the Fourth Amendment: (1) "[T]here must be a 'substantial' government interest that informs the regulatory scheme pursuant to which the inspection is made"; (2) "the warrantless inspections must be 'necessary' to further [the] regulatory scheme"; and (3) "the statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant." *Burger*, 482 U. S., at 702–703 (internal quotation marks omitted). We assume petitioner's interest in ensuring that hotels maintain accurate and complete registries might fulfill the first of these requirements, but conclude that §41.49 fails the second and third prongs of this test.

The City claims that affording hotel operators any opportunity for precompliance review would fatally under-

mine the scheme's efficacy by giving operators a chance to falsify their records. Brief for Petitioner 41–42. The Court has previously rejected this exact argument, which could be made regarding any recordkeeping requirement. See *Barlow's, Inc.*, 436 U. S., at 320 ("[It is not] apparent why the advantages of surprise would be lost if, after being refused entry, procedures were available for the [Labor] Secretary to seek an *ex parte* warrant to reappear at the premises without further notice to the establishment being inspected"); cf. *Lone Steer*, 464 U. S., at 411, 415 (affirming use of administrative subpoena which provided an opportunity for precompliance review as a means for obtaining "payroll and sales records"). We see no reason to accept it here.

As explained above, nothing in our decision today precludes an officer from conducting a surprise inspection by obtaining an *ex parte* warrant or, where an officer reasonably suspects the registry would be altered, from guarding the registry pending a hearing on a motion to quash. See *Barlow's, Inc.*, 436 U. S., at 319–321; *Riley*, 573 U. S., at ___ (slip op., at 12). JUSTICE SCALIA's claim that these procedures will prove unworkable given the large number of hotels in Los Angeles is a red herring. See *post*, at 11. While there are approximately 2,000 hotels in Los Angeles, *ibid.*, there is no basis to believe that resort to such measures will be needed to conduct spot checks in the vast majority of them. See *supra,* at 11.

Section 41.49 is also constitutionally deficient under the "certainty and regularity" prong of the closely regulated industries test because it fails sufficiently to constrain police officers' discretion as to which hotels to search and under what circumstances. While the Court has upheld inspection schemes of closely regulated industries that called for searches at least four times a year, *Dewey*, 452 U. S., at 604, or on a "regular basis," *Burger*, 482 U. S., at 711, §41.49 imposes no comparable standard.

\*     \*     \*

For the foregoing reasons, we agree with the Ninth Circuit that §41.49(3)(a) is facially invalid insofar as it fails to provide any opportunity for precompliance review before a hotel must give its guest registry to the police for inspection. Accordingly, the judgment of the Ninth Circuit is affirmed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 13–1175

_____

## CITY OF LOS ANGELES, CALIFORNIA, PETITIONER *v.* NARANJIBHAI PATEL, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 22, 2015]

JUSTICE SCALIA, with whom THE CHIEF JUSTICE and JUSTICE THOMAS join, dissenting.

The city of Los Angeles, like many jurisdictions across the country, has a law that requires motels, hotels, and other places of overnight accommodation (hereinafter motels) to keep a register containing specified information about their guests. Los Angeles Municipal Code (LAMC) §41.49(2) (2015). The purpose of this recordkeeping requirement is to deter criminal conduct, on the theory that criminals will be unwilling to carry on illicit activities in motel rooms if they must provide identifying information at check-in. Because this deterrent effect will only be accomplished if motels actually do require guests to provide the required information, the ordinance also authorizes police to conduct random spot checks of motels' guest registers to ensure that they are properly maintained. §41.49(3). The ordinance limits these spot checks to the four corners of the register, and does not authorize police to enter any nonpublic area of the motel. To the extent possible, police must conduct these spot checks at times that will minimize any disruption to a motel's business.

The parties do not dispute the governmental interests at stake. Motels not only provide housing to vulnerable transient populations, they are also a particularly attractive site for criminal activity ranging from drug dealing

and prostitution to human trafficking. Offering privacy and anonymity on the cheap, they have been employed as prisons for migrants smuggled across the border and held for ransom, see Sanchez, Immigrant Smugglers Become More Ruthless, Washington Post, June 28, 2004, p. A3; Wagner, Human Smuggling, Arizona Republic, July 23, 2006, p. A1, and rendezvous sites where child sex workers meet their clients on threat of violence from their procurers.

Nevertheless, the Court today concludes that Los Angeles's ordinance is "unreasonable" inasmuch as it permits police to flip through a guest register to ensure it is being filled out without first providing an opportunity for the motel operator to seek judicial review. Because I believe that such a limited inspection of a guest register is eminently reasonable under the circumstances presented, I dissent.

# I

I assume that respondents may bring a facial challenge to the City's ordinance under the Fourth Amendment. Even so, their claim must fail because, as discussed *infra*, the law is constitutional in most, if not all, of its applications. See *United States* v. *Salerno*, 481 U. S. 739, 751 (1987). But because the Court discusses the propriety of a facial challenge at some length, I offer a few thoughts.

Article III limits our jurisdiction to "Cases" and "Controversies." Accordingly, "[f]ederal courts may not 'decide questions that cannot affect the rights of litigants in the case before them' or give 'opinion[s] advising what the law would be upon a hypothetical state of facts.'" *Chafin* v. *Chafin*, 568 U. S. ___, ___ (2013) (slip op., at 5). To be sure, the *reasoning* of a decision may suggest that there is no permissible application of a particular statute, *Chicago* v. *Morales,* 527 U. S. 41, 77 (1999) (SCALIA, J., dissenting), and under the doctrine of *stare decisis*, this reasoning—to

the extent that it is necessary to the holding—will be binding in all future cases. But in this sense, the facial invalidation of a statute is a logical consequence of the Court's opinion, not the immediate effect of its judgment. Although we have at times described our holdings as invalidating a law, it is always the application of a law, rather than the law itself, that is before us.

The upshot is that the effect of a given case is a function not of the plaintiff's characterization of his challenge, but the narrowness or breadth of the ground that the Court relies upon in disposing of it. If a plaintiff elects not to present any case-specific facts in support of a claim that a law is unconstitutional—as is the case here—he will limit the grounds on which a Court may find for him to highly abstract rules that would have broad application in future cases. The decision to do this might be a poor strategic move, especially in a Fourth Amendment case, where the reasonableness of a search is a highly factbound question and general, abstract rules are hard to come by. Cf. *Sibron* v. *New York*, 392 U. S. 40, 59 (1968). But even had the plaintiffs in this case presented voluminous facts in a self-styled as-applied challenge, nothing would force this Court to rely upon those facts rather than the broader principle that the Court has chosen to rely upon. I see no reason why a plaintiff's self-description of his challenge as facial would provide an independent reason to reject it unless we were to delegate to litigants our duty to say what the law is.

## II

The Fourth Amendment provides, in relevant part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." Grammatically, the two clauses of the Amendment seem to be independent—and

directed at entirely different actors. The former tells the executive what it must do when it conducts a search, and the latter tells the judiciary what it must do when it issues a search warrant. But in an effort to guide courts in applying the Search-and-Seizure Clause's indeterminate reasonableness standard, and to maintain coherence in our case law, we have used the Warrant Clause as a guidepost for assessing the reasonableness of a search, and have erected a framework of presumptions applicable to broad categories of searches conducted by executive officials. Our case law has repeatedly recognized, however, that these are mere presumptions, and the only constitutional *requirement* is that a search be reasonable.

When, for example, a search is conducted to enforce an administrative regime rather than to investigate criminal wrongdoing, we have been willing to modify the probable-cause standard so that a warrant may issue absent individualized suspicion of wrongdoing. Thus, our cases say a warrant may issue to inspect a structure for fire-code violations on the basis of such factors as the passage of time, the nature of the building, and the condition of the neighborhood. *Camara* v. *Municipal Court of City and County of San Francisco,* 387 U. S. 523, 538–539 (1967). As we recognized in that case, "reasonableness is still the ultimate standard. If a valid public interest justifies the intrusion contemplated, then there is probable cause to issue a suitably restricted search warrant." *Id.*, at 539. And precisely "because the ultimate touchstone of the Fourth Amendment is 'reasonableness,'" even the presumption that the search of a home without a warrant is unreasonable "is subject to certain exceptions." *Brigham City* v. *Stuart*, 547 U. S. 398, 403 (2006).

One exception to normal warrant requirements applies to searches of closely regulated businesses. "[W]hen an entrepreneur embarks upon such a business, he has voluntarily chosen to subject himself to a full arsenal of

governmental regulation," and so a warrantless search to enforce those regulations is not unreasonable. *Marshall* v. *Barlow's, Inc.*, 436 U. S. 307, 313 (1978). Recognizing that warrantless searches of closely regulated businesses may nevertheless *become* unreasonable if arbitrarily conducted, we have required laws authorizing such searches to satisfy three criteria: (1) There must be a "'substantial' government interest that informs the regulatory scheme pursuant to which the inspection is made"; (2) "the warrantless inspections must be 'necessary to further [the] regulatory scheme'"; and (3) "'the statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant.'" *New York* v. *Burger*, 482 U. S. 691, 702–703 (1987).

Los Angeles's ordinance easily meets these standards.

## A

In determining whether a business is closely regulated, this Court has looked to factors including the duration of the regulatory tradition, *id.,* at 705–707, *Colonnade Catering Corp.* v. *United States*, 397 U. S. 72, 75–77 (1970), *Donovan* v. *Dewey*, 452 U. S. 594, 606 (1981); the comprehensiveness of the regulatory regime, *Burger, supra,* at 704–705, *Dewey, supra,* at 606; and the imposition of similar regulations by other jurisdictions, *Burger, supra,* at 705. These factors are not talismans, but shed light on the expectation of privacy the owner of a business may reasonably have, which in turn affects the reasonableness of a warrantless search. See *Barlow's, supra,* at 313.

Reflecting the unique public role of motels and their commercial forebears, governments have long subjected these businesses to unique public duties, and have established inspection regimes to ensure compliance. As Blackstone observed, "Inns, in particular, being intended for the lodging and receipt of travellers, may be indicted, sup-

pressed, and the inn-keepers fined, if they refuse to enter-
tain a traveller without a very sufficient cause: for thus to
frustrate the end of their institution is held to be disorderly
behavior." 4 W. Blackstone, Commentaries on the Laws
of England 168 (1765). Justice Story similarly recognized
"[t]he soundness of the public policy of subjecting particu-
lar classes of persons to extraordinary responsibility, in
cases where an extraordinary confidence is necessarily
reposed in them, and there is an extraordinary temptation
to fraud, or danger of plunder." J. Story, Commentaries
on the Law of Bailments §464, pp. 487–488 (5th ed. 1851).
Accordingly, in addition to the obligation to receive any
paying guest, "innkeepers are bound to take, not merely
ordinary care, but uncommon care, of the goods, money,
and baggage of their guests," *id.,* §470, at 495, as travel-
lers "are obliged to rely almost implicitly on the good faith
of innholders, whose education and morals are none of the
best, and who might have frequent opportunities of asso-
ciating with ruffians and pilferers," *id.,* §471, at 498.

These obligations were not merely aspirational. At the
time of the founding, searches—indeed, warrantless
searches—of inns and similar places of public accommoda-
tion were commonplace. For example, although Massa-
chusetts was perhaps the State most protective against
government searches, "the state code of 1788 still allowed
tithingmen to search public houses of entertainment on
every Sabbath without any sort of warrant." W. Cuddihy,
Fourth Amendment: Origins and Original Meaning 602–
1791, 743 (2009).[1]

As this evidence demonstrates, the regulatory tradition
governing motels is not only longstanding, but comprehen-

--------

[1] As Beale helpfully confirms, "[f]rom the earliest times the funda-
mental characteristic of an inn has been its public nature. It is a public
house, a house of public entertainment, or, as it is legally phrased, a
common inn." J. Beale, The Law of Innkeepers and Hotels §11, p. 10
(1906).

sive. And the tradition continues in Los Angeles. The City imposes an occupancy tax upon transients who stay in motels, LAMC §21.7.3, and makes the motel owner responsible for collecting it, §21.7.5. It authorizes city officials "to enter [a motel], free of charge, during business hours" in order to "inspect and examine" them to determine whether these tax provisions have been complied with. §§21.7.9, 21.15. It requires all motels to obtain a "Transient Occupancy Registration Certificate," which must be displayed on the premises. §21.7.6. State law requires motels to "post in a conspicuous place . . . a statement of rate or range of rates by the day for lodging," and forbids any charges in excess of those posted rates. Cal. Civ. Code Ann. §1863 (West 2010). Hotels must change bed linens between guests, Cal. Code Regs., tit. 25, §40 (2015), and they must offer guests the option not to have towels and linens laundered daily, LAMC §121.08. "Multiuse drinking utensils" may be placed in guest rooms only if they are "thoroughly washed and sanitized after each use" and "placed in protective bags." Cal. Code Regs., tit. 17, §30852. And state authorities, like their municipal counterparts, "may at reasonable times enter and inspect any hotels, motels, or other public places" to ensure compliance. §30858.

The regulatory regime at issue here is thus substantially *more* comprehensive than the regulations governing junkyards in *Burger*, where licensing, inventory-recording, and permit-posting requirements were found sufficient to qualify the industry as closely regulated. 482 U. S., at 704–705. The Court's suggestion that these regulations are not sufficiently targeted to motels, and are "akin to . . . minimum wage and maximum hour rules," *ante*, at 15, is simply false. The regulations we have described above reach into the "minutest detail[s]" of motel operations, *Barlow's, supra*, at 314, and those who enter that business today (like those who have entered it over the centuries)

do so with an expectation that they will be subjected to especially vigilant governmental oversight.

Finally, this ordinance is not an outlier. The City has pointed us to more than 100 similar register-inspection laws in cities and counties across the country, Brief for Petitioner 36, and n. 3, and that is far from exhaustive. In all, municipalities in at least 41 States have laws similar to Los Angeles's, Brief for National League of Cities et al. as *Amici Curiae* 16–17, and at least 8 States have their own laws authorizing register inspections, Brief for California et al. as *Amici Curiae* 12–13.

This copious evidence is surely enough to establish that "[w]hen a [motel operator] chooses to engage in this pervasively regulated business . . . he does so with the knowledge that his business records . . . will be subject to effective inspection." *United States* v. *Biswell*, 406 U. S. 311, 316 (1972). And *that* is the relevant constitutional test—not whether this regulatory superstructure is "the same as laws subjecting inns to warrantless searches," or whether, as an historical matter, government authorities not only required these documents to be kept but permitted them to be viewed on demand without a motel's consent. *Ante,* at 16.

The Court's observation that "[o]ver the past 45 years, the Court has identified only four industries" as closely regulated, *ante*, at 14, is neither here nor there. Since we first concluded in *Colonnade Catering* that warrantless searches of closely regulated businesses are reasonable, we have only identified *one* industry as *not* closely regulated, see *Barlow's*, 436 U. S., at 313–314. The Court's statistic thus tells us more about how this Court exercises its discretionary review than it does about the number of industries that qualify as closely regulated. At the same time, lower courts, which do not have the luxury of picking the cases they hear, have identified many more businesses as closely regulated under the test we have announced:

pharmacies, *United States* v. *Gonsalves*, 435 F. 3d 64, 67
(CA1 2006); massage parlors, *Pollard* v. *Cockrell*, 578
F. 2d 1002, 1014 (CA5 1978); commercial-fishing opera-
tions, *United States* v. *Raub*, 637 F. 2d 1205, 1208–1209
(CA9 1980); day-care facilities, *Rush* v. *Obledo*, 756 F. 2d
713, 720–721 (CA9 1985); nursing homes, *People* v. *First-
enberg*, 92 Cal. App. 3d 570, 578–580, 155 Cal. Rptr. 80,
84–86 (1979); jewelers, *People* v. *Pashigian*, 150 Mich.
App. 97, 100–101, 388 N. W. 2d 259, 261–262 (1986) (*per
curiam*); barbershops, *Stogner* v. *Kentucky*, 638 F. Supp. 1,
3 (WD Ky. 1985); and yes, even rabbit dealers, *Lesser* v.
*Espy*, 34 F. 3d 1301, 1306–1307 (CA7 1994). Like auto-
mobile junkyards and catering companies that serve alco-
hol, many of these businesses are far from "intrinsically
dangerous," cf. *ante*, at 14, n. 5. This should come as no
surprise. The reason closely regulated industries may be
searched without a warrant has nothing to do with the
risk of harm they pose; rather, it has to do with the expec-
tations of those who enter such a line of work. See *Bar-
low's*, *supra,* at 313.

<center>B</center>

The City's ordinance easily satisfies the remaining
*Burger* requirements: It furthers a substantial govern-
mental interest, it is necessary to achieving that interest,
and it provides an adequate substitute for a search
warrant.

Neither respondents nor the Court question the sub-
stantial interest of the City in deterring criminal activity.
See Brief for Respondents 34–41; *ante*, at 15. The private
pain and public costs imposed by drug dealing, prostitu-
tion, and human trafficking are beyond contention, and
motels provide an obvious haven for those who trade in
human misery.

Warrantless inspections are also necessary to advance
this interest. Although the Court acknowledges that law

enforcement can enter a motel room without a warrant when exigent circumstances exist, see *ante*, at 13, n. 4, the whole reason criminals use motel rooms in the first place is that they offer privacy and secrecy, so that police will never come to discover these exigencies. The recordkeeping requirement, which all parties admit is permissible, therefore operates by *deterring* crime. Criminals, who depend on the anonymity that motels offer, will balk when confronted with a motel's demand that they produce identification. And a motel's evasion of the recordkeeping requirement fosters crime. In San Diego, for example, motel owners were indicted for collaborating with members of the Crips street gang in the prostitution of under-age girls; the motel owners "set aside rooms apart from the rest of their legitimate customers where girls and women were housed, charged the gang members/pimps a higher rate for the rooms where 'dates' or 'tricks' took place, and warned the gang members of inquiries by law enforcement." Office of the Attorney General, Cal. Dept. of Justice, The State of Human Trafficking in California 25 (2012). The warrantless inspection requirement provides a necessary incentive for motels to maintain their registers thoroughly and accurately: They never know when law enforcement might drop by to inspect.

Respondents and the Court acknowledge that *inspections* are necessary to achieve the purposes of the record-keeping regime, but insist that *warrantless* inspections are not. They have to acknowledge, however, that the motel operators who conspire with drug dealers and procurers may demand precompliance judicial review simply as a pretext to buy time for making fraudulent entries in their guest registers. The Court therefore must resort to arguing that warrantless inspections are not "necessary" because other alternatives exist.

The Court suggests that police could obtain an administrative subpoena to search a guest register and, if a motel

SCALIA, J., dissenting

moves to quash, the police could "guar[d] the registry pending a hearing" on the motion. *Ante*, at 17. This proposal is equal parts 1984 and Alice in Wonderland. It protects motels from government inspection of their registers by authorizing government agents to seize the registers[2] (if "guarding" entails forbidding the register to be moved) or to upset guests by a prolonged police presence at the motel. The Court also notes that police can obtain an *ex parte* warrant before conducting a register inspection. *Ante*, at 17. Presumably such warrants could issue without probable cause of wrongdoing by a particular motel, see *Camara*, 387 U. S., at 535–536; otherwise, this would be no alternative at all. Even so, under this regime police would have to obtain an *ex parte* warrant before *every* inspection. That is because law enforcement would have no way of knowing ahead of time which motels would refuse consent to a search upon request; and if they wait to obtain a warrant until consent is refused, motels will have the opportunity to falsify their guest registers while the police jump through the procedural hoops required to obtain a warrant. It is quite plausible that the costs of this always-get-a-warrant "alternative" would be prohibitive for a police force in one of America's largest cities, juggling numerous law-enforcement priorities, and confronting more than 2,000 motels within its jurisdiction. E. Wallace, K. Pollock, B. Horth, S. Carty, & N. Elyas, Los Angeles Tourism: A Domestic and International Analysis 7 (May 2014 online at http://www.lachamber.com/clientuploads/Global_Programs/WTW/2014/LATourism_LMU_May2014.pdf (as visited June 19, 2015, and available in Clerk of Court's

——————

[2]We are not at all "baffled at the idea that . . . police officers may seize something that they cannot immediately search." *Ante*, at 12, n. 3. We are baffled at the idea that anyone would think a seizure of required records less intrusive than a visual inspection.

case file). To be sure, the fact that obtaining a warrant might be costly will not by itself render a warrantless search reasonable under the Fourth Amendment; but it can render a warrantless search *necessary* in the context of an administrative-search regime governing closely regulated businesses.

But all that discussion is in any case irrelevant. The administrative search need only be reasonable. It is not the burden of Los Angeles to show that there are no less restrictive means of achieving the City's purposes. Sequestration or *ex parte* warrants were *possible* alternatives to the warrantless search regimes approved by this Court in *Colonnade Catering*, *Biswell*, *Dewey*, and *Burger*. By importing a least-restrictive-means test into *Burger*'s Fourth Amendment framework, today's opinion implicitly overrules that entire line of cases.

Finally, the City's ordinance provides an adequate substitute for a warrant. Warrants "advise the owner of the scope and objects of the search, beyond which limits the inspector is not expected to proceed." *Barlow's*, 436 U. S., at 323. Ultimately, they aim to protect against "devolv[ing] almost unbridled discretion upon executive and administrative officers, particularly those in the field, as to when to search and whom to search." *Ibid.*

Los Angeles's ordinance provides that the guest register must be kept in the guest reception or guest check-in area, or in an adjacent office, and that it "be made available to any officer of the Los Angeles Police Department for inspection. Whenever possible, the inspection shall be conducted at a time and in a manner that minimizes any interference with the operation of the business." LAMC §41.49(3). Nothing in the ordinance authorizes law enforcement to enter a nonpublic part of the motel. Compare this to the statute upheld in *Colonnade Catering*, which provided that "'[t]he Secretary or his delegate may enter, in the daytime, any building or place where any articles or

objects subject to tax are made, produced, or kept, so far as it may be necessary for the purpose of examining said articles or objects,'" 397 U. S., at 73, n. 2 (quoting 26 U. S. C. §7606(a) (1964 ed.)); or the one in *Biswell*, which stated that "'[t]he Secretary may enter during business hours the premises (including places of storage) of any firearms or ammunition importer . . . for the purpose of inspecting or examining (1) any records or documents required to be kept . . . , and (2) any firearms or ammunition kept or stored,'" 406 U. S., at 312, n. 1 (quoting 18 U. S. C. §923(g) (1970 ed.)); or the one in *Dewey*, which granted federal mine inspectors "'a right of entry to, upon, or through any coal or other mine,'" 452 U. S., at 596 (quoting 30 U. S. C. §813(a) (1976 ed., Supp. III)); or the one in *Burger*, which compelled junkyard operators to "'produce such records and permit said agent or police officer to examine them and any vehicles or parts of vehicles which are subject to the record keeping requirements of this section and which are on the premises,'" 482 U. S., at 694, n. 1 (quoting N. Y. Veh. & Traf. Law §415–a5 (McKinney 1986)). The Los Angeles ordinance—which limits warrantless police searches to the pages of a guest register in a public part of a motel—circumscribes police discretion in much more exacting terms than the laws we have approved in our earlier cases.

The Court claims that Los Angeles's ordinance confers too much discretion because it does not adequately limit the *frequency* of searches. Without a trace of irony, the Court tries to distinguish Los Angeles's law from the laws upheld in *Dewey* and *Burger* by pointing out that the latter regimes required inspections at least four times a year and on a "'regular basis,'" respectively. *Ante*, at 17. But the warrantless police searches of a business "10 times a day, every day, for three months" that the Court envisions under Los Angeles's regime, *ante*, at 11, are entirely consistent with the regimes in *Dewey* and *Burger*;

10 times a day, every day, is "at least four times a year," and on a (much too) "'regular basis.'" *Ante,* at 17.

That is not to say that the Court's hypothetical searches are necessarily constitutional. It is only to say that Los Angeles's ordinance presents no greater risk that such a hypothetical will materialize than the laws we have already upheld. As in our earlier cases, we should leave it to lower courts to consider on a case-by-case basis whether warrantless searches have been conducted in an unreasonably intrusive or harassing manner.

### III

The Court reaches its wrongheaded conclusion not simply by misapplying our precedent, but by mistaking our precedent for the Fourth Amendment itself. Rather than bother with the text of that Amendment, the Court relies exclusively on our administrative-search cases, *Camara, See* v. *Seattle,* 387 U. S. 541 (1967), and *Barlow's.* But the Constitution predates 1967, and it remains the supreme law of the land today. Although the categorical framework our jurisprudence has erected in this area may provide us guidance, it is guidance to answer the constitutional question at issue: whether the challenged search is *reasonable.*

An administrative, warrantless-search ordinance that narrowly limits the scope of searches to a single business record, that does not authorize entry upon premises not open to the public, and that is supported by the need to prevent fabrication of guest registers, is, to say the least, far afield from the laws at issue in the cases the Court relies upon. The Court concludes that such minor intrusions, permissible when the police are trying to tamp down the market in stolen auto parts, are "unreasonable" when police are instead attempting to stamp out the market in child sex slaves.

Because I believe that the limited warrantless searches

authorized by Los Angeles's ordinance are reasonable under the circumstances, I respectfully dissent.

# SUPREME COURT OF THE UNITED STATES

_____

No. 13–1175

_____

## CITY OF LOS ANGELES, CALIFORNIA, PETITIONER *v.* NARANJIBHAI PATEL, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 22, 2015]

JUSTICE ALITO, with whom JUSTICE THOMAS joins, dissenting.

After today, the city of Los Angeles can never, under any circumstances, enforce its 116-year-old requirement that hotels make their registers available to police officers. That is because the Court holds that §41.49(3)(a) of the Los Angeles Municipal Code (2015) is *facially* unconstitutional. Before entering a judgment with such serious safety and federalism implications, the Court must conclude that every application of this law is unconstitutional—*i.e.*, that "'no set of circumstances exists under which the [law] would be valid.'" *Ante,* at 7 (quoting *United States* v. *Salerno*, 481 U. S. 739, 745 (1987)). I have doubts about the Court's approach to administrative searches and closely regulated industries. *Ante,* at 9–17. But even if the Court were 100% correct, it still should uphold §41.49(3)(a) because many other applications of this law are constitutional. Here are five examples.

Example One. The police have probable cause to believe that a register contains evidence of a crime. They go to a judge and get a search warrant. The hotel operator, however, refuses to surrender the register, but instead stashes it away. Officers could tear the hotel apart looking for it. Or they could simply order the operator to produce it. The Fourth Amendment does not create a right to defy a war-

rant. Hence §41.49(3)(a) could be constitutionally applied in this scenario. Indeed, the Court concedes that it is proper to apply a California obstruction of justice law in such a case. See *ante,* at 8–9, n. 1; Brief for Respondents 49. How could applying a city law with a similar effect be different? No one thinks that overlapping laws are unconstitutional. See, *e.g., Yates* v. *United States*, 574 U. S. ___, ___ (2015) (KAGAN, J. dissenting) (slip op., at 10–11) ("Overlap—even significant overlap—abounds in criminal law") (collecting citations). And a specific law gives more notice than a general law.

In any event, the Los Angeles ordinance is arguably broader in at least one important respect than the California obstruction of justice statute on which the Court relies. *Ante*, at 8–9, n. 1. The state law applies when a person "willfully resists, delays, or obstructs any public officer . . . in the discharge or attempt to discharge any duty of his or her office." Cal. Penal Code Ann. §148(a)(1) (West 2014). In the example set out above, suppose that the hotel operator, instead of hiding the register, simply refused to tell the police where it is located. The Court cites no California case holding that such a refusal would be unlawful, and the city of Los Angeles submits that under California law, "[o]bstruction statutes prohibit a hotel owner from *obstructing* a search, but they do not require affirmative assistance." Reply Brief 5. The Los Angeles ordinance, by contrast, unequivocally requires a hotel operator to make the register available on request.

*Example Two.* A murderer has kidnapped a woman with the intent to rape and kill her and there is reason to believe he is holed up in a certain motel. The Fourth Amendment's reasonableness standard accounts for exigent circumstances. See, *e.g., Brigham City* v. *Stuart*, 547 U. S. 398, 403 (2006). When the police arrive, the motel operator folds her arms and says the register is locked in a safe. Invoking §41.49(3)(a), the police order the operator

to turn over the register. She refuses. The Fourth Amendment does not protect her from arrest.

Example Three. A neighborhood of "pay by the hour" motels is a notorious gathering spot for child-sex traffickers. Police officers drive through the neighborhood late one night and see unusual amounts of activity at a particular motel. The officers stop and ask the motel operator for the names of those who paid with cash to rent rooms for less than three hours. The operator refuses to provide the information. Requesting to see the register—and arresting the operator for failing to provide it—would be reasonable under the "totality of the circumstances." *Ohio* v. *Robinette*, 519 U. S. 33, 39 (1996). In fact, the Court has upheld a similar reporting duty against a Fourth Amendment challenge where the scope of information required was also targeted and the public's interest in crime prevention was no less serious. See *California Bankers Assn.* v. *Shultz*, 416 U. S. 21, 39, n. 15, 66–67 (1974) (having "no difficulty" upholding a requirement that banks must provide reports about transactions involving more than $10,000, including the name, address, occupation, and social security number of the customer involved, along with a summary of the transaction, the amount of money at issue, and the type of identification presented).

Example Four. A motel is operated by a dishonest employee. He has been charging more for rooms than he records, all the while pocketing the difference. The owner finds out and eagerly consents to a police inspection of the register. But when officers arrive and ask to see the register, the operator hides it. The Fourth Amendment does not allow the operator's refusal to defeat the owner's consent. See, *e.g., Mancusi* v. *DeForte*, 392 U. S. 364, 369–370 (1968). Accordingly, it would not violate the Fourth Amendment to arrest the operator for failing to make the register "available to any officer of the Los Angeles Police Department for inspection." §41.49(3)(a).

Example Five.  A "mom and pop" motel always keeps its old-fashioned guest register open on the front desk.  Anyone who wants to can walk up and leaf through it.  (Such motels are not as common as they used to be, but Los Angeles is a big place.)  The motel has no reasonable expectation of privacy in the register, and no one doubts that police officers—like anyone else—can enter into the lobby.  See, *e.g., Florida* v. *Jardines*, 569 U. S. 1, ___ (2013) (slip op., at 6); *Donovan* v. *Lone Steer, Inc.*, 464 U. S. 408, 413 (1984).  But when an officer starts looking at the register, as others do, the motel operator at the desk snatches it away and will not give it back.  Arresting that person would not violate the Fourth Amendment.

These are just five examples.  There are many more.  The Court rushes past examples like these by suggesting that §41.49(3)(a) does no "work" in such scenarios.  *Ante,* at 8.  That is not true.  Under threat of legal sanction, this law orders hotel operators to do things they do not want to do.  To be sure, there may be circumstances in which §41.49(3)(a)'s command conflicts with the Fourth Amendment, and in those circumstances the Fourth Amendment is supreme.  See U. S. Const., Art VI, cl. 2.  But no different from any other local law, the remedy for such circumstances should be an as-applied injunction *limited to the conflict with the Fourth Amendment.*  Such an injunction would protect a hotel from being "searched 10 times a day, every day, for three months, without any violation being found." *Ante,* at 11.  But unlike facial invalidation, an as-applied injunction does not produce collateral damage.  Section 41.49(3)(a) should be enforceable in those many cases in which the Fourth Amendment is not violated.

There are serious arguments that the Fourth Amendment's application to warrantless searches and seizures is inherently inconsistent with facial challenges.  See *Sibron* v. *New York*, 392 U. S. 40, 59, 62 (1968) (explaining that because of the Fourth Amendment's reasonableness re-

quirement, "[t]he constitutional validity of a warrantless search is pre-eminently the sort of question which can only be decided in the concrete factual context of the individual case"); Brief for Manhattan Institute for Policy Research as *Amicus Curiae* 33 ("A constitutional claim under the first clause of the Fourth Amendment is never a 'facial' challenge, because it is always and inherently a challenge to executive action"). But assuming such facial challenges ever make sense conceptually, this particular one fails under basic principles of facial invalidation. The Court's contrary holding is befuddling. I respectfully dissent.