# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

## Case No. 15-1429

---

**ROBERT DRAPER;  ARIEL WEISBERG;  DONNA MAJOR;  ERIC NOTKIN;
ROBERT BOUDRIE;  BRENT CARLTON;  CONCORD ARMORY, LLC;  PRECISION
POINT FIREARMS, LLC;  SECOND AMENDMENT FOUNDATION, INC.**

*Plaintiffs – Appellants*

**COMMONWEALTH SECOND AMENDMENT, INC.**

*Plaintiff*

v.

**MAURA HEALEY, in her capacity as
The Attorney General of the Commonwealth of Massachusetts**

*Defendant – Appellee*

---

ON APPEAL FROM A JUDGMENT OF
THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS
Civil Action No. 1:14-CV-12471-NMG

## BRIEF OF PLAINTIFFS-APPELLANTS

**Alexander Aron Flig**
Law Office of Alexander A. Flig
1st Circuit No. 1169830
BBO No. 669132
490 Chapman Street, Suite 201
Canton, Massachusetts 02021
(781) 352-7260

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellants provide the following statement identifying any parent corporation and any publicly traded company owning 10 percent or more of their stock:

The Second Amendment Foundation, Inc. is a non-profit charitable corporation with its principle place of business located at 12500 NE 10th Place, Bellevue, Washington 98005. The Second Amendment Foundation, Inc. is a tax exempt entity pursuant to Section 501(c)(3) of the Internal Revenue Code and is therefore not traded on any stock exchange. The Second Amendment Foundation, Inc. has no parent company and no publicly traded company owns 10 percent or more of its stock.

**/s/ Alexander A. Flig**
Attorney for Plaintiffs – Appellants

///

///

///

# TABLE OF CONTENTS

**CORPORATE DISCLOSURE STATEMENT** ................................................................................ 1

**REASONS WHY ORAL ARGUMENT SHOULD BE HEARD** ................................................. 1

**JURISDICTIONAL STATEMENT** ............................................................................................... 2

**ISSUES PRESENTED** ...................................................................................................................... 3

**STATEMENT OF THE CASE** ......................................................................................................... 4

    I.  RELEVANT FACTS ............................................................................................................... 4

        A.  The Massachusetts Statutory and Regulatory Scheme for Retail
Sales and Transfers of Handguns ............................................................................... 4

        B.  Glock Handguns ................................................................................................................ 5

            1.  Glock Handguns are Firearms in Common Use .......................................... 5

            2.  The "Load Indicators" of Gen3/4 Glock Pistols are *Virtually
Identical* to Those of Other Massachusetts Approved Handguns ........................ 6

        C.  The CONSUMERS Could Not Acquire Gen3/4 Glock Pistols from the
DEALERS Because of Vagueness in the REGULATION ...................................... 6

        D.  The Plaintiffs' Requests for Clarification From the AG Regarding
Gen3/4 Glock Pistols' Compliance With the REGULATION and the
AG's Dismissive Responses Thereto .......................................................................... 8

    II.  PROCEDURAL HISTORY .............................................................................................. 11

    III.  RULINGS BY THE DISTRICT COURT ................................................................... 12

**SUMMARY OF ARGUMENT** ................................................................................................... 14

**ARGUMENT** .................................................................................................................... 21

I.   STANDARD OF REVIEW ....................................................................................... 21

    A.   De Novo Standard of Review for a Rule 12(b)(6) Motion to Dismiss ..................... 21

    B.   Abuse of Discretion Standard of Review ............................................................. 22

II.  ORGANIZATIONAL STANDING ............................................................................ 23

    A.   The District Court Relied on Inapplicable Authorities to Deny SAF
        Organizational Standing Through the Standing of its Members ............................... 23

    B.   Facts Alleged in the Complaint and in SAF's Affidavit Establish
        SAF's Organizational Standing............................................................................ 24

III. FACIAL VOID-FOR-VAGUENESS CHALLENGE ..................................................... 27

    A.   The District Court Analyzed the DEALERS' Facial Vagueness
        Challenge Through a Flawed Analytical Framework........................................... 27

    B.   The District Court Misapplied the Salerno "No Set of
        Circumstances" Analytical Framework for Facial Challenges................................... 29

    C.   The District Court Converted the Defendant AG's Rule 12(b)(6)
        Motion to Dismiss into a Rule 56 Motion for Summary Judgment,
        But Without Affording Plaintiffs A Reasonable Opportunity to
        Present All Pertinent Material............................................................................. 31

    D.   The District Court Misapplied the Doctrine of Stare Decisis to the
        Improperly Admitted and Irrelevant Fact Evidence......................................... 33

    E.   The Standard for Facial Vagueness Challenges and the
        REGULATION's Complete Failure to Meet that Standard ............................... 35

IV.  AS-APPLIED VOID-FOR-VAGUENESS CHALLENGE ............................................. 40

    A.   The District Court's Finding of the DEALERS' Notice and
        Knowledge of Gen3/4 Glock Pistols' REGULATION Noncompliance
        is Based on an Incomplete Analysis, Assumption of a Nonexistent
        Fact, Non-Application of Applicable Authority and on the
        Application of Inapplicable Legal Authority ....................................................... 41

B.  The District Court Did Not Test the *Correctness* of the AG's *Application* of the Disputed Definition of "Load Indicator" to Gen3/4 Glock Pistols ................................................................................................ 45

C.  The District Court Concluded That the Words Defining "Load Indicator" are Constitutionally Valid Without Referring to Any Standard of Compliance, Any Evidence or Any Legal Authorities ............................ 47

V.  VIOLATION OF THE SECOND AMENDMENT ............................................... 53

A.  The District Court Issued Rulings on a Moot Cause of Action .................................... 54

B.  The District Court Violated the Canon of Constitutional Avoidance ........................ 55

C.  The District Court Violated the Article III Canon Prohibiting Advisory Opinions ................................................................................................ 56

1.  The District Court's First Advisory Ruling .................................................. 57

2.  The District Court's Second Advisory Ruling .............................................. 58

a.  Wrong and Nonexistent Facts ........................................................ 58

b.  Flawed Analysis ................................................................................ 59

3.  The District Court's Third Advisory Ruling ................................................. 64

**CONCLUSION** ........................................................................................................... 66

# TABLE OF AUTHORITIES

## Cases

ACLUM v. Conf. of Catholic Bishops,
   705 F. 3d 44, 52 (1st Cir. 2013)............................................................................................61, 73

Animal Welfare Inst. v. Martin,
   623 F.3d 19, 25 (1st Cir. 2010)........................................................................................ 25

Auer v. Robbins,
   519 U.S. 452, 462 (1997)..................................................................................................57, 58

Ayotte v. Planned Parenthood of Northern New Eng.,
   546 US 320, 329 (2006)..................................................................................................... 44

Bell Atl. Corp. v. Twombly,
   550 U.S. 544, 566 (2007)................................................................................................... 15

Camreta v. Greene,
   564 U.S. ___, 131 S. Ct. 2020, 2045 (2011) ................................................................. 73

Chafin v. Chafin,
   568 U.S. ___, 133 S. Ct. 1017, 2023 (2013) ................................................... 19, 61, 62

Charlesbank Equity Fund II v. Blinds to Go,
   370 F. 3d 151, 158 (1st Cir. 2004) ................................................................................. 24

Chicago v. Morales,
   527 U.S. 41, 55 (1999)...................................................................................................passim

Christopher v. SmithKline Beecham Corp.,
   132 S. Ct. 2156, 2166 (2012)........................................................................................... 52

City of Los Angeles v. Patel,
   No. 13-1175, (22 June 2015).........................................................................................16, 34

Coates v. Cincinnati,
   402 U.S. 611, 614 (1971)................................................................................................43, 44

Cook v. Gates,
    528 F. 3d 42, 56 (1st Cir. 2008) ................................................................ 46

Crooker v. Magaw,
    41 F. Supp. 2d 87, 92 (D. Mass. 1999) ..................................................... 32

Culhane v. Aurora Loan Servs. of Neb.,
    708 F.3d 282, 289 (1st Cir. 2013) ............................................................. 25

Debnam v. FedEx Home Delivery,
    766 F.3d 93, 96 (1st Cir. 2014) .............................................15, 23, 30, 50

Decotiis v. Whittemore,
    635 F. 3d 22, 33 (1st Cir. 2011) ................................................................ 60

DISTRICT OF COLUMBIA V. HELLER,
    554 U.S. 570, 630 (2008) .................................................................. passim

FCC v. Fox Television Stations, Inc.,
    567 U.S. ___, 132 S. Ct. 2307, 2317 (2012) ......................................72, 76

FW/PBS, Inc. v. Dallas,
    493 U.S. 215 (1990) .................................................................................. 26

García-Catalán v. United States,
    734 F.3d 100, 103 (1st Cir. 2013) ............................................................. 23

Gately v. Massachusetts,
    2 F.3d 1221, 1227 (1st Cir.1993) .............................................................. 38

Grayned v. City of Rockford,
    408 U.S. 104, 108 fn. (1972) .................................................................... 75

Hoffman Estates v. Flipside, Hoffman Estates, Inc.,
    455 U.S. 489, 497 (1982) ............................................................ 34, 40, 56

Johansen v. U.S.,
    506 F.3d 65 (1st Cir. 2007) ................................................................63, 64

Johnson v. US,
    No. 13-7120 (26 June 2015) ................................................................35, 44

Kampfer v. Cuomo,
    993 F. Supp. 2d 188, 196 (N.D.N.Y. 2014) ................................................................... 68

Kerin v. Titeflex Corp.,
    770 F. 3d 978, 981 (1st Cir. 2014) ............................................................................... 27

Lewis v. Continental Bank Corp.,
    494 U.S. 472, 477, (1990) ............................................................................................ 63

Love v. Butler,
    952 F.2d 10, 13 (1st Cir. 1991) ............................................................................... 33, 34

Lujan v. Defenders of Wildlife,
    504 U.S. 555, 560-61 (1992) ........................................................................................ 23

Mangual v. Rotger-Sabat,
    317 F.3d 45, 60 (1st Cir.2003) ..................................................................................... 61

Overseas Military Sales Corp. v. Giralt-Armada,
    503 F.3d 12, 17 (1st Cir. 2007) .................................................................................... 62

Pitonyak v. State,
    253 S.W.3d 834, 845 (Tex. App. 2008) ......................................................... 36, 38, 39, 40

Powell v. Tompkins,
    Docket No. 13-1310 (1st Cir. 2015) at footnote 9 ................................................... 69, 71

Reno v. American Civil Liberties Union,
    521 U.S. 844, 884 – 885 (1997) ................................................................................... 44

Rosario-Urdaz v. Rivera-Hernandez,
    350 F.3d 219, 221 (1st Cir. 2003) ........................................................................... 23, 24

Rosaura Bldg. Corp. v. Municipality of Mayaguez,
    778 F.3d 55 (1st Cir. 2015) .......................................................................................... 22

Schware v. Board of Bar Examiners,
    353 U.S. 232, 238-239 (1957) ...................................................................................... 47

Smilow v. Southwestern Bell Mobile Sys., Inc.,
    323 F.3d 32, 37 (1st Cir.2003) ............................................................................... 24, 28

Smith *ex rel.* Smith v. Bryco Arms,
    33 P.3d 638 (N.M. App. 2001)....................................................................36, 38, 39, 40

Summers v. Earth Island Inst.,
    555 U.S. 488, 498-99 (2009) ..................................................................................26, 27

United States v. Cardales-Luna,
    632 F. 3d 731, 734 (1st Cir. 2011) ............................................................................ 38

United States v. Diaz-Bastardo,
    929 F.2d 798, 799 (1st Cir.1991)............................................................................... 37

United States v. Salerno,
    481 U.S. 739, 745 (1987)..................................................................................passim

United States v. Williams,
    553 U.S. 285, 306 (2008)..................................................................................passim

United States v. Zhen Zhou Wu,
    711 F.3d 1, 15 (1st Cir. 2013) cert. denied sub nom. Yufeng Wei v. United States,
    134 S. Ct. 365 (2013) ..............................................................................................48, 49

Washington State Grange v. Washington State Republican Party,
    552 U.S. 442, 450 (2008)..........................................................................................30, 32

Waste Mgmt. Holdings, Inc. v. Mowbray,
    208 F.3d 288, 295 (1st Cir. 2000) ............................................................................. 27

Wilson v. HSBC Mortg. Services, Inc.,
    744 F. 3d 1, 7 (2015)..................................................................................................22, 28

## Statutes

28 U.S.C. § 1291.............................................................................................................2

28 U.S.C. § 1331.............................................................................................................2

28 U.S.C. § 1343(a)(3) ...................................................................................................2

42 U.S.C. § 1983 ........................................................................................................... 2

Internal Revenue Code § 501(c)(3) ............................................................................... 1

M.G.L. C.140 §123 ........................................................................................................ 4

M.G.L. c.93A ................................................................................................................. 5

M.G.L. c.93A §9(3A) .................................................................................................... 5

## Rules

F.R.C.P. Rule 12(b)(6) .......................................................................................... passim

F.R.C.P. Rule 12(d) ............................................................................................... 18, 36

F.R.C.P. Rule 56 ............................................................................................... 26, 27, 37

Federal Rule of Appellate Procedure 26.1 ...................................................................... 1

Local Rule 34.0 .............................................................................................................. 1

## Regulations

940 C.M.R. 16.00 ........................................................................................................... 4

940 C.M.R. 16.01 ........................................................................................................... 4

940 C.M.R. 16.05(1) ..................................................................................................... 42

940 C.M.R. 16.05(3) ............................................................................................ 5, 31, 32

## REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

Pursuant to Local Rule 34.0, plaintiffs-appellants respectfully request oral argument on the issues and facts contained in this brief and its accompanying addendum. In light of the importance of the Constitutional issues in the case, the complex weave of the Massachusetts Attorney General's theories and factual nuances, oral argument will assist the Court's review.

///

///

///

///

///

# JURISDICTIONAL STATEMENT

The Federal District Court for the District of Massachusetts had subject matter jurisdiction over this matter pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331 and 1343(a)(3) because this matter involves constitutional issues under the Second and Fourteenth Amendments to the U.S. Constitution.

This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1291 because the District Court's 5 March 2015 grant of the Defendant's Motion to Dismiss (Joint Appendix ["JA"] 352) disposed of all of the Plaintiffs' claims, constituting a final judgment.  Plaintiffs timely filed their Notice of Appeal on 3 April 2015 (entered on 14 April 2015).  (JA353).

///

///

///

///

# ISSUES PRESENTED

1.     Must an organization asserting standing through the standing of its members identify such members at the initial pleadings stage, even if the organization provides substantially detailed information regarding its members, can identify with particularly those members affected by the challenged regulation and promises to do so during discovery?

2.     Is a regulatory design requirement facially void-for-vagueness

   a.     –if it is comprised of words so subjective that an enforcement agency can negate *any* attempt at compliance, or

   b.     –non-compliance is impossible because *anything* will meet the wholly subjective standard of the design requirement?

3.     Does an agency's summary proclamation that one of several virtually identical implementations of a standardless regulatory design requirement is not compliant provide constitutionally adequate notice of what *does* comply with the regulation?

4.     May a federal district court make rulings on issues that are not before the court, or issues about which there is no case or controversy between the parties?

*///*

*///*

# STATEMENT OF THE CASE

## I. RELEVANT FACTS

### A. The Massachusetts Statutory and Regulatory Scheme for Retail Sales and Transfers of Handguns

Massachusetts firearms dealers may sell or transfer to eligible Massachusetts residents only those handguns that comply with *both* of two independent standards: (1) M.G.L. c.140 §123 (the "STATUTE"), and (2) the Massachusetts Attorney General's ("AG") Handgun Sales Regulation codified at 940 C.M.R. 16.00, *et seq.* (the "REGULATION"). (JA27).

The STATUTE prohibits sales of handguns which do not comply with enumerated design or performance criteria, and requires the Executive Office of Public Safety and Security ("EOPSS") to publish a list of complying handguns in the quarterly Approved Firearms Roster. (JA27). The REGULATION has its own handgun design requirements, among which is that pistols contain a "magazine safety disconnect" or a "load indicator". (JA361). The REGULATION at §16.01 defines a "load indicator" as "a device which plainly indicates that a cartridge is in the firing chamber within the handgun." Id. (JA358). This definition of "load indicator" is the crux of this lawsuit.

The enabling statute for the Handgun Sales Regulation is Chapter 93A of the Massachusetts General Laws, commonly known as the "Consumer Protection Act". (JA357). The REGULATION at §16.05(3) provides (with very limited exception) that

it is *per se* a violation of Chapter 93A for a firearms dealer to "transfer or offer to transfer to any customer located within the Commonwealth any handgun which does not contain a load indicator or magazine safety disconnect."  Violation of Chapter 93A exposes the violator to double or treble damages and reimbursement of attorney fees.  M.G.L. c.93A §9(3A).  (JA29).

## B.  Glock Handguns

### 1.  Glock Handguns are Firearms in Common Use

Pistols manufactured by Glock, Inc. of Smyrna, Georgia are some of the most common—if not *the* most common—handguns in use throughout the United States. They are enormously popular due to their widely reputed quality, reliability and ability to function under adverse conditions, enjoying an amazing 65% market share of handguns used by U.S. law enforcement agencies.  Glock pistols are prized for their reliability and accuracy by competitive shooters, almost invariably dominating the list of production handguns used in most national and international sport shooting competitions.  Glock pistols are extremely popular self-defense firearms because of their simplicity and reliability, contributing to the fulfillment of the core purpose of the Second Amendment right.  District of Columbia v. Heller, 554 U.S. 570, 630 (2008).  (JA30).

Like many other popular handgun manufacturers, Glock offers a variety of handguns models.  Unlike other manufacturers, however, Glock handguns are

distinguished primarily by their size and caliber of ammunition they use; otherwise (with few exceptions) *all* Glock pistol models are nearly identical in design—they are scaled up or scaled down versions of the same pistol. (JA30-JA31).

Third Generation ("Gen3") and Fourth Generation ("Gen4") Glock pistols were introduced in 1998 and 2010, respectively. (JA31). *Virtually **ALL** production Gen3/4 Glock handguns* (that are not designed and sold strictly to law enforcement, military and/or government agencies) *comply with the STATUTE and are therefore included on the EOPSS Approved Firearms Roster*. (JA31-JA32).

## 2. The "Load Indicators" of Gen3/4 Glock Pistols are *Virtually Identical* to Those of Other Massachusetts Approved Handguns

The AG has tacitly approved many "load indicator" implementations on handguns legally sold in Massachusetts. (JA41-JA42). In particular, she has not objected to extractor-based "load indicators" of several handgun makes and models that are *virtually identical* to that employed by Gen3/4 Glock pistols, including Kahr Arms pistols (all models), Heckler & Koch USP and P-series of pistols and Beretta 92-series of pistols. (JA42).

## C. The CONSUMERS Could Not Acquire Gen3/4 Glock Pistols from the DEALERS Because of Vagueness in the REGULATION

Appellants Robert Draper, Ariel Weisberg, Donna Major, Eric Notkin, Robert Boudrie and Brent Carlton (collectively the "CONSUMERS") are all Massachusetts residents duly licensed to acquire and possess firearms in Massachusetts. (JA22).

The CONSUMERS are a diverse group of individuals but each has extensive knowledge of and experience with firearms. (JA32-JA34).

Business entity appellants, Precision Point Firearms, LLC and Concord Armory, LLC (collectively the "DEALERS"), both hold federal and state firearms dealer licenses.[1] (JA21-JA22). Both DEALERS also hold federal Type 07 licenses ("Title 1 manufacturer of firearms and ammunition…") and both are licensed Massachusetts gunsmiths.[2] (JA 108, 110).

Each of the CONSUMERS sought to acquire a Gen3/4 Glock pistol from one or both of the DEALERS.[3] (JA32-JA34). The DEALERS rejected every one of the CONSUMERS' solicitations (JA34-JA35), citing in each instance their confusion over Gen3/4 Glock pistols' compliance with the REGULATION and consequent fear of an enforcement action by the AG should she disagree with their reasoned opinion that Gen3/4 Glock pistols comply with the REGULATION. (JA35).

*///*

---

[1] The federal Bureau of Alcohol, Tobacco, Firearms and Explosives ("BATFE") issues several types of federal firearms licenses. FFLs doing business in Massachusetts must also be licensed as firearms dealers by EOPSS.

[2] The DEALERS' federal Type 07 licenses and Massachusetts gunsmith licenses permit the DEALERS to manufacture, alter and/or customize firearms.

[3] The CONSUMERS did not seek to purchase pistols directly from Glock, Inc. because Glock, Inc. does not have firearms dealer licenses in Massachusetts. Thus, pursuant to both federal and Massachusetts law Glock, Inc. cannot transfer firearms to Massachusetts residents.

### D. The Plaintiffs' Requests for Clarification From the AG Regarding Gen3/4 Glock Pistols' Compliance With the REGULATION and the AG's Dismissive Responses Thereto

Each of the plaintiffs wrote to the AG asking whether Gen3/4 Glock pistols comply with the REGULATION and if not, *why* not. (JA36). The AG responded by letter to each of the CONSUMERS and DEALERS (JA37), declaring:

> "The handguns presently manufactured by Glock, Inc. ("Glock") are not in compliance with the Massachusetts Handgun Sales Regulations, *because they lack an effective load indicator* or magazine safety disconnect." [Emphasis in italics.]

The AG's letters contained *no information at all regarding **what** about Gen3/4 Glock pistols' "load indicators" the AG concluded renders them not "effective", i.e. shape, size, color, location, texture, etc.*; according to the AG, they are simply not effective.

Nevertheless, the AG insisted there is ample information about *why* she proclaimed Gen3/4 Glock pistols REGULATION noncompliant. She wrote to CONSUMER Brent Carlton (JA38):

> "Handgun dealers in Massachusetts have *clear information* on this point *from Glock, EOPSS, and this Office* ... when they inform prospective purchasers that Glock firearms cannot legally be sold to civilians in Massachusetts." [Emphasis in italics.]

The AG's responses to the DEALERS' inquiries (JA37) included:

> "If you are unsure whether a handgun on the EOPS (sic) roster meets the additional safety requirements of our Office's regulations, you should contact the *manufacturer*, who should be able to provide you with that information." [Emphasis in italics.]

To DEALER Precision Point Firearms, LLC the AG added that her Office "has been clear and consistent in our communications to dealers and consumers about the reason that Glock firearms do not comply with the Regulations". (JA43).

Prior to her responses to the plaintiffs' requests for clarification regarding Gen3/4 Glock pistols' compliance with the REGULATION, *none* of the plaintiffs had ever received *any* communications from the AG, including "the reason that Glock firearms do not comply with the Regulations". The sources to which the AG redirected the plaintiffs' inquiries do not so much as hint that information. For example, EOPSS, to whom the AG directed the plaintiffs' inquiries regarding *why* she proclaimed Gen3/4 Glock pistols' "load indicators" noncompliant *explicitly disclaims any responsibility for **any** handgun's compliance with the REGULATION* and expressly directs users back to the AG's website for that guidance (JA43):

> "Massachusetts licensed firearms dealers should note that … [f]irearms on this Approved Firearms Roster do not necessarily comply with the requirements of the Attorney General's Handgun Sales Regulations. Information about those regulations, as well as the Enforcement Notice may be obtained from the Office of the Attorney General and may be accessed on the website of the Attorney General (www.ago.state.ma.us)." Approved Firearms Roster, (JA27-JA28).

The AG's website yields exactly ***one (1)*** result for the search term "Glock", *completely unrelated to any issue in this lawsuit*. (JA39). There is no Enforcement Notice on the AG's website or anywhere on any Massachusetts government website. The AG redirection of the plaintiffs' inquiries to "Glock, Inc.", the "manufacturer, who should be able to provide you with that information" is meaningless because Glock,

Inc. is a private entity not subject to the REGULATION and who has no legal duty to inform the DEALERS or CONSUMERS whether any of their products comply with any Massachusetts law or regulation.

///

///

///

///

///

///

///

///

///

## II. <u>PROCEDURAL HISTORY</u>

Plaintiffs filed their complaint on 11 June 2014. The defendant AG filed her motion to dismiss the complaint on 22 August 2014. Plaintiffs filed their opposition to the AG's motion to dismiss on 12 September 2014. The AG obtained leave of court and filed a response to the plaintiffs' opposition on 2 October 2014 and the plaintiffs, too, obtained leave of court and filed a reply thereto on 24 October 2014.

*Amicus curiae* Brady Center to Prevent Gun Violence ("BRADY") obtained leave of court and filed a brief in support of the AG's motion to dismiss on 6 October 2014. Plaintiffs filed their opposition to BRADY's amicus brief on 31 October 2014.

A hearing on the AG's motion to dismiss was held on 19 February 2015. BRADY did not participate in the hearing. The District Court issued its memorandum and order ("Dismissal Memorandum") (JA332-JA350), and order of Dismissal (JA351-JA352), on 5 March 2015. The plaintiffs timely filed their notice of appeal.

///

///

///

///

# III. RULINGS BY THE DISTRICT COURT

Massachusetts Federal District Court made the following eight (8) rulings in dismissing the complaint on the AG's F.R.C.P. Rule 12(b)(6) motion to dismiss:

1. Organizational plaintiff Second Amendment Foundation, Inc. ("SAF") lacks standing through the standing of its members because SAF "has not identified [ ] any specific members" who have been negatively affected by the REGULATION." Dismissal Memorandum, 5-6 (JA185-JA186).

2. The DEALERS' facial void-for-vagueness challenge to the REGULATION's definition of "load indicator" fails the Salerno "no set of circumstances" standard because the "defendant offered several examples of firearms where it is clear that they would fail to meet the regulation's standards." Dismissal Memorandum, 10 (JA190).

3. The Court "conclude[d] that the plaintiffs' knowledge and receipt of actual notice that the Gen3/4 Glock pistols are [REGULATION] noncompliant defeat their as-applied challenge to the regulation." Dismissal Memorandum, 12 (JA192).

4. "The plaintiffs' argument that the AG never explained why the Glock load indicators fail the regulatory standard is irrelevant to the constitutional vagueness challenge [because the focus of the analysis is] not [ ] why or how the AG reached her conclusion." Dismissal Memorandum, 13 (JA193).

5. "The regulatory language at issue here, 'a device which plainly indicates,' is ... straightforward ... in context because [it] describe that the purpose of a load

indicator…  The Court concludes that the language of the regulation provides clear guidance for and fair notice to firearms dealers of ordinary intelligence."  Dismissal Memorandum, 13-14 (JA193-JA194).

6.      "The [REGULATION] fits comfortably among the categories of regulation that Heller suggested would be 'presumptively lawful' because it 'impos[es] conditions and qualifications on the commercial sale of arms.'"  Dismissal Memorandum, 16 (JA196).

7.      "The regulation does not substantially burden the right to bear arms in self-defense in one's home because the ban on two kinds of Glock pistols in no way prevents citizens from obtaining a wide array of firearms."  Dismissal Memorandum, 16-17 (JA196-JA197).

8.      "Even if the regulation did  impinge on Second Amendment rights, the Court finds that it passes constitutional muster under any standard of scrutiny [because] [t]he defendant has demonstrated a strong showing of a 'substantial relationship' between the restrictions imposed by the regulation and the important government objective of protecting the safety of its citizens."  Dismissal Memorandum, 17 (JA197).

///


///

# SUMMARY OF ARGUMENT

## Preamble

The core issue in this lawsuit is whether the words "device which plainly indicates" in the REGULATION's definition of "load indicator" meet the Fourteenth Amendment due process standard of fair notice regarding compliance with that alternative design requirement for pistols sold in Massachusetts. The burden on the CONSUMERS' Second Amendment right—their inability to acquire Gen3/4 Glock pistols—is directly derivative of the chilling effect the unconstitutionally vague definition of "load indicator" has on the DEALERS' firearm sales.

## Organizational Standing

The Second Amendment Foundation, Inc. ("SAF) sought to participate in this lawsuit through the standing of its Massachusetts dealer and consumer members. The District Court denied standing to SAF because it did not, at the initial pleadings stage, identify its members affected by the REGULATION.

The District Court erred by relying on an authority requiring an organization seeking standing through injury to its members to identify those members *by the Rule 56 motion for summary judgment* stage, after discovery has developed the facts.

The District Court also ignored the axiomatic rule that initial pleadings "simply [need] enough fact to raise a *reasonable expectation that discovery will reveal evidence* of the [allegation]." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 566

(2007) (emphasis in italics).  SAF's affidavit provided detailed numbers and specific injuries alleged by its Massachusetts members and the plaintiffs explicitly promised to identify individual injured members during discovery.  Based on the information in the complaint and in SAF's affidavit, it was clear that discovery would readily have provided the necessary information.  The District Court's rejection of SAF's standing was an abuse of discretion because it did not "draw[] all reasonable inferences in the plaintiff's favor" as required when considering a motion to dismiss.  Debnam v. FedEx Home Delivery, 766 F.3d 93, 96 (1st Cir. 2014).

## Dealers' *Facial* Void for Vagueness Challenge

The DEALERS alleged that the words "device which plainly indicates" in the definition of the REGULATION's "load indicator" alternative design requirement are so vague that no one can determine with any reasonable certainty whether *any* implementation of "load indicator" complies.  The AG's proclamation that, without explanation (and refusal to explain) how, Gen3/4 Glock pistols' "load indicator" are noncompliant—while tacitly approving virtually identical "load indicators" on other pistols sold in Massachusetts—is the product of this unconstitutional vagueness, further plunging compliance into irredeemable confusion.

The District Court dismissed the facial void-for-vagueness claim relying on an outdated authority limiting facial void-for-vagueness claims primarily to the First Amendment.  The Supreme Court, however, declared in Chicago v. Morales, 527 U.S.

41, 55 (1999), that "[w]hen vagueness permeates the text of [ ] a law, it is subject to facial attack." It went further in <u>City of Los Angeles v. Patel</u>, No. 13-1175, (22 June 2015) by declaring that "[it] has allowed [facial] challenges to proceed under a diverse array of constitutional provisions," including the Second Amendment (referring to <u>District of Columbia v. Heller</u>, 554 U.S. 570 (2008)).

The District Court also misapplied the infamous "no set of circumstances" standard of <u>United States v. Salerno</u>, 481 U.S. 739, 745 (1987) to dismiss the DEALERS' facial void-for-vagueness claim. "To the extent we have consistently articulated a clear standard for facial challenges, it is not the <u>Salerno</u> formulation, which has never been the decisive factor in any decision of this Court, including <u>Salerno</u> itself…" <u>City of Chicago v. Morales</u>, 527 U.S. 41, 54, fn. 22 (1999). Even if "there will be straightforward cases" in which the proper application of a vague law is clear, the <u>Salerno</u> "requirement of vagueness in all applications" is a "tautology: If we hold a statute to be vague, it is vague in all its applications (and never mind the reality)." <u>Johnson v. US</u>, No. 13-7120 (26 June 2015).

Besides using the incorrect analytical framework, the District Court abused its discretion by converting the AG's motion to dismiss into a motion for summary judgment by admitting *dicta* from two out-of-circuit state appellate cases as *fact evidence* of "applications under which the REGULATION would not be vague." The District Court did not afford plaintiffs an opportunity to refute the admitted *fact evidence* as F.R.C.P. Rule 12(d) requires.

Even with the improperly admitted *fact evidence*, neither of the two cases relied on by the District Court—one a products liability case and the other a prosecution for murder—have any *factual* or *legal* issues in common with one another or with any issue in *this* case.

In short, the cases relied on by the District Court as examples of "applications under which the REGULATION would not be vague" under the <u>Salerno</u> "no set of circumstances" standard are completely different and have no stare decisis effect whatsoever in this case.

### Dealers' *As-Applied* Void for Vagueness Challenge

The District Court fundamentally erred in dismissing the DEALERS' as-applied void for vagueness claim by *deferring to the AG's summary proclamation* of noncompliance—implicitly making a *factual finding* that Gen3/4 Glock pistols' "load indicators" are indeed REGULATION noncompliant—*without itself* confronting how the challenged words "device which plainly indicates" *actually* apply to Gen3/4 Glock pistols' "load indicators".  The District Court did so without reference to any facts, any legal authorities, any industry standards or *anything* else.

Similarly, relying on "civil regulations [] govern[ing] commercial conduct are held to a lower standard than criminal statutes in the vagueness analysis" the District Court concluded that the challenged words "device which plainly indicates" are "straightforward ... in context because they describe [ ] the purpose of a load

indicator…"  Again, the District Court's ruling is silent as to how the *purpose* of the REGULATION's "load indicator" alternative design requirement establishes a *standard* of compliance *as applied to Gen3/4 Glock pistols*.

## CONSUMERS' Second Amendment Claim

The CONSUMERS' Second Amendment claim is entirely derivative of, and dependent on, the DEALERS' Fourteenth Amendment claim.  The CONSUMERS could not acquire Gen3/4 Glock pistols (firearms in common use) because the DEALERS feared enforcement actions by the AG should she disagree with their opinion that Gen3/4 Glock pistols comply with the REGULATION.

The District Court's Dismissal of the DEALERS' Fourteenth Amendment due process claim mooted the CONSUMERS' Second Amendment claim.  Accordingly, *all* of the District Court's Second Amendment-related rulings were improper "advisory opinions" prohibited by Article III of the Constitution as no "live" Second Amendment controversy remained for the District Court to resolve.  Chafin v. Chafin, 568 U.S. __, 133 S. Ct. 1017, 2023 (2013).

The District Court's Second Amendment-related rulings and findings also violated the canon of constitutional avoidance because a finding of mootness of the CONSUMERS' Second Amendment claim upon the Dismissal of the DEALERS' Fourteenth Amendment claim would have avoided deciding substantive constitutional issues.

## The Analytical Lens Through Which to Review the District Court's Rulings:  Their Real World *Practical* Result

The District Court concluded that the words "device which plainly indicates…" as they are used in the definition of "load indicator" are "straightforward … in context …"  While finding clarity in these words "in common usage and with common meaning", the District Court completely ignored *how, in practice,* these words transmute into a real-world constitutionally sound standard of compliance.  The District Court's Dismissal of the DEALERS' facial and as-applied void-for-vagueness challenges (especially so at the pleading stage *before* discovery) while allowing the AG's summary rejection of one of several virtually identical implementations of "load indicator" is thus best viewed through its practical results:

Both DEALERS are Type 07 FFLs (licensed firearm manufacturers) and gunsmiths (JA108, JA110).  Both are licensed and capable of bringing Gen3/4 Glock pistols into compliance with the REGULATION.  What should they *do*?

- Should they paint some unspecified component(s) of the pistols some color or other, or some combination or pattern of colors?

- Should they drill a hole in the base of the firing chamber or someplace else on the pistol?

- Should they thicken, extend, serrate or smooth the tab on the extractor that protrudes from the slide when the extractor engages the rim of a cartridge?

- Should they provide a depth gauge to be inserted into the barrel to check for the presence of a cartridge?

*What* are they to do?

What guidance do the DEALERS—*anyone* including the AG—have to render Gen 3/4 Glock pistols REGULATION compliant after the District Court ruled that the words a "device which plainly indicates..." is all the constitutionally adequate guidance they need?

> "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved;  but rather the indeterminacy of precisely *what* that fact is."  U.S. v. Williams, 553 U.S. 285, 306 (2008), italicized emphasis.

///

///

///

///

///

///

# ARGUMENT

## I. <u>STANDARD OF REVIEW</u>

### A. De Novo Standard of Review for a Rule 12(b)(6) Motion to Dismiss

"We review the district court's grant of a Rule 12(b)(6) motion de novo." <u>Wilson v. HSBC Mortg. Services, Inc.</u>, 744 F. 3d 1, 7 (2015) (citations omitted). "The de novo standard of review does not limit [the Court of Appeal] to the district court's rationale…" <u>Rosaura Bldg. Corp. v. Municipality of Mayaguez</u>, 778 F.3d 55 (1st Cir. 2015) (citations omitted).

"In deciding whether the district court properly dismissed a claim, we ask whether the complaint 'state[s] a claim to relief that is plausible on its face,' accepting the plaintiff's factual allegations and drawing all reasonable inferences in the plaintiff's favor." <u>Debnam v. FedEx Home Delivery</u>, 766 F.3d 93, 96 (1st Cir. 2014) (citations omitted). "In determining whether a complaint crosses the plausibility threshold, 'the reviewing court [must] draw on its judicial experience and common sense.'" <u>García-Catalán v. United States</u>, 734 F.3d 100, 103 (1st Cir. 2013) (citations omitted). "This context-specific inquiry does not demand 'a high degree of factual specificity.'" <u>Id.</u>

> "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim." <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1992) (quotation marks omitted).

## B. Abuse of Discretion Standard of Review

An abuse of discretion exists when the district court makes an error of law (<u>Rosario-Urdaz v. Rivera-Hernandez</u>, 350 F.3d 219, 221 (1st Cir. 2003), or "relies significantly on an improper factor, omits a significant factor, or makes a clear error of judgment in weighing the relevant factors." <u>Smilow v. Southwestern Bell Mobile Sys., Inc.</u>, 323 F.3d 32, 37 (1st Cir.2003) ." Though this is a deferential standard "… appellate courts must be careful to ensure that deference does not mutate into blind allegiance." <u>Charlesbank Equity Fund II v. Blinds to Go</u>, 370 F. 3d 151, 158 (1st Cir. 2004). "An error of law is, of course, always an abuse of discretion." <u>Rosario-Urdaz</u>, 221.

///

///

///

///

///

///

## II.    <u>ORGANIZATIONAL STANDING</u>

"Because the question of whether certain facts establish standing is a question of law, we review the district court's resolution of the issue de novo." <u>Culhane v. Aurora Loan Servs. of Neb.</u>, 708 F.3d 282, 289 (1st Cir. 2013).

An organization asserting standing through the standing of its members must show that

> "(1) at least one of its members would have standing to sue as an individual, (2) 'the interests at stake are germane to the organization's purpose,' and (3) individual members' participation is not necessary to either the claim asserted or the relief requested."

<u>Animal Welfare Inst. v. Martin</u>, 623 F.3d 19, 25 (1st Cir. 2010) (citations omitted).

Here, the District Court ruled *at the motion to dismiss stage* that organizational plaintiff SAF did not establish standing through the standing of its members because "[SAF] has not identified any specific members" who were allegedly injured by the REGULATION. Dismissal Memorandum, 5 (JA337).

### A. The District Court Relied on Inapplicable Authorities to Deny SAF Organizational Standing Through the Standing of its Members

The District Court relied on <u>Summers v. Earth Island Inst.</u>, 555 U.S. 488, 498-99 (2009) to deny SAF standing, quoting "… 'the affidavit provided by the [organization] to establish standing would be insufficient because it did not name the individuals who were harmed by the challenged [regulation]'". Dismissal Memorandum, 5 (JA337). That language in <u>Summers</u> originates from <u>FW/PBS, Inc.</u>

<u>v. Dallas</u>, 493 U.S. 215 (1990), where at p. 235 the Supreme Court gave context for its ruling: "Following expedited discovery, petitioners' constitutional claims were resolved through cross-motions for summary judgment."

In this case *no discovery had been accomplished when the District Court denied SAF standing*. More importantly, the District Court's ruling was on the AG's Rule 12(b)(6) *motion to dismiss*—not at the never-reached *fact-developed* Rule 56 *motion for summary judgment* stage. The District Court ignored this legal point from the plaintiffs' Response (JA276): "Nowhere in <u>Summers</u> did the Court require 'naming the affected member' at the initial pleading stage, nor is 'motion to dismiss' mentioned anywhere in the decision." (JA275-JA276).

"An abuse of discretion [ ] occurs if the court adopts an incorrect legal rule." <u>Waste Mgmt. Holdings, Inc. v. Mowbray</u>, 208 F.3d 288, 295 (1st Cir. 2000). The District Court's adoption of the legal rule applicable to Rule 56 motions for summary judgment to deny SAF standing at the Rule 12(b)(6) motion to dismiss stage was an abuse its discretion.

### B. Facts Alleged in the Complaint and in SAF's Affidavit Establish SAF's Organizational Standing

"When reviewing a pre-discovery grant of a motion to dismiss for lack of standing, 'we accept as true all well-pleaded fact[s] ... and indulge all reasonable inferences' in the plaintiff's favor." <u>Kerin v. Titeflex Corp.</u>, 770 F. 3d 978, 981 (1st Cir. 2014) (citations omitted). "[W]here ... standing is at issue we may consider further

particularized allegations of fact deemed supportive of [plaintiffs'] standing, such as those contained within an affidavit."  Wilson v. HSBC Mortg. Services, Inc., 744 F.3d 1, 7 (1st Cir. 2014) (citations omitted).

SAF's affidavit listed detailed numbers of its Massachusetts members, and of those, the number who "contacted SAF … specifically regarding the Massachusetts Handgun Sales Regulation."  The District Court even quoted those figures in its Dismissal Memorandum, 5 (JA337).  Inexplicably, however, the District Court ignored the affidavit's very next paragraph (¶8):  "Approximately 40 to 70 SAF members have contacted SAF within the past year specifically regarding the Massachusetts Handgun Sales Regulation that is at issue in this lawsuit."  The District Court ignored the even more "particularized allegations of fact" in ¶9 of SAF's affidavit:

> "Many of SAF's [firearms dealer] members … cannot determine whether they may sell or transfer Gen3/4 Glock pistols to Massachusetts residents, or as [SAF's] Massachusetts resident[ ] [members] want to but cannot purchase Gen3/4 Glock pistols because of … the Massachusetts Handgun Sales Regulation."

The District Court also disregarded SAF's explicit promise to "comply with [discovery] requests asking for the identification of [SAF's] members and/or supporters described in [its] declaration…" (JA276).

An abuse of discretion exists when the district court "… makes a clear error of judgment in weighing the relevant factors."  Smilow v. Southwestern Bell Mobile Sys, *supra*, at 37.  With so many detailed facts alleged in the complaint and in SAF's

affidavit regarding its aggrieved members—sans only their names but with the express promise to provide that information in discovery—there was more than a reasonable expectation that "*discovery will reveal* [the identify of specific SAF members]" whose standing would provide standing to SAF." The District Court made a clear error of judgment.

///

///

///

///

///

///

///

### III. FACIAL VOID-FOR-VAGUENESS CHALLENGE

#### A. The District Court Analyzed the DEALERS' Facial Vagueness Challenge Through a Flawed Analytical Framework

Rather than analyzing the DEALERS' facial challenge by "accepting the plaintiff's factual allegations and drawing all reasonable inferences in the plaintiff's favor" [Debnam v. FedEx Home Delivery, *supra*, 96] the District Court cited Washington State Grange v. Washington State Republican Party, 552 U.S. 442, 450 (2008) for its analysis from the opposite, *negative perspective*:[4]

> "As a preliminary matter, facial challenges are typically disfavored because they 'often rest on speculation,' which lead to the risk of premature interpretation of statutes and regulations." Dismissal Memorandum, 9 (JA341).

The District Court's reliance on Washington State Grange for its analytical framework was wrong because there is no "speculation" in this case. The AG unequivocally insists the REGULATION is abundantly clear *as is*. She wrote "Handgun dealers in Massachusetts have *clear information* on [why Gen3/4 Glock "load indicators" are allegedly noncompliant] ..." (JA135) and that she "has been *clear and consistent* ... about the *reason* that Glock firearms do not comply with the Regulations". (JA127). Indeed, the AG insisted

> "... the [DEALERS] have not just an available process but an actual answer from a government official that is unquestionably clear as to the particular conduct in which they allegedly wish to engage." (JA189).

---

[4]     Additionally, the appeal in Washington State Grange followed rulings on the parties' *Rule 56 motions for summary judgment*, not on motions to dismiss. Id., 448.

She asserted her "letters were perfectly clear—the dealers may not sell the Glocks at issue because they fail to meet the requirements of 16.05(3)." (JA195).

Despite the AG's pronouncement of clarity in her REGULATION, the complaint the exhibits thereto (JA38-JA39) thoroughly documents the "clear information on this point":  there is ***none—<u>whatsoever</u>***.    But the AG also deflected all further inquiries to another executive branch agency, EOPSS, *which explicitly redirects that inquiry back to the defendant AG* (JA43) and to Glock, Inc. (JA43), a private party who is not subject to the REGULATION, does not have any known legal duty or authority to render such judgments, and has no known public enforcement authority.[5]  The *finality* of the AG's declaration of the REGULATION's clarity and her determined *avoidance* to answer how Gen3/4 Glock pistols' load indicators "fail to meet the requirements of 16.05(3)" eliminates all risk of "speculation".

Nor is there any risk of "premature interpretation".  Citing <u>Crooker v. Magaw</u>, 41 F. Supp. 2d 87, 92 (D. Mass. 1999), the AG argued "administrative agencies do not have an enforceable obligation to perform this sort of advisory mission…" (JA194).  But the <u>Crooker</u> court plainly stated that "declaratory judgment actions cannot be used to obtain answers to hypothetical questions" such as the one that was before it.  <u>Id.</u>, 92.  In contrast, the DEALERS in this case did not make hypothetical inquiries of

---

[5]    The deflection of questions regarding regulatory compliance to a private party is in its own right an unlawful abdication of the defendant AG's *governmental* authority and inherent *state* police power vested solely in the defendant AG's *public* office.  (JA144).

the AG; they asked why—what *criteria* the AG used—to proclaim Gen3/4 Glock pistols *presently* noncompliant.

Finally, the District Court read into <u>Washington State Grange</u> that which is not there, e.g. that it concerned facial challenges to "statutes and regulations". <u>Washington State Grange</u> dealt only with *statutes*—not *regulations*. "[F]acial challenges threaten to short circuit the *democratic process* by preventing *laws* embodying the *will of the people* from being implemented in a manner consistent with the Constitution.'" <u>Id.</u>, 451 (italicized emphasis, citations omitted.) The risk of "short circuit[ing] the democratic process" does not exist regarding *regulations*— *executive agency* pronouncements—as opposed to *statutes*, which are the result of the legislative "*democratic process*". The District Court approached its analysis of the DEALERS' facial challenge from the wrong perspective.

### B. The District Court Misapplied the Salerno "No Set of Circumstances" Analytical Framework for Facial Challenges

Focusing on the *standard* applicable to the DEALERS' facial void-for-vagueness challenge (apart from the *perspective* from which their challenge *should have been* analyzed), the District Court pronounced that "so long as there is some application under which the [REGULATION] would *not* be vague, a facial vagueness claim cannot stand." Dismissal Memorandum, 10 (JA342). This originates from the infamous dicta in <u>United States v. Salerno</u>, 481 U.S. 739, 745 (1987) that facial invalidation of a statute requires "that no set of circumstances exists under which

the Act would be valid".  Further limiting the *scope* of the DEALERS' facial vagueness

challenge, the District Court adopted the AG's motion to dismiss authority <u>Love v.</u>

<u>Butler</u>, 952 F.2d 10, 13 (1st Cir. 1991) that "vagueness challenges to statutes not

threatening First Amendment interests are examined in light of the facts of the case

at hand;  the statute is judged on an as-applied basis."

Aside from the fact that <u>Salerno</u> and <u>Love</u> concerned statutes whereas this

case concerns a *regulation*, "a law … *may* [ ] be challenged *on its face* as unduly

vague, in violation of due process."  <u>Hoffman Estates v. Flipside, Hoffman Estates,</u>

<u>Inc.</u>, 455 U.S. 489, 497 (1982) (italicized emphasis).  That is the DEALERS' facial

claim in this case.  More recently the Supreme Court elucidated the *current* state of

the law regarding the *breadth* of facial challenges in <u>City of Los Angeles v. Patel</u>, No.

13-1175 (22 June 2015):

> "[T]he [Supreme] Court has allowed [facial] challenges to proceed
> under a diverse array of constitutional provisions.  *See*, e.g., … <u>District</u>
> <u>of Columbia v. Heller</u>, 554 U.S. 570 (2008) (Second Amendment)…"
> Addendum ("AD") 67.

Thus, *current* law does *not* confine the DEALERS' to an as-applied challenge because

the *REGULATION* does not threaten First Amendment interests.

The applicability of the <u>Salerno</u> standard to facial challenges was squarely

addressed in <u>Chicago v. Morales</u>, 527 U.S. 41, 54, fn. 22 (1999):  "To the extent we

have consistently articulated a clear standard for facial challenges, it is *not* the

<u>Salerno</u> formulation, *which has never been the decisive factor in any decision of this*

*Court, including <u>Salerno</u> itself*…. (emphasis in italics)."  To be sure, in <u>Johnson v. US,</u>

No. 13-7120 (26 June 2015), the Supreme Court struck down the residual clause of the Armed Career Criminal Act as *facially* void-for-vagueness while recognizing "there will be straightforward cases" [Slip Op. 10 (AD13)] were application of the clause is clear.

> "[A]lthough statements in some of our opinions could be read to suggest otherwise, our *holdings* squarely contradict the theory that a vague provision is constitutional merely because there is **some** conduct that clearly falls within the provision's grasp." Id., 11 (AD14) (original italicized emphasis, local emphasis in bolded text).

Capping its holding in Johnson, the Supreme Court flatly rejected a "requirement of vagueness in all applications", calling it a "tautology:  If we hold a statute to be vague, it is vague in all its applications (and never mind the reality)." Id., 12 (AD15).

A regulation is void-for-vagueness if it "fails to give ordinary people fair notice of the conduct it punishes, or [is] so standardless that it invites arbitrary enforcement." Id., 3 (AD6).  If anything, that standard is more exacting in this case because of the burden on the CONSUMERS' Second Amendment right.


### C. The District Court Converted the Defendant AG's Rule 12(b)(6) Motion to Dismiss into a Rule 56 Motion for Summary Judgment, But Without Affording Plaintiffs A Reasonable Opportunity to Present All Pertinent Material

The "defendant [ ] offered" and the District Court admitted as ***fact evidence*** "several examples of firearms where it is clear that they would fail to meet the regulation's standards".  Dismissal Memorandum, 10 (JA342).  From Smith *ex rel.* Smith v. Bryco Arms, 33 P.3d 638 (N.M. App. 2001), cited by the AG in her motion to

dismiss (JA187), the District Court admitted as *fact evidence* the dicta "[T]he J-22 handgun does not incorporate a … a 'chamber load indicator,'…"  From <u>Pitonyak v. State</u>, 253 S.W.3d 834, 845 (Tex. App. 2008) cited by the AG in her motion to dismiss (JA187) the District Court as *fact evidence* the dicta "The pistol in question did not have … a loading indicator to show that a bullet is in the firing chamber."  This *fact evidence* of "applications under which the REGULATION would not be vague" was the District Court's basis for dismissing the DEALERS' facial vagueness challenge.

F.R.C.P. Rule 12(d) requires a district court to advise the parties if, in ruling on a Rule 12(b)(6) motion to dismiss, it is taking into consideration materials outside the pleadings.  If so, "the motion must be treated as one for summary judgment under Rule 56."  Upon the conversion of the Rule 12(b)(6) motion to dismiss into a Rule 56 motion for summary judgment, "All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."

But the District Court did not inform the parties of its intention to convert the defendant AG's Rule 12(b)(6) motion to dismiss into a Rule 56 motion for summary judgment by treating *dicta* from cases cited by the defendant AG as *fact evidence* in *this* case.  The Plaintiffs were not afforded an opportunity to "controvert[ ] [the] accuracy" of that fact evidence of "several examples of firearms … that [ ] would fail to meet the regulation's standards" that the "defendant has offered."  Dismissal Memorandum, 10 (JA342).

### D. The District Court Misapplied the Doctrine of Stare Decisis to the Improperly Admitted and Irrelevant Fact Evidence

In general, "accepted principles of stare decisis militate strongly in favor of resolving identical points in the same way for identically situated defendants." United States v. Diaz-Bastardo, 929 F.2d 798, 799 (1st Cir.1991). "Even the narrowest conception of stare decisis demands that two panels faced with the same *legal* question and identical facts reach the same outcome." U.S. v. Cardales-Luna, 632 F. 3d 731, 734 (1st Cir. 2011) (original emphasis, internal citations omitted). "[A] decision dependent upon its underlying facts is not necessarily controlling precedent as to a subsequent analysis of the same question on different facts and a different record." Gately v. Massachusetts, 2 F.3d 1221, 1227 (1st Cir.1993). "[T]he *exact same* evidence" admitted for a particular purpose in an earlier case may be stare decisis in a subsequent case, but only for the *same legal issue*. Cardales-Luna, at 735 (emphasis in italics).

The District Court in the instant matter did not parallelize the "*legal* question" in this case (constitutionality of the REGULATION's *definition* of "load indicator") with the *legal* questions in in Smith and Pitonyak. Nor could it.

Smith was a products liability case. The text quoted and relied on by the District Court is, *in context* (with **omitted** text in bolded italics):

> **"Plaintiff raises strict products liability and negligence theories of recovery** ... predicated upon the fact that [t]he J-22 handgun does not incorporate ... a 'chamber load indicator' ... alerting users that the J-22 can fire even though the magazine has been removed." Smith., p. 641.

_Smith_ is otherwise silent about its _definition_ of "chamber load indicator". The purpose of the "chamber load indicator" in this products liability case was different than that of the REGULATION in this case. For what it's worth, New Mexico does not have a "chamber load indicator" requirement for firearms.

_Pitonyak_ was a murder case in which the appellant argued that he could not have had the intent to murder when he pulled the trigger of his handgun (identified only as a ".380 semiautomatic pistol") because he did not check and therefore did not know whether it was loaded. The text quoted and relied upon by the District Court is, _in context_ (with **omitted** text in bolded italics):

> "**[Pitonyak] also cites the testimony of defense firearms expert Edward Hueske, who testified that** the pistol in question did not have a safety or a loading indicator to show that a bullet is in the firing chamber." _Pitonyak_, p. 845.

There is _nothing_ more in _Pitonyak_ regarding _what_, according to "firearms expert Edward Hueske", constitutes a "loading indicator", how it is defined by Texas law and/or regulation (it is not) or anything else about this contraption _mentioned only twice in passing_. Nothing indicates that anyone even asserted that the _unidentified_ handgun _had_ a "loading indicator".

_Neither_ the law nor the facts in _Smith_ or _Pitonyak_ are remotely related to anything in the instant matter. The District Court made a fundamental error of law in admitting the dicta of these cases as _fact evidence_ and relying on them for some form of stare decisis.

### E. The Standard for Facial Vagueness Challenges and the REGULATION's Complete Failure to Meet that Standard

"A law that does not reach constitutionally protected conduct and therefore satisfies the overbreadth test may nevertheless be challenged on its face as unduly vague, in violation of due process." Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 497 (1982). "In reviewing a business regulation for facial vagueness … the principal inquiry is whether the law affords fair warning of what is proscribed." Id., 503. "To the extent we have consistently articulated a clear standard for facial challenges, it is *not* the Salerno formulation, *which has never been the decisive factor in any decision of this Court, including Salerno itself*…." Chicago v. Morales, 527 U.S. 41, 54, fn. 22 (1999) (emphasis in italics). "[W]e have struck down statutes that tied criminal culpability to whether the defendant's conduct was 'annoying' or 'indecent'–wholly *subjective* judgments *without statutory definitions, narrowing context, or settled legal meanings*." Williams, *supra*, 304 (internal citations omitted, emphasis in italics).

There is nothing that provides the DEALERS or anyone else notice of what is permitted and what is proscribed by the words "device which plainly indicates" as used to define "load indicator". Nowhere in the Massachusetts General Laws nor in the Code of Massachusetts Regulation is there *any* limiting construction for the words "device," "plainly," and "indicate" used alone or in any combination in the "narrowing context" of firearms. (JA222-JA223).

---

- **Mr. Flig (Hearing Transcript 18:19 – 24)** (JA315)**:**

  Your Honor, I think, to make the issue clearer, we can go back to the old [] real estate adage, location, location, location. The words by themselves are straightforward, there's no argument with that. The context in which they are used makes them inherently vague.

"Device" is an amorphous term that can mean anything, including just "thing". The AG has not objected to a "load indicator" consisting of nothing more than a small hole in a firing chamber for its visual inspection. Nor has she objected to a protruding on top of the slide. She has not objected to an extractor-based "load indicator" that protrudes from the slide when a cartridge is in the firing chamber (as employed by Gen3/4 Glock pistols). Searching the REGULATION and its enabling statute for "precisely *what* that fact is" that transforms an ordinary thing into a REGULATION-compliant "device which plainly indicates" [Williams, *supra*, at 306] reveals that nothing requires that it be *built into to the pistol itself*. A simple rod can "plainly indicate" the presence or absence of a cartridge depending on how far down the barrel it can be inserted.

The vagueness of the word "device" as it defines "load indicator" is glaring when compared to the unobjectionable use of the same word in the REGULATION's definition of "magazine safety disconnect" in the same subsection. Section 16.05(1) defines a "magazine safety disconnect" as "a *device* that prevents the firing of the handgun when the magazine is detached from the handgun". [Emphasis in italics.] The purpose of this "device" is also its *binary* compliance standard: *either* this "device" prevents the firing of the handgun when the magazine is detached *or* it

does not.  There is no grey area.  A handgun cannot be fired "a little" or fired "a lot".  In this narrowing context, how the magazine safety disconnect "device" works, where and what it is, etc. are not germane to *whether* it accomplishes its unambiguous *mission* measured by its equally unambiguous *standard*.

Contrast the vague words "plainly indicates" as used in the definition of "load indicator".  There is no need to venture to extremes to conceive of a multitude of very reasonable interpretations.  "Indicate" can be visual and "plainly" can be any range of distances, angles and lighting conditions.  "Indicate" can be audible and "plainly" can be any range of decibels and frequencies.  "Indicate" can be tactile and "plainly" can be feeling a slight projection with a bare fingertip to a sensation in the palm through a thick glove.

In reality, the REGULATION's definition of "load indicator" is less than standardless;  it is *meaningless*.  That is why the <u>Salerno</u> "no set of circumstances" standard is inapplicable.  Indeed, the *opposite* is applicable:  under "no set of circumstances" can any semi-automatic pistol (including Gen3/4 Glock pistols) ***not*** comply with the "load indicator" alternative design requirement because (1) the definition of "load indicator" is so vulnerable to "wholly *subjective* judgments *without statutory definitions, narrowing context, or settled legal meanings*" (<u>Williams</u>,

*supra*, 304) such that *anything* complies, or (2) more practically, *all semi-automatic pistols* have "load indicators" *inherent in their design*—the slide.[6]

The REGULATION is incurably vague, not in the sense that it requires conformance "to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all, [and] [a]s a result, 'men of common intelligence must necessarily guess at its meaning.'" <u>Coates v. Cincinnati</u>, 402 U.S. 611, 614 (1971) (string cite omitted). "[T]he vice of the [REGULATION] lies not alone in its violation of the due process standard of vagueness[;] [it] also violates the constitutional right" of the CONSUMERS by preventing them from acquiring Gen3/4 Glock pistols, firearms in common use. <u>Id.</u>, 615.

The Court should strike the "load indicator" portion of the REGULATION as facially void-for-vagueness since it is "vague in all its applications (and never mind the reality)." <u>Johnson</u>, *supra*, Slip Op. 12. No particular interpretation of "load indicator" is permissible because the REGULATION's use of the words "device which plainly indicates" *in the context in which they are used* is so standardless that any interpretation is actually the ***rewriting*** of the REGULATION.

> "In considering a facial challenge, this Court may impose a limiting construction on a statute only if it is 'readily susceptible' to such a construction... This Court 'will not rewrite a ... law to conform it to

---

[6] The slide is the top part of a semi-automatic pistol that moves to the rear during the operating cycle and returns to its starting position through spring tension. Pulling the slide back always exposes the firing chamber for both visual and tactile inspection. This is invariably the surest method that nearly all, if not ***all*** would strenuously argue the *only* method to confirm the presence or absence of a cartridge in the firing chamber.

constitutional requirements.'"  <u>Reno v. American Civil Liberties Union</u>,
521 U.S. 844, 884 – 885 (1997) (internal and string cite omitted).

Thus, *any* interpretation fails because it implicitly excludes a multitude of equally valid interpretations.  "[O]ur constitutional mandate and institutional competence are limited [so] we restrain ourselves from 'rewrit[ing] state law to conform it to constitutional requirements' even as we strive to salvage it."  <u>Ayotte v. Planned Parenthood of Northern New Eng.</u>, 546 US 320, 329 (2006) (internal citation omitted).

///

///

///

///

///

///

# IV. <u>AS-APPLIED VOID-FOR-VAGUENESS CHALLENGE</u>

"A plaintiff asserts an as-applied challenge by claiming that a statute is unconstitutional as-applied to his or her particular conduct, even though the statute may be valid as to other parties." <u>Cook v. Gates</u>, 528 F. 3d 42, 56 (1st Cir. 2008). In this case, the as-applied vagueness challenge is directed at the words "device which plainly indicates" as applied to the *object* of the DEALERS' conduct (Gen3/4 Glock pistols), the analogue for the DEALERS' *conduct* (firearm sales). Stated slightly differently, the vague REGULATION as-applied to *Gen3/4 Glock pistols* directly affects the DEALERS' conduct regarding these pistols, and correspondingly, the availability to the CONSUMERS of these firearms "in common use".

The District Court concluded that the DEALERS's as-applied vagueness challenge failed because: (1) "the plaintiffs' knowledge and receipt of actual notice that the Gen3/4 Glock pistols are noncompliant defeat their as-applied challenge to the regulation", and (2) "the language of the regulation provides clear guidance for and fair notice to firearms dealers of ordinary intelligence." Dismissal Memorandum, 12 (JA344). Both conclusions are wrong.

///

///

///

**A. The District Court's Finding of the DEALERS' Notice and Knowledge of Gen3/4 Glock Pistols' REGULATION Noncompliance is Based on an Incomplete Analysis, Assumption of a Nonexistent Fact, Non-Application of Applicable Authority and on the Application of Inapplicable Legal Authority**

The DEALERS' as-applied vagueness challenge is not about whether the REGULATION applies to *them* (that much is self-evident) but *how* it applies to *Gen3/4 Glock pistols*, which then affects the DEALERS' conduct. The DEALERS contend that it is impossible to determine Gen3/4 Glock pistols' compliance with the REGULATION by applying the words "device which plainly indicates" to their particular implementation of "load indicator". That impinges on the DEALERS' Fourteenth Amendment right to engage in a legitimate employment or business. Schware v. Board of Bar Examiners, 353 U.S. 232, 238-239 (1957).

The District Court approached the DEALERS' as-applied vagueness challenge by stating that it "need only determine whether the regulation is vague as applied to the *particular facts at issue*". [Dismissal Memorandum, 13 (JA193)] But then it then focused **solely** on "'whether the plaintiffs, as people of ordinary intelligence, can determine if the Gen3/4 Glock pistols comply with the regulation" [Dismissal Memorandum, 13 (JA193)] *while making no inquiry at all into whether or how the words "device which plainly indicates" provided DEALERS with fair notice of some compliance standard when **actually** applied to Gen3/4 Glock pistols' implementation of "load indicator".*

The District Court based its Dismissal of the DEALERS' as-applied vagueness claim on United States v. Zhen Zhou Wu, 711 F.3d 1, 15 (1st Cir. 2013) cert. denied sub nom. Yufeng Wei v. United States, 134 S. Ct. 365 (2013), which held that "challengers of [a] regulation cannot claim they lacked fair notice [from an allegedly vague law] because they 'knew they were violating U.S. export regulations.'" Dismissal Memorandum, 12 (JA192). The District Court concluded that "the plaintiffs' knowledge and receipt of actual notice that the Gen3/4 Glock pistols are noncompliant defeat their as-applied challenge to the regulation." Id. (JA192).

First, the District Court's reliance on U.S. v. Zhen Zhou Wu is misplaced. In Zhen Zhou Wu the defendants

> "... *repeatedly attempted to disguise* the fact that they were exporting [ ] and that *they lacked the necessary licenses* to do so—further evidence that the defendants *knew* they were violating U.S. export regulations when they shipped the phase shifters [ ] without government permission." 711 F.3d at 16, italicized emphasis.

In contrast, the DEALERS here (1) did *not* sell any Gen3/4 Glock pistols to the CONSUMERS, (2) were *actually* confused (3) by an *actually* vague regulation (4) made all-the-more-so confusing by the AG's baffling summary proclamation that Gen3/4 Glock pistols' "load indicators" are not REGULATION compliant while tacitly approving other virtually identical "load indicators". The facts of Zhen Zhou Wu are completely different from the facts in this case.

From the District Court's application of the inapplicable Zhen Zhou Wu to the facts of this case it is immediately obvious that it *assumed*—without reference to

*any* *facts or legal authorities*—that "Gen3/4 Glock pistols *are* noncompliant" because, well, the AG said so. The District Court adopted, without inquiry or reason, the AG's *petitio principia* syllogism of **presuming the answer to question this lawsuit seeks to resolve**: "There is no vagueness here and no injury that may be attendant to it" because "the Attorney General's Office *informed* the dealers … that *these Glock pistols in fact violated the regulation*". (JA185). The plaintiffs forcefully argued against this fallacious logic:

> "The sham logic leading to this false conclusion would require this Court to adopt the un-established premise that '*Glock pistols in fact violated the regulation*' as true because, just as the [AG] applied this reasoning to the DEALERS, *she said so*." (JA216) (original emphasis).

The District Court made no mention of this refutation in its Dismissal Memorandum nor did it *itself* confront how the challenged words "device which plainly indicates" *actually apply* to Gen3/4 Glock pistols' load indicators. Practically, this amounts to the District Court making an *implicit factual finding* that Gen3/4 Glock pistols' "load indicators" are noncompliant, again, because the AG said so. This baseless assumption is the basis for all of the District Court's erroneous rulings on the DEALERS' as-applied challenge.

Further, rather than "accepting the plaintiff's factual allegations and drawing all reasonable inferences in the plaintiff's favor" [<u>Debnam v. FedEx Home Delivery</u>, *supra*, 96] the District Court rejected the DEALERS' stated lack of "knowledge … that [] Gen3/4 Glock pistols are [regulation] noncompliant" *before* they wrote to the AG (assuming noncompliance was established at that time—or ever). That is exactly

*why* the DEALERS wrote to the AG *seeking clarification* regarding compliance. (JA108, JA110). They wrote that from their "discussions with []dealers and distributors" they formed an "*anecdotal* understanding that [Gen3/4 Glock pistols] are not compliant" but were unable to "explain what features make them noncompliant".

The District Court also did not "draw[] all reasonable inferences" from the plaintiffs' alleged facts by falsely concluding that the DEALERS "admit[ted] that they were aware that the regulation foreclosed the transfer or sale of the Glock pistols at issue." Dismissal Memorandum, 12 (JA344-JA345). But the DEALERS pleaded "that they were aware that [the AG capriciously summarily ***proclaimed*** Glock pistols non-compliant, which] foreclosed the transfer or sale of the Glock pistols at issue."

Nor did the District Court "draw[] all reasonable inferences in the plaintiff's favor" when it concluded that the DEALERS gained actual knowledge from the "receipt of actual notice [AG's response letters] that the Gen3/4 Glock pistols are noncompliant." What the DEALERS received was "actual notice that [the AG capriciously summarily ***proclaimed*** that] that the Gen3/4 Glock pistols are noncompliant"—not that they are *actually* noncompliant.

This entire line of reasoning is plainly flawed from the start in every respect.

*///*

## B. The District Court Did Not Test the *Correctness* of the AG's *Application* of the Disputed Definition of "Load Indicator" to Gen3/4 Glock Pistols

One of the most troubling concerns about the District Court's ruling is that it did not *itself* confront Gen3/4 Glock pistols' *actual* compliance with the "device which plainly indicates" standard because it dismissed the DEALERS' as-applied challenge on the false premise that they had "knowledge and [ ] actual notice that the Gen3/4 Glock pistols are noncompliant". The District Court did not *itself* review the **facts** forming the basis of the AG's *summary proclamation* that Gen3/4 Glock pistols' "load indicators" are REGULATION noncompliant, nor could it even if it tried—**because there are none**. The District Court simply assumed her proclamation is correct. The *practical* result is no elucidation regarding *what* about Gen3/4 Glock pistols' "load indicators" renders them noncompliant (in the AG's opinion), but now with the District Court's imprimatur—without reference to *any* facts or evidence—that the AG was *correct* in that determination.

The District Court correctly observed that "[i]n the field of regulatory statutes governing business activities, where the acts limited are in a narrow category, greater leeway is allowed" [Dismissal Memorandum, 13 (JA345)], but

> "deference [to an agency] is [ ] unwarranted when there is reason to suspect that the agency's interpretation 'does not reflect the agency's fair and considered judgment on the matter in question... This might occur when ... it appears that the interpretation is nothing more than a 'convenient litigating position' ... or a 'post hoc rationalizatio[n]' advanced by an agency seeking to defend past agency action against attack.'"

<u>Christopher v. SmithKline Beecham Corp.</u>, 132 S. Ct. 2156, 2166 (2012) (internal citations and quotations omitted).  But in this case not only has the AG withheld any *interpretation* of the words "device which plainly indicates"—and *refuses* to do so (now with the District Court's sanction)—she also refuses to disclose (now with the District Court's sanction) "what" specifically about Gen3/4 Glock pistols' "load indicators" she determined renders them noncompliant.

///

///

///

///

///

///

///

///

## C. The District Court Concluded That the Words Defining "Load Indicator" are Constitutionally Valid Without Referring to Any Standard of Compliance, Any Evidence or Any Legal Authorities

The complaint explicitly pleaded (JA42) and all of the plaintiffs' subsequent submissions to the District Court (including oral argument at the hearing on the AG's motion to dismiss) stressed, that the AG's summary proclamation that Gen3/4 Glock pistols' "load indicators" are REGULATION noncompliant—while tacitly approving other pistols' virtually identical "load indicators"—only deepened the existing confusion over *what* is required to comply with the hopelessly vague "load indicator" alternative design requirement. Simple logic dictates that identical implementations of "load indicator" are either all compliant or none are compliant.

"What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely *what* that fact is." <u>Williams</u>, *supra*, at 306, emphasis in italics. Though it really belongs in the facial vagueness analysis, the District Court ruled regarding the *as-applied* vagueness challenge:

> "The words ['a device which plainly indicates'] are straightforward both individually and in context because they describe that the purpose of a load indicator in a handgun is to inform a user unequivocally that the gun is loaded." Dismissal Memorandum, 13-14 (JA345-JA346).

But conspicuously missing from the District Court's ruling is "precisely *what* that fact is" that accomplishes the "purpose of … inform[ing] a user unequivocally that the gun is loaded" *as applied to* Gen3/4 Glock pistols *from the words "device which*

*plainly indicates".*  A clear *purpose* without any compliance standard informs no one, including the AG, *what* is required to comply with the REGULATION.  <u>Williams</u>, *supra*.  This is starkly manifested by the *real world result* of the District Court's ruling:

Both DEALERS are Type 07 FFLs ("Title 1 manufacturer of firearms and ammunition, who may also act as dealer") and are Massachusetts licensed gunsmiths.  (JA108, JA110).  Each is licensed and capable of modifying firearms, including Gen3/4 Glock pistols, to make them compliant with the REGULATION's "load indicator" alternative design requirement.  Based on the District Court's ruling that the words "device which plainly indicates" are "straightforward both individually and in context" *as applied to Gen3/4 Glock pistols* (*all* pistols, really), **what should the DEALERS do to bring Gen3/4 Glock pistols into compliance?**

Should they make Gen3/4 Glock "load indicators"

—longer or shorter?

—thicker or thinner?

—brighter or duller?

—rougher or smoother?

—painted yellow, green, blue, fire engine red or some combination of colors?

*Where* should that ***what*** "device which plainly indicates" be located on the pistol?

—on the right, left, top or bottom?

—on the frontstrap or the backstrap?

—on the slide, on the frame or on the trigger?

—at the muzzle or at the breach?

Should that **what** "device which plainly indicates" be visual, tactile, audible or

some combination of these?  *How* will compliance be *measured*?  With a—

—ruler?

—protractor?

—depth gauge?

—photometer?

—weight scale?

—sound meter?

### What should the DEALERS do?

> "[I]f arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them.  A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory applications."

Hoffman Estates, *supra*, at 498 (1982) (citations omitted).  Echoing Hoffman, Justice

Stephen Breyer stated in his concurring opinion in Morales, *supra*, 527 U.S. at p. 71

(original italics)

> "The ordinance is unconstitutional, not because a policeman applied this discretion wisely or poorly in a particular case, but rather because the policeman enjoys too much discretion in *every* case.  And if every application of the ordinance represents an exercise of unlimited discretion, then the ordinance is invalid in all its applications."

Without any explanation by the AG or analysis by the District Court regarding how or why the wholly subjective words "device which plainly indicates" *as applied to Gen3/4 Glock pistols* renders them noncompliant gives the AG "unlimited discretion" in "*every* case". This is not an abstraction: "Opining that the Attorney General 'has not objected' to certain pistols is not the same as alleging that the Attorney General has either approved them or given any indication that they meet the load indicator standards." (JA193-JA194). "[T]he Commonwealth never said that the non-Glocks were okay…" Id., 13. "The fact that the Commonwealth didn't say anything about some load indicators … doesn't actually tell you anything in terms of discriminatory enforcement." (JA308-JA309).

But it does. The AG provided no facts regarding how she applied her "fair and considered judgment on the matter in question" (Auer v. Robbins, 519 U.S. 452, 462 (1997)) to the **what** about Gen3/4 Glock pistols' "load indicators" that renders them noncompliant *with the words "device which plainly indicates"*. She did, however, reveal the *extent* of her "fair and considered judgment on the matter" by pointing out what she *believes* are *differences* in the "[p]ictures of the Glock load indicator device shown in Complaint exhibits 42 and 43", "manual excerpts", and "appear[ance] from the exhibits…." (JA192, JA194). The AG explained in her Opposition at p. 14 (JA94)

> "*These manual excerpts* show guns with colored indicators that provide a shading contrast to demonstrate (1) the location of the load indicator and (2) that cartridges are in the firing chamber… On the other hand,

the Glock device [ ] is not colored and does not provide such a contrast. The extent of protrusion, the shape, the size, and the exact placement of the load indicator device also *appear from the exhibits* to differ between Glocks and those purportedly 'virtually identical' firearms."

At the oral hearing on the AG's motion to dismiss, the AG repeated how she determined that Gen3/4 Glock pistols' noncompliance with the "device which plainly indicates" standard:  they "sort of" appear different in the exhibits to the complaint:

- **Mr. Kaplan (Hearing Transcript** (JA309-JA310 ) (emphasis in italics)**:**

    Now, *looking at these exhibits*, one can see right away that—from the information that's there, that the non-Glock indicators, you know, they have color, they have shading, from the way they're described and shown, they sort of stick right out and announce, Hey, this gun is loaded.

    If one looks at what's listed for the Glock, there's no color, there's nothing that really jumps out that, if you looked at it in one position versus another, you would necessarily know that there's something to be worried about.

Gleaned from this "post hoc rationalization advanced by an agency seeking to defend past agency action against attack" [Auer, *supra*, p. 462] is that the REGULATION's compliance standard includes one or more unspecified aspects of shape, size, protrusion, color, shading, shading contrast, "sticking right out", "announcing 'Hey, this gun is loaded'", and "exact placement".  Returning to the question prompted by the District Court's ruling, ***what should the DEALERS do, based on the foregoing "standard", to bring Gen3/4 Glock pistols into compliance with the REGULATION?***

The District Court's faulty reasoning and context-less *non-application* of the words "device which plainly indicates" to Gen3/4 Glock pistols plunges this entire issue into a compliance morass. Worse, it licenses the AG with "unlimited discretion" to proclaim *any* "load indicator" implementation noncompliant.

///

///

///

///

///

///

///

///

///

# V. **VIOLATION OF THE SECOND AMENDMENT**

The CONSUMERS' Second Amendment claim is entirely derivative of the chilling effect on firearms transactions between the DEALERS and the CONSUMERS due to the unconstitutional vagueness in the REGULATION.

> "The unconstitutionally vague and ambiguous 'load indicator' [alternative] design requirement of the Handgun Sales Regulation and the Attorney General's capricious conclusion that 3rd and 4th generation Glock pistols lack an 'effective load indicator' device have prevented the DEALERS and CONSUMERS from engaging in purchase and sale transactions of firearms in common use (i.e. Glock pistols) thereby directly infringing on the CONSUMERS' core fundamental rights protected by the Second Amendment." (JA21).

To the extent the *absence* in the complaint of *any* additional bases for the CONSUMERS' Second Amendment claim did not convey that unconstitutional vagueness was the *only* basis for their claim—"[o]ur review on a motion to dismiss is confined to the face of the complaint" <u>Decotiis v. Whittemore</u>, 635 F. 3d 22, 33 (1st Cir. 2011)—their explicit declaration should have foreclosed that question: "[T]he Complaint does not challenge … the REGULATION's "load indicator" requirement (*independent of its unconstitutionally vague definition*) is unconstitutional *per se*." (JA217) (original emphasis).

The District Court understood that the CONSUMERS' Second Amendment claim was wholly derivative of, and contingent on, the DEALERS' Fourteenth Amendment due process claim.  It was clear in all of the plaintiffs' submissions to

the Court and explicitly acknowledged in oral argument at hearing on the AG's motion to dismiss:

- **Court (Hearing Transcript 16:8 – 10) (JA313):**

  "[P]lease clarify your position with respect to your Second Amendment claim. Is it wholly derivative of your vagueness challenge or not?"

- **Mr. Flig (Hearing Transcript 17:19 – 21) (JA314):**

  "[The CONSUMERS'] Second Amendment claim is in fact derivative of the Fourteenth Amendment due process claim by the dealer Plaintiffs."

### A. The District Court Issued Rulings on a Moot Cause of Action

"There is [ ] no case or controversy, and a suit becomes moot, when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." Chafin v. Chafin, *supra*, at 2023 (internal citations and quotation marks omitted). "The doctrine of mootness enforces the mandate 'that an actual controversy must be extant at *all stages of the review, not merely at the time the complaint is filed.*'" Mangual v. Rotger-Sabat, 317 F.3d 45, 60 (1st Cir.2003) (emphasis in italics). Moreover, "[m]ootness is a ground which should ordinarily be decided *in advance of any determination on the merits*." ACLUM v. Conf. of Catholic Bishops, 705 F. 3d 44, 52 (1st Cir. 2013) (emphasis in italics).

The District Court ignored these jurisdictional precepts and issued rulings on the CONSUMERS' moot Second Amendment claim. The District Court's Dismissal of the DEALERS' Fourteenth Amendment due process cause of action mooted the CONSUMERS' Second Amendment cause of action upon which it was *wholly*

predicated.  Nevertheless, the District Court issued three separate erroneous rulings on the mooted Second Amendment claim.


### B.  The District Court Violated the Canon of Constitutional Avoidance

Under the doctrine of constitutional avoidance federal courts are not to reach constitutional issues where alternative grounds for resolution are available.  <u>ACLUM v. Conf. of Catholic Bishops</u>, 705 F. 3d 44, 52 (1st Cir. 2013).

> "The desire to resolve more constitutional questions ought not lead to altering our jurisdictional rules.  That is the precise object that our legal tradition tells us we should resist.  Haste to resolve constitutional issues has never been thought advisable.  We instead have encouraged the Courts of Appeals to follow 'that older, wiser judicial counsel not to pass on questions of constitutionality ... unless such adjudication is unavoidable.'"

<u>Camreta v. Greene</u>, 564 U.S. __, 131 S. Ct. 2020, 2045 (2011) (internal citations and quotation marks omitted.)

Having mooted the CONSUMERS' Second Amendment claim by dismissing the DEALERS' due process claims, the District Court should have ended its analysis of what were purely constitutional Second Amendment issues.  It did not, and instead directly addressed the CONSUMERS' Second Amendment constitutional claims.  This violated of the canon of constitutional avoidance and was an abuse of discretion.


*///*

### C. The District Court Violated the Article III Canon Prohibiting Advisory Opinions

"Article III of the Constitution restricts the power of federal courts to 'Cases' and 'Controversies.'" <u>Chafin v. Chafin</u>, *supra*, 2023.  In so limiting the jurisdiction of the federal courts, Article III "ensures that courts do not render advisory opinions." <u>Overseas Military Sales Corp. v. Giralt-Armada</u>, 503 F.3d 12, 17 (1st Cir. 2007) (citing U.S. Const. art. III, § 2, cl. 1).  Federal courts may not "decide questions that cannot affect the rights of litigants in the case before them" or give "opinion[s] advising what the law would be upon a hypothetical state of facts."  <u>Lewis v. Continental Bank Corp.</u>, 494 U.S. 472, 477, (1990).  The distinction between a "conclusive decree" and an "advisory opinion" was reiterated in <u>Johansen v. U.S.</u>, 506 F.3d 65 (1st Cir. 2007) (string citations omitted, original emphasis):

> "The real value of the judicial pronouncement—what makes it a proper judicial resolution of a 'case or controversy' rather than an advisory opinion—is in the settling of some dispute *which affects the behavior of the defendant towards the plaintiff*."

None of the District Court's three Second-Amendment-related rulings are related to the *sole* Second Amendment-related issue in this lawsuit:  the *impact* of the unconstitutionally vague REGULATION's on the CONSUMERS' Second Amendment right.  In fact, the District Court ruled on issues specifically *disclaimed* by the plaintiffs.

*///*

## 1. The District Court's First Advisory Ruling

The District Court's first improper Second Amendment-related ruling was that the REGULATION meets constitutional muster because it is "among the categories of regulation that <u>Heller</u> suggested would be 'presumptively lawful' because it 'impos[es] conditions and qualifications on the commercial sale of arms.'" Dismissal Memorandum, 16 (JA348). Alas, the plaintiffs did not challenge the presumptive lawfulness of the REGULATION to regulate commercial sales of firearms. On the contrary, the plaintiffs explicitly demurred that the they do "not challenge … that the REGULATION's "load indicator" requirement (*independent of its unconstitutionally vague definition*) is unconstitutional *per se*." (JA217) (original emphasis).

Moreover, the plaintiffs disentangled the AG's motion to dismiss conflation of the "presumptive validity of regulations over the 'commercial sale of arms' [from] the presumptive validity of the *implementation* and *impact* of such regulations." <u>Id.</u> (JA217) "The *effect* of the REGULATION's unconstitutional vagueness on the DEALERS' commercial activity (sales of firearms) renders it impossible for the CONSUMERS to acquire [Gen3/4 Glock pistols]." (JA218). Whether the REGULATION is "'presumptively lawful' because it 'impos[es] conditions and qualifications on the commercial sale of arms'" [Dismissal Memorandum, 16 (JA348)] is not the subject of this lawsuit; this ruling by the District Court does not settle any "dispute *which affects the behavior of the defendant towards the plaintiff*."

### 2. The District Court's Second Advisory Ruling

The District Court's second improper Second Amendment-related ruling was that "[t]he regulation does not substantially burden the [Second Amendment] because the ban on two kinds of Glock pistols in no way prevents citizens from obtaining a wide array of firearms." Dismissal Memorandum, 16-17 (JA348-JA349). The District Court erred both factually and in its legal analysis in this ruling.

### a. Wrong and Nonexistent Facts

The District Court misapprehended the *plaintiffs'* alleged facts by adopting the *AG's misrepresentation* of the plaintiffs' alleged facts at p. 18 (JA198) of her motion to dismiss, in which she wrote "plaintiffs themselves explain that [] the regulation makes two models of handguns unmerchantable in Massachusetts…" Nowhere in any court submissions or at oral argument did the plaintiffs allege that "two kinds of Glock pistols" are at issue. On the contrary, plaintiffs clearly alleged that *all* Gen3/4 models of Glock pistols listed on the EOPSS Approved Firearms Roster—*53 (fifty-three)* models—are the subject of the Complaint. (JA31, JA55-JA70). Even if the District Court misunderstood the allegation, it is one of a quantum order of magnitude regarding the *impact* of the REGULATION's unconstitutional vagueness.

Far more importantly, the District Court's conclusion that the "regulation does not substantially burden the [Second Amendment]…" presupposes that the plaintiffs allege that it *does* burden the Second Amendment "*independent of its unconstitutionally vague definition [of 'load indicator']*." (JA217). Yet again, nowhere

in any court submissions or at oral argument did the plaintiffs claim that the REGULATION is unconstitutional *independent of its unconstitutional vague definition of "load indicator"*.

The District Court declared that the REGULATION's burden on the Second Amendment is not "substantial[ ]", because (based on the incorrect assumption that the "ban [is] on *two* kinds of Glock pistols" [Dismissal Memorandum, 16 (JA348)]) it leaves a "wide array of firearms" available to the CONSUMERS that the AG did not ban—*yet* (*see* discussion below). That assumption about the availability of a "wide array of firearms" is unfounded because no evidence has been admitted regarding what pistols are *not* available because of the unconstitutionally vague REGULATION. Nor did the District Court articulate what *is* included in the "wide array of firearms" that it *assumed* remains available. The foregoing is the result of the District Court's Dismissal of this lawsuit *prior* to developing the facts through discovery. This entire aspect of the District Court's ruling based on false assumptions and on never-presented evidence is just wrong.

### b. Flawed Analysis

Instead of focusing on the *vagueness* in the REGULATION and the challenged *conduct* it sanctions (arbitrary and capricious enforcement), the District Court's Second Amendment burden analysis—conspicuously lacking any citation to legal authorities for its approach—focuses on the *non-categorical* impact on the Second Amendment (purportedly leaving a "wide array of firearms" available) *despite* the

REGULATION. By the District Court's logic, the REGULATION is cured of its unconstitutionality and/or the AG's ban of Gen3/4 Glock pistols is cured of its arbitrariness and capriciousness so long as alternative pistols remain available to the CONSUMERS: "The regulation does not substantially burden the right to bear arms ... *because [it] in no way prevents citizens from obtaining a wide array of firearms*." Dismissal Memorandum, 16-17 (JA348-JA349). At what quantitative and/or qualitative point would the District Court rule that the reduction in the availability of firearms burdens Second Amendment rights?

This is the exact *opposite* of the Second Amendment burden analysis prescribed by the Supreme Court in the now famous <u>District of Columbia v. Heller</u>, 554 U.S. 570 (2008) case. There, the Supreme Court sharply criticized Justice Breyer's proposed

> "... judge-empowering 'interest-balancing inquiry' that 'asks whether the statute burdens a protected interest in a way or to an extent that is *out of proportion* to the statute's salutary effects upon other important governmental interests.'" <u>Id.</u>, 634 (emphasis in italics).

Whether it is a "salutary effect" or a non-categorical arbitrary and capricious ban on certain brands or models of firearms, the discrete variable <u>Heller</u> unambiguously excluded from the burden on constitutional rights analysis in general—and the Second Amendment in particular—is "*proportion[ality]*" between the offending law or regulation (and/or its enforcement) and its *result* or *impact*.[7]

---

[7] The Supreme Court expressly rejected this District Court's very reasoning that "[t]he regulation does not substantially burden the right to bear arms ... *because*

"We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding 'interest-balancing' approach. The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon. A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." Id., 634 – 635 (emphasis in the original).

The District Court also based its holding that the REGULATION "does not violate the Second Amendment... [because it] does not substantially burden the right to bear arms..." [Dismissal Memorandum, 16 (JA348)] on an inapplicable holding in a sister District Court. The District Court cited Kampfer v. Cuomo, 993 F. Supp. 2d 188, 196 (N.D.N.Y. 2014) which:

"... dismiss[ed] a constitutional challenge to a state statute 'because the provisions at issue attempt only to decrease in number *certain firearms deemed particularly dangerous by the legislature for the sake of public safety*, which interests are clearly advanced by the legislation, they do not infringe the Second Amendment right to keep and bear arms." Dismissal Memorandum, 17 (JA349) (emphasis in italics).

But the plaintiffs did not challenge the *purpose* of the REGULATION, whatever it is (or the AG purports it to be), or whether the REGULATION *advances* whatever the AG purports it to advance. The plaintiffs specifically disclaimed such allegations:

"[W]hether a regulatory 'load indicator' requirement is or is not closely or substantially related to an important or compelling government purpose ... is not

*[it] in no way prevents citizens from obtaining a wide array of firearms*." Dismissal Memorandum, 16-17 (JA348-JA349): "It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed." Heller, *supra*, 629.

the subject of the Complaint…"  (JA217).  The District Court thus conflated a non-issue in this lawsuit—whether the REGULATION (assuming it meets constitutional *clarity* standards) fulfills its purported purpose—with its incorrect ruling that the DEALERS' Fourteenth Amendment due process cause of action fails because "[t]he words ['device which plainly indicates'] are straightforward both individually and in context."

This Court explained in <u>Powell v. Tompkins</u>, Docket No. 13-1310 (1ˢᵗ Cir. 2015) at footnote 9 that "[s]everal circuits have adopted a two-part framework for evaluating a claim of Second Amendment infringement in the post-<u>Heller</u> era" and "thus far [we] have … hewed closely and cautiously to Heller's circumscribed analysis and holding."

> "Broadly speaking, some courts first consider whether the challenged law imposes a burden on conduct that falls within the scope of the Second Amendment's guarantee as historically understood, and if so, courts next determine the appropriate form of judicial scrutiny to apply (typically, some form of either intermediate scrutiny or strict scrutiny).  [Multiple citations omitted.]"  <u>Id.</u>

Applying the first prong of this framework to the facts of this case immediately exposes the incorrectness of the District Court's holding that the REGULATION "does not violate the Second Amendment… [because it] does not substantially burden the right to bear arms…" [Dismissal Memorandum, 16 (JA348)]:

> ***Does "the challenged [REGULATION] imposes a burden on conduct that falls within the scope of the Second Amendment's guarantee as historically understood?"***

The Second Amendment extends to firearms "in common use". <u>Heller</u>, at 627. Handguns are a "class of 'arms' that Americans overwhelmingly choose for the lawful purpose of self-defense." <u>Heller</u>, at 571. Gen3/4 Glock pistols are handguns "in common use." (JA30). The Second Amendment extends to Gen3/4 Glock pistols.

At the "core [of the Second Amendment is the] lawful purpose of self-defense…" <u>Heller</u>, at 630. Each of the CONSUMERS, duly licensed to acquire and possess firearms in Massachusetts, sought to acquire a Gen3/4 Glock pistol for "competitive shooting and self-defense purposes." (JA32-JA34). In seeking to purchase Gen3/4 Glock pistols (firearms "in common use") from the DEALERS, the CONSUMERS were exercising a right protected by the Second Amendment.

The REGULATION's unconstitutionally vague "load indicator" alternative design requirement and the Attorney General's capricious ban of Gen3/4 Glock pistols have prevented the DEALERS and CONSUMERS from engaging in purchase and sale transactions of firearms in common use. (JA21). The CONSUMERS have been prevented from exercising a right protected by the Second Amendment. The REGULATION burdens conduct that falls within the scope of the Second Amendment's guarantee.

Once burden on the Second Amendment has been established, "some form of either intermediate scrutiny or strict scrutiny" is applied to the challenged law or regulation. <u>Powell v. Tompkins</u>, *supra*.

The District Court erred that "[c]ivil regulations that govern commercial conduct are held to a lower standard than criminal statutes in the vagueness analysis." Dismissal Memorandum, 13 (JA345). The "civil regulation governing commercial conduct" at issue in this lawsuit directly affects and has actually burdened a *constitutional right*. Where a constitutional right is burdened some form of heightened scrutiny analysis is triggered, which necessitates a correspondingly higher level of "precision and guidance [in the challenged regulation] so that those enforcing the law do not act in an arbitrary or discriminatory way." FCC v. Fox Television Stations, Inc., 567 U.S. __, 132 S. Ct. 2307, 2317 (2012) (string citation omitted). Heller foreclosed the application of any reduced level of scrutiny to analyze burdens on the fundamental right to keep and bear arms.[8]

### 3. The District Court's Third Advisory Ruling

The District Court's third and final improper Second Amendment-related ruling was "[e]ven if the regulation did impinge on Second Amendment rights" it survives "under any standard of scrutiny" because

> "[t]he defendant has demonstrated a strong showing of a 'substantial relationship' between the restrictions imposed by the regulation and the important government objective of protecting the safety of its citizens." Dismissal Memorandum, 17 (JA349).

---

[8] The Supreme Court made clear that reduced levels of scrutiny, such as the rational basis test, may ***not*** be used to evaluate burdens on constitutionally enumerated rights. Heller, *supra*, 628 n.27.

The District Court did not make *any* findings or cite *any* facts which constitute the AG's "strong showing" of a 'substantial relationship' between "the restrictions imposed by the regulation and the important government objective of protecting the safety of its citizens".  Nor did the District Court cite any argument by either the plaintiffs or the AG for or against the subject of this ruling.  The District Court did not cite any authorities to support this ruling.  Worse yet, this ruling defies the Supreme Court's ruling in <u>Heller</u> in which it bluntly said "***Obviously*** ["rational basis" scrutiny] could ***not*** be used to evaluate the extent to which a legislature may regulate a specific, enumerated right ... [including] the right to keep and bear arms." <u>Id.</u>, 628 n.27.  Here, the regulation was not by a democratically elected legislature but by an executive branch agency.  This ruling by the District Court was made in a complete vacuum of facts and law.

///

///

///

///

# CONCLUSION

A danger of allowing vague laws to remain in effect is that "[u]ncertain meanings inevitably lead citizens to steer far wider of the unlawful zone … than if the boundaries of the forbidden areas were clearly marked."  Grayned v. City of Rockford, 408 U.S. 104, 108 fn. (1972) and quotation marks omitted.

That is precisely the situation here.  The CONSUMERS were unable to obtain Gen3/4 Glock pistols, firearms "in common use", because the unconstitutional vagueness in the REGULATION caused the DEALERS to avoid selling these pistols.  The DEALERS feared an enforcement action should the AG disagree with their reasoned opinion that *based on the text* of the REGULATION that Gen3/4 Glock pistols are in compliance.  The AG's vacuous responses to the plaintiffs' letters seeking clarification only plunged the issue of compliance further down into the vagueness abyss, as she proclaimed—without explanation—Gen3/4 Glock pistols' "load indicators" noncompliant while tacitly approving the virtually identical "load indicator" implementations of several other pistol makes and models.  Vagueness in the REGULATION makes such capricious enforcement possible.

> "Even when speech is not at issue, the void for vagueness doctrine addresses at least two connected but discrete due process concerns: first, that *regulated parties should know what is required of them so they may act accordingly*;  second, precision and guidance are necessary *so that those enforcing the law do not act in an arbitrary or discriminatory way*."  FCC v. Fox Television Stations, 567 U.S. __, 132 S.Ct. 2307, 2317 (2012) (emphasis in italics).

For the foregoing reasons, plaintiffs respectfully request that the judgment of the District Court be reversed and the case remanded with instructions to enter a judgment that the REGULATION's definition of "load indicator" is facially void for vagueness and as applied to Gen3/4 Glock pistols, and that all of the District Court's Second Amendment related rulings be reversed. Alternatively, all of the District Court's rulings should be reversed and the case remanded for further proceedings consistent with the findings of this Court.

///

///

///

///

///

///

///

Respectfully submitted,

Dated: 14 October 2015.

**ROBERT DRAPER; ARIEL WEISBERG; DONNA MAJOR; ERIC NOTKIN; ROBERT BOUDRIE; BRENT CARLTON; CONCORD ARMORY, LLC; PRECISION POINT FIREARMS, LLC, and SECOND AMENDMENT FOUNDATION, INC.**

By and through their attorney of record

**/s/ Alexander A. Flig**

Alexander A. Flig, Esq
1st Circuit No. 1169830
BBO No. 669132
490 Chapman Street, Suite 201
Canton, Massachusetts 02021-2039
Telephone: (781) 352-7260
Facsimile: (781) 583-5080
E-Mail: alex@fliglaw.com

# CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

## Type-Volume Limitation, Typeface Requirements
## and Type Style Requirements

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

| | |
|---|---|
| **X** | This brief contains 13,691 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). |
| | This brief uses a monospaced typeface and contains lines 800 of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). |

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

| | |
|---|---|
| **X** | This brief has been prepared in a proportionally spaced typeface using Cambria font, size 13 (the equivalent of Times New Roman, size 14, but with better screen readability). |
| | This brief has been prepared in a monospaced typeface using [state name and version of word processing program] with [state number of characters per inch and name of type style]. |

Dated:  14 October 2015

**/s/ Alexander A. Flig**
_____
Attorney for Plaintiffs – Appellants

# CERTIFICATE OF SERVICE

    I hereby certify that on this date I electronically filed the foregoing **ASSENTED-TO MOTION BY APPELLANTS TO EXTEND TIME FOR FILING BRIEF; SUPPORTING AFFIRMATION** with the Clerk of the Court using the CM/ECF system which will send notification of this filing to the following registered participants in this matter:

| Appellee's Counsel | Amicus' Counsel |
|---|---|
| **William Porter, Esq.** <br> **Attorney General of Massachusetts** <br> 1 Ashburton Place <br> Boston, Massachusetts 02108 <br> bill.porter@state.ma.us | **L. Scott Harshbarger, Esq.** <br> **Proskauer Rose, LLP** <br> 1 International Place, 22nd Floor <br> Boston, Massachusetts 02110-0000 <br> sharshbarger@proskauer.com |
| **Julia Eleanor Kobick** <br> **Attorney General of Massachusetts** <br> 1 International Place, 22nd Floor <br> Boston, Massachusetts 02110-0000 <br> julia.kobick@state.ma.us | **John E. Roberts, Esq.** <br> **Proskauer Rose, LLP** <br> 1 International Place, 22nd Floor <br> Boston, Massachusetts 02110-0000 <br> jroberts@proskauer.com |

Dated: 14 October 2015

**Counsel for Plaintiffs - Appellants**

**/s/ Alexander A. Flig**

Alexander A. Flig, Esq
1st Circuit No. 1169830
BBO No. 669132
490 Chapman Street, Suite 201
Canton, Massachusetts 02021-2039
Telephone:   (781) 352-7260
Facsimile:   (781) 583-5080
E-Mail:   alex@fliglaw.com

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

## Case No. 15-1429

Robert Draper, Ariel Weisberg, Donna Major, Eric Notkin,
Robert Boudrie and Brent Carlton (collectively the
"CONSUMERS");  Concord Armory, LLC and Precision Point
Armory, LLC (collectively the "DEALERS"), and Second
Amendment Foundation, Inc.

*Plaintiffs – Appellants*

v.

MAURA HEALEY, in her capacity as
The Attorney General of the Commonwealth of Massachusetts

*Defendant – Appellee*

ON APPEAL FROM A JUDGMENT OF THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS
Civil Action No. 1:14-CV-12471-NMG

## ADDENDUM TO BRIEF OF PLAINTIFFS-APPELLANTS

**Alexander Aron Flig**
Law Office of Alexander A. Flig
1st Circuit No. 1169830
MA BBO No. 669132
490 Chapman Street,Suite 201
Canton, Massachusetts 02021
(781) 352-7260

# TABLE OF CONTENTS

| Tab | Description | Page(s) |
|---|---|---|
| **1** | <u>**Johnson v. U.S.**</u><br>No. 13-7120, Slip Opinion (S.Ct., 26 JUN 2015) | 1 – 59 |
| **2** | <u>**City of Los Angeles v. Patel**</u><br>No. 13–1175 Slip Opinion (S.Ct., 22 JUN 2015) | 60 – 101 |

# Tab 1

Johnson v. U.S.

No. 13-7120, Slip Opinion (S.Ct., 26 JUN 2015)

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## JOHNSON *v.* UNITED STATES

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

No. 13–7120.   Argued November 5, 2014—Reargued April 20, 2015— Decided June 26, 2015

After petitioner Johnson pleaded guilty to being a felon in possession of a firearm, see 18 U. S. C. §922(g), the Government sought an enhanced sentence under the Armed Career Criminal Act, which imposes an increased prison term upon a defendant with three prior convictions for a "violent felony," §924(e)(1), a term defined by §924(e)(2)(B)'s residual clause to include any felony that "involves conduct that presents a serious potential risk of physical injury to another." The Government argued that Johnson's prior conviction for unlawful possession of a short-barreled shotgun met this definition, making the third conviction of a violent felony. This Court had previously pronounced upon the meaning of the residual clause in *James* v. *United States*, 550 U. S. 192; *Begay* v. *United States*, 553 U. S. 137; *Chambers* v. *United States*, 555 U. S. 122; and *Sykes* v. *United States*, 564 U. S. 1, and had rejected suggestions by dissenting Justices in both *James* and *Sykes* that the clause is void for vagueness. Here, the District Court held that the residual clause does cover unlawful possession of a short-barreled shotgun, and imposed a 15-year sentence under ACCA. The Eighth Circuit affirmed.

*Held*: Imposing an increased sentence under ACCA's residual clause violates due process. Pp. 3–15.

   (a) The Government violates the Due Process Clause when it takes away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement. *Kolender* v. *Lawson*, 461 U. S. 352, 357–358. Courts must use the "categorical approach" when deciding whether an offense is a violent felony, looking "only to the fact that the defendant has been convicted

of crimes falling within certain categories, and not to the facts underlying the prior convictions." *Taylor* v. *United States*, 495 U. S. 575, 600. Deciding whether the residual clause covers a crime thus requires a court to picture the kind of conduct that the crime involves in "the ordinary case," and to judge whether that abstraction presents a serious potential risk of physical injury. *James, supra,* at 208. Pp. 3–5.

(b) Two features of the residual clause conspire to make it unconstitutionally vague. By tying the judicial assessment of risk to a judicially imagined "ordinary case" of a crime rather than to real-world facts or statutory elements, the clause leaves grave uncertainty about how to estimate the risk posed by a crime. See *James, supra,* at 211. At the same time, the residual clause leaves uncertainty about how much risk it takes for a crime to qualify as a violent felony. Taken together, these uncertainties produce more unpredictability and arbitrariness than the Due Process Clause tolerates. This Court's repeated failure to craft a principled standard out of the residual clause and the lower courts' persistent inability to apply the clause in a consistent way confirm its hopeless indeterminacy. Pp. 5–10.

(c) This Court's cases squarely contradict the theory that the residual clause is constitutional merely because some underlying crimes may clearly pose a serious potential risk of physical injury to another. See, *e.g., United States* v. *L. Cohen Grocery Co.,* 255 U. S. 81, 89. Holding the residual clause void for vagueness does not put other criminal laws that use terms such as "substantial risk" in doubt, because those laws generally require gauging the riskiness of an individual's conduct on a particular occasion, not the riskiness of an idealized ordinary case of the crime. Pp. 10–13.

(d) The doctrine of *stare decisis* does not require continued adherence to *James* and *Sykes.* Experience leaves no doubt about the unavoidable uncertainty and arbitrariness of adjudication under the residual clause. *James* and *Sykes* opined about vagueness without full briefing or argument. And continued adherence to those decisions would undermine, rather than promote, the goals of evenhandedness, predictability, and consistency served by *stare decisis.* Pp. 13–15.

526 Fed. Appx. 708, reversed and remanded.

S<small>CALIA</small>, J., delivered the opinion of the Court, in which R<small>OBERTS</small>, C. J., and G<small>INSBURG</small>, B<small>REYER</small>, S<small>OTOMAYOR</small>, and K<small>AGAN</small>, JJ., joined. K<small>ENNEDY</small>, J., and T<small>HOMAS</small>, J., filed opinions concurring in the judgment. A<small>LITO</small>, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 13–7120

_____

## SAMUEL JAMES JOHNSON, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

[June 26, 2015]

JUSTICE SCALIA delivered the opinion of the Court.

Under the Armed Career Criminal Act of 1984, a defendant convicted of being a felon in possession of a firearm faces more severe punishment if he has three or more previous convictions for a "violent felony," a term defined to include any felony that "involves conduct that presents a serious potential risk of physical injury to another." 18 U. S. C. §924(e)(2)(B). We must decide whether this part of the definition of a violent felony survives the Constitution's prohibition of vague criminal laws.

## I

Federal law forbids certain people—such as convicted felons, persons committed to mental institutions, and drug users—to ship, possess, and receive firearms. §922(g). In general, the law punishes violation of this ban by up to 10 years' imprisonment. §924(a)(2). But if the violator has three or more earlier convictions for a "serious drug offense" or a "violent felony," the Armed Career Criminal Act increases his prison term to a minimum of 15 years and a maximum of life. §924(e)(1); *Johnson* v. *United States*, 559 U. S. 133, 136 (2010). The Act defines "violent

felony" as follows:

> "any crime punishable by imprisonment for a term ex-
> ceeding one year . . . that—
>
>   "(i) has as an element the use, attempted use, or
> threatened use of physical force against the person of
> another; or
>
>   "(ii) is burglary, arson, or extortion, involves use of
> explosives, *or otherwise involves conduct that presents
> a serious potential risk of physical injury to another*."
> §924(e)(2)(B) (emphasis added).

The closing words of this definition, italicized above, have
come to be known as the Act's residual clause. Since 2007,
this Court has decided four cases attempting to discern its
meaning. We have held that the residual clause (1) covers
Florida's offense of attempted burglary, *James* v. *United
States*, 550 U. S. 192 (2007); (2) does *not* cover New Mexi-
co's offense of driving under the influence, *Begay* v. *United
States*, 553 U. S. 137 (2008); (3) does *not* cover Illinois'
offense of failure to report to a penal institution, *Cham-
bers* v. *United States*, 555 U. S. 122 (2009); and (4) does
cover Indiana's offense of vehicular flight from a law-
enforcement officer, *Sykes* v. *United States*, 564 U. S. 1
(2011). In both *James* and *Sykes*, the Court rejected sug-
gestions by dissenting Justices that the residual clause
violates the Constitution's prohibition of vague criminal
laws. Compare *James*, 550 U. S., at 210, n. 6, with *id.,* at
230 (SCALIA, J., dissenting); compare *Sykes*, 564 U. S., at
___ (slip op., at 13–14), with *id.,* at ___ (SCALIA, J., dissent-
ing) (slip op., at 6–8).

   This case involves the application of the residual clause
to another crime, Minnesota's offense of unlawful posses-
sion of a short-barreled shotgun. Petitioner Samuel John-
son is a felon with a long criminal record. In 2010, the
Federal Bureau of Investigation began to monitor him
because of his involvement in a white-supremacist organi-

zation that the Bureau suspected was planning to commit acts of terrorism. During the investigation, Johnson disclosed to undercover agents that he had manufactured explosives and that he planned to attack "the Mexican consulate" in Minnesota, "progressive bookstores," and "'liberals.'" Revised Presentence Investigation in No. 0:12CR00104–001 (D. Minn.), p. 15, ¶16. Johnson showed the agents his AK–47 rifle, several semiautomatic firearms, and over 1,000 rounds of ammunition.

After his eventual arrest, Johnson pleaded guilty to being a felon in possession of a firearm in violation of §922(g). The Government requested an enhanced sentence under the Armed Career Criminal Act. It argued that three of Johnson's previous offenses—including unlawful possession of a short-barreled shotgun, see Minn. Stat. §609.67 (2006)—qualified as violent felonies. The District Court agreed and sentenced Johnson to a 15-year prison term under the Act. The Court of Appeals affirmed. 526 Fed. Appx. 708 (CA8 2013) (*per curiam*). We granted certiorari to decide whether Minnesota's offense of unlawful possession of a short-barreled shotgun ranks as a violent felony under the residual clause. 572 U. S. ___ (2014). We later asked the parties to present reargument addressing the compatibility of the residual clause with the Constitution's prohibition of vague criminal laws. 574 U. S. ___ (2015).

## II

The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." Our cases establish that the Government violates this guarantee by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement. *Kolender* v. *Lawson*, 461 U. S. 352, 357–358

(1983). The prohibition of vagueness in criminal statutes "is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law," and a statute that flouts it "violates the first essential of due process." *Connally* v. *General Constr. Co.*, 269 U. S. 385, 391 (1926). These principles apply not only to statutes defining elements of crimes, but also to statutes fixing sentences. *United States* v. *Batchelder*, 442 U. S. 114, 123 (1979).

In *Taylor* v. *United States*, 495 U. S. 575, 600 (1990), this Court held that the Armed Career Criminal Act requires courts to use a framework known as the categorical approach when deciding whether an offense "is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another." Under the categorical approach, a court assesses whether a crime qualifies as a violent felony "in terms of how the law defines the offense and not in terms of how an individual offender might have committed it on a particular occasion." *Begay*, *supra*, at 141.

Deciding whether the residual clause covers a crime thus requires a court to picture the kind of conduct that the crime involves in "the ordinary case," and to judge whether that abstraction presents a serious potential risk of physical injury. *James, supra,* at 208. The court's task goes beyond deciding whether creation of risk is an element of the crime. That is so because, unlike the part of the definition of a violent felony that asks whether the crime "has *as an element* the use . . . of physical force," the residual clause asks whether the crime "*involves conduct*" that presents too much risk of physical injury. What is more, the inclusion of burglary and extortion among the enumerated offenses preceding the residual clause confirms that the court's task also goes beyond evaluating the chances that the physical acts that make up the crime will

injure someone. The act of making an extortionate demand or breaking and entering into someone's home does not, in and of itself, normally cause physical injury. Rather, risk of injury arises because the extortionist might engage in violence *after* making his demand or because the burglar might confront a resident in the home *after* breaking and entering.

We are convinced that the indeterminacy of the wide-ranging inquiry required by the residual clause both denies fair notice to defendants and invites arbitrary enforcement by judges. Increasing a defendant's sentence under the clause denies due process of law.

### A

Two features of the residual clause conspire to make it unconstitutionally vague. In the first place, the residual clause leaves grave uncertainty about how to estimate the risk posed by a crime. It ties the judicial assessment of risk to a judicially imagined "ordinary case" of a crime, not to real-world facts or statutory elements. How does one go about deciding what kind of conduct the "ordinary case" of a crime involves? "A statistical analysis of the state reporter? A survey? Expert evidence? Google? Gut instinct?" *United States* v. *Mayer*, 560 F. 3d 948, 952 (CA9 2009) (Kozinski, C. J., dissenting from denial of rehearing en banc). To take an example, does the ordinary instance of witness tampering involve offering a witness a bribe? Or threatening a witness with violence? Critically, picturing the criminal's behavior is not enough; as we have already discussed, assessing "potential risk" seemingly requires the judge to imagine how the idealized ordinary case of the crime subsequently plays out. *James* illustrates how speculative (and how detached from statutory elements) this enterprise can become. Explaining why attempted burglary poses a serious potential risk of physical injury, the Court said: "An armed would-be burglar

may be spotted by a police officer, a private security guard, or a participant in a neighborhood watch program. Or a homeowner . . . may give chase, and a violent encounter may ensue." 550 U. S., at 211. The dissent, by contrast, asserted that any confrontation that occurs during an attempted burglary "is likely to consist of nothing more than the occupant's yelling 'Who's there?' from his window, and the burglar's running away." *Id.*, at 226 (opinion of SCALIA, J.). The residual clause offers no reliable way to choose between these competing accounts of what "ordinary" attempted burglary involves.

At the same time, the residual clause leaves uncertainty about how much risk it takes for a crime to qualify as a violent felony. It is one thing to apply an imprecise "serious potential risk" standard to real-world facts; it is quite another to apply it to a judge-imagined abstraction. By asking whether the crime "*otherwise* involves conduct that presents a serious potential risk," moreover, the residual clause forces courts to interpret "serious potential risk" in light of the four enumerated crimes—burglary, arson, extortion, and crimes involving the use of explosives. These offenses are "far from clear in respect to the degree of risk each poses." *Begay*, 553 U. S., at 143. Does the ordinary burglar invade an occupied home by night or an unoccupied home by day? Does the typical extortionist threaten his victim in person with the use of force, or does he threaten his victim by mail with the revelation of embarrassing personal information? By combining indeterminacy about how to measure the risk posed by a crime with indeterminacy about how much risk it takes for the crime to qualify as a violent felony, the residual clause produces more unpredictability and arbitrariness than the Due Process Clause tolerates.

This Court has acknowledged that the failure of "persistent efforts . . . to establish a standard" can provide evidence of vagueness. *United States* v. *L. Cohen Grocery*

*Co.,* 255 U. S. 81, 91 (1921). Here, this Court's repeated attempts and repeated failures to craft a principled and objective standard out of the residual clause confirm its hopeless indeterminacy. Three of the Court's previous four decisions about the clause concentrated on the level of risk posed by the crime in question, though in each case we found it necessary to resort to a different ad hoc test to guide our inquiry. In *James*, we asked whether "the risk posed by attempted burglary is comparable to that posed by its closest analog among the enumerated offenses," namely completed burglary; we concluded that it was. 550 U. S., at 203. That rule takes care of attempted burglary, but offers no help at all with respect to the vast majority of offenses, which have no apparent analog among the enumerated crimes. "Is, for example, driving under the influence of alcohol more analogous to burglary, arson, extortion, or a crime involving use of explosives?" *Id.,* at 215 (SCALIA, J., dissenting).

*Chambers,* our next case to focus on risk, relied principally on a statistical report prepared by the Sentencing Commission to conclude that an offender who fails to report to prison is not "significantly more likely than others to attack, or physically to resist, an apprehender, thereby producing a 'serious potential risk of physical injury.'" 555 U. S., at 128–129. So much for failure to report to prison, but what about the tens of thousands of federal and state crimes for which no comparable reports exist? And even those studies that are available might suffer from methodological flaws, be skewed toward rarer forms of the crime, or paint widely divergent pictures of the riskiness of the conduct that the crime involves. See *Sykes,* 564 U. S., at \_\_\_–\_\_\_ (SCALIA, J., dissenting) (slip op., at 4–6); *id.,* at \_\_\_, n. 4 (KAGAN, J., dissenting) (slip op., at 6, n. 4).

Our most recent case, *Sykes,* also relied on statistics, though only to "confirm the commonsense conclusion that

Indiana's vehicular flight crime is a violent felony." *Id.*, at ___ (majority opinion) (slip op., at 8). But common sense is a much less useful criterion than it sounds—as *Sykes* itself illustrates. The Indiana statute involved in that case covered everything from provoking a high-speed car chase to merely failing to stop immediately after seeing a police officer's signal. See *id.,* at ___ (KAGAN, J., dissenting) (slip op., at 3–4). How does common sense help a federal court discern where the "ordinary case" of vehicular flight in Indiana lies along this spectrum? Common sense has not even produced a consistent conception of the degree of risk posed by each of the four enumerated crimes; there is no reason to expect it to fare any better with respect to thousands of unenumerated crimes. All in all, *James*, *Chambers*, and *Sykes* failed to establish any generally applicable test that prevents the risk comparison required by the residual clause from devolving into guesswork and intuition.

The remaining case, *Begay*, which preceded *Chambers* and *Sykes*, took an entirely different approach. The Court held that in order to qualify as a violent felony under the residual clause, a crime must resemble the enumerated offenses "in kind as well as in degree of risk posed." 553 U. S., at 143. The Court deemed drunk driving insufficiently similar to the listed crimes, because it typically does not involve "purposeful, violent, and aggressive conduct." *Id.,* at 144–145 (internal quotation marks omitted). Alas, *Begay* did not succeed in bringing clarity to the meaning of the residual clause. It did not (and could not) eliminate the need to imagine the kind of conduct typically involved in a crime. In addition, the enumerated crimes are not much more similar to one another in kind than in degree of risk posed, and the concept of "aggressive conduct" is far from clear. *Sykes* criticized the "purposeful, violent, and aggressive" test as an "addition to the statutory text," explained that "levels of risk" would normally be

dispositive, and confined *Begay* to "strict liability, negligence, and recklessness crimes." 564 U. S., at ___–___ (slip op., at 10–11).

The present case, our fifth about the meaning of the residual clause, opens a new front of uncertainty. When deciding whether unlawful possession of a short-barreled shotgun is a violent felony, do we confine our attention to the risk that the shotgun will go off by accident while in someone's possession? Or do we also consider the possibility that the person possessing the shotgun will later use it to commit a crime? The inclusion of burglary and extortion among the enumerated offenses suggests that a crime may qualify under the residual clause even if the physical injury is remote from the criminal act. But how remote is too remote? Once again, the residual clause yields no answers.

This Court is not the only one that has had trouble making sense of the residual clause. The clause has "created numerous splits among the lower federal courts," where it has proved "nearly impossible to apply consistently." *Chambers*, 555 U. S., at 133 (ALITO, J., concurring in judgment). The most telling feature of the lower courts' decisions is not division about whether the residual clause covers this or that crime (even clear laws produce close cases); it is, rather, pervasive disagreement about the nature of the inquiry one is supposed to conduct and the kinds of factors one is supposed to consider. Some judges have concluded that deciding whether conspiracy is a violent felony requires evaluating only the dangers posed by the "simple act of agreeing [to commit a crime]," *United States* v. *Whitson*, 597 F. 3d 1218, 1222 (CA11 2010) (*per curiam*); others have also considered the probability that the agreement will be carried out, *United States* v. *White*, 571 F. 3d 365, 370–371 (CA4 2009). Some judges have assumed that the battery of a police officer (defined to include the slightest touching) could "explode into violence

and result in physical injury," *United States* v. *Williams*, 559 F. 3d 1143, 1149 (CA10 2009); others have felt that it "do[es] a great disservice to law enforcement officers" to assume that they would "explod[e] into violence" rather than "rely on their training and experience to determine the best method of responding," *United States* v. *Carthorne*, 726 F. 3d 503, 514 (CA4 2013). Some judges considering whether statutory rape qualifies as a violent felony have concentrated on cases involving a perpetrator much older than the victim, *United States* v. *Daye*, 571 F. 3d 225, 230–231 (CA2 2009); others have tried to account for the possibility that "the perpetrator and the victim [might be] close in age," *United States* v. *McDonald*, 592 F. 3d 808, 815 (CA7 2010). Disagreements like these go well beyond disputes over matters of degree.

It has been said that the life of the law is experience. Nine years' experience trying to derive meaning from the residual clause convinces us that we have embarked upon a failed enterprise. Each of the uncertainties in the residual clause may be tolerable in isolation, but "their sum makes a task for us which at best could be only guesswork." *United States* v. *Evans*, 333 U. S. 483, 495 (1948). Invoking so shapeless a provision to condemn someone to prison for 15 years to life does not comport with the Constitution's guarantee of due process.

### B

The Government and the dissent claim that there will be straightforward cases under the residual clause, because some crimes clearly pose a serious potential risk of physical injury to another. See *post,* at 14–15 (opinion of ALITO, J.). True enough, though we think many of the cases the Government and the dissent deem easy turn out not to be so easy after all. Consider just one of the Government's examples, Connecticut's offense of "rioting at a correctional institution." See *United States* v. *Johnson*,

Opinion of the Court

616 F. 3d 85 (CA2 2010). That certainly sounds like a violent felony—until one realizes that Connecticut defines this offense to include taking part in "any disorder, disturbance, strike, riot or other organized disobedience to the rules and regulations" of the prison. Conn. Gen. Stat. §53a–179b(a) (2012). Who is to say which the ordinary "disorder" most closely resembles—a full-fledged prison riot, a food-fight in the prison cafeteria, or a "passive and nonviolent [act] such as disregarding an order to move," *Johnson*, 616 F. 3d, at 95 (Parker, J., dissenting)?

In all events, although statements in some of our opinions could be read to suggest otherwise, our *holdings* squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp. For instance, we have deemed a law prohibiting grocers from charging an "unjust or unreasonable rate" void for vagueness—even though charging someone a thousand dollars for a pound of sugar would surely be unjust and unreasonable. *L. Cohen Grocery Co.*, 255 U. S., at 89. We have similarly deemed void for vagueness a law prohibiting people on sidewalks from "conduct[ing] themselves in a manner annoying to persons passing by"—even though spitting in someone's face would surely be annoying. *Coates* v. *Cincinnati*, 402 U. S. 611 (1971). These decisions refute any suggestion that the existence of *some* obviously risky crimes establishes the residual clause's constitutionality.

Resisting the force of these decisions, the dissent insists that "a statute is void for vagueness only if it is vague in all its applications." *Post,* at 1. It claims that the prohibition of unjust or unreasonable rates in *L. Cohen Grocery* was "vague in all applications," even though one can easily envision rates so high that they are unreasonable by any measure. *Post,* at 16. It seems to us that the dissent's supposed requirement of vagueness in all applications is not a requirement at all, but a tautology: If we hold a

statute to be vague, it is vague in all its applications (and never mind the reality). If the existence of some clearly unreasonable rates would not save the law in *L. Cohen Grocery*, why should the existence of some clearly risky crimes save the residual clause?

The Government and the dissent next point out that dozens of federal and state criminal laws use terms like "substantial risk," "grave risk," and "unreasonable risk," suggesting that to hold the residual clause unconstitutional is to place these provisions in constitutional doubt. See *post,* at 7–8. Not at all. Almost none of the cited laws links a phrase such as "substantial risk" to a confusing list of examples. "The phrase 'shades of red,' standing alone, does not generate confusion or unpredictability; but the phrase 'fire-engine red, light pink, maroon, *navy blue,* or colors that otherwise involve shades of red' assuredly does so." *James,* 550 U. S., at 230, n. 7 (SCALIA, J., dissenting). More importantly, almost all of the cited laws require gauging the riskiness of conduct in which an individual defendant engages *on a particular occasion.* As a general matter, we do not doubt the constitutionality of laws that call for the application of a qualitative standard such as "substantial risk" to real-world conduct; "the law is full of instances where a man's fate depends on his estimating rightly . . . some matter of degree," *Nash* v. *United States*, 229 U. S. 373, 377 (1913). The residual clause, however, requires application of the "serious potential risk" standard to an idealized ordinary case of the crime. Because "the elements necessary to determine the imaginary ideal are uncertain both in nature and degree of effect," this abstract inquiry offers significantly less predictability than one "[t]hat deals with the actual, not with an imaginary condition other than the facts." *International Harvester Co. of America* v. *Kentucky*, 234 U. S. 216, 223 (1914).

Finally, the dissent urges us to save the residual clause

from vagueness by interpreting it to refer to the risk posed by the particular conduct in which the defendant engaged, not the risk posed by the ordinary case of the defendant's crime. See *post,* at 9–13. In other words, the dissent suggests that we jettison for the residual clause (though not for the enumerated crimes) the categorical approach adopted in *Taylor,* see 495 U. S., at 599–602, and reaffirmed in each of our four residual-clause cases, see *James,* 550 U. S., at 202; *Begay,* 553 U. S., at 141; *Chambers,* 555 U. S., at 125; *Sykes,* 564 U. S., ___ (slip op., at 5). We decline the dissent's invitation. In the first place, the Government has not asked us to abandon the categorical approach in residual-clause cases. In addition, *Taylor* had good reasons to adopt the categorical approach, reasons that apply no less to the residual clause than to the enumerated crimes. *Taylor* explained that the relevant part of the Armed Career Criminal Act "refers to 'a person who . . . has three previous convictions' for—not a person who has committed—three previous violent felonies or drug offenses." 495 U. S., at 600. This emphasis on convictions indicates that "Congress intended the sentencing court to look only to the fact that the defendant had been convicted of crimes falling within certain categories, and not to the facts underlying the prior convictions." *Ibid. Taylor* also pointed out the utter impracticability of requiring a sentencing court to reconstruct, long after the original conviction, the conduct underlying that conviction. For example, if the original conviction rested on a guilty plea, no record of the underlying facts may be available. "[T]he only plausible interpretation" of the law, therefore, requires use of the categorical approach. *Id.,* at 602.

### C

That brings us to *stare decisis.* This is the first case in which the Court has received briefing and heard argument from the parties about whether the residual clause is void

for vagueness. In *James*, however, the Court stated in a footnote that it was "not persuaded by [the principal dissent's] suggestion . . . that the residual provision is unconstitutionally vague." 550 U. S., at 210, n. 6. In *Sykes*, the Court again rejected a dissenting opinion's claim of vagueness. 564 U. S., at ___–___ (slip op., at 13–14).

The doctrine of *stare decisis* allows us to revisit an earlier decision where experience with its application reveals that it is unworkable. *Payne* v. *Tennessee*, 501 U. S. 808, 827 (1991). Experience is all the more instructive when the decision in question rejected a claim of unconstitutional vagueness. Unlike other judicial mistakes that need correction, the error of having rejected a vagueness challenge manifests itself precisely in subsequent judicial decisions: the inability of later opinions to impart the predictability that the earlier opinion forecast. Here, the experience of the federal courts leaves no doubt about the unavoidable uncertainty and arbitrariness of adjudication under the residual clause. Even after *Sykes* tried to clarify the residual clause's meaning, the provision remains a "judicial morass that defies systemic solution," "a black hole of confusion and uncertainty" that frustrates any effort to impart "some sense of order and direction." *United States* v. *Vann*, 660 F. 3d 771, 787 (CA4 2011) (Agee, J., concurring).

This Court's cases make plain that even decisions rendered after full adversarial presentation may have to yield to the lessons of subsequent experience. See, *e.g., United States* v. *Dixon*, 509 U. S. 688, 711 (1993); *Payne*, 501 U. S., at 828–830 (1991). But *James* and *Sykes* opined about vagueness without full briefing or argument on that issue—a circumstance that leaves us "less constrained to follow precedent," *Hohn* v. *United States*, 524 U. S. 236, 251 (1998). The brief discussions of vagueness in *James* and *Sykes* homed in on the imprecision of the phrase "serious potential risk"; neither opinion evaluated the

uncertainty introduced by the need to evaluate the riski-
ness of an abstract ordinary case of a crime.  550 U. S., at
210, n. 6; 564 U. S., at ___ (slip op., at 13–14).  And depart-
ing from those decisions does not raise any concerns about
upsetting private reliance interests.

Although it is a vital rule of judicial self-government,
*stare decisis* does not matter for its own sake.  It matters
because it "promotes the evenhanded, predictable, and
consistent development of legal principles."  *Payne, supra,*
at 827.  Decisions under the residual clause have proved to
be anything but evenhanded, predictable, or consistent.
Standing by *James* and *Sykes* would undermine, rather
than promote, the goals that *stare decisis* is meant to
serve.

*          *          *

We hold that imposing an increased sentence under the
residual clause of the Armed Career Criminal Act violates
the Constitution's guarantee of due process.  Our contrary
holdings in *James* and *Sykes* are overruled.  Today's deci-
sion does not call into question application of the Act to
the four enumerated offenses, or the remainder of the
Act's definition of a violent felony.

We reverse the judgment of the Court of Appeals for the
Eighth Circuit and remand the case for further proceed-
ings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

————

No. 13–7120

————

## SAMUEL JAMES JOHNSON, PETITIONER v. UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

[June 26, 2015]

JUSTICE KENNEDY, concurring in the judgment.

In my view, and for the reasons well stated by JUSTICE ALITO in dissent, the residual clause of the Armed Career Criminal Act is not unconstitutionally vague under the categorical approach or a record-based approach. On the assumption that the categorical approach ought to still control, and for the reasons given by JUSTICE THOMAS in Part I of his opinion concurring in the judgment, Johnson's conviction for possession of a short-barreled shotgun does not qualify as a violent felony.

For these reasons, I concur in the judgment.

# SUPREME COURT OF THE UNITED STATES

_____

No. 13–7120

_____

## SAMUEL JAMES JOHNSON, PETITIONER v. UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

[June 26, 2015]

JUSTICE THOMAS, concurring in the judgment.

I agree with the Court that Johnson's sentence cannot stand. But rather than use the Fifth Amendment's Due Process Clause to nullify an Act of Congress, I would resolve this case on more ordinary grounds. Under conventional principles of interpretation and our precedents, the offense of unlawfully possessing a short-barreled shotgun does not constitute a "violent felony" under the residual clause of the Armed Career Criminal Act (ACCA).

The majority wants more. Not content to engage in the usual business of interpreting statutes, it holds this clause to be unconstitutionally vague, notwithstanding the fact that on four previous occasions we found it determinate enough for judicial application. As JUSTICE ALITO explains, that decision cannot be reconciled with our precedents concerning the vagueness doctrine. See *post,* at 13–17 (dissenting opinion). But even if it were a closer case under those decisions, I would be wary of holding the residual clause to be unconstitutionally vague. Although I have joined the Court in applying our modern vagueness doctrine in the past, see *FCC* v. *Fox Television Stations, Inc.*, 567 U. S. \_\_\_, \_\_\_–\_\_\_ (2012) (slip op., at 16–17), I have become increasingly concerned about its origins and application. Simply put, our vagueness doctrine shares an uncomfortably similar history with substantive due pro-

cess, a judicially created doctrine lacking any basis in the Constitution.

## I

We could have easily disposed of this case without nullifying ACCA's residual clause. Under ordinary principles of statutory interpretation, the crime of unlawfully possessing a short-barreled shotgun does not constitute a "violent felony" under ACCA. In relevant part, that Act defines a "violent felony" as a "crime punishable by imprisonment for a term exceeding one year" that either

> "(i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or
> "(ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another." 18 U. S. C. §924(e)(2)(B).

The offense of unlawfully possessing a short-barreled shotgun neither satisfies the first clause of this definition nor falls within the enumerated offenses in the second. It therefore can constitute a violent felony only if it falls within ACCA's so-called "residual clause"—*i.e.*, if it "involves conduct that presents a serious potential risk of physical injury to another." §924(e)(2)(B)(ii).

To determine whether an offense falls within the residual clause, we consider "whether the conduct encompassed by the elements of the offense, in the ordinary case, presents a serious potential risk of injury to another." *James* v. *United States*, 550 U. S. 192, 208 (2007). The specific crimes listed in §924(e)(2)(B)(ii)—arson, extortion, burglary, and an offense involving the use of explosives—offer a "baseline against which to measure the degree of risk" a crime must present to fall within that clause. *Id.,* at 208. Those offenses do not provide a high threshold, see *id.*, at

203, 207–208, but the crime in question must still present a "'serious'"—a "'significant' or 'important'"—risk of physical injury to be deemed a violent felony, *Begay* v. *United States*, 553 U. S. 137, 156 (2008) (ALITO, J., dissenting); accord, *Chambers* v. *United States*, 555 U. S. 122, 128 (2009).

To qualify as serious, the risk of injury generally must be closely related to the offense itself. Our precedents provide useful examples of the close relationship that must exist between the conduct of the offense and the risk presented. In *Sykes* v. *United States*, 564 U. S. 1 (2011), for instance, we held that the offense of intentional vehicular flight constitutes a violent felony because that conduct always triggers a dangerous confrontation, *id.*, at ___ (slip op., at 8). As we explained, vehicular flights "by definitional necessity occur when police are present" and are done "in defiance of their instructions . . . with a vehicle that can be used in a way to cause serious potential risk of physical injury to another." *Ibid.* In *James*, we likewise held that attempted burglary offenses "requir[ing] an overt act directed toward the entry of a structure" are violent felonies because the underlying conduct often results in a dangerous confrontation. 550 U. S., at 204, 206. But we distinguished those crimes from "the more attenuated conduct encompassed by" attempt offenses "that c[an] be satisfied by preparatory conduct that does not pose the same risk of violent confrontation," such as "'possessing burglary tools.'" *Id.*, at 205, 206, and n. 4. At some point, in other words, the risk of injury from the crime may be too attenuated for the conviction to fall within the residual clause, such as when an additional, voluntary act (*e.g.*, the *use* of burglary tools to enter a structure) is necessary to bring about the risk of physical injury to another.

In light of the elements of and reported convictions for the unlawful possession of a short-barreled shotgun, this

crime does not "involv[e] conduct that presents a serious potential risk of physical injury to another," §924(e)(2)(B)(ii). The acts that form the basis of this offense are simply too remote from a risk of physical injury to fall within the residual clause.

Standing alone, the elements of this offense—(1) unlawfully (2) possessing (3) a short-barreled shotgun—do not describe inherently dangerous conduct. As a conceptual matter, "simple possession [of a firearm], even by a felon, takes place in a variety of ways (*e.g.*, in a closet, in a storeroom, in a car, in a pocket) many, perhaps most, of which do not involve likely accompanying violence." *United States* v. *Doe*, 960 F. 2d 221, 225 (CA1 1992). These weapons also can be stored in a manner posing a danger to no one, such as unloaded, disassembled, or locked away. By themselves, the elements of this offense indicate that the ordinary commission of this crime is far less risky than ACCA's enumerated offenses.

Reported convictions support the conclusion that mere possession of a short-barreled shotgun does not, in the ordinary case, pose a serious risk of injury to others. A few examples suffice. In one case, officers found the sawed-off shotgun locked inside a gun cabinet in an empty home. *State* v. *Salyers*, 858 N. W. 2d 156, 157–158 (Minn. 2015). In another, the firearm was retrieved from the trunk of the defendant's car. *State* v. *Ellenberger*, 543 N. W. 2d 673, 674 (Minn. App. 1996). In still another, the weapon was found missing a firing pin. *State* v. *Johnson*, 171 Wis. 2d 175, 178, 491 N. W. 2d 110, 111 (App. 1992). In these instances and others, the offense threatened no one.

The Government's theory for why this crime should nonetheless qualify as a "violent felony" is unpersuasive. Although it does not dispute that the unlawful possession of a short-barreled shotgun can occur in a nondangerous manner, the Government contends that this offense poses

a serious risk of physical injury due to the connection between short-barreled shotguns and other serious crimes. As the Government explains, these firearms are "weapons not typically possessed by law-abiding citizens for lawful purposes," *District of Columbia* v. *Heller*, 554 U. S. 570, 625 (2008), but are instead primarily intended for use in criminal activity. In light of that intended use, the Government reasons that the ordinary case of this possession offense will involve the *use* of a short-barreled shotgun in a serious crime, a scenario obviously posing a serious risk of physical injury.

But even assuming that those who unlawfully possess these weapons typically intend to use them in a serious crime, the risk that the Government identifies arises not from the act of possessing the weapon, but from the act of using it. Unlike attempted burglary (at least of the type at issue in *James*) or intentional vehicular flight—conduct that by itself often or always invites a dangerous confrontation—possession of a short-barreled shotgun poses a threat *only* when an offender decides to engage in additional, voluntary conduct that is not included in the elements of the crime. Until this weapon is assembled, loaded, or used, for example, it poses no risk of injury to others in and of itself. The risk of injury to others from mere possession of this firearm is too attenuated to treat this offense as a violent felony. I would reverse the Court of Appeals on that basis.

## II

As the foregoing analysis demonstrates, ACCA's residual clause can be applied in a principled manner. One would have thought this proposition well established given that we have already decided four cases addressing this clause. The majority nonetheless concludes that the operation of this provision violates the Fifth Amendment's Due Process Clause.

JUSTICE ALITO shows why that analysis is wrong under our precedents. See *post,* at 13–17 (dissenting opinion). But I have some concerns about our modern vagueness doctrine itself. Whether that doctrine is defensible under the original meaning of "due process of law" is a difficult question I leave for the another day, but the doctrine's history should prompt us at least to examine its constitutional underpinnings more closely before we use it to nullify yet another duly enacted law.

### A

We have become accustomed to using the Due Process Clauses to invalidate laws on the ground of "vagueness." The doctrine we have developed is quite sweeping: "A statute can be impermissibly vague . . . if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill* v. *Colorado*, 530 U. S. 703, 732 (2000). Using this framework, we have nullified a wide range of enactments. We have struck down laws ranging from city ordinances, *Papachristou* v. *Jacksonville*, 405 U. S. 156, 165–171 (1972), to Acts of Congress, *United States* v. *L. Cohen Grocery Co.*, 255 U. S. 81, 89–93 (1921). We have struck down laws whether they are penal, *Lanzetta* v. *New Jersey*, 306 U. S. 451, 452, 458 (1939), or not, *Keyishian* v. *Board of Regents of Univ. of State of N. Y.*, 385 U. S. 589, 597–604 (1967).[1] We have struck down laws addressing

---

[1] By "penal," I mean laws "authoriz[ing] criminal punishment" as well as those "authorizing fines or forfeitures . . . [that] are enforced through civil rather than criminal process." Cf. C. Nelson, Statutory Interpretation 108 (2011) (discussing definition of "penal" for purposes of rule of lenity). A law requiring termination of employment from public institutions, for instance, is not penal. See *Keyishian*, 385 U. S., at 597–604. Nor is a law creating an "obligation to pay taxes." *Milwaukee County* v. *M. E. White Co.*, 296 U. S. 268, 271 (1935). Conversely, a law imposing a monetary exaction as a punishment for noncompliance with

subjects ranging from abortion, *Colautti* v. *Franklin*, 439 U. S. 379, 390 (1979), and obscenity, *Winters* v. *New York*, 333 U. S. 507, 517–520 (1948), to the minimum wage, *Connally* v. *General Constr. Co.*, 269 U. S. 385, 390–395 (1926), and antitrust, *Cline* v. *Frink Dairy Co.*, 274 U. S. 445, 453–465 (1927). We have even struck down a law using a term that has been used to describe criminal conduct in this country since before the Constitution was ratified. *Chicago* v. *Morales*, 527 U. S. 41, 51 (1999) (invalidating a "loitering" law); see *id.,* at 113, and n. 10 (THOMAS, J., dissenting) (discussing a 1764 Georgia law requiring the apprehension of "all able bodied persons . . . who shall be found loitering").

That we have repeatedly used a doctrine to invalidate laws does not make it legitimate. Cf., *e.g., Dred Scott* v. *Sandford*, 19 How. 393, 450–452 (1857) (stating that an Act of Congress prohibiting slavery in certain Federal Territories violated the substantive due process rights of slaveowners and was therefore void). This Court has a history of wielding doctrines purportedly rooted in "due process of law" to achieve its own policy goals, substantive due process being the poster child. See *McDonald* v. *Chicago*, 561 U. S. 742, 811 (2010) (THOMAS, J., concurring in part and concurring in judgment) ("The one theme that links the Court's substantive due process precedents together is their lack of a guiding principle to distinguish 'fundamental' rights that warrant protection from nonfundamental rights that do not"). Although our vagueness doctrine is distinct from substantive due process, their histories have disquieting parallels.

### 1

The problem of vague penal statutes is nothing new.

---

a regulatory mandate is penal. See *National Federation of Independent Business* v. *Sebelius*, 567 U. S. ___, ___–___ (2012) (SCALIA, KENNEDY, THOMAS, and ALITO, JJ., dissenting) (slip op., at 16–26).

The notion that such laws may be void under the Constitution's Due Process Clauses, however, is a more recent development.

Before the end of the 19th century, courts addressed vagueness through a rule of strict construction of penal statutes, not a rule of constitutional law. This rule of construction—better known today as the rule of lenity— first emerged in 16th-century England in reaction to Parliament's practice of making large swaths of crimes capital offenses, though it did not gain broad acceptance until the following century. See Hall, Strict or Liberal Construction of Penal Statutes, 48 Harv. L. Rev. 748, 749– 751 (1935); see also 1 L. Radzinowicz, A History of English Criminal Law and Its Administration From 1750, pp. 10– 11 (1948) (noting that some of the following crimes triggered the death penalty: "marking the edges of any current coin of the kingdom," "maliciously cutting any hopbinds growing on poles in any plantation of hops," and "being in the company of gypsies"). Courts relied on this rule of construction in refusing to apply vague capital-offense statutes to prosecutions before them. As an example of this rule, William Blackstone described a notable instance in which an English statute imposing the death penalty on anyone convicted of "stealing sheep, *or other cattle*" was "held to extend to nothing but mere sheep" as "th[e] general words, 'or other cattle,' [were] looked upon as much too loose to create a capital offence." 1 Commentaries on the Laws of England 88 (1765).[2]

---

[2] At the time, the ordinary meaning of the word "cattle" was not limited to cows, but instead encompassed all "[b]easts of pasture; not wild nor domestick." 1 S. Johnson, A Dictionary of the English Language (4th ed. 1773). Parliament responded to the judicial refusal to apply the provision to "cattle" by passing "another statute, 15 Geo. II. c. 34, extending the [law] to bulls, cows, oxen, steers, bullocks, heifers, calves, and lambs, by name." 1 Blackstone, Commentaries on the Laws of England, at 88.

Vague statutes surfaced on this side of the Atlantic as well. Shortly after the First Congress proposed the Bill of Rights, for instance, it passed a law providing "[t]hat every person who shall attempt to trade with the Indian tribes, or be found in the Indian country with such merchandise in his possession as are usually vended to the Indians, without a license," must forfeit the offending goods. Act of July 22, 1790, ch. 33, §3, 1 Stat. 137–138. At first glance, punishing the unlicensed possession of "merchandise . . . usually vended to the Indians," *ibid.*, would seem far more likely to "invit[e] arbitrary enforcement," *ante,* at 5, than does the residual clause.

But rather than strike down arguably vague laws under the Fifth Amendment Due Process Clause, antebellum American courts—like their English predecessors—simply refused to apply them in individual cases under the rule that penal statutes should be construed strictly. See, *e.g., United States* v. *Sharp,* 27 F. Cas. 1041 (No. 16,264) (CC Pa. 1815) (Washington, J.). In *Sharp,* for instance, several defendants charged with violating an Act rendering it a capital offense for "any seaman" to "make a revolt in [a] ship," Act of Apr. 30, 1790, §8, 1 Stat. 114, objected that "the offence of making a revolt, [wa]s not sufficiently defined by this law, or by any other standard, to which reference could be safely made; to warrant the court in passing a sentence upon [them]." 27 F. Cas., at 1043. Justice Washington, riding circuit, apparently agreed, observing that the common definitions for the phrase "make a revolt" were "so multifarious, and so different" that he could not "avoid feeling a natural repugnance, to selecting from this mass of definitions, one, which may fix a crime upon these men, and that too of a capital nature." *Ibid.* Remarking that "[l]aws which create crimes, ought to be so explicit in themselves, or by reference to some other standard, that all men, subject to their penalties, may know what acts it is their duty to avoid," he refused

to "recommend to the jury, to find the prisoners guilty of making, or endeavouring to make a revolt, however strong the evidence may be." *Ibid.*

Such analysis does not mean that federal courts believed they had the power to invalidate vague penal laws as unconstitutional. Indeed, there is good evidence that courts at the time understood judicial review to consist "of a refusal to give a statute effect as operative law in resolving a case," a notion quite distinct from our modern practice of "'strik[ing] down' legislation." Walsh, Partial Unconstitutionality, 85 N. Y. U. L. Rev. 738, 756 (2010). The process of refusing to apply such laws appeared to occur on a case-by-case basis. For instance, notwithstanding his doubts expressed in *Sharp*, Justice Washington, writing for this Court, later rejected the argument that lower courts could arrest a judgment under the same ship-revolt statute because it "does not define the offence of endeavouring to make a revolt." *United States* v. *Kelly*, 11 Wheat. 417, 418 (1826). The Court explained that "it is . . . competent to the Court to give a judicial definition" of "the offence of endeavouring to make a revolt," and that such definition "consists in the endeavour of the crew of a vessel, or any one or more of them, to overthrow the legitimate authority of her commander, with intent to remove him from his command, or against his will to take possession of the vessel by assuming the government and navigation of her, or by transferring their obedience from the lawful commander to some other person." *Id.,* at 418–419. In dealing with statutory indeterminacy, federal courts saw themselves engaged in construction, not judicial review as it is now understood.[3]

_____

[3] Early American state courts also sometimes refused to apply a law they found completely unintelligible, even outside of the penal context. In one antebellum decision, the Pennsylvania Supreme Court did not even attempt to apply a statute that gave the Pennsylvania state treasurer "'as many votes'" in state bank elections as "'were held by

2

Although vagueness concerns played a role in the strict construction of penal statutes from early on, there is little indication that anyone before the late 19th century believed that courts had the power under the Due Process Clauses to nullify statutes on that ground. Instead, our modern vagueness doctrine materialized after the rise of substantive due process. Following the ratification of the Fourteenth Amendment, corporations began to use that Amendment's Due Process Clause to challenge state laws that attached penalties to unauthorized commercial conduct. In addition to claiming that these laws violated their substantive due process rights, these litigants began—with some success—to contend that such laws were unconstitutionally indefinite. In one case, a railroad company challenged a Tennessee law authorizing penalties against any railroad that demanded "more than a just and reasonable compensation" or engaged in "unjust and unreasonable discrimination" in setting its rates. *Louisville & Nashville R. Co.* v. *Railroad Comm'n of Tenn.*, 19 F. 679, 690 (CC MD Tenn. 1884) (internal quotation marks deleted). Without specifying the constitutional authority for its holding, the Circuit Court concluded that "[n]o citizen . . . can be constitutionally subjected to penalties and despoiled of his property, in a criminal or quasi criminal proceeding, under and by force of such indefinite

_____

*individuals*'" without providing guidance as to which individuals it was referring. *Commonwealth* v. *Bank of Pennsylvania*, 3 Watts & Serg. 173, 177 (1842). Concluding that it had "seldom, if ever, found the language of legislation so devoid of certainty," the court withdrew the case. *Ibid.*; see also *Drake* v. *Drake*, 15 N. C. 110, 115 (1833) ("Whether a statute be a public or a private one, if the terms in which it is couched be so vague as to convey no definite meaning to those whose duty it is to execute it, either ministerially or judicially, it is necessarily inoperative"). This practice is distinct from our modern vagueness doctrine, which applies to laws that are intelligible but vague.

legislation." *Id.,* at 693 (emphasis deleted).

Justice Brewer—widely recognized as "a leading spokesman for 'substantized' due process," Gamer, Justice Brewer and Substantive Due Process: A Conservative Court Revisited, 18 Vand. L. Rev. 615, 627 (1965)— employed similar reasoning while riding circuit, though he did not identify the constitutional source of judicial authority to nullify vague laws. In reviewing an Iowa law authorizing fines against railroads for charging more than a "reasonable and just" rate, Justice Brewer mentioned in dictum that "no penal law can be sustained unless its mandates are so clearly expressed that any ordinary person can determine in advance what he may and what he may not do under it." *Chicago & N. W. R. Co.* v. *Dey*, 35 F. 866, 876 (CC SD Iowa 1888).

Constitutional vagueness challenges in this Court initially met with some resistance. Although the Court appeared to acknowledge the possibility of unconstitutionally indefinite enactments, it repeatedly rejected vagueness challenges to penal laws addressing railroad rates, *Railroad Comm'n Cases*, 116 U. S. 307, 336–337 (1886), liquor sales, *Ohio ex rel. Lloyd* v. *Dollison*, 194 U. S. 445, 450–451 (1904), and anticompetitive conduct, *Nash* v. *United States*, 229 U. S. 373, 376–378 (1913); *Waters-Pierce Oil Co.* v. *Texas (No. 1)*, 212 U. S. 86, 108–111 (1909).

In 1914, however, the Court nullified a law on vagueness grounds under the Due Process Clause for the first time. In *International Harvester Co. of America* v. *Kentucky*, 234 U. S. 216 (1914), a tobacco company brought a Fourteenth Amendment challenge against several Kentucky antitrust laws that had been construed to render unlawful "any combination [made] . . . for the purpose or with the effect of fixing a price that was greater or less than the real value of the article," *id.,* at 221. The company argued that by referring to "real value," the laws pro-

vided "no standard of conduct that it is possible to know." *Ibid.* The Court agreed. *Id.,* at 223–224. Although it did not specify in that case which portion of the Fourteenth Amendment served as the basis for its holding, *ibid.,* it explained in a related case that the lack of a knowable standard of conduct in the Kentucky statutes "violated the fundamental principles of justice embraced in the conception of due process of law." *Collins* v. *Kentucky*, 234 U. S. 634, 638 (1914).

### 3

Since that time, the Court's application of its vagueness doctrine has largely mirrored its application of substantive due process. During the *Lochner* era, a period marked by the use of substantive due process to strike down economic regulations, *e.g., Lochner* v. *New York*, 198 U. S. 45, 57 (1905), the Court frequently used the vagueness doctrine to invalidate economic regulations penalizing commercial activity.[4] Among the penal laws it found to be impermissibly vague were a state law regulating the production of crude oil, *Champlin Refining Co.* v. *Corporation Comm'n*

———————

[4] During this time, the Court would apply its new vagueness doctrine outside of the penal context as well. In *A. B. Small Co.* v. *American Sugar Refining Co.*, 267 U. S. 233 (1925), a sugar dealer raised a defense to a breach-of-contract suit that the contracts themselves were unlawful under several provisions of the Lever Act, including one making it "'unlawful for any person . . . to make any unjust or unreasonable . . . charge in . . . dealing in or with any necessaries,' or to agree with another 'to exact excessive prices for any necessaries,'" *id.,* at 238. Applying *United States* v. *L. Cohen Grocery Co.*, 255 U. S. 81 (1921), which had held that provision to be unconstitutionally vague, the Court rejected the dealer's argument. 267 U. S., at 238–239. The Court explained that "[i]t was not the criminal penalty that was held invalid, but the exaction of obedience to a rule or standard which was so vague and indefinite as really to be no rule or standard at all." *Id.,* at 239. That doctrine thus applied to penalties as well as "[a]ny other means of exaction, such as declaring the transaction unlawful or stripping a participant of his rights under it." *Ibid.*

*of Okla.*, 286 U. S. 210, 242–243 (1932), a state antitrust law, *Cline*, 274 U. S., at 453–465, a state minimum-wage law, *Connally*, 269 U. S., at 390–395, and a federal price-control statute, *L. Cohen Grocery Co.*, 255 U. S., at 89–93.[5]

Around the time the Court began shifting the focus of its substantive due process (and equal protection) jurisprudence from economic interests to "discrete and insular minorities," see *United States* v. *Carolene Products Co.*, 304 U. S. 144, 153, n. 4 (1938), the target of its vagueness doctrine changed as well. The Court began to use the vagueness doctrine to invalidate noneconomic regulations, such as state statutes penalizing obscenity, *Winters*, 333 U. S., at 517–520, and membership in a gang, *Lanzetta*, 306 U. S., at 458.

Successful vagueness challenges to regulations penalizing commercial conduct, by contrast, largely fell by the wayside. The Court, for instance, upheld a federal regulation punishing the knowing violation of an order instructing drivers transporting dangerous chemicals to "'avoid, so far as practicable . . . driving into or through congested thoroughfares, places where crowds are assembled, street car tracks, tunnels, viaducts, and dangerous crossings,'" *Boyce Motor Lines, Inc.* v. *United States*, 342 U. S. 337,

_____

[5] Vagueness challenges to laws regulating speech during this period were less successful. Among the laws the Court found to be sufficiently definite included a state law making it a misdemeanor to publish, among other things, materials "'which shall tend to encourage or advocate disrespect for law or for any court or courts of justice,'" *Fox* v. *Washington*, 236 U. S. 273, 275–277 (1915), a federal statute criminalizing candidate solicitation of contributions for "'any political purpose whatever,'" *United States* v. *Wurzbach*, 280 U. S. 396, 398–399 (1930), and a state prohibition on becoming a member of any organization that advocates using unlawful violence to effect "'any political change,'" *Whitney* v. *California*, 274 U. S. 357, 359–360, 368–369 (1927). But see *Stromberg* v. *California*, 283 U. S. 359, 369–370 (1931) (holding state statute punishing the use of any symbol "'of opposition to organized government'" to be impermissibly vague).

338–339, 343 (1952). And notwithstanding its earlier conclusion that an Oklahoma law requiring state employees and contractors to be paid "'not less than the current rate of per diem wages in the locality where the work is performed'" was unconstitutionally vague, *Connally, supra,* at 393, the Court found sufficiently definite a federal law forbidding radio broadcasting companies from attempting to compel by threat or duress a licensee to hire "'persons in excess of the number of employees needed by such licensee to perform actual services,'" *United States* v. *Petrillo,* 332 U. S. 1, 3, 6–7 (1947).

In more recent times, the Court's substantive due process jurisprudence has focused on abortions, and our vagueness doctrine has played a correspondingly significant role. In fact, our vagueness doctrine served as the basis for the first draft of the majority opinion in *Roe* v. *Wade,* 410 U. S. 113 (1973), on the theory that laws prohibiting all abortions save for those done "for the purpose of saving the life of the mother" forced abortionists to guess when this exception would apply on penalty of conviction. See B. Schwartz, The Unpublished Opinions of the Burger Court 116–118 (1988) (reprinting first draft of *Roe*). *Roe,* of course, turned out as a substantive due process opinion. See 410 U. S., at 164. But since then, the Court has repeatedly deployed the vagueness doctrine to nullify even mild regulations of the abortion industry. See *Akron* v. *Akron Center for Reproductive Health, Inc.,* 462 U. S. 416, 451–452 (1983) (nullifying law requiring "'that the remains of the unborn child [be] disposed of in a humane and sanitary manner'"); *Colautti,* 439 U. S., at 381 (nullifying law mandating abortionists adhere to a prescribed standard of care if "there is 'sufficient reason to believe that the fetus may be viable'").[6]

_____

[6]All the while, however, the Court has rejected vagueness challenges to laws punishing those on the other side of the abortion debate. When

In one of our most recent decisions nullifying a law on vagueness grounds, substantive due process was again lurking in the background. In *Morales*, a plurality of this Court insisted that "the freedom to loiter for innocent purposes is part of the 'liberty' protected by the Due Process Clause of the Fourteenth Amendment," 527 U. S., at 53, a conclusion that colored its analysis that an ordinance prohibiting loitering was unconstitutionally indeterminate, see *id.,* at 55 ("When vagueness permeates the text of" a penal law "infring[ing] on constitutionally protected rights," "it is subject to facial attack").

I find this history unsettling. It has long been understood that one of the problems with holding a statute "void for 'indefiniteness'" is that "'indefiniteness' . . . is itself an indefinite concept," *Winters, supra*, at 524 (Frankfurter, J., dissenting), and we as a Court have a bad habit of using indefinite concepts—especially ones rooted in "due process"—to invalidate democratically enacted laws.

### B

It is also not clear that our vagueness doctrine can be reconciled with the original understanding of the term "due process of law." Our traditional justification for this doctrine has been the need for notice: "A conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited." *United States* v. *Williams*, 553 U. S. 285, 304 (2008); accord, *ante,* at 3. Presumably, that justification rests on the view expressed in

---

it comes to restricting the speech of abortion opponents, the Court has dismissed concerns about vagueness with the observation that "'we can never expect mathematical certainty from our language,'" *Hill* v. *Colorado*, 530 U. S. 703, 733 (2000), even though such restrictions are arguably "at least as imprecise as criminal prohibitions on speech the Court has declared void for vagueness in past decades," *id.,* at 774 (KENNEDY, J., dissenting).

*Murray's Lessee* v. *Hoboken Land & Improvement Co.*, 18 How. 272 (1856), that "due process of law" constrains the legislative branch by guaranteeing "usages and modes of proceeding existing in the common and statute law of England, before the emigration of our ancestors, and which are shown not to have been unsuited to their civil and political condition by having been acted on by them after the settlement of this country," *id.,* at 277. That justification assumes further that providing "a person of ordinary intelligence [with] fair notice of what is prohibited," *Williams*, *supra,* at 304, is one such usage or mode.[7]

To accept the vagueness doctrine as founded in our Constitution, then, one must reject the possibility "that the Due Process Clause requires only that our Government must proceed according to the 'law of the land'—that is, according to written constitutional and statutory provisions," which may be all that the original meaning of this provision demands. *Hamdi* v. *Rumsfeld*, 542 U. S. 507, 589 (2004) (THOMAS, J., dissenting) (some internal quotation marks omitted); accord, *Turner* v. *Rogers*, 564 U. S.

─────────

[7] As a general matter, we should be cautious about relying on general theories of "fair notice" in our due process jurisprudence, as they have been exploited to achieve particular ends. In *BMW of North America, Inc.* v. *Gore*, 517 U. S. 559 (1996), for instance, the Court held that the Due Process Clause imposed limits on punitive damages because the Clause guaranteed "that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose," *id.,* at 574. That was true even though "when the Fourteenth Amendment was adopted, punitive damages were undoubtedly an established part of the American common law of torts," and "no particular procedures were deemed necessary to circumscribe a jury's discretion regarding the award of such damages, or their amount." *Pacific Mut. Life Ins. Co.* v. *Haslip*, 499 U. S. 1, 26–27 (1991) (SCALIA, J., concurring in judgment). Even under the view of the Due Process Clause articulated in *Murray's Lessee*, then, we should not allow nebulous principles to supplant more specific, historically grounded rules. See 499 U. S., at 37–38 (opinion of SCALIA, J.).

___, ___ (2011) (THOMAS, J., dissenting) (slip op., at 2). Although *Murray's Lessee* stated the contrary, 18 How., at 276, a number of scholars and jurists have concluded that "considerable historical evidence supports the position that 'due process of law' was a separation-of-powers concept designed as a safeguard against unlicensed executive action, forbidding only deprivations not authorized by legislation or common law." D. Currie, The Constitution in the Supreme Court: The First Hundred Years 1789–1888, p. 272 (1985); see also, *e.g., In re Winship*, 397 U. S. 358, 378–382 (1970) (Black, J., dissenting). Others have disagreed. See, *e.g.,* Chapman & McConnell, Due Process as Separation of Powers, 121 Yale L. J. 1672, 1679 (2012) (arguing that, as originally understood, "the principle of due process" required, among other things, that "statutes that purported to empower the other branches to deprive persons of rights without adequate procedural guarantees [be] subject to judicial review").

I need not choose between these two understandings of "due process of law" in this case. JUSTICE ALITO explains why the majority's decision is wrong even under our precedents. See *post,* at 13–17 (dissenting opinion). And more generally, I adhere to the view that "'[i]f any fool would know that a particular category of conduct would be within the reach of the statute, if there is an unmistakable core that a reasonable person would know is forbidden by the law, the enactment is not unconstitutional on its face,'" *Morales, supra,* at 112 (THOMAS, J., dissenting), and there is no question that ACCA's residual clause meets that description, see *ante,* at 10 (agreeing with the Government that "there will be straightforward cases under the residual clause").

\*        \*        \*

I have no love for our residual clause jurisprudence: As I observed when we first got into this business, the Sixth

Amendment problem with allowing district courts to conduct factfinding to determine whether an offense is a "violent felony" made our attempt to construe the residual clause "'an unnecessary exercise.'" *James*, 550 U. S., at 231 (THOMAS, J., dissenting). But the Court rejected my argument, choosing instead to begin that unnecessary exercise. I see no principled way that, four cases later, the Court can now declare that the residual clause has become too indeterminate to apply. Having damaged the residual clause through our misguided jurisprudence, we have no right to send this provision back to Congress and ask for a new one. I cannot join the Court in using the Due Process Clause to nullify an Act of Congress that contains an unmistakable core of forbidden conduct, and I concur only in its judgment.

# SUPREME COURT OF THE UNITED STATES

_____

No. 13–7120

_____

## SAMUEL JAMES JOHNSON, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE EIGHTH CIRCUIT

[June 26, 2015]

JUSTICE ALITO, dissenting.

The Court is tired of the Armed Career Criminal Act of 1984 (ACCA) and in particular its residual clause. Anxious to rid our docket of bothersome residual clause cases, the Court is willing to do what it takes to get the job done. So brushing aside *stare decisis*, the Court holds that the residual clause is unconstitutionally vague even though we have twice rejected that very argument within the last eight years. The canons of interpretation get no greater respect. Inverting the canon that a statute should be construed if possible to avoid unconstitutionality, the Court rejects a reasonable construction of the residual clause that would avoid any vagueness problems, preferring an alternative that the Court finds to be unconstitutionally vague. And the Court is not stopped by the well-established rule that a statute is void for vagueness only if it is vague in all its applications. While conceding that some applications of the residual clause are straightforward, the Court holds that the clause is now void in its entirety. The Court's determination to be done with residual clause cases, if not its fidelity to legal principles, is impressive.

# I
## A

Petitioner Samuel Johnson (unlike his famous name-sake) has led a life of crime and violence. His presentence investigation report sets out a résumé of petty and serious crimes, beginning when he was 12 years old. Johnson's adult record includes convictions for, among other things, robbery, attempted robbery, illegal possession of a sawed-off shotgun, and a drug offense.

In 2010, the Federal Bureau of Investigation (FBI) began monitoring Johnson because of his involvement with the National Socialist Movement, a white-supremacist organization suspected of plotting acts of terrorism. In June of that year, Johnson left the group and formed his own radical organization, the Aryan Liberation Movement, which he planned to finance by counterfeiting United States currency. In the course of the Government's investigation, Johnson "disclosed to undercover FBI agents that he manufactured napalm, silencers, and other explosives for" his new organization. 526 Fed. Appx. 708, 709 (CA8 2013) (*per curiam*). He also showed the agents an AK–47 rifle, a semiautomatic rifle, a semiautomatic pistol, and a cache of approximately 1,100 rounds of ammunition. Later, Johnson told an undercover agent: "You know I'd love to assassinate some . . . hoodrats as much as the next guy, but I think we really got to stick with high priority targets." Revised Presentence Investigation Report (PSR) ¶15. Among the top targets that he mentioned were "the Mexican consulate," "progressive bookstores," and individuals he viewed as "liberals." PSR ¶16.

In April 2012, Johnson was arrested, and he was subsequently indicted on four counts of possession of a firearm by a felon and two counts of possession of ammunition by a felon, in violation of 18 U. S. C. §§922(g) and 924(e). He pleaded guilty to one of the firearms counts, and the Dis-

trict Court sentenced him to the statutory minimum of 15 years' imprisonment under ACCA, based on his prior felony convictions for robbery, attempted robbery, and illegal possession of a sawed-off shotgun.

## B

ACCA provides a mandatory minimum sentence for certain violations of §922(g), which prohibits the shipment, transportation, or possession of firearms or ammunition by convicted felons, persons previously committed to a mental institution, and certain others. Federal law normally provides a maximum sentence of 10 years' imprisonment for such crimes. See §924(a)(2). Under ACCA, however, if a defendant convicted under §922(g) has three prior convictions "for a violent felony or a serious drug offense," the sentencing court must impose a sentence of at least 15 years' imprisonment. §924(e)(1).

ACCA's definition of a "violent felony" has three parts. First, a felony qualifies if it "has as an element the use, attempted use, or threatened use of physical force against the person of another." §924(e)(2)(B)(i). Second, the Act specifically names four categories of qualifying felonies: burglary, arson, extortion, and offenses involving the use of explosives. See §924(e)(2)(B)(ii). Third, the Act contains what we have called a "residual clause," which reaches any felony that "otherwise involves conduct that presents a serious potential risk of physical injury to another." *Ibid.*

The present case concerns the residual clause. The sole question raised in Johnson's certiorari petition was whether possession of a sawed-off shotgun under Minnesota law qualifies as a violent felony under that clause. Although Johnson argued in the lower courts that the residual clause is unconstitutionally vague, he did not renew that argument here. Nevertheless, after oral argument, the Court raised the question of vagueness on its

own. The Court now holds that the residual clause is unconstitutionally vague in all its applications. I cannot agree.

## II

I begin with *stare decisis.* Eight years ago in *James* v. *United States*, 550 U. S. 192 (2007), JUSTICE SCALIA, the author of today's opinion for the Court, fired an opening shot at the residual clause. In dissent, he suggested that the residual clause is void for vagueness. *Id.*, at 230. The Court held otherwise, explaining that the standard in the residual clause "is not so indefinite as to prevent an ordinary person from understanding" its scope. *Id.*, at 210, n. 6.

Four years later, in *Sykes* v. *United States*, 564 U. S. 1 (2011), JUSTICE SCALIA fired another round. Dissenting once again, he argued that the residual clause is void for vagueness and rehearsed the same basic arguments that the Court now adopts. See *id., at* ___–___ (slip op., at 7–8); see also *Derby* v. *United States*, 564 U. S. ___, ___–___ (2011) (SCALIA, J., dissenting from denial of certiorari) (slip op., at 4–5). As in *James*, the Court rejected his arguments. See *Sykes*, 564 U. S., at ___ (slip op., at 13–14). In fact, JUSTICE SCALIA was the *only* Member of the *Sykes* Court who took the position that the residual clause could not be intelligibly applied to the offense at issue. The opinion of the Court, which five Justices joined, expressly held that the residual clause "states an intelligible principle and provides guidance that allows a person to 'conform his or her conduct to the law.'" *Id.*, at ___–___ (slip op., at 13–14) (quoting *Chicago* v. *Morales*, 527 U. S. 41, 58 (1999) (plurality opinion)). JUSTICE THOMAS's concurrence, while disagreeing in part with the Court's interpretation of the residual clause, did not question its constitutionality. See *Sykes*, 564 U. S., at ___ (opinion concurring in judgment). And JUSTICE KAGAN's dissent,

which Justice Ginsburg joined, argued that a proper application of the provision required a different result. See *id.,* at ___. Thus, eight Members of the Court found the statute capable of principled application.

It is, of course, true that "[s]*tare decisis* is not an inexorable command." *Payne* v. *Tennessee*, 501 U. S. 808, 828 (1991). But neither is it an empty Latin phrase. There must be good reasons for overruling a precedent, and there is none here. Nothing has changed since our decisions in *James* and *Sykes*—nothing, that is, except the Court's weariness with ACCA cases.

Reprising an argument that Justice Scalia made to no avail in *Sykes*, *supra*, at ___ (dissenting opinion) (slip op., at 7), the Court reasons that the residual clause must be unconstitutionally vague because we have had trouble settling on an interpretation. See *ante,* at 7. But disagreement about the meaning and application of the clause is not new. We were divided in *James* and in *Sykes* and in our intervening decisions in *Begay* v. *United States*, 553 U. S. 137 (2008), and *Chambers* v. *United States,* 555 U. S. 122 (2009). And that pattern is not unique to ACCA; we have been unable to come to an agreement on many recurring legal questions. The Confrontation Clause is one example that comes readily to mind. See, *e.g., Williams* v. *Illinois*, 567 U. S. ___ (2012); *Bullcoming* v. *New Mexico*, 564 U. S. ___ (2011); *Melendez-Diaz* v. *Massachusetts*, 557 U. S. 305 (2009). Our disagreements about the meaning of that provision do not prove that the Confrontation Clause has no ascertainable meaning. Likewise, our disagreements on the residual clause do not prove that it is unconstitutionally vague.

The Court also points to conflicts in the decisions of the lower courts as proof that the statute is unconstitutional. See *ante*, at 9–10. The Court overstates the degree of disagreement below. For many crimes, there is no dispute that the residual clause applies. And our certiorari docket

provides a skewed picture because the decisions that we are asked to review are usually those involving issues on which there is at least an arguable circuit conflict. But in any event, it has never been thought that conflicting interpretations of a statute justify judicial elimination of the statute. One of our chief responsibilities is to resolve those disagreements, see Supreme Court Rule 10, not to strike down the laws that create this work.

The Court may not relish the task of resolving residual clause questions on which the Circuits disagree, but the provision has not placed a crushing burden on our docket. In the eight years since *James*, we have decided all of three cases involving the residual clause. See *Begay*, *supra*; *Chambers*, *supra*; *Sykes*, *supra*. Nevertheless, faced with the unappealing prospect of resolving more circuit splits on various residual clause issues, see *ante,* at 9, six Members of the Court have thrown in the towel. That is not responsible.

### III

Even if we put *stare decisis* aside, the Court's decision remains indefensible. The residual clause is not unconstitutionally vague.

### A

The Fifth Amendment prohibits the enforcement of vague criminal laws, but the threshold for declaring a law void for vagueness is high. "The strong presumptive validity that attaches to an Act of Congress has led this Court to hold many times that statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language." *United States* v. *National Dairy Products Corp.*, 372 U. S. 29, 32 (1963). Rather, it is sufficient if a statute sets out an "ascertainable standard." *United States* v. *L. Cohen Grocery Co.*, 255 U. S. 81, 89

(1921). A statute is thus void for vagueness only if it wholly "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States* v. *Williams*, 553 U. S. 285, 304 (2008).

The bar is even higher for sentencing provisions. The fair notice concerns that inform our vagueness doctrine are aimed at ensuring that a "'person of ordinary intelligence [has] a reasonable opportunity to know what is prohibited, so that he may act accordingly.'" *Hoffman Estates* v. *Flipside, Hoffman Estates, Inc.*, 455 U. S. 489, 498 (1982) (quoting *Grayned* v. *City of Rockford*, 408 U. S. 104, 108 (1972)). The fear is that vague laws will "'trap the innocent.'" 455 U. S., at 498. These concerns have less force when it comes to sentencing provisions, which come into play only after the defendant has been found guilty of the crime in question. Due process does not require, as Johnson oddly suggests, that a "prospective criminal" be able to calculate the precise penalty that a conviction would bring. Supp. Brief for Petitioner 5; see *Chapman* v. *United States*, 500 U. S. 453, 467–468 (1991) (concluding that a vagueness challenge was "particularly weak "since whatever debate there is would center around the appropriate sentence and not the criminality of the conduct").

## B

ACCA's residual clause unquestionably provides an ascertainable standard. It defines "violent felony" to include any offense that "involves conduct that presents a serious potential risk of physical injury to another." 18 U. S. C. §924(e)(2)(B)(ii). That language is by no means incomprehensible. Nor is it unusual. There are scores of federal and state laws that employ similar standards. The Solicitor General's brief contains a 99-page appendix

setting out some of these laws.  See App. to Supp. Brief for United States; see also *James, supra,* at 210, n. 6.  If all these laws are unconstitutionally vague, today's decision is not a blast from a sawed-off shotgun; it is a nuclear explosion.

Attempting to avoid such devastation, the Court distinguishes these laws primarily on the ground that almost all of them "require gauging the riskiness of conduct in which an individual defendant engages *on a particular occasion.*" *Ante,* at 12 (emphasis in original).  The Court thus admits that, "[a]s a general matter, we do not doubt the constitutionality of laws that call for the application of a qualitative standard such as 'substantial risk' to real-world conduct." *Ibid.*  Its complaint is that the residual clause "requires application of the 'serious potential risk' standard to an *idealized ordinary case of the crime.*" *Ibid.* (emphasis added).  Thus, according to the Court, ACCA's residual clause is unconstitutionally vague because its standard must be applied to "an idealized ordinary case of the crime" and not, like the vast majority of the laws in the Solicitor General's appendix, to "real-world conduct."

ACCA, however, makes no reference to "an idealized ordinary case of the crime."  That requirement was the handiwork of this Court in *Taylor* v. *United States,* 495 U. S. 575 (1990).  And as I will show, the residual clause can reasonably be interpreted to refer to "real-world conduct."[1]

---

[1] The Court also says that the residual clause's reference to the enumerated offenses is "confusing."  *Ante,* at 12.  But this is another argument we rejected in *James* v. *United States*, 550 U. S. 192 (2007), and *Sykes* v. *United States*, 564 U. S. 1 (2011), and it is no more persuasive now.  Although the risk level varies among the enumerated offenses, all four categories of offenses involve conduct that presents a serious potential risk of harm to others.  If the Court's concern is that some of the enumerated offenses do not seem especially risky, all that means is that the statute "sets a low baseline level for risk."  *Id.,* at ___ (THOMAS, J., concurring in judgment) (slip op., at 2).

### C

When a statute's constitutionality is in doubt, we have an obligation to interpret the law, if possible, to avoid the constitutional problem. See, *e.g., Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Constr. Trades Council*, 485 U. S. 568, 575 (1988). As one treatise puts it, "[a] statute should be interpreted in a way that avoids placing its constitutionality in doubt." A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts §38, p. 247 (2012). This canon applies fully when considering vagueness challenges. In cases like this one, "our task is not to destroy the Act if we can, but to construe it, if consistent with the will of Congress, so as to comport with constitutional limitations." *Civil Service Comm'n* v. *Letter Carriers,* 413 U. S. 548, 571 (1973); see also *Skilling* v. *United States*, 561 U. S. 358, 403 (2010). Indeed, "'[t]he elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality.'" *Id.,* at 406 (quoting *Hooper* v. *California*, 155 U. S. 648, 657 (1895); emphasis deleted); see also *Ex parte Randolph*, 20 F. Cas. 242, 254 (No. 11,558) (CC Va. 1833) (Marshall, C. J.).

The Court all but concedes that the residual clause would be constitutional if it applied to "real-world conduct." Whether that is the *best* interpretation of the residual clause is beside the point. What matters is whether it is a reasonable interpretation of the statute. And it surely is that.

First, this interpretation heeds the pointed distinction that ACCA draws between the "element[s]" of an offense and "conduct." Under §924(e)(2)(B)(i), a crime qualifies as a "violent felony" if one of its "element[s]" involves "the use, attempted use, or threatened use of physical force against the person of another." But the residual clause, which appears in the very next subsection, §924(e)(2)(B)(ii), focuses on "conduct"—specifically, "con-

duct that presents a serious potential risk of physical injury to another." The use of these two different terms in §924(e) indicates that "conduct" refers to things done during the commission of an offense that are not part of the elements needed for conviction. Because those extra actions vary from case to case, it is natural to interpret "conduct" to mean real-world conduct, not the conduct involved in some Platonic ideal of the offense.

Second, as the Court points out, standards like the one in the residual clause almost always appear in laws that call for application by a trier of fact. This strongly suggests that the residual clause calls for the same sort of application.

Third, if the Court is correct that the residual clause is nearly incomprehensible when interpreted as applying to an "idealized ordinary case of the crime," then that is telling evidence that this is not what Congress intended. When another interpretation is ready at hand, why should we assume that Congress gave the clause a meaning that is impossible—or even, exceedingly difficult—to apply?

### D

Not only does the "real-world conduct" interpretation fit the terms of the residual clause, but the reasons that persuaded the Court to adopt the categorical approach in *Taylor* either do not apply or have much less force in residual clause cases.

In *Taylor*, the question before the Court concerned the meaning of "burglary," one of ACCA's enumerated offenses. The Court gave three reasons for holding that a judge making an ACCA determination should generally look only at the elements of the offense of conviction and not to other things that the defendant did during the commission of the offense. First, the Court thought that ACCA's use of the term "convictions" pointed to the categorical approach. The Court wrote: "Section 924(e)(1) refers to 'a person who

. . . has three previous convictions' for—not a person who has committed—three previous violent felonies or drug offenses." 495 U. S., at 600. Second, the Court relied on legislative history, noting that ACCA had previously contained a generic definition of burglary and that "the deletion of [this] definition . . . may have been an inadvertent casualty of a complex drafting process." *Id.*, at 589–590, 601. Third, the Court felt that "the practical difficulties and potential unfairness of a factual approach [were] daunting." *Id.*, at 601.

None of these three grounds dictates that the categorical approach must be used in residual clause cases. The second ground, which concerned the deletion of a generic definition of burglary, obviously has no application to the residual clause. And the first ground has much less force in residual clause cases. In *Taylor*, the Court reasoned that a defendant has a "conviction" for burglary only if burglary is the offense set out in the judgment of conviction. For instance, if a defendant commits a burglary but pleads guilty, under a plea bargain, to possession of burglar's tools, the *Taylor* Court thought that it would be unnatural to say that the defendant had a *conviction* for burglary. Now consider a case in which a gang member is convicted of illegal possession of a sawed-off shotgun and the evidence shows that he concealed the weapon under his coat, while searching for a rival gang member who had just killed his brother. In that situation, it is not at all unnatural to say that the defendant had a conviction for a crime that "involve[d] *conduct* that present[ed] a serious potential risk of physical injury to another." §924(e)(2)(B)(ii) (emphasis added). At the very least, it would be a reasonable way to describe the defendant's conviction.

The *Taylor* Court's remaining reasons for adopting the categorical approach cannot justify an interpretation that renders the residual clause unconstitutional. While the

*Taylor* Court feared that a conduct-specific approach would unduly burden the courts, experience has shown that application of the categorical approach has not always been easy. Indeed, the Court's main argument for overturning the statute is that this approach is unmanageable in residual clause cases.

As for the notion that the categorical approach is more forgiving to defendants, there is a strong argument that the opposite is true, at least with respect to the residual clause. Consider two criminal laws: Injury occurs in 10% of cases involving the violation of statute A, but in 90% of cases involving the violation of statute B. Under the categorical approach, a truly dangerous crime under statute A might not qualify as a violent felony, while a crime with no measurable risk of harm under statute B would count against the defendant. Under a conduct-specific inquiry, on the other hand, a defendant's actual conduct would determine whether ACCA's mandatory penalty applies.

It is also significant that the allocation of the burden of proof protects defendants. The prosecution bears the burden of proving that a defendant has convictions that qualify for sentencing under ACCA. If evidentiary deficiencies, poor recordkeeping, or anything else prevents the prosecution from discharging that burden under the conduct-specific approach, a defendant would not receive an ACCA sentence.

Nor would a conduct-specific inquiry raise constitutional problems of its own. It is questionable whether the Sixth Amendment creates a right to a jury trial in this situation. See *Almendarez-Torres* v. *United States*, 523 U.S. 224 (1998). But if it does, the issue could be tried to a jury, and the prosecution could bear the burden of proving beyond a reasonable doubt that a defendant's prior crimes involved conduct that presented a serious potential risk of injury to another. I would adopt this alternative interpre-

tation and hold that the residual clause requires an examination of real-world conduct.

The Court's only reason for refusing to consider this interpretation is that "the Government has not asked us to abandon the categorical approach in residual-clause cases." *Ante,* at 13.   But the Court cites no case in which we have suggested that a saving interpretation may be adopted only if it is proposed by one of the parties.   Nor does the Court cite any secondary authorities advocating this rule. Cf. Scalia, Reading Law §38 (stating the canon with no such limitation).   On the contrary, we have long recognized that it is "our plain duty to adopt that construction which will save [a] statute from constitutional infirmity," where fairly possible.   *United States ex rel. Attorney General* v. *Delaware & Hudson Co.*, 213 U. S. 366, 407 (1909). It would be strange if we could fulfill that "plain duty" only when a party asks us to do so.   And the Court's refusal to consider a saving interpretation not advocated by the Government is hard to square with the Court's adoption of an argument that petitioner chose not to raise.   As noted, Johnson did not ask us to hold that the residual clause is unconstitutionally vague, but the Court interjected that issue into the case, requested supplemental briefing on the question, and heard reargument.   The Court's refusal to look beyond the arguments of the parties apparently applies only to arguments that the Court does not want to hear.

### E

Even if the categorical approach is used in residual clause cases, however, the clause is still not void for vagueness.   "It is well established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined" on an as-applied basis. *United States* v. *Mazurie*, 419 U. S. 544, 550 (1975). "Objections to vagueness under the Due Process Clause rest

on the lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk." *Maynard* v. *Cartwright*, 486 U. S. 356, 361 (1988). Thus, in a due process vagueness case, we will hold that a law is facially invalid "only if the enactment is impermissibly vague in *all* of its applications." *Hoffman Estates*, 455 U. S., at 494–495 (emphasis added); see also *Chapman*, 500 U. S., at 467.[2]

In concluding that the residual clause is facially void for vagueness, the Court flatly contravenes this rule. The Court admits "that there will be straightforward cases under the residual clause." *Ante,* at 10. But rather than exercising the restraint that our vagueness cases prescribe, the Court holds that the residual clause is unconstitutionally vague even when its application is clear.

The Court's treatment of this issue is startling. Its facial invalidation precludes a sentencing court that is applying ACCA from counting convictions for even those specific offenses that this Court previously found to fall within the residual clause. See *James*, 550 U. S., at 203–209 (attempted burglary); *Sykes*, 564 U. S., at ___–___ (slip op., at 5–9) (flight from law enforcement in a vehicle).

---

[2] This rule is simply an application of the broader rule that, except in First Amendment cases, we will hold that a statute is facially unconstitutional only if "no set of circumstances exists under which the Act would be valid." *United States* v. *Salerno*, 481 U. S. 739, 745 (1987). A void-for-vagueness challenge is a facial challenge. See *Hoffman Estates* v. *Flipside, Hoffman Estates, Inc*., 455 U. S. 489, 494–495, and nn. 5, 6, 7 (1982); *Chicago* v. *Morales*, 527 U. S. 41, 79 (1999) (SCALIA, J., dissenting). Consequently, there is no reason why the no-set-of-circumstances rule should not apply in this context. I assume that the Court does not mean to abrogate the no-set-of-circumstances rule in its entirety, but the Court provides no justification for its refusal to apply that rule here. Perhaps the Court has concluded, for some undisclosed reason, that void-for-vagueness claims are different from all other facial challenges not based on the First Amendment. Or perhaps the Court has simply created an ACCA exception.

Still worse, the Court holds that vagueness bars the use of the residual clause in other cases in which its applicability can hardly be questioned. Attempted rape is an example. See, *e.g., Dawson* v. *United States*, 702 F. 3d 347, 351–352 (CA6 2012). Can there be any doubt that "an idealized ordinary case of th[is] crime" "involves conduct that presents a serious potential risk of physical injury to another"? How about attempted arson,[3] attempted kidnapping,[4] solicitation to commit aggravated assault,[5] possession of a loaded weapon with the intent to use it unlawfully against another person,[6] possession of a weapon in prison,[7] or compelling a person to act as a prostitute?[8] Is there much doubt that those offenses "involve conduct that presents a serious potential risk of physical injury to another"?

Transforming vagueness doctrine, the Court claims that we have never actually *held* that a statue may be voided for vagueness only when it is vague in all its applications. But that is simply wrong. In *Hoffman Estates*, we reversed a Seventh Circuit decision that voided an ordinance prohibiting the sale of certain items. See 455 U. S., at 491. The Seventh Circuit struck down the ordinance because it was "unclear in *some* of its applications," but we reversed and emphasized that a law is void for vagueness "only if [it] is impermissibly vague in all of its applications." *Id.,* at 494–495; see also *id.,* at 495, n. 7 (collecting cases). Applying that principle, we held that the "facial

---

[3] *United States* v. *Rainey*, 362 F. 3d 733, 735–736 (CA11) (*per curiam*), cert. denied, 541 U. S. 1081 (2004).

[4] *United States* v. *Kaplansky*, 42 F. 3d 320, 323–324 (CA6 1994) (en banc).

[5] *United States* v. *Benton*, 639 F. 3d 723, 731–732 (CA6), cert. denied, 565 U. S. ___ (2011).

[6] *United States* v. *Lynch*, 518 F. 3d 164, 172–173 (CA2 2008), cert. denied, 555 U. S. 1177 (2009).

[7] *United States* v. *Boyce*, 633 F. 3d 708, 711–712 (CA8 2011), cert. denied, 565 U. S. ___ (2012).

[8] *United States* v. *Brown*, 273 F. 3d 747, 749–751 (CA7 2001).

challenge [wa]s unavailing" because "at least some of the items sold . . . [we]re covered" by the ordinance. *Id.,* at 500. These statements were not dicta. They were the holding of the case. Yet the Court does not even mention this binding precedent.

Instead, the Court says that the facts of two *earlier* cases support a broader application of the vagueness doctrine. See *ante,* at 11. That, too, is incorrect. Neither case remotely suggested that mere overbreadth is enough for facial invalidation under the Fifth Amendment.

In *Coates* v. *Cincinnati*, 402 U. S. 611, 612 (1971), we addressed an ordinance that restricted free assembly and association rights by prohibiting "annoying" conduct. Our analysis turned in large part on those First Amendment concerns. In fact, we specifically explained that the "vice of the ordinance lies not alone in its violation of the due process standard of vagueness." *Id.,* at 615. In the present case, by contrast, no First Amendment rights are at issue. Thus, *Coates* cannot support the Court's rejection of our repeated statements that "vagueness challenges to statutes which *do not involve First Amendment freedoms* must be examined in light of the facts . . . at hand." *Mazurie*, *supra*, at 550 (emphasis added).

Likewise, *L. Cohen Grocery Co.*, 255 U. S. 81, proves precisely the opposite of what the Court claims. In that case, we struck down a statute prohibiting "'unjust or unreasonable rate[s]'" because it provided no "ascertainable standard of guilt" and left open "the widest conceivable inquiry, the scope of which no one can foresee and the result of which no one can foreshadow or adequately guard against." *Id.,* at 89. The clear import of this language is that the law at issue was impermissibly vague in all applications. And in the years since, we have never adopted the majority's contradictory interpretation. On the contrary, we have characterized the case as involving a statute that could "not constitutionally be applied to any set of

facts." *United States* v. *Powell*, 423 U. S. 87, 92 (1975). Thus, our holdings and our dicta prohibit the Court's expansion of the vagueness doctrine. The Constitution does not allow us to hold a statute void for vagueness unless it is vague in all its applications.

## IV

Because I would not strike down ACCA's residual clause, it is necessary for me to address whether Johnson's conviction for possessing a sawed-off shotgun qualifies as a violent felony. Under either the categorical approach or a conduct-specific inquiry, it does.

## A

The categorical approach requires us to determine whether "the conduct encompassed by the elements of the offense, in the ordinary case, presents a serious potential risk of injury to another." *James*, 550 U. S., at 208. This is an "inherently probabilistic" determination that considers the circumstances and conduct that ordinarily attend the offense. *Id.,* at 207. The mere fact that a crime *could* be committed without a risk of physical harm does not exclude it from the statute's reach. See *id.,* at 207–208. Instead, the residual clause speaks of "potential risk[s]," §924(e)(2)(B)(ii), a term suggesting "that Congress intended to encompass possibilities even more contingent or remote than a simple 'risk,' much less a certainty." *James, supra,* at 207–208.

Under these principles, unlawful possession of a sawed-off shotgun qualifies as a violent felony. As we recognized in *District of Columbia* v. *Heller*, 554 U. S. 570, 625 (2008), sawed-off shotguns are "not typically possessed by law-abiding citizens for lawful purposes." Instead, they are uniquely attractive to violent criminals. Much easier to conceal than long-barreled shotguns used for hunting and other lawful purposes, short-barreled shotguns can be

hidden under a coat, tucked into a bag, or stowed under a car seat. And like a handgun, they can be fired with one hand—except to more lethal effect. These weapons thus combine the deadly characteristics of conventional shotguns with the more convenient handling of handguns. Unlike those common firearms, however, they are not typically possessed for lawful purposes. And when a person illegally possesses a sawed-off shotgun during the commission of a crime, the risk of violence is seriously increased. The ordinary case of unlawful possession of a sawed-off shotgun therefore "presents a serious potential risk of physical injury to another." §922(e)(2)(B)(ii).

Congress' treatment of sawed-off shotguns confirms this judgment. As the Government's initial brief colorfully recounts, sawed-off shotguns were a weapon of choice for gangsters and bank robbers during the Prohibition Era. See Brief for United States 4.[9]  In response, Congress enacted the National Firearms Act of 1934, which required individuals possessing certain especially dangerous weapons—including sawed-off shotguns—to register with the Federal Government and pay a special tax. 26 U. S. C. §§5845(a)(1)–(2). The Act was passed on the understanding that "while there is justification for permitting the citizen to keep a pistol or revolver for his own protection without any restriction, there is no reason why anyone

---

[9]Al Capone's south-side Chicago henchmen used sawed-off shotguns when they executed their rivals from Bugs Moran's north-side gang during the infamous Saint Valentine's Day Massacre of 1929. See 7 Chicago Gangsters Slain by Firing Squad of Rivals, Some in Police Uniforms, N. Y. Times, Feb. 15, 1929, p. A1. Wild Bill Rooney was gunned down in Chicago by a "sawed-off shotgun [that] was pointed through a rear window" of a passing automobile. Union Boss Slain by Gang in Chicago, N. Y. Times, Mar. 20, 1931, p. 52. And when the infamous outlaws Bonnie and Clyde were killed by the police in 1934, Clyde was found "clutching a sawed-off shotgun in one hand." Barrow and Woman are Slain by Police in Louisiana Trap, N. Y. Times, May 24, 1934, p. A1.

except a law officer should have a . . . sawed-off shotgun." H. R. Rep. No. 1780, 73d Cong., 2d Sess., 1 (1934). As amended, the Act imposes strict registration requirements for any individual wishing to possess a covered shotgun, see, *e.g.,* §§5822, 5841(b), and illegal possession of such a weapon is punishable by imprisonment for up to 10 years. See §§5861(b)–(d), 5871. It is telling that this penalty exceeds that prescribed by federal law for quintessential violent felonies.[10] It thus seems perfectly clear that Congress has long regarded the illegal possession of a sawed-off shotgun as a crime that poses a serious risk of harm to others.

The majority of States agree. The Government informs the Court, and Johnson does not dispute, that 28 States have followed Congress' lead by making it a crime to possess an unregistered sawed-off shotgun, and 11 other States and the District of Columbia prohibit private possession of sawed-off shotguns entirely. See Brief for United States 8–9 (collecting statutes). Minnesota, where petitioner was convicted, has adopted a blanket ban, based on its judgment that "[t]he sawed-off shotgun has no legitimate use in the society whatsoever." *State* v. *Ellenberger*, 543 N. W. 2d 673, 676 (Minn. App. 1996) (internal quotation marks and citation omitted). Possession of a sawed-off shotgun in Minnesota is thus an inherently criminal act. It is fanciful to assume that a person who chooses to break the law and risk the heavy criminal penalty incurred by possessing a notoriously dangerous

--------

[10]See, *e.g.,* 18 U. S. C. §111(a) (physical assault on federal officer punishable by not more than eight years' imprisonment); §113(a)(7) (assault within maritime or territorial jurisdiction resulting in substantial bodily injury to an individual under the age of 16 punishable by up to five years' imprisonment); §117(a) ("assault, sexual abuse, or serious violent felony against a spouse or intimate partner" by a habitual offender within maritime or territorial jurisdiction punishable by up to five years' imprisonment, except in cases of "substantial bodily injury").

weapon is unlikely to use that weapon in violent ways.

### B

If we were to abandon the categorical approach, the facts of Johnson's offense would satisfy the residual clause as well. According to the record in this case, Johnson possessed his sawed-off shotgun while dealing drugs. When police responded to reports of drug activity in a parking lot, they were told by two people that "Johnson and another individual had approached them and offered to sell drugs." PSR ¶45. The police then searched the vehicle where Johnson was seated as a passenger, and they found a sawed-off shotgun and five bags of marijuana. Johnson admitted that the gun was his.

Understood in this context, Johnson's conduct posed an acute risk of physical injury to another. Drugs and guns are never a safe combination. If one of his drug deals had gone bad or if a rival dealer had arrived on the scene, Johnson's deadly weapon was close at hand. The sawed-off nature of the gun elevated the risk of collateral damage beyond any intended targets. And the location of the crime—a public parking lot—significantly increased the chance that innocent bystanders might be caught up in the carnage. This is not a case of "mere possession" as Johnson suggests. Brief for Petitioner i. He was not storing the gun in a safe, nor was it a family heirloom or collector's item. He illegally possessed the weapon in case he needed to use it during another crime. A judge or jury could thus conclude that Johnson's offense qualified as a violent felony.

There should be no doubt that Samuel Johnson was an armed career criminal. His record includes a number of serious felonies. And he has been caught with dangerous weapons on numerous occasions. That this case has led to the residual clause's demise is confounding. I only hope that Congress can take the Court at its word that either

amending the list of enumerated offenses or abandoning the categorical approach would solve the problem that the Court perceives.

# Tab 2

## City of Los Angeles v. Patel

No. 13-1175, Slip Opinion (S.Ct., 22 JUN 2015)

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.*, 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## CITY OF LOS ANGELES, CALIFORNIA *v.* PATEL ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 13–1175.  Argued March 3, 2015—Decided June 22, 2015

Petitioner, the city of Los Angeles (City), requires hotel operators to record and keep specific information about their guests on the premises for a 90-day period.  Los Angeles Municipal Code §41.49.  These records "shall be made available to any officer of the Los Angeles Police Department for inspection . . . at a time and in a manner that minimizes any interference with the operation of the business," §41.49(3)(a), and a hotel operator's failure to make the records available is a criminal misdemeanor, §11.00(m).  Respondents, a group of motel operators and a lodging association, brought a facial challenge to §41.49(3)(a) on Fourth Amendment grounds.  The District Court entered judgment for the City, finding that respondents lacked a reasonable expectation of privacy in their records.  The Ninth Circuit subsequently reversed, determining that inspections under §41.49(3)(a) are Fourth Amendment searches and that such searches are unreasonable under the Fourth Amendment because hotel owners are subjected to punishment for failure to turn over their records without first being afforded the opportunity for precompliance review.

*Held*:

1. Facial challenges under the Fourth Amendment are not categorically barred or especially disfavored.  Pp. 4–8.

(a) Facial challenges to statutes—as opposed to challenges to particular applications of statutes—have been permitted to proceed under a diverse array of constitutional provisions.  See, *e.g., Sorrell* v. *IMS Health Inc.*, 564 U. S. ___ (First Amendment); *District of Columbia* v. *Heller*, 554 U. S. 570 (Second Amendment).  The Fourth Amendment is no exception.  *Sibron* v. *New York*, 392 U. S. 40, distinguished.  This Court has entertained facial challenges to statutes

AD61

authorizing warrantless searches, declaring them, on several occasions, facially invalid, see, *e.g., Chandler* v. *Miller*, 520 U. S. 305, 308–309. Pp. 4–7.

(b) Petitioner contends that facial challenges to statutes authorizing warrantless searches must fail because they will never be unconstitutional in all applications, but this Court's precedents demonstrate that such challenges can be brought, and can succeed. Under the proper facial-challenge analysis, only applications of a statute in which the statute actually authorizes or prohibits conduct are considered. See, *e.g., Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833. When addressing a facial challenge to a statute authorizing warrantless searches, the proper focus is on searches that the law actually authorizes and not those that could proceed irrespective of whether they are authorized by the statute, *e.g.,* where exigent circumstances, a warrant, or consent to search exists. Pp. 7–8.

2. Section 41.49(3)(a) is facially unconstitutional because it fails to provide hotel operators with an opportunity for precompliance review. Pp. 9–17.

(a) "'[S]earches conducted outside the judicial process . . . are *per se* unreasonable under the Fourth Amendment—subject only to a few . . . exceptions.'" *Arizona* v. *Gant*, 556 U. S. 332, 338. One exception is for administrative searches. See *Camara* v. *Municipal Court of City and County of San Francisco*, 387 U. S. 523, 534. To be constitutional, the subject of an administrative search must, among other things, be afforded an opportunity to obtain precompliance review before a neutral decisionmaker. See *See* v. *Seattle*, 387 U. S. 541, 545. Assuming the administrative search exception otherwise applies here, §41.49 is facially invalid because it fails to afford hotel operators any opportunity for precompliance review. To be clear, a hotel owner must only be afforded an opportunity for precompliance review; actual review need occur only when a hotel operator objects to turning over the records. This opportunity can be provided without imposing onerous burdens on law enforcement. For instance, officers in the field can issue administrative subpoenas without probable cause that a regulation is being infringed. This narrow holding does not call into question those parts of §41.49 requiring hotel operators to keep records nor does it prevent police from obtaining access to those records where a hotel operator consents to the search, where the officer has a proper administrative warrant, or where some other exception to the warrant requirement applies. Pp. 9–13.

(b) Petitioner's argument that the ordinance is facially valid under the more relaxed standard for closely regulated industries is rejected. See *Marshall* v. *Barlow's, Inc.*, 436 U. S. 307, 313. This Court has only recognized four such industries, and nothing inherent in the

Syllabus

operation of hotels poses a comparable clear and significant risk to the public welfare.  Additionally, because the majority of regulations applicable to hotels apply to many businesses, to classify hotels as closely regulated would permit what has always been a narrow exception to swallow the rule.  But even if hotels were closely regulated, §41.49 would still contravene the Fourth Amendment as it fails to satisfy the additional criteria that must be met for searches of closely regulated industries to be reasonable.  See *New York* v. *Burger*, 482 U. S. 691, 702–703.  Pp. 13–17.

738 F. 3d 1058, affirmed.

SOTOMAYOR, J., delivered the opinion of the Court, in which KENNEDY, GINSBURG, BREYER, and KAGAN, JJ., joined.  SCALIA, J., filed a dissenting opinion, in which ROBERTS, C. J., and THOMAS, J., joined.  ALITO, J., filed a dissenting opinion, in which THOMAS, J., joined.

AD63

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports. Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

────────────

No. 13–1175

────────────

## CITY OF LOS ANGELES, CALIFORNIA, PETITIONER *v.* NARANJIBHAI PATEL, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 22, 2015]

JUSTICE SOTOMAYOR delivered the opinion of the Court.

Respondents brought a Fourth Amendment challenge to a provision of the Los Angeles Municipal Code that compels "[e]very operator of a hotel to keep a record" containing specified information concerning guests and to make this record "available to any officer of the Los Angeles Police Department for inspection" on demand. Los Angeles Municipal Code §§41.49(2), (3)(a), (4) (2015). The questions presented are whether facial challenges to statutes can be brought under the Fourth Amendment and, if so, whether this provision of the Los Angeles Municipal Code is facially invalid. We hold facial challenges can be brought under the Fourth Amendment. We further hold that the provision of the Los Angeles Municipal Code that requires hotel operators to make their registries available to the police on demand is facially unconstitutional because it penalizes them for declining to turn over their records without affording them any opportunity for pre-compliance review.

## I
## A

Los Angeles Municipal Code (LAMC) §41.49 requires hotel operators to record information about their guests, including: the guest's name and address; the number of people in each guest's party; the make, model, and license plate number of any guest's vehicle parked on hotel property; the guest's date and time of arrival and scheduled departure date; the room number assigned to the guest; the rate charged and amount collected for the room; and the method of payment. §41.49(2). Guests without reservations, those who pay for their rooms with cash, and any guests who rent a room for less than 12 hours must present photographic identification at the time of check-in, and hotel operators are required to record the number and expiration date of that document. §41.49(4). For those guests who check in using an electronic kiosk, the hotel's records must also contain the guest's credit card information. §41.49(2)(b). This information can be maintained in either electronic or paper form, but it must be "kept on the hotel premises in the guest reception or guest check-in area or in an office adjacent" thereto for a period of 90 days. §41.49(3)(a).

Section 41.49(3)(a)—the only provision at issue here—states, in pertinent part, that hotel guest records "shall be made available to any officer of the Los Angeles Police Department for inspection," provided that "[w]henever possible, the inspection shall be conducted at a time and in a manner that minimizes any interference with the operation of the business." A hotel operator's failure to make his or her guest records available for police inspection is a misdemeanor punishable by up to six months in jail and a $1,000 fine. §11.00(m) (general provision applicable to entire LAMC).

### B

In 2003, respondents, a group of motel operators along with a lodging association, sued the city of Los Angeles (City or petitioner) in three consolidated cases challenging the constitutionality of §41.49(3)(a). They sought declaratory and injunctive relief. The parties "agree[d] that the sole issue in the . . . action [would be] a facial constitutional challenge" to §41.49(3)(a) under the Fourth Amendment. App. 195. They further stipulated that respondents have been subjected to mandatory record inspections under the ordinance without consent or a warrant. *Id.,* at 194–195.

Following a bench trial, the District Court entered judgment in favor of the City, holding that respondents' facial challenge failed because they lacked a reasonable expectation of privacy in the records subject to inspection. A divided panel of the Ninth Circuit affirmed on the same grounds. 686 F. 3d 1085 (2012). On rehearing en banc, however, the Court of Appeals reversed. 738 F. 3d 1058, 1065 (2013).

The en banc court first determined that a police officer's nonconsensual inspection of hotel records under §41.49 is a Fourth Amendment "search" because "[t]he business records covered by §41.49 are the hotel's private property" and the hotel therefore "has the right to exclude others from prying into the[ir] contents." *Id.,* at 1061. Next, the court assessed "whether the searches authorized by §41.49 are reasonable." *Id.,* at 1063. Relying on *Donovan* v. *Lone Steer, Inc.,* 464 U. S. 408 (1984), and *See* v. *Seattle,* 387 U. S. 541 (1967), the court held that §41.49 is facially unconstitutional "as it authorizes inspections" of hotel records "without affording an opportunity to 'obtain judicial review of the reasonableness of the demand prior to suffering penalties for refusing to comply.'" 738 F. 3d, at 1065 (quoting *See,* 387 U. S., at 545).

Two dissenting opinions were filed. The first dissent

argued that facial relief should rarely be available for Fourth Amendment challenges, and was inappropriate here because the ordinance would be constitutional in those circumstances where police officers demand access to hotel records with a warrant in hand or exigent circumstances justify the search. 738 F. 3d, at 1065–1070 (opinion of Tallman, J.). The second dissent conceded that inspections under §41.49 constitute Fourth Amendment searches, but faulted the majority for assessing the reasonableness of these searches without accounting for the weakness of the hotel operators' privacy interest in the content of their guest registries. *Id.,* at 1070–1074 (opinion of Clifton, J.).

We granted certiorari, 574 U. S. ___ (2014), and now affirm.

## II

We first clarify that facial challenges under the Fourth Amendment are not categorically barred or especially disfavored.

### A

A facial challenge is an attack on a statute itself as opposed to a particular application. While such challenges are "the most difficult . . . to mount successfully," *United States* v. *Salerno*, 481 U. S. 739, 745 (1987), the Court has never held that these claims cannot be brought under any otherwise enforceable provision of the Constitution. Cf. Fallon, Fact and Fiction About Facial Challenges, 99 Cal. L. Rev. 915, 918 (2011) (pointing to several Terms in which "the Court adjudicated more facial challenges on the merits than it did as-applied challenges"). Instead, the Court has allowed such challenges to proceed under a diverse array of constitutional provisions. See, *e.g., Sorrell* v. *IMS Health Inc.*, 564 U. S. ___ (2011) (First Amendment); *District of Columbia* v. *Heller*, 554 U. S. 570

(2008) (Second Amendment); *Chicago* v. *Morales*, 527 U. S. 41 (1999) (Due Process Clause of the Fourteenth Amendment); *Kraft Gen. Foods, Inc.* v. *Iowa Dept. of Revenue and Finance*, 505 U. S. 71 (1992) (Foreign Commerce Clause).

Fourth Amendment challenges to statutes authorizing warrantless searches are no exception. Any claim to the contrary reflects a misunderstanding of our decision in *Sibron* v. *New York*, 392 U. S. 40 (1968). In *Sibron*, two criminal defendants challenged the constitutionality of a statute authorizing police to, among other things, "'stop any person abroad in a public place whom [they] reasonably suspec[t] is committing, has committed or is about to commit a felony.'" *Id.,* at 43 (quoting then N. Y. Code Crim. Proc. §180–a). The Court held that the search of one of the defendants under the statute violated the Fourth Amendment, 392 U. S., at 59, 62, but refused to opine more broadly on the statute's validity, stating that "[t]he constitutional validity of a warrantless search is pre-eminently the sort of question which can only be decided in the concrete factual context of the individual case." *Id.,* at 59.

This statement from *Sibron*—which on its face might suggest an intent to foreclose all facial challenges to statutes authorizing warrantless searches—must be understood in the broader context of that case. In the same section of the opinion, the Court emphasized that the "operative categories" of the New York law at issue were "susceptible of a wide variety of interpretations," *id.,* at 60, and that "[the law] was passed too recently for the State's highest court to have ruled upon many of the questions involving potential intersections with federal constitutional guarantees," *id.,* at 60, n. 20. *Sibron* thus stands for the simple proposition that claims for facial relief under the Fourth Amendment are unlikely to succeed when there is substantial ambiguity as to what conduct a statute authorizes: Where a statute consists of "extraordinarily

AD68

elastic categories," it may be "impossible to tell" whether and to what extent it deviates from the requirements of the Fourth Amendment. *Id.,* at 59, 61, n. 20.

This reading of *Sibron* is confirmed by subsequent precedents. Since *Sibron*, the Court has entertained facial challenges under the Fourth Amendment to statutes authorizing warrantless searches. See, *e.g., Vernonia School District 47J* v. *Acton*, 515 U. S. 646, 648 (1995) ("We granted certiorari to decide whether" petitioner's student athlete drug testing policy "violates the Fourth and Fourteenth Amendments to the United States Constitution"); *Skinner* v. *Railway Labor Executives' Assn.*, 489 U. S. 602, 633, n. 10 (1989) ("[R]espondents have challenged the administrative scheme on its face. We deal therefore with whether the [drug] tests contemplated by the regulation can *ever* be conducted"); cf. *Illinois* v. *Krull*, 480 U. S. 340, 354 (1987) ("[A] person subject to a statute authorizing searches without a warrant or probable cause may bring an action seeking a declaration that the statute is unconstitutional and an injunction barring its implementation"). Perhaps more importantly, the Court has on numerous occasions declared statutes facially invalid under the Fourth Amendment. For instance, in *Chandler* v. *Miller*, 520 U. S. 305, 308–309 (1997), the Court struck down a Georgia statute requiring candidates for certain state offices to take and pass a drug test, concluding that this "requirement . . . [did] not fit within the closely guarded category of constitutionally permissible suspicionless searches." Similar examples abound. See, *e.g., Ferguson* v. *Charleston*, 532 U. S. 67, 86 (2001) (holding that a hospital policy authorizing "nonconsensual, warrantless, and suspicionless searches" contravened the Fourth Amendment); *Payton* v. *New York*, 445 U. S. 573, 574, 576 (1980) (holding that a New York statute "authoriz[ing] police officers to enter a private residence without a warrant and with force, if necessary, to make a routine felony

arrest" was "not consistent with the Fourth Amendment");
*Torres* v. *Puerto Rico*, 442 U. S. 465, 466, 471 (1979) (hold-
ing that a Puerto Rico statute authorizing "police to search
the luggage of any person arriving in Puerto Rico from the
United States" was unconstitutional because it failed to
require either probable cause or a warrant).

### B

Petitioner principally contends that facial challenges to
statutes authorizing warrantless searches must fail be-
cause such searches will never be unconstitutional in all
applications. Cf. *Salerno*, 481 U. S., at 745 (to obtain
facial relief the party seeking it "must establish that no
set of circumstances exists under which the [statute]
would be valid"). In particular, the City points to situa-
tions where police are responding to an emergency, where
the subject of the search consents to the intrusion, and
where police are acting under a court-ordered warrant.
See Brief for Petitioner 19–20. While petitioner frames
this argument as an objection to respondents' challenge in
this case, its logic would preclude facial relief in every
Fourth Amendment challenge to a statute authorizing
warrantless searches. For this reason alone, the City's
argument must fail: The Court's precedents demonstrate
not only that facial challenges to statutes authorizing
warrantless searches can be brought, but also that they
can succeed. See Part II–A, *supra*.

Moreover, the City's argument misunderstands how
courts analyze facial challenges. Under the most exacting
standard the Court has prescribed for facial challenges, a
plaintiff must establish that a "law is unconstitutional in
all of its applications." *Washington State Grange* v. *Wash-
ington State Republican Party*, 552 U. S. 442, 449 (2008).
But when assessing whether a statute meets this stand-
ard, the Court has considered only applications of the

statute in which it actually authorizes or prohibits conduct. For instance, in *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833 (1992), the Court struck down a provision of Pennsylvania's abortion law that required a woman to notify her husband before obtaining an abortion. Those defending the statute argued that facial relief was inappropriate because most women voluntarily notify their husbands about a planned abortion and for them the law would not impose an undue burden. The Court rejected this argument, explaining: The "[l]egislation is measured for consistency with the Constitution by its impact on those whose conduct it affects. . . . The proper focus of the constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." *Id.,* at 894.

Similarly, when addressing a facial challenge to a statute authorizing warrantless searches, the proper focus of the constitutional inquiry is searches that the law actually authorizes, not those for which it is irrelevant. If exigency or a warrant justifies an officer's search, the subject of the search must permit it to proceed irrespective of whether it is authorized by statute. Statutes authorizing warrantless searches also do no work where the subject of a search has consented. Accordingly, the constitutional "applications" that petitioner claims prevent facial relief here are irrelevant to our analysis because they do not involve actual applications of the statute.[1]

───────────

[1] Relatedly, the United States claims that a statute authorizing warrantless searches may still have independent force if it imposes a penalty for failing to cooperate in a search conducted under a warrant or in an exigency. See Brief for United States as *Amicus Curiae* 19. This argument gets things backwards. An otherwise facially unconstitutional statute cannot be saved from invalidation based solely on the existence of a penalty provision that applies when searches are not actually authorized by the statute. This argument is especially unconvincing where, as here, an independent obstruction of justice statute imposes a penalty for "willfully, resist[ing], delay[ing], or obstruct[ing]

### III

Turning to the merits of the particular claim before us, we hold that §41.49(3)(a) is facially unconstitutional because it fails to provide hotel operators with an opportunity for precompliance review.

### A

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." It further provides that "no Warrants shall issue, but upon probable cause." Based on this constitutional text, the Court has repeatedly held that "'searches conducted outside the judicial process, without prior approval by [a] judge or [a] magistrate [judge], are *per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" *Arizona* v. *Gant*, 556 U. S. 332, 338 (2009) (quoting *Katz* v. *United States*, 389 U. S. 347, 357 (1967)). This rule "applies to commercial premises as well as to homes." *Marshall* v. *Barlow's, Inc.*, 436 U. S. 307, 312 (1978).

Search regimes where no warrant is ever required may be reasonable where "'special needs . . . make the warrant and probable-cause requirement impracticable,'" *Skinner*, 489 U. S., at 619 (quoting *Griffin* v. *Wisconsin*, 483 U. S. 868, 873 (1987) (some internal quotation marks omitted)), and where the "primary purpose" of the searches is "[d]istinguishable from the general interest in crime control," *Indianapolis* v. *Edmond*, 531 U. S. 32, 44 (2000). Here, we assume that the searches authorized by §41.49 serve a "special need" other than conducting criminal investigations: They ensure compliance with the record-

———————

any public officer . . . in the discharge or attempt to discharge any duty of his or her office of employment." Cal. Penal Code Ann. §148(a)(1) (West 2014).

keeping requirement, which in turn deters criminals from operating on the hotels' premises.[2] The Court has referred to this kind of search as an "administrative searc[h]." *Camara* v. *Municipal Court of City and County of San Francisco*, 387 U. S. 523, 534 (1967). Thus, we consider whether §41.49 falls within the administrative search exception to the warrant requirement.

The Court has held that absent consent, exigent circumstances, or the like, in order for an administrative search to be constitutional, the subject of the search must be afforded an opportunity to obtain precompliance review before a neutral decisionmaker. See *See*, 387 U. S., at 545; *Lone Steer*, 464 U. S., at 415 (noting that an administrative search may proceed with only a subpoena where the subpoenaed party is sufficiently protected by the opportunity to "question the reasonableness of the subpoena, before suffering any penalties for refusing to comply with it, by raising objections in an action in district court"). And, we see no reason why this minimal requirement is inapplicable here. While the Court has never attempted to prescribe the exact form an opportunity for precompliance review must take, the City does not even attempt to argue that §41.49(3)(a) affords hotel operators any opportunity whatsoever. Section 41.49(3)(a) is, therefore, facially invalid.

A hotel owner who refuses to give an officer access to his or her registry can be arrested on the spot. The Court has held that business owners cannot reasonably be put to this kind of choice. *Camara*, 387 U. S., at 533 (holding that "broad statutory safeguards are no substitute for individualized review, particularly when those safeguards may

─────────────

[2]Respondents contend that §41.49's principal purpose instead is to facilitate criminal investigation. Brief for Respondents 44–47. Because we find that the searches authorized by §41.49 are unconstitutional even if they serve the City's asserted purpose, we decline to address this argument.

only be invoked at the risk of a criminal penalty"). Absent an opportunity for precompliance review, the ordinance creates an intolerable risk that searches authorized by it will exceed statutory limits, or be used as a pretext to harass hotel operators and their guests. Even if a hotel has been searched 10 times a day, every day, for three months, without any violation being found, the operator can only refuse to comply with an officer's demand to turn over the registry at his or her own peril.

To be clear, we hold only that a hotel owner must be afforded an *opportunity* to have a neutral decisionmaker review an officer's demand to search the registry before he or she faces penalties for failing to comply. Actual review need only occur in those rare instances where a hotel operator objects to turning over the registry. Moreover, this opportunity can be provided without imposing onerous burdens on those charged with an administrative scheme's enforcement. For instance, respondents accept that the searches authorized by §41.49(3)(a) would be constitutional if they were performed pursuant to an administrative subpoena. Tr. of Oral Arg. 36–37. These subpoenas, which are typically a simple form, can be issued by the individual seeking the record—here, officers in the field—without probable cause that a regulation is being infringed. See *See*, 387 U. S., at 544 ("[T]he demand to inspect may be issued by the agency"). Issuing a subpoena will usually be the full extent of an officer's burden because "the great majority of businessmen can be expected in normal course to consent to inspection without warrant." *Barlow's, Inc.*, 436 U. S., at 316. Indeed, the City has cited no evidence suggesting that without an ordinance authorizing on-demand searches, hotel operators would regularly refuse to cooperate with the police.

In those instances, however, where a subpoenaed hotel operator believes that an attempted search is motivated by illicit purposes, respondents suggest it would be suffi-

cient if he or she could move to quash the subpoena before
any search takes place. Tr. of Oral Arg. 38–39. A neutral
decisionmaker, including an administrative law judge,
would then review the subpoenaed party's objections
before deciding whether the subpoena is enforceable.
Given the limited grounds on which a motion to quash can
be granted, such challenges will likely be rare. And, in the
even rarer event that an officer reasonably suspects that a
hotel operator may tamper with the registry while the
motion to quash is pending, he or she can guard the regis-
try until the required hearing can occur, which ought not
take long. *Riley* v. *California*, 573 U. S. ___ (2014) (slip
op., at 12) (police may seize and hold a cell phone "to
prevent destruction of evidence while seeking a warrant");
*Illinois* v. *McArthur*, 531 U. S. 326, 334 (2001) (citing
cases upholding the constitutionality of "temporary re-
straints where [they are] needed to preserve evidence until
police could obtain a warrant"). Cf. *Missouri* v. *McNeely*,
569 U. S. ___ (2013) (slip op., at 12) (noting that many
States have procedures in place for considering warrant
applications telephonically).[3]

Procedures along these lines are ubiquitous. A 2002
report by the Department of Justice "identified
approximately 335 existing administrative subpoena
authorities held by various [federal] executive branch
entities." Office of Legal Policy, Report to Congress
on the Use of Administrative Subpoena Authorities by
Executive Branch Agencies and Entities 3, online
at http://www.justice.gov/archive/olp/rpt_to_congress.htm
(All Internet materials as visited June 19, 2015, and
available in Clerk of Court's case file). Their prevalence

---

[3] JUSTICE SCALIA professes to be baffled at the idea that we could
suggest that in certain circumstances, police officers may seize some-
thing that they cannot immediately search. *Post*, at 10–11 (dissenting
opinion). But that is what this Court's cases have explicitly endorsed,
including *Riley* just last Term.

confirms what common sense alone would otherwise lead us to conclude: In most contexts, business owners can be afforded at least an opportunity to contest an administrative search's propriety without unduly compromising the government's ability to achieve its regulatory aims.

Of course administrative subpoenas are only one way in which an opportunity for precompliance review can be made available. But whatever the precise form, the availability of precompliance review alters the dynamic between the officer and the hotel to be searched, and reduces the risk that officers will use these administrative searches as a pretext to harass business owners.

Finally, we underscore the narrow nature of our holding. Respondents have not challenged and nothing in our opinion calls into question those parts of §41.49 that require hotel operators to maintain guest registries containing certain information. And, even absent legislative action to create a procedure along the lines discussed above, see *supra,* at 11, police will not be prevented from obtaining access to these documents. As they often do, hotel operators remain free to consent to searches of their registries and police can compel them to turn them over if they have a proper administrative warrant—including one that was issued *ex parte*—or if some other exception to the warrant requirement applies, including exigent circumstances.[4]

## B

Rather than arguing that §41.49(3)(a) is constitutional

---

[4]In suggesting that our holding today will somehow impede law enforcement from achieving its important aims, JUSTICE SCALIA relies on instances where hotels were used as "prisons for migrants smuggled across the border and held for ransom" or as "rendezvous sites where child sex workers meet their clients on threat of violence from their procurers." See *post*, at 2. It is hard to imagine circumstances more exigent than these.

under the general administrative search doctrine, the City and JUSTICE SCALIA contend that hotels are "closely regulated," and that the ordinance is facially valid under the more relaxed standard that applies to searches of this category of businesses. Brief for Petitioner 28–47; *post,* at 5. They are wrong on both counts.

Over the past 45 years, the Court has identified only four industries that "have such a history of government oversight that no reasonable expectation of privacy . . . could exist for a proprietor over the stock of such an enterprise," *Barlow's, Inc.,* 436 U. S., 313. Simply listing these industries refutes petitioner's argument that hotels should be counted among them. Unlike liquor sales, *Colonnade Catering Corp.* v. *United States*, 397 U. S. 72 (1970), firearms dealing, *United States* v. *Biswell*, 406 U. S. 311, 311–312 (1972), mining, *Donovan* v. *Dewey*, 452 U. S. 594 (1981), or running an automobile junkyard, *New York* v. *Burger*, 482 U. S. 691 (1987), nothing inherent in the operation of hotels poses a clear and significant risk to the public welfare. See, *e.g., id.,* at 709 ("Automobile junkyards and vehicle dismantlers provide the major market for stolen vehicles and vehicle parts"); *Dewey*, 452 U. S., at 602 (describing the mining industry as "among the most hazardous in the country").[5]

Moreover, "[t]he clear import of our cases is that the closely regulated industry . . . is the exception." *Barlow's, Inc.*, 436 U. S., at 313. To classify hotels as pervasively regulated would permit what has always been a narrow exception to swallow the rule. The City wisely refrains from arguing that §41.49 itself renders hotels closely regulated. Nor do any of the other regulations on which

——————

[5] JUSTICE SCALIA's effort to depict hotels as raising a comparable degree of risk rings hollow. See *post*, at 1, 14. Hotels—like practically all commercial premises or services—can be put to use for nefarious ends. But unlike the industries that the Court has found to be closely regulated, hotels are not intrinsically dangerous.

petitioner and JUSTICE SCALIA rely—regulations requiring hotels to, *inter alia*, maintain a license, collect taxes, conspicuously post their rates, and meet certain sanitary standards—establish a comprehensive scheme of regulation that distinguishes hotels from numerous other businesses. See Brief for Petitioner 33–34 (citing regulations); *post*, at 7 (same). All businesses in Los Angeles need a license to operate. LAMC §§21.03(a), 21.09(a). While some regulations apply to a smaller set of businesses, see *e.g.* Cal. Code Regs., tit. 25, §40 (2015) (requiring linens to be changed between rental guests), online at http://www.oal.ca.gov/ccr.htm, these can hardly be said to have created a "'comprehensive'" scheme that puts hotel owners on notice that their "'property will be subject to periodic inspections undertaken for specific purposes,'" *Burger*, 482 U. S., at 705, n. 16 (quoting *Dewey*, 452 U. S., at 600). Instead, they are more akin to the widely applicable minimum wage and maximum hour rules that the Court rejected as a basis for deeming "the entirety of American interstate commerce" to be closely regulated in *Barlow's, Inc.* 436 U. S., at 314. If such general regulations were sufficient to invoke the closely regulated industry exception, it would be hard to imagine a type of business that would not qualify. See Brief for Google Inc. as *Amicus Curiae* 16–17; Brief for the Chamber of Commerce of United States of America as *Amicus Curiae* 12–13.

Petitioner attempts to recast this hodgepodge of regulations as a comprehensive scheme by referring to a "centuries-old tradition" of warrantless searches of hotels. Brief for Petitioner 34–36. History is relevant when determining whether an industry is closely regulated. See, *e.g., Burger*, 482 U. S., at 707. The historical record here, however, is not as clear as petitioner suggests. The City and JUSTICE SCALIA principally point to evidence that hotels were treated as public accommodations. Brief for Petitioner 34–36; *post*, at 5–6, and n. 1. For instance, the

AD78

Commonwealth of Massachusetts required innkeepers to "'furnish[] . . . suitable provisions and lodging, for the refreshment and entertainment of strangers and travellers, pasturing and stable room, hay and provender . . . for their horses and cattle.'" Brief for Petitioner 35 (quoting An Act For The Due Regulation Of Licensed Houses (1786), reprinted in Acts and Laws of the Commonwealth of Massachusetts 209 (1893)). But laws obligating inns to provide suitable lodging to all paying guests are not the same as laws subjecting inns to warrantless searches. Petitioner also asserts that "[f]or a long time, [hotel] owners left their registers open to widespread inspection." Brief for Petitioner 51. Setting aside that modern hotel registries contain sensitive information, such as driver's licenses and credit card numbers for which there is no historic analog, the fact that some hotels chose to make registries accessible to the public has little bearing on whether government authorities could have viewed these documents on demand without a hotel's consent.

Even if we were to find that hotels are pervasively regulated, §41.49 would need to satisfy three additional criteria to be reasonable under the Fourth Amendment: (1) "[T]here must be a 'substantial' government interest that informs the regulatory scheme pursuant to which the inspection is made"; (2) "the warrantless inspections must be 'necessary' to further [the] regulatory scheme"; and (3) "the statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant." *Burger*, 482 U. S., at 702–703 (internal quotation marks omitted). We assume petitioner's interest in ensuring that hotels maintain accurate and complete registries might fulfill the first of these requirements, but conclude that §41.49 fails the second and third prongs of this test.

The City claims that affording hotel operators any opportunity for precompliance review would fatally under-

mine the scheme's efficacy by giving operators a chance to falsify their records.   Brief for Petitioner 41–42.   The Court has previously rejected this exact argument, which could be made regarding any recordkeeping requirement. See *Barlow's, Inc.*, 436 U. S., at 320 ("[It is not] apparent why the advantages of surprise would be lost if, after being refused entry, procedures were available for the [Labor] Secretary to seek an *ex parte* warrant to reappear at the premises without further notice to the establishment being inspected"); cf. *Lone Steer*, 464 U. S., at 411, 415 (affirming use of administrative subpoena which provided an opportunity for precompliance review as a means for obtaining "payroll and sales records").   We see no reason to accept it here.

As explained above, nothing in our decision today precludes an officer from conducting a surprise inspection by obtaining an *ex parte* warrant or, where an officer reasonably suspects the registry would be altered, from guarding the registry pending a hearing on a motion to quash.   See *Barlow's, Inc.*, 436 U. S., at 319–321; *Riley*, 573 U. S., at ___ (slip op., at 12).   JUSTICE SCALIA's claim that these procedures will prove unworkable given the large number of hotels in Los Angeles is a red herring.   See *post*, at 11. While there are approximately 2,000 hotels in Los Angeles, *ibid.*, there is no basis to believe that resort to such measures will be needed to conduct spot checks in the vast majority of them.   See *supra,* at 11.

Section 41.49 is also constitutionally deficient under the "certainty and regularity" prong of the closely regulated industries test because it fails sufficiently to constrain police officers' discretion as to which hotels to search and under what circumstances.   While the Court has upheld inspection schemes of closely regulated industries that called for searches at least four times a year, *Dewey*, 452 U. S., at 604, or on a "regular basis," *Burger*, 482 U. S., at 711, §41.49 imposes no comparable standard.

\*      \*      \*

For the foregoing reasons, we agree with the Ninth Circuit that §41.49(3)(a) is facially invalid insofar as it fails to provide any opportunity for precompliance review before a hotel must give its guest registry to the police for inspection.  Accordingly, the judgment of the Ninth Circuit is affirmed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

————

No. 13–1175

————

## CITY OF LOS ANGELES, CALIFORNIA, PETITIONER *v.* NARANJIBHAI PATEL, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 22, 2015]

JUSTICE SCALIA, with whom THE CHIEF JUSTICE and JUSTICE THOMAS join, dissenting.

The city of Los Angeles, like many jurisdictions across the country, has a law that requires motels, hotels, and other places of overnight accommodation (hereinafter motels) to keep a register containing specified information about their guests. Los Angeles Municipal Code (LAMC) §41.49(2) (2015). The purpose of this recordkeeping requirement is to deter criminal conduct, on the theory that criminals will be unwilling to carry on illicit activities in motel rooms if they must provide identifying information at check-in. Because this deterrent effect will only be accomplished if motels actually do require guests to provide the required information, the ordinance also authorizes police to conduct random spot checks of motels' guest registers to ensure that they are properly maintained. §41.49(3). The ordinance limits these spot checks to the four corners of the register, and does not authorize police to enter any nonpublic area of the motel. To the extent possible, police must conduct these spot checks at times that will minimize any disruption to a motel's business.

The parties do not dispute the governmental interests at stake. Motels not only provide housing to vulnerable transient populations, they are also a particularly attractive site for criminal activity ranging from drug dealing

and prostitution to human trafficking. Offering privacy and anonymity on the cheap, they have been employed as prisons for migrants smuggled across the border and held for ransom, see Sanchez, Immigrant Smugglers Become More Ruthless, Washington Post, June 28, 2004, p. A3; Wagner, Human Smuggling, Arizona Republic, July 23, 2006, p. A1, and rendezvous sites where child sex workers meet their clients on threat of violence from their procurers.

Nevertheless, the Court today concludes that Los Angeles's ordinance is "unreasonable" inasmuch as it permits police to flip through a guest register to ensure it is being filled out without first providing an opportunity for the motel operator to seek judicial review. Because I believe that such a limited inspection of a guest register is eminently reasonable under the circumstances presented, I dissent.

## I

I assume that respondents may bring a facial challenge to the City's ordinance under the Fourth Amendment. Even so, their claim must fail because, as discussed *infra*, the law is constitutional in most, if not all, of its applications. See *United States* v. *Salerno*, 481 U. S. 739, 751 (1987). But because the Court discusses the propriety of a facial challenge at some length, I offer a few thoughts.

Article III limits our jurisdiction to "Cases" and "Controversies." Accordingly, "[f]ederal courts may not 'decide questions that cannot affect the rights of litigants in the case before them' or give 'opinion[s] advising what the law would be upon a hypothetical state of facts.'" *Chafin* v. *Chafin*, 568 U. S. ___, ___ (2013) (slip op., at 5). To be sure, the *reasoning* of a decision may suggest that there is no permissible application of a particular statute, *Chicago* v. *Morales,* 527 U. S. 41, 77 (1999) (SCALIA, J., dissenting), and under the doctrine of *stare decisis*, this reasoning—to

the extent that it is necessary to the holding—will be binding in all future cases. But in this sense, the facial invalidation of a statute is a logical consequence of the Court's opinion, not the immediate effect of its judgment. Although we have at times described our holdings as invalidating a law, it is always the application of a law, rather than the law itself, that is before us.

The upshot is that the effect of a given case is a function not of the plaintiff's characterization of his challenge, but the narrowness or breadth of the ground that the Court relies upon in disposing of it. If a plaintiff elects not to present any case-specific facts in support of a claim that a law is unconstitutional—as is the case here—he will limit the grounds on which a Court may find for him to highly abstract rules that would have broad application in future cases. The decision to do this might be a poor strategic move, especially in a Fourth Amendment case, where the reasonableness of a search is a highly factbound question and general, abstract rules are hard to come by. Cf. *Sibron* v. *New York*, 392 U. S. 40, 59 (1968). But even had the plaintiffs in this case presented voluminous facts in a self-styled as-applied challenge, nothing would force this Court to rely upon those facts rather than the broader principle that the Court has chosen to rely upon. I see no reason why a plaintiff's self-description of his challenge as facial would provide an independent reason to reject it unless we were to delegate to litigants our duty to say what the law is.

## II

The Fourth Amendment provides, in relevant part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." Grammatically, the two clauses of the Amendment seem to be independent—and

AD84

directed at entirely different actors.  The former tells the executive what it must do when it conducts a search, and the latter tells the judiciary what it must do when it issues a search warrant.  But in an effort to guide courts in applying the Search-and-Seizure Clause's indeterminate reasonableness standard, and to maintain coherence in our case law, we have used the Warrant Clause as a guidepost for assessing the reasonableness of a search, and have erected a framework of presumptions applicable to broad categories of searches conducted by executive officials.  Our case law has repeatedly recognized, however, that these are mere presumptions, and the only constitutional *requirement* is that a search be reasonable.

When, for example, a search is conducted to enforce an administrative regime rather than to investigate criminal wrongdoing, we have been willing to modify the probable-cause standard so that a warrant may issue absent individualized suspicion of wrongdoing.  Thus, our cases say a warrant may issue to inspect a structure for fire-code violations on the basis of such factors as the passage of time, the nature of the building, and the condition of the neighborhood.  *Camara* v. *Municipal Court of City and County of San Francisco,* 387 U. S. 523, 538–539 (1967).  As we recognized in that case, "reasonableness is still the ultimate standard.  If a valid public interest justifies the intrusion contemplated, then there is probable cause to issue a suitably restricted search warrant."  *Id.*, at 539.  And precisely "because the ultimate touchstone of the Fourth Amendment is 'reasonableness,'" even the presumption that the search of a home without a warrant is unreasonable "is subject to certain exceptions."  *Brigham City* v. *Stuart*, 547 U. S. 398, 403 (2006).

One exception to normal warrant requirements applies to searches of closely regulated businesses.  "[W]hen an entrepreneur embarks upon such a business, he has voluntarily chosen to subject himself to a full arsenal of

AD85

governmental regulation," and so a warrantless search to enforce those regulations is not unreasonable. *Marshall* v. *Barlow's, Inc.*, 436 U. S. 307, 313 (1978). Recognizing that warrantless searches of closely regulated businesses may nevertheless *become* unreasonable if arbitrarily conducted, we have required laws authorizing such searches to satisfy three criteria: (1) There must be a "'substantial' government interest that informs the regulatory scheme pursuant to which the inspection is made"; (2) "the warrantless inspections must be 'necessary to further [the] regulatory scheme'"; and (3) "'the statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant.'" *New York* v. *Burger*, 482 U. S. 691, 702–703 (1987).

Los Angeles's ordinance easily meets these standards.

## A

In determining whether a business is closely regulated, this Court has looked to factors including the duration of the regulatory tradition, *id.,* at 705–707, *Colonnade Catering Corp.* v. *United States*, 397 U. S. 72, 75–77 (1970), *Donovan* v. *Dewey*, 452 U. S. 594, 606 (1981); the comprehensiveness of the regulatory regime, *Burger, supra,* at 704–705, *Dewey, supra,* at 606; and the imposition of similar regulations by other jurisdictions, *Burger, supra,* at 705. These factors are not talismans, but shed light on the expectation of privacy the owner of a business may reasonably have, which in turn affects the reasonableness of a warrantless search. See *Barlow's, supra,* at 313.

Reflecting the unique public role of motels and their commercial forebears, governments have long subjected these businesses to unique public duties, and have established inspection regimes to ensure compliance. As Blackstone observed, "Inns, in particular, being intended for the lodging and receipt of travellers, may be indicted, sup-

**AD86**

pressed, and the inn-keepers fined, if they refuse to entertain a traveller without a very sufficient cause: for thus to frustrate the end of their institution is held to be disorderly behavior." 4 W. Blackstone, Commentaries on the Laws of England 168 (1765). Justice Story similarly recognized "[t]he soundness of the public policy of subjecting particular classes of persons to extraordinary responsibility, in cases where an extraordinary confidence is necessarily reposed in them, and there is an extraordinary temptation to fraud, or danger of plunder." J. Story, Commentaries on the Law of Bailments §464, pp. 487–488 (5th ed. 1851). Accordingly, in addition to the obligation to receive any paying guest, "innkeepers are bound to take, not merely ordinary care, but uncommon care, of the goods, money, and baggage of their guests," *id.,* §470, at 495, as travellers "are obliged to rely almost implicitly on the good faith of innholders, whose education and morals are none of the best, and who might have frequent opportunities of associating with ruffians and pilferers," *id.,* §471, at 498.

These obligations were not merely aspirational. At the time of the founding, searches—indeed, warrantless searches—of inns and similar places of public accommodation were commonplace. For example, although Massachusetts was perhaps the State most protective against government searches, "the state code of 1788 still allowed tithingmen to search public houses of entertainment on every Sabbath without any sort of warrant." W. Cuddihy, Fourth Amendment: Origins and Original Meaning 602–1791, 743 (2009).[1]

As this evidence demonstrates, the regulatory tradition governing motels is not only longstanding, but comprehen-

---

[1] As Beale helpfully confirms, "[f]rom the earliest times the fundamental characteristic of an inn has been its public nature. It is a public house, a house of public entertainment, or, as it is legally phrased, a common inn." J. Beale, The Law of Innkeepers and Hotels §11, p. 10 (1906).

sive. And the tradition continues in Los Angeles. The City imposes an occupancy tax upon transients who stay in motels, LAMC §21.7.3, and makes the motel owner responsible for collecting it, §21.7.5. It authorizes city officials "to enter [a motel], free of charge, during business hours" in order to "inspect and examine" them to determine whether these tax provisions have been complied with. §§21.7.9, 21.15. It requires all motels to obtain a "Transient Occupancy Registration Certificate," which must be displayed on the premises. §21.7.6. State law requires motels to "post in a conspicuous place . . . a statement of rate or range of rates by the day for lodging," and forbids any charges in excess of those posted rates. Cal. Civ. Code Ann. §1863 (West 2010). Hotels must change bed linens between guests, Cal. Code Regs., tit. 25, §40 (2015), and they must offer guests the option not to have towels and linens laundered daily, LAMC §121.08. "Multiuse drinking utensils" may be placed in guest rooms only if they are "thoroughly washed and sanitized after each use" and "placed in protective bags." Cal. Code Regs., tit. 17, §30852. And state authorities, like their municipal counterparts, "may at reasonable times enter and inspect any hotels, motels, or other public places" to ensure compliance. §30858.

The regulatory regime at issue here is thus substantially *more* comprehensive than the regulations governing junkyards in *Burger*, where licensing, inventory-recording, and permit-posting requirements were found sufficient to qualify the industry as closely regulated. 482 U. S., at 704–705. The Court's suggestion that these regulations are not sufficiently targeted to motels, and are "akin to . . . minimum wage and maximum hour rules," *ante*, at 15, is simply false. The regulations we have described above reach into the "minutest detail[s]" of motel operations, *Barlow's, supra*, at 314, and those who enter that business today (like those who have entered it over the centuries)

do so with an expectation that they will be subjected to especially vigilant governmental oversight.

Finally, this ordinance is not an outlier. The City has pointed us to more than 100 similar register-inspection laws in cities and counties across the country, Brief for Petitioner 36, and n. 3, and that is far from exhaustive. In all, municipalities in at least 41 States have laws similar to Los Angeles's, Brief for National League of Cities et al. as *Amici Curiae* 16–17, and at least 8 States have their own laws authorizing register inspections, Brief for California et al. as *Amici Curiae* 12–13.

This copious evidence is surely enough to establish that "[w]hen a [motel operator] chooses to engage in this pervasively regulated business . . . he does so with the knowledge that his business records . . . will be subject to effective inspection." *United States* v. *Biswell*, 406 U. S. 311, 316 (1972). And *that* is the relevant constitutional test—not whether this regulatory superstructure is "the same as laws subjecting inns to warrantless searches," or whether, as an historical matter, government authorities not only required these documents to be kept but permitted them to be viewed on demand without a motel's consent. *Ante,* at 16.

The Court's observation that "[o]ver the past 45 years, the Court has identified only four industries" as closely regulated, *ante,* at 14, is neither here nor there. Since we first concluded in *Colonnade Catering* that warrantless searches of closely regulated businesses are reasonable, we have only identified *one* industry as *not* closely regulated, see *Barlow's,* 436 U. S., at 313–314. The Court's statistic thus tells us more about how this Court exercises its discretionary review than it does about the number of industries that qualify as closely regulated. At the same time, lower courts, which do not have the luxury of picking the cases they hear, have identified many more businesses as closely regulated under the test we have announced:

pharmacies, *United States* v. *Gonsalves*, 435 F. 3d 64, 67 (CA1 2006); massage parlors, *Pollard* v. *Cockrell*, 578 F. 2d 1002, 1014 (CA5 1978); commercial-fishing operations, *United States* v. *Raub*, 637 F. 2d 1205, 1208–1209 (CA9 1980); day-care facilities, *Rush* v. *Obledo*, 756 F. 2d 713, 720–721 (CA9 1985); nursing homes, *People* v. *Firstenberg*, 92 Cal. App. 3d 570, 578–580, 155 Cal. Rptr. 80, 84–86 (1979); jewelers, *People* v. *Pashigian*, 150 Mich. App. 97, 100–101, 388 N. W. 2d 259, 261–262 (1986) (*per curiam*); barbershops, *Stogner* v. *Kentucky*, 638 F. Supp. 1, 3 (WD Ky. 1985); and yes, even rabbit dealers, *Lesser* v. *Espy*, 34 F. 3d 1301, 1306–1307 (CA7 1994). Like automobile junkyards and catering companies that serve alcohol, many of these businesses are far from "intrinsically dangerous," cf. *ante*, at 14, n. 5. This should come as no surprise. The reason closely regulated industries may be searched without a warrant has nothing to do with the risk of harm they pose; rather, it has to do with the expectations of those who enter such a line of work. See *Barlow's*, *supra,* at 313.

## B

The City's ordinance easily satisfies the remaining *Burger* requirements: It furthers a substantial governmental interest, it is necessary to achieving that interest, and it provides an adequate substitute for a search warrant.

Neither respondents nor the Court question the substantial interest of the City in deterring criminal activity. See Brief for Respondents 34–41; *ante*, at 15. The private pain and public costs imposed by drug dealing, prostitution, and human trafficking are beyond contention, and motels provide an obvious haven for those who trade in human misery.

Warrantless inspections are also necessary to advance this interest. Although the Court acknowledges that law

enforcement can enter a motel room without a warrant when exigent circumstances exist, see *ante*, at 13, n. 4, the whole reason criminals use motel rooms in the first place is that they offer privacy and secrecy, so that police will never come to discover these exigencies. The recordkeeping requirement, which all parties admit is permissible, therefore operates by *deterring* crime. Criminals, who depend on the anonymity that motels offer, will balk when confronted with a motel's demand that they produce identification. And a motel's evasion of the recordkeeping requirement fosters crime. In San Diego, for example, motel owners were indicted for collaborating with members of the Crips street gang in the prostitution of under-age girls; the motel owners "set aside rooms apart from the rest of their legitimate customers where girls and women were housed, charged the gang members/pimps a higher rate for the rooms where 'dates' or 'tricks' took place, and warned the gang members of inquiries by law enforcement." Office of the Attorney General, Cal. Dept. of Justice, The State of Human Trafficking in California 25 (2012). The warrantless inspection requirement provides a necessary incentive for motels to maintain their registers thoroughly and accurately: They never know when law enforcement might drop by to inspect.

Respondents and the Court acknowledge that *inspections* are necessary to achieve the purposes of the record-keeping regime, but insist that *warrantless* inspections are not. They have to acknowledge, however, that the motel operators who conspire with drug dealers and procurers may demand precompliance judicial review simply as a pretext to buy time for making fraudulent entries in their guest registers. The Court therefore must resort to arguing that warrantless inspections are not "necessary" because other alternatives exist.

The Court suggests that police could obtain an administrative subpoena to search a guest register and, if a motel

moves to quash, the police could "guar[d] the registry pending a hearing" on the motion. *Ante*, at 17. This proposal is equal parts 1984 and Alice in Wonderland. It protects motels from government inspection of their registers by authorizing government agents to seize the registers[2] (if "guarding" entails forbidding the register to be moved) or to upset guests by a prolonged police presence at the motel. The Court also notes that police can obtain an *ex parte* warrant before conducting a register inspection. *Ante,* at 17. Presumably such warrants could issue without probable cause of wrongdoing by a particular motel, see *Camara*, 387 U. S., at 535–536; otherwise, this would be no alternative at all. Even so, under this regime police would have to obtain an *ex parte* warrant before *every* inspection. That is because law enforcement would have no way of knowing ahead of time which motels would refuse consent to a search upon request; and if they wait to obtain a warrant until consent is refused, motels will have the opportunity to falsify their guest registers while the police jump through the procedural hoops required to obtain a warrant. It is quite plausible that the costs of this always-get-a-warrant "alternative" would be prohibitive for a police force in one of America's largest cities, juggling numerous law-enforcement priorities, and confronting more than 2,000 motels within its jurisdiction. E. Wallace, K. Pollock, B. Horth, S. Carty, & N. Elyas, Los Angeles Tourism: A Domestic and International Analysis 7 (May 2014 online at http://www.lachamber.com/clientuploads/Global_Programs/WTW/2014/LATourism_LMU_May2014.pdf (as visited June 19, 2015, and available in Clerk of Court's

---

[2] We are not at all "baffled at the idea that . . . police officers may seize something that they cannot immediately search." *Ante*, at 12, n. 3. We are baffled at the idea that anyone would think a seizure of required records less intrusive than a visual inspection.

case file).  To be sure, the fact that obtaining a warrant might be costly will not by itself render a warrantless search reasonable under the Fourth Amendment; but it can render a warrantless search *necessary* in the context of an administrative-search regime governing closely regulated businesses.

But all that discussion is in any case irrelevant.  The administrative search need only be reasonable.  It is not the burden of Los Angeles to show that there are no less restrictive means of achieving the City's purposes.  Sequestration or *ex parte* warrants were *possible* alternatives to the warrantless search regimes approved by this Court in *Colonnade Catering*, *Biswell*, *Dewey*, and *Burger*.  By importing a least-restrictive-means test into *Burger*'s Fourth Amendment framework, today's opinion implicitly overrules that entire line of cases.

Finally, the City's ordinance provides an adequate substitute for a warrant.  Warrants "advise the owner of the scope and objects of the search, beyond which limits the inspector is not expected to proceed."  *Barlow's*, 436 U. S., at 323.  Ultimately, they aim to protect against "devolv[ing] almost unbridled discretion upon executive and administrative officers, particularly those in the field, as to when to search and whom to search."  *Ibid.*

Los Angeles's ordinance provides that the guest register must be kept in the guest reception or guest check-in area, or in an adjacent office, and that it "be made available to any officer of the Los Angeles Police Department for inspection.  Whenever possible, the inspection shall be conducted at a time and in a manner that minimizes any interference with the operation of the business."  LAMC §41.49(3).  Nothing in the ordinance authorizes law enforcement to enter a nonpublic part of the motel.  Compare this to the statute upheld in *Colonnade Catering*, which provided that "'[t]he Secretary or his delegate may enter, in the daytime, any building or place where any articles or

objects subject to tax are made, produced, or kept, so far as it may be necessary for the purpose of examining said articles or objects,'" 397 U. S., at 73, n. 2 (quoting 26 U. S. C. §7606(a) (1964 ed.)); or the one in *Biswell*, which stated that "'[t]he Secretary may enter during business hours the premises (including places of storage) of any firearms or ammunition importer . . . for the purpose of inspecting or examining (1) any records or documents required to be kept . . . , and (2) any firearms or ammunition kept or stored,'" 406 U. S., at 312, n. 1 (quoting 18 U. S. C. §923(g) (1970 ed.)); or the one in *Dewey*, which granted federal mine inspectors "'a right of entry to, upon, or through any coal or other mine,'" 452 U. S., at 596 (quoting 30 U. S. C. §813(a) (1976 ed., Supp. III)); or the one in *Burger*, which compelled junkyard operators to "'produce such records and permit said agent or police officer to examine them and any vehicles or parts of vehicles which are subject to the record keeping requirements of this section and which are on the premises,'" 482 U. S., at 694, n. 1 (quoting N. Y. Veh. & Traf. Law §415–a5 (McKinney 1986)). The Los Angeles ordinance—which limits warrantless police searches to the pages of a guest register in a public part of a motel—circumscribes police discretion in much more exacting terms than the laws we have approved in our earlier cases.

The Court claims that Los Angeles's ordinance confers too much discretion because it does not adequately limit the *frequency* of searches. Without a trace of irony, the Court tries to distinguish Los Angeles's law from the laws upheld in *Dewey* and *Burger* by pointing out that the latter regimes required inspections at least four times a year and on a "'regular basis,'" respectively. *Ante*, at 17. But the warrantless police searches of a business "10 times a day, every day, for three months" that the Court envisions under Los Angeles's regime, *ante*, at 11, are entirely consistent with the regimes in *Dewey* and *Burger*;

10 times a day, every day, is "at least four times a year," and on a (much too) "'regular basis.'" *Ante,* at 17.

That is not to say that the Court's hypothetical searches are necessarily constitutional. It is only to say that Los Angeles's ordinance presents no greater risk that such a hypothetical will materialize than the laws we have already upheld. As in our earlier cases, we should leave it to lower courts to consider on a case-by-case basis whether warrantless searches have been conducted in an unreasonably intrusive or harassing manner.

## III

The Court reaches its wrongheaded conclusion not simply by misapplying our precedent, but by mistaking our precedent for the Fourth Amendment itself. Rather than bother with the text of that Amendment, the Court relies exclusively on our administrative-search cases, *Camara, See* v. *Seattle,* 387 U. S. 541 (1967), and *Barlow's*. But the Constitution predates 1967, and it remains the supreme law of the land today. Although the categorical framework our jurisprudence has erected in this area may provide us guidance, it is guidance to answer the constitutional question at issue: whether the challenged search is *reasonable*.

An administrative, warrantless-search ordinance that narrowly limits the scope of searches to a single business record, that does not authorize entry upon premises not open to the public, and that is supported by the need to prevent fabrication of guest registers, is, to say the least, far afield from the laws at issue in the cases the Court relies upon. The Court concludes that such minor intrusions, permissible when the police are trying to tamp down the market in stolen auto parts, are "unreasonable" when police are instead attempting to stamp out the market in child sex slaves.

Because I believe that the limited warrantless searches

authorized by Los Angeles's ordinance are reasonable under the circumstances, I respectfully dissent.

AD96

# SUPREME COURT OF THE UNITED STATES

_____

No. 13–1175

_____

### CITY OF LOS ANGELES, CALIFORNIA, PETITIONER
_v._ NARANJIBHAI PATEL, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 22, 2015]

JUSTICE ALITO, with whom JUSTICE THOMAS joins, dissenting.

After today, the city of Los Angeles can never, under any circumstances, enforce its 116-year-old requirement that hotels make their registers available to police officers. That is because the Court holds that §41.49(3)(a) of the Los Angeles Municipal Code (2015) is _facially_ unconstitutional. Before entering a judgment with such serious safety and federalism implications, the Court must conclude that every application of this law is unconstitutional—_i.e.,_ that "'no set of circumstances exists under which the [law] would be valid.'" _Ante,_ at 7 (quoting _United States_ v. _Salerno_, 481 U. S. 739, 745 (1987)). I have doubts about the Court's approach to administrative searches and closely regulated industries. _Ante,_ at 9–17. But even if the Court were 100% correct, it still should uphold §41.49(3)(a) because many other applications of this law are constitutional. Here are five examples.

Example One. The police have probable cause to believe that a register contains evidence of a crime. They go to a judge and get a search warrant. The hotel operator, however, refuses to surrender the register, but instead stashes it away. Officers could tear the hotel apart looking for it. Or they could simply order the operator to produce it. The Fourth Amendment does not create a right to defy a war-

rant. Hence §41.49(3)(a) could be constitutionally applied in this scenario. Indeed, the Court concedes that it is proper to apply a California obstruction of justice law in such a case. See *ante,* at 8–9, n. 1; Brief for Respondents 49. How could applying a city law with a similar effect be different? No one thinks that overlapping laws are unconstitutional. See, *e.g., Yates* v. *United States*, 574 U. S. ___, ___ (2015) (KAGAN, J. dissenting) (slip op., at 10–11) ("Overlap—even significant overlap—abounds in criminal law") (collecting citations). And a specific law gives more notice than a general law.

In any event, the Los Angeles ordinance is arguably broader in at least one important respect than the California obstruction of justice statute on which the Court relies. *Ante*, at 8–9, n. 1. The state law applies when a person "willfully resists, delays, or obstructs any public officer . . . in the discharge or attempt to discharge any duty of his or her office." Cal. Penal Code Ann. §148(a)(1) (West 2014). In the example set out above, suppose that the hotel operator, instead of hiding the register, simply refused to tell the police where it is located. The Court cites no California case holding that such a refusal would be unlawful, and the city of Los Angeles submits that under California law, "[o]bstruction statutes prohibit a hotel owner from *obstructing* a search, but they do not require affirmative assistance." Reply Brief 5. The Los Angeles ordinance, by contrast, unequivocally requires a hotel operator to make the register available on request.

Example Two. A murderer has kidnapped a woman with the intent to rape and kill her and there is reason to believe he is holed up in a certain motel. The Fourth Amendment's reasonableness standard accounts for exigent circumstances. See, *e.g., Brigham City* v. *Stuart*, 547 U. S. 398, 403 (2006). When the police arrive, the motel operator folds her arms and says the register is locked in a safe. Invoking §41.49(3)(a), the police order the operator

to turn over the register. She refuses. The Fourth Amendment does not protect her from arrest.

Example Three. A neighborhood of "pay by the hour" motels is a notorious gathering spot for child-sex traffickers. Police officers drive through the neighborhood late one night and see unusual amounts of activity at a particular motel. The officers stop and ask the motel operator for the names of those who paid with cash to rent rooms for less than three hours. The operator refuses to provide the information. Requesting to see the register—and arresting the operator for failing to provide it—would be reasonable under the "totality of the circumstances." *Ohio* v. *Robinette*, 519 U. S. 33, 39 (1996). In fact, the Court has upheld a similar reporting duty against a Fourth Amendment challenge where the scope of information required was also targeted and the public's interest in crime prevention was no less serious. See *California Bankers Assn.* v. *Shultz*, 416 U. S. 21, 39, n. 15, 66–67 (1974) (having "no difficulty" upholding a requirement that banks must provide reports about transactions involving more than $10,000, including the name, address, occupation, and social security number of the customer involved, along with a summary of the transaction, the amount of money at issue, and the type of identification presented).

Example Four. A motel is operated by a dishonest employee. He has been charging more for rooms than he records, all the while pocketing the difference. The owner finds out and eagerly consents to a police inspection of the register. But when officers arrive and ask to see the register, the operator hides it. The Fourth Amendment does not allow the operator's refusal to defeat the owner's consent. See, *e.g., Mancusi* v. *DeForte*, 392 U. S. 364, 369–370 (1968). Accordingly, it would not violate the Fourth Amendment to arrest the operator for failing to make the register "available to any officer of the Los Angeles Police Department for inspection." §41.49(3)(a).

Example Five. A "mom and pop" motel always keeps its old-fashioned guest register open on the front desk. Anyone who wants to can walk up and leaf through it. (Such motels are not as common as they used to be, but Los Angeles is a big place.) The motel has no reasonable expectation of privacy in the register, and no one doubts that police officers—like anyone else—can enter into the lobby. See, *e.g., Florida* v. *Jardines*, 569 U. S. 1, ___ (2013) (slip op., at 6); *Donovan* v. *Lone Steer, Inc.*, 464 U. S. 408, 413 (1984). But when an officer starts looking at the register, as others do, the motel operator at the desk snatches it away and will not give it back. Arresting that person would not violate the Fourth Amendment.

These are just five examples. There are many more. The Court rushes past examples like these by suggesting that §41.49(3)(a) does no "work" in such scenarios. *Ante,* at 8. That is not true. Under threat of legal sanction, this law orders hotel operators to do things they do not want to do. To be sure, there may be circumstances in which §41.49(3)(a)'s command conflicts with the Fourth Amendment, and in those circumstances the Fourth Amendment is supreme. See U. S. Const., Art VI, cl. 2. But no different from any other local law, the remedy for such circumstances should be an as-applied injunction *limited to the conflict with the Fourth Amendment.* Such an injunction would protect a hotel from being "searched 10 times a day, every day, for three months, without any violation being found." *Ante,* at 11. But unlike facial invalidation, an as-applied injunction does not produce collateral damage. Section 41.49(3)(a) should be enforceable in those many cases in which the Fourth Amendment is not violated.

There are serious arguments that the Fourth Amendment's application to warrantless searches and seizures is inherently inconsistent with facial challenges. See *Sibron* v. *New York*, 392 U. S. 40, 59, 62 (1968) (explaining that because of the Fourth Amendment's reasonableness re-

quirement, "[t]he constitutional validity of a warrantless search is pre-eminently the sort of question which can only be decided in the concrete factual context of the individual case"); Brief for Manhattan Institute for Policy Research as *Amicus Curiae* 33 ("A constitutional claim under the first clause of the Fourth Amendment is never a 'facial' challenge, because it is always and inherently a challenge to executive action"). But assuming such facial challenges ever make sense conceptually, this particular one fails under basic principles of facial invalidation. The Court's contrary holding is befuddling. I respectfully dissent.