No. 15-1429

# United States Court of Appeals
## for the First Circuit

———————————

ROBERT DRAPER, ARIEL WEISBERG, DONNA MAJOR, ERIC NOTKIN, ROBERT
BOUDRIE, BRENT CARLTON(S), CONCORD ARMORY, LLC, PRECISION POINT
FIREARMS, LLC, AND SECOND AMENDMENT FOUNDATION, INC.
*Plaintiff-Appellants*,

*v.*

MAURA HEALEY, IN HER CAPACITY AS ATTORNEY GENERAL OF MASSACHUSETTS,
*Defendant-Appellee.*

———————————

ON APPEAL FROM A FINAL JUDGMENT OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

———————————

**BRIEF OF THE DEFENDANT-APPELLEE**

———————————

MAURA HEALEY
  *Attorney General of Massachusetts*

Julia Kobick, No. 1162713
    *Assistant Attorney General*
Government Bureau
One Ashburton Place
Boston, Massachusetts 02108
(617) 963-2559
julia.kobick@state.ma.us

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................iv

STATEMENT OF THE ISSUES...............................................................1

STATEMENT OF THE CASE..................................................................2

STATEMENT OF FACTS ........................................................................3

    The Attorney General's Handgun Sales Regulations......................................3

    Factual and Procedural History .................................................................8

SUMMARY OF ARGUMENT ...............................................................12

ARGUMENT .........................................................................................15

    I.    The Term "Load Indicator" in Section 16.05(3) Is Not Vague
          As Applied to Glock Pistols or on Its Face. .......................................15

        A.    Section 16.05(3) Is Not Unconstitutionally Vague As
             Applied to Glock Pistols. .........................................................15

            1.    The Dealer Plaintiffs Had Fair Notice That Glock
                  Pistols Lack an Effective Load Indicator. .....................17

                  a.    The Dealer Plaintiffs Had Actual Notice
                      That Glock Pistols Lack a Load Indicator
                      That Satisfies Section 16.05(3). ...........................17

                  b.    Persons of Ordinary Intelligence Would
                      Understand that Glock Pistols Lack a Load
                      Indicator That Plainly Indicates When a
                      Cartridge is in the Firing Chamber......................21

                2.    The Dealer Plaintiffs Failed to Allege That Section
                  16.05(3) Authorizes or Encourages Discriminatory
                  Enforcement..................................................................27

        B.    The District Court Correctly Dismissed the Claim That
             the Term "Load Indicator" in Section 16.05(3) Is Void
             for Vagueness.........................................................................29

1.     The Dealer Plaintiffs Cannot Challenge Section
16.05(3) as Void for Vagueness Because Such
Claims May Only Be Asserted When a Regulation
Threatens First Amendment Freedoms. ........................30

2.     Even If the Plaintiffs Could Assert a Void-for-
Vagueness Claim, the Claim Fails Because the
Term "Load Indicator" Is Not Vague In All of Its
Applications and Has a Plainly Legitimate Sweep. .......34

C.     The Dealer Plaintiffs Lack Standing to Raise Their
Vagueness Claim Because Their Requested Remedy
Would Not Redress Their Alleged Injury.................................38

II.     The District Court Correctly Dismissed the Consumer
Plaintiffs' Second Amendment Claim. .................................40

A.     The Attorney General Will Stipulate to Dismissal of the
Plaintiffs' Second Amendment Claim. .....................................41

B.     Section 16.05(3) Does Not Infringe the Consumer
Plaintiffs' Second Amendment Rights. ....................................42

1.     As a Qualification on the Commercial Sale of
Arms, Section 16.05(3) Is Presumptively Lawful..........43

2.     Section 16.05(3) Does Not Implicate the Second
Amendment Because It Imposes, At Most, a *De
Minimis* Burden on the Right to Possess a Firearm
in the Home for Self-Defense.........................................45

3.     Section 16.05(3) Easily Withstands Heightened
Scrutiny Because It Is Substantially Related to the
Government's Important Interest in Public Safety.........48

III.    The District Court Correctly Determined that the Second
Amendment Foundation Lacks Associational Standing. ....................52

CONCLUSION.................................................................55

Certificate of Compliance With Rule 32(a).............................................57

ii

Certificate Of Service..............................................................................57

ADDENDUM ......................................................................................58

# TABLE OF AUTHORITIES

## Cases

*Am. Exp.-Isbrandtsen Lines, Inc. v. Fed. Mar. Comm'n*,
 389 F.2d 962 (D.C. Cir. 1968)....................................................................27

*Am. Shooting Sports Council, Inc. v. Attorney General*,
 429 Mass. 871, 711 N.E.2d 899 (1999).........................................4, 8, 25, 51

*Bauer v. Harris*,
 94 F. Supp. 3d 1149 (E.D. Cal. 2015) .........................................................45

*Bell v. Glock, Inc. (USA)*,
 92 F. Supp. 2d 1067 (D. Mont. 2000) ..........................................................36

*Bellone v. Southwick-Tolland Reg'l Sch. Dist.*,
 748 F.3d 418 (1st Cir. 2014).......................................................................38

*Chapman v. United States*,
 500 U.S. 453 (1991)...............................................................................31, 33

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
 467 U.S. 837 (1984)....................................................................................30

*City of Chicago v. Morales*,
 527 U.S. 41 (1999).....................................................................................34

*City of Los Angeles v. Patel*,
 135 S. Ct. 2443 (2015)................................................................................33

*Clark v. Jeter*,
 486 U.S. 456 (1988)................................................................................49-50

*Commonwealth v. McGowan*,
 464 Mass. 232, 982 N.E.2d 495 (2013).........................................................44

*Crooker v. Magaw*,
 41 F. Supp. 2d 87 (D. Mass. 1999)...............................................................28

*District of Columbia v. Heller*,
   554 U.S. 570 (2008)............................................ 12, 14, 42, 43, 44, 47, 48, 49

*Drake v. Filko*,
   724 F.3d 426 (3d Cir. 2013) ........................................................49

*Fletcher v. Haas*,
   851 F. Supp. 2d 287 (D. Mass. 2012)........................................54

*Friedman v. City of Highland Park*,
   784 F.3d 406 (7th Cir. 2015) ......................................................47

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
   528 U.S. 167 (2000)......................................................................52

*FW/PBS, Inc. v. Dallas*,
   493 U.S. 215 (1990)......................................................................53

*Garner v. White*,
   726 F.2d 1274 (8th Cir. 1984) ....................................................28

*Giragosian v. Ryan*,
   547 F.3d 59 (1st Cir. 2008).....................................................36, 37

*Gonzales v. Carhart*,
   550 U.S. 124 (2007)................................................................20, 26

*Grayned v. City of Rockland*,
   408 U.S. 104 (1972)..................................... 20, 21, 22, 23, 24, 26

*Haley v. City of Boston*,
   657 F.3d 39 (1st Cir. 2011)..........................................................38

*Heller v. District of Columbia*,
   670 F.3d 1244 (D.C. Cir. 2011).............................................45, 49

*Heller v. District of Columbia*,
   801 F.3d 264 (D.C. Cir. 2015).....................................................45

*Hightower v. City of Boston*,
    693 F.3d 61 (1st Cir. 2012)........................................................48

*Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*,
    452 U.S. 264 (1981)................................................................50

*Hodgkins v. Holder*,
    677 F. Supp. 2d 202 (D.D.C. 2010)..........................................54

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010)..............................................16, 22, 26, 30, 31

*In re Colonial Mortgage Bankers Corp.*,
    324 F.3d 12 (1st Cir. 2003)......................................................37

*Jackson v. City and Cty. of San Francisco*,
    746 F.3d 953 (9th Cir. 2014) ...................................................44

*Johnson v. United States*,
    135 S. Ct. 2551 (2015).............................................................33

*Kachalsky v. Cacace*,
    817 F. Supp. 2d 235 (S.D.N.Y. 2011) ......................................54

*Kachalsky v. Cty. of Westchester*,
    701 F.3d 81 (2d Cir. 2012) ..............................45, 49,  50, 54

*Kampfer v. Cuomo*,
    993 F. Supp. 2d 188 (N.D.N.Y. 2014) ......................................47

*Love v. Butler*,
    952 F.2d 10 (1st Cir. 1991)................................................31, 32

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)................................................................40

*Maynard v. Cartwright*,
    486 U.S. 356 (1988)..........................................................17, 31

*McDonald v. City of Chicago,*
        561 U.S. 742 (2010)................................................................42, 43

*McGuire v. Reilly,*
        260 F.3d 36 (1st Cir. 2001)................................................................50

*Morales Feliciano v. Rullan,*
        378 F.3d 42 (1st Cir. 2004)................................................................38

*Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco,*
        *Firearms, & Explosives,*
        700 F.3d 185 (5th Cir. 2012) ............................................................44, 45

*N.Y. State Rifle & Pistol Ass'n v. Cuomo,*
        804 F.3d 242 (2d Cir. 2015) ..........................................24, 34, 45, 46

*Papachristou v. City of Jacksonville,*
        405 U.S. 156 (1972)................................................................16

*Parker v. Levy,*
        417 U.S. 733 (1974)................................................................36

*Pennhurst State Sch. & Hosp. v. Halderman,*
        465 U.S. 89 (1984)................................................................21

*Pitonyak v. State,*
        253 S.W.3d 834 (Tex. App. 2008) ..........................................36, 37, 38

*Powell v. Tompkins,*
        783 F.3d 332 (1st Cir. 2015)................................................................43

*Richmond Boro Gun Club, Inc. v. City of New York,*
        97 F.3d 681 (2d Cir. 1996) ..........................................24, 27, 35

*Sabri v. United States,*
        541 U.S. 600 (2004)................................................................30

*Smith ex rel. Smith v. Bryco Arms*,
  33 P.3d 638 (N.M. App. 2001) ..........................................................36, 37, 38

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998).......................................................................................40

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009).......................................................................52, 53, 55

*SunCom Mobile & Data, Inc. v. FCC*,
  87 F.3d 1386 (D.C. Cir. 1996)......................................................................38

*Teixeira v. Cty. of Alameda*,
  2013 WL 707043 (N.D. Cal. 2013) ..............................................................45

*Turner Broadcasting Sys., Inc. v. FCC*,
  512 U.S. 622 (1994).......................................................................................50

*United States v. AVX Corp.*,
  962 F.2d 108 (1st Cir. 1992).........................................................52, 53, 54

*United States v. Booker*,
  644 F.3d 12 (1st Cir. 2011).........................................................48, 49, 50

*United States v. Chester*,
  628 F.3d 673 (4th Cir. 2010) .......................................................................49

*United States v. DeCastro*,
  682 F.3d 160 (2d Cir. 2012) ..................................................................45, 46

*United States v. Hsu*,
  364 F.3d 192 (4th Cir. 2004) ................................................................18, 31

*United States v. Marzzarella*,
  614 F.3d 85 (3d Cir. 2010) ...........................................................................49

*United States v. Masciandaro*,
  638 F.3d 458 (4th Cir. 2011) .......................................................................49

*United States v. Mazurie*,
    419 U.S. 544 (1975)................................................................................31, 33

*United States v. Nee*,
    261 F.3d 79 (1st Cir. 2001).....................................................................38

*United States v. Saffo*,
    227 F.3d 1260 (10th Cir. 2000) ..................................................................19

*United States v. Salerno*,
    481 U.S. 739 (1987)................................................................................34

*United States v. Torres-Rosario*,
    658 F.3d 110 (1st Cir. 2011) .......................................................................44

*United States v. Williams*,
    553 U.S. 285 (2008)........................................................................16, 24, 26

*United States v. Zhen Zhou Wu*,
    711 F.3d 1 (1st Cir. 2013)................................................................18, 20, 31

*URI Student Senate v. Town of Narragansett*,
    631 F.3d 1 (1st Cir. 2011).....................................................21, 22, 24, 32, 34

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
    455 U.S. 489 (1982)............................................... 16, 20, 27, 29, 31, 33, 34

*Warth v. Seldin*,
    422 U.S. 490 (1975)................................................................................40

*Washington v. Glucksberg*,
    521 U.S. 702 (1997)................................................................................34

*Wash. State Grange v. Wash. State Republican Party*,
    552 U.S. 442 (2008)............................................................................30, 34

*Woollard v. Gallagher*,
    712 F.3d 865 (4th Cir. 2012) ................................................................49, 50

## Constitutional Provisions and Statutes

U.S. Const. amend. II........................................................................*passim*

Ma. Const. amend. art. 64, § 1 ......................................................30

21 U.S.C. § 209 ...............................................................................23

30 U.S.C. § 871(g) ..........................................................................23

42 U.S.C. § 1983 ..........................................................................2, 11

50 U.S.C. § 1547 .............................................................................23

Fed. R. Civ. P. 41(a)(1)(A)(ii) ......................................................42

Cal. Penal Code § 31910(b)(5) ......................................................47

Cal. Penal Code § 32000(a) ...........................................................47

M.G.L. c. 93A ...........................................................................13, 28

M.G.L. c. 93A, § 2(a)........................................................................5

M.G.L. c. 93A, § 2(c)............................................................. 1, 4-5, 8

M.G.L. c. 93A, § 9(3A).....................................................................5

M.G.L. c. 106, § 2A–403(2) ...........................................................23

M.G.L. c. 140, § 123 .........................................................................6

M.G.L. c. 160, § 176A .....................................................................23

M.G.L. c. 166, § 21B(3)...................................................................23

Mass. St. 1998, c. 180, § 19 .............................................................6

**Rules and Regulations**

940 C.M.R § 16.01 ...................................................................*passim*

940 C.M.R § 16.03 ...................................................................5

940 C.M.R § 16.04 ...................................................................5

940 C.M.R § 16.05(1) ...............................................................5

940 C.M.R § 16.05(2) ...............................................................5

940 C.M.R § 16.05(3) ...............................................................*passim*

940 C.M.R § 16.05(4) ...............................................................6, 46

940 C.M.R § 16.06(1) ...............................................................6

940 C.M.R § 16.06(2) ...............................................................6

940 C.M.R § 16.08 ...................................................................39

940 C.M.R § 16.09 ...................................................................46

**Miscellaneous**

*American Heritage College Dictionary* (4th ed. 2004) ...........................................22

Cal. Roster of Handguns Certified for Sale, *available
at* http://certguns.doj.ca.gov/ ...................................................................47

C. Masero, *Gun Fatal[ity] Is All Too Familiar a Scenario*,
Boston Herald, Dec. 6, 1997, at 4.................................................................4

GLOCK, Inc., Re: Commercial Sales of GLOCK Pistols in
Massachusetts, *available
at* http://www.gssfonline.com/hot_topics/massachusetts_
commsales.pdf ...................................................................9

J. Heaney & J.B. Johnson, *Gun Tragedy Leaves Toddler Dead; Youth Accidentally Shot 2-year-old, Police Say*, BOSTON HERALD, Mar. 22, 1996, at 1 ...........................................................................4

J. Rakowski, *Gun Control Urged as 2 Families Mourn*, BOSTON GLOBE, Mar. 17, 1996, at 76.........................................................................4

J.S. Vernick et al., "*I Didn't Know the Gun Was Loaded*": *An Examination of Two Safety Devices That Can Reduce the Risk of Unintentional Firearms Injuries*, J. OF PUB. HEALTH POLICY, Vol. 20, No. 4, pp. 427–440 (1999)..................................3, 7

J.S. Vernick et al., *Unintentional and Undetermined Firearms Related Deaths: A Preventable Death Analysis for Three Safety Devices*, INJURY PREVENTION, Vol. 2003, No. 9, pp. 307–311 (2003).............................................................. 50-51

N. Sinauer et al., *Unintentional, Nonfatal Firearm-Related Injuries*, J. OF THE AM. MEDICAL ASS'N, Vol. 25, No. 22, pp. 1740–43 (1996)..............................................................................3

Office of the Attorney General, July 16, 2004 Consumer Advisory on Glock Handguns, *available at* http://www.mass.gov/ago/docs/regulations/enforcement-notices/ag-handgun-regulation-enforcement-notices.pdf ...........................9

T. Smith, National Opinion Research Ctr., 1997–98 NATIONAL GUN POLICY SURVEY (Sept. 1998), *available at* http://www.norc.org/PDFs/publications/SmithT_Nat_Gun_Policy_199798.pdf ..............................................................7

U.S. General Accounting Office, Report to the Chairman, Subcommittee on Antitrust, Monopolies, and Business Rights, Committee on the Judiciary, U.S. Senate, ACCIDENTAL SHOOTINGS: MANY DEATHS AND INJURIES CAUSED BY FIREARMS COULD BE PREVENTED (1991) .................3, 4, 8, 36, 50

*Webster's 7th New Collegiate Dictionary* (1967).....................................22

## <u>STATEMENT OF THE ISSUES</u>

Pursuant to her authority under the Consumer Protection Act, M.G.L. c. 93A, § 2(c), the Attorney General has promulgated regulations aimed at promoting the safety and merchantability of handguns sold by firearms dealers in Massachusetts. One regulation, in particular, requires certain handguns sold by firearms dealers to be equipped with either a load indicator or a magazine safety disconnect. *See* 940 Code Mass. Regs. ("C.M.R.") § 16.05(3). A "load indicator" is defined as "a device which plainly indicates that a cartridge is in the firing chamber within the handgun." *Id.* § 16.01.

The questions presented are:

(1) Whether the term "load indicator," as used in 940 C.M.R. § 16.05(3) and defined in 940 C.M.R. § 16.01, is unconstitutionally vague on its face or as applied to handguns manufactured by Glock, Inc., in violation of the Fourteenth Amendment to the United States Constitution;

(2) Whether requiring a load indicator or magazine safety disconnect on certain handguns sold by Massachusetts firearms dealers violates the Second Amendment to the United States Constitution; and

(3) Whether the Second Amendment Foundation, Inc. lacks standing to sue on behalf of its members as an organizational plaintiff.

## STATEMENT OF THE CASE

Plaintiff-appellants are six firearms consumers, two Massachusetts firearms dealers, and one advocacy organization.[1] They filed this lawsuit under 42 U.S.C. § 1983 to challenge the constitutionality of a safety regulation promulgated by the Attorney General that requires a load indicator or magazine safety disconnect on certain handguns sold in Massachusetts. Joint Appendix ("JA") 19–46. The dealer plaintiffs claimed that the term "load indicator" was unconstitutionally vague on its face and as applied to the sale of pistols manufactured by Glock, Inc. JA 39–44. And the consumer plaintiffs claimed that the regulation violates the Second Amendment because it prevents them from purchasing Glock pistols, even though it permits them to purchase a wide range of other handguns. JA 44–45.

The Attorney General moved to dismiss the complaint, arguing that the plaintiffs lacked standing and failed to state a claim on which relief can be granted. JA 176–204. After holding a hearing, the District Court granted the Attorney General's motion. JA 333–52. The District Court determined that the consumer and dealer plaintiffs had standing to pursue their claims, but that the organizational plaintiffs lacked standing. JA 335–39. On the merits, the District Court concluded that the dealer and consumer plaintiffs failed to state a claim that the term "load

---

[1] Commonwealth Second Amendment, Inc., another advocacy organization, was named as a plaintiff in the District Court, but has not joined in this appeal. Joint Appendix 19, 22–23, 354–55.

indicator" was unconstitutionally vague and failed to state a viable Second Amendment claim. JA 340–49. The appellants timely appealed. JA 354–55.

## STATEMENT OF FACTS

### The Attorney General's Handgun Sales Regulations

Throughout the 1980s and 1990s, government officials became increasingly alarmed by the numbers of Americans killed and injured by accidental discharges of firearms. During that time, firearms were responsible for, on average, 1,500 unintentional deaths and 17,000 unintentional injuries each year.[2] In an effort to understand the magnitude of the problem, the U.S. Government Accountability Office ("GAO") conducted a comprehensive study of accidental firearms deaths in 1991.[3] It found that firearms were the fourth leading cause of accidental death among children aged 5 to 14, the third leading cause of accidental death among 15- to 24-years-olds, and the sixth leading cause of potential years of life lost from

---

[2] *See* U.S. General Accounting Office, Report to the Chairman, Subcommittee on Antitrust, Monopolies, and Business Rights, Committee on the Judiciary, U.S. Senate, ACCIDENTAL SHOOTINGS: MANY DEATHS AND INJURIES CAUSED BY FIREARMS COULD BE PREVENTED 2, 9 (1991), available at http://www.gao.gov/assets/160/150353.pdf (hereinafter GAO Report); J.S. Vernick et al., "*I Didn't Know the Gun Was Loaded*"*: An Examination of Two Safety Devices That Can Reduce the Risk of Unintentional Firearms Injuries*, J. OF PUB. HEALTH POLICY, Vol. 20, No. 4, p. 429 (1999); N. Sinauer et al., *Unintentional, Nonfatal Firearm-Related Injuries*, J. OF THE AM. MEDICAL ASS'N, Vol. 25, No. 22, pp. 1740–42 (1996).

[3] *See generally* GAO Report, *supra* note 2.

accidents across all age groups.[4] It also concluded that 1 in 3 of these accidental deaths could have been prevented by the addition of a firearms safety device.[5]

The devastation of accidental firearms deaths came into sharp focus in Massachusetts in 1996 when, in the span of 10 days, three children—a 14-year-old boy, a 12-year-old boy, and a 2-year-old boy—were killed in accidental firearms shootings.[6] In each of these shootings, the person who fired the handgun believed, incorrectly, that it was unloaded.[7]

In response to these tragedies and the sobering statistics on accidental firearms fatalities, the Massachusetts Attorney General proposed a set of regulations designed to reduce unintentional firearms deaths and injuries, promote firearms safety, and assure consumers that handguns sold in Massachusetts were merchantable. *See Am. Shooting Sports Council, Inc. v. Attorney General*, 429 Mass. 871, 711 N.E.2d 899, 901, 907 n.19 (1999). After holding multiple hearings and incorporating feedback from interested parties, the Attorney General promulgated regulations pursuant to the Consumer Protection Act, M.G.L. c. 93A,

---

[4] GAO Report, *supra* note 2, at 8.

[5] GAO Report, *supra* note 2, at 3, 17.

[6] *See* J. Rakowski, *Gun Control Urged as 2 Families Mourn*, BOSTON GLOBE, Mar. 17, 1996, at 76; J. Heaney & J.B. Johnson, *Gun Tragedy Leaves Toddler Dead; Youth Accidentally Shot 2-year-old, Police Say*, BOSTON HERALD, Mar. 22, 1996, at 1; C. Masero, *Gun Fatal[ity] Is All Too Familiar a Scenario*, BOSTON HERALD, Dec. 6, 1997, at 4.

[7] *See id.*

§ 2(c). That statute empowers the Attorney General to define by regulation any "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." M.G.L. c. 93A, § 2(a), (c). Such unfair or deceptive acts or practices are unlawful in Massachusetts, and violators may be subject to treble damages and attorneys' fees and costs. *Id.* §§ 2(a), 9(3A).

The regulations make it an unfair or deceptive practice for a dealer[8] in Massachusetts to transfer[9] handguns[10] to civilians that fail rigorous performance tests, that are made of inferior materials, or that are prone to accidental discharge, "drop firing," explosion, repeated firing, or other failures. 940 C.M.R. § 16.04. They require dealers to sell handguns with tamper-resistant serial numbers, safety locking devices, and child safety devices that make it unlikely that children under six can pull the trigger. *Id.* §§ 16.03, 16.05(1)–(2). And they require dealers to

---

[8] The regulations specifically apply to "handgun-purveyors," which, subject to certain exceptions not relevant here, is defined to include persons or entities that transfer five or more handguns per year to non-law-enforcement and non-military customers in Massachusetts. 940 C.M.R. § 16.01. That definition encompasses dealers, wholesalers, and manufacturers. For ease of reference, however, this brief will refer to handgun-purveyors as "dealers."

[9] The term "transfer" is generally defined to include selling, renting, or leasing. 940 C.M.R. § 16.01.

[10] "Handguns" are defined as "a weapon, designed to be fired by the use of a single hand, from which may be fired or ejected one or more solid projectiles propelled via a chemical ignition, and which has: (a) a smooth bore with a barrel less than 18 inches long; (b) a smooth bore and an overall weapon length of less than 26 inches; or (c) a rifled bore with a barrel less than 16 inches." 940 C.M.R. § 16.01. The regulations do not, therefore, apply to rifles and shotguns.

provide a specific written safety warning with every handgun sale; to show buyers how to load, unload, and safely store the handgun; and to demonstrate how to engage and disengage the safety devices on the handgun. *Id.* §§ 16.06(1)–(2).[11]

Section 16.05(3) of the regulations, the regulation challenged here, makes it an unfair or deceptive practice for a dealer to transfer or offer to transfer to a customer "any handgun which does not contain a load indicator or magazine safety disconnect." *Id.* § 16.05(3). A "load indicator" is defined as "a device which plainly indicates that a cartridge is in the firing chamber within the handgun." *Id.* § 16.01. And a "magazine safety disconnect" is defined as "a device that prevents the firing of the handgun when the magazine is detached from the handgun." *Id.* The regulations specify that Section 16.05(3)'s requirement "applies only to handguns that have a mechanism to load cartridges via a magazine," *id.* § 16.05(4); it therefore covers semi-automatic pistols, but not revolvers or single-shot pistols. The regulations also require dealers to notify customers of the presence or absence of a load indicator or magazine safety disconnect on any handgun they wish to purchase. *Id.* § 16.06(2).

---

[11] Shortly after the Attorney General promulgated these regulations, the Legislature adopted many of the same safety provisions, incorporating their terms into the statutes regulating dealer licenses and criminal conduct. *See* Mass. St. 1998, c. 180, § 19. Those provisions are now largely codified at M.G.L. c. 140, § 123. The challenged regulation requiring a load indicator or magazine safety disconnect on certain handguns was not codified by statute.

Section 16.05(3) was grounded in research on the effectiveness of load indicators and magazine safety disconnects. Many accidental firearms deaths and injuries, the Attorney General recognized, occur when a gun user does not realize that a round of ammunition is in the gun's firing chamber. A 1997 report by the National Opinion Research Center found that only 65% of Americans knew that a pistol can fire when the magazine is removed, because a round can remain in the chamber; 35% believed incorrectly that the gun could not fire or said they did not know.[12] Of those surveyed, 28% lived in a household with a gun.[13] By requiring a safety device that plainly alerts a handgun user that a round is in the chamber or that disables the gun when the magazine is removed, Section 16.05(3) sought to reduce injuries and fatalities caused by this misconception.

Section 16.05(3) was further supported by the 1991 GAO research, which found that load indicators can prevent a significant number of accidental handgun fatalities and injuries. According to the GAO's report, people shot and killed themselves or others with a gun they believed was unloaded in 23% of the 1,501

---

[12] *See* T. Smith, National Opinion Research Ctr., 1997–98 NATIONAL GUN POLICY SURVEY 17 (Sept. 1998), available at http://www.norc.org/PDFs/publications/SmithT_Nat_Gun_Policy_199798.pdf; Vernick et al., *supra* note 2, at 430 (reporting the same survey results for the National Opinion Research Center's 1997 report).

[13] Vernick et al., *supra* note 2, at 430.

7

accidental firearms fatalities in 1988.[14] All of these deaths—numbering 345 in 1988—could have been prevented with a load indicator, the GAO found.[15] "[L]ives could be saved and injuries prevented," the GAO concluded, "if all guns were equipped with either a child-proof safety or a loading indicator or both."[16]

In 1999, the Massachusetts Supreme Judicial Court upheld the Handgun Sales Regulations as a proper exercise of the Attorney General's authority under G.L. c. 93A, § 2(c). *Am. Shooting Sports Council*, 711 N.E.2d at 907. The court held that the Attorney General could regulate as a deceptive or unfair act the sale of unmerchantable handguns that "fail fundamental requirements of safety and performance." *Id.* at 904–05. It also held that the regulations were a permissible "adjunct to safety and performance requirements imposed by the Legislature on handguns in order to protect the public's health, safety, or welfare." *Id.*

### Factual and Procedural History

In December 2013 and May 2014, dealer plaintiffs Concord Armory, LLC and Precision Point Firearms, LLC wrote to the Attorney General's Office ("AGO") to ask whether third and fourth generation pistols manufactured by

---

[14] GAO Report, *supra* note 2, at 3, 17.

[15] GAO Report, *supra* note 2, at 3, 17, 24, 34. The report also found that an additional 8% of accidental firearms fatalities could have been prevented by a child-proofing safety device. *Id.* at 3, 17.

[16] GAO Report, *supra* note 2, at 33.

Glock, Inc. comply with the Handgun Sales Regulations, and if not, what features make the pistols noncompliant. JA 108, 110. The AGO responded that the Glock pistols do not comply with the regulations "because they lack an effective load indicator or magazine safety disconnect." JA 125, 127. The letter stated that in 2004, the AGO had notified Glock of its pistols' noncompliance, and since then "has been clear and consistent in our communication to dealers and consumers about the reason that Glock firearms do not comply with the Regulations." JA 127.[17] If the dealer plaintiffs "could benefit from the ability to sell Glock firearms," the letter continued, they "may want to communicate that to Glock, Inc., and ask if

---

[17] A letter posted to the Glock Shooting Sports Foundation's website notes that the AGO informed Glock of its pistols' noncompliance on June 22, 2004. *See* GLOCK, Inc., Re: Commercial Sales of GLOCK Pistols in Massachusetts, available at http://www.gssfonline.com/hot_topics/massachusetts_commsales.pdf. The letter instructs Massachusetts dealers to return all newly manufactured Glock handguns to Glock. *Id.* In addition, in a July 16, 2004 Consumer Advisory, the Attorney General stated:

> AG Reilly's Office has notified Glock, Inc. that the "extractor indicator" device which the company recently added to its handguns is not an effective load indicator and, therefore, does not comply with the handgun regulations. The AG's Office reached this determination after consulting with firearms experts. In response, Glock has recalled all handguns shipped to dealers and distributors in the Commonwealth and ceased in-state sales.

*See* Office of the Attorney General, July 16, 2004 Consumer Advisory on Glock Handguns, available at http://www.mass.gov/ago/docs/regulations/enforcement-notices/ag-handgun-regulation-enforcement-notices.pdf. Because this Advisory was not posted on the AGO website at the time this case was filed, the Attorney General does not rely on it in this brief.

they have plans to employ an effective load indicator or magazine safety disconnect as many other firearms manufacturers have done." JA 127.

In April and June 2014, the six consumer plaintiffs separately emailed the two dealer plaintiffs to ask if they could buy a third or fourth generation Glock pistol. JA 32–34, 76–91. The dealer plaintiffs responded that they could not sell the Glock pistols because they do not comply with the Attorney General's handgun regulations. JA 93–106. As Concord Armory wrote, "[I]t is Concord Armory's understanding that we would be at risk of [an] Enforcement Action…by the Attorney General of Massachusetts if we were to sell or transfer this pistol to you." JA 95, 101, 105. The consumer plaintiffs then wrote letters to the AGO asking whether third and fourth generation Glock pistols comply with the regulations, and if not, why they are noncompliant. JA 108–123. The AGO responded that the Glock pistols do not comply with the regulations "because they lack an effective load indicator or magazine safety disconnect." JA 129–39. Since 2004, the AGO explained, Glock has not notified the AGO "of any change in the features of their firearms nor attempted to certify any firearms model as compliant with the Massachusetts Handgun Sales Regulations," so "newly manufactured Glock handguns may not be transferred by a handgun dealer to a Massachusetts civilian." *Id.*

The plaintiffs then brought this lawsuit under 42 U.S.C. § 1983 to challenge the constitutionality of 940 C.M.R. § 16.05(3). In Count 1 of the complaint, the dealer plaintiffs claimed that the term "load indicator" in Section 16.05(3), as defined in Section 16.01, is unconstitutionally vague on its face and as applied to third and fourth generation Glock pistols. JA 39–44. In Count 2, the consumer plaintiffs claimed that Section 16.05(3) violates their Second Amendment rights because it prevents them from purchasing third and fourth generation Glock pistols in Massachusetts. JA 44–45.

The District Court granted the Attorney General's motion to dismiss the complaint. JA 333–52. The court first determined that the organizational plaintiffs lacked standing to sue in their own right because they did not sufficiently allege that they were injured by Section 16.05(3). JA 336–37. The court also determined that they lacked standing to sue on behalf of their members because they did not identify any member who was dissuaded from buying or selling a Glock pistol by Section 16.05(3). JA 337–38.

Next, the court rejected the dealer plaintiffs' claim that the term "load indicator" is facially vague, concluding instead that there are numerous valid applications of the load indicator definition. JA 340–42. The dealers' as-applied vagueness claim likewise failed, the court ruled, because the dealers had actual knowledge that third and fourth generation Glock pistols do not comply with

Section 16.05(3), and because the "load indicator" definition employs straightforward words in common usage and with common meaning. JA 343–46. "The vagueness doctrine," the court explained, "is concerned with whether the plaintiffs, as people of ordinary intelligence, can determine if the Gen3/4 Glock pistols comply with the regulation and not with why or how the AG reached her conclusion." JA 345.

Finally, the court ruled that the consumer plaintiffs' Second Amendment claim failed for three reasons: (1) Under *District of Columbia v. Heller*, 554 U.S. 570, 626–27 & n.26 (2008), regulations like Section 16.05(3) that "impos[e] conditions and qualifications on the commercial sale of arms" are "presumptively lawful"; (2) Section 16.05(3) does not substantially burden the right to possess firearms for self-defense in the home because a wide range of firearms may be acquired in Massachusetts, even though Section 16.05(3) makes certain Glock pistols unmerchantable; and (3) by requiring certain handguns in Massachusetts to have a load indicator or magazine safety disconnect, Section 16.05(3) is substantially related to the government's important interest in promoting the public's safety.

## <u>SUMMARY OF ARGUMENT</u>

The District Court correctly dismissed the dealer plaintiffs' claim that the term "load indicator" in Section 16.05(3) is unconstitutionally vague as applied to

third and fourth generation Glock pistols. The dealer plaintiffs had fair notice that Section 16.05(3) proscribed their proposed conduct—selling Glock pistols—for two reasons. First, the Attorney General specifically informed them that Glock pistols lack an effective load indicator or magazine safety disconnect, and plaintiffs cannot challenge a regulation as unconstitutionally vague when they have actual knowledge that the regulation forbids their proposed conduct. Second, the definition of "load indicator"—"a device which plainly indicates that a cartridge is in the firing chamber within the handgun"—provides persons of ordinary intelligence fair notice that Glock pistols lack a load indicator. To the extent the dealer plaintiffs argue that Section 16.05(3) encourages discriminatory enforcement, that claim also fails because it should not be addressed in this pre-enforcement context, and because the plaintiffs failed to allege that the Attorney General has pursued chapter 93A enforcement actions in a discriminatory manner.

The District Court also correctly dismissed the dealer plaintiffs' facial claim challenging Section 16.05(3) as unconstitutionally vague. When, as here, the challenged enactment does not burden First Amendment rights, plaintiffs can only challenge that enactment as applied; they cannot assert a facial claim premised on vagueness. And even if the dealer plaintiffs could challenge Section 16.05(3) as vague on its face, the claim would fail because the term "load indicator" is not vague in all of its applications and has a plainly legitimate sweep.

13

As an alternative basis for affirmance, the dealer plaintiffs lack standing to assert their vagueness claims. They ask this Court to invalidate the load indicator clause of Section 16.05(3) if this Court determines that the term "load indicator" is unconstitutionally vague. But if the load indicator clause of the regulation were invalidated, the alternative clause in the regulation—that is, that handguns must be sold with a magazine safety disconnect—would remain. Because Glock pistols lack a magazine safety disconnect, they would remain unavailable for sale in Massachusetts, even if the dealer plaintiffs prevail on their vagueness claim. Because the dealer plaintiffs' requested remedy would not address their alleged injury, they cannot demonstrate the redressability component of Article III standing.

The District Court also correctly dismissed the consumer plaintiffs' claim that Section 16.05(3) violates their Second Amendment rights by limiting their access to Glock pistols. To the extent the consumer plaintiffs wish to narrow that claim in this Court, the Attorney General will stipulate to dismissal of the claim if the dealer plaintiffs lose on their vagueness claims. On the merits, the Second Amendment claim fails for multiple reasons. Section 16.05(3) is a safety regulation that imposes a qualification on the commercial sale of firearms and therefore qualifies as "presumptively lawful" under *Heller*. The regulation does not impose a substantial burden on Second Amendment rights, because it applies to only a small

subset of firearms sales and leaves ample alternatives for law-abiding citizens to acquire a firearm for self-defense in their homes. Even if Section 16.05(3) did implicate the Second Amendment and trigger heightened scrutiny, it would easily survive review because it is substantially related to the Commonwealth's important interests in promoting public safety and preventing accidental handgun injuries and fatalities.

Finally, the District Court correctly concluded that the Second Amendment Foundation, Inc. lacks standing to sue on behalf of its members because it failed to identify any members that had allegedly been dissuaded by Section 16.05(3) from buying or selling Glock pistols.

## ARGUMENT

### I.    The Term "Load Indicator" in Section 16.05(3) Is Not Vague As Applied to Glock Pistols or on Its Face.

The District Court correctly dismissed the dealer plaintiffs' claim that the term "load indicator," as used in Section 16.05(3) and defined in Section 16.01, is unconstitutionally vague as applied to third and fourth generation Glock pistols, or on its face, in violation of due process.

#### A.    Section 16.05(3) Is Not Unconstitutionally Vague As Applied to Glock Pistols.

To determine whether a challenged enactment is vague, a court asks whether it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously

15

discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008); *see also Holder v. Humanitarian Law Project*, 561 U.S. 1, 20 (2010). In applying this test, courts demand more clarity from regulations that impose criminal penalties than from regulations, like Section 16.05(3), that impose civil sanctions. *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99 (1982) ("[E]conomic regulation is subject to a less strict vagueness test because its subject matter is often narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action."); *Papachristou v. City of Jacksonville*, 405 U.S. 156, 172 (1972) ("In the field of regulatory statutes governing business activities, where the acts limited are in a narrow category, greater leeway is allowed.").

Under both components of this test, the term "load indicator" in Section 16.05(3)—a civil safety regulation that sets consumer protection standards—is constitutional as applied to third and fourth generation Glock pistols. The dealer plaintiffs had fair notice that Glock pistols lack a load indicator or magazine safety disconnect and therefore do not satisfy Section 16.05(3). And the dealer plaintiffs failed to allege that the Attorney General has enforced Section 16.05(3) in a discriminatory manner against Glock pistols, nor could they make such allegations in this pre-enforcement lawsuit.

1. **The Dealer Plaintiffs Had Fair Notice That Glock Pistols Lack an Effective Load Indicator.**

The District Court correctly determined, for two independent reasons, that the dealer plaintiffs had fair notice that Glock pistols lack a load indicator. First, the dealer plaintiffs were directly informed by the AGO that Section 16.05(3) proscribes the sale of third and fourth generation Glock pistols because those handguns lack an effective load indicator or magazine safety disconnect. Second, even if the dealer plaintiffs' actual knowledge of Section 16.05(3)'s application to Glock pistols did not foreclose their vagueness claim, the definition of "load indicator" provides persons of ordinary intelligence fair notice that Glocks are noncompliant with Section 16.05(3).

a. **The Dealer Plaintiffs Had Actual Notice That Glock Pistols Lack a Load Indicator That Satisfies Section 16.05(3).**

"Objections to vagueness under the Due Process Clause rest on the lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk." *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988). In this case, the dealer plaintiffs freely admit that they knew Section 16.05(3) prohibited the sale of third and fourth generation Glock pistols. *See* JA 43, ¶ 70.1. Both dealers' letters to the AGO acknowledged that Glock pistols are noncompliant. JA 108 ("From our discussions with other dealers and distributors, we understand Glock pistols are not compliant with the Attorney General's

17

Handgun Sales Regulations."); JA 110 ("We have simply 'known' for years that these third and fourth-generation Glock pistols do not comply with the Handguns Sales Regulation."). In response to those letters, the AGO confirmed that "handguns presently manufactured by Glock, Inc. are not in compliance with the Massachusetts Handgun Sales Regulations, because they lack an effective load indicator or magazine safety disconnect." JA 125, 127. And after receiving the AGO's response, Concord Armory wrote to the consumer plaintiffs that it "would be at risk of [an] Enforcement Action…by the Attorney General" if it sold a Glock pistol. JA 95, 101, 105.

A vagueness claim fails as a matter of law when a plaintiff knows that its proposed conduct is proscribed by the challenged regulation. Indeed, this Court recently rejected an as-applied vagueness claim when the regulated parties "actually believed" that the applicable statute and regulation forbade their conduct. *See United States v. Zhen Zhou Wu*, 711 F.3d 1, 15–16 (1st Cir. 2013) (rejecting vagueness challenge because the defendants "knew they were violating U.S. export regulations"). Other courts have similarly concluded that a vagueness claim is defeated by actual knowledge that one's conduct or proposed conduct violates the challenged statute or regulation. *See, e.g.*, *United States v. Hsu*, 364 F.3d 192, 196 (4th Cir. 2004) (rejecting vagueness claim because the defendants "*in fact* had fair notice that the statute and regulations proscribed their conduct" (emphasis in

original)); *United States v. Saffo*, 227 F.3d 1260, 1269 (10th Cir. 2000) (rejecting vagueness claim because the defendant "had knowledge of the illegality of her activities").

Those precedents control this case. The dealer plaintiffs' as-applied challenge fails because they had actual knowledge that their proposed conduct—selling third and fourth generation Glock pistols—is proscribed by Section 16.05(3). The AGO's clarification that Glock pistols lack an effective load indicator or magazine safety disconnect eliminated any confusion they might have had about the applicability of Section 16.05(3) to the sale of those handguns.

The dealer plaintiffs protest that their actual knowledge cannot defeat their vagueness claim because the AGO cannot simply inform them that Glock pistols are noncompliant with Section 16.05(3). *See* Appellants' Br. at 43–44. But of course it can. The dealers specifically wrote to the AGO to ask if Glock pistols comply with the Handgun Sales Regulations, and if not, why not. JA 108, 110. The AGO replied that the guns do not comply because they lack the safety devices required by Section 16.05(3). JA 125, 127. The dealer plaintiffs may not like that response, but because it clearly and directly answered their inquiry, and provided them actual knowledge, their vagueness claim must fail.

Moreover, any disagreement they have with the AGO's determination is irrelevant. A vagueness claim must be premised upon lack of fair notice, and so

only allows a regulated entity to protest its inability to conform its conduct to the law; it does not allow the regulated entity to air its disagreement with the law enforcement agency's interpretation of the law. *See, e.g.*, *Gonzales v. Carhart*, 550 U.S. 124, 149 (2007); *Grayned v. City of Rockland*, 408 U.S. 104, 108 (1972). Once the law enforcement agency has informed the regulated entity that its proposed conduct is proscribed by statute or regulation, that entity has all the knowledge it needs to conform its conduct to the law. Indeed, vagueness challenges to economic regulations are so rarely successful in part because business owners can seek clarification from the government regarding the meaning of a civil regulation, as the dealers did here. *See Hoffman Estates*, 455 U.S. at 498 (economic regulation is subject to less probing inquiry because "the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry"); *Zhen Zhou Wu*, 711 F.3d at 15 (existence of a process "to obtain an official government answer" on the applicability of a regulation to a regulated party's proposed conduct "mitigates any concern about the law trapping an unwary dealer").

The District Court's only role in analyzing the dealer plaintiffs' vagueness claim was to consider the question of fair notice; it was not to determine whether the AGO correctly applied Section 16.05(3) to particular handguns. The dealer plaintiffs are therefore wrong to fault the District Court for declining to "review the

facts forming the basis of the AG's summary proclamation that Gen3/4 Glock pistols' 'load indicators' are regulation noncompliant." Appellants' Br. at 45 (emphasis removed). Whether the dealer plaintiffs could bring a different claim—challenging the merits of the AGO's determination as inconsistent with the terms of the regulation—was not for the District Court to address as part of a vagueness challenge.[18] As the District Court recognized, the correctness of the AGO's determination that Glock pistols lack effective load indicators has no bearing on the ability of ordinary persons to conform their conduct to Section 16.05(3)'s safety requirements.

### b.    Persons of Ordinary Intelligence Would Understand that Glock Pistols Lack a Load Indicator That Plainly Indicates When a Cartridge is in the Firing Chamber.

The dealer plaintiffs' vagueness claim also fails because persons of ordinary intelligence can understand that Glock pistols lack a load indicator. In assessing as-applied vagueness claims, courts are mindful that "meticulous specificity" and "mathematical certainty" are not required of regulations, *Grayned*, 408 U.S. at 110, for "words are rough-hewn tools, not surgically precise instruments," *URI Student Senate v. Town of Narragansett*, 631 F.3d 1, 14 (1st Cir. 2011). Accordingly,

---

[18] The dealer plaintiffs did not assert that claim in this case, and appropriately so, as it would have been barred by the Eleventh Amendment. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984) (Eleventh Amendment prohibits federal courts from ordering state officials to conform their conduct to state law).

"'reasonable breadth' in the terms employed by [a regulation] does not require that it be invalidated on vagueness grounds." *Id.* (quoting *Grayned*, 408 U.S. at 110).

The regulations provide a concise definition for the term "load indicator": It is "a device which plainly indicates that a cartridge is in the firing chamber within the handgun." 940 C.M.R. § 16.01; *see also Humanitarian Law Project*, 561 U.S. at 21 (statutory definitions "increased the clarity of the statute's terms"). This definition specifies what a load indicator must do (i.e., alert a gun user when a gun is loaded), and it clarifies that the warning to the gun user must be "plai[n]." The phrase "device which plainly indicates," moreover, employs commonly used words with widely accepted meanings. A "device" is "a piece of equipment or a mechanism designed to serve a special purpose or perform a special function." *Webster's 7th New Collegiate Dictionary* 227 (1967); *see also American Heritage College Dictionary* 388 (4th ed. 2004) ("a contrivance or an invention serving a particular purpose"). "Plainly" means "evident to the mind or senses: obvious." *Webster's*, *supra*, at 646; *see also American Heritage*, *supra*, at 1063 ("Free from obstruction, open; clear: in plain view[;] Obvious to the mind; evident"). And "indicates" means "[t]o show the way to or the direction of; point out[;] To serve as a sign, symptom, or token of; signify." *American Heritage*, *supra*, at 705; *see also Webster's*, *supra*, at 427 ("to point out or point to with more or less exactness[;] to be a sign, symptom, or index of"). These words appear hundreds of

22

times in the Massachusetts General Laws and the U.S. Code.[19] Read together, they provide notice of what is required to satisfy Section 16.05(3), but are also flexible enough to permit manufacturers to install a range of devices that plainly indicate when a gun is loaded.[20]

Indeed, the phrase "device which plainly indicates" is far more concrete than regulatory phrases that have been invalidated as unconstitutionally vague. Statutes criminalizing "annoying" or "indecent" conduct, for example, have been struck down because they require "wholly subjective judgments without statutory

---

[19] *See, e.g.*, 21 U.S.C. § 209 (the "package shall be *plainly* labeled"); M.G.L. c. 160, § 176A ("Every railroad corporation shall equip each of its track motor cars… with an electric headlight of sufficient candle power when lighted to render *plainly* visible during clear weather…"); 50 U.S.C. § 1547 ("Authority to introduce United States Armed Forces into hostilities or into situations wherein involvement in hostilities is *clearly indicated* by the circumstances shall not be inferred—(1) from any provision of law…or (2) from any treaty…"); M.G.L. c. 106, § 2A–403(2) ("Retraction may be by any method that *clearly indicates* to the aggrieved party that the repudiating party intends to perform under the lease contract…"); 30 U.S.C. § 871(g) ("The Secretary shall…require that *devices* be installed on all such belts which will give a warning automatically when a fire occurs…"); M.G.L. c. 166, § 21B(3) ("an insulated cagetype guard or other effective protective *device*…shall be installed…") (emphasis added in each citation).

[20] The dealer plaintiffs contend that the term "load indicator" is vague when compared with the term "magazine safety disconnect," which is defined as "a device that prevents the firing of the handgun when the magazine is detached." 940 C.M.R. § 16.01. The fact that a magazine safety disconnect either prevents a gun from firing when the magazine is detached, or does not, and is therefore "binary," *see* Appellants' Br. at 36, does not cast doubt on the constitutionality of the load indicator definition because the vagueness doctrine does not demand "mathematical certainty" in language. *Grayned*, 408 U.S. at 110.

23

definition, narrowing context, or settled legal meanings." *Williams*, 533 U.S. at 306. But "device which plainly indicates" is not so indeterminate. Its operative verb and adverb—"plainly indicates"—are similar to the phrase "protrudes conspicuously," which was likewise upheld against a vagueness challenge. *See Richmond Boro Gun Club, Inc. v. City of New York*, 97 F.3d 681, 684–86 (2d Cir. 1996) (upholding terms used to define "assault weapon," including "a pistol grip that protrudes conspicuously beneath the action" and "a threaded barrel designed to accommodate a flash suppressor"). And the phrase "device which plainly indicates" is comparable to a range of regulatory phrases that have also withstood vagueness challenges, notwithstanding their "flexibility and reasonable breadth." *Grayned*, 408 U.S. at 110. *See, e.g.*, *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 265 (2d Cir. 2015) ("*NYSRPA*") (upholding phrases used to defined "assault weapon[s]" and magazine limits, including "can be readily restored or converted to accept," "copies or duplicates thereof with the capability of" listed gun models, and "semiautomatic version[s] of an automatic rifle, shotgun or firearm"); *URI Student Senate*, 631 F.3d at 13–15 (upholding phrases "substantial disturbance" and "significant segment of a neighborhood").

The application of the load indicator definition is further clarified by the purpose of Section 16.05(3)—to promote public health and safety by deterring accidental handgun discharges. *See URI Student Senate*, 631 F.3d at 15 (looking to

the purpose of an ordinance challenged as unconstitutionally vague). That purpose was recognized by the Supreme Judicial Court, *see Am. Shooting Sports Council*, 711 N.E.2d at 904, 906, 907 n.19, and is revealed in the substance of the safety regulations, including one that requires a warning about the "hundreds [of people who] die from accidental discharge[s]" each year, 940 C.M.R. § 16.06(1). In order to effectively deter accidental handgun discharges, a load indicator must in fact alert the handgun user that a cartridge is in the chamber. It must, therefore, "plainly" alert the user to the presence of the cartridge; a device that does not make obvious to the user when a handgun is loaded does not comply with Section 16.05(3).

Even a cursory review of the extractor device included on third and fourth generation Glock pistols reveals that it does not "plainly indicate" when a cartridge is in the firing chamber. Two manuals for Glock pistols, attached as exhibits to the complaint, show images of the extractor. *See* Add. 19, 23.[21] From those images, it is difficult to discern the difference between the position of the extractor in the loaded and unloaded positions. *See id.* The imperceptible protuberance on the side of the pistol does not obviously signal to users when the gun is loaded, especially

---

[21] These documents, cited in the Addendum, were attached as Exhibits 42 and 43 to the complaint, and are included on pages 174-a through –f of the Supplemental Joint Appendix. For ease of reference, the Attorney General has also included them in her Addendum.

when compared with other handguns' load indicators that use, for example, colored warnings, textual warnings, and pins that protrude conspicuously. *See, e.g.*, Add. 9–10, 14, 17.[22] For that reason, the Glock extractor is unlikely to effectively guard against the accidental handgun discharges Section 16.05(3) seeks to prevent.

The dealer plaintiffs complain that the AGO's letters did not explain why a Glock pistol's extractor does not qualify as a load indicator. Appellants' Br. at 46, 50. But as explained above, the answer is self-evident. And, in any case, the vagueness doctrine is concerned with *whether* the dealer plaintiffs, as people of ordinary intelligence, can determine (even by inquiry to the regulator) if Glock pistols comply with Section 16.05(3), not with *why* the Attorney General determined that the pistols are noncompliant. *See Williams*, 553 U.S. at 304; *Gonzales*, 550 U.S. at 149; *Grayned*, 408 U.S. at 108. Insofar as the dealer plaintiffs propose making modifications to Glock pistols' extractor devices, *see* Appellants' Br. at 48–49, the question whether different devices would satisfy Section 16.05(3) is irrelevant to this as-applied challenge. *See, e.g.*, *Humanitarian Law Project*, 561 U.S. at 22–23 ("hypothetical situations designed to test the limits

---

[22] These documents, cited in the Addendum, were attached as Exhibits 33, 34, and 38 to the complaint, and are included in the Joint Appendix at JA 146–47, 151, and 162–63. However, because the exhibits were printed in black-and-white in the Joint Appendix, the Attorney General has included the color versions that were attached to the complaint in her Addendum.

of" the challenged regulatory phrase are "beside the point" in an as-applied challenge).[23]

### 2. The Dealer Plaintiffs Failed to Allege That Section 16.05(3) Authorizes or Encourages Discriminatory Enforcement.

To the extent the dealer plaintiffs claim that the "load indicator" definition is vague as applied to Glock pistols because it gives rise to a risk of discriminatory enforcement, that claim was correctly dismissed. When, as here, the plaintiff has asserted a pre-enforcement challenge, courts invariably decline to address any allegation that the regulation is likely to be enforced in a discriminatory manner. *See, e.g.*, *Hoffman Estates*, 455 U.S. at 503–04 (rejecting pre-enforcement challenge premised on risk of discriminatory enforcement because there "will be time enough to consider any such problems when they arise"); *Richmond Boro Gun Club*, 97 F.3d at 686 ("It would be premature to entertain this vagueness challenge based on a speculative threat of arbitrary enforcement until a broader use of the ordinance is actually initiated." (internal quotation marks omitted)). Because

---

[23] The dealer plaintiffs' effort to narrow the range of devices that would satisfy the "load indicator" definition, *see* Appellants' Br. at 48–49 and JA 40 (¶ 68.1), risks reducing the number of handgun models that may be sold in Massachusetts. But if the plaintiffs' complaint is that the regulations provide too much flexibility and choice for compliance, that would not implicate the Due Process Clause. *See Am. Exp.-Isbrandtsen Lines, Inc. v. Fed. Mar. Comm'n*, 389 F.2d 962, 967 (D.C. Cir. 1968) (plaintiffs "should welcome the leeway and flexibility" afforded by the regulation).

such claims are "especially speculative," the "principal inquiry" in pre-enforcement vagueness challenges "is whether the law affords fair warning of what is proscribed." *Garner v. White*, 726 F.2d 1274, 1278 (8th Cir. 1984). For that reason, this Court should decline to consider whether Section 16.05(3) might be enforced in a discriminatory manner.

In addition to being premature, any claim of discriminatory enforcement of Section 16.05(3) is wholly unfounded. The complaint did not allege that the Attorney General has enforced Section 16.05(3) in a discriminatory manner against Glock pistols; indeed, the complaint failed to make any allegations whatsoever about chapter 93A enforcement actions brought by the Attorney General. Absent any allegation that the Attorney General has enforced Section 16.05(3) by filing chapter 93A lawsuits in a discriminatory manner, the claim must fail.

Nor was the dealer plaintiffs' allegation that the Attorney General "has not objected" to other pistols' load indicators sufficient to withstand a motion to dismiss. *See* JA 42 (¶ 69.3) (emphasis removed); Appellants' Br. at 47, 50. The Attorney General signals nothing about the compatibility of handguns with the regulations by "not objecting" to them, and she need not preemptively offer advisory opinions about all handguns. *See Crooker v. Magaw*, 41 F. Supp. 2d 87, 92 (D. Mass. 1999) (although "an agency may willingly attempt to assist in response to reasonable inquiries, generally speaking administrative agencies do not

28

have an enforceable obligation to perform this sort of advisory mission, for good and practical reasons"). The other handguns identified by the dealer plaintiffs may indeed have effective load indicators, but the dealers have not alleged that the Attorney General has affirmatively indicated that they comply with Section 16.05(3). On the other hand, to the extent any handguns have load indicator devices that are similar to the extractor indicator on Glock pistols, those handguns may also be unmerchantable in Massachusetts. The dealer plaintiffs did not, therefore, allege that the Attorney General has enforced Section 16.05(3) in a discriminatory or arbitrary manner against Glock pistols.

### B.  The District Court Correctly Dismissed the Claim That the Term "Load Indicator" in Section 16.05(3) Is Void for Vagueness.

The dealer plaintiffs' claim that the phrase "load indicator" is unconstitutionally vague on its face is similarly deficient, for two reasons. First, because Section 16.05(3) does not threaten First Amendment freedoms, the dealer plaintiffs may not advance a claim that it is void for vagueness.[24] Second, even if the dealer plaintiffs could bring a facial claim, the claim would fail because Section 16.05(3) is not vague in all of its applications and has a plainly legitimate sweep.

---

[24] A void-for-vagueness challenge is a facial challenge. *See Hoffman Estates*, 455 U.S. at 494–95 & nn. 5, 6, 7.

1.    **The Dealer Plaintiffs Cannot Challenge Section 16.05(3) as Void for Vagueness Because Such Claims May Only Be Asserted When a Regulation Threatens First Amendment Freedoms.**

Facial challenges to statutes and regulations are disfavored because they "rest on speculation" and "raise the risk of 'premature interpretation…on the basis of factually barebones records.'" *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 (2008) (quoting *Sabri v. United States*, 541 U.S. 600, 609 (2004)). These concerns are heightened when a plaintiff asserts a facial challenge to a statute or regulation premised on vagueness grounds. Such claims force a court to reason based on hypotheticals and "sheer speculation" about the meaning of a text, *Humanitarian Law Project*, 561 U.S. at 25, a form of analysis that "run[s] contrary to the fundamental principle of judicial restraint," *Washington State Grange*, 552 U.S. at 454.[25]

---

[25] The dealer plaintiffs discount the Supreme Court's discussion of facial claims' disfavored status in *Washington State Grange* because that case concerned a statute, whereas this case concerns a regulation. Appellants' Br. at 29. Invalidation of a statute on its face undermines the democratic process, they theorize, whereas invalidation of a regulation on its face does not. *See id.* There is nothing to this. Unlike other executive branch agency heads in Massachusetts, the Attorney General is an elected constitutional officer, democratically accountable to the People. *See* MA. CONST. amend. art. 64, § 1. And even if that were not so, it is well established that executive branch agencies delegated policymaking responsibility by the Legislature are politically accountable. *See, e.g.*, *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 865 (1984).

Because of these concerns, the Supreme Court has crafted special rules for claims challenging a statute or regulation as void for vagueness. In particular, vagueness claims that "'do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand.'" *Hoffman Estates*, 455 U.S. at 495 n.7 (quoting *United States v. Mazurie*, 419 U.S. 544, 550 (1975)). "Outside the First Amendment context," courts only "consider 'whether a statute is vague as applied to *the particular facts at issue*'"; courts do not entertain the claim that a statute is vague on its face. *Zhen Zhou Wu*, 711 F.3d at 15 (quoting *Humanitarian Law Project*, 561 U.S. at 18) (emphasis in original); *see also Chapman v. United States*, 500 U.S. 453, 467 (1991) ("First Amendment freedoms are not infringed by [the challenged statute], so the vagueness claim must be evaluated as the statute is applied to the facts of this case."); *Hsu*, 364 F.3d at 196 (same). Applying this rule, this Court has rejected as "inappropriate" a void-for-vagueness claim because "[i]t is well-established that '[v]agueness challenges to statutes not threatening First Amendment interests are examined in light of the facts of the case at hand; the statute is judged on an as-applied basis.'" *Love v. Butler*, 952 F.2d 10, 13 (1st Cir. 1991) (quoting *Maynard*, 486 U.S. at 361).

Under this straightforward rule, the dealer plaintiffs' void-for-vagueness challenge to Section 16.05(3) must fail. The claim does not implicate First Amendment freedoms; the plaintiffs do not contend, nor could they, that Section

31

16.05(3) threatens to chill protected speech or expression. At most, they maintain

that the alleged vagueness of the term "load indicator" threatens the exercise of

Second Amendment rights, a premise that, as explained in Part II.B, is itself faulty.

*See infra*, at 42–51. Because the dealer plaintiffs' vagueness claim has no bearing

on First Amendment freedoms, it may only be "judged on an as-applied basis," and

therefore fails as a matter of law to the extent it launches a facial attack on Section

16.05(3). *Love*, 952 F.2d at 13.

Attempting to circumvent this rule, the dealer plaintiffs contend that their

claim is viable because it does not rest on speculation or hypothetical inquiries.

Appellants' Br. at 27–29. Pointing to the AGO's letters indicating that Glock

pistols do not comply with Section 16.05(3), the dealer plaintiffs maintain that this

case involves no speculation regarding the application of Section 16.05(3) to

Glocks. *See id.* But the question whether Section 16.05(3) is vague as applied to

Glock pistols is the question presented by the dealer plaintiffs' as-applied claim.

The question before this Court on the facial claim is whether Section 16.05(3) has

a plainly legitimate sweep or is unconstitutionally vague as applied to all of the

other handguns covered by the Handgun Sales Regulations. *See infra*, at 34–38;

*URI Student Senate*, 631 F.3d at 13 ("For . . . a facial challenge to succeed, . . . the

complainant must demonstrate that the law is impermissibly vague in all of its

applications."). Addressing whether the term "load indicator" is intolerably vague

as applied to all other covered handguns would surely require speculation and hypotheticals.

The dealer plaintiffs also contend that they can pursue their void-for-vagueness claim because, as the Supreme Court recently stated, facial challenges to statutes can proceed under the Second Amendment. *See* Appellants' Br. at 30 (quoting *City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2449 (2015)). This is a non sequitur. Whether or not the plaintiffs can assert a Second Amendment claim challenging Section 16.05(3) on its face has no bearing on whether they can assert a vagueness claim challenging Section 16.05(3) on its face. In suggesting that facial claims can be pursued under the Second Amendment, the Supreme Court did not displace its decades of jurisprudence restricting void-for-vagueness claims to cases implicating First Amendment concerns. *See Chapman*, 500 U.S. at 467; *Hoffman Estates*, 455 U.S. at 495 n.7; *Mazurie*, 419 U.S. at 550.[26]

---

[26] In *Johnson v. United States*, 135 S. Ct. 2551 (2015), the Supreme Court recently invalidated the residual clause of the Armed Career Criminal Act, a criminal sentencing statute, on its face. *Johnson* is best viewed as an exception to the general rule that facial vagueness challenges may not be asserted in non-First Amendment cases because it involved two exceptional circumstances. First, the Supreme Court had a decade-long history of "repeated attempts and repeated failures to craft a principled and objective standard out of the residual clause." *Id.* at 2558. Second, the residual clause required a court to evaluate prior convictions by imagining the "ordinary case" of a crime, an inherently abstract and indeterminate task. *Id.* at 2557–58, 2561. *Johnson* did not overrule the decades of precedent restricting void-for-vagueness challenges to cases implicating First Amendment freedoms, and it is especially far afield from the void-for-vagueness

(footnote continued)

### 2. Even If the Plaintiffs Could Assert a Void-for-Vagueness Claim, the Claim Fails Because the Term "Load Indicator" Is Not Vague In All of Its Applications and Has a Plainly Legitimate Sweep.

Even if the dealer plaintiffs could assert a claim challenging Section 16.05(3) as void for vagueness, the claim would fail as a matter of law. To succeed on a facial claim contesting the alleged vagueness of a statute or regulation, "the complainant must demonstrate that the law is impermissibly vague in all of its applications." *Hoffman Estates*, 455 U.S. at 498; *accord URI Student Senate*, 631 F.3d at 13.[27] In discussing facial claims in general, the Supreme Court has also stated that such claims fail when a statute or regulation has a "'plainly legitimate sweep.'" *Washington State Grange*, 552 U.S. at 449 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 739–40 & n.7 (1997) (Stevens, J., concurring in

---

(footnote continued)
challenge in this case, involving a non-criminal regulation that has generated no cases in which courts have struggled to identify its meaning.

[27] This standard is an application of the broader rule that, except in First Amendment cases, courts will only deem a statute facially unconstitutional if "no set of circumstances exist under which the [challenged enactment] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). The dealer plaintiffs contend that the Supreme Court rejected this standard in *City of Chicago v. Morales*, 527 U.S. 41, 54 n.22 (1999). Appellants' Br. at 30. But *Morales* was only decided by a three-Justice plurality; this Court has accordingly continued to apply the *Hoffman Estates* standard after *Morales*. *See URI Student Senate*, 631 F.3d at 13; *see also NYSRPA*, 804 F.3d at 265 ("[B]ecause the test set forth by the *Morales* plurality has not been adopted by the Supreme Court as a whole, we are not required to apply it.").

judgments)). Under either standard, the term "load indicator" in Section 16.05(3) easily passes constitutional muster.

The regulations define a "load indicator" as "a device which plainly indicates that a cartridge is in the firing chamber within the handgun." 940 C.M.R. § 16.01. It is readily apparent that persons of ordinary intelligence could apply this definition to distinguish between handguns that are equipped with a load indicator, and those that are not. The plaintiffs themselves admit that multiple handguns—including, for example, the FMK model 9C1 and the Ruger SR series handguns—do come equipped with a device that plainly indicates a cartridge is in the firing chamber. *See* JA 41, 145–51. On the other hand, it is both obvious and indisputable that some handguns are *not* equipped with a load indicator that plainly indicates that a cartridge is in the firing chamber. *See Richmond Boro Gun Club*, 97 F.3d at 684 ("it is obvious…that there exist numerous conceivably valid applications of" ordinance banning assault weapons). The 1991 GAO report found that load indicators could have prevented 23% of accidental firearms fatalities in 1988; the guns used in those shootings, of course, lacked a device that would have plainly

35

indicated to the shooter that a cartridge was in the chamber. *See* GAO Report, *supra* note 2, at 3, 17, 24, 34.[28]

Elsewhere, courts have recognized that certain handguns lack a load indicator plainly indicating that a cartridge is in the firing chamber. *See, e.g.*, *Pitonyak v. State*, 253 S.W.3d 834, 845 (Tex. App. 2008) ("[T]he pistol in question did not have a safety or a loading indicator to show that a bullet is in the firing chamber."); *Bell v. Glock, Inc. (USA)*, 92 F. Supp. 2d 1067, 1068 (D. Mont. 2000) ("The Glock Model 20 handgun is a semi-automatic 10mm pistol . . . [that] does not have a conventional manual external safety or a loaded chamber indicator.")[29]; *Smith ex rel. Smith v. Bryco Arms*, 33 P.3d 638, 641 (N.M. App. 2001) ("[T]he J-22 handgun does not incorporate a 'magazine-out safety,' a 'chamber load indicator,' or a written warning on the gun itself alerting users that the J-22 can fire even though the magazine has been removed."). And this very case, involving Glock pistols, provides a further example of handguns that lack a load indicator. *See Parker v. Levy*, 417 U.S. 733, 756 (1974) ("One to whose [proposed] conduct a statute clearly applied may not successfully challenge it for vagueness.").

---

[28] In ruling on a motion to dismiss, a District Court may consider "matters of public record," including publicly available government reports like the GAO report referenced here. *Giragosian v. Ryan*, 547 F.3d 59, 65 (1st Cir. 2008).

[29] The Glock Model 20 referenced in the *Bell* case is not among the third or fourth generation Glock pistols at issue in this case because it was sold before the introduction of third generation Glocks to the market. *See Bell*, 92 F. Supp. 2d at 1068.

Consequently, the term "load indicator" is not vague in all of its applications and has a plainly legitimate sweep.

The dealer plaintiffs do not dispute that the term "load indicator" is clear in some applications and has a plainly legitimate sweep. Instead, they object that the District Court improperly converted the Attorney General's motion to dismiss into a motion for summary judgment by referring to two cases—*Pitonyak v. State*, 253 S.W.3d 834 (Tex. App. 2008), and *Smith ex rel. Smith v. Bryco Arms*, 33 P.3d 638 (N.M. App. 2001)—discussing handguns that lacked a load indicator. Appellants' Br. at 31–34. This objection is meritless. "[M]atters of public record are fair game in adjudicating Rule 12(b)(6) motions, and a court's reference to such matters does not convert a motion to dismiss into a motion for summary judgment." *In re Colonial Mortgage Bankers Corp.*, 324 F.3d 12, 19 (1st Cir. 2003); *see also Giragosian v. Ryan*, 547 F.3d 59, 65 (1st Cir. 2008). State court decisions and documents are matters of public record. *See Giragosian*, 547 F.3d at 66. Nor was the District Court's reference to *Pitonyak* and *Smith* unexpected or surprising to the dealer plaintiffs. Those decisions were cited in the Attorney General's memorandum in support of her motion to dismiss, and the dealer plaintiffs had the

opportunity to respond to them in their opposition and sur-reply briefs, but did not do so.[30]

### C.   The Dealer Plaintiffs Lack Standing to Raise Their Vagueness Claim Because Their Requested Remedy Would Not Redress Their Alleged Injury.

Finally, and as an alternative basis for affirmance,[31] the dealer plaintiffs lack standing to assert their vagueness claims because the remedy they have requested would not redress their alleged injury.[32]

---

[30] In any event, this argument is forfeited. The dealer plaintiffs raised no objection, in either their opposition or sur-reply brief, to the District Court's consideration of *Pitonyak* and *Smith*'s discussion of the lack of load indicators. *See* JA 206–33, 274–82; *Bellone v. Southwick-Tolland Reg'l Sch. Dist.*, 748 F.3d 418, 425 (1st Cir. 2014) (citing *United States v. Nee*, 261 F.3d 79, 86 (1st Cir. 2001) ("It is a cardinal principle that [i]ssues not squarely raised in the district court will not be entertained on appeal." (internal quotation marks omitted))).  And even if the dealer plaintiffs could raise the argument for the first time here, it would be subject to plain error review. *See Morales Feliciano v. Rullan*, 378 F.3d 42, 49 (1st Cir. 2004). "That type of review entails four showings: (1) that an error occurred (2) which was clear or obvious and which not only (3) affected the [appellant's] substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." *Id.* (quotation marks omitted). The dealer plaintiffs make no argument on the latter two factors of this test. With respect to the first two factors, as explained above, the District Court's citation to *Pitonyak* and *Smith* for the proposition that some handguns lack load indicators was not clear and obvious error.

[31] "The court of appeals may affirm an order of dismissal on a ground not relied upon by the district court, as long as that ground is evident from the record." *Haley v. City of Boston*, 657 F.3d 39, 46 (1st Cir. 2011).

[32] Although the Attorney General did not raise this argument in the District Court, she did challenge the dealer plaintiffs' standing. *See* JA 184–85. And in any event, "[s]tanding…is a jurisdictional issue which cannot be waived or conceded." *SunCom Mobile & Data, Inc. v. FCC*, 87 F.3d 1386, 1388 n.3 (D.C. Cir. 1996).

The dealer plaintiffs have asked this Court to "strike the 'load indicator' portion of the regulation as facially void-for-vagueness" and as vague as applied to Glock pistols. Appellants' Br. at 38 (emphasis removed). If this Court were to invalidate the load indicator portion of Section 16.05(3), the alternative method for satisfying Section 16.05(3)—namely, that any handgun sold by a Massachusetts dealer must contain a magazine safety disconnect—would remain. *See* 940 C.M.R. § 16.05(3).[33] Because third and fourth generation Glock pistols do not have a magazine safety disconnect, *see* JA 125, 127, those handguns would remain noncompliant with Section 16.05(3). Likewise, any handguns that have an effective load indicator, but not a magazine safety disconnect, would become noncompliant with Section 16.05(3). The dealer plaintiffs' requested remedy for the alleged vagueness of the term "load indicator," therefore, would not enable them to sell third and fourth generation Glock pistols, and it would make *more* handguns unmerchantable in Massachusetts.

Because this Court would not be able to redress the dealer plaintiffs' alleged injury (i.e., the inability to sell Glock pistols) with the remedy they have requested,

---

[33] The dealer plaintiffs have not challenged the magazine safety disconnect portion of Section 16.05(3); in fact, they admit that it is not unconstitutionally vague. *See* Appellants' Br. at 36–37, JA 221. Even if the dealer plaintiffs were to prevail on their vagueness claim, then, this Court could only invalidate the "load indicator" portion of Section 16.05(3); it could not invalidate Section 16.05(3) in its entirety. *See* 940 C.M.R. § 16.08 (severability clause).

the dealer plaintiffs do not have standing to assert their vagueness claims. Redressability—that is, "a likelihood that the requested relief will address the alleged injury," *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998)— is an essential component of Article III standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). An alleged injury is only redressable when "a plaintiff 'personally would benefit in a tangible way from the court's intervention.'" *Steel Co.*, 523 U.S. at 104 n.5 (quoting *Warth v. Seldin*, 422 U.S. 490, 508 (1975)). Because the dealer plaintiffs would not benefit in any tangible way from an order invalidating the load indicator portion of Section 16.05(3), they lack standing to advance the vagueness claims they assert. *See Steel Co.*, 523 U.S. at 109–10 (respondent lacked standing because "none of the relief sought by respondent would likely remedy its alleged injury in fact").

## II.   The District Court Correctly Dismissed the Consumer Plaintiffs' Second Amendment Claim.

The District Court correctly rejected the consumer plaintiffs' claim that Section 16.05(3) violates the Second Amendment because it restricts their access to third and fourth generation Glock pistols. *See* JA 44–45. To the extent the plaintiffs wish to restrict the scope of their Second Amendment claim in this Court, the Attorney General will agree to stipulate to the dismissal of the claim if the dismissal of their vagueness claim is upheld. Failing that, this Court should affirm the dismissal of the plaintiffs' Second Amendment claim on the merits.

**A.    The Attorney General Will Stipulate to Dismissal of the Plaintiffs' Second Amendment Claim.**

The consumer plaintiffs contend that their Second Amendment claim is conditioned on, or derivative of, their vagueness claim. Appellants' Br. at 53–54. This position is somewhat perplexing. The complaint asserted an unqualified Second Amendment claim, one that gave no indication of its purportedly conditional status. *See* JA 44–45. Although the plaintiffs later represented that the claim was derivative, *see* JA 217, they have cited no authority for the proposition that a Second Amendment claim *can* be derivative of a vagueness claim. Nor is it obvious what such a claim would mean, since alleged uncertainty over the application of a handgun regulation to Glock pistols would presumably burden Second Amendment rights less than the certain application of the regulation to Glock pistols. Moreover, characterizing the Second Amendment claim as derivative would leave it in an odd posture. The plaintiffs do not want this Court to reach their Second Amendment claim if they lose on their vagueness claim. *See* Appellants' Br. at 54–55. But if the plaintiffs prevail on their vagueness claim, this Court would not need to reach their Second Amendment claim. Because this Court need not address the Second Amendment claim in either circumstance, the claim would do no work in this lawsuit.

Nevertheless, the consumer plaintiffs have voluntarily narrowed their Second Amendment claim, and to the extent they wish to stipulate to dismissal of

the claim if they lose on their vagueness claim, the Attorney General will join in the stipulation. *See* Fed. R. Civ. P. 41(a)(1)(A)(ii). But because the plaintiffs have also argued the merits of their Second Amendment claim notwithstanding their characterization of the claim as derivative, *see* Appellants' Br. at 60–64, the Attorney General must as well.

### B. Section 16.05(3) Does Not Infringe the Consumer Plaintiffs' Second Amendment Rights.

The Second Amendment provides, "A well regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed." U.S. CONST. amend. II. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Supreme Court held that the Second Amendment secures law-abiding, responsible citizens a limited right, incorporated against the States, to possess a firearm in the home for self-defense. But the Court also emphasized that "the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626.

In this case, the consumer plaintiffs' claim that Section 16.05(3) infringes their Second Amendment rights by restricting their ability to buy third and fourth generation Glock pistols fails for three reasons. First, Section 16.05(3) does not implicate the Second Amendment because it is among the categories of firearms regulations identified in *Heller* as presumptively lawful. Second, Section 16.05(3) does not implicate the Second Amendment because any burden it imposes on

42

Second Amendment rights is *de minimis*. Third, even if Section 16.05(3) did implicate the Second Amendment and this Court were to review it under heightened scrutiny, the regulation would easily survive because it is substantially related to the government's important interests in promoting public safety and deterring accidental firearms injuries and fatalities.

### 1.    As a Qualification on the Commercial Sale of Arms, Section 16.05(3) Is Presumptively Lawful.

*Heller* and *McDonald* "firmly disavowed any notion that an individual has a constitutional right 'to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.'" *Powell v. Tompkins*, 783 F.3d 332, 347 (1st Cir. 2015), *cert. pending*, No. 15–6063 (quoting *Heller*, 554 U.S. at 626; *McDonald*, 561 U.S. at 786). Indeed, *Heller* emphasized that it does not "cast doubt on" certain "presumptively lawful regulatory measures," including, but not limited to, "prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places[,]…or laws imposing conditions and qualifications on the commercial sale of arms." 554 U.S. at 626–27 & n.26.

Section 16.05(3) falls squarely within the categories of firearms regulations deemed "presumptively lawful" by *Heller* because it is imposes a "qualificatio[n] on the commercial sale of arms." 554 U.S. at 626–27. The regulation only applies to handgun-purveyors, defined as a "person or entity that transfers" five or more

"handguns to a customer located within the Commonwealth" each year. 940 C.M.R. § 16.01. As a result, it only covers entities offering handguns for sale in commerce; it does not apply to individual gun owners. Section 16.05(3) is also, at most, a modest condition or qualification on the sale of arms, not an outright ban on the sale of any arms. So long as a covered handgun is equipped with one of two safety devices—either a load indicator or magazine safety disconnect—Section 16.05(3) imposes no limit on that handgun's availability for purchase in Massachusetts. Section 16.05(3) is therefore precisely the sort of qualification on the commercial sale of arms that *Heller* identified as presumptively lawful.

Because Section 16.05(3) is presumptively lawful, it does not implicate the Second Amendment at all. *See, e.g.*, *Jackson v. City and Cty. of San Francisco*, 746 F.3d 953, 960 (9th Cir. 2014); *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 195 (5th Cir. 2012); *Commonwealth v. McGowan*, 464 Mass. 232, 239, 982 N.E.2d 495, 500 (2013).[34] Indeed, "[t]he historical record shows that gun safety regulation was commonplace in the colonies"; "when the fledgling republic adopted the Second Amendment, an expectation of sensible gun safety regulation was woven into the tapestry of the

---

[34] Even if the presumption that Section 16.05(3) is lawful could be rebutted, *see United States v. Torres-Rosario*, 658 F.3d 110, 113 (1st Cir. 2011), the consumer plaintiffs included no allegations in their complaint, and have made no argument on appeal, to rebut that presumption.

guarantee." *Nat'l Rifle Ass'n*, 700 F.3d at 200. For these reasons, comparable regulations on the commercial sale of arms are readily upheld against Second Amendment challenges. *See, e.g.*, *Bauer v. Harris*, 94 F. Supp. 3d 1149, 1155 (E.D. Cal. 2015), *appeal pending*, No. 15-15428 (CA9) (fee imposed on firearms sales); *Teixeira v. Cty. of Alameda*, 2013 WL 707043, *6 (N.D. Cal. 2013) (zoning ordinance restricting the sale of firearms in certain locations). As in those cases, the consumer plaintiffs' Second Amendment claim fails as a matter of law because Section 16.05(3) is presumptively lawful.

> **2.    Section 16.05(3) Does Not Implicate the Second Amendment Because It Imposes, At Most, a *De Minimis* Burden on the Right to Possess a Firearm in the Home for Self-Defense.**

The consumer plaintiffs' Second Amendment claim also fails as a matter of law because Section 16.05(3) does not substantially burden the exercise of Second Amendment rights.

Firearms regulations that do not substantially burden Second Amendment rights, or that impose only *de minimis* burdens, do not merit heightened scrutiny or give rise to viable Second Amendment claims. *See, e.g.*, *NYSRPA*, 804 F.3d at 259; *Heller v. District of Columbia*, 801 F.3d 264, 273–74 (D.C. Cir. 2015) (*Heller III*); *Kachalsky v. Cty. of Westchester*, 701 F.3d 81, 93 (2d Cir. 2012); *United States v. DeCastro*, 682 F.3d 160, 166 (2d Cir. 2012); *Heller v. District of Columbia*, 670 F.3d 1244, 1254–55 (D.C. Cir. 2011) (*Heller II*). More specifically, if a regulation

leaves "'adequate alternatives…for law-abiding citizens to acquire a firearm for self-defense,'" no substantial burden on Second Amendment rights exists and any Second Amendment challenge to the regulation must fail. *NYSRPA*, 804 F.3d at 259 (quoting *DeCastro*, 682 F.3d at 168).

To the extent Section 16.05(3) imposes any burden on the right to possess a firearm in the home for self-defense by limiting access to certain Glock pistols, that burden is self-evidently *de minimis* and non-substantial. While Section 16.05(3) currently prevents firearms dealers from selling third and fourth generation Glock pistols,[35] the regulation leaves ample alternatives for law-abiding citizens to acquire a firearm for self-defense. Section 16.05(3) is not a ban on guns. It does not make the possession of any firearm illegal. And it applies only to a subset of the firearms available for sale in Massachusetts. As the complaint acknowledges, Section 16.05(3) has no effect whatsoever on the sale of rifles, shotguns, revolvers, and single-shot pistols because it applies only to "handguns that have a mechanism to load cartridges via a magazine." 940 C.M.R. § 16.05(4). *See* JA 28–29 (¶¶ 26–27, 30). The complaint also admits that many semi-automatic

---

[35] First and second generation Glock pistols that were manufactured before the Handguns Sales Regulations took effect are available for sale in Massachusetts. *See* 940 C.M.R. § 16.09 (enforcement dates). If Glock, Inc. were to add an effective load indicator or magazine safety disconnect to its third and fourth generation pistols, those pistols could also be sold in Massachusetts in accordance with Section 16.05(3). *See* JA 127.

pistols comply with Section 16.05(3) and are available for sale in Massachusetts. *See* JA 41–42 (¶¶ 69.2–69.3).[36] Consequently, the consumer plaintiffs could have acquired a broad range of alternative firearms to use in defense of their homes.[37] The fact that they wish to purchase one particular brand of semi-automatic pistol, even one that is in common use, does not give rise to a Second Amendment claim, because the Second Amendment does not guarantee "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626; *cf. Friedman v. City of Highland Park*, 784 F.3d 406, 411 (7th Cir. 2015) (upholding ordinance banning assault weapons and large-capacity magazines in part because it "leaves residents…ample means to exercise the 'inherent right of self-defense' that the Second Amendment protects"); *Kampfer v. Cuomo*, 993 F. Supp. 2d 188, 196 (N.D.N.Y. 2014), *appeal docketed*, No. 14-0110 (2d Cir. 2014) (dismissing challenge to assault weapons ban that "attempt[ed] only to decrease in number certain firearms deemed particularly dangerous by the

---

[36] Contrary to the consumer plaintiffs' argument, *see* Appellants' Br. at 59, these admissions in the complaint enabled the District Court to properly conclude, prior to discovery, that a range of alternative firearms remained available to the plaintiffs.

[37] California prohibits the sale of pistols that lack a load indicator *and* a magazine safety disconnect, and a range of firearms also remains available for sale in that state. *See* Cal. Penal Code §§ 31910(b)(5), 32000(a); Cal. Roster of Handguns Certified for Sale, http://certguns.doj.ca.gov/.

legislature for the sake of public safety" and therefore did "not infringe the Second Amendment").

### 3. Section 16.05(3) Easily Withstands Heightened Scrutiny Because It Is Substantially Related to the Government's Important Interest in Public Safety.

Finally, even if Section 16.05(3) implicated the Second Amendment, the regulation would easily survive constitutional scrutiny. This Court has "consistently recognized that *Heller* established that the possession of operative firearms for use in defense of the home constitutes the 'core' of the Second Amendment." *Hightower v. City of Boston*, 693 F.3d 61, 72 (1st Cir. 2012); *see also United States v. Booker*, 644 F.3d 12, 25 n.17 (1st Cir. 2011). Laws and regulations that affect other aspects of firearms possession are "distinct from this core interest emphasized in *Heller*." *Hightower*, 693 F.3d at 72.

Section 16.05(3) affects interests well outside this core of the Second Amendment. A classic firearms safety measure, its aim is to prevent accidental firearms fatalities and injuries caused by unsafe handguns. It does not prevent a person from possessing a handgun in his or her home or elsewhere, whether for self-defense or any other lawful purpose. *See Heller*, 554 U.S. at 632 (laws that seek "to prevent accidents," like regulations on firearms storage, "do not remotely burden the right of self-defense as much as an absolute ban on handguns").

48

Because Section 16.05(3) affects interests outside the core of the Second Amendment, it should be reviewed under, at most, intermediate scrutiny. Many courts of appeals have concluded that "[t]he level of scrutiny applicable under the Second Amendment 'depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right.'" *Heller II*, 670 F.3d at 1257 (quoting *United States v. Chester*, 628 F.3d 673, 682 (4th Cir. 2010)). Those enactments that "d[o] not severely limit the possession of firearms" merit a lesser degree of scrutiny than laws that burden the core Second Amendment right. *United States v. Marzzarella*, 614 F.3d 85, 97 (3d Cir. 2010). Accordingly, most courts of appeals have applied, at most, intermediate scrutiny to enactments, like Section 16.05(3), that affect interests outside the core of the Second Amendment. *See, e.g.*, *Drake v. Filko*, 724 F.3d 426, 436 (3d Cir. 2013); *Woollard v. Gallagher*, 712 F.3d 865, 876 (4th Cir. 2012); *Kachalsky*, 701 F.3d at 93; *Heller II*, 670 F.3d at 1256–58; *Booker*, 644 F.3d at 25; *United States v. Masciandaro*, 638 F.3d 458, 471, 473–74 (4th Cir. 2011).[38]

In applying intermediate scrutiny, a court must ask whether the challenged enactment is "substantially related to an important governmental objective." *Clark*

---

[38] The strict scrutiny standard of review, by contrast, would conflict with *Heller*'s approval of "presumptively lawful" enactments, like laws imposing qualifications on the commercial sale of arms. 554 U.S. at 626–27 & n.26. Because strict scrutiny would threaten to invalidate all of these regulatory measures, it does not apply to laws that assertedly burden non-core Second Amendment rights.

*v. Jeter*, 486 U.S. 456, 461 (1988); *see Booker*, 644 F.3d at 25. The test requires "substantial deference to the predictive judgments" of the regulator. *Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 665 (1994). To survive intermediate scrutiny, the challenged regulation must only be "reasonably adapted" to the governmental objective, *Woollard*, 712 F.3d at 876; the fit between the regulation and the government's interest need not be "perfect." *Kachalsky*, 701 F.3d at 97.

Section 16.05(3) easily withstands intermediate scrutiny. The government interest it advances—promoting public safety by deterring accidental handgun injuries and fatalities—is indisputably important. *See Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 300 (1981) ("Protection of the health and safety of the public is a paramount governmental interest."); *McGuire v. Reilly*, 260 F.3d 36, 48 (1st Cir. 2001) ("increas[ing] public safety" is an interest "firmly rooted in the state's traditional police powers" and is "precisely the sor[t] of interes[t] that justif[ies] some incidental burdening" of rights). And Section 16.05(3) is substantially related to that interest. As the GAO found in its 1991 report, 23% of accidental firearms fatalities nationwide could be prevented by a load indicator on the firearm. *See* GAO Report, *supra* note 2, at 3, 17. That represents hundreds of lives saved, *see id.*, and likely thousands of injuries prevented each year. Subsequent research has similarly concluded that 20% of accidental firearms deaths could be prevented by a load indicator. *See* J.S. Vernick

et al., *Unintentional and Undetermined Firearms Related Deaths: A Preventable Death Analysis for Three Safety Devices*, 2003 INJURY PREVENTION 307, 308 (2003), *available at* http://injuryprevention.bmj.com/content/9/4/307.full.pdf+html.

Moreover, the regulations include several exemptions that allow sophisticated users to purchase handguns without safety devices if they choose. For example, handguns sold to educational collectors and military and law enforcement personnel are exempt from the requirements. 940 C.M.R. § 16.01. The regulations also permit the transfer of "firearms solely designed and sold specifically for formal target shooting competition." *Id.* Thus, the regulations protect inexperienced handgun users from the "harmful or unexpected risks" of handguns lacking safety devices, while allowing certain categories of more experienced users to assume the risk of acquiring handguns without the challenged safety devices. *Am. Shooting Sports Council*, 711 N.E.2d at 904.

The empirical support for the link between load indicators and reduced firearms fatalities, coupled with the exemptions available for certain sophisticated handgun users, demonstrate the close fit between Section 16.05(3) and the Commonwealth's interests in preventing handgun injuries and deaths and promoting public safety. Accordingly, even if this Court assumes that the regulation implicates the Second Amendment, Section 16.05(3) must be upheld.

## III.    The District Court Correctly Determined that the Second Amendment Foundation Lacks Associational Standing.

The District Court correctly dismissed the Second Amendment Foundation, Inc. ("SAF") for failure to establish its standing to sue on behalf of its members.[39] To demonstrate standing, SAF was required to satisfy the familiar three-part test for Article III standing,[40] as well as an additional three-part test for associational standing. Under the associational standing test, SAF was required to allege that "(1) at least one of [its] members possesses standing to sue in his or her own right; (2) the interests that the suit seeks to vindicate are pertinent to the objectives for which the organization was formed; and (3) neither the claim asserted nor the relief demanded necessitates the personal participation of affected individuals." *United States v. AVX Corp.*, 962 F.2d 108, 116 (1st Cir. 1992); *accord Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

To meet the first element of this test, an organization must specifically "identify members who have suffered the requisite harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). "This requirement of naming the affected

---

[39] SAF separately asserted standing to sue on its own behalf in the District Court, but on appeal it only contends that it has standing to sue on behalf of its members. *See* Appellants' Br. at 23–26.

[40] Under the general test, SAF was required to allege that it suffered an "'injury in fact' that is concrete and particularized," that the injury was "fairly traceable to the challenged action of the defendant," and that it was "likely that a favorable judicial decision will prevent or redress the injury." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).

individuals," *id.* at 498–99, cannot be satisfied by "general allegation[s] of actual injury to members," *AVX Corp.*, 962 F.2d at 117. *See Summers*, 555 U.S. at 498 (citing with approval its discussion in *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 235 (1990), which "noted that the affidavit produced by the city to establish standing would be insufficient because it did not name the individuals who were harmed by the challenged license-revocation program"). And the requirement applies "at the pleading stage," because whenever "standing is at issue, heightened specificity is obligatory." *AVX Corp.*, 962 F.2d at 115.

The complaint failed this element of the associational standing test because it did not identify a single SAF member who had allegedly been dissuaded or prevented from selling or purchasing Glock pistols because of Section 16.05(3). At most, SAF's affidavit asserted that "[m]any of SAF's members have asked SAF to take legal action to challenge" Section 16.05(3) because those members could not determine whether they could sell or purchase third and fourth generation Glocks. JA 242. But this allegation is just the sort of "[g]auzy generalit[y]..., unsubstantiated by any sort of a factual foundation, [that] cannot survive a motion to dismiss." *AVX Corp.*, 962 F.2d at 117. This Court has made clear that such generalized allegations of harm to members will not withstand a motion to dismiss when the organization's "members are unidentified" and their "asserted injury is not anchored in any relevant particulars." *Id.*

Appellants object that it was premature for the District Court to dismiss SAF at the motion to dismiss stage, before discovery had commenced. Appellants' Br. at 24–26. In their view, the requirement that an organization name a member with personal standing to sue attaches only at the summary judgment stage. *Id.* But this Court has already rejected that argument, explaining instead that "generalized allegation[s] of individual harm" that leave an organization's members "unidentified" are "insufficient to withstand [a] motio[n] to dismiss." *AVX Corp.*, 962 F.2d at 117. And other courts have likewise dismissed SAF for lack of standing when it has failed to identify members injured by challenged firearms regulations. *See, e.g.*, *Kachalsky v. Cacace*, 817 F. Supp. 2d 235, 251 (S.D.N.Y. 2011), *aff'd sub nom. Kachalsky v. Cty. of Westchester*, 701 F.3d 81 (2d Cir. 2012) (SAF dismissed because it "fail[ed] to allege anywhere in the First Amended Complaint that it has any members who have applied for and been rejected full-carry permits"); *Hodgkins v. Holder*, 677 F. Supp. 2d 202, 206 (D.D.C. 2010) (SAF dismissed because it "failed to allege that it has any members who are U.S. citizens residing abroad who intend to purchase firearms domestically in violation of the laws at issue").[41]

---

[41] *See also Fletcher v. Haas*, 851 F. Supp. 2d 287, 291 (D. Mass. 2012) (SAF lacked associational standing because it failed, at the summary judgment stage, to "identif[y] a *single* member who sought to obtain a license to carry a firearm in Massachusetts, let alone was denied" (emphasis in original)).

Nor is the appellants' argument sensible, because discovery from the Attorney General would not have aided SAF in identifying its members with individual standing to challenge Section 16.05(3). It is SAF, not the Attorney General, that possesses information about the identities of its own members. And it was SAF, not the Attorney General, that shouldered the burden to identify members with standing. *Summers*, 555 U.S. at 498, 499. For that reason, SAF's "promise to comply with [discovery] requests asking for the identification of [SAF's] members" was entirely beside the point. Appellants' Br. at 25. If SAF had members who were dissuaded from selling or purchasing Glock pistols because of Section 16.05(3), it could have identified those members in its declaration in opposition to the motion to dismiss.

Accordingly, the District Court's determination that SAF lacked standing to challenge Section 16.05(3) on behalf of its members should be affirmed.

## **CONCLUSION**

For the foregoing reasons, this Court should affirm the judgment of the District Court.

Respectfully submitted,

MAURA HEALEY
ATTORNEY GENERAL

  /s/ Julia E. Kobick
Julia E. Kobick, No. 1162713
Assistant Attorney General
Government Bureau
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2559
julia.kobick@state.ma.us

Date: January 22, 2016

## Certificate of Compliance With Rule 32(a)

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,785 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

/s/      Julia E. Kobick
Counsel for Defendant-Appellee
Dated:        1/22/2016

## Certificate Of Service

I hereby certify that on January 22, 2016 I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system. I certify that the following parties or their counsel of record are registered as ECF Filers and that they will be served by the CM/ECF system:

Alexander A. Flig, Esq.
490 Chapman Street, Suite 201
Canton, Massachusetts 02021-2039
alex@fliglaw.com

/s/      Julia E. Kobick
Counsel for Defendant-Appellee
Dated:        1/22/2016

## **ADDENDUM**

1.    Handgun Sales Regulations, 940 C.M.R. 16.00 ................................. ADD001

2.    Exhibit 33 of the Complaint ............................................................. ADD007

3.    Exhibit 34 of the Complaint ............................................................. ADD011

4.    Exhibit 38 of the Complaint ............................................................. ADD015

5.    Exhibit 42 of the Complaint ............................................................. ADD018

6.    Exhibit 43 of the Complaint ............................................................. ADD021

940 CMR:   OFFICE OF THE ATTORNEY GENERAL

940 CMR 16.00:        HANDGUN SALES

Section

16.01:  Definitions
16.02:  Unfair or Deceptive Practices: General
16.03:  Tamper-Resistant Serial Numbers
16.04:  Sale of Handguns Made From Inferior Materials
16.05:  Sale of Handguns Without Childproofing or Safety Devices
16.06:  Safety Warning/Disclosures
16.07:  Transfers of Used Handguns
16.08:  Severability
16.09:  Enforcement Dates

The Attorney General of the Commonwealth of Massachusetts promulgates 940 CMR 16.00 pursuant to authority granted to him under M.G.L. c. 93A, § 2(c). 940 CMR 16.00 defines certain unfair acts or practices but is not intended to describe all types of practices prohibited by M.G.L. c. 93A, § 2. 940 CMR 16.00 does not legitimize acts that are not specifically prohibited by 940 CMR 16.00, and does not alter or amend common law rights and remedies available to consumers. 940 CMR 16.00 is designed to supplement existing statutes and regulations. References to statutes and other regulations shall include amendments thereto from time to time.

16.01:  Definitions

For purposes of 940 CMR 16.00, the following terms shall have the following meanings:

Average group diameter test result:  shall mean the arithmetic mean of three separate group diameter test results taken from a set distance.

Combination handle lock:  shall mean a device which precludes the use of the handgun unless the combination tumblers are properly aligned. This device may, for example, have the numbers for the combination tumblers protrude from the handle of the handgun.

Educational collector:  shall mean an individual who is properly licensed as a bonafide collector pursuant to 520 CMR 7.00, and whose collection is maintained for purposes of display, research, lecturing, demonstration, or historical significance, as opposed to being maintained for personal enjoyment and/or possible future profit.

Group diameter test result:  shall mean the largest spread in inches between the centers of any of the holes made in a test target after firing five rounds from the handgun in question at the target from a set distance. The ammunition used shall be the type recommended by the handgun manufacturer in its user manual, or if none is recommended, any standard ammunition of the correct caliber in new condition.

Hammer deactivation device:  shall mean a built-in device (or an extension of the hammer) which allows a user manually to lower the handgun's hammer into a deactivated position, and which must be manually re-toggled in order to re-cock the hammer before the handgun can be fired.

Handgun:  shall mean a weapon, designed to be fired by the use of a single hand, from which may be fired or ejected one or more solid projectiles propelled via a chemical ignition, and which has:
  (a)  a smooth bore with a barrel less than 18 inches long;
  (b)  a smooth bore and an overall weapon length of less than 26 inches; or
  (c)  a rifled bore with a barrel less than 16 inches.

940 CMR:  OFFICE OF THE ATTORNEY GENERAL

16.01:  continued

Handgun Drop Test:  shall mean a test in which the handgun in question shall be:
   (a)  test loaded;
   (b)  set such that the handgun is ready to fire; and
   (c)  dropped onto a solid slab of concrete from a height of one meter from each of the
following positions:
      1.  normal firing position,
      2.  upside down,
      3.  on grip,
      4.  on the muzzle,
      5.  on either side, and
      6.  on the exposed hammer or striker (or if there is no exposed hammer or striker, then
      the rearmost part of the firearm).
In addition, if the handgun is designed so that its hammer or striker may be set in other
positions, the handgun in question shall be tested with the hammer or striker in each such
position (but otherwise ready to fire).  Alternatively, the tester may use different handguns
of the same make and model, in similar condition, for the test of each of these
hammer/striker settings.

Handgun Performance Test:  shall mean a test in which the handgun in question shall fire 600
rounds, stopping every 100 rounds to tighten any loose screws and to clean the gun (if required
by the cleaning schedule in the user manual), and as needed to refill the empty magazine or
cylinder to capacity before continuing.  For any handgun that loads other than via a detachable
magazine, the tester shall also pause every 50 rounds for ten minutes.  The ammunition used
shall be the type recommended by the handgun manufacturer in its user manual, or if none is
recommended, any standard ammunition of the correct caliber in new condition.  A handgun
shall pass this test if it:
   (a)  fires the first 20 rounds without a malfunction, and
   (b)  fires the full 600 rounds with no more than six malfunctions and without any crack or
breakage of an operating part of the handgun which increases the danger of injury to the
user.

Handgun-purveyor:  shall mean any person or entity that transfers handguns to a customer
located within the Commonwealth of Massachusetts.  However, handgun-purveyor shall not
include any of the aforementioned if:
   (a)  the person or entity transfers less than five handguns per year,
   (b)  the transfer in question is for the purpose of, and does, directly or indirectly, supply law
enforcement officials or United States military personnel with handguns for their official
duties,
   (c)  the transfer in question is for the purpose of, and does, directly or indirectly, supply
museums or educational collectors with the handguns in question,
   (d)  the transfer in question is undertaken to, and does, result in the surrender of handguns
to military or law enforcement personnel,
   (e)  the transfer in question is of handguns that qualify as antique firearms as defined in 18
U.S.C. § 921, or
   (f)  the transfer in question is of handguns that are solely designed and sold specifically for
formal target shooting competition.

Key activated trigger lock: shall mean a device that when locked in place by means of a key,
prevents a potential user from pulling the trigger of the handgun without first removing the
trigger lock by use of the trigger lock's key.

Load indicator:  shall mean a device which plainly indicates that a cartridge is in the firing
chamber within the handgun.

Magazine safety disconnect:  shall mean a device that prevents the firing of the handgun when
the magazine is detached from the handgun.

Make and model: shall mean any group of handguns, all of which are made by a manufacturer
by the same method and according to the same design pattern and specifications.

940 CMR:   OFFICE OF THE ATTORNEY GENERAL

16.01:  continued

Make and Model Performance Requirements:  shall mean a test in which three handguns in new condition of the make and model being tested shall each pass the Handgun Performance Test.

Make and Model's Average Group Diameter Test Result:  shall mean the arithmetic mean of the results of three Average Group Diameter Tests, each performed on a different handgun in new condition of the make and model being tested.

Malfunction:  shall mean any failure to feed, chamber, fire, extract, or eject a round, or any failure to accept or eject a magazine, or any other failure which prevents the handgun, without manual intervention beyond that needed for routine firing and periodic reloading, from firing the chambered round or moving a new round into position so that the handgun is capable of firing the new round properly.  Malfunction shall not include a misfire caused by a faulty cartridge whose primer fails to detonate when properly hit by the handgun's firing mechanism.

Passive use-limitation device: shall mean a device that automatically resets itself so that an unauthorized user cannot fire the handgun.  As an example, a key activated trigger lock is not a passive use-limitation device because it needs to be re-locked manually after its key is used to unlock it; thus the next user can fire the handgun without having to unlock the handgun.

Prone to accidental discharge:  shall mean unable to pass the following test: five handguns in new condition of the make and model in question shall each be subjected to, and none shall discharge during, the Handgun Drop Test.

Ready to fire:  shall mean loaded, and in a condition such that pulling the trigger (and taking any action that must simultaneously accompany the pulling of the trigger as part of the firing procedure) will fire the handgun.

Serial number:  shall mean the number stamped, inscribed, or placed upon a handgun by a handgun-purveyor pursuant to M.G.L. c. 269, § 11E.

Solenoid use-limitation device:  shall mean a device which precludes, by use of a magnetically activated relay, the firing of the handgun unless a magnet of the appropriate strength is placed in proximity to the handle of the handgun.  Such magnet may be imbedded in a ring which can be worn on the user's gun hand.

Test loaded:  shall mean loading each chamber of the handgun in question with an empty case with a primer installed.

Transfer:  shall mean sell, rent, or lease.  Transfer shall not include a sale to a business entity that is primarily a firearm wholesaler, so long as the sale, by its terms, prohibits the purchaser from reselling the handgun to a handgun retailer or consumer in the Commonwealth.

16.02:   Unfair or Deceptive Practices: General

(1)  It shall be an unfair or deceptive practice for any handgun-purveyor, in conjunction with the transfer (or offer to transfer) of a handgun to a consumer in the Commonwealth, to fail to comply with M.G.L. c. 93A, 940 CMR 16.00 et seq., or any other existing local, state, or federal statute, rule or regulation whose implementation serves to protect consumers from unfair and deceptive practices by means including, but not limited to, regulating conditions of sale, precluding the sale of products when such sale will place purchasers in violation of the law, demanding the disclosure of information, and ensuring the satisfactory condition and non-contraband status of goods proffered for sale.  Examples of the above include laws, regulations, and rules that:
(a)  forbid the sale of handguns to juveniles, addicts, or mentally incompetent individuals,
(b)   forbid the sale of silencers, armor penetrating bullets, or machine-gun pistols (when possession by purchasers will be unlawful),
(c)  forbid participation in any way in the obliteration of serial numbers from handguns prior to sale,
(d)   forbid the sale of handguns whose serial numbers have been defaced,

940 CMR:   OFFICE OF THE ATTORNEY GENERAL

16.02:   continued

        (e)   require sellers to keep records of handgun sales,
        (f)   forbid sellers from delivering or transporting handguns loaded, or
        (g)   forbid the delivery of handguns to the custody of a minor.

    (2)   It shall be an unfair or deceptive practice for a handgun-purveyor to make material misrepresentations or make false certifications regarding any handgun offered for transfer.

### 16.03:   Tamper-Resistant Serial Numbers

It shall be an unfair or deceptive practice for a handgun-purveyor to transfer or offer to transfer to any customer located within the Commonwealth any handgun on which the serial number has been placed solely in a location on the handgun that results in the number's susceptibility to eradication. A serial number shall be deemed not susceptible to eradication for purposes of 940 CMR 16.00 if:

(1)  it is placed on the interior of the handgun, and the handgun-purveyor provides information regarding the location of the interior serial number to the Office of the Attorney General and other law enforcement officials upon request; or

(2)  it is placed on the exterior of the handgun in a way that is not visible to the unaided eye, but is visible with the aid of an infrared detector or other device, and the handgun-purveyor provides information regarding the location of the nonvisible serial number or any method by which this number can be made viewable to the Office of the Attorney General and other law enforcement officials upon request.

### 16.04:   Sale of Handguns Made From Inferior Materials

It shall be an unfair or deceptive practice for a handgun-purveyor to transfer or offer to transfer to any customer located within the Commonwealth any make and model of handgun that:

(1)   has a frame, barrel, cylinder, slide or breechblock:
    (a)   composed of any metal having a melting point of less than 900°F,
    (b)   composed of any material having an ultimate tensile strength of less than 55,000 pounds per square inch, or
    (c)   composed of any powdered metal having a density of less than 7.5 grams per cubic centimeter; or

(2)  is prone to repeated firing based on a single pull of the trigger, prone to the explosion of the handgun during firing with standard ammunition, or prone to accidental discharge.

(3)  940 CMR 16.04(1) shall not apply to any make and model of handgun which satisfies the Make and Model Performance Requirements. The Attorney General may require that the handgun-purveyor, or the entity testing the make and model in question on behalf of the handgun-purveyor, provide a sworn certification verifying that the make and model met the performance requirements. At the Attorney General's discretion, he may, upon 60 days notice, require that any such test be performed again by an independent testing entity chosen by the Attorney General, upon three test guns of the make and model purchased at retail. In such a case, the prior certification shall be prospectively invalid at the conclusion of the notice period and the make and model in question may henceforth only meet the Make and Model Performance Requirements by obtaining a certification from the independent tester. A handgun-purveyor may resubmit a make and model to the independent tester for testing an unlimited number of times.

### 16.05:   Sale of Handguns Without Childproofing or Safety Devices

(1)   It shall be an unfair or deceptive practice to sell a handgun without a safety device in violation of M.G.L. c. 140, § 131K.

(2)   It shall be an unfair or deceptive practice for a handgun-purveyor to transfer or offer to transfer to any customer located within the Commonwealth any handgun which does not contain

ADD004

940 CMR: OFFICE OF THE ATTORNEY GENERAL

16.05: continued

a mechanism which effectively precludes an average five year old child from operating the handgun when it is ready to fire; such mechanisms shall include, but are not limited to: raising trigger resistance to at least a ten pound pull, altering the firing mechanism so that an average five year old child's hands are too small to operate the handgun, or requiring a series of multiple motions in order to fire the handgun.

(3) It shall be an unfair or deceptive practice for a handgun-purveyor to transfer or offer to transfer to any customer located within the Commonwealth any handgun which does not contain a load indicator or magazine safety disconnect.

(4) 940 CMR 16.05(2) shall not apply to handguns which have a hammer deactivation device. 940 CMR 16.05(3) applies only to handguns that have a mechanism to load cartridges via a magazine.

16.06: Safety Warning/Disclosures

(1) It shall be an unfair or deceptive practice for a handgun-purveyor to transfer or offer to transfer to any customer located within the Commonwealth any handgun unless that handgun is accompanied by the following warning, provided on a separate sheet of paper included within the packaging enclosing the gun, which, in at least 12 point type, states the following:

"WARNING FROM THE MASSACHUSETTS ATTORNEY GENERAL: This handgun is not equipped with a device that fully blocks use by unauthorized users. More than 200,000 firearms like this one are stolen from their owners every year in the United States. In addition, there are more than a thousand suicides each year by younger children and teenagers who get access to firearms. Hundreds more die from accidental discharge. It is likely that many more children sustain serious wounds, or inflict such wounds accidentally on others. In order to limit the chance of such misuse, it is imperative that you keep this weapon locked in a secure place and take other steps necessary to limit the possibility of theft or accident. Failure to take reasonable preventive steps may result in innocent lives being lost, and in some circumstances may result in your liability for these deaths."

Failure to include this warning in the packaging enclosing the gun shall not be a violation of 940 CMR 16.00 if the handgun in question complies with 940 CMR 16.05(1) by means of a built-in passive use-limitation device, including but not limited to a nondetachable solenoid use-limitation device.

(2) It shall be an unfair or deceptive practice for a handgun-purveyor to transfer a handgun directly to a retail customer located within the Commonwealth without demonstrating how to load, unload, and safely store the handgun, and how to engage and disengage all safety devices on the handgun. This shall include an explanation of the circumstances for which the safety devices are designed to prevent the firing of the handgun. The handgun-purveyor shall also note for the retail customer the absence, if any, of the following: a load indicator, a magazine safety disconnect or an internal safety.

(3) It shall be an unfair or deceptive practice for a handgun purveyor to transfer to a customer located within the Commonwealth a handgun that has a barrel shorter than three inches, unless the handgun purveyor discloses the limits of the accuracy of the make and model of handgun for sale by providing in writing to the customer (prior to sale) the make and model's average group diameter test result at seven yards, average group diameter test result at 14 yards, and average group diameter test result at 21 yards.

16.07: Transfers of Used Handguns

(1) 940 CMR 16.03 and 16.05(2) and (3) shall not apply to the transfer of (or offer to transfer) any handgun that previously has been sold at retail to a consumer and that was manufactured prior to the enforcement date for those provisions.

ADD005

940 CMR:   OFFICE OF THE ATTORNEY GENERAL

16.07:   continued

(2)  940 CMR 16.06(3) shall not apply to the transfer of (or offer to transfer) any handgun that previously has been sold at retail to a consumer, was manufactured prior to the enforcement date for 940 CMR 16.06(3), and for which the handgun-purveyor discloses the limits of the accuracy of the specific handgun for sale by providing in writing to the customer(prior to sale) the handgun's average group diameter test result at seven yards, average group diameter test result at 14 yards, and average group diameter test result at 21 yards.

(3)  940 CMR 16.04(2), as it pertains to any make and model prone to accidental discharge, shall not apply to the transfer of (or offer to transfer) any handgun that previously has been sold at retail to a consumer, was manufactured prior to the enforcement date for 940 CMR 16.04(2), and for which the handgun-purveyor provides to the buyer a sworn certification that the handgun-purveyor has performed the Handgun Drop Test on the handgun in question in fully cocked position, and on the same handgun (or on other handguns of the same make and model in similar condition) in all other hammer/striker positions, and that there were no discharges during the test.

(4)  940 CMR 16.04(1) shall not apply to the transfer of (or offer to transfer) any handgun that previously has been sold at retail to a consumer, was manufactured prior to the enforcement date for 940 CMR 16.04(1), and for which the handgun-purveyor provides a sworn certification to the buyer that the specific handgun purchased passed the Handgun Performance Test.

16.08:   Severability

If any section or subsection of 940 CMR 16.00 shall be held invalid, the validity of the remainder of 940 CMR 16.00 shall not be affected thereby. If the application of any section or subsection of 940 CMR 16.00 to any person or circumstance shall be held invalid, the applicability of such section or subsection to any other person or circumstance shall not be affected thereby.

16.09:   Enforcement Dates

940 CMR 16.00 shall apply as follows:

(1)  940 CMR 16.01, 16.02, and 16.08, and 940 CMR 16.06(1) and (2) shall apply to acts committed or practices in force as of January 15, 1998;

(2)  940 CMR 16.04 and 940 CMR 16.06(3), 16.07(2), (3) and (4) shall apply to acts committed or practices in force as of June 30, 1998; and

(3)  940 CMR 16.03 and 16.05, and 940 CMR 16.07(1) shall apply to acts committed or practices in force as of September 30, 1998.

REGULATORY AUTHORITY

940 CMR 16.00:   M.G.L. c. 93A, § 2(c).

(PAGES 125 THROUGH 130 ARE RESERVED FOR FUTURE USE.)

# 33



# Model 9C1

## Instruction Manual and Safety Features
### Read this manual completely before using this handgun.



ADD008

**PROUDLY AMERICAN**

### Loaded Chamber Indicator

#### When Chamber Loaded:

A red pin will protrude out the back of the slide when a round is in the chamber. Text "**LOADED IF OUT**" warns the user of the condition. The loaded condition is visually apparent in light and readily apparent in dark by feel.



#### When Chamber Unloaded:

The red pin will not protrude out the back of the slide if no round is in the chamber. The unloaded condition is visually apparent in light and readily apparent in dark by feel.



ADD009

 © 2009 Model 9C1 is a registered trademark of FMK Firearms, Inc. All rights reserved. Made in USA

## Striker Indicator

The 9C1 handgun is a Double Action Only pistol. In one stroke of the trigger, the firing element (the striker) is pulled back (action 1) and released (action 2) firing the weapon. When the striker moves back, it will show in the large hole within the slide end cap <span style="color:red">warning: *discharge is imminent.*</span>

 

Discharge is imminent.

ADD010

© 2009 Model 9C1 is a registered trademark of FMK Firearms, Inc. All rights reserved. Made in USA **9**

Case 1:14-cv-12471-NMG Document 43 Filed 06/27/14 Page 1 of 6

**34**

# INSTRUCTION MANUAL FOR



BLUED &
STAINLESS
STEEL

CALIBER
9mm, 40 S&W, &
45 Auto

# RUGER® SR-SERIES

## SR9®, SR9c™, SR40®, SR40c™ & SR45™

### MANUAL SAFETY MODEL PISTOLS



## – Rugged, Reliable Firearms –



### READ THE INSTRUCTIONS AND WARNINGS IN THIS MANUAL CAREFULLY BEFORE USING THIS FIREARM

© 2013 Sturm, Ruger & Co., Inc.

This manual may not be reproduced in whole or in part without the express written permission of Sturm, Ruger & Co., Inc.

### For Service on This Model Please Call:
### (928) 778-6555 (See p. 34)

THIS INSTRUCTION MANUAL SHOULD ALWAYS ACCOMPANY THIS FIREARM AND BE TRANSFERRED WITH IT UPON CHANGE OF OWNERSHIP, OR WHEN THE FIREARM IS LOANED OR PRESENTED TO ANOTHER PERSON

### www.ruger.com
ADD012

VS & KVS 4/13A  C
R5

# NOMENCLATURE



**Sights** have high-visibility white dots both front and rear. Both sights can be adjusted for windage.

**Slide's** open-top design minimizes possibility of jamming, enables shooter to clear any malfunction easily by hand.

Elevation click-adjustable **rear sight** is drift adjustable for windage.

When ambidextrous **manual safety** is in "safe" position, locks the trigger and trigger bar.

**Frame** is a rigid one-piece glass reinforced nylon.

**Takedown pin.**

Oversize **trigger guard** permits shooting with gloved hand.

Ambidextrous **magazine latch** permits positive retention and quick removal of magazine.

**Slide stop** holds the slide open and is activated automatically when last shot is fired (if magazine is in pistol), or can be manually operated.

Magazine has **gripping grooves** on floorplate.

---



**Loaded Chamber Indicator** protrudes from the top of the slide and provides a visual and tactile indication when a round is present in the firing chamber.

Ambidextrous **manual safety**.

The **Accessory Rail** accepts most lights and sighting devices designed to fit the M1913 Picatinny Standard Rail.

**Trigger safety** and **firing pin block** prevent firing unless trigger is completely pulled.

Unique **Reversible Backstrap** changes from flat to arched (shown) in seconds.

The **Magazine latch**.

The **Magazine Disconnect** is designed to prevent the pistol from being fired when the magazine is removed, even if a live round remains in the firing chamber.

ADD013

7

# OPERATION OF
# LOADED CHAMBER INDICATOR

You should always treat every gun as though it is loaded and always keep the muzzle pointed in a safe direction. Never rely upon any safety or mechanical device to justify unsafe or careless gun handling.  In order to assist you in determining the presence of a cartridge in the chamber of your **RUGER® SR-SERIES** pistol, and to comply with state laws, the **SR-SERIES** is equipped with a loaded chamber indicator.  The indicator appears on the top of the slide. (See "Nomenclature," p. 7.)

When the chamber is empty, the loaded chamber indicator should be flush with the top of the slide. (See Figure 8a, below.)

When the chamber is loaded, the forward portion of the loaded chamber indicator should protrude from the top of the slide. When the chamber contains a cartridge, a red bar should be visible on either side of the loaded chamber indicator. (See Figure 8b, below.)

## OPERATION OF LOADED CHAMBER INDICATOR

**Indicator Flush With Top**



Figure 8a

**Chamber Empty**

**Indicator Protrudes From Top - Red Bar Visible**



Figure 8b

**"Loaded When Up"**

**Cartridge in Chamber**

> ⚠ **NEVER RELY ON YOUR MEMORY OR ANY LOADED CHAMBER INDICATOR TO KNOW IF A GUN IS LOADED. ANY MECHANICAL DEVICE CAN FAIL. ALWAYS VISUALLY CHECK THE CHAMBER BY RETRACTING THE SLIDE AND EXAMINING THE CHAMBER TO BE <u>SURE</u> WHETHER IT IS EMPTY OR LOADED.**

ADD014

38



SAFETY & INSTRUCTION MANUAL

# **P99** PISTOL



 Read the instructions and warnings in this manual
CAREFULLY BEFORE using this firearm.

ADD016

# WALTHER ARMS, INC.

## 3. PRODUCT DESCRIPTION

### 3.2.1. Loaded Chamber Indicator

The loaded chamber indicator is on the right side of the slide.

The loaded chamber indicator can be observed when the rear of the extractor is recessed, revealing a red colored marking (3.2.1. Fig. 1).



*3.2.1. Fig. 1*

**⚠ WARNING** DO NOT RELY UPON THE LOADED CHAMBER INDICATOR TO VERIFY THE PRESENCE OR ABSENCE OF A ROUND IN THE CHAMBER. ALWAYS CHECK THE CHAMBER OF THE FIREARM BY REMOVING THE MAGAZINE AND LOCKING THE SLIDE IN THE OPEN POSITION.

**⚠ WARNING** ALWAYS TREAT EVERY FIREARM AS IF IT WERE LOADED AND WOULD FIRE IF THE TRIGGER IS PULLED: THE AMOUNT OF LIGHT, CLEANLINESS OF THE PISTOL AND OTHER FACTORS MAY LIMIT THE EFFECTIVENESS OF THE LOADED CHAMBER INDICATOR. CLEANING SOLVENTS OR WEAR MAY DARKEN OR REMOVE THE RED COLOR, OR POWDER RESIDUE OR DIRT MAY COVER IT UP. IF YOU DO NOT SEE THE RED DOT, DO NOT ASSUME THE CHAMBER IS EMPTY. AFTER FIRST CHECKING THAT THE MAGAZINE HAS BEEN REMOVED, PULL THE SLIDE BACK UNTIL YOU CAN LOOK INTO THE CHAMBER AND VERIFY WHETHER IT IS EMPTY OR NOT.

### 3.2.2. Striker Status Indicator

The P99 has a cocking indicator in the rear of the slide. The pistol uses an internal striker with a tip that protrudes out of the slide end cap when the striker is cocked.

- In the de-cocked state, the tip can be neither seen nor felt (3.2.2. Fig. 1, left side).
- The tip protrudes from the rear of the slide when the pistol is cocked (3.2.2. Fig. 1, middle).
- The tip is approximately .04" (1 mm) inside the slide end cap on cocked P99 QA (3.2.2. Fig. 1, right side). It can be seen, but not felt.



*3.2.2. Fig. 1, from left to right: de-cocked, cocked, cocked (P99 QA only)*

Case 1:14-cv-12471-NMG Document 4-4 Filed: 06/17/14 Page 23 of 28

42

# NOTICE

This GLOCK pistol is equipped with an improved extractor that produces a visual and tactile indication of a loaded chamber, although one should always check a firearm both visually and manually to determine if there is a round in the chamber as indicated on p. 34 of the Instructions for Use Manual. The extractor indicator is located on the right hand side of the slide (as viewed from the rear) (never check the extractor's position by pointing the firearm at yourself and looking at it from the front as it may be loaded and could cause serious bodily injury to yourself or others), immediately behind the ejection port. When the chamber is unloaded the extractor is depressed [Fig. 1], and when the chamber is loaded the extractor pivots out from the slide [Fig. 2].

The Massachusetts Attorney General has determined that this is a safety feature that has to be installed in all semi-automatic pistols shipped to Massachusetts. GLOCK recommends you refer to the Instructions for Use Manual for detail information on loading and unloading procedures as well as other safety features and the basic firearm safety rules and precautions for the safe use and handling of your GLOCK pistol.



**Fig. 1**                 ADD019        **Fig. 2**

## WARNING FROM THE MASSACHUSETTS ATTORNEY GENERAL:

This handgun is not equipped with a device that fully blocks use by unauthorized users. More than 200,000 handguns like this one are stolen from their owners every year in the United States. In addition, there are more than a thousand suicides each year by younger children and teenagers who get access to firearms. Hundreds more die from accidental discharge. It is likely that many more children sustain serious wounds, or inflict such wounds accidentally on others. In order to limit the chance of such misuse, it is imperative that you keep this weapon locked in a secure place and take other steps necessary to limit the possibility of theft or accident. Failure to take reasonable preventive steps may result in innocent lives being lost, and in some circumstances may result in your liability for these deaths.

**43**

**INSTRUCTIONS FOR USE**



**GLOCK®**

**PERFECTION**



⚠ WARNING

READ THIS MANUAL CAREFULLY BEFORE LOADING OR USING YOUR GLOCK PISTOL.

⚠ WARNING

LIKE MOST MODERN HANDGUNS YOUR GLOCK PISTOL IS DESIGNED WITHOUT A CONVENTIONAL MANUAL SAFETY, THEREFORE YOU MUST CONSIDER IT TO BE LOADED AND READY TO FIRE UNTIL YOU HAVE REMOVED THE MAGAZINE AND VISUALLY AND PHYSICALLY (WITH YOUR FINGER) CONFIRMED THAT THE CHAMBER IS EMPTY.

30887 / 09 13

# GLOCK® SAFE ACTION® PISTOLS
## ALL MODELS

Instruction for use.indd 1                                    19.09.2013  10:08:06



even when operating in saltwater conditions. The matte black surface minimizes light reflection - an advantage in tactical circumstances.

BARREL: The barrel (2) is mechanically locked and cold-hammer forged. It also has the same advanced surface treatment as the slide. The rounded (hexagonal or octagonal) interior profile offers numerous advantages over conventional barrel profiles, including elimination of corners/edges making them considerably easier to clean and maintaining uniform precision even after a high number of rounds have been fired.



LOADED CHAMBER INDICATOR: The extractor (10) serves as a loaded chamber indicator (Picture 1) to comply with the laws of certain states and its position may visually and physically indicate whether there is a cartridge in the chamber of the pistol. When the chamber is unloaded the extractor is depressed (Picture 2) and when the chamber is loaded the extractor pivots out from the slide (Picture 3).



⚠ WARNING Although your GLOCK pistol has a loaded chamber indicator, it is a mechanical device, which could fail. Never rely solely on a loaded chamber indicator or your memory to determine whether your GLOCK pistol is loaded or unloaded. Always remove the magazine, retract and lock the slide by pulling it fully to the rear and then visually and physically (with your finger) check to make sure there is not a cartridge in the chamber, as fully described in the Unloading Procedure and Safety Check, Chapter 8 (Pages 19-20).

8