# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

Docket No. 15-1429

_____

ROBERT DRAPER, ARIEL WEISBERG, DONNA MAJOR, ERIC NOTKIN,
ROBERT BOUDRIE, BRENT CARLTON(S), CONCORD ARMORY, LLC,
PRECISION POINT FIREARMS, LLC, AND SECOND AMENDMENT
FOUNDATION, INC.,
Plaintiffs-Appellants,

-vs-

MAURA HEALEY, IN HER CAPACITY AS ATTORNEY GENERAL OF
MASSACHUSETTS,
Defendant-Appellee

_____

On Appeal From the United States District Court
For the District of Massachusetts
1:14-cv-12471-NMG

**BRIEF OF *AMICUS CURIAE* THE LAW CENTER TO PREVENT GUN
VIOLENCE SUPPORTING AFFIRMANCE**

David Tennant, Esq.
Lynnette Nogueras-Trummer, Esq.
Matthew Struhar, Esq.
NIXON PEABODY LLP
1300 Clinton Square
Rochester, NY 14604
T: (585) 263-1000
E:dtennant@nixonpeabody.com
　　mstruhar@nixonpeabody.com
　　lnoguerastrummer@nixonpeabody.com

*Attorneys for Amicus Curiae the Law Center to
Prevent Gun Violence*

W. Daniel Deane, Esq.
Bar No. 120813
NIXON PEABODY LLP
900 Elm Street, 14th Floor
Manchester, NH 03101-2031
T: (603) 628-4047
E: ddeane@nixonpeabody.com

*Attorneys for Amicus Curiae the Law
Center to Prevent Gun Violence*

# TABLE OF CONTENTS

**Page(s)**

CORPORATE DISCLOSURE STATEMENT ................................................... 1

INTEREST OF *AMICUS CURIAE* ............................................................... 2

INTRODUCTION ........................................................................................... 2

ARGUMENT .................................................................................................. 7

I. THE REGULATIONS DO NOT IMPLICATE THE SECOND
AMENDMENT. ..................................................................................... 7

   A. Plaintiffs' Second Amendment Claims .......................................... 7

      a. *Heller* Recognizes Several "Presumptively Lawful" Regulatory
Measures That Fall Outside The Historical Scope Of The
Second Amendment ............................................................. 9

      b. First circuit case law further establishes that "presumptively
lawful" regulations fall outside the scope of the Second
Amendment .................................................................... 10

         i. United States v Rene E ............................................ 10

         ii. United States v Booker ............................................ 11

         iii. Resulting Two-Part Test ........................................... 13

   B. The Regulations At Issue Here Fall Outside The Second Amendment
Because They Merely Impose A Condition On The Commercial Sale
of Handguns ............................................................................ 15

   C. The Safety Regulations Are Sufficiently "Rooted in History" To
Avoid Heightened Scrutiny ........................................................ 16

      a. States Have Long Conditioned the Sale of Firearms And
Ammunition on Meeting Safety Requirements .................... 17

      b. States Have Continued to Require Certain Safety Features for
Firearms, Including Load Indicators ................................... 19

II. EVEN IF SECTION 16.05 IMPLICATES THE SECOND AMENDMENT,
INTERMEDIATE SCRUTINY IS THE PROPER STANDARD OF
REVIEW ............................................................................................. 21

   A. Courts Determine the Appropriate Level of Review in Second
Amendment Cases by Examining How Severely a Challenged Law
Burdens the Core of the Right ..................................................... 22

        a.     The Core of the Second Amendment ...................................23

        b.     The Severity of the Law's Burden on Second Amendment Rights...................................................................................24

   B.    This Court Should Adopt Intermediate Scrutiny In Accordance With The Prevailing View In Other Circuits........................................24

   C.    Section 16.05 Does Not Burden The Core Right Of The Second Amendment..............................................................................26

   D.    Strict Scrutiny Is Generally Inappropriate In The Second Amendment Context and Should Not Be Applied Here ....................................27

III.   THE REGULATIONS EASILY PASS INTERMEDIATE SCRUTINY. ..29

   A.    Gun Safety And Prevention Of Gun Violence Are Important And Compelling Governmental Interests ...........................................29

   B.    The Regulation Substantially Furthers These Interests ...................31

CONCLUSION..............................................................................................32

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Adarand Constructors v. Pena*,
   515 U.S. 200 (1995)............................................................................28

*Bauer v. Harris*,
   No. 1:11-cv-1440-LJO-MSJ, 2015 WL 881515 (E.D. Cal. Mar. 2, 2015),
   appeal docketed, No. 15-15428 (9th Cir. Mar. 9, 2015) ...................................16

*Bonidy v. U.S. Postal Serv.*,
   790 F.3d 1121 (10th Cir. 2015) ................................................................13, 21

*Davis v. Grimes*,
   9 F. Supp. 3d 12, 24 (D. Mass. 2014)................................................................23

*Department of Revenue of Ky. v. Davis*,
   553 U.S. 328 (2008)............................................................................28

*District of Columbia v. Heller*,
   554 U.S. 570 (2008)..................................................................passim

*Draper v. Healey*,
   No. 1:14-cv-12471-NMG, Dkt. 45 at 16 (D. Mass. Mar. 5, 2015) ...................15

*Ezell v. City of Chicago*,
   651 F.3d 684 (7th Cir. 2011) ....................................................................22, 25

*Heller v. District of Columbia*,
   670 F.3d 1244 (D.C. Cir. 2011)............................................................22, 25, 28

*Hightower v. City of Boston*,
   693 F.3d 61 (1st Cir. 2012)................................................................16, 23, 26

*Hirabayashi v. United States*,
   320 U.S. 81 (1943)............................................................................28

*Hodel v. Virginia Surface Mining*,
   452 U.S. 264 (1981)............................................................................30

i

*Jackson v. City & Cty. of San Francisco,*
    746 F.3d 953 (9th Cir. 2014) cert. denied, 135 S. Ct. 2799, 192 L. Ed. 2d
    865 (2015) ...................................................................................passim

*Kachalsky v. County of Westchester,*
    701 F.3d 81 (2d Cir. 2012) ...................................................21, 26, 28

*McDonald v. City of Chicago,*
    561 U.S. 742 (2010).........................................................................2, 7

*McGuire v. Reilly,*
    260 F.3d 36 (1st Cir. 2001) ..................................................................30

*New York State Rifle & Pistol Ass'n v. Cuomo,*
    804 F.3d 242 (2d Cir. N.Y. Oct. 19, 2015)...................................22, 25

*NRA v. ATF,*
    700 F.3d 185 (5th Cir. 2012) ...............................................22, 25, 29

*Pena v. Lindley,*
    No. 2:09-cv-01185-KJM-CKD (E.D. Cal. Feb. 25, 2015) ...........15, 19

*Powell v. Tompkins,*
    783 F.3d 332 ..........................................................................................25

*Simon & Schuster, Inc. v. Members of NY State Crime Victims Bd.,*
    502 U.S. 105 (1991)..............................................................................27

*Teixeira v. Cnty. of Alameda,*
    No. 12-CV-03288-WHO, 2013 WL 4804756 (N.D. Cal. Sept. 9, 2013),
    appeal docketed, No. 13-17132 (9th Cir. Oct. 23, 2013) ...................16

*Turner Broad. Sys., Inc. v. FCC,*
    512 U.S. 622 (1994).............................................................................29

*United States v. Armstrong,*
    706 F.3d 1 (1st Cir. 2013)....................................................................26

*United States v. Barton,*
    633 F.3d 168 (3d Cir. 2011) ........................................................13, 23

*United States v. Booker,*
    644 F.3d 12 (1st Cir. 2011).............................................................passim

*United States v. Chester*,
628 F.3d 673 (4th Cir. 2010) ...............................................................22, 24, 25

*United States v. Chovan*,
735F.3d 1127 (9th Cir. 2013) ...................................................................passim

*United States v. Colon-Quiles*,
859 F. Supp. 2d 229,235 (D.P.R. May 4, 2012)...................................................24

*United States v. Greeno*,
679 F.3d 510 (6th Cir. 2012) ...............................................................................23

*United States v. Huitron-Guizar*,
678 F.3d 1164 (10th Cir. 2012) ..........................................................................28

*United States v. Marzzarella*,
614 F.3d 85 (3d Cir. 2010) ............................................................................25, 28

*United States v. Masciandaro*,
638 F.3d 458 (4th Cir. 2011) ...............................................................................30

*United States v. Murphy*,
681 F. Supp. 2d 95 (D. Me. 2010) .......................................................................12

*United States v. Reese*,
627 F.3d 792 (10th Cir. 2010), cert. denied, 131 S. Ct. 2476 (2011)................23

*United States v. Rene E.*,
583 F.3d 8 (1st Cir. 2009)............................................................................passim

*United States v. Staten*,
666 F.3d 154 (4th Cir. 2011), cert. denied, 132 S. Ct. 1937 (2012)..................23

*United States v. Williams*,
616 F.3d 685 (7th Cir. 2010) ...............................................................................28

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989).............................................................................................29

*Woollard v. Gallagher*,
712 F.3d 865 (4th Cir. 2013) ...............................................................................28

**OTHER CASES**

*Commonwealth v. McGowan*,
  982 N.E.2d 495 (Mass. 2013) ....................................................12, 31

**FEDERAL STATUTES**

18 U.S.C. § 922(g)(9) ...................................................................11

**OTHER STATUTES**

1973 Ill. Laws 1130, § 1 ..............................................................20

2010 Maryland Code, Public Safety, § 5-132 ...........................19

1814 Mass. Acts. 464-65, § 2 ......................................................19

1881 Mass. Acts. 333-34, Chapter 60 § 18 ...............................18

2003 Md. Laws. 246 ....................................................................19

1821 Me. Laws 685, Chapter 162 § 1 .........................................18

1786 N.H. Laws 10, Chapter 22 ..................................................17

1820 N.H. Laws 274-75, Chapter 15 §§ 1-9 ..............................18

1974 N.Y. Laws 2665-66, § 1 ......................................................20

1795 Pa. Laws 242, § 6 ...............................................................18

Cal. Penal Code § 31905 .............................................................20

Cal. Penal Code § 31910(b)(94) .................................................19

**RULES**

940 C.M.R. § 16.00, *et seq.* ...............................................passim

**CONSTITUTIONAL PROVISIONS**

U.S. Const. Amendment II............................................................passim

OTHER AUTHORITIES

4 Blackstone, *Commentaries on the Laws of England* 168 (1769) .........................17

Adam Winkler, *Fundamentally Wrong About Fundamental Rights* .......................27

Adam Winkler, *Scrutinizing the Second Amendment,* 105 Mich. L. Rev. 683
(2007) ..............................................................................................................27

Commonwealth of Massachusetts, Executive Office of Public Safety and
Security, Approved Firearms Roster, 09-2015, at
http://www.mass.gov/eopss/docs/chsb/firearms/approvedfirearmsroster05
-2015.pdf. ...................................................................................................8, 27

FBI, Crime on the United States, Crime Trends, Table 8, Expanded
Homicide Weapon, at https://www.fbi.gov/about-us/cjis/ucr/crime-in-the-
u.s/2014/crime-in-the-u.s.-2014/tables/expanded-homicide-
data/expanded_homicide_data_table_8_murder_victims_by_weapon_201
0-2014.xls..........................................................................................................30

Joseph Blocher, Categoricalism and Balancing in First and Second
Amendment Analysis, 84 N.Y.U.L. Rev. 375, 422 (2009) ...............................29

Saul Cornell & Nathan DeDino*, A Well Regulated Right: The Early
America Origins of Gun Control, 73 Fordham L. Rev. 487, 505-508
(2004) ...........................................................................................................10, 18

Brian J. Siebel, City Lawsuits Against the Gun Industry: A Roadmap for
Reforming Gun Industry Misconduct, 18 St. Louis U. Pub. L. Rev. 247,
254–55 (1999) ..................................................................................................31

Roger Pauly, *Firearms: The Life Story of a Technology* (2004) .............................20

Robert H. Churchill, Gun Regulation, the Police Power, and the Right to
Keep Arms in Early America: The Legal Context of the Second
Amendment, 25 Law & Hist. Rev. 139 ............................................................18

U.S. Dep't of Health & Human Servs., Centers for Disease Control &
Prevention, Nat'l Center for Injury Prevention & Control, Deaths: Final
Data for 2013, table 18, available at
http://www.cdc.gov/nchs/data/nvsr/nvsr64/nvsr64_02.pdf...............................21

U.S. General Accounting Office, Accidental Shootings: Many Deaths and Injuries Caused by Firearms Could Be Prevented 17 (Mar. 1991), at http://www.gao.gov/assets/160/150353.pdf ...................................................3, 4

Garen J. Wintemute, The Epidemiology of Firearm Violence in the Twenty-First Century United States, Annual Review of Public Health, vol. 36: 5-19, 2015, available at http://www.annualreviews.org/doi/pdf/10.1146/annurev-publhealth-031914-122535. ................................................................................................30

WISQARS *Unintentional Firearm Gunshot Nonfatal Injuries and Rates per 100,000*...........................................................................................................31

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Fed. R. App. P. 26., Amicus Law Center to Prevent Gun

Violence states that it is not a publicly held corporation, does not have a parent

corporation, does not issue stock and therefore, no publicly held corporation owns

10% or more of its stock.

## INTEREST OF *AMICUS CURIAE*

*Amicus curiae* the Law Center to Prevent Gun Violence (the "Law Center") is a non-profit, national law center dedicated to reducing gun violence and the devastating impact it has on communities. The Law Center focuses on providing comprehensive legal expertise to promote smart gun laws. These efforts include tracking all Second Amendment litigation nationwide and providing support to jurisdictions facing legal challenges to their gun laws. As an amicus, the Law Center has provided informed analysis in a variety of firearm-related cases, including *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. City of Chicago*, 561 U.S. 742 (2010). It seeks to do the same here. The Law Center submits this *amicus* brief with consent from all parties. No counsel for any party to this appeal authored any part of the brief. No party or third person, other than *amicus* and its agents, contributed funds towards preparing and submitting this brief.

## INTRODUCTION

Accidental shootings claim hundreds of lives and cause thousands of injuries in the United States each year. Compounding the tragedy of so many accidental shootings is the fact that a child is often the one to pick up a loaded firearm and accidentally fire it. At the same time, these tragedies are "highly preventable through proper design of firearms." *See* Johns Hopkins Center for Gun Policy and

Research, The Case for Gun Policy Reforms in America (October 2012).[1]

Unintentional shootings can "be prevented by magazine safety disconnect devices and chamber load indicators, relatively inexpensive safety features already available on many handguns."[2]

The following key findings underscore the deadly toll taken by unintentional shooting in the United States:

- From 2005 to 2010, almost 3,800 people died, and another 95,000 people were injured in unintentional shootings.[3]

- Over 1,300 victims of unintentional shootings for the period 2005–2010 were under 25 years of age.[4]

- 8% of such shooting deaths result from shots fired by children under the age of six.[5]

This is not a problem without a solution. The gun safety features challenged here are intended to prevent, through inexpensive safety devices, the recurring

---

[1] Available at: http://www.jhsph.edu/research/centers-and-institutes/johns-hopkins-center-for-gun-policy-and-research/publications/WhitePaper020514_CaseforGunPolicyReforms.pdf.

[2] *Id*. at p. 11.

[3] *http://smartgunlaws.org/gun-deaths-and-injuries-statistics/*

[4] *Id*.

[5] U.S. General Accounting Office, Accidental Shootings: Many Deaths and Injuries Caused by Firearms Could Be Prevented 17 (Mar. 1991), at http://www.gao.gov/assets/160/150353.pdf

tragedy of individuals—particularly children—picking up a gun, thinking it is empty, and accidentally firing it and shooting themselves or others. Avoiding such accidental shootings is a primary goal not only of the safety regulations challenged here but also the Massachusetts law imposing age restrictions on transfers of firearms, which this Court upheld against Second Amendment challenge in *United States v. Rene E.*, 583 F.3d 8, 12-16 (1st Cir. 2009).

This case involves similar efforts by the Commonwealth of Massachusetts to reduce accidental shootings by requiring new handguns—as a condition of a sale—to be equipped with one of two safety features, i.e., either a chamber load indicator or a magazine disconnect.  940 C.M.R. §§ 16.01, 16.05. The title of Section 16.05 is "Sale of Handguns Without Childproofing or Safety Devices," and the Attorney General of Massachusetts promulgated these regulations under his authority, along with other rules that relate to the sale of handguns within the Commonwealth. *See* 940 C.M.R. 16.00, *et seq*. Massachusetts' efforts are backed up by data from the U.S. General Accounting Office, which has estimated that 31% of unintentional deaths caused by firearms might be prevented by the addition of two simple devices: a child-proof safety lock (8%) and a loading indicator (23%).[6] Plaintiffs'

---

[6] U.S. General Accounting Office, Accidental Shootings: Many Deaths and Injuries Caused by Firearms Could Be Prevented 17 (Mar. 1991), at http://www.gao.gov/assets/160/150353.pdf

legal challenges in this case all revolve solely around Massachusetts' "load indicator" requirement. Our brief, thus, concentrates solely on that challenge.

The load indicator challenged here is intended to prevent the recurring tragedy of individuals—particularly children—picking up a gun, thinking it is empty, and accidentally firing it and shooting themselves or others. It is an inexpensive safety feature already available on many handguns that simply informs the user if a bullet is in the chamber and ready to be fired. That information is just as critical to a handgun owner who seeks to employ the firearm for self-defense, as it is to someone cleaning the gun or otherwise picking up the weapon and who could accidentally kill or injure someone in his vicinity. Avoiding such accidental shootings is a primary goal of the safety regulations challenged here.

This type of warning device is not a novel idea, and is not unique to the gun industry. Manufacturers of automobiles, for example, equip their vehicles with a host of safety devices to overcome limitations in human perception, knowledge and judgment. Such basic items include: airbags, airbag detectors, dashboard displays of low tire pressure, and seatbelt warning systems that chime if the driver and passengers do not buckle up. The automobile is communicating information that may be overlooked or not readily apparent to the occupants of the vehicle— information that if not communicated may expose occupants to injury or death during operation. Such common sense safety devices make perfect sense on a car;

so, too, does a chamber load indicator on a handgun to prevent human mistakes based on misinformation that carries potentially deadly consequences.

Plaintiffs admit on appeal that the "crux" of their suit is their contention that the Massachusetts load indicator regulation is unconstitutionally vague, yet they spend more than twelve pages of their opening brief criticizing the district court's substantive Second Amendment analysis and arguing that the modest safety requirements at issue here amount to an impermissible burden on the Second Amendment. Appellants' Brief at 4, 53-67. For the reasons discussed in detail below, the district court was entirely correct in both its analysis and its ultimate conclusion that the basic safety requirements at issue here do not violate the Second Amendment.

There is no argument that the load indicator technology is unproven, unfeasible, prohibitively costly or otherwise not practicable. As Appellants admit: "virtually all production Gen 3 / 4 Glock handguns comply with the statute and are in the approved firearms roster." Appellants' Brief at 6. Load indicators have been around for more than a century, are inexpensive and easily incorporated into handgun design. Section 16.05 is a common-sense gun safety regulation to protect human life—and children in particular—that only a few gun manufacturers could find objectionable.

**ARGUMENT**

## I. THE REGULATIONS DO NOT IMPLICATE THE SECOND AMENDMENT.

The text of the Second Amendment reads, "A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. According to the Supreme Court of the United States, although there is an individual right to keep and bear arms under the Second Amendment, it is "not unlimited" and does not protect "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *District of Columbia v. Heller*, 554 U.S. 570, 626-627 (2008); *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010).

Although the Court in *Heller* found that a broad prohibition on the possession of any and all operable handguns in the home violated the Second Amendment, the Court was careful to explain that many other types of reasonable regulations do not violate the Second Amendment. Indeed, as this Court recognized in *United States v. Rene E.*, 583 F.3d 8 (1st Cir. 2009), *Heller* and *McDonald* establish that certain firearm regulations do not implicate the Second Amendment at all, including the safety regulations at issue in this case.

### A. Plaintiffs' Second Amendment Claims

Almost as an afterthought, Appellants offer a confusing collection of arguments ostensibly connected to the Second Amendment. Appellants' Brief at

53-65 (disclaiming a direct Second Amendment challenge but suggesting it is derivative of their constitutional challenge based on vagueness). Plaintiffs appear to argue that, by requiring the use of chamber load indicators on all newly manufactured handguns sold in Massachusetts, the safety regulations burden the Second Amendment rights of consumers to possess commonly-used firearms because it prevents consumers from buying guns without a load indicator. *Id*. at 53-65.

Appellants offer this circular argument while acknowledging the undisputed fact that hundreds of handgun models are offered for commercial sale in Massachusetts with the required load indicators. *Id*. at 66. Indeed, the Massachusetts-approved roster of acceptable handguns (equipped with chamber load indicators) covers hundreds of models from scores of different manufacturers. *See* Commonwealth of Massachusetts, Executive Office of Public Safety and Security, Approved Firearms Roster, 09-2015, at http://www.mass.gov/eopss/docs/chsb/firearms/approvedfirearmsroster05-2015.pdf. Of note, the Massachusetts roster includes more than 50 models of handguns manufactured by Glock alone, a brand apparently favored by Appellants. Appellants' Brief at 57, 59. This presents wide choice to consumers partial to that brand.

No Second Amendment violation, direct or indirect, can be premised on the unavailability of a particular, preferred handgun model offered by a single manufacturer—in this case, Glock. Especially where the challenged regulations leave consumers with a wide choice of handgun design and operability (such as caliber, weight, etc.), including *dozens* of models made by that very same manufacturer. Appellants' claim[7] presents nothing like the facts at issue in *Heller*, where the District of Columbia in effect prohibited the possession of *any and all* operable handguns in the home. *See supra*, at 7.

As set out below, the challenged Massachusetts safety regulations fall outside the Second Amendment as construed by *Heller* and subsequent cases because the regulations: (1) establish conditions for the commercial sale of firearms, which *Heller* recognizes as a "presumptively lawful" category; and (2) are analogous to "longstanding" firearm safety regulations that states have long implemented to protect public safety.

### a. *Heller* Recognizes Several "Presumptively Lawful" Regulatory Measures That Fall Outside The Historical Scope Of The Second Amendment.

The Supreme Court has recognized several "presumptively lawful" firearm regulations that arguably fall outside the scope of the Second Amendment. *Heller*, 554 U.S. at 626-27, n. 26. As Justice Scalia expressly stated when discussing

---

[7] Appellants' Brief at 65-66.

limitations on the Second Amendment right, "*nothing in our opinion should be taken to cast doubt on* longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws *imposing conditions and qualifications on the commercial sale of arms*." *Id.* (emphasis added). The Court was careful to note that this list was not exhaustive, but merely provided examples of lawful regulations. *Id.*

   **b. First circuit case law further establishes that "presumptively lawful" regulations fall outside the scope of the Second Amendment.**

   **i.  *United States v Rene E.***

In *Rene E.*, 583 F.3d at 9, this Court upheld the constitutionality of a ban on juveniles from acquiring and possessing handguns. The Court premised its "conclusion on the existence of a longstanding tradition of prohibiting juveniles from both receiving and possessing handguns…." *Id.* at 12. Specifically, this Court examined "the contemporary federal restrictions on firearm and handgun possession by juveniles" and "nineteenth-century state laws imposing similar restrictions, as the *Heller* Court did." *Id.* (citing Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 503 (2004)). Because regulating juvenile access to firearms was rooted in history, the Court held that the federal ban on juvenile acquisition and

possession of firearms did not violate the Second Amendment. *See Rene E.*, 583 F.3d at 12-16.

The *Rene E.* court further observed that *Heller* "identified limits deriving from various historical restrictions on possessing and carrying weapons." *Id*. at 12. These presumptively valid regulations included "laws imposing conditions and qualifications on the commercial sale of arms." *Id*. According to this Court, such "restrictions, as well as others similarly rooted in history, were left intact by the Second Amendment and by *Heller*." *Id*. As a result, the *Rene E.* court did not apply any level of heightened review in upholding the challenged juvenile handgun prohibition.

## ii. United States v Booker.

Following *Rene E.*, this Court in *United States v. Booker,* 644 F.3d 12, 25 (1st Cir. 2011) addressed a Second Amendment challenge to the constitutionality of 18 U.S.C. § 922(g)(9), which prohibits individuals convicted of a "misdemeanor crime of domestic violence" from possessing, shipping, or receiving firearms. The *Booker* court rejected the criminal defendant's Second Amendment challenge, observing that, "the Second Amendment permits categorical regulation of gun possession by classes of persons—e.g., felons and the mentally ill— rather than requiring that restrictions on the right be imposed only on an individualized, case-by-case basis." *Id*. at 23 *(citing Heller*, 554 U.S. at 626, 128 S.Ct. 2783). And with

respect to the particular prohibition on firearm possession of those convicted of misdemeanor crimes of domestic violence, the *Booker* court concluded that:

> § 922(g)(9) fits comfortably among the categories of regulations that *Heller* suggested would be 'presumptively lawful.' Section 922(g)(9) is, historically and practically, a corollary outgrowth of the federal felon disqualification statute.

*Id*. at 24-25 (quoting *Heller*, 554 U.S. at 627 n. 26, 128 S.Ct. 2783).

At the same time, this Court agreed with the Seventh Circuit that the "adoption of a *new* categorical limit on the Second Amendment right . . . must be supported by some form of 'strong showing,' necessitating a substantial relationship between the restriction and an important governmental objective." *Id*. at 25 (emphasis added) (quoting *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) (en banc)).

The challenged law in *Booker* was upheld under intermediate review, but such scrutiny should not be needed where the law falls squarely into an *already identified* categorical exception. *See, e.g., United States v. Murphy*, 681 F. Supp. 2d 95, 103 (D. Me. 2010) ("The Court's conclusion in *Booker* applies with more force given *Heller*'s express reference to the mentally ill."). This is consistent with how other courts have treated the presumptively lawful categories. *See Commonwealth v. McGowan*, 982 N.E.2d 495, 500 (Mass. 2013) ("These laws could be presumptively lawful . . . only if they fell outside the scope of the Second

Amendment and therefore were not subject to heightened scrutiny."); *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1125–26 (10th Cir. 2015); *United States v. Barton*, 633 F.3d 168, 172 (3d Cir. 2011).

### iii. Resulting Two-Part Test

Reading *Rene E.* and *Booker* together, the following two-step analytical approach applies to Second Amendment challenges in the First Circuit:

<u>Step 1</u>

A law falls outside the scope of the Second Amendment, and is not subject to heightened scrutiny, if *either* (1) the law falls into one of the "presumptively lawful" categorical limits expressly identified in *Heller*; *or* (2) "persuasive historical evidence" shows that the law's impact is outside the Amendment's traditional scope. *See Jackson v. City & Cty. of San Francisco,* 746 F.3d 953, 960 (9th Cir. 2014) cert. denied, 135 S. Ct. 2799, 192 L. Ed. 2d 865 (2015). Such laws are subject to rational basis review only.

<u>Step 2</u>

If the challenged law does not satisfy either of the conditions set out in Step 1, then the court applies some form of heightened scrutiny. The proper level of review depends upon whether the challenged law substantially burdens the core Second Amendment right of self-defense. Generally, this will require the

government to demonstrate a substantial relationship between the challenged regulation and an important government objective. *Booker,* 644 F.3d at 25.

This two-step analysis is the precise approach taken by the Ninth Circuit in *Jackson*, after a careful consideration of *Heller* and subsequent Second Amendment case law. *See Jackson*, 746 F.3d at 960 ("To determine whether a challenged law falls outside the historical scope of the Second Amendment, we ask whether the regulation is one of the 'presumptively lawful regulatory measures' identified in *Heller*, 554 U.S. at 627 n.26, *or* whether the record includes persuasive historical evidence establishing that the regulation at issue imposes prohibitions that fall outside the historical scope of the Second Amendment.") (emphasis added).

The gun safety regulations challenged here are properly deemed to fall outside the scope of the Second Amendment under Step 1 of the analysis. Even if this Court were to move to Step 2, intermediate scrutiny is the appropriate level of review because the challenged regulations do not burden lawful self-defense. Given their substantial relationship to the important government interest of preventing unintentional shootings, the challenged regulations easily pass constitutional muster.

**B. The Regulations At Issue Here Fall Outside The Second Amendment Because They Merely Impose A Condition On The Commercial Sale of Handguns.**

Section 16.05 squarely falls into the categorical exemption identified in *Heller* pertaining to the "conditions and qualifications on the commercial sale of arms," and therefore falls outside the scope of the Second Amendment. *Heller*, 554 U.S. at 626-27. The regulation is imposed on dealers, and it merely conditions the sale of handguns on the presence of readily available technology, namely load indicators and magazine disconnects. 940 C.M.R. 16.05(3). Notably, Section 16.05 is silent on the possession of noncompliant handguns, which remains lawful. Nor does Section 16.05 limit the issuance of concealed carry licenses to permit applicants with compliant handguns. In short, all Section 16.05 does is condition the commercial sale of new handguns on the inclusion of a readily available safety technology.

The district court properly concluded that Section 16.05 "fits comfortably among the categories of regulation that *Heller* suggested would be 'presumptively lawful' because it 'impos[es] conditions and qualifications on the commercial sale of arms.'" *Draper v. Healey*, No. 1:14-cv-12471-NMG, Dkt. 45 at 16 (D. Mass. Mar. 5, 2015); *see also Pena v. Lindley*, No. 2:09-cv-01185-KJM-CKD, slip op. at 22-23 (E.D. Cal. Feb. 25, 2015) (the California Unsafe Handgun Act "does not burden the Second Amendment at step one because it is 'presumptively lawful.'").

A prohibition on the commercial sale of firearms is easily distinguishable from a condition placed on such activity and Section 16.05 is far removed from the handgun prohibition at issue in *Heller*, which the Supreme Court noted was unique in its breadth. *Heller*, 554 U.S. at 629. As noted above, the *Heller* Court made clear that conditions and qualifications on the sale of arms are "presumptively lawful." *Id.* at 626-27. As many courts have held, such presumptively lawful regulations on the commercial sale of firearms fall outside the scope of the Second Amendment. *See Rene E.*, 583 F.3d at 16; *Hightower v. City of Boston,* 693 F.3d 61, 74-75 (1st Cir. 2012). *See also Bauer v. Harris*, No. 1:11-cv-1440-LJO-MSJ, 2015 WL 881515, at *6 (E.D. Cal. Mar. 2, 2015), appeal docketed, No. 15-15428 (9th Cir. Mar. 9, 2015); *Teixeira v. Cnty. of Alameda*, No. 12-CV-03288-WHO, 2013 WL 4804756, at *6 (N.D. Cal. Sept. 9, 2013), appeal docketed, No. 13-17132 (9th Cir. Oct. 23, 2013).

As such, this Court may uphold the challenged regulations in this case without further review.

### C. The Safety Regulations Are Sufficiently "Rooted in History" To Avoid Heightened Scrutiny.

In addition to falling within a "presumptively lawful" category, there is also "persuasive historical evidence" that the challenged regulations fall outside the scope of the Second Amendment. Under *Rene E.*, Section 16.05 is sufficiently "rooted in history," as to be "left intact by the Second Amendment and by *Heller*."

16

*Rene E.*, 583 F.3d at 12. As explained below, design and safety standards analogous to those imposed by the challenged regulations date back to the Founding Era. Such standards have included requiring, for instance, gunpowder casks to broadcast labels that indicate their safety.

Massachusetts has been a leader in imposing such standards since the early 19th Century and, as demonstrated by Section 16.05, remains so today. And other states have also required handguns, when sold, to come equipped with load indicators and magazine disconnects. Accordingly, the historical approach adopted by this Circuit in *Rene E.* provides a separate basis for holding that Section 16.05 is categorically exempt from Second Amendment scrutiny. *Id*.

### a. States Have Long Conditioned the Sale of Firearms And Ammunition on Meeting Safety Requirements.

Section 16.05 is hardly a groundbreaking law. States have long required manufacturers of firearms and ammunition to meet certain safety standards. In fact, the regulation of ammunition and related safety standards predates the Founding Era. *See* 4 Blackstone, *Commentaries on the Laws of England* 168 (1769); 1786 N.H. Laws 10, ch. 22. In the early days of the American Republic, New England states—including the Commonwealth of Massachusetts—and others regulated the sale of gunpowder by requiring inspection and approval of all gun powder intended for sale. *See, e.g.,* 1809 Mass. Laws 444, ch. 52. These laws, which served as conditions and qualifications on the sale of gunpowder, forbade gunpowder

merchants from selling casks that lacked the requisite indicia of safety—namely, a mark from state inspectors that signaled to the purchaser the gunpowder was safe. *See, e.g.*, 1820 N.H. Laws 274-75, ch. 15 §§ 1-9.

New England was not alone in requiring that pre-approved casks of gunpowder carry safety markings. One Pennsylvania statute from the Founding Era, for instance, required merchants to label their casks with a stamped grade indicating the strength of the gunpowder. 1795 Pa. Laws 242, § 6. Inspectors used then-advanced technology to determine the gunpowder's strength, and graded casks accordingly with marks of "lowest," "middle," or "highest." *Id.* at 240, § 2. Merchants were only permitted to sell casks that indicated the gunpowder strength and stamped with "S.P." ("State of Pennsylvania"). *Id.* at 242, § 6.

During the 19th century, Massachusetts led the way in imposing conditions and qualifications on the sale of firearms. To qualify for sale, a firearm had to carry a stamp indicating that it had passed inspection. 1881 Mass. Acts. 333-34, ch. 60 § 18. *See* 1821 Me. Laws 685, ch 162 § 1 (providing for the appointment of "provers of gun barrels," who would "try the strength" of firearms and mark those that passed inspection); *see generally* Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early America Origins of Gun Control*, 73 Fordham L. Rev. 487, 505-508 (2004) (surveying extensive state regulation of firearms from Colonial times through 19th century); Robert H. Churchill, Gun Regulation, the

Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment, 25 Law & Hist. Rev. 139.  In Massachusetts, a merchant who tried to sell new, untested firearms or who tampered with the required markings could be fined, as could a customer who knowingly bought an unapproved gun. 1814 Mass. Acts. 464-65, § 2.

### b. States Have Continued to Require Certain Safety Features for Firearms, Including Load Indicators.

Massachusetts was not unique in prohibiting the sale of firearms "without a safety device." 940 C.M.R. § 16.05(1). In 1980, New York required that all pistols carry "manual or automatically operated safety device[s]," among other important safety features. N.Y.C.R.R. 9, § 482.5(f). California's Unsafe Handgun Act, which was recently upheld by the Eastern District of California, requires handguns to be sold with chamber-load indicators or magazine disconnects. Cal. Penal Code § 31910(b)(94); *Pena v. Lindley*, No. 2:09-cv-01185-KJM-CKD (E.D. Cal. Feb. 25, 2015). Additionally, in 2003, Maryland flatly prohibited merchants from transferring new handguns "unless the handgun has an integrated mechanical safety device," such as a load indicator or magazine disconnect. 2010 Maryland Code, Public Safety, Firearms, Section 5-132 - Handgun safety devices (2003 Md. Laws. 246).

States did not adopt these regulations in a vacuum. New York began requiring firearm safety features in 1974, when the state enacted regulations to

prohibit the manufacture and sale of unsafe and unreliable firearms. 1974 N.Y.

Laws 2665-66, § 1. This legislative action addressed a dysfunctional marketplace

for consumer firearms. A large influx of weapons in the United States arising from

America's involvement in two world wars led to intense price competition for

consumer firearms. *See* Roger Pauly, *Firearms: The Life Story of a Technology*,

107, 112-13 (2004). As a result, some manufacturers sought to achieve cost

savings by sacrificing "normal safety features and with inferior materials and poor

workmanship." 1974 N.Y. Laws 2665-66, § 1.

To confront this emerging problem, states adopted various regulations that

imposed quality standards intended to enhance the safety of firearms. These

regulations included, in addition to those described above:

- Materials-and-designs inspections, including "firing tests" and "melting pot tests," which ensured the safety and durability of the firearms by ensuring that they were not manufactured hastily and with cheap, unreliable metals (*see, e.g.*, N.Y.C.R.R. 9, § 482.5-6; 1973 Ill. Laws 1130, § 1);

- "Drop testing," which ensures that a firearm is not vulnerable to being unintentionally fired (*see, e.g.*, NY.C.R.R. 9, § 482.6(c); 1998 Mass. Laws 364, § 19; Cal. Penal Code § 31905).

Requiring firearms to possess minimum safety standards falls within core

public safety powers exercised by states, as practiced by state regulators from the

Founding Era to today. As this Court noted, the prevailing attitude during the

Founding Era was that firearm regulations that enhanced public safety were

consistent with the Constitutional guarantee of the right to bear arms. *Rene E.*, 583 F.3d at 15-16.

For the two independent reasons discussed above, the challenged regulation may be upheld by this Court at step one of the Second Amendment analysis, without the need to select and apply heightened review.

## II.  EVEN IF SECTION 16.05 IMPLICATES THE SECOND AMENDMENT, INTERMEDIATE SCRUTINY IS THE PROPER STANDARD OF REVIEW.

Even if the Court finds that the Second Amendment is implicated here, the proper standard of review is intermediate scrutiny. Because the exercise of the Second Amendment right creates unique and significant risks to public safety, the level of scrutiny applied in evaluating Second Amendment challenges must not deprive legislatures of necessary flexibility to address the problem of gun violence. *See Heller*, 554 U.S. at 636 (the Constitution permits legislatures "a variety of tools for combating that problem"); *Kachalsky v. County of Westchester*, 701 F.3d 81, 98-99 (2d Cir. 2012). Firearms—which by their very nature are dangerous instruments responsible for over 30,000 deaths and 70,000 injuries each year[8]— must necessarily be regulated. *See Bonidy*, 790 F.3d 1121, 1126 (10th Cir. 2015)

---

[8]  See U.S. Dep't of Health & Human Servs., Centers for Disease Control & Prevention, Nat'l Center for Injury Prevention & Control, Deaths: Final Data for 2013, table 18, available at http://www.cdc.gov/nchs/data/nvsr/nvsr64/nvsr64_02.pdf

("The risk inherent in firearms and other weapons distinguishes the Second Amendment right from other fundamental rights that have been held to be evaluated under a strict scrutiny test, such as the right to marry and the right to be free from viewpoint discrimination, which can be exercised without creating a direct risk to others.").

## A. Courts Determine the Appropriate Level of Review in Second Amendment Cases by Examining How Severely a Challenged Law Burdens the Core of the Right

Courts generally look at two factors to determine if intermediate scrutiny is proper in the Second Amendment context: (1) how close does the regulation go to the core of the Second Amendment; and (2) the severity of the burden on that right. *Jackson*, 746 F.3d at 960; *United States v. Chovan*,735 F.3d 1127, 1138 (9th Cir. 2013); *Ezell v. City of Chicago*, 651 F.3d 684, 703 (7th Cir. 2011); *United States v. Chester*, 628 F.3d 673, 682-83 (4th Cir. 2010); *Heller v. District of Columbia*, 670 F.3d 1244, 1257 (D.C. Cir. 2011) ("the level of scrutiny applicable under the Second Amendment surely 'depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right.'"); *NRA v. ATF*, 700 F.3d 185, 205 (5th Cir. 2012); *New York State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 254 (2d Cir. N.Y. Oct. 19, 2015). Strict scrutiny is reserved for severe restrictions on the core Second Amendment right.

### a. The Core of the Second Amendment

This Court in *Hightower* correctly observed that "[c]ourts have consistently recognized that *Heller* established that the possession of operative firearms for use in defense of the home constitutes the 'core' of the Second Amendment." 693 F.3d at 72. Sister circuits likewise generally agree that the core of the Second Amendment is "the right of law-abiding responsible citizens to use arms in defense of hearth and home." *See Chovan*, 735 F.3d at 1138.[9] As noted above, the Supreme Court in *Heller* qualified its holding in many respects, including specifically recognizing the longstanding historical practice and continuing modern right of states to enact laws "imposing conditions and qualifications on the commercial sale of arms." *Davis v. Grimes*, 9 F. Supp. 3d 12, 24 (D. Mass. 2014) (quoting *Heller*,

---

[9] *See, e.g.*, *United States v. Greeno*, 679 F.3d 510, 517 (6th Cir. 2012) ("The core right recognized in *Heller* is 'the right of law-abiding, responsible citizens to use arms in defense of hearth and home.'" (quoting *Heller*, 128 S. Ct. at 2821)); *Barton*, 633 F.3d at 170 ("At the 'core' of the Second Amendment is the right of 'law-abiding, responsible citizens to use arms in defense of hearth and home.'" (quoting *Heller*, 128 S. Ct. at 2821)); *United States v. Staten*, 666 F.3d 154, 158 (4th Cir. 2011) ("According to the Court, the core right of the Second Amendment is 'the right of law-abiding, responsible citizens to use arms in defense of hearth and home.'" (quoting *Heller*, 128 S. Ct. at 2821)), cert. denied, 132 S. Ct. 1937 (2012); *United States v. Reese*, 627 F.3d 792, 800 (10th Cir. 2010) (same), cert. denied, 131 S. Ct. 2476 (2011). This Court in *United States v. Booker*, 644 F.3d 12, 25 n.17 (1st Cir. 2011) disclaimed any "attempt to discern the 'core' Second Amendment right vindicated in *Heller*," while noting that "*Heller* stated that the Second Amendment 'elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home.'" (quoting *Heller*, 128 S. Ct. at 2821)), cert. denied, 132 S. Ct. 1538, 182 L. Ed. 2d 175 (2012).

554 U.S. at 626-27) (emphasis added). That carve-out logically removes such regulation from Second Amendment scrutiny altogether. *See*, *infra*, at 13. At the very least, the Supreme Court's recognition of "presumptively lawful" regulation in the area of commercial sales substantially weighs against the use of strict scrutiny in this context. It makes no sense to submit a "presumptively lawful" regulation to the most exacting standard of constitutional review available.

### b. The Severity of the Law's Burden on Second Amendment Rights.

To evaluate the severity of a law's burden on Second Amendment rights, courts look to whether the challenged regulations leave open alternative channels for self-defense with a firearm or altogether foreclose the possession of a broad class of firearms, as was the case in *Heller*. A severe burden is much more likely to be found in the latter case. *See Jackson*, 746 F.3d at 961; *United States v. Colon-Quiles*, 859 F. Supp. 2d 229,235 (D.P.R. May 4, 2012) (intermediate scrutiny was the appropriate standard since the law at issue "simply regulates the manner in which a person may exercise his Second Amendment right to bear arms, but does not prohibit the exercise of such a right"); *see also Chovan*, 735 F.3d at 1138; *Ezell*, 651 F.3d at 703; *Chester*, 628 F.3d at 682-83.

### B. This Court Should Adopt Intermediate Scrutiny In Accordance With The Prevailing View In Other Circuits.

Sister circuit courts have refused to apply strict scrutiny to laws that do not substantially burden the core right protected by the Second Amendment. Instead,

these circuit courts have applied a form of intermediate scrutiny, while observing that the level of scrutiny "'depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the [Second Amendment] right.'" *Heller*, 670 F.3d at 1257 (quoting *Chester*, 628 F.3d at 682); *United States v. Marzzarella*, 614 F.3d 85, 96-97 (3d Cir. 2010) (applying intermediate scrutiny where "[t]he burden imposed by the law does not severely limit the possession of firearms."); *NRA v. ATF*, 700 F.3d 185, 205 (5th Cir. 2012) ("A law that burdens the core of the Second Amendment guarantee…would trigger strict scrutiny, while a less severe law would be proportionately easier to justify.").

This analytical approach has been followed in the Second, Third, Fourth, Fifth, Seventh, and Ninth Circuits, as well as in the D.C. Circuit. *New York State Rifle & Pistol Ass'n*, 804 F.3d at 260; *Chovan*, 735 F.3d 1127, 1138 (9th Cir. 2013); *Ezell v. City of Chicago*, 651 F.3d 684, 703 (7th Cir 2011); *Chester*, 628 F.3d at 682-83.

Although this Court has yet to select a definitive approach, its prior analysis is consistent with the application of intermediate scrutiny to gun regulations that do not fall into one of the enumerated categorical exemptions. *See Powell v. Tompkins*, 783 F.3d 332, 347 n.9 ("We thus far have entered the discourse on few occasions, mostly in direct appeals of federal firearms convictions, and have hewed closely and cautiously to *Heller*'s circumscribed analysis and holding.");

*Hightower*, 693 F.3d at 74 ("[Plaintiff's] claim fails whatever standard of scrutiny is used, even assuming there is some Second Amendment interest in carrying the concealed weapons at issue. We do not reach the question of what standard of scrutiny applies here."). In *Booker*, 644 F.3d 12, and *United States v. Armstrong*, 706 F.3d 1 (1st Cir. 2013), this Court upheld the federal statute criminalizing firearm possession by persons convicted of a misdemeanor crime of domestic violence, and in doing so, applied a form of means-ends scrutiny akin to intermediate scrutiny, because the law imposed a new categorical limit on the Second Amendment right. *Booker*, 644 F.3d at 25; *Armstrong*, 706 F.3d at 8.

Thus, this Court's precedent supports the application here of intermediate scrutiny. This Court has never suggested that strict scrutiny would apply to gun regulations like those at issue in this case, and to impose that requirement here would result in "handcuffing lawmakers" attempting to reduce accidental gun deaths. *Kachalsky*, 701 F.3d at 96.

### C. Section 16.05 Does Not Burden The Core Right Of The Second Amendment.

Section 16.05 falls well outside the core of the Second Amendment. First, it does not in any way prevent a law-abiding individual from possessing a useable handgun in their home for purposes of self-defense. It only imposes a narrow restriction on the type of handguns that a commercial dealer may sell. There remain hundreds of handguns available for purchase that would enable defense of

home and hearth. *See* Commonwealth of Massachusetts, Executive Office of Public Safety and Security, Approved Firearms Roster, 09-2015. In fact, Section 16.05 arguably facilitates self-defense in the home by ensuring that the gun owner will be able to see that the weapon is loaded should the owner need to use it for self-defense in his or her home.

### D. Strict Scrutiny Is Generally Inappropriate In The Second Amendment Context and Should Not Be Applied Here.

Strict scrutiny is generally not an appropriate standard of review in the Second Amendment context. Most constitutionally enumerated rights simply do not trigger strict scrutiny. *See* Adam Winkler, *Scrutinizing the Second Amendment,* 105 Mich. L. Rev. 683 (2007); Adam Winkler, *Fundamentally Wrong About Fundamental Rights*, 23 Const. Comment. 227 (2006). Rights that *do* require strict scrutiny are different, and reflect justifications that do not apply here. For example, strict scrutiny is appropriate in evaluating challenges to content-based speech restrictions and laws involving racial classifications. Courts apply the most stringent level of review to laws burdening speech of a particular content because they "raise[] the specter that the government may effectively drive certain ideas or viewpoints from the marketplace." *Simon & Schuster, Inc. v. Members of NY State Crime Victims Bd.*, 502 U.S. 105, 116 (1991). Such laws are fundamentally at odds with "the premise of individual dignity and choice upon which our political system rests." *Id.* Racial classifications similarly merit strict scrutiny because

"[d]istinctions between citizens solely because of their ancestry are by their very nature odious." *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943). Such laws are "in most circumstances irrelevant to any constitutionally acceptable legislative purpose." *Adarand Constructors v. Pena*, 515 U.S. 200, 216 (1995).

Gun regulations do not raise similar concerns. On the contrary, state and local governments have a profound interest—indeed, "cardinal civic responsibilities"—to protect the public and law enforcement personnel from gun violence. *Department of Revenue of Ky. v. Davis*, 553 U.S. 328, 342 (2008). The "rigid" inquiry mandated by strict scrutiny is not appropriate for Second Amendment legal challenges addressing core police powers. *Kachalsky*, 701 F.3d at 96-101.

Nor is it logical to apply strict scrutiny to a law falling into a category that the Supreme Court has identified as being "presumptively lawful." Notably, nearly all circuit courts that have identified the level of scrutiny for evaluating Second Amendment claims have expressly rejected the use of strict scrutiny. *See*, *e.g.*, *United States v. Huitron-Guizar*, 678 F.3d 1164, 1169 (10th Cir. 2012); *Woollard v. Gallagher*, 712 F.3d 865, 876 (4th Cir. 2013); *Kachalsky,* 701 F.3d at 96; *Heller II*, 670 F.3d at 1256; *Jackson*, 746 F.3d at 964-65; *United States v. Williams*, 616 F.3d 685, 691-93 (7th Cir. 2010); *Marzzarella*, 614 F.3d at 96-97.

It would be plain error to apply strict scrutiny to a "presumptively lawful" regulatory measure. *See NRA*, 700 F.3d at 206 ("[T]o the extent that these laws resemble presumptively lawful regulatory measures, they must not trigger strict scrutiny."); *see also* Joseph Blocher, Categoricalism and Balancing in First and Second Amendment Analysis, 84 N.Y.U.L. Rev. 375, 422 (2009) (analogizing the commercial sale of arms to commercial speech, which receives reduced protection under the First Amendment).

## III. THE REGULATIONS EASILY PASS INTERMEDIATE SCRUTINY.

Intermediate scrutiny requires a showing that the asserted governmental end is "significant," "substantial," or "important." *See, e.g.*, *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 662 (1994); *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). It requires that the fit between the challenged regulation and the stated objective be reasonable, not perfect, and does not require that the regulation be the least restrictive means of serving the interest. *Jackson,* 746 F.3d at 965; *Ward v. Rock Against Racism*, 491 U.S. 781, 798-99 (1989).

### A. Gun Safety And Prevention Of Gun Violence Are Important And Compelling Governmental Interests.

Gun violence poses a serious threat to public safety in Massachusetts and nationally. In 2015, 11,961 people were murdered in the U.S. and of those

murders, 8,124 were committed using firearms.[10] Tens of thousands more are

treated each year for non-fatal gunshot wounds in hospitals around the country.[11]

The interests of curbing gun violence and public safety are recognized as

compelling governmental interests. "This goal—to promote public safety and

prevent accidents caused by unsafe guns—is an important, and indeed, compelling

government interest." *See Hodel v. Virginia Surface Mining*, 452 U.S. 264, 300

(1981) ("protection of the health and safety of the public is a paramount

government interest"); *McGuire v. Reilly*, 260 F.3d 36, 48 (1st Cir. 2001)

("[I]ncreas[ing] public safety" is an interest "firmly rooted in the state's traditional

police powers" and is "precisely the sort of interest[] that justif[ies] some

incidental burdening" of rights."); *United States v. Masciandaro*, 638 F.3d 458,

473 (4th Cir. 2011) ("[T]he government has a substantial interest in providing for

the safety of individuals.").

---

[10] FBI, Crime on the United States, Crime Trends, Table 8, Expanded Homicide Weapon, at https://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2014/crime-in-the-u.s.-2014/tables/expanded-homicide-data/expanded_homicide_data_table_8_murder_victims_by_weapon_2010-2014.xls

[11] Garen J. Wintemute, The Epidemiology of Firearm Violence in the Twenty-First Century United States, Annual Review of Public Health, Vol. 36: 5-19, 2015, available at http://www.annualreviews.org/doi/pdf/10.1146/annurev-publhealth-031914-122535.

## B. The Regulation Substantially Furthers These Interests.

The requirement for a load indicator substantially addresses the dangers of accidental firearm discharges. Accidental firearm discharges are a serious safety concern. *See Commonwealth. v. McGowan*, 464 Mass. 232, 242 n.7, 982 N.E.2d 495, 502 n.7 (2013) ("[I]n 2009 . . . firearm accidents killed an additional 114 children and teenagers.") (citing Children's Defense Fund, Protect Children Not Guns, 2012, at 38). As noted in the Introduction, *supra*, between 2005 and 2010, almost 3,800 people were killed and over 95,000 people injured in unintentional shootings in the U.S. In 2013 alone, there were 16,864 unintentional non-fatal and 505 fatal injuries reported in the United States.[12]

Load indicators are recognized as an effective safety device in preventing accidental discharges. *See* Brian J. Siebel, City Lawsuits Against the Gun Industry: A Roadmap for Reforming Gun Industry Misconduct, 18 St. Louis U. Pub. L. Rev. 247, 254–55 (1999) (citing 1991 GAO Report that found certain types of injuries "could have been prevented by the incorporation of two simple safety devices into firearms—a grip safety and a chamber-loaded indicator"). Every single one of these practical, sensible safety features, with a proven ability to avert recurring real

---

[12] WISQARS *Unintentional Firearm Gunshot Nonfatal Injuries and Rates per 100,000*; 2013, United States, All Races, Both Sexes, All Ages; Disposition: All Cases; 2013, *WISQARS 2013* United *States Unintentional Firearm Deaths and Rates per 100,000*; All Races, Both Sexes, All Ages.

world tragedies, comes without any appreciable inconvenience to the gun owner, and in the case of the load indicator actually makes the handgun more useful. And all of these benefits are achieved without imposing any burden recognizable under the Second Amendment.

Thus, Section 16.05 substantially furthers public safety by reducing the risk of accidental shootings. Given the obvious and profound harms caused by accidental shootings, and the equally obvious and profound benefits that can be achieved by equipping firearms with chamber load indicators, Massachusetts necessarily demonstrated a substantial relationship between the challenged regulations and the important governmental objective of protecting residents from accidental shootings.

## CONCLUSION

The District Court's judgment should be affirmed.

Dated: January 29, 2016

Respectfully submitted,

**NIXON PEABODY LLP**

Attorneys for *Amicus Curiae* the Law Center to Prevent Gun Violence

By: /s/ W. Daniel Deane, Esq.
W. Daniel Deane, Esq.
Bar No. 120813
900 Elm Street, 14th Floor
Manchester, NH 03101-2031
T: (603) 628-4047
E: ddeane@nixonpeabody.com

David Tennant, Esq.
Lynnette Nogueras-Trummer, Esq.
Matthew Struhar, Esq.
1300 Clinton Square
Rochester, NY 14604
T: (585) 263-1000
E: dtennant@nixonpeabody.com
mstruhar@nixonpeabody.com
lnoguerastrummer@nixonpeabody.com

**CERTIFICATE OF COMPLIANCE WITH RULE 32(A)**

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 29(d) and 32(a)(7)(B) because this brief contains 6,972 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface, 14-point Time New Roman font, using Microsoft Word 2010.

Dated:  January 29, 2016                    /s/ W. Daniel Deane, Esq.
                                            W. Daniel Deane, Esq.


**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing has been served on this 29th day of January, 2016, by Electronic Case Filing (CM/ECF) on all counsel of record.

Dated:  January 29, 2016                    /s/ W. Daniel Deane, Esq.
                                            W. Daniel Deane, Esq.