# United States Court of Appeals

### for the

# First Circuit

Case No. 15-1429

ROBERT DRAPER; ARIEL WEISBERG; DONNA MAJOR; ERIC NOTKIN;
ROBERT BOUDRIE; BRENT CARLTON; CONCORD ARMORY, LLC;
PRECISION POINT FIREARMS, LLC; SECOND AMENDMENT
FOUNDATION, INC.

*Plaintiffs-Appellants,*

COMMONWEALTH SECOND AMENDMENT, INC.,

*Plaintiff,*

– v–

MAURA T. HEALEY,

*Defendant-Appellee.*

Appeal from an Order entered from the
United States District Court for the District of Massachusetts, Boston

## BRIEF OF THE BRADY CENTER TO PREVENT GUN
## VIOLENCE, AS AMICUS CURIAE, SUPPORTING
## DEFENDANT-APPELLEE AND SEEKING AFFIRMANCE

KIMBERLY A. MOTTLEY, ESQ.
JOHN E. ROBERTS, ESQ.
LAURA STAFFORD, ESQ.
PROSKAUER ROSE LLP
One International Place
Boston Massachusetts 02110-2600
(617) 526-9600

*Attorneys for Amicus Curiae,*
*The Brady Center to Prevent Gun*
*Violence*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Fed. R. App. P. 29(c)(1), the Brady Center to Prevent Gun Violence states that it is not a corporation but rather is a 501(c)(3) social welfare organization.

# TABLE OF CONTENTS

I.      INTEREST OF AMICUS CURIAE ......................................................1

II.      PRELIMINARY STATEMENT...........................................................2

III.      STATEMENT OF FACTS...................................................................3

     A.      Load Indicators Inform A User That A Gun Is Loaded........................5

     B.      Load Indicators Have Been In Use For More Than A
         Century ............................................................................6

     C.      Load Indicators Are Effective In Preventing Accidental
         Shootings...........................................................................8

     D.      Load Indicator Regulations Have Saved Lives ...................................10

IV.      ARGUMENT ...................................................................................12

     A.      The Second Amendment Does Not Enshrine A Right To
         Unsafe Guns.......................................................................12

     B.      The Massachusetts Load Indicator Regulation Is
         Substantially Related To The Government's Interest In
         Protecting Its Citizens .......................................................16

V.      CONCLUSION ................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*Am. Shooting Sports Council v. Harshbarger*,
  711 N.E.2d 899 (Mass. 1999) ........................................................ 11

*Colo. Outfitters Ass'n v. Hickenlooper*,
  24 F. Supp. 3d 1050 (D. Colo. 2014) .......................................... 16

*Davis v. Grimes*,
  9 F. Supp. 3d 12 (D. Mass. 2014) ............................................... 17

*Dist. of Columbia v. Heller*,
  554 U.S. 570 (2008) ............................................................... passim

*Heller v. Dist. of Columbia*,
  670 F.3d 1244 (D.C. Cir. 2011) ................................................. 17

*Hightower v. City of Boston*,
  693 F.3d 61 (1st Cir. 2012) ........................................................ 12

*IMS Health Inc. v. Ayotte*,
  550 F.3d 42 (1st Cir. 2008) ................................................... 18, 19

*Jackson v. City & Cnty. of San Francisco*,
  746 F.3d 953 (9th Cir. 2014) ..................................................... 18

*Kamfer v. Cuomo*,
  993 F. Supp. 2d 188 (N.D.N.Y. 2014) ....................................... 16

*Madsen v. Women's Health Ctr., Inc.*,
  512 U.S. 753 (1994) .................................................................... 18

*McDonald v. City of Chicago*,
  130 S. Ct. 3020 (2010) .......................................................... 13, 14

*Nat'l Treasury Emps. Union v. Von Raab*,
  489 U.S. 656 (1989) .................................................................... 18

iii

*Peña v. Lindley*,
　No. 09-cv-01185, 2015 WL 854684 (E.D. Cal. Feb. 26, 2015) .................. 13, 15

*Powell v. Tompkins*,
　783 F.3d 332 (1st Cir. 2015) .................................................................. 12, 14, 17

*Sorrell v. IMS Health Inc.*,
　131 S. Ct. 2653 (2011) ............................................................................ 18, 19

*United States v. Booker*,
　644 F.3d 12 (1st Cir. 2011) ..................................................................... 17

*United States v. Chester*,
　628 F.3d 673 (4th Cir. 2010) .................................................................. 13

*United States v. Skoien*,
　614 F.3d 638 (7th Cir. 2010) .................................................................. 17

## STATUTES

940 Code Mass. Regs. § 16.05 ................................................................ 10

Cal. Penal Code §§ 16380, 31910 ........................................................... 11

Mass. Gen. Laws. Chapter 140, § 123 .................................................... 15

## OTHER AUTHORITIES

Associated Press, *Pa. Dad Accidentally Shoots, Kills 7-year-old Son
　After Leaving Gun Store*, PennLive, Dec. 10, 2012 .............................. 4

Bianca Cain Johnson, *Teen Charged with Involuntary Manslaughter
　in Fatal Shooting Monday*, Augusta Chronicle, Nov. 12, 2013 ............. 4

Commonwealth of Massachusetts, Executive Office of Public Safety
　and Security, Approved Firearms Roster 09-2015 ................................ 7

Ctrs. For Disease Control & Prevention, Deaths:  Final Data for 2013 ................ 3, 8

Ctrs. for Disease Control & Prevention, Firearm Mortality by State: 2014 .................................................................................................12

Everytown for Gun Safety & Moms Demand Action, Innocents Lost: A Year of Accidental Gun Deaths (2014) ...........................................8

Garen J. Wintemute et al., *Unintentional Firearm Deaths in California*, 29 J. Trauma 457 (1989) ...................................................10

Garen J. Wintemute et al., *When Children Shoot Children: 88 Unintended Deaths in California*, 257 JAMA 3107 (1987) ..............................10

Gun Violence Archive, Accidental Deaths, http://www.gunviolencearchive.org/accidental-deaths .....................................12

Gun Violence Archive, Summary Ledger: 2014 Toll of Gun Violence....................3

Helen Pow, *Horror as Father Accidentally Shoots Son, 10, Dead in front of Wife and Daughter as He Cleans Gun in Living Room*, DailyMail.com, Mar. 26, 2013 .......................................................4

Joe Heaney & Jason B. Johnson, *Gun Tragedy Leaves Toddler Dead; Youth Accidentally Shot 2-year-old, Police Say*, Boston Herald, Mar. 22, 1996.......................................................................11

Jon S. Vernick et al., *I Didn't Know the Gun Was Loaded: An Examination of Two Safety Devices that Can Reduce the Risk of Unintentional Firearm Injuries*, 4 J. Public Health Pol'y 427 (1999) ..............................................................................10

Jon S. Vernick, et al., *Unintentional and Undetermined Firearm Related Deaths: A Preventable Death Analysis for Three Safety Devices*, 9 Injury Prevention 307 (2003).........................................10

Judy Rakowski, *Gun Control Urged as 2 Families Mourn*, Boston Globe, Mar. 17, 1996 .......................................................11

Law Ctr. to Prevent Gun Violence, The California Model: Twenty Years of Putting Safety First (2013)................................................11

Law Ctr. to Prevent Gun Violence, Design Safety Standards Policy Summary (2013) ...............................................................9

Law Ctr. to Prevent Gun Violence, *Post-Heller Litigation Summary* (2015) ............................................................................................... 13

*Mass. Regs Target Gun Makers, Dealers*, Massachusetts Lawyers Weekly, April 10, 2000 ............................................................................... 10

Michael Luo & Mike McIntire, *Children and Guns: The Hidden Toll*, N.Y. Times, Sept. 29, 2013 ................................................................... 8

Office of the Attorney General, California Dep't of Justice, Roster of Handguns Certified for Sale ............................................................... 7

Robert E. Walker, Cartridges and Firearm Identification (2013) .......................... 5, 7

Sean Madden, Guns in American Society: An Encyclopedia of History, Politics, Culture, and the Law (2012) ................................................ 6, 7

Teresa Tritch, *Taking Note: Do California's Laws Prevent Gun Deaths?*, N.Y.Times.com, July 30, 2014 ........................................................ 11

U.S. Gov't Accountability Office, Accidental Shootings: Many Deaths and Injuries Caused by Firearms Could Be Prevented (1991) ........................................................................................... 8, 9

U.S. Patent No. 385,360 ........................................................................................ 6, 7

# INTEREST OF AMICUS CURIAE[1]

The Brady Center to Prevent Gun Violence is a non-profit organization dedicated to reducing gun violence through education, research, and legal advocacy. One of the Brady Center's primary goals is to encourage the implementation of safe designs, distribution, and sales of firearms to reduce gun deaths and injuries, and to protect the rights of governmental bodies to take strong, effective actions to prevent gun violence. Through its Legal Action Project, the Brady Center has filed numerous amicus curiae briefs in cases concerning gun violence prevention and firearms laws, including in the Massachusetts Supreme Judicial Court's gun storage case, *Jupin v. Kask*, and the United States Supreme Court's Second Amendment cases, *District of Columbia v. Heller* and *McDonald v. City of Chicago*. The Brady Center has also advocated for gun manufacturers to utilize safety features that save lives, including the load indicators at issue in this litigation. For all of these reasons, the Brady Center has a strong interest in the outcome of this appeal.

---

[1] All parties have consented to the filing of this brief. No counsel to a party authored the brief in whole or in part, and no person other than amicus and its counsel contributed any money towards its preparation or submission.

## PRELIMINARY STATEMENT

Each year, hundreds of Americans die from accidental shootings, and countless more suffer serious injuries. In an effort to combat this pressing public health problem, the Massachusetts Attorney General in 1997 promulgated a series of common-sense regulations designed to make guns safer. One of those regulations—and the sole regulation challenged here—requires all guns sold by dealers in the Commonwealth to feature a load indicator, a device that alerts the user when the weapon is loaded and able to be discharged. Several studies have demonstrated that load indicators reduce accidental shootings and save lives by preventing unintentional discharges that can occur when people fail to realize that a gun is loaded. California similarly requires that all firearms sold in that state have a load indicator.

Although the safety benefits of load indicators are undeniable, Appellants contend that the Massachusetts regulation treads on their Second Amendment rights because their favorite models of handgun do not have a load indicator and thus cannot be purchased in the Commonwealth. That argument fails for at least two reasons.

*First*, the Second Amendment does not enshrine a right to possess unsafe firearms. The Supreme Court has explained that the Second Amendment protects a citizen's right to keep and bear arms for self-defense. The challenged regulation

comports with the Second Amendment because it does not prevent anyone from purchasing, keeping, or using handguns for protection. Indeed, Appellants admit that a panoply of handguns are available for them to purchase in Massachusetts and use for self-protection notwithstanding the challenged regulation. The challenged regulation therefore does not prevent Appellants from exercising their Second Amendment rights.

*Second*, even if the challenged regulation did implicate Second Amendment rights, the regulation passes muster because it is substantially related to a significant government interest. It is beyond dispute that protecting the health and safety of its citizenry is a compelling purpose for the Commonwealth. Load indicators have proven to be an effective means of reducing accidental deaths and injuries. Consequently, the challenged regulation easily survives judicial scrutiny.

## STATEMENT OF FACTS

Each year, hundreds of Americans die after being shot by firearms that accidentally discharge.[2] Many of these accidental shootings occur because the person holding the gun did not know that it was loaded. For example, in Georgia,

---

[2] Ctrs. For Disease Control & Prevention, Deaths: Final Data for 2013, table 10, *available at* http://www.cdc.gov/nchs/data/nvsr/nvsr64/nvsr64_02.pdf; *see also* Gun Violence Archive, Summary Ledger: 2014 Toll of Gun Violence, *available at* http://www.gunviolencearchive.org/tolls/2014 (reflecting 1,601 people killed in accidental shootings in 2014).

a teenager accidentally shot and killed a friend while playing with a handgun. The teenager "took the gun, removed the magazine, pointed the gun back at [the victim] and pulled the trigger. Police said [the shooter] believed the gun was unloaded."[3] Similarly, in Pennsylvania, a seven-year-old boy was shot and killed when a handgun accidentally fired as his father was climbing into the front seat of the family's truck. His father had unloaded the magazine at home but failed to realize that a bullet was still in the chamber.[4] And in North Carolina, a man was cleaning his gun while watching television when the gun accidentally fired, hitting his son in the back of the head and killing him. The boy's uncle told reporters that "[t]here must have been a bullet lodged in the chamber and it fired and hit him."[5]

The Massachusetts Attorney General was aiming directly at accidental shootings like these when he promulgated the challenged regulation in 1997. The

---

[3] Bianca Cain Johnson, *Teen Charged with Involuntary Manslaughter in Fatal Shooting Monday*, Augusta Chronicle, Nov. 12, 2013, *available at* http://chronicle.augusta.com/news/crime-courts/2013-11-12/teen-charged-involuntary-manslaughter-monday-fatal-shooting?v=1384267618.

[4] Associated Press, *Pa. Dad Accidentally Shoots, Kills 7-year-old Son After Leaving Gun Store*, PennLive, Dec. 10, 2012*, available at* http://www.pennlive.com/midstate/index.ssf/2012/12/pa_dad_accidentally_shoots_kil.html.

[5] Helen Pow, *Horror as Father Accidentally Shoots Son, 10, Dead in front of Wife and Daughter as He Cleans Gun in Living Room*, DailyMail.com, Mar. 26, 2013, *available at* http://www.dailymail.co.uk/news/article-2299214/North-Carolina-man-Christopher-Stanlane-accidentally-kills-son-10-cleaning-gun.html.

regulation mandates that all handguns sold in the Commonwealth feature a load indicator, a device that has been proven to reduce fatalities by accidental gunshot.

### A. Load Indicators Inform A User That A Gun Is Loaded.

A load indicator, sometimes called a "loaded-chamber indicator" or "chamber-loaded indicator," is a device that alerts a gun user that a cartridge is in the chamber. Unlike safety devices that disable a weapon from firing, a load indicator is "an appendage on the firearm that presents itself when a cartridge is loaded in the chamber and when the action is cocked." Robert E. Walker, Cartridges and Firearm Identification 332 (2013) ("Walker"). Its sole purpose is to quickly and easily communicate to the gun holder that the weapon is loaded.

Load indicators can take many forms. For instance, Ruger SR series handguns feature a tab on the top of each gun that rises when the gun is loaded. *Id.* at 333. Jimenez Arms incorporates into its pistols a red plastic knob that emerges from the rear of the slide when a magazine is loaded into the gun. *Id.* Load indicators may also feature written warnings. On the Ruger SR series handgun, for example, the load indicator tab is bright red and reads "LOADED WHEN UP." *See* Figure 1.



Fig. 1. A loaded chamber indicator on the Ruger SR9c handgun. This load indicator provides clear instructions to the gun handler. Source: Gunblast.com

**B.     Load Indicators Have Been In Use For More Than A Century.**

Load indicators have a long pedigree.  The first load indicator was patented in 1888 and was described as a "simple and effective device for the purpose of indicating, without breaking the arm, the presence of a charge in the barrel or barrels" of a firearm.  U.S. Patent No. 385,360 at 1:12-14; *see also* Sean Madden, Guns in American Society: An Encyclopedia of History, Politics, Culture, and the Law 515 (2012) ("Madden").  The original load indicator consisted of a lever that elevated when a cartridge entered the barrel.  Madden at 515.  The primary purpose of the original load indicator was to improve safety.  According to the patent, the load indicator device provided "an effective means for the prevention of accidental discharges . . . since the person handling the arm is immediately made aware of the

fact that the arm is charged by the said indicator, and therefore warned to be careful in handling the arm." U.S. Patent No. 385,360 at 2:32-38.

Load indicators caught on quickly. Many gun models designed in the late 1800s and early 1900s had this feature, including those manufactured by Browning, Colt, Winchester, Luger, Walther, and Sauer. Walker at 333; Madden at 515. Today, load indicators remain a widely-used feature on firearms. *See* Madden at 515 (estimating that as many as 20% of all guns manufactured in the United States have load indicators). Massachusetts, for example, has approved for sale over 800 models of firearms; all of these models feature a load indicator and meet the Commonwealth's other safety requirements.[6] Similarly, California's Roster of Handguns Certified for Sale lists more than 700 handguns that meet California's safety requirements, including the requirement that they feature a load indicator.[7]

---

[6] Commonwealth of Massachusetts, Executive Office of Public Safety and Security, Approved Firearms Roster 09-2015, *available at* http://www.mass.gov/eopss/docs/chsb/firearms/approvedfirearmsroster05-2015.pdf.

[7] Office of the Attorney General, California Dep't of Justice, Roster of Handguns Certified for Sale, *available at* http://certguns.doj.ca.gov.

### C. Load Indicators Are Effective In Preventing Accidental Shootings.

Accidental shootings kill hundreds of people per year and result in an untold number of serious injuries. According to government statistics, in 2013 (the year for which the most recent government data is available), 505 Americans died as a result of the accidental discharge of a gun.[8] Of those killed, sixty-nine were fourteen years old or younger. One survey found that the number of children killed in accidental shootings from December 2012 to December 2013 was even higher, concluding that "at least 100 children were killed in unintentional shootings— almost two each week, 61 percent higher than federal data reflect."[9]

According to a study by the U.S. Government Accountability Office, accidental shootings often occur because the user is unaware that a weapon is loaded. U.S. Gov't Accountability Office, Accidental Shootings: Many Deaths and Injuries Caused by Firearms Could Be Prevented 2-3 (1991) ("GAO

---

[8] Ctrs. For Disease Control & Prevention, Deaths: Final Data for 2013, table 10, *available at* http://www.cdc.gov/nchs/data/nvsr/nvsr64/nvsr64_02.pdf.

[9] Everytown for Gun Safety & Moms Demand Action, Innocents Lost: A Year of Accidental Gun Deaths 3 (2014), *available at* http://everytownresearch.org/documents/2015/04/innocents-lost.pdf; *see also* Michael Luo & Mike McIntire, *Children and Guns: The Hidden Toll*, N.Y. Times, Sept. 29, 2013, at A1, *available at* http://www.nytimes.com/2013/09/29/us/children-and-guns-the-hidden-toll.html.

Report").[10]  Indeed, even the most responsible gun owner can have difficulty

knowing whether there are any rounds in the chamber.  For instance, in guns

requiring magazines, a cartridge "can remain in the chamber even after the

magazine is removed, leading a person to believe the gun is unloaded."  Law Ctr.

to Prevent Gun Violence, Design Safety Standards Policy Summary (2013).[11]

Moreover, a prudent gun owner might typically leave his weapon unloaded and

therefore assume that it is always free of ammunition.  GAO Report at 4.

Furthermore, a gun owner might pull the trigger several times without discharge

(an act known as "dry-firing") and therefore assume that the chamber is empty

when in fact it is not.  *Id.*  In each of these instances, a load indicator would alert

the gun owner that a potentially lethal cartridge remains in the chamber.

The effectiveness of load indicators in preventing accidental deaths cannot

be gainsaid.  The GAO has concluded that load indicators could "save many lives

and [] undoubtedly also prevent many injuries."  *Id.* at 1.  Indeed, nearly a quarter

of the accidental firearms fatalities analyzed in the GAO study could have been

prevented by a load indicator.  *Id.* at 2-3.  Extrapolating from that data, the GAO

estimated that load indicators could prevent hundreds of deaths per year.  *Id.* at 24.

---

[10] *Available at* http://www.gao.gov/assets/160/150353.pdf.

[11] *Available at* http://smartgunlaws.org/gun-design-safety-standards-policy-summary.

The GAO's conclusions are borne out by academic studies. For example, a 2003 study by the Bloomberg School of Public Health at Johns Hopkins University came to nearly the same conclusion as the GAO report: Approximately 20% of accidental gun deaths could have been prevented by the inclusion of a load indicator.[12] Similarly, two studies from the late 1980s concluded that in more than 20% of accidental shootings in which children were involved, the child who shot the gun was not aware that the gun was loaded.[13]

### D. Load Indicator Regulations Have Saved Lives.

In 1997, the Massachusetts Attorney General promulgated the regulation at issue here, which requires all handguns sold in the Commonwealth to feature a load indicator. *See* 940 Code Mass. Regs. ("C.M.R.") § 16.05. The load indicator requirement was part of a larger set of regulations designed to eliminate from the Commonwealth guns that "failed to satisfy certain safety and performance requirements." *Mass. Regs Target Gun Makers, Dealers*, Massachusetts Lawyers

---

[12] Jon S. Vernick, et al., *Unintentional and Undetermined Firearm Related Deaths: A Preventable Death Analysis for Three Safety Devices*, 9 Injury Prevention 307, 307-11 (2003); *see also* Jon S. Vernick et al., *I Didn't Know the Gun Was Loaded: An Examination of Two Safety Devices that Can Reduce the Risk of Unintentional Firearm Injuries*, 4 J. Public Health Pol'y 427, 427-40 (1999).

[13] Garen J. Wintemute et al., *Unintentional Firearm Deaths in California*, 29 J. Trauma 457 (1989); Garen J. Wintemute et al., *When Children Shoot Children: 88 Unintended Deaths in California*, 257 JAMA 3107 (1987).

Weekly, April 10, 2000.[14] The regulations were adopted after three children were killed in accidental shootings in Massachusetts over a ten-day period in 1996; each of those shootings was attributed to a minor discharging a handgun thought to be unloaded.[15]

Massachusetts is not alone in recognizing the life-saving potential of load indicators. In 2003, California passed legislation requiring that semiautomatic pistols have a "chamber load indicator," or a "device that plainly indicates that a cartridge is in the firing chamber." Cal. Penal Code §§ 16380, 31910. California implemented its load indicator requirement as part of a substantial overhaul of its gun laws. These reforms have brought real results for Californians: Between 1993 and 2010, the state's gun death rate was cut by 56%, "a reduction that translates to thousands of lives saved every single year."[16]

---

[14] In 1999, the Massachusetts Supreme Judicial Court upheld these regulations in the face of an argument that the Attorney General had exceeded his authority in promulgating them. *Am. Shooting Sports Council v. Harshbarger*, 711 N.E.2d 899 (Mass. 1999).

[15] Joe Heaney & Jason B. Johnson, *Gun Tragedy Leaves Toddler Dead; Youth Accidentally Shot 2-year-old, Police Say*, Boston Herald, Mar. 22, 1996; Judy Rakowski, *Gun Control Urged as 2 Families Mourn*, Boston Globe, Mar. 17, 1996.

[16] Law Ctr. to Prevent Gun Violence, The California Model: Twenty Years of Putting Safety First (2013), *available at* http://smartgunlaws.org/wp-content/uploads/2013/07/20YearsofSuccess_ForWebFINAL5.pdf; *see also* Teresa Tritch, *Taking Note: Do California's Laws Prevent Gun Deaths?*, N.Y.Times.com,

It is no coincidence that the two states with load indicator requirements have some of the lowest gun death rates in the country. Massachusetts and California rank 48th and 43rd, respectively, in gun death rates, according to the Centers for Disease Control and Prevention.[17] And of the hundreds of accidental shooting deaths that occurred in 2015, only two took place in the Commonwealth.[18]

## ARGUMENT

**A.    The Second Amendment Does Not Enshrine A Right To Unsafe Guns.**

The Supreme Court has held that the Second Amendment protects a citizen's right to keep and bear arms for the limited purpose of self-defense. *Dist. of Columbia v. Heller*, 554 U.S. 570, 599 (2008); *see also Powell v. Tompkins*, 783 F.3d 332, 344 (1st Cir. 2015) (explaining that the "Second Amendment secures a limited individual right to keep and bear arms for self-defense of hearth and home unconnected to organized militia"). In the words of this Court, the "core" of the Second Amendment is "the possession of operative firearms for use in defense of the home." *Hightower v. City of Boston*, 693 F.3d 61, 72 (1st Cir. 2012); *see also*

---

July 30, 2014, http://takingnote.blogs.nytimes.com/2014/07/30/do-californias-gun-laws-prevent-gun-deaths.

[17] Ctrs. for Disease Control & Prevention, Firearm Mortality by State: 2014, *available at* http://www.cdc.gov/nchs/pressroom/sosmap/Firearm.htm.

[18] Gun Violence Archive, Accidental Deaths, http://www.gunviolencearchive.org/accidental-deaths.

*McDonald v. City of Chicago*, 130 S. Ct. 3020, 3036 (2010). "[L]aws that do not implicate the central self-defense concern of the Second Amendment may be more easily justified." *United States v. Chester*, 628 F.3d 673, 682 (4th Cir. 2010).

The Supreme Court has explained that the right to bear arms for self-defense is far from unlimited. *Heller*, 554 U.S. at 626-27. That is to say, the Second Amendment does not enshrine "a right to keep and carry any weapon whatsoever in any manner whatsoever for whatever purpose." *Id.* at 626. To the contrary, gun use and ownership may be restricted so long as responsible, law-abiding citizens are not effectively prevented from using a firearm to protect themselves. *See, e.g.*, Law Ctr. to Prevent Gun Violence, *Post-Heller Litigation Summary* 6-13 & nn.33-75 (2015) (collecting cases and concluding that the vast majority of gun regulations have been upheld in the wake of *Heller*).[19] In particular, "laws imposing conditions and qualifications on the commercial sale of arms" are "presumptively lawful." *Heller*, 554 U.S. at 626-27 & n.26.

The Massachusetts load indicator regulation challenged here does not implicate the Second Amendment because it does not prevent any resident of the Commonwealth from purchasing or using a firearm for the purpose of self-defense. *See Peña v. Lindley*, No. 09-cv-01185, 2015 WL 854684, at *12 (E.D. Cal. Feb.

---

[19] *Available at* http://issuu.com/mikemclively/docs/post-heller_litigation_summary_-_ma/1?e=12582649/12137101.

26, 2015) (upholding against Second Amendment challenge a California law that requires all guns to have load indicators because the law "does not burden plaintiffs' rights under the Second Amendment"). To the contrary, hundreds of models of firearms are available for purchase and use in the Commonwealth notwithstanding the regulation. *See* note 6, *supra*. Indeed, in their own complaint, Appellants identify at least nine different manufacturers whose handgun models satisfy the challenged regulation and therefore can be purchased in the Commonwealth. J.A. 41-42, ¶ 69.2. The load indicator regulation is thus a far cry from laws that "totally ban[] handgun possession in the home," which are the only laws that the Supreme Court has found inconsistent with the Second Amendment. *Heller*, 554 U.S. at 628; *see also McDonald*, 561 U.S. at 3026 (invalidating law "effectively banning handgun possession" in Chicago).

This Court "hew[s] closely and cautiously" to the "circumscribed" holdings of *Heller* and *McDonald*. *Powell*, 783 F.3d at 347 n.9 (collecting cases). Those cases stand for the proposition that states and municipalities cannot enact outright bans on gun ownership. However, those cases do not remotely suggest that the regulation challenged here—which does nothing more than block the sale of unsafe guns while at the same time allowing Massachusetts residents to purchase and use a wide variety of firearms for self-defense—is constitutionally infirm.

To be sure, Appellants argue that the challenged regulation impedes their Second Amendment rights because they cannot purchase *two specific models* of handguns that do not have load indicators.  In effect, Appellants contend that the Second Amendment enshrines an absolute right to purchase the precise handgun model of one's choosing, even if it has been deemed unsafe and too dangerous for the public.  But the Supreme Court has already squarely rejected that notion.  *See Heller*, 554 U.S. at 626 (noting that Second Amendment does not bestow the right "to carry any weapon whatsoever"); *see also Peña*, 2015 WL 854684, at *13 (holding that plaintiffs' "insistence upon particular handguns [falls] outside the scope of the right to bear arms").  If Appellants' argument were to carry the day, the Commonwealth would be powerless to ban the sale of a handgun that failed safety testing because it, say, frequently blows up in the user's hand.  *See* Mass. Gen. Laws. ch. 140, § 123.  That cannot be what the Constitution requires.  Indeed, it cannot be forgotten that Americans enjoy other rights as well, including a fundamental right to live, and governments have an important role in protecting life and public safety that coexists with—and is not eliminated by—the Second Amendment.

At bottom, Appellants and other residents of the Commonwealth are free to defend themselves with a variety of firearms notwithstanding the challenged regulation.  The regulation therefore does not impede Appellants' Second

Amendment right to self-defense.  *See Kamfer v. Cuomo*, 993 F. Supp. 2d 188, 196

(N.D.N.Y. 2014) (dismissing a Second Amendment challenge to a state statute

intended "to decrease in number certain firearms deemed particularly dangerous by

the legislature for the sake of public safety").  Indeed, a regulation that does not

impede the "general ability of a person to defend him or herself" does not run afoul

of the Second Amendment.  *Colo. Outfitters Ass'n v. Hickenlooper*, 24 F. Supp. 3d

1050, 1069-71 (D. Colo. 2014) (upholding law limiting magazines to 15 rounds

because 15 shots is sufficient for self-defense).

The reality is that the challenged regulation is nothing more than a rule

"imposing conditions and qualifications on the commercial sale of arms."  *Heller*,

554 U.S. at 626-27 & n.26.  Under *Heller*, it is therefore presumptively lawful.  *Id.*

Indeed, *Heller* expressly stated that its holding does not preclude states from

passing regulations that—like the regulation challenged here—are designed to

make the use of guns safer.  *See id.* at 632 (noting that "laws regulating the storage

of firearms to prevent accidents" are likely valid).

**B.  The Massachusetts Load Indicator Regulation Is Substantially Related To The Government's Interest In Protecting Its Citizens.**

Even if the load indicator regulation did somehow impede Second

Amendment rights, it still passes constitutional muster because it is substantially

related to a significant governmental interest.

The First Circuit has not expressly declared the level of scrutiny that applies to regulations that implicate the Second Amendment. *Powell*, 783 F.3d at 347 n.9. Nevertheless, in *United States v. Booker*, the First Circuit subjected to intermediate scrutiny a law that banned those convicted of domestic violence from possessing a gun. 644 F.3d 12, 25 (1st Cir. 2011) (requiring "substantial relationship between the restriction and an important governmental objective"); *Davis v. Grimes*, 9 F. Supp. 3d 12, 25, 27-28 (D. Mass. 2014) (noting that *Booker* formulation is effectively intermediate scrutiny). Other circuits uniformly apply intermediate scrutiny to laws that do not implicate the "core" Second Amendment right of self-defense in the home. *Grimes*, 9 F. Supp. 3d at 27-28 (collecting cases). The challenged regulation does not trespass on this "core" right because it does not prevent any citizen from possessing a handgun at home for self-protection. Accordingly, the regulation at most would be subject to intermediate scrutiny.

Under intermediate scrutiny, a regulation passes muster if it is substantially related to a significant government interest. *See, e.g.*, *Heller v. Dist. of Columbia*, 670 F.3d 1244, 1258 (D.C. Cir. 2011) ("*Heller II*"); *United States v. Skoien*, 614 F.3d 638, 641-42 (7th Cir. 2010) (en banc). In this case, the load indicator regulation survives intermediate scrutiny, and it is not close.

As an initial matter, there can be little doubt that the Commonwealth has a substantial interest in protecting its citizenry from physical harm. *See, e.g.*,

*Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 768 (1994) ("The State [] has a strong interest in ensuring the public safety and order . . . ."); *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 670-71, 677 (1989) (citing government's substantial interest in public safety in upholding practice of drug testing border agents who carry firearms).  Indeed, "'[i]t is self-evident' that public safety is an important government interest."  *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 965 (9th Cir. 2014).

Moreover, there is a substantial relationship between the challenged regulation and the Commonwealth's important interest in protecting the safety of its citizens.  To establish the requisite nexus between the load indicator regulation and the public safety interest, the Commonwealth "must demonstrate that the harms it recites are real and that the restriction will in fact alleviate them to a material degree."  *IMS Health Inc. v. Ayotte*, 550 F.3d 42, 55 (1st Cir. 2008), *abrogated on other grounds by Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653 (2011).  "A state need not go beyond the demands of common sense to show that a statute promises directly to advance an identified governmental interest."  *Id.*  "While empirical data must plausibly point to a conclusion, that data need not be accompanied by a surfeit of background information," and the required connection between law and government interest can be shown "based solely on history,

consensus, and simple common sense." *Id.* (quotation marks and citations omitted).

Here, as explained above, extensive data supports the Attorney General's conclusion that accidental shootings are a serious public health problem. *See supra* at 5-12. Moreover, substantial evidence demonstrates that many accidental gunshots would be prevented—and many lives saved—if every gun featured a load indicator. *See id.* Indeed, it is "common sense" that a person holding a gun will be exceedingly careful if he knows that the gun is loaded and that one wrong move could kill himself or a companion. *Ayotte*, 550 F.3d at 55. The challenged regulation therefore directly advances public safety and saves lives by ensuring that every gun owner knows when his weapon has the potential to make a lethal discharge. That is to say, there is a substantial relationship between the challenged regulation and the Commonwealth's important objective of protecting its citizens.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Dated: January 29, 2016               Respectfully submitted,

/s/ Kimberly A. Mottley
Kimberly A. Mottley
John E. Roberts
Laura Stafford
PROSKAUER ROSE LLP
One International Place
Boston, Massachusetts 02110
(617) 526-9600 (telephone)
(617) 526-9800 (facsimile)
kmottley@proskauer.com
jroberts@proskauer.com
lstafford@proskauer.com


*Attorneys for Amicus Curiae*

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**

**Certificate of Compliance with Type-Volume Limitation,
Typeface Requirement, and Type Style Requirements**

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(a)(B) because this brief contains 4,932 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because: this brief has been prepared in a proportionally spaced typeface using Microsoft Word Times New Roman 14 point font.

<u>/s/ Kimberly A. Mottley</u>
Kimberly A. Mottley

*Attorney for Amicus Curiae*

Dated: January 29, 2016

## CERTIFICATE OF FILING AND SERVICE

I, Elissa Matias, hereby certify pursuant to Fed. R. App. P. 25(d) that, on

January 29, 2016, the foregoing Brief of the Brady Center to Prevent Gun Violence

as, Amicus Curiae, Supporting Defendant-Appellee and Seeking Affirmance was

filed through the CM/ECF system and served electronically on the individual listed

below:

Alexander A. Flig
490 Chapman Street
Suite 201
Canton, MA 02021
(781) 352-7260

Lydia E. French
Julia Eleanor Kobick
William W. Porter
MA Attorney General's Office
1 Ashburton Place
Boston, MA 02108
(617) 727-2200

/s/ Elissa Matias
   Elissa Matias